## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| NORMAN MACPHEE, Individually and On Behalf of All Others Similarly Situated,<br><br>     Plaintiff,<br><br> v.<br><br>MIMEDX GROUP, INC., MICHAEL J. SENKEN, and PARKER H. PETIT,<br><br>     Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Norman MacPhee ("Plaintiff"), by and through his attorneys, alleges upon personal knowledge as to himself, and upon information and belief as to all other matters, based upon the investigation conducted by and through his attorneys, which included, among other things, a review of documents filed by Defendants (as defined below) with the United States Securities and Exchange Commission (the "SEC"), conference call transcripts, news reports, press releases issued by Defendants, and other publicly available documents, as follows:

### NATURE AND SUMMARY OF THE ACTION

1.   This is a federal securities class action on behalf of all investors who purchased or otherwise acquired Defendant MiMedx Group, Inc. ("MiMedx" or

the "Company") common stock between March 7, 2013 through February 19, 2018 inclusive (the "Class Period"). This action is brought on behalf of the Class for violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. §§ 78j(b) and 78t(a) and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

2.      MiMedx is a medical device development and supply company, utilizing a number of different distributors to deliver its products. Among those distributors is AvKARE, Inc. ("AvKARE") – a federal contractor. Through MiMedx's distribution agreement with AvKARE, the Company was able to order products directly to Department of Veterans Affairs ("VA") hospitals at will. The revenues derived from MiMedx's distribution agreement with AvKARE made up a significant portion of the Company's total revenues. In 2013, for example, 56% of the Company's total revenues were attributable to its agreement with AvKARE.

3.      In December 2016, two former employees of MiMedx filed a complaint against the Company, alleging, among other things, retaliatory termination by MiMedx after reporting fraudulent revenue recognition practices (defined herein as the "Whistleblower Action"). In particular, those employees alleged that MiMedx had engaged in a "channel-stuffing scheme" to "fraudulently recognize revenue [purportedly earned under its distribution agreement with

AvKARE] in its certified financial statements before the revenue had been realized or realizable and earned." The Company denied those claims and, in fact, sued the employees for tortious interference, among other things.

4.     In September 2017 several market research analysts (often called "short reporters") published reports which, among other things, focused on the allegedly fraudulent revenue recognition practices of MiMedx alleged in the Whistleblower Action. Again, MiMedx denied these allegations and sued each of the research companies for, among other things, libel, slander, and defamation.

5.     Then, on February 20, 2018 – after months of denying that it had engaged in a fraudulent revenue scheme – MiMedx disclosed an "internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company," and with regard to "the accounting treatment of certain distributor contracts." The Company further announced that, because of this internal investigation, it would delay the release of its fourth quarter and fiscal year 2017 financial results.

6.     On this news, MiMedx's share price plunged more than 39% to close at $8.75 on February 8, 2018, from its previous close of $14.47, causing tens of millions of dollars in losses to investors.

7.    Throughout the Class Period, Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) MiMedx was engaged in a "channel-stuffing" scheme designed to inappropriately recognize revenue that had not yet been realized; (ii) the Company lacked adequate internal controls over financial reporting; and (iii) that as a result of the foregoing, MiMedx's publicly disseminated financial statements were materially false and misleading.

## JURISDICTION AND VENUE

8.    The federal securities claims asserted herein arise under §§ 10(b) and 20(a) of the Exchange Act, 15 U.S.C. § 78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. § 240.10b-5.

9.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §1331 and § 27 of the Exchange Act, 15 U.S.C. § 78aa.

10.    This Court has jurisdiction over each Defendant named herein because each Defendant is an individual or corporation who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by

the District Court permissible under traditional notions of fair play and substantial justice.

11.     Venue is proper in this District pursuant to § 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1931(b), as the Company has its principal executive offices located in this District and conducts substantial business here. Additionally, many of the acts and practices complained of herein occurred in substantial part in this District, and witnesses and individual Defendants are located in here.

12.     In connection with the acts, omissions, conduct and other wrongs in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce including but not limited to the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

13.     Plaintiff Norman MacPhee was a shareholder of MiMedx during the Class Period. As set forth in the accompanying certification, incorporated by reference herein, Plaintiff acquired and held shares of the Company at artificially inflated prices during the Class Period and has been damaged by the revelation of the Company's material misrepresentations and material omissions.

5

14.     Defendant MiMedx Group, Inc. is a Florida corporation with its principal executive offices located at 1775 West Oak Commons Court, NE Marietta, Georgia 30062. MiMedx operates as a medical device company that focuses on supplying biomaterials for soft tissue repair, in addition to other biomaterial-based products for other medical applications.  The Company trades on the NASDAQ stock exchange under the ticker symbol "MDXG."

15.     Defendant Michael J. Senken ("Senken") has served at all relevant times as MiMedx's Chief Financial Officer.

16.     Defendant Parker H. Petit ("Petit") has served at all relevant times as MiMedx's Chief Executive Officer.

17.     Collectively, Senken and Petit are referred to throughout this complaint as the "Individual Defendants."

18.     The Individual Defendants, because of their positions at the Company, possessed the power and authority to control the content and form of the Company's annual reports, quarterly reports, press releases, investor presentations, and other materials provided to the SEC, securities analysts, money and portfolio managers and investors, *i.e.*, the market. The Individual Defendants authorized the publication of the documents, presentations, and materials alleged herein to be misleading prior to its issuance and had the ability and opportunity to prevent the

issuance of these false statements or to cause them to be corrected. Because of their positions within the Company and their access to material non-public information available to them but not to the public, the Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public and that the positive representations being made were false and misleading. The Individual Defendants are liable for the false statements pleaded herein.

## SUBSTANTIVE ALLEGATIONS

### A.    *Background*

19.    On April 29, 2012, MiMedx entered into a Production Distribution Agreement, subsequently amended March 25, 2013, with AvKARE, Inc. ("AvKARE") – a federal supply schedule contractor and wholesale distributor of pharmaceuticals, disposable medical and surgical supplies, and other healthcare-related equipment – through which MiMedx distributed medical products to VA hospitals until that agreement expired on June 30, 2017.

### B.    *Materially False And Misleading Statements Made During the Class Period*

20.    The Class Period begins on March 7, 2013. On that day, MiMedx issued a press release and filed the same as Exhibit 99.1 to a Form 8-K with the SEC, entitled "MIMEDX ANNOUNCES 2012 RESULTS," summarizing the

financial and operating results for the period ended December 31, 2012. Among other things, the Company's March 7, 2013 press release provided:

**Highlights of 2012 Results include:**

- Tripling of Revenue over 2011

- First full year of positive Adjusted EBITDA

- Adjusted EBITDA increased by nearly $9 million

- Gross Margins at record level of 81%

**Full Year and Fourth Quarter 2012 Results**

The Company recorded record revenue for the year ended December 31, 2012, with revenue of $27.1 million, more than three times 2011 full year revenue of $7.8 million. Earnings before interest, taxes, depreciation, amortization, impairment of intangibles, earn-out liability and share based compensation (Adjusted EBITDA*) for the year ended December 31, 2012, were $2.4 million, a $8.7 million improvement as compared to the Adjusted EBITDA loss of $6.3 million for the year ended December 31, 2011.

The fourth quarter of 2012 marked the 8th consecutive quarter in which the Company reported improved gross margins. The Company's 2012 gross margins of 81% are nearly a forty-two percentage point improvement over full year 2011 gross margins of 57%.

The Company recorded record revenue for the quarter ended December 31, 2012, with revenue of $10.5 million, an increase of 299% or $7.9 million over fourth quarter of 2011 revenue of $2.6 million, and a 32% increase over the third quarter of 2012. Adjusted EBITDA* for the quarter ended December 31, 2012, were $411,000, a $2.1 million improvement as compared to the Adjusted EBITDA loss of $1.64 million for the quarter ended December 31, 2011.

21.    On March 15, 2013, MiMedx filed on Form 10-K with the SEC, its annual financial results for the period ended December 31, 2012, providing the Company's consolidated financial results for that period (which were previously summarized in the Company's March 7, 2013 press release). The income statement included in that Form 10-K stated:

### MIMEDX GROUP, INC. AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF OPERATIONS

|  | Years Ended December 31, | |
|  | 2012 | 2011 |
| --- | --- | --- |
| REVENUES: | | |
| Net sales | $ 27,053,773 | $ 7,760,446 |
| | | |
| OPERATING COSTS AND EXPENSES: | | |
| Cost of products sold | 5,188,378 | 3,357,909 |
| Research and development expenses | 2,884,546 | 2,976,313 |
| Selling, general and administrative expenses | 20,970,687 | 11,181,437 |
| Impairment of intangible assets | 1,798,495 | - |
| Fair value adjustment of earn-out liability | 1,567,050 | 5,803 |
| LOSS FROM OPERATIONS | (5,355,383) | (9,761,016) |
| | | |
| OTHER INCOME (EXPENSE), net | | |
| Amortization of debt discount | (1,714,101) | (315,152) |
| Interest expense, net | (592,892) | (117,818) |
| | | |
| LOSS BEFORE INCOME TAXES | (7,662,376) | (10,193,986) |
| Income taxes | - | - |
| | | |
| NET LOSS | $ (7,662,376) | $ (10,193,986) |
| | | |
| Net loss per common share | | |
| Basic and diluted | $ (0.09) | $ (0.14) |
| | | |
| Shares used in computing net loss per common share | | |
| Basic and diluted | 81,646,295 | 72,450,337 |

22.     The Company's March 15, 2013Form 10-K also assured investors of the effectiveness of the Company's internal control over financial reporting:

**Item 9A.     Controls and Procedures**

**Disclosure Controls and Procedures**

We maintain "disclosure controls and procedures" within the meaning of Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, or the Exchange Act. Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed by the Company in the reports filed under the Exchange Act, such as this Annual Report on Form 10-K, is recorded, processed, summarized and reported within the time periods specified in the U.S. Securities and Exchange Commission's rules and forms. Our disclosure controls and procedures include controls and procedures designed to provide reasonable assurance that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow for timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and no evaluation of controls and procedures can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected. Management is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As required by Rule 13a-15(b) of the Exchange Act, prior to filing this Annual Report on Form 10-K, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the

Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K. Based on their evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were effective as of the end of the period covered by this Annual Report on Form 10-K.

## Management's Report on Internal Control over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Securities Exchange Act of 1934, as amended). Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2012. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control-Integrated Framework. Our management has concluded that, as of December 31, 2012, our internal control over financial reporting is effective based on these criteria.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Therefore, even those systems determined to be effective can provide only reasonable assurance with respect to financial statement preparation and presentation. Also, projections of any evaluation of the effectiveness of internal controls over financial reporting to future periods are subject to the risk that the controls may become inadequate.

An evaluation was also performed under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of any changes in our internal control over financial reporting that occurred during our last fiscal quarter and that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting. That evaluation did not identify any change in our internal control over financial reporting that occurred during our latest fiscal quarter that

has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

Cherry, Bekaert & Holland, L.L.P., an independent registered accounting firm, as auditors of our financial statements have issued an attestation report on the effectiveness of the Company's and its subsidiaries' internal control over financial reporting as of December 31, 2012. Cherry, Bekaert & Hollard, L.L.P.'s report is included in this report.

23. The Company's March 15, 2013 Form 10-K was signed by

Defendants Senken and Petit and contained certifications pursuant to the Sarbanes-

Oxley Act of 2002 ("SOX"), signed by each, which certified:

1. I have reviewed this annual report on Form 10-K of MiMedx Group, Inc.;

2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;

3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;

4. The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in the Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

(a)     designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared,

(b)     designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles,

(c)     evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this annual report based on such evaluation, and

(d)     disclosed in this annual report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent function):

(a)     all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the

> registrant's ability to record, process, summarize and report financial information; and

(b)    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

24.    On May 10 2013, MiMedx filed with the SEC its quarterly report on Form 10-Q for the three month period ended March 31, 2013, providing, among other things, the Company's consolidated financial results for that period:

### MIMEDX GROUP, INC. AND SUBSIDIARIES
### CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(unaudited)

|  | Three Months Ended March 31, | |
|---|---|---|
|  | 2013 | 2012 |
| Revenues: |  |  |
| Net sales | $ 11,556,493 | $ 3,705,808 |
| Cost of sales | 1,905,020 | 958,855 |
| Gross margin | 9,651,473 | 2,746,953 |
|  |  |  |
| Operating expenses: |  |  |
| Research and development expenses | 1,246,757 | 407,072 |
| Selling, general and administrative expenses | 8,369,010 | 2,637,269 |
| Amortization of intangible assets | 262,596 | 333,977 |
|  |  |  |
| Operating income (loss) | (226,890) | (631,365) |
|  |  |  |
| Other income (expense), net |  |  |
| Amortization of debt discount | (1,328,439) | (310,477) |
| Interest expense, net | (14,804) | (151,810) |
|  |  |  |
| Income (loss) before income tax provision | (1,570,133) | (1,093,652) |
| Income tax provision | (50,275) | - |
|  |  |  |
| Net Income (loss) | $ (1,620,408) | $ (1,093,652) |
|  |  |  |
| Net income (loss) per common share - basic and diluted | $ (0.02) | $ (0.01) |
|  |  |  |
| Weighted average shares outstanding - basic and diluted | 93,128,466 | 74,872,122 |

14

25.     MiMedx's May 10, 2013 Form 10-Q also assured investors of the effectiveness of the Company's internal control over financial reporting:

**Item 4.        Controls and Procedures**

**Disclosure Controls and Procedures**

As required by Rule 13a-15(b) under the Securities Exchange Act of 1934, as amended (the "Exchange Act"), we have carried out an evaluation of the effectiveness of the design and operation of our disclosure controls and procedures as of the end of the period covered by this report. This evaluation was carried out under the supervision and with the participation of our management, including our Chief Executive Officer and Principal Financial Officer. Based upon that evaluation, our Chief Executive Officer and Principal Financial Officer concluded that our controls and procedures were effective as of the end of the period covered by this report.

Disclosure controls and procedures are controls and other procedures that are designed to ensure that information required to be disclosed in our reports filed or submitted under the Exchange Act is recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms. Disclosure controls and procedures include controls and procedures designed to ensure that information required to be disclosed in our reports filed under the Exchange Act is accumulated and communicated to management, including our Chief Executive Officer and Principal Financial Officer, as appropriate, to allow timely decisions regarding disclosures.

**Changes in Internal Control over Financial Reporting**

There was no change in our internal control over financial reporting that occurred during the three months ended March 31, 2013, that has materially affected, or is reasonably likely to materially affect, our internal control over financial reporting.

26.     MiMedx's May 10, 2013 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications, signed by both which were substantially similar to the certifications described in ¶23, *supra*.

27.     On August 8, 2013, MiMedx filed on Form 10-Q its quarterly for the three month period ended June 30, 2013, providing, among other things, the Company's consolidated financial results for that period:

### MIMEDX GROUP, INC. AND SUBSIDIARIES
### CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(unaudited)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2013 | 2012 | 2013 | 2012 |
| Revenues: | | | | |
| Net sales | $ 13,514,743 | $ 4,884,256 | $ 25,071,235 | $ 8,590,064 |
| Cost of sales | 2,198,482 | 1,114,926 | 4,103,502 | 2,073,781 |
| Gross margin | 11,316,261 | 3,769,330 | 20,967,733 | 6,516,283 |
| | | | | |
| Operating expenses: | | | | |
| Research and development expenses | 924,468 | 503,086 | 2,171,222 | 910,158 |
| Selling, general and administrative expenses | 10,868,372 | 3,049,783 | 19,237,384 | 5,687,052 |
| Amortization of intangible assets | 267,638 | 333,977 | 530,234 | 667,954 |
| | | | | |
| Operating income (loss) | (744,217) | (117,516) | (971,107) | (748,881) |
| | | | | |
| Other income (expense), net | | | | |
| Amortization of debt discount | — | (472,749) | (1,328,439) | (783,226) |

| Interest expense, net | (13,172) | (153,804) | (27,976) | (305,614) |
|---|---|---|---|---|
| Income (loss) before income tax provision | (757,389) | (744,069) | (2,327,522) | (1,837,721) |
| Income tax provision | — | — | (50,275) | — |
| Net Income (loss) | $ (757,389) | $ (744,069) | $ (2,377,797) | $ (1,837,721) |
| Net income (loss) per common share - basic and diluted | $ (0.01) | $ (0.01) | $ (0.03) | $ (0.02) |
| Weighted average shares outstanding - basic and diluted | 95,988,100 | 79,952,542 | 94,599,406 | 77,416,073 |

28.     MiMedx's August 8, 2013 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶25, *supra*.

29.     MiMedx's August 8, 2013 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications, signed by both which were substantially similar to the certifications described in ¶23, *supra.*

30.     On November 8, 2013, MiMedx filed on Form 10-K with the SEC its full year and quarterly financial results for the periods ended September 30, 2013, providing, among other things, the Company's consolidated financial results for that period:

## MIMEDX GROUP, INC. AND SUBSIDIARIES
## CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2013 | 2012 | 2013 | 2012 |
| Net sales | $16,115,708 | $ 7,954,046 | $41,186,943 | $16,544,110 |
| Cost of sales | 2,113,438 | 1,425,336 | 6,216,940 | 3,499,117 |
| Gross margin | 14,002,270 | 6,528,710 | 34,970,003 | 13,044,993 |
| | | | | |
| Operating expenses: | | | | |
| Research and development expenses | 1,287,361 | 838,690 | 3,458,585 | 1,748,847 |
| Selling, general and administrative expenses | 12,711,225 | 5,756,559 | 31,948,607 | 11,443,611 |
| Impairment of intangible assets | — | 1,798,495 | — | 1,798,495 |
| Fair value adjustment of earn-out liability | — | 1,320,000 | — | 1,320,000 |
| Amortization of intangible assets | 259,575 | 449,692 | 789,809 | 1,117,646 |
| | | | | |
| Operating income (loss) | (255,891) | (3,634,726) | (1,226,998) | (4,383,606) |
| | | | | |
| Other income (expense), net | | | | |
| Amortization of debt discount | — | (439,064) | (1,328,439) | (1,222,290) |
| Interest expense, net | (4,527) | (145,582) | (32,503) | (451,196) |
| | | | | |
| Income (loss) before income tax provision | (260,418) | (4,219,372) | (2,587,940) | (6,057,092) |
| Income tax provision | (46,700) | — | (96,975) | — |
| | | | | |
| Net Income (loss) | $ (307,118) | $(4,219,372) | $(2,684,915) | $(6,057,092) |
| | | | | |
| Net income (loss) per common share - basic and diluted | $ — | $ (0.05) | $ (0.03) | $ (0.07) |
| | | | | |
| Weighted average shares outstanding - basic and diluted | 96,914,856 | 84,493,164 | 95,429,988 | 84,091,014 |

31.    MiMedx's November 8, 2013 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting by

incorporating "Controls and Procedures" disclosures substantially similar to those in ¶25, *supra*.

32.     MiMedx's November 8, 2013 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications, signed by both which were substantially similar to the certifications described in ¶23, *supra*.

33.     On March 4, 2014, MiMedx filed on Form 10-K with the SEC its full year and quarterly financial results for the periods ended December 31, 2013, providing, among other things, the Company's consolidated financial results for those periods:

### MIMEDX GROUP, INC. AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF OPERATIONS

|  | Years Ended December 31, | | |
|  | 2013 | 2012 | 2011 |
|---|---|---|---|
| Net sales | $59,180,734 | $27,053,773 | $  7,760,446 |
| Cost of sales | 9,328,114 | 5,188,378 | 3,357,909 |
| Gross margin | 49,852,620 | 21,865,395 | 4,402,537 |
|  |  |  |  |
| Operating expenses: |  |  |  |
| Research and development expenses | 4,843,457 | 2,884,546 | 2,976,313 |
| Selling, general and administrative expenses | 46,225,657 | 19,590,446 | 9,845,529 |
| Impairment of intangible assets | 368,102 | 1,798,495 | — |
| Fair value adjustment of earn- | — | 1,567,050 | 5,803 |

| out liability | | | |
| --- | --- | --- | --- |
| Amortization of intangible assets | 1,053,971 | 1,380,241 | 1,335,908 |
| | | | |
| Operating income (loss) | (2,638,567) | (5,355,383) | (9,761,016) |
| | | | |
| Other income (expense), net | | | |
| Amortization of debt discount | (1,328,439) | (1,714,101) | (315,152) |
| Interest expense, net | (45,233) | (592,892) | (117,818) |
| | | | |
| Income (loss) before income tax provision | (4,012,239) | (7,662,376) | (10,193,986) |
| Income tax provision | (99,614) | — | — |
| | | | |
| Net income (loss) | $ (4,111,853) | $ (7,662,376) | $(10,193,986) |
| | | | |
| Net income (loss) per common share - basic and diluted | $       (0.04) | $       (0.09) | $       (0.14) |
| | | | |
| Weighted average shares outstanding - basic and diluted | 96,285,504 | 81,646,295 | 72,450,337 |

34.     MiMedx's March 4, 2014 Form 10-K further reported that distribution through its distribution agreement with AvKARE accounted for 56% of the Company's total revenues. Specifically, the Company provided:

**Customer Concentration**

We provide products to Government accounts, including the Veteran's Administration, through a distributor relationship with AvKARE, Inc., which is a veteran-owned General Services Administration Federal Supply Schedule Contractor.  In 2013, sales to

this distributor represented 56% of our revenues. The distribution agreement has a term of three years ending in April 2015, and has the potential to be extended for three additional one year terms. This distribution relationship is different than our other distribution relationships in that our direct sales force calls on Government accounts to generate orders for our products, which are placed directly with the distributor. Thus, if our agreement with this distributor was terminated for any reason, including because this distributor was no longer a Federal Supply Schedule Contractor, we believe we could retain or regain that business by contracting with another distributor to service these government accounts or becoming a General Services Administration Federal Supply Schedule Contractor ourselves. Nevertheless, any disruption in the inclusion of our products on the Federal Supply Schedule for any reason could materially and adversely affect our business, revenues and results of operations.

Another of our distributors represented an additional 10% of our total revenues in 2013. Our current distribution agreement with this distributor has a three year term, expiring in November 2015.

35.   MiMedx's March 4, 2014 Form 10-K also assured investors of the effectiveness of the Company's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶22, supra.

36.   MiMedx's March 4, 2014 Form 10-K was signed by Defendants Senken and Petit and contained SOX certifications, signed by both which were substantially similar to the certifications described in ¶23, *supra*.

37.     On May 12, 2014, MiMedx filed on Form 10-Q its quarterly report on

Form 10-Q for the three month period ended March 31, 2014, providing, among

other things, the Company's consolidated financial results for that period:

MIMEDX GROUP, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(unaudited)

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2014 | 2013 |
| Net sales | $19,559,188 | $11,556,493 |
| Cost of sales | 2,977,275 | 1,905,020 |
| Gross margin | 16,581,913 | 9,651,473 |
|  |  |  |
| Operating expenses: |  |  |
| Research and development expenses | 1,390,044 | 1,246,757 |
| Selling, general and administrative expenses | 15,851,553 | 8,369,010 |
| Amortization of intangible assets | 231,331 | 262,596 |
|  |  |  |
| Operating income (loss) | (891,015) | (226,890) |
|  |  |  |
| Other income (expense), net |  |  |
| Amortization of debt discount | — | (1,328,439) |
| Interest expense, net | (21,024) | (14,804) |
|  |  |  |
| Income (loss) before income tax provision | (912,039) | (1,570,133) |
| Income tax provision | (10,033) | (50,275) |
|  |  |  |
| Net income (loss) | $ (922,072) | $ (1,620,408) |

| | | | |
|---|---|---|---|
| Net income (loss) per common share - basic and diluted | $ | (0.01) $ | (0.02) |
| Weighted average shares outstanding - basic and diluted | | 105,358,694 | 93,128,466 |

38.     MiMedx's May 12, 2014 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶25, *supra*.

39.     MiMedx's May 12, 2014 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications, signed by both which were substantially similar to the certifications described in ¶23, *supra*.

40.     On August 11, 2014, MiMedx filed on Form 10-Q its quarterly report on Form 10-Q for the three month period ended June 30, 2014, providing, among other things, the Company's consolidated financial results for that period:

### MIMEDX GROUP, INC. AND SUBSIDIARIES
### CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(unaudited)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2014 | 2013 | 2014 | 2013 |
| Net sales | $25,573,198 | $13,514,743 | $45,132,386 | $25,071,235 |

23

| | | | | |
|---|---|---|---|---|
| Cost of sales | 2,739,967 | 2,198,482 | 5,717,243 | 4,103,502 |
| Gross margin | 22,833,231 | 11,316,261 | 39,415,143 | 20,967,733 |
| | | | | |
| Operating expenses: | | | | |
| Research and development expenses | 1,799,803 | 924,468 | 3,189,846 | 2,171,222 |
| Selling, general and administrative expenses | 21,193,232 | 10,868,372 | 37,044,785 | 19,237,384 |
| Amortization of intangible assets | 231,959 | 267,638 | 463,290 | 530,234 |
| Operating income (loss) | (391,763) | (744,217) | (1,282,778) | (971,107) |
| | | | | |
| Other income (expense), net | | | | |
| Amortization of debt discount | — | — | — | (1,328,439) |
| Interest expense, net | (8,429) | (13,172) | (29,453) | (27,976) |
| | | | | |
| Income (loss) before income tax provision | (400,192) | (757,389) | (1,312,231) | (2,327,522) |
| Income tax provision | 10,033 | — | — | (50,275) |
| | | | | |
| Net income (loss) | $ (390,159) | $ (757,389) | $ (1,312,231) | $ (2,377,797) |

| | | | |
|---|---|---|---|
| Net income (loss) per common share - basic and diluted | $ — | $ (0.01) | $ (0.01) | $ (0.03) |
| Weighted average shares outstanding - basic and diluted | 105,757,178 | 95,988,100 | 105,552,330 | 94,599,406 |

41.     MiMedx's August 11, 2014 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶25, *supra*.

42.     MiMedx's August 11, 2014 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications, signed by both which were substantially similar to the certifications described in ¶23, *supra*.

43.     On November 10, 2014, MiMedx filed on Form 10-Q its quarterly report on Form 10-Q for the three month period ended September 30, 2014, providing, among other things, the Company's consolidated financial results for that period:

MIMEDX GROUP, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(unaudited)

|  | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
|  | 2014 | 2013 | 2014 | 2013 |
| Net sales | $33,517,762 | $16,115,708 | $78,650,148 | $41,186,943 |
| Cost of sales | 3,348,005 | 2,113,438 | 9,065,248 | 6,216,940 |
| Gross margin | 30,169,757 | 14,002,270 | 69,584,900 | 34,970,003 |
| | | | | |
| Operating expenses: | | | | |
| Research and development expenses | 2,014,306 | 1,287,361 | 5,204,153 | 3,458,585 |
| Selling, general and administrative expenses | 24,192,479 | 12,711,225 | 61,237,264 | 31,948,607 |
| Amortization of intangible assets | 232,079 | 259,575 | 695,368 | 789,809 |
| Operating income (loss) | 3,730,893 | (255,891) | 2,448,115 | (1,226,998) |
| | | | | |
| Other income (expense), net | | | | |
| Amortization of debt discount | — | — | — | (1,328,439) |
| Interest expense, net | (9,126) | (4,527) | (38,579) | (32,503) |

| Income (loss) before income tax provision | 3,721,767 | (260,418) | 2,409,536 | (2,587,940) |
|---|---|---|---|---|
| Income tax provision | (22,062) | (46,700) | (22,062) | (96,975) |
| | | | | |
| Net income (loss) | $ 3,699,705 | $ (307,118) | $ 2,387,474 | $ (2,684,915) |
| | | | | |
| Net income (loss) per common share - basic | $ 0.03 | $ — | $ 0.02 | $ (0.03) |
| | | | | |
| Net income (loss) per common share - diluted | $ 0.03 | $ — | $ 0.02 | $ (0.03) |
| | | | | |
| Weighted average shares outstanding - basic | 105,756,945 | 96,914,856 | 105,331,344 | 95,429,988 |
| | | | | |
| Weighted average shares outstanding - diluted | 112,814,658 | 96,914,856 | 112,525,016 | 95,429,988 |

44.    MiMedx's November 10, 2014 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting by

27

incorporating "Controls and Procedures" disclosures substantially similar to those in ¶25, *supra*.

45.    MiMedx's November 10, 2014 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications, signed by both which were substantially similar to the certifications described in ¶23, *supra*.

46.    On March 13, 2015, MiMedx filed on Form 10-K with the SEC its full year and quarterly financial results for the periods ended December 31, 2014, providing, among other things, the Company's consolidated financial results for those periods:

## MIMEDX GROUP, INC. AND SUBSIDIARIES
## CONSOLIDATED STATEMENTS OF OPERATIONS
### (in thousands, except share and per share data)

|  | Years Ended December 31, | | |
|  | 2014 | 2013 | 2012 |
| --- | --- | --- | --- |
| Net sales | $ 118,223 | $ 59,181 | $ 27,053 |
| Cost of sales | 12,665 | 9,328 | 5,188 |
| Gross margin | 105,558 | 49,853 | 21,865 |
|  |  |  |  |
| Operating expenses: |  |  |  |
| Research and development expenses | 7,050 | 4,843 | 2,885 |
| Selling, general and administrative expenses | 90,480 | 46,227 | 19,591 |
| Impairment of intangible assets | — | 368 | 1,798 |
| Fair value adjustment of earn- | — | — | 1,567 |

| | | | | | | |
|---|---|---|---|---|---|---|
| out liability | | | | | | |
| Amortization of intangible assets | | 928 | | 1,054 | | 1,380 |
| | | | | | | |
| Operating income (loss) | | 7,100 | | (2,639) | | (5,356) |
| | | | | | | |
| Other income (expense), net | | | | | | |
| Amortization of debt discount | | — | | (1,328) | | (1,714) |
| Interest expense, net | | (48) | | (45) | | (593) |
| | | | | | | |
| Income (loss) before income tax provision | | 7,052 | | (4,012) | | (7,663) |
| Income tax provision | | (832) | | (100) | | — |
| | | | | | | |
| Net income (loss) | $ | 6,220 | $ | (4,112) | $ | (7,663) |
| | | | | | | |
| Net income (loss) per common share - basic | $ | 0.06 | $ | (0.04) | $ | (0.09) |
| | | | | | | |
| Net income (loss) per common share - diluted | $ | 0.05 | $ | (0.04) | $ | (0.09) |
| | | | | | | |
| Weighted average shares outstanding - basic | | 105,793,008 | | 96,285,504 | | 81,646,295 |
| | | | | | | |
| Weighted average shares outstanding - diluted | | 113,295,504 | | 96,285,504 | | 81,646,295 |

47.     MiMedx's March 13, 2015 Form 10-K further reported that distribution through its distribution agreement with AvKARE accounted for 34% of the Company's total revenues. Specifically, the Company provided:

**Customer Concentration**

In 2014, we provided products to Government accounts, including the Department of Veteran's Affairs, through a distributor relationship with AvKARE, Inc., which is a veteran-owned General Services Administration Federal Supply Schedule (FSS) Contractor. In 2014, sales to this distributor represented 34% of our revenues. The distribution agreement has a term of three years ending in April 2015, but provides a renewal clause for up to two successive terms of one year each following expiration of the initial term. In 2014, we applied for, and in early 2015 received, our own FSS contract with a term through 2020, which will allow us to sell directly to governmental accounts.

48.     MiMedx's March 13, 2015 Form 10-K also assured investors of the effectiveness of the Company's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶22, *supra*.

49.     MiMedx's March 13, 2015 Form 10-K was signed by Defendants Senken and Petit and contained SOX certifications, signed by both which were substantially similar to the certifications described in ¶23, *supra*.

50.    On May 1, 2015, MiMedx filed on Form 10-Q its quarterly report on Form 10-Q for the three month period ended March 31, 2015, providing, among other things, the Company's consolidated financial results for that period:

MIMEDX GROUP, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands except, share and per share data)
(unaudited)

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2015 | 2014 |
| Net sales | $ 40,767 | $ 19,559 |
| Cost of sales | 5,148 | 2,977 |
| Gross margin | 35,619 | 16,582 |
| Operating expenses: | | |
| Research and development expenses | 1,831 | 1,390 |
| Selling, general and administrative expenses | 29,308 | 15,852 |
| Amortization of intangible assets | 233 | 231 |
| Operating income (loss) | 4,247 | (891) |
| Other income (expense), net | | |
| Interest expense, net | (14) | (21) |
| Income (loss) before income tax provision | 4,233 | (912) |
| Income tax provision | (146) | (10) |
| Net Income (loss) | $ 4,087 | $ (922) |
| Net income (loss) per common share - basic | $ 0.04 | $ (0.01) |

| | | | |
|---|---|---|---|
| Net income (loss) per common share - diluted | $ 0.04 | $ (0.01) |
| Weighted average shares outstanding - basic | 105,820,335 | 105,358,694 |
| Weighted average shares outstanding - diluted | 113,638,551 | 105,358,694 |

51.     MiMedx's May 1, 2015 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶25, *supra*.

52.     MiMedx's May 1, 2015 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications, signed by both which were substantially similar to the certifications described in ¶23, *supra*.

53.     On August 7, 2015, MiMedx filed on Form 10-Q its quarterly report on Form 10-Q for the three month period ended June 30, 2015, providing, among other things, the Company's consolidated financial results for that period:

MIMEDX GROUP, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except share and per share data)
(unaudited)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2015 | 2014 | 2015 | 2014 |

| | | | | | | | |
|---|---:|---|---:|---|---:|---|---:|
| Net sales | $ | 45,679 | $ | 25,573 | $ | 86,446 | $ | 45,132 |
| Cost of sales | | 5,089 | | 2,740 | | 10,237 | | 5,717 |
| Gross margin | | 40,590 | | 22,833 | | 76,209 | | 39,415 |
| | | | | | | | |
| Operating expenses: | | | | | | | |
| Research and development expenses | | 2,054 | | 1,800 | | 3,885 | | 3,190 |
| Selling, general and administrative expenses | | 32,651 | | 21,193 | | 61,960 | | 37,045 |
| Amortization of intangible assets | | 233 | | 232 | | 465 | | 463 |
| Operating income (loss) | | 5,652 | | (392) | | 9,899 | | (1,283) |
| | | | | | | | |
| Other income (expense), net | | | | | | | |
| Interest income (expense), net | | 1 | | (8) | | (13) | | (29) |
| | | | | | | | |
| Income (loss) before income tax provision | | 5,653 | | (400) | | 9,886 | | (1,312) |
| Income tax provision | | (223) | | 10 | | (369) | | — |
| | | | | | | | |
| Net income (loss) | $ | 5,430 | $ | (390) | $ | 9,517 | $ | (1,312) |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Net income (loss) per common share - basic | $ | 0.05 | $ | 0.00 | $ | 0.09 | $ | (0.01) |
| Net income (loss) per common share - diluted | $ | 0.05 | $ | 0.00 | $ | 0.08 | $ | (0.01) |
| Weighted average shares outstanding - basic | | 106,211,120 | | 105,757,178 | | 106,013,752 | | 105,552,330 |
| Weighted average shares outstanding - diluted | | 114,186,329 | | 105,757,178 | | 113,892,087 | | 105,552,330 |

54.   MiMedx's August 7, 2015 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶25, *supra*.

55.   MiMedx's August 7, 2015 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications, signed by both which were substantially similar to the certifications described in ¶23, *supra*.

56.    On November 6, 2015, MiMedx filed on Form 10-Q its quarterly report on Form 10-Q for the three month period ended September 30, 2015, providing, among other things, the Company's consolidated financial results for that period:

### MIMEDX GROUP, INC. AND SUBSIDIARIES
### CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except share and per share data)
(unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
| --- | --- | --- | --- | --- |
| | 2015 | 2014 | 2015 | 2014 |
| Net sales | $ 49,015 | $ 33,518 | $ 135,461 | $ 78,650 |
| Cost of sales | 4,979 | 3,348 | 15,217 | 9,065 |
| Gross margin | 44,036 | 30,170 | 120,244 | 69,585 |
| Operating expenses: | | | | |
| Research and development expenses | 2,187 | 2,014 | 6,072 | 5,204 |
| Selling, general and administrative expenses | 34,901 | 24,193 | 96,860 | 61,238 |
| Amortization of intangible assets | 234 | 232 | 699 | 695 |
| Operating income | 6,714 | 3,731 | 16,613 | 2,448 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Other income (expense), net | | | | | | | |
| Interest income (expense), net | | (5) | | (9) | | (18) | | (39) |
| | | | | | | | |
| Income before income tax provision | | 6,709 | | 3,722 | | 16,595 | | 2,409 |
| Income tax provision | | (158) | | (22) | | (527) | | (22) |
| Net income | $ | 6,551 | $ | 3,700 | $ | 16,068 | $ | 2,387 |
| Net income per common share - basic | $ | 0.06 | $ | 0.03 | $ | 0.15 | $ | 0.02 |
| Net income per common share - diluted | $ | 0.06 | $ | 0.03 | $ | 0.14 | $ | 0.02 |
| Weighted average shares outstanding - basic | | 106,511,294 | | 105,756,945 | | 106,178,136 | | 105,331,344 |
| Weighted average shares outstanding - diluted | | 114,556,036 | | 112,814,658 | | 114,110,120 | | 112,525,016 |

57.    MiMedx's November 6, 2015 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶25, *supra*.

58.    MiMedx's November 6, 2015 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications, signed by both which were substantially similar to the certifications described in ¶23, *supra*.

59.    On February 29, 2016, MiMedx filed on Form 10-K with the SEC its full year and quarterly financial results for the periods ended December 31, 2015, providing, among other things, the Company's consolidated financial results for those periods:

### MIMEDX GROUP, INC. AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF OPERATIONS
### (in thousands, except share and per share data)

| | Years Ended December 31, | | |
| --- | --- | --- | --- |
| | 2015 | 2014 | 2013 |
| Net sales | $ 187,296 | $ 118,223 | $ 59,181 |
| Cost of sales | 20,202 | 12,665 | 9,328 |
| Gross margin | 167,094 | 105,558 | 49,853 |
| Operating expenses: | | | |
| Research and development expenses | 8,413 | 7,050 | 4,843 |

| | | | |
|---|---:|---:|---:|
| Selling, general and administrative expenses | 133,384 | 90,480 | 46,227 |
| Impairment of intangible assets | — | — | 368 |
| Amortization of intangible assets | 933 | 928 | 1,054 |
| Operating income (loss) | 24,364 | 7,100 | (2,639) |
| Other income (expense), net | | | |
| Amortization of debt discount | — | — | (1,328) |
| Interest expense, net | (86) | (48) | (45) |
| Income (loss) before income tax provision | 24,278 | 7,052 | (4,012) |
| Income tax provision | 5,168 | (832) | (100) |
| Net income (loss) | $ 29,446 | $ 6,220 | $ (4,112) |
| Net income (loss) per common share - basic | $ 0.28 | $ 0.06 | $ (0.04) |
| Net income (loss) per common share - diluted | $ 0.26 | $ 0.05 | $ (0.04) |
| Weighted average shares outstanding - basic | 105,929,205 | 105,793,008 | 96,285,504 |
| Weighted average shares outstanding - diluted | 113,628,482 | 113,295,504 | 96,285,504 |

60.     MiMedx's February 29, 2016 Form 10-K further reported that distribution through its distribution agreement with AvKARE accounted for 24% of the Company's total revenues. Specifically, the Company provided:

**Customer Concentration**

The Company provides products to Government accounts, including the Department of Veteran's Affairs, through a distributor relationship with AvKARE, Inc. ("AvKARE"), which is a veteran-owned General Services Administration Federal Supply Schedule (FSS) Contractor.  In addition, in 2014, the Company applied for, and in early 2015 received, its own FSS contract with a term through 2020, which allows the Company to sell directly to Government accounts. The initial term of the distribution agreement with AvKARE was due to expire in April 2015 but it has been extended via amendment through June 30, 2017, with the ability to further extend under certain circumstances. The agreement with AvKARE, as amended, allows the Company to sell its products directly on the FSS. Ultimately, the Company intends to transition all of its Government sales to sales sold directly to Government accounts on the FSS. In 2015, sales to AvKARE represented approximately 24% of total revenue.

61.     MiMedx's February 29, 2016 Form 10-K also assured investors of the effectiveness of the Company's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶22, *supra*.

62.     MiMedx's February 29, 2016 Form 10-K was signed by Defendants Senken and Petit and contained SOX certifications, signed by both which were substantially similar to the certifications described in ¶23, *supra*.

63.     On May 10, 2016, MiMedx filed on Form 10-Q its quarterly report on Form 10-Q for the three month period ended March 31, 2016, providing, among other things, the Company's consolidated financial results for that period:

MIMEDX GROUP, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except share and per share data)
(unaudited)

|  | Three Months Ended March 31, | |
| --- | --- | --- |
|  | 2016 | 2015 |
| Net sales | $      53,367 | $      40,767 |
| Cost of sales | 7,946 | 5,148 |
| Gross margin | 45,421 | 35,619 |
|  |  |  |
| Operating expenses: |  |  |
|   Research and development expenses | 2,496 | 1,831 |
|   Selling, general and administrative expenses | 40,648 | 29,308 |
|   Amortization of intangible assets | 810 | 233 |
| Operating income | 1,467 | 4,247 |
|  |  |  |
| Other income (expense), net |  |  |
|   Interest (expense), net | (56) | (14) |
|  |  |  |
| Income before income tax provision | 1,411 | 4,233 |
| Income tax provision | (214) | (146) |
|  |  |  |
| Net income | $      1,197 | $      4,087 |

| | | |
|---|---|---|
| Net income per common share - basic | $ 0.01 | $ 0.04 |
| Net income per common share - diluted | $ 0.01 | $ 0.04 |
| Weighted average shares outstanding - basic | 105,538,271 | 105,820,335 |
| Weighted average shares outstanding - diluted | 112,039,860 | 113,638,551 |

64.    MiMedx's May 10, 2016 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶25, *supra*.

65.    MiMedx's May 10, 2016 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications, signed by both which were substantially similar to the certifications described in ¶23, *supra*.

66.    On August 2, 2016, MiMedx filed on Form 10-Q its quarterly report on Form 10-Q for the three month period ended June 30, 2016, providing, among other things, the Company's consolidated financial results for that period:

MIMEDX GROUP, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except share and per share data)
(unaudited)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| Net sales | $ 57,342 | $ 45,679 | $ 110,710 | $ 86,446 |
| Cost of sales | 7,394 | 5,089 | 15,341 | 10,237 |
| Gross margin | 49,948 | 40,590 | 95,369 | 76,209 |
| Operating expenses: | | | | |
| Research and development expenses | 3,168 | 2,054 | 5,664 | 3,885 |
| Selling, general and administrative expenses | 42,772 | 32,651 | 83,420 | 61,960 |
| Amortization of intangible assets | 447 | 233 | 1,257 | 465 |
| Operating income | 3,561 | 5,652 | 5,028 | 9,899 |
| Other income (expense), net | | | | |
| Interest income (expense), net | (111) | 1 | (167) | (13) |
| Income before | 3,450 | 5,653 | 4,861 | 9,886 |

income tax provision

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Income tax provision | | (1,475) | | (223) | | (1,689) | | (369) |
| Net income | $ | 1,975 | $ | 5,430 | $ | 3,172 | $ | 9,517 |
| Net income per common share - basic | $ | 0.02 | $ | 0.05 | $ | 0.03 | $ | 0.09 |
| Net income per common share - diluted | $ | 0.02 | $ | 0.05 | $ | 0.03 | $ | 0.08 |
| Weighted average shares outstanding - basic | | 106,191,932 | | 106,211,120 | | 105,873,727 | | 106,013,752 |
| Weighted average shares outstanding - diluted | | 112,148,415 | | 114,186,329 | | 112,095,051 | | 113,892,087 |

67.   MiMedx's August 2, 2016 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶25, *supra*.

68.     MiMedx's August 2, 2016 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications, signed by both which were substantially similar to the certifications described in ¶23, *supra*.

69.     On November 8, 2016, MiMedx filed on Form 10-Q its quarterly report on Form 10-Q for the three month period ended September 30, 2016, providing, among other things, the Company's consolidated financial results for that period:

### MIMEDX GROUP, INC. AND SUBSIDIARIES
### CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except share and per share data)
(unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2016 | 2015 | 2016 | 2015 |
| Net sales | $ 64,429 | $ 49,015 | $ 175,139 | $ 135,461 |
| Cost of sales | 7,997 | 4,979 | 23,338 | 15,217 |
| Gross margin | 56,432 | 44,036 | 151,801 | 120,244 |
| Operating expenses: | | | | |
| Research and development expenses | 2,919 | 2,187 | 8,582 | 6,072 |
| Selling, general and administrative expenses | 48,179 | 34,901 | 131,599 | 96,860 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Amortization of intangible assets | | 631 | | 234 | | 1,889 | | 699 |
| Operating income | | 4,703 | | 6,714 | | 9,731 | | 16,613 |
| Other income (expense), net | | | | | | | | |
| Interest income (expense), net | | (87) | | (5) | | (254) | | (18) |
| Income before income tax provision | | 4,616 | | 6,709 | | 9,477 | | 16,595 |
| Income tax provision | | (1,295) | | (158) | | (2,984) | | (527) |
| Net income | $ | 3,321 | $ | 6,551 | $ | 6,493 | $ | 16,068 |
| Net income per common share - basic | $ | 0.03 | $ | 0.06 | $ | 0.06 | $ | 0.15 |
| Net income per common share - diluted | $ | 0.03 | $ | 0.06 | $ | 0.06 | $ | 0.14 |
| Weighted average shares outstanding - basic | | 105,991,990 | | 106,511,294 | | 105,927,890 | | 106,178,136 |
| Weighted average shares | | 112,361,179 | | 114,556,036 | | 112,193,701 | | 114,110,120 |

| outstanding - diluted | | | | |
|---|---|---|---|---|
| | _____ | _____ | _____ | _____ |

70.     MiMedx's November 8, 2016 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶25, *supra*.

71.     MiMedx's November 8, 2016 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications, signed by both which were substantially similar to the certifications described in ¶23, *supra*.

72.     On December 15, 2016, two former employees of MiMedx – Jess Kruchoski and Luke Tornquist – filed a lawsuit in the United States District Court for the District of Minnesota (C.A. No. 16-cv-04171) against MiMedx and Petit (the "Whistleblower Lawsuit"). Among other things, that lawsuit put forward detailed allegations about a "channel-stuffing scheme" orchestrated by MiMedx and its executives to "fraudulently recognize revenue in its certified financial statements before the revenue had been realized or realizable and earned." This "channel-stuffing scheme," it was alleged, "implicates" MiMedx's distribution agreement with AvKARE, which permitted MiMedx to order certain products for delivery to VA hospitals. Because "[n]either AvKare nor the end customer—the

VA—requests the" orders, and AvKare did not "exercise physical control over the product," MiMedex was allegedly able to claim orders that had not actually yet been filled as revenue to meet its forecasts.

73.    On March 1, 2017, MiMedx filed on Form 10-K with the SEC its full year and quarterly financial results for the periods ended December 31, 2016, providing, among other things, the Company's consolidated financial results for those periods:

### MIMEDX GROUP, INC. AND SUBSIDIARIES
### CONSOLIDATED STATEMENTS OF OPERATIONS
### (in thousands, except share and per share data)

| | Years Ended December 31, | | |
| | 2016 | 2015 | 2014 |
| --- | --- | --- | --- |
| Net sales | $ 245,015 | $ 187,296 | $ 118,223 |
| Cost of sales | 32,407 | 20,202 | 12,665 |
| Gross margin | 212,608 | 167,094 | 105,558 |
| | | | |
| Operating expenses: | | | |
| Research and development expenses | 12,038 | 8,413 | 7,050 |
| Selling, general and administrative expenses | 179,997 | 133,384 | 90,480 |
| Amortization of intangible assets | 2,127 | 933 | 928 |
| | | | |
| Operating income (loss) | 18,446 | 24,364 | 7,100 |

| Other income (expense), net | | | | | | |
| Interest expense, net | | (339) | | (86) | | (48) |
| | | | | | | |
| Income (loss) before income tax provision | | 18,107 | | 24,278 | | 7,052 |
| Income tax provision | | (6,133) | | 5,168 | | (832) |
| | | | | | | |
| Net income (loss) | $ | 11,974 | $ | 29,446 | $ | 6,220 |
| | | | | | | |
| Net income (loss) per common share - basic | $ | 0.11 | $ | 0.28 | $ | 0.06 |
| | | | | | | |
| Net income (loss) per common share - diluted | $ | 0.11 | $ | 0.26 | $ | 0.05 |
| | | | | | | |
| Weighted average shares outstanding - basic | | 105,928,348 | | 105,929,205 | | 105,793,008 |
| | | | | | | |
| Weighted average shares outstanding - diluted | | 112,441,709 | | 113,628,482 | | 113,295,504 |

74. MiMedx's March 1, 2017 Form 10-K summarized the Company's revenue recognition practices with regard to its agreement with AvKARE as follows:

*Revenue Recognition*

The Company sells its products through a combination of a direct sales force, independent stocking distributors and third - party representatives in the U.S. and independent distributors in international markets. The Company recognizes revenue when title to the goods and risk of loss transfers to customers, provided there are no

material remaining performance obligations required of the Company or any matters of customer acceptance. The Company records revenues from sales to our independent stocking distributors at the time the product is shipped to the distributor. Our stocking distributors, who sell the products to their customers or sub-distributors, contractually take title to the products and assume all risks of ownership at the time of shipment. Our stocking distributors are obligated to pay us the contractually agreed upon invoice price within specified terms regardless of when, if ever, they sell the products. Our stocking distributors do not have any contractual rights of return or exchange other than for defective product or shipping error; however, in limited situations, we do accept returns or exchanges at our discretion.

Some of the Company's sales to Government accounts, including the Department of Veterans Affairs, are made through a distributor relationship with AvKARE, which is a veteran-owned General Services Administration Federal Supply Schedule (FSS) contractor. The Company's agreement with AvKARE expires, subject to certain for-cause termination rights, on June 30, 2017. The Company may also elect to terminate the agreement without cause and pay a termination fee to AvKARE as specified in the agreement. Upon termination of the agreement, the parties may mutually agree to extend the agreement or the Company has an obligation to repurchase AvKARE's remaining inventory, if any, within ninety (90) days in accordance with the terms of the Agreement. At the end of the term, the parties expect AvKARE's inventory to be minimal, based upon AvKARE's obligation to use commercially reasonable efforts to achieve target sales levels over the remaining term of the agreement.

We continually evaluate new and current customers, including our stocking distributors, for collectability based on various factors including past history with the customer, evaluation of their credit worthiness, and current economic conditions. We only record revenue when collectability is reasonably assured. A portion of the Company's revenue is generated from inventory maintained at hospitals or physician's offices.

We make estimates of potential future sales returns, discounts and allowances related to current period product revenue and these are reflected as a reduction of revenue in the same period revenue is recognized. We base our estimate for sales returns, discounts and allowances on historical sales and product return information, including historical experience and actual and projected trend information as well as projected sales returns based on estimated usage and contractual arrangements with AvKARE. These estimates have historically been consistent with actual results.

75.    MiMedx's March 1, 2017 Form 10-K also assured investors of the effectiveness of the Company's internal control over financial reporting with regard to its accounting for revenue. Specifically, the Company's Form 10-K provided:

**Item 9A. Controls and Procedures**

**Evaluation of Disclosure Controls and Procedures**

We maintain "disclosure controls and procedures" within the meaning of Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, or the "Exchange Act". Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed by the Company in the reports filed under the Exchange Act, such as this Annual Report on Form 10-K, is recorded, processed, summarized and reported within the time periods specified in the U.S. Securities and Exchange Commission's rules and forms. Our disclosure controls and procedures include controls and procedures designed to provide reasonable assurance that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow for timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated,

can provide only reasonable assurance of achieving the desired control objectives, and no evaluation of controls and procedures can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected. Management is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As required by Rule 13a-15(b) of the Exchange Act, prior to filing this Annual Report on Form 10-K, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K. Based on their evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our reporting and disclosure controls and procedures were not effective as a result of the material weakness in our internal control over financial reporting discussed below.

Changes in internal controls: There were no changes in our internal control over financial reporting as defined in Exchange Act Rules 13a- 15(f) and 15d-15(f) that occurred during our most recently completed fiscal quarter that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

Material weakness: In reviewing the Company's tax accounting in preparation for filing this Form 10-K, our management identified a deficiency in our internal control over financial reporting that is described below in Management's Annual Report on Internal Control Over Financial Reporting. Our management has concluded that this deficiency constitutes a material weakness in our internal control over financial reporting related to our accounting for income taxes. This material weakness did not result in a material misstatement of the Company's annual financial statements for the year ended December 31, 2016. However, management concluded that this material weakness, if un-remediated, could have resulted in a material

misstatement of the Company's annual or interim consolidated financial statements that would not have been prevented or detected by our internal controls. Accordingly, management determined that this control deficiency constituted a material weakness. We have developed a remediation plan for this material weakness, which is described below.

**Management's Annual Report on Internal Control Over Financial Reporting**

Our management, including our principal executive officer and principal financial officer, is responsible for establishing and maintaining adequate internal control over financial reporting. Our management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework and criteria established in Internal Control - Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on its evaluation, our management has concluded that our internal control over financial reporting was not effective as of December 31, 2016, due to the material weakness in our internal control over financial reporting related to our accounting for income taxes. A material weakness is a deficiency, or combination of deficiencies, in internal control over financial reporting such that there is a reasonable possibility that a material misstatement of our annual or interim financial statements will not be prevented or detected on a timely basis. In reviewing the Company's tax accounting in preparation for filing this Form 10-K, management concluded the Company had a material weakness in the design of our internal control over the tax accounting related to an overstatement of an excess tax benefit which, if undetected could have resulted in an understatement of income taxes payable. Specifically, management did not have adequate supervision and review of certain technical tax accounting performed by a third party tax specialist in 2016. This was identified during the audit process prior to preparation of the Company's financial statements and, therefore did not result in a material misstatement of the Company's annual financial statements for the year ended December 31, 2016 or any of our previously issued annual or interim consolidated financial statements. This material

weakness, if undetected, could have resulted in an understatement of income taxes payable, resulting in a material misstatement of the Company's annual consolidated financial statements that would not have been prevented or detected by its internal controls.

The effectiveness of our internal control over financial reporting as of December 31, 2016 has been audited by Cherry Bekaert LLP, an independent registered public accounting firm, as stated in their report which appears in Item 8 of this Annual Report on Form 10-K.

Remediation Plan: Management has begun implementing a remediation plan to address the control deficiency that led to the material weakness. The remediation plan includes the following:

• Implementing specific review procedures, including the increased involvement of our CFO and Controller as well as the hiring of an internal tax specialist to oversee the work performed by the third - party tax specialists.

• Strengthening our income tax control with improved documentation standards, technical oversight, and training.

When fully implemented and operational, we believe the measures described above will remediate the material weakness we have identified and generally strengthen our internal control over financial reporting. We currently plan to have our enhanced review procedures and documentation standards in place and operating in the first quarter of 2017. Our goal is to remediate this material weakness by the end of the first quarter of 2017, subject to there being sufficient opportunities to conclude, through testing, that the enhanced control is operating effectively.

Cherry Bekaert LLP, an independent registered accounting firm, as auditors of our financial statements have issued an attestation report on the effectiveness of the Company's and its subsidiaries' internal control over financial reporting as of December 31, 2016. Cherry Bekaert LLP's report is included in this report.

76.     MiMedx's March 1, 2017 Form 10-K was signed by Defendants Senken and Petit and contained SOX certifications, signed by both which were substantially similar to the certifications described in ¶23, *supra*.

77.     On May 1, 2017, MiMedx filed on Form 10-Q its quarterly report on Form 10-Q for the three month period ended March 31, 2017, providing, among other things, the Company's consolidated financial results for that period:

MIMEDX GROUP, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except share and per share data)
(unaudited)

| | Three Months Ended March 31, | |
| --- | --- | --- |
| | 2017 | 2016 |
| Net sales | $ 72,607 | $ 53,367 |
| Cost of sales | 8,743 | 7,946 |
| Gross margin | 63,864 | 45,421 |
| | | |
| Operating expenses: | | |
| Research and development expenses | 4,202 | 2,496 |
| Selling, general and administrative expenses | 52,951 | 40,648 |
| Amortization of intangible assets | 526 | 810 |
| Operating income | 6,185 | 1,467 |
| | | |
| Other expense, net | | |
| Interest expense, net | (145) | (56) |

| | | | |
|---|---|---|---|
| Income before income tax provision | | 6,040 | 1,411 |
| Income tax provision (expense) benefit | | (1,713) | (214) |
| Net income | $ | 4,327 | $ 1,197 |
| Net income per common share - basic | $ | 0.04 | $ 0.01 |
| Net income per common share - diluted | $ | 0.04 | $ 0.01 |
| Weighted average shares outstanding - basic | | 105,708,526 | 105,538,271 |
| Weighted average shares outstanding - diluted | | 113,730,591 | 112,039,860 |

78.    MiMedx's May 1, 2017 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting with regard to its accounting for revenue. Specifically, the Company provided:

**Item 4. Controls and Procedures**
**Disclosure Controls and Procedures**

We maintain "disclosure controls and procedures" within the meaning of Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, or the "Exchange Act". Our disclosure controls and procedures are designed to provide reasonable assurance that information required to be disclosed by the Company in the reports filed under the Exchange Act, such as this Quarterly Report on Form 10-Q, is recorded, processed, summarized and reported within the time periods specified in the U.S. Securities and Exchange Commission's rules and forms. Our disclosure controls and procedures include controls and procedures designed to provide

reasonable assurance that such information is accumulated and communicated to our management, including our Chief Executive Officer and Chief Financial Officer, as appropriate, to allow for timely decisions regarding required disclosure. In designing and evaluating our disclosure controls and procedures, management recognizes that any controls and procedures, no matter how well designed and operated, can provide only reasonable assurance of achieving the desired control objectives, and no evaluation of controls and procedures can provide absolute assurance that all control issues and instances of fraud, if any, within a company have been detected. Management is required to apply its judgment in evaluating the cost-benefit relationship of possible controls and procedures.

As required by Rule 13a-15(b) of the Exchange Act, prior to filing this Quarterly Report on Form 10-Q, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Quarterly Report on Form 10-Q. Based upon that evaluation, the Company's Chief Executive Officer and Chief Financial Officer have concluded that the Company's disclosure controls and procedures, as defined in Rule 13a-15(e) under the Securities Exchange Act of 1934, as amended, were not effective because of the material weakness in our internal control over financial reporting, as described in Management's Report On Internal Control Over Financial Reporting in Item 9A of our Annual Report on Form 10-K for the year ended December 31, 2016 (the "2016 10-K"), which continues to exist as of March 31, 2017.

### *Remediation of Material Weakness in Internal Control over Financial Reporting*

The Company took steps during the first quarter of 2017 to remediate its material weakness in internal control over financial reporting related to our accounting for income taxes.  In reviewing the Company's tax accounting in preparation for filing the 2016 10-K,

management concluded the Company had a material weakness in the design of our internal control over the tax accounting related to an overstatement of an excess tax benefit which, if undetected could have resulted in an understatement of income taxes payable. Specifically, management did not have adequate supervision and review of certain technical tax accounting performed by a third party tax specialist in 2016.

The Company has made progress implementing activities and improvements to address the control deficiency that led to the material weakness during the first quarter of 2017 which include:

•      Implementing specific review procedures, including the increased involvement of our CFO and Controller.

•      Beginning the process of hiring of an internal tax specialist to oversee the work performed by the third - party tax specialists.

•      Strengthening our income tax control with improved documentation standards, technical oversight, and training.

When fully implemented and operational, we believe the measures described above will remediate the material weakness we have identified and generally strengthen our internal control over financial reporting. The material weakness will not be considered remediated until the applicable remedial controls operate for a sufficient period of time and management has concluded, through testing, that these controls are operating effectively. The Company expects to make additional improvements in internal control during the remainder of 2017. Our goal is to remediate this material weakness by the end of the 2017 fiscal year, subject to there being sufficient opportunities to conclude, through testing, that the enhanced control is operating effectively.

**Changes in Internal Control over Financial Reporting**

Other than the efforts discussed immediately above in Remediation of the Material Weakness in Internal Control over Financial

Reporting, there was no change in the Company's internal control over financial reporting that occurred during the

79.     MiMedx's May 1, 2017 Form 10-Q also described the ongoing litigation with its two former employees, Jess Kruchoski and Luke Tornquist as follows:

### Former Employee Litigation

On December 13, 2016, the Company filed lawsuits against former employees Jess Kruchoski (in the lawsuit styled MiMedx Group, Inc. v. Academy Medical, LLC, et. al. in the County Court of the Fifteenth Judicial Circuit in and for Palm Beach County, Florida (the "Florida Action")) and Luke Tornquist (in the lawsuit styled MiMedx Group, Inc., v. Luke Tornquist in the Superior Court for Cobb County, Georgia, which was removed to the United States District Court for the Northern District of Georgia (the "Georgia Action")).  Both the Florida and Georgia Actions assert claims against Messrs. Kruchoski and Tornquist that each of them violated their restrictive covenants entered into with the Company, that each of them misappropriated trade secrets of the Company, that each of them tortiously interfered with contracts between the Company and its customers and employees and that each of them breached his duty of loyalty owed to the Company, among other claims.

On December 15, 2016, Messrs. Kruchoski and Tornquist filed a lawsuit in the United States District Court of Minnesota (the "Minnesota Action") against the Company and the Company's Chairman and Chief Executive Officer, Parker Petit. The plaintiffs in this lawsuit each claimed that their employment with the Company was terminated in retaliation for their complaints about the Company's alleged business practices in violation of the Dodd-Frank Act, 15 U.S.C. § 78u-6(h); and was an unlawful discharge in violation of Minnesota Statutes Section 181.931 subdivision 1. Mr. Kruchoski also claimed that the termination of his employment with the

Company constituted marital status discrimination and familial status discrimination in violation of the Minnesota Human Rights Act. Messrs. Kruchoski and Tornquist also claimed that Mr. Petit tortiously interfered with their employment relationships with the Company.

On January 26, 2017, the Company and Mr. Petit filed motions to dismiss the Minnesota Action.  In response, Messrs. Kruchoski and Tornquist voluntarily dismissed the Minnesota Action without prejudice on February 7, 2017. On February 7, 2017, Mr. Tornquist filed his Answer and Counterclaims in the Georgia Action wherein he asserted claims similar to those he had asserted in the Minnesota Action, with the exception that he did not include a claim of tortious interference against Mr. Petit.  On February 13, 2017, the Judge in the Georgia Action entered a Consent Order enforcing the restrictive covenants against Mr. Tornquist.  On February 27, 2017, the Judge in the Florida Action entered a Consent Order enforcing the restrictive covenants against Mr. Kruchoski.

On February 15, 2017, Mr. Kruchoski filed a new lawsuit in Georgia against MiMedx and Mr. Petit, making many of the same allegations in that suit as were made in the Minnesota suit, with the addition of claims against the Company and Mr. Petit for defamation.  In March, MiMedx and Mr. Petit both filed motions to dismiss Mr. Kruchoski's claims, which motions are currently pending, arguing, among other things, that the claims should be brought in the Florida Action.

On December 29, 2016, MiMedx also initiated an action against former employee Mike Fox in the United States District Court for the Northern District of Illinois alleging breach of contract with respect to his restrictive covenants, breach of his duty of loyalty, breach of his fiduciary duty and for the return of certain MiMedx property.

On December 30, 2016, MiMedx initiated a lawsuit against former employee Harold Purdy and his company, Recon Medical Devices, LLC in the Texas state district court for Dallas County alleging breach of Mr. Purdy's restrictive covenants, breach of Mr. Purdy's duty of loyalty, conspiracy to breach other employees' duties to MiMedx,

tortious interference, and misappropriation of trade secrets. Mr. Purdy has a pending counterclaim against MiMedx alleging breach of contract.

The Company continues to vigorously pursue its claims asserted in all of these actions and also to vigorously defend against the lawsuits and counterclaims asserted against it.

80.     Notably, the Company's form 10-Q did not inform investors that Jess Kruchoski and Luke Tornquist had alleged that "[o]ver the course of their employment, Kruchoski and Tornquist discovered a fraudulent revenue recognition scheme orchestrated by MiMedx's executive leadership, including MiMedx's CEO, Parker Petit. MiMedx employed this fraudulently revenue recognition scheme to artificially inflate quarterly revenue and deceive investors."

81.     MiMedx's May 1, 2017 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications, signed by both which were substantially similar to the certifications described in ¶23, supra.

82.     On July 31, 2017, MiMedx filed on Form 10-Q its quarterly report on Form 10-Q for the three month period ended June 30, 2017, providing, among other things, the Company's consolidated financial results for that period:

MIMEDX GROUP, INC. AND SUBSIDIARIES
CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except share and per share data)
(unaudited)

| | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| Net sales | $ 76,412 | $ 57,342 | $ 149,019 | $ 110,710 |
| Cost of sales | 8,631 | 7,394 | 17,374 | 15,341 |
| Gross margin | 67,781 | 49,948 | 131,645 | 95,369 |
| Operating expenses: | | | | |
| Research and development expenses | 4,747 | 3,168 | 8,949 | 5,664 |
| Selling, general and administrative expenses | 55,314 | 42,772 | 108,265 | 83,420 |
| Amortization of intangible assets | 507 | 447 | 1,033 | 1,257 |
| Operating income | 7,213 | 3,561 | 13,398 | 5,028 |
| Other expense, net | | | | |
| Interest expense, net | (149) | (111) | (294) | (167) |
| Income before income tax | 7,064 | 3,450 | 13,104 | 4,861 |

provision

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Income tax (provision) benefit | | 1,005 | | (1,475) | | (708) | | (1,689) |
| Net income | $ | 8,069 | $ | 1,975 | $ | 12,396 | $ | 3,172 |
| Net income per common share - basic | $ | 0.08 | $ | 0.02 | $ | 0.12 | $ | 0.03 |
| Net income per common share - diluted | $ | 0.07 | $ | 0.02 | $ | 0.11 | $ | 0.03 |
| Weighted average shares outstanding - basic | | 106,805,162 | | 106,191,932 | | 106,254,433 | | 105,873,727 |
| Weighted average shares outstanding - diluted | | 117,285,865 | | 112,148,415 | | 115,856,317 | | 112,095,051 |

83.     MiMedx's July 31, 2017 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting with regard to its accounting for revenue by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶78, *supra*.

84.     MiMedx's July 31, 2017 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications, signed by both which were substantially similar to the certifications described in ¶23, *supra*.

85.     On August 10, 2017, MiMedx disclosed on Form 8-K that it had dismissed its long-time independent registered public accounting firm, Cherry Bekaert LLP, replacing the firm with Ernst & Young LLP.

86.     In early September, an investigative news company, The Capital Forum, issued a report stating that it had confirmed that "[t]he VA Office of Inspector General (OIG) is conducting an investigation that involves documents related to MiMedx." On September 7, 2017, MiMedx responded with a press release stating that it was not the subject of any such investigation. Specifically, the Company stated:

> MiMedx has been aware for some time of an ongoing investigation by the Department of Veterans Affairs ("VA") Office of Inspector General, but the Company is <u>not</u> a target of that investigation.  The Company is assisting with the investigation as requested by the government.  To the extent there has been any innuendo by The Capitol Forum or others that somehow MiMedx is a target, that is simply incorrect based on available information.

(emphasis in original).

87.     On September 20, 2017, two research groups often referred to as "short reporters" – Aurelius Value and Viceroy Research – published separate

reports targeted at MiMedx detailing a number of red flags indicating potential fraudulent activity. For instance, the Aurelius Value report entitled "MiMedx: Flying Too Close To The Sun" summarized its findings as follows:

We see large undiscounted channel stuffing and kickback risks lurking beneath the surface at MiMedx (NASDAQ: MDXG). This report specifically exposes:

- Undisclosed related party transactions and entanglements with distributors, including a key MiMedx distributor that has been controlled by an insider. These relationships are especially problematic because secret ties to distributors have featured prominently in historical channel stuffing schemes.

- Detailed allegations that MiMedx's channel stuffing scheme relies on at least three more distributors who have undisclosed special agreements involving millions in discounted product and favorable financing terms as "house accounts". Not only does the alleged scheme now extend significantly beyond the VA, but MiMedx has allegedly manipulated its financials through multiple avenues to hit sales targets.

- Documents showing that over 40 podiatrists across the country, including the current President of the American Podiatric Medical Association, received undisclosed membership interests in a MiMedx reseller linked to MiMedx affiliates. The HHS Office of Inspector General has declared physician owned distributors as "inherently suspect" in a special fraud alert.

The research mosaic at MiMedx stirs memories of ArthroCare, a medical device company with a similar revenue recognition policy that inflated sales by "parking" millions in product at distributors

before period ends. ArthroCare's fraud relied on a distributor secretly controlled by insiders, which metastasized alongside a scandal involving improper relationships with doctors.

88.     In response, MiMedx sued The Capital Forum in late September 2017 alleging, among other things libel, slander, and defamation. On October 4, 2017, MiMedx took the same tract with Aurelius Value and Viceroy Research, suing them in Federal Court in the Southern District of New York. Among other things, MiMedx labeled the allegations of "channel-stuffing" in the Aurelius Value and Viceroy Research reports (which rehashed claims by former employees made in the Whistleblower Lawsuit) as "false."

89.     On October 31, 2017, MiMedx filed on Form 10-Q its quarterly report on Form 10-Q for the three month period ended September 30, 2017, providing, among other things, the Company's consolidated financial results for that period:

### MIMEDX GROUP, INC. AND SUBSIDIARIES
### CONDENSED CONSOLIDATED STATEMENTS OF OPERATIONS
(in thousands, except share and per share data)
(unaudited)

| | Three Months Ended September 30, | | Nine Months Ended September 30, | |
|---|---|---|---|---|
| | 2017 | 2016 | 2017 | 2016 |
| Net sales | $ 84,573 | $ 64,429 | $ 233,592 | $ 175,139 |
| Cost of sales | 9,599 | 7,997 | 26,972 | 23,338 |
| Gross margin | 74,974 | 56,432 | 206,620 | 151,801 |

| | | | | |
|---|---|---|---|---|
| **Operating expenses:** | | | | |
| Research and development expenses | 5,481 | 2,919 | 14,430 | 8,582 |
| Selling, general and administrative expenses | 60,233 | 48,179 | 168,498 | 131,599 |
| Amortization of intangible assets | 418 | 631 | 1,451 | 1,889 |
| Operating income | 8,842 | 4,703 | 22,241 | 9,731 |
| | | | | |
| **Other income (expense)** | | | | |
| Gain on divestiture | 4,274 | — | 4,274 | — |
| Interest expense, net | (43) | (87) | (337) | (254) |
| | | | | |
| Income before income tax provision | 13,073 | 4,616 | 26,178 | 9,477 |
| Income tax provision (expense) benefit | 4,384 | (1,295) | 3,675 | (2,984) |
| | | | | |
| Net income | $ 17,457 | $ 3,321 | $ 29,853 | $ 6,493 |
| | | | | |
| Net income per common share - | $ 0.16 | $ 0.03 | $ 0.28 | $ 0.06 |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| basic | | | | | | | |
| Net income per common share - diluted | $ | 0.15 | $ | 0.03 | $ | 0.26 | $ | 0.06 |
| Weighted average shares outstanding - basic | | 106,871,436 | | 105,991,990 | | 106,469,278 | | 105,927,890 |
| Weighted average shares outstanding - diluted | | 117,501,925 | | 112,361,179 | | 116,547,006 | | 112,193,701 |

90.    MiMedx's October 31, 2017 Form 10-Q also assured investors of the effectiveness of MiMedx's internal control over financial reporting with regard to its accounting for revenue by incorporating "Controls and Procedures" disclosures substantially similar to those in ¶78, *supra*.

91.    MiMedx's October 31, 2017 Form 10-Q was signed by Defendants Senken and Petit and contained SOX certifications, signed by both which were substantially similar to the certifications described in ¶23, *supra*.

92.    On January 8, 2018, MiMedx issued a press release entitled "MiMedx Releases Preliminary 2017 Revenue of $324.5 Million representing a 32% increase over 2016," and filed the same on Form 8-K with the SEC disclosing, among other

things, the Company's preliminary fourth quarter and full year 2017 financial

results. Among other things, the Company's January 8, 2018 press release

provided:

### *Fourth Quarter 2017 Preliminary Revenue of $90.9 Million Surpasses upper Range of Q4 guidance by Nearly $3 million*

**Marietta, Georgia**, January 7, 2018, (PR Newswire) -- MiMedx Group, Inc. (NASDAQ: MDXG), the leading biopharmaceutical company developing and marketing regenerative and therapeutic biologics utilizing human placental tissue allografts with patent-protected processes for multiple sectors of healthcare, today announced preliminary record revenue results for the fourth quarter and full-year 2017 and revenue expectations for the first quarter of 2018.

**Fourth Quarter 2017 Revenue Highlights**

- **Q4 2017 revenue of $90.9 Million grew 30% over Q4 2016 revenue and exceeded upper end of guidance by nearly $3 million**
- **Excluding divested subsidiary, Stability Biologics, Q4 2017 revenue grew by 34% over Q4 2016**
- **Q4 2017 Wound Care revenue grew 27% over Q4 2016**
- **Surgical, Sports Medicine and Orthopedics (SSO) revenue for Q4 2017 grew 40% over Q4 2016**

**Full-Year 2017 Revenue Highlights**

- **Full-year 2017 revenue of $324.5 million increased 32% over full year 2016 and exceeded upper end of guidance**
- **Excluding divested subsidiary, Stability Biologics, full-year 2017 revenue grew by 36% over 2016**

- **Full-year 2017 Wound Care revenue of $238.3 million increased by 30% over 2016**
- **Full-year 2017 SSO revenue of $86.2 million grew 41% over 2016**

The Company recorded preliminary record revenue for the year ended December 31, 2017 of $324.5 million, a $79.5 million or 32% increase over 2016 revenue of $245.0 million. The Company recorded record revenue for the 2017 fourth quarter of $90.9 million, a $21.0 million or 30% increase over 2016 fourth quarter revenue of $69.9 million.

**Management Commentary**

Parker H. "Pete" Petit, Chairman and CEO stated, "The fourth quarter of 2017 makes 28 consecutive quarters of sequential revenue growth and 27 of 28 quarters of meeting or exceeding our revenue guidance. At the end of November, we expected we would exceed our revenue forecast for the quarter, as we indicated in our press release on November 30, 2017. We forecasted December to be a solid growth month, and our sales force more than lived up to our expectations with a robust month to close out the year. We are entering 2018 with strong momentum that should produce an exciting 2018."

Bill Taylor, President and COO, noted, "Contributing to our accelerating sales momentum is the market growth we have achieved with our refined territory analytics for the larger markets and our effective secondary market strategy. The significant prospects for Venous Leg Ulcer (VLU) reimbursement coverage being added during 2018 as a result of the publication of the compelling results confirming the clinical efficacy of EpiFix® in the treatment of VLUs, will further fuel this momentum. As we stated earlier, with our current breadth of commercial carrier reimbursement coverage primarily for Diabetic Foot Ulcers (DFUs), we expect our 2018 Wound Care growth to be aided by our ability to ultimately achieve over 100 million additional commercial lives having EpiFix coverage for the treatment of VLUs."

"Both of our sales verticals had strong performances during the fourth quarter. Wound Care performed extremely well in the fourth quarter with 27% growth over the prior year's fourth quarter, and SSO revenue grew significantly over 2016 with 40% quarter over quarter growth. Fourth quarter revenue from our direct sales force represented approximately 95% of total revenue, and revenue from distributors and Original Equipment Manufacturers (OEMs) accounted for less than 5% of total fourth quarter revenue," Taylor added.

93.     The statements above were each materially false and misleading because they failed to disclose and misrepresented adverse facts known by Defendants. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that (i) MiMedx was engaged in a "channel-stuffing" scheme designed to inappropriately recognize revenue that had not yet been realized; (ii) the Company lacked adequate internal controls over financial reporting; and (iii) that as a result of the foregoing, MiMedx's publicly disseminated financial statements were materially false and misleading.

### C. *The Truth Emerges – Disclosures At The End Of The Class Period*

94.     On February 20, 2018, MiMedx issued a press release entitled "MiMedx Postpones Release of its Fourth Quarter and Fiscal Year 2017 Financial Results" and filed the same on Form 8-K with the SEC, in which the Company disclosed, among other things, that "The Audit Committee of MiMedx's Board of Directors has engaged independent legal and accounting advisors to conduct an

70

internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company. Company executives are also reviewing, among other items, the accounting treatment of certain distributor contracts," and that its earnings report would be delayed. In pertinent part, the February 20, 2018 press release provided:

### MiMedx Postpones Release of its Fourth Quarter and Fiscal Year 2017 Financial Results

**Marietta, Georgia**, February 20, 2018 -- MiMedx Group, Inc. (NASDAQ: MDXG), a leading developer and marketer of regenerative and therapeutic biologics, today announced that it will postpone the release of its financial results, as well as the filing of its Form 10-K, for the year ended December 31, 2017.

The Audit Committee of MiMedx's Board of Directors has engaged independent legal and accounting advisors to conduct an internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company. Company executives are also reviewing, among other items, the accounting treatment of certain distributor contracts.

The Audit Committee is working closely with its advisors to complete this investigation in as timely a manner as possible. The Company will not be in a position to release its financial results until the Audit Committee's internal investigation is completed.

The Company believes, based on information available to date, that the outcome of such investigation should not have a material impact on revenue guidance for 2018. The Company's unaudited cash and cash equivalents as of December 31, 2017 were approximately $33 million, after giving effect to the use of approximately $24 million for share repurchases in the fourth quarter of 2017 as part of the Company's Share Repurchase Program. The Company had no debt

outstanding as of December 31, 2017. The Company also does not expect this delay to affect its operational performance and clinical research activities.

"Our Board of Directors and executives believe it is in the best interests of our Company and shareholders for our Audit Committee to address these allegations in an internal investigation with the support of independent legal and accounting advisors. We look forward to releasing our 2017 financial results as soon as this process is complete," said Parker H. "Pete" Petit, Chairman and CEO. "MiMedx has been experiencing rapid growth over the last few years as our product portfolio continues to meet significant, unmet needs in the marketplace. We are literally saving lives by saving limbs, and we expect to continue to deliver operational and clinical success in the months and years to come."

## CLASS ACTION ALLEGATIONS

95.     Plaintiff brings this action as a class action pursuant to Rule 23 of the

Federal Rules of Civil Procedure on behalf of a class of all persons and entities

who purchased or otherwise acquired MiMedx securities between March 7, 2013

through February 19, 2018 inclusive (the "Class Period"). Excluded from the Class

are Defendants, directors and officers of the Company, as well as their families and

affiliates.

96.     The members of the Class are so numerous that joinder of all

members is impracticable. Throughout the Class Period, MiMedx securities were

actively traded on the NASDAQ stock exchange. While the exact number of Class

members is unknown to Plaintiff at this time and can only be ascertained through

appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. As of October 13, 2017, there were 111,034,873 shares of MiMedx common stock outstanding. Record owners and other members of the Class may be identified from records maintained by MiMedx or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

97.     There is a well-defined community of interest in the questions of law and fact involved in this case. Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.     Whether Defendants violated the Exchange Act;

b.     Whether Defendants omitted and/or misrepresented material facts;

c.     Whether Defendants' statements omitted material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading;

d.     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e.     Whether the price of the Company's stock was artificially inflated; and

    f.     The extent of damage sustained by Class members and the appropriate measure of damages.

98.    Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct alleged herein.

99.    Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation. Plaintiff has no interests that conflict with those of the Class.

100.    A class action is superior to other available methods for the fair and efficient adjudication of this controversy. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## **LOSS CAUSATION**

101.    Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.

102.    During the Class Period, Plaintiff and the Class purchased MiMedx securities at artificially inflated prices and were damaged thereby.

103.    On February 20, 2018, MiMedx disclosed an "internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company," and with regard to "the accounting treatment of certain distributor contracts." The Company further announced that, because of this internal investigation, it would delay the release of its fourth quarter and fiscal year 2017 financial results.

104.    On this news, MiMedx's share price fell 39.5% to close at $8.75 on February 20, 2018.

105.    This decline is directly attributable to the Company's February 20, 2018 announcement disclosing an internal investigation relating to certain distribution practices and contracts.

## FRAUD ON THE MARKET

106.    Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine that, among other things:

   a.    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

   b.    The omissions and misrepresentations were material;

   c.    The Company's common stock traded in efficient markets;

d.   The misrepresentations alleged herein would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

e.   Plaintiff and other members of the class purchased the Company's common stock between the time Defendants misrepresented or failed to disclose material facts and the time that the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

107.   At all relevant times, the markets for the Company's stock were efficient for the following reasons, among others: (i) the Company filed periodic public reports with the SEC; and (ii) the Company regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures such as communications with the financial press, securities analysts, and other similar reporting services. Plaintiff and the Class relied on the price of the Company's common stock, which reflected all information in the market, including the misstatements by Defendants.

## NO SAFE HARBOR

108.   The statutory safe harbor provided for forward-looking statements under certain conditions do not apply to any of the allegedly false statements

pleaded in this Complaint. The specific statements pleaded herein were not identified as forward-looking statements when made.

109.    To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.

## CAUSES OF ACTION

## COUNT I

### Violation of § 10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder
### (Against All Defendants)

110.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

111.    During the Class Period, Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

112.    Defendants violated § 10(b) of the Exchange Act and Rule 10b-5 in that they (i) employed devices, schemes, and artifices to defraud; (ii) made untrue

statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon those who purchased or otherwise acquired the Company's securities during the Class Period.

113.    Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for the Company's common stock. Plaintiff and the Class would not have purchased the Company's common stock at the price paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

## COUNT II

### Violation of § 20(a) of the Exchange Act
### (Against The Individual Defendants)

114.    Plaintiff repeats and re-alleges each and every allegation contained above as if fully set forth herein.

115.    The Individual Defendants acted as controlling persons of the Company within the meaning of § 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions at the Company, the Individual Defendants had the power and authority to cause or prevent the Company from engaging in the wrongful conduct complained of herein. The Individual Defendants were provided

with or had unlimited access to the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be false or misleading both prior to and immediately after their publication, and had the ability to prevent the issuance of those materials or to cause them to be corrected so as not to be misleading.

116.    In particular, each of these Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

117.    As set forth above, MiMedx violated Section 10(b) and Rule 10b-5 by its acts and/or omissions as alleged in this Complaint. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

A.    determining that this action is a proper class action pursuant to Rule 23(a) and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of the Class as defined herein, and a certification of Plaintiff as class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and appointment of Plaintiff's counsel as Lead Counsel;

B.    awarding compensatory damages in favor of Plaintiff and the other class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment and post-judgment interest thereon.

C.    awarding Plaintiff and other members of the Class their costs and expenses in this litigation, including reasonable attorneys' fees and experts' fees and other costs and disbursements; and

D.    awarding Plaintiff and the other Class members such other relief as this Court may deem just and proper.

## <u>DEMAND FOR JURY TRIAL</u>

Plaintiff hereby demands a trial by jury in this action of all issues so triable.

DATED: February 23, 2018

**HOLZER & HOLZER, LLC**

___*s/* Corey D. Holzer_____
Corey D. Holzer
Georgia Bar Number: 364698
Marshall P. Dees

Georgia Bar Number: 105776
Alexandria P. Rankin
Georgia Bar Number: 949684
1200 Ashwood Parkway, Suite 410
Atlanta, Georgia 30338
Telephone:   770-392-0090
Facsimile:    770-392-0029

**BLOCK & LEVITON LLP**
Jeffrey  C.  Block  (pro  hac  vice
forthcoming)
Bradley  J.  Vettraino  (pro  hac  vice
forthcoming)
155 Federal Street, Suite 400
Boston, MA 02110
Tel: 617-398-5600
Fax: 617-507-6020
Jeff@blockesq.com
Bradley@blockesq.com

*Counsel for Plaintiff*

## PLAINTIFF'S CERTIFICATION OF SECURITIES
## <u>FRAUD CLASS ACTION COMPLAINT</u>

I, **Norman MacPhee**, hereby certify that the following is true and correct to the best of my knowledge, information and belief:

1. I have reviewed, and authorize the filing on my behalf of, the draft complaint regarding MiMedx Group, Inc. (the "Company").
2. I did not purchase the securities which are the subject of the complaint at the direction of counsel, or in order to participate in any private action arising under the federal securities laws.
3. My transactions in the Company's securities during the Class Period are as follows:

| Date | Transaction | No. of shares | Price per share |
|---|---|---|---|
| 01/26/2018 | Buy | 600 | $16.6148 |
| 01/31/2018 | Buy | 564 | $17.635 |

4. I am willing to serve as a representative party on behalf of the class in this action, including providing testimony at deposition and trial, if necessary.
5. During the three-year period preceding the date of my signing this Certification, I have never sought to be appointed nor have I ever been appointed as lead plaintiff or class representative in any class action arising under the securities laws of the United States.
6. I will not accept any payment for serving as a representative party on behalf of the Class beyond my pro rata share of any possible recovery, except for an award, as ordered or approved by the court, for reasonable costs and expenses (including lost wages) directly relating to my representation of the Class.
Signed under the penalties of perjury on **<u>02/21/2018</u>**.


Signature: