UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| In re MIMEDX GROUP, INC. SECURITIES LITIGATION | ) ) ) | Case No. 1:18-cv-00830-WMR |
| This Document Relates To: | ) ) ) | <u>COMPLAINT – CLASS ACTION</u> |
| ALL ACTIONS. | ) ) ) | **JURY TRIAL DEMANDED** |

**CONSOLIDATED COMPLAINT FOR VIOLATIONS
<u>OF THE FEDERAL SECURITIES LAWS</u>**

# TABLE OF CONTENTS

**Page**

I.    SUMMARY OF THE ACTION ........................................................................2

II.   JURISDICTION AND VENUE .................................................................12

III.  PARTIES ...................................................................................................13

    A.    Lead Plaintiff ....................................................................................13

    B.    Defendants .........................................................................................13

        1.    MiMedx and the Individual Defendants .....................................13

        2.    Defendant Cherry Bekaert .........................................................17

IV.   SUBSTANTIVE ALLEGATIONS .............................................................18

    A.    Background of the Company ...............................................................18

    B.    MiMedx Drove Revenue Through Improper Sales and
        Distribution Practices .........................................................................21

        1.    MiMedx Offers Inducements to Secure Sales ...........................23

            a.    The Company Targets Health Providers with a
               Campaign of Influence ...................................................23

            b.    MiMedx Markets Its Products by Guaranteeing and
               Gaming Reimbursement .................................................28

            c.    Defendants Manipulate Charitable Contributions to
               Gain Sales .......................................................................34

        2.    Defendants Rely on Master Commercial Distributors and
            Suspect Physician-Owned Distributors to Inflate Revenues ....39

3.      Defendants Engage in Improper Revenue Recognition and Channel Stuffing with Government Accounts ......................... 47

        a.      The Company Courts Lucrative Government Accounts ........................................................................ 47

        b.      MiMedx Uses AvKARE to Prematurely Recognize Revenue ......................................................................... 49

C.      Defendants Ramp Up Their Fraudulent Revenue Scheme to Keep MiMedx's Growth Story Alive .................................................. 57

D.      Defendants' Scheme Catches Up to Them ......................................... 67

        1.      MiMedx Customers Are Overstuffed ...................................... 67

        2.      The Company Avoids Returns ................................................ 70

        3.      The Company Loses Track of Inventory ................................ 72

E.      Defendants' Illicit Sales Practices and Pervasive Accounting Fraud Fuel MiMedx's Growth ........................................................... 78

F.      Employees Begin to Protest the Company's Fraudulent Scheme and Face Retaliation from Executives ................................................ 79

V.      THE TRUTH OF DEFENDANTS' FRAUD BEGAN TO LEAK OUT, BUT DEFENDANTS CONTINUED TO MISLEAD INVESTORS BY DOWNPLAYING AND DENYING THE FRAUD ....... 87

A.      News of Defendants' Fraud Began to Emerge from Whistleblowers and Other Sources, Attracting Attention from Government Authorities ...................................................................... 87

B.      As Public Scrutiny Intensified, MiMedx Was Forced to Launch Another Internal Investigation into Its Sales and Distribution Practices .......................................................................................... 122

C.    Defendants Announced a Massive Six-Year Accounting Restatement and Executive Resignations............................................134

VI.    THE TRUTH CONCERNING DEFENDANTS' FRAUD CONTINUED TO BE REVEALED AFTER THE CLASS PERIOD........136

VII.    THE MIMEDX DEFENDANTS ACTED WITH SCIENTER .................147

A.    The Individual Defendants Acted with Scienter ..............................147

1.    The Individual Defendants Were Active Participants in the Fraud .....................................................................................147

2.    The Magnitude of Fraud Supports the Individual Defendants' Scienter ...............................................................153

3.    Defendants' Aggressive Campaign to Cover Up, Deny, and Downplay the Fraud Supports Scienter ...................................155

4.    The Individual Defendants' Own Public Statements Support Scienter...................................................................................159

5.    The Conduct of ABH Informed Defendants of Improper Practices ..............................................................................160

6.    The Individual Defendants' Compensation Incentivized Their Fraud..............................................................................161

B.    MiMedx Acted with Scienter ...........................................................164

VIII.    THE MIMEDX DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ..............................................................................................169

A.    The MiMedx Defendants Made False and Misleading Statements and Omitted Material Facts Regarding the Company's Growth ..........................................................................170

- iii -

B.   The MiMedx Defendants Made False and Misleading Statements and Omitted Material Facts Regarding the Company's Distributors ...................................................184

    1.   The MiMedx Defendants Falsely Represented that the Company's Major Distributors Were "Independent".............185

    2.   The MiMedx Defendants Concealed the True Extent of MiMedx's Reliance on Distributor Sales................................191

    3.   The MiMedx Defendants Falsely Represented that the Company Did Not Use Physician-Owned Distributors..........193

C.   The MiMedx Defendants Made False and Misleading Statements and Omitted Material Facts Related to the Company's Compliance Programs and "Culture of Integrity" .........195

    1.   The MiMedx Defendants Falsely Invoked the AdvaMed Code as the Basis for MiMedx Policies...................................195

    2.   The MiMedx Defendants Falsely Represented that Compliance with the Company's Stated Policies and Applicable Health Care Laws and Regulations Was an Important Part of the Company's Operations.........................199

D.   The MiMedx Defendants Made Materially False and Misleading Statements and Omitted Material Facts in Their Efforts to Deny, Downplay, and Conceal the Fraud .........................205

E.   The MiMedx Defendants' False and Misleading Statements Violated Item 303 of Regulation S-K ................................................209

IX.   THE MIMEDX DEFENDANTS' GAAP VIOLATIONS, ACCOUNTING RESTATEMENT, INEFFECTIVE INTERNAL CONTROLS, AND MATERIALLY FALSE AND MISLEADING FINANCIAL STATEMENTS..................................................................211

A.   MiMedx's Reported Financial Results Were False and Not Prepared in Accordance with GAAP ................................................213

B. MiMedx Violated GAAP Rules for Recognizing Revenue ..............219

    1. Consignment Sales .................................................................222

    2. Right of Return Sales ............................................................225

C. MiMedx Made Materially False and Misleading Disclosures of Its Revenue Recognition Policies in Its Financial Statements ..........227

    1. MiMedx Concealed Its Improper Recognition of AvKARE Revenue ...................................................................................234

    2. MiMedx Concealed Its Improper Recognition of CPM and SLR Revenue .........................................................................240

D. MiMedx's GAAP Violations of Related Party Standards ...............243

E. MiMedx Improperly Accounted for Payments Made to PAN ..........247

F. MiMedx Admitted Material Weaknesses in its Internal Controls ....248

G. Petit and Senken Falsely Certified the Accuracy of the Company's Financial Statements Through Their Sarbanes-Oxley Certifications and Other Statements .......................................256

X. CHERRY BEKAERT'S CRITICAL ROLE IN THE COMPANY'S FRAUD .................................................................................................258

A. Cherry Bekaert's Failure to Comply with PCAOB Standards Over MiMedx's Financial Statements ..............................................263

B. Cherry Bekaert's Failure to Comply with PCAOB Standards Over MiMedx's ICFR ......................................................................282

C. Cherry Bekaert's False and Misleading Statements ........................285

D. Cherry Bekaert Acted with Scienter .................................................290

XI. LOSS CAUSATION ......................................................................296

XII.    PRESUMPTION OF RELIANCE ..............................................303

XIII.   NO SAFE HARBOR ...............................................................307

XIV.    LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS ......................308

COUNT I  FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE
         ACT AND RULE 10b-5 PROMULGATED THEREUNDER
         AGAINST THE MIMEDX DEFENDANTS ..............................................311

COUNT II  FOR VIOLATIONS OF SECTION 10(b) OF THE
          EXCHANGE ACT AND RULE 10b-5 PROMULGATED
          THEREUNDER AGAINST CHERRY BEKAERT ...................................317

COUNT III  FOR VIOLATIONS OF SECTION 20(a) OF THE
           EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS.......322

PRAYER FOR RELIEF ....................................................................324

JURY TRIAL DEMANDED ..............................................................325

By and through its undersigned counsel, Lead Plaintiff Carpenters Pension Fund of Illinois ("Lead Plaintiff") brings this federal securities class action against Defendants MiMedx Group, Inc. ("MiMedx" or "Company"), Parker H. Petit ("Petit"), Michael J. Senken ("Senken"), William C. Taylor ("Taylor"), Christopher M. Cashman ("Cashman") (together, "MiMedx Defendants"), and Cherry Bekaert LLP, formerly known as Cherry Bekaert & Holland, L.L.P. ("Cherry Bekaert") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Lead Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation:  (a) review and analysis of public filings made by MiMedx and other related non-parties with the United States Securities and Exchange Commission ("SEC"); (b) review and analysis of press releases and other publications disseminated by Defendants and other related non-parties; (c) review and analysis of securities analyst reports, news articles, websites, and other publicly available information concerning Defendants and other related non-parties; and (d) interviews with factual sources, including multiple individuals formerly employed by the Company.  Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.      SUMMARY OF THE ACTION

1.      When Petit was appointed as Chief Executive Officer ("CEO") in 2009, MiMedx was a relatively small skin-graft manufacturer with less than $1,000 in revenue.  In 2011, the Company acquired a proprietary process, known as PURION, which allowed it to develop and mass produce its two primary commercial products: EpiFix and AmnioFix.  The Company rapidly took off, reporting explosive growth from 2012 to 2017.

2.      From the first quarter of 2012 ("1Q12") through the third quarter of 2017 ("3Q17"), the Company met or exceeded revenue guidance in all but one quarter.  The Company's reported annual revenue in 2016 was over $245 million, an approximate ***3,000%*** increase over annual revenue in 2011, just five years earlier.  Fueled by this growth, the Company's stock price surged over 254%.

3.      The Company's rapid growth led MiMedx to be named the fifth-fastest growing public company in America by *Fortune* magazine in September 2017.  According to Petit, this put MiMedx "ahead of Facebook and Amazon."  Elaborating on the Company's track record, Petit boasted:  "***I have been told that MiMedx's performance has been so flawless that people think we must be doing something '***wrong***.'***"

4.     Unbeknownst to investors, during the "Class Period" – from March 7, 2013 through June 29, 2018 – the Company's remarkable growth and "flawless" performance were actually predicated on myriad improper and illicit sales and distribution practices, as well as a massive accounting fraud perpetrated at the behest of its executive leadership.  Defendants' fraud was so pervasive that it has necessitated a restatement of nearly six years of the Company's financial statements, which now cannot be completed until ***all of the Company's sales*** from 2012 forward are reviewed ("Restatement").  Defendants' fraud has also led to intense government scrutiny, including ongoing investigations by the SEC, United States Department of Justice ("DOJ"), and United States Department of Veteran Affairs ("VA").  As the fraud was exposed, Petit (CEO), Senken (Chief Financial Officer ("CFO")), and Taylor (Chief Operating Officer ("COO")) were terminated for conduct detrimental to the Company, and Cashman (Chief Commercialization Officer ("CCO")) suspiciously departed the Company.

5.     As one former employee described, the Company's "win at all cost culture . . . fostered by the tone and conduct of senior management at the highest levels. . . . led to a mind boggling level of sales and accounting irregularities."  As part of its "win at all cost" culture, Defendants trained employees to use illicit practices to sell MiMedx products.  Defendants improperly created demand by training sales

representatives to infiltrate, influence, and offer illegal inducements to doctors and associated staff to encourage the use of MiMedx products and become ambassadors for the Company.

6.     Defendants also employed an array of schemes to secure and guarantee reimbursement for their costly products from third-party payors (*i.e.*, Medicare/Medicaid, and large private insurers), which was critical to customer uptake. To further ensure that the use of their products would be worry-free, the Company even went so far as to unlawfully cover patients' co-pays and co-insurance through a coordinated scheme to funnel MiMedx's purported charitable contributions to cover such costs.  These practices, which violated multiple federal laws, enabled the Company to increase demand for MiMedx products and grow their revenue.

7.     Defendants also orchestrated a massive fraudulent revenue scheme to propel the Company's growth.  Defendants used their close relationships with supposedly independent distributors to engage in a multitude of improper revenue recognition practices, to artificially inflate the Company's sales, achieve revenue guidance, and maintain the appearance of consistent growth, all in violation of Generally Accepted Accounting Principles ("GAAP").

8.     In 2012, the Company partnered with AvKARE, Inc. ("AvKARE"), a veteran-owned company with a Federal Supply Schedule ("FSS").  This relationship

gave the Company a lucrative opportunity to grow its sales at VA facilities through a fixed-price, indefinite quantity contract. Without third-party reimbursement concerns, sales to the VA's large network of facilities yielded tremendous profit. The Company's relationship with AvKARE, however, was not what it seemed. While Defendants told investors AvKARE was an independent distributor, it was really a pass-through that the Company used as a front to prematurely and improperly recognize revenue and channel stuff excessive amounts of inventory at the end of financial reporting quarters to create an illusion that the Company's revenues and profits were soaring.

9. Likewise, the Company relied on its commercial distributors to provide bogus but needed revenue injections at the end of quarters. The Company's "Master Distributors" on the commercial side, CPM Medical, Inc. ("CPM") and SLR Medical Consulting, LLC ("SLR"), were known as "house accounts" and had close relationships with Company leadership. They served as valuable cohorts, funneling MiMedx products through a massive network of sub-distributors, many of which were Physician Owned Distributors ("PODs"), a form of distributorship found to be "inherently suspect" by the United States Department of Health and Human Services ("HHS"), in that they raise concerns about kickbacks provided to the physician members. MiMedx relied on these distributors and their nefarious network to take

significant quantities of product at quarter-end to create the false impression of sales and revenues in order to inflate the Company's financial performance. In return, MiMedx provided them with highly favorable terms, including reduced prices, special financing, and lax returns. The distributors and their sub-distributors then profited by selling MiMedx products at a premium.

10.     Defendants concealed their illicit sales practices, improper revenue recognition, and unlawful side arrangements with distributors from the market. Quarter after quarter, they falsely attributed MiMedx's revenue growth to the strength of their product, superior management, and extolled the Company's strong compliance and "culture of integrity." Defendants' misstatements and omissions misled investors and artificially inflated the Company's stock price. But the growth story Defendants pedaled was an intentional sham, predicated on fraud that was unsustainable.

11.     Defendant Cherry Bekaert, the Company's supposedly independent auditor, allowed the fraudulent scheme to continue unabated for years. As an independent auditor, Cherry Bekaert was required to skeptically and objectively audit MiMedx and render an opinion on whether MiMedx's financial statements "fairly present[ed], in all material respects, the financial condition and results of operations of the Company." Instead of discharging its duties, Cherry Bekaert helped Defendants conceal their fraud through the issuance of false "clean" audit opinions. The opinions

provided the Company's financial statements with a veneer of legitimacy and misled investors.  By these acts, Cherry Bekaert participated in or simply ignored MiMedx's accounting improprieties and failed to perform key procedures required under pertinent audit standards, rendering its audits so deficient that they were tantamount to no audit at all.

12.    Due to the scale and pervasiveness of the fraud, as the Class Period wore on, it became increasingly difficult to make it appear that MiMedx was growing at the same rate.  Although it was becoming impossible to achieve "real growth on a false number," Defendants directed employees to continue the improper channel stuffing or there would "be hell to pay."  VA facilities became flooded with MiMedx products, with shelves "absolutely overflowing" and grafts "spilling out of every cabinet available."  On the commercial side, SLR stepped in to replace CPM, which had defaulted due to the collapse and bankruptcy of physician-owned hospital Forest Park Medical Center ("Forest Park"), and continued to take excess products under their side arrangement to help the Company manufacture bogus revenue.  The Company also stuffed the shelves of clinics and made shipments to doctors' offices when those doctors had not even ordered the products.

13.    Ultimately, this torrent of fraudulent practices caught up with Defendants.  While the Company had originally planned to feather back overstuffed

product as returns against revenue in future reporting periods, there was simply too much to return without raising a red flag or jeopardizing the Company's ability to meet financial projections in the quarter ahead. Employees began to express concern as to the legality of the Company's sales and revenue recognition practices to upper management, including Petit, Taylor, and Cashman. Defendants responded by swiftly threatening, terminating, suing, and publicly attacking those who dared come forward. Such retaliation backfired, however, causing several employees to file public whistleblower complaints detailing Defendants' fraudulent and illegal practices, bringing to light the truth behind the Company's meteoric rise. Nevertheless, Defendants continued to conceal the fraud through public denials (which were false themselves) and by attacking the whistleblowers and their integrity and honesty.

14.     Following the Company's first white-washed internal investigation into such allegations, which falsely concluded that there was no fraud, as well as mounting SEC scrutiny into MiMedx's financial relationships with distributors, the Company dismissed Cherry Bekaert under suspicious circumstances, on August 4, 2017. Defendants attempted to deflect blame from themselves through the Cherry Bekaert dismissal, replacing it with Ernst & Young LLP ("EY" or "Ernst & Young"). But additional details regarding the Company's pervasive fraud continued to be exposed, including the Company's improper relationships with its distributors, channel stuffing,

- 8 -

and other illicit sales practices.  Desperate to keep MiMedx's house of cards from collapsing, Defendants responded with a vociferous campaign of denials, rebuttals, and retaliation.

15.    Mounting pressure ultimately led the Company to undertake a second internal investigation and postpone the release of its financial results for fiscal year 2017 ("FY17").  Despite misleading assurances from the Company's executives that the Company had done nothing wrong and was enjoying strong sales and financial results, MiMedx's problems continued to mount.  The Company formed a Special Litigation Committee on June 6, 2018.  And, just one day later, the Company announced that its second internal investigation had revealed that its reported financial results for fiscal years 2012 to 2016 and the first three quarters of 2017 could no longer be relied upon and would have to be restated.  The Company also announced that Senken, its CFO, and John E. Cranston ("Cranston"), its Controller and Treasurer, had left the Company.

16.    The shakeup continued on July 2, 2018, when the Company further disclosed that based on the Board of Directors' business judgment and information identified through the Company's second independent investigation, Petit and Taylor had "resigned."  On September 20, 2018, the Company stated that these resignations, as well as Senken's and Cranston's, should be treated as terminations "for cause"

because these executives "engaged in, among other things, conduct detrimental to the business or reputation of the company."

17.     On November 7, 2018, the Company revealed additional facts regarding the magnitude of its revenue recognition problems.  The Company indicated that its review needed to expand and stated that it had to review all of the Company's sales dating back to 2012, which would prolong the amount of time it would take for the Company to prepare its restated financial statements, and also revealed that it had received a notice of delisting from the NASDAQ Global Select Market ("NASDAQ"), the market on which MiMedx's common stock was listed.

18.     On December 5, 2018, MiMedx announced more shocking news, that the Company's new independent auditor, EY, had resigned.  In a filing with the SEC two days later, the Company ominously disclosed that EY had warned that "internal controls necessary for the Company to develop reliable financial statements *do not exist*."  MiMedx further disclosed that EY had advised that the Company needed "to significantly expand the scope of its audit, due to *material allegations of inappropriate financial reporting, material allegations of noncompliance with laws and regulations*, the findings to date from the [second] independent investigation conducted by the Audit Committee into these allegations, and the lack of internal controls necessary for the Company to develop reliable financial statements."

- 10 -

Additionally, MiMedx disclosed that EY had advised the Company that it was "unable to rely on representations" from the Interim CEO and Interim CFO because of their reliance on "legacy management personnel." The Company has yet to publicly announce a replacement for EY.

19.    Consistent with EY's assessment, MiMedx issued more bad news on April 11, 2019, admitting that the fraud was even broader than it had disclosed before. The scope of work related to the Company's Restatement had to be expanded "[d]ue to the depth, breadth and complexity of issues identified through the Audit Committee's investigation." As a result, the Company was scrutinizing revenue recognition practices for all years from 2012 to 2018 and installing "improved processes and controls to monitor sales practices, authorize credits and returns, [and] recognize revenue." The Company warned that additional actions may be forthcoming as a result of the Audit Committee's findings.

20.    The unraveling of Defendants' fraud negatively impacted the Company's stock price, resulting in millions in investor losses. To recover the damages that Defendants inflicted on investors, Lead Plaintiff brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder, on behalf of itself and all persons or entities that

purchased or otherwise acquired the common stock of MiMedx during the Class Period, and who were damaged thereby (the "Class").

## II.    JURISDICTION AND VENUE

21.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5.   This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

22.    Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c) and Section 27 of the Exchange Act because MiMedx transacts business and the principle office of the Company is located in this District, many of the acts and practices complained of herein occurred in substantial part in this District, and Defendants disseminated materially false and misleading statements complained of herein to MiMedx shareholders from this District.

23.    In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

III.   **PARTIES**

   A.   **Lead Plaintiff**

24.   Lead Plaintiff Carpenters Pension Fund of Illinois was appointed to serve as Lead Plaintiff in this action by Order of this Court dated January 16, 2019 [ECF No. 42].   As shown in the certification filed contemporaneously herewith and incorporated herein, Lead Plaintiff purchased or otherwise acquired MiMedx common stock at artificially inflated prices during the Class Period and suffered economic losses when true facts about the Company's operating and financial condition were disclosed, and the artificial inflation was removed from the price of MiMedx common stock.[1]

   B.   **Defendants**

      1.   **MiMedx and the Individual Defendants**

25.   Defendant MiMedx is a Florida corporation with its principal place of business located in Marietta, Georgia.   From April 25, 2013 through November 7, 2018, MiMedx's common stock was publicly traded on the NASDAQ under the ticker symbol "MDXG."   Effective November 8, 2018, MiMedx's common stock was delisted from NASDAQ and began trading on the over-the-counter market operated by OTC Markets Group Inc. under the same ticker symbol.

---

[1]   *See* Certification of Carpenters Pension Fund of Illinois, attached hereto as Exhibit A.

26.     Defendant Petit joined MiMedx as CEO, President, and Chairman of the Board of Directors ("Chairman") on February 24, 2009. Petit was terminated from those positions for cause, effective June 30, 2018. Thereafter, Petit continued to serve as a member of the Company's Board of Directors until he was forced to resign from that position effective September 20, 2018.

27.     Defendant Senken was CFO of MiMedx from January 15, 2010 through June 6, 2018, and was subsequently terminated from the Company for cause and departed on June 30, 2018, after serving in a transitional role.

28.     Defendant Taylor joined MiMedx on September 22, 2009 as COO and President, and was also named a Director of MiMedx on October 25, 2011. Taylor was terminated from those positions for cause and departed the Company effective June 30, 2018.

29.     Defendant Cashman joined MiMedx on November 7, 2014 as CCO and Executive Vice President. On December 5, 2018, the Company announced that "the role of [CCO] has been eliminated and Chris Cashman will be departing the organization."

30.     Defendants Petit, Senken, Taylor, and Cashman are collectively referred to herein as the "Individual Defendants."

- 14 -

31.     During and prior to the Class Period, the Individual Defendants, as senior executive officers of MiMedx and as further detailed herein, were privy to confidential and proprietary information concerning MiMedx. Because of their positions with MiMedx, the Individual Defendants had access to non-public information about the Company's business operations, financial condition, markets, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith. As such, the Individual Defendants had access to material adverse non-public information concerning the financial condition and prospects of the Company, as discussed in detail below. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

32.     The Individual Defendants are liable as direct participants in the wrongs complained of herein. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and material omissions

- 15 -

therefrom, and were aware of their materially false and misleading nature.  Each of the Individual Defendants had access to the material adverse undisclosed information about the Company's business prospects, financial condition, and performance as particularized herein, and knew or recklessly disregarded that these material adverse facts rendered the representations made by or about MiMedx and its business, which were issued or adopted by the Company, materially false and misleading.

33.     In addition, the Individual Defendants, by reason of their status as senior executive officers, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein.  Because of their positions of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

34.     As senior executive officers and controlling persons of a publicly traded company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the NASDAQ and governed by the federal securities laws, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any

previously issued statements that had become materially misleading or untrue so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions of material fact during the Class Period violated these specific requirements and obligations.

35. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers or acquirers of the Company's publicly traded common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding the Company's operating and financial condition and the intrinsic value of MiMedx common stock, causing Lead Plaintiff and other members of the Class to purchase or otherwise acquire MiMedx common stock at artificially inflated prices.

### 2.   Defendant Cherry Bekaert

36. Defendant Cherry Bekaert is a certified public accounting firm headquartered in Richmond, Virginia, with an office in Atlanta, Georgia. Cherry Bekaert served as MiMedx's external auditor for fiscal years 2008 through 2016. Cherry Bekaert was "dismissed" by MiMedx effective August 4, 2017.

37.    With knowledge or reckless disregard of MiMedx's true financial condition, Cherry Bekaert provided unqualified (*i.e.*, "clean") audit opinions that the financial statements contained in MiMedx's annual reports on Forms 10-K for fiscal years 2013 to 2016 presented fairly, in all material respects, the financial position of MiMedx, and that MiMedx maintained, in all material respects, effective internal control over its financial reporting for fiscal years 2012 to 2015 (citing in 2016 only a failure of internal control in connection with a tax-related item).

## IV.    SUBSTANTIVE ALLEGATIONS

### A.    Background of the Company

38.    MiMedx is a biomedical company based in Marietta, Georgia that holds itself out as the "leading global supplier of amniotic tissue products."[2]  The Company designs, manufactures, and sells products derived from human placental tissues, the thin, moist tissues that protect the fetus, donated by mothers after childbirth.  These products are sold in the form of sheets or wraps applied to a patient's skin (often referred to as "grafts" or "tissues") or in the form of micronized powders applied to a patient's skin either topically or by injection.  They are intended to enhance healing, modulate inflammation, or minimize scar tissue formation in patients.

---

[2]    MiMedx Group Inc., Annual Report (Form 10-K) (Mar. 3, 2017) ("2016 Form 10-K") at 2.

39.     Approximately one year after MiMedx was formed, on February 24, 2009, the Company appointed Petit as Chairman, CEO, and President.  When Petit joined the Company, MiMedx was a relatively small skin-graft manufacturer with less than $1,000 in revenue.  In 2011, the Company acquired a proprietary sterilization process called "PURION" from Surgical Biologics, LLC which was designed to maximize production yield while minimizing processing costs.  Employing the newly acquired PURION process, the Company developed its two primary commercial products during the Class Period:  EpiFix and AmnioFix.

40.     EpiFix is a Wound Care product configured for external use.  It is intended to treat inflammation and chronic wounds, including diabetic foot ulcers ("DFUs"), venous leg ulcers ("VLUs"), arterial ulcers, burns, and surgical wounds. EpiFix was sold in a sheet (graft) form, which came in 13 different sizes including three mesh configurations.  Prices ranged from approximately $895 per graft to $6,700 per graft, with the most expensive being the 7x7 cm graft.[3]  EpiFix was also sold in an injectable, micronized powder form, in three different sizes.

41.     AmnioFix is a Surgical, Sports Medicine & Orthopedics ("SSO") product configured for internal, surgical use.  It is intended to treat inflammation, minimize

---

[3]     *See* Ex. B, Viceroy Research Group, *MiMedx's employment of kickback & bribery scheme inducers makes it uninvestable*, at 34 (Sept. 20, 2017).

scar tissue formation, and treat conditions such as tendonitis, plantar fasciitis, lateral epicondylitis, medical epicondylitis, bursitis, strains, and sprains. Like EpiFix, AmnioFix is sold both in sheet form (AmnioFix and AmnioFix Wrap) and injectable, micronized powder form (AmnioFix Injectable). Unlike EpiFix, however, AmnioFix is not covered by Medicare, Medicaid, or private insurance.

42. MiMedx operates one business segment, called Regenerative Biomaterials, which includes all of its products. However, MiMedx reports revenue in two separate product categories: (a) Wound Care; and (b) SSO. Throughout the Class Period, Wound Care represented the larger of the two categories, with 55-75% of total revenue (primarily from sales of EpiFix), compared to SSO, which comprised 20-25% of total revenue (primarily from sales of AmnioFix).

43. The majority of the Company's revenues come from domestic sales to health care customers throughout the United States. These customers could be broken into two general categories: government customers and private "commercial" customers. The Company's government customers include hospitals and other health care facilities operated by the VA and United States Department of Defense ("DOD"). MiMedx's commercial customers, on the other hand, are privately owned and operated health care providers such as hospitals, clinics, and doctors' offices.

## B.   MiMedx Drove Revenue Through Improper Sales and Distribution Practices

44.    With EpiFix and AmnioFix in its arsenal, the Company sought to rapidly expand sales in both commercial and government sales channels.  The Company did this by partnering with a network of sales agents and distributors that were purportedly independent from MiMedx, including AvKARE (its government distributor) for EpiFix and CPM and SLR (its master commercial distributors) for AmnioFix.

45.    The Company faced steep competition from other producers of grafts, including Osiris Therapeutics, Inc. ("Osiris"), Organogenesis Inc. ("Organogenesis"), and Advanced BioHealing, Inc. ("ABH"), which had already been entrenched in the market.  To outmaneuver competitors and achieve the continuous growth that Petit regularly spoke of, Defendants employed a business model described by Tom Tierney ("Tierney"), a former Regional Sales Director in MiMedx's Surgical division, as "*a mind-boggling level of sales and accounting irregularities*" and "win at all cost" culture "fostered by the tone and conduct of senior management at the highest levels."[4]  As part of this culture, MiMedx favored individuals who engaged in illegal

---

[4]    18 U.S.C. §1514A Complaint, at ¶18, *Tierney v. MiMedx Grp., Inc.* (U.S. Dep't Labor (July 16, 2018) ("*Tierney* Complaint").  Another MiMedx whistleblower added, "[y]ou can't fathom the amount of fraud that was happening."  *See* Viceroy Research Group, *More whistleblowers come forward with details of MiMedx sales scheme* (Oct.

behavior "at the expense of others who attempt to follow [C]ompany policies and stay within the law," and "discriminat[ed] against individuals who opposed MiMedx's fraudulent practices."[5]

46.     From the outset of their efforts to sell EpiFix and AmnioFix, Defendants engaged in fraudulent sales and distribution practices.  These practices included a campaign of influence to generate demand for MiMedx products and implicit arrangements with distributors in both its government and commercial channels that enabled it to inflate its revenue and boost the Company's market perception and stock price.  Chief among them was channel stuffing – a practice by which the Company shipped out or otherwise placed significant quantities of merchandise in its sales channels in order to record revenue for such shipments or placements, even though they were not true sales and could not be recognized in this manner under GAAP. The improper channel stuffing, which routinely occurred at the end of financial quarters, was carefully orchestrated by Defendants to help the Company achieve revenue forecasts and maintain a false appearance of consistent growth.

17, 2017), (further corroborating the investigative reporting to date, a whistleblower stated: "Everything in the Aurelius and Viceroy reports, I can attest to."), https://viceroyresearch.org/2017/10/10/more-whistleblowers-come-forward-with-details-of-mimedx-sales-scheme/.  Viceroy "notified the SEC/DOJ of these concerns as [they] were informed local invoices will prove MiMedx is conducting this activity." *Id.*

[5]     *Tierney* Complaint, at ¶18.

1.    **MiMedx Offers Inducements to Secure Sales**

a.    **The Company Targets Health Providers with a Campaign of Influence**

47.    The Company has taken the position that all of its products are "minimally manipulated" human tissues and therefore qualify as "361 HCT/Ps," meaning products that are regulated solely under Section 361 of the Public Health Service Act (21 C.F.R. §361) and are exempt from United States Food and Drug Administration ("FDA") and other pharmaceutical regulations and guidelines.[6] As a result of the apparent lack of regulations, MiMedx sales representatives were encouraged and trained by Defendants to work loosely and aggressively in a lawless environment they referred to as the "Wild West."  Growing business and beating competitors were key objectives at MiMedx, and therefore the Company expected its employees to generate revenue at all costs.[7]

---

[6]    The FDA, to the contrary, has declared that the Company's injectables do not qualify as 361 HCT/Ps, as they are not minimally manipulated. *See* Letter from Mary A. Malarkey to Bill Taylor, Surgical Biologic – Untitled Letter (Aug. 28, 2013), available                                                                                              at https://www.fda.gov/biologicsbloodvaccines/guidancecomplianceregulatoryinform ation/complianceactivities/enforcement/untitledletters/ucm367184.htm.   Thus, the Company was required to obtain a Biologics License Application from the FDA for its injectables, which it never did during the Class Period.

[7]    Moreover, when questions later began to emerge, the Company maintained that, as 361 HCT/Ps, its products were not governed by the Physician Payments Sunshine Act

- 23 -

48.     To increase demand for its products, the Company trained its sales force to engage in a host of improper sales practices to ingratiate themselves with health care personnel, so they would become interested in MiMedx products and advocate their use at health care facilities.  As explained by former MiMedx employee Jon Vitale ("Vitale"),[8] MiMedx's sales strategy was designed to get its sales representatives into physician offices in a "consulting" capacity.[9]  This allowed MiMedx to have "direct interaction with patients, clinical staff responsible for treating patients, and billing staff" responsible for processing the paperwork needed to obtain insurance reimbursements.[10]

49.     This was part of an "influence campaign" that was "designed to get potential customers to approve the use of MiMedx products in their facility and then

_____

("Sunshine Act"), which is a federal statute implemented to increase transparency surrounding drug manufacturers' financial relationships with physicians and hospitals.

[8]     Vitale worked at MiMedx from January 27, 2014 to December 29, 2016 as a sales representative and sales manager responsible for portions of MiMedx's South Carolina territory.  *See* Complaint, at ¶¶9, 20, 55, *Vitale v. MiMedx Grp., Inc.*, No. 3:19-cv-00529-RBH (D.S.C. Feb. 19, 2019) ECF No. 1-1 ("*Vitale* 2019 Complaint").  Vitale served three of the Company's federal accounts, including the Dorn VA, and approximately 15 commercial accounts in South Carolina, primarily wound care centers and private physician offices.  *See* Complaint, ¶¶60-61, *United States, ex rel., Vitale v. MiMedx Grp., Inc.*, No. 3:17-cv-00166-RBH (D.S.C. Jan. 19, 2017) ECF No. 1 ("*Vitale Qui Tam* Complaint").

[9]     *See id.* at ¶64.

[10]     *Id.*

- 24 -

expand the use of those products to new patients, uses, and product lines."[11] The influence campaign began with wining and dining health care personnel responsible for purchasing decisions. As Vitale explained, he and other sales representatives were trained to create a relationship with customers by bringing free lunches to the office and taking physicians to dinner.[12] "Company sales representatives were required by Petit to host lunches and dinners with doctors, meetings he called 'healing reviews.'"[13] An internal MiMedx spreadsheet reviewed by *The Wall Street Journal* and provided to federal investigators, "show[ed] hundreds of company meals hosting thousands of doctors over 10 months in 2016."[14] MiMedx representatives also used speaker programs to reward physicians and solicit new customers. The Company's speaker programs paid customer physicians between $600 and $5,000 per "speech," to read PowerPoint slide decks prepared by MiMedx extolling the benefits of the Company's products to fellow physicians.[15] Defendants' inducements violated a host of federal statutes, particularly when made to VA employees as explained in detail below.

---

[11] *Id*. at ¶69.

[12] *See Vitale Qui Tam* Complaint, at ¶65.

[13] *See* Gretchen Morgenson, *MiMedx Kept Cheaper Products Out of Its Offerings to VA Hospitals*, WALL ST. J. (Oct. 5, 2018), https://www.wsj.com/articles/mimedx-kept-cheaper-products-out-of-its-offerings-to-va-hospitals-1538731801.

[14] *See id.*

[15] *See Vitale Qui Tam* Complaint, at ¶68.

50.     On May 8, 2018, for example, the DOJ announced that a doctor, physical therapist, and nurse practitioner at the Wm. Jennings Bryan Dorn VA Medical Center in Columbia, South Carolina ("Dorn VA") were indicted by a federal grand jury for knowingly committing health care fraud and other criminal acts related to MiMedx.[16] According to the Indictment, the Dorn VA defendants accepted a host of improper benefits from MiMedx between 2012 and 2015, including cash payments, meals, trips, and gifts, to induce them to order, purchase, and use MiMedx products. This "caused the excessive use of MiMedx products on VA patients in South Carolina."[17] The DOJ made clear that, by accepting these bribes, the Dorn VA defendants "**became**

---

[16]    *See* Department of Defense Indictment ("Indictment"), *United States v. Becker*, No. 6:18-cr-00481-DCC (D.S.C. May 8, 2018) ("*Becker*"); DOJ Press Release, Federal Grand Jury Indictments (May 8, 2018), https://www.justice.gov/usao-sc/pr/federal-grand-jury-indictments-70.   Specifically, the Indictment charged the Dorn VA defendants with violating:  (a) 18 U.S.C. §1347, which makes it a crime to knowingly and willfully execute, or attempt to execute, a scheme to defraud any health care benefit program or to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program, in connection with the delivery of or payment for health care benefits, items, or services; (b) 18 U.S.C. §201, which prohibits directly or indirectly giving, offering, or promising anything of value to a federal government official to influence an official act or fraud on the United States; and (c) 18 U.S. §208, which prohibits government officials from participating personally and substantially in matters in which they knowingly have a financial interest.

[17]    *Id.* at ¶7.

*employees, agents, or independent contractors of MiMedx*."[18] This was precisely the point of Defendants' influence campaign.

51.     MiMedx is also under investigation by the DOD's Criminal Investigative Service in connection with the Company's financial arrangements with a surgeon, Dr. Eric D. Martin, at Charlie Norwood VA Medical Center in Augusta, Georgia ("Augusta VA").   According to *The Wall Street Journal*, a grand jury had been commissioned to hear testimony on the matter "to determine whether Dr. Martin received compensation from the company without proper clearance."[19]   "Dr. Martin has been a big user of MiMedx products, especially its injectables . . . . In one month he used almost $1 million of the products."

52.     MiMedx's influence campaign was implemented by sales representatives who were trained to ingratiate themselves with key decision-makers at prospective health care customers.   Vitale observed that "[w]hile physician interaction was always important, the true target of this influence campaign in wound care centers was the

---

[18]   *Id.* at ¶6.  The court in *Becker* continued the trial of the Dorn VA defendants until mid-2020, after each of the defendants entered into a Pretrial Diversion Agreement with the DOJ in late 2018/early 2019.

[19]   *See* Gretchen Morgenson, *MiMedx Kept Cheaper Products Out of Its Offerings to VA Hospitals*, WALL ST. J. (Oct. 5, 2018), https://www.wsj.com/articles/mimedx-kept-cheaper-products-out-of-its-offerings-to-va-hospitals-1538731801.

potential customer's program director who could aid in getting a product approved for use by the customer's office or clinic."[20]   After gaining an audience with such targets:

> MiMedx reps argued to program directors and private physicians that the **use of its products** – far more expensive than most wound care products – would generate profits for the customer [(*i.e.*, the doctors)], **which charge for the sale and application (*i.e., grafting*)** of MiMedx products at a **higher rate than for the use of standard of care products**.  As an individual tasked with clinical *and* fiscal responsibilities, program directors were often far more receptive to these arguments than physicians, particularly when the program director was employed by a private management company (*e.g.*, Healogics, Inc.).[21]

### b.    MiMedx Markets Its Products by Guaranteeing and Gaming Reimbursement

53.    The Company depends heavily on its customers having the ability to obtain reimbursement for the costs of its products from third-party sources.  The Company states that its "growth substantially depends on adequate levels of third-party reimbursement for [its] products"[22] and its "success in obtaining third-party reimbursement for [its] products is a significant competitive advantage."[23]

54.    Aside from government accounts, the Company's EpiFix customers rely on reimbursement from insurers, including federal insurance programs (*e.g.*,

---

[20]   *Vitale Qui Tam* Complaint, at ¶66.

[21]   *Id.* at ¶67.

[22]   2016 Form 10-K at 9.

[23]   *Id.* at 11.

Medicare/Medicaid) and private insurance companies.  Federal insurance programs have prescribed coverage criteria and reimbursement rates, while private insurance companies have their own coverage criteria and negotiate payment levels.[24]  The ability of MiMedx's customers to obtain reimbursement for EpiFix was critical to the Company's ability to drive sales, particularly because EpiFix was far more expensive than traditional wound care products.[25]

55.    To encourage adoption of its products, the Company alleviated reimbursement concerns by offering doctors and hospitals a "reimbursement guarantee."  As Vitale stated, for example, "MiMedx promised customers that if they used the company's reimbursement specialists, who were trained certified coders, to submit claims and pursue insurance appeals, then MiMedx would waive payment on any claim rejected by an insurer."[26]  In other words, the Company provided customers with a guarantee that MiMedx would cover denied reimbursements as long as the customer followed the Company's guidance and directives.[27]  If a reimbursement estimate was inaccurate, and customers failed to receive reimbursement, then MiMedx

---

[24]  *Id.* at 9.

[25]  *Vitale Qui Tam* Complaint, at ¶67.

[26]  *Vitale Qui Tam* Complaint, at ¶103.

[27]  *See* Ex.C, Reimbursement Hotline Service Guarantee, Exhibit 3 to John P. Minahan Deposition, *MiMedx Grp., Inc. v. Village Podiatry Grp.*, *LLC*, No. 17EV000617 (Ga. Fulton Cty. Sept. 20, 2017) ("*Village Podiatry*").

would cover the cost of the product by providing free products, credits, or debt forgiveness. MiMedx called this initiative the "Reimbursement Hotline Service Guarantee Program."[28] These "guarantees occur[ed] at the corporate level and nationwide."[29]

56.     MiMedx also told health care providers that they were not required to pay MiMedx until they received reimbursement from an insurer (*i.e.*, they only had to "pay when paid"). Tierney stated that the Company assured customers "that they had no obligation to pay for [MiMedx] products unless they received reimbursements from insurance providers."[30] This was evidenced, for example, by the Company's business relationship with Village Podiatry, an Atlanta-based podiatric health care provider with several centers across Georgia, between 2013 and 2016.[31] According to John P. Minahan ("Minahan"), the CFO of Village Podiatry's parent company, MiMedx and Village Podiatry had an implicit off balance sheet arrangement.[32]

---

[28]   *See* Transcript of John P. Minahan Deposition taken on July 20, 2017, *Village Podiatry* ("Minahan Dep."), 110:21-22.

[29]   False Claims Act *Qui Tam* Complaint, at ¶119, *United States, ex rel. Montecalvo v. MiMedx Grp., Inc.*, No. 14-01260-RCL (D.D.C. July 24, 2014) ECF No. 1 ("*Montecalvo* Complaint").

[30]   Tierney was employed at the Company as Regional Sales Director from April 2016 to January 2018. *Tierney* Complaint, at ¶15.

[31]   Minahan Dep. 47:10-16; 91:2-6.

[32]   *Id*. 91:9-11.

MiMedx shipped consignment inventory to Village Podiatry centers but Village Podiatry would only pay MiMedx for this inventory if Village Podiatry was reimbursed from an insurer." If the insurer did not reimburse Village Podiatry, on the other hand, it was not obligated to pay MiMedx for the products it used.[33] In instances like this, the Company would treat the transaction as a "no charge evaluation," which meant neither the doctor nor the patient would have to pay for it, and it would be booked as a selling, general, and administrative ("SG&A") expense.

57.    These practices were corroborated by other MiMedx employees, for example:

> What Village Podiatry is saying is absolutely how Mimedx operated. Consignment inventory was sent in, reps would run the insurance verification, the product was applied [to a patient], reps would work wi[th] the billers to ensure it was coded and billed correctly, we'd check the eob [explanation of benefits from the insurer] when it came back to ensure it was fully reimbursed. Only at that point did we enter the implant information into Salesforce, which generated the invoice, which had the 30-day payment terms. If the insurance denied payment, the reps would just change the consignment product to "no charge evaluation" [*i.e.* SG&A expense] units so the doctor and patient weren't out the money. We were told by managers this was legal because as long as the insurance company didn't reimburse the product, it wasn't fraud.[34]

---

[33]   *Id.* 47:10-16, 91:2-6.

[34]   *See* petite parker the barker, *How close is MiMedx to the end of death row?* (Nov. 22, 2017), http://petiteparkerthebarker.com/how-close-is-mimedx-to-the-end-of-death-row.

Such practices were designed to encourage the doctor to continue using MiMedx products in the future.

58.     Additionally, the Company induced the use of its products by helping instruct providers how to profit by "gaming their reimbursement" from insurers, also referred to as "marketing the spread."  This practice is explained by Tierney, a former Regional Sales Director in MiMedx's Surgical division.[35]  MiMedx "mark[eted] the spread" between the amount charged by MiMedx and the amount the doctors would later receive from Medicare/Medicaid as reimbursement for those products.[36]  MiMedx did this by also providing "steep discounts, rebates, free products, and other kickbacks" to doctors, which were not reported to Medicare/Medicaid.[37]  Medicare/Medicare would then reimburse those products at higher prices, enabling the doctors to benefit from the spread.

59.     The Company also trained its sales representatives to encourage doctors to use more MiMedx grafts, and larger MiMedx grafts, than were unnecessary to treat patients' conditions by marketing the reimbursements available for such grafts.  For example, sales representatives provided physicians' offices with a document titled,

---

[35]  *Tierney* Complaint, at ¶¶6, 20.

[36]  *Id.* at ¶14.

[37]  *Id.*

"Epifix Medicare Office Reimbursement Made Easy." This document instructed doctors to submit EpiFix reimbursement claims to Medicare for the maximum amount of billable units and detailed the spread between the cost of EpiFix and the Medicare reimbursement rate, *i.e.*, the profit the doctor would receive.[38]

60.    These practices violated multiple federal statutes because they resulted in false claims being submitted to federal health care programs.[39] In particular, they violated the Anti-Kickback Statute ("AKS")[40] and the False Claims Act ("FCA")[41] by

---

[38]   *See* Ex. D, Viceroy Research Group, *Viceroy activates 'The Honeypot' – Parker H. Petit & MiMedx caught red-handed*, at 4 (Dec. 14, 2017).

[39]   *See, e.g.*, Centers for Medicare & Medicaid Services, *Laws Against Health Care Fraud Resource Guide* (Sept. 2015), https://www.cms.gov/Medicare-Medicaid-Coordination/Fraud-Prevention/Medicaid-Integrity-Education/Downloads/fwa-laws-resourceguide.pdf; DOJ Press Release, *Pharmaceutical Manufacturers to Pay $421.2 Million to Settle False Claims Act Cases*, (Dec. 7, 2010), https://www.justice.gov/opa/pr/pharmaceutical-manufacturers-pay-4212-million-settle-false-claims-act-cases ("The difference between the resulting inflated government payments and the actual price paid by healthcare providers for a drug is referred to as the 'spread.' . . . Because payment from the Medicare and Medicaid programs was based on the false inflated prices, the government alleged that the defendants caused false claims to be submitted to federal healthcare programs[.]").

[40]   The AKS, 42 U.S.C. §1320a-7b, makes it a crime to knowingly and willingly offer, pay, solicit, or receive anything of value (directly or indirectly) in order to induce or reward referrals of items or services reimbursable by a federal health care program.

[41]   The FCA, 31 U.S.C. §3729, *et seq.*, protects the federal government from being overcharged or sold substandard goods or services by imposing civil liability on any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the federal government (including federal health care programs such as

inducing the use of MiMedx products over others, enabling the Company's customers to profit or, at a minimum, accept products without normal financial risk, given that they only paid MiMedx if they got paid from insurers.[42]

### c.   Defendants Manipulate Charitable Contributions to Gain Sales

61.    While the Company's scheme induced medical providers to use MiMedx products, the products were not accessible to all patients, even if the products were covered by insurance.  Patients still incurred out-of-pocket costs for using such products, including co-payments (a fixed amount that a patient owes for a treatment), co-insurance (a fixed percentage of a treatment owed by a patient), and deductibles (a fixed amount owed by a patient during a given time period).  Patients who could not

---

Medicare or Medicaid), which, in the health care context, includes billing for unnecessary services and billing for services or items that were not rendered.

[42]   *See* OFFICE OF INSPECTOR GEN., DEP'T HEALTH & HUMAN SERVS., *Special Fraud Alert:   Physician-Owned   Entities*   (Mar.   26,   2013),   at   1 https://oig.hhs.gov/fraud/docs/alertsandbulletins/2013/pod_special_fraud_alert.pdf ("One purpose of the anti-kickback statute is to protect patients from inappropriate medical referrals or recommendations by health care professionals who may be unduly influenced by financial incentives."); *see also* OFFICE OF INSPECTOR GEN., DEP'T HEALTH & HUMAN SERVS., *Supplemental Special Advisory Bulletin: Independent Charity Patient Assistance Programs*, 79 Fed. Reg. 31120-01 (May 30, 2014) (The HHS-OIG has explained, "[f]or purposes of the [AKS], 'remuneration' includes the transfer of anything of value, directly or indirectly, overtly or covertly, in cash or in kind.  The [AKS] cover[s] any arrangement where one purpose of the remuneration was to give or obtain money for the referral of services or to induce further referrals.").

afford these out-of-pocket costs might not elect to use MiMedx's products.  Medical providers might also reject MiMedx's products based on concerns that they could not collect these out-of-pocket costs from patients.

62.     MiMedx came up with a way to address this – it would illegally subsidize co-payments and co-insurance for its products and, thus, induce medical providers to use them.  Such subsidies violated the FCA, AKS, and other federal statutes. Therefore, to avoid detection, MiMedx subsidized such payments indirectly, by manipulating charitable donations to the Patient Access Network Foundation ("PAN").  PAN is a charitable organization that seeks to help federally and commercially insured patients with out-of-pocket expenses.

63.     Distributions from PAN are issued from "disease funds" that cover such insurance-related costs associated with specific types of diseases.  Among its programs, PAN covers certain insurance-related costs on behalf of wound care patients in the Medicare program.  During the Class Period, PAN operated funds for donations related to the treatment of DFUs and VLUs, two conditions that MiMedx's EpiFix grafts were frequently used to treat.  As of January 2017, the DFU fund and VLU fund each awarded up to $3,500 per patient annually.  Patients seeking assistance from these funds were required to submit an application to PAN demonstrating financial need, which meant that the patient earned less than $50,000

per year.  As grants could only be awarded when the funds were "open" – *i.e.*, sufficiently funded by donations from PAN contributors – grants were awarded to eligible applicants on a first-come, first-serve basis until the available money was exhausted.

64.     MiMedx realized it could direct its PAN donations to cover co-payments for its own products.  The Company did so by coordinating the submission of patient applications held by its sales representatives until MiMedx donated to the PAN fund. After the donations were made, in effect opening the fund, MiMedx sales representatives submitted the patient applications for co-payment amounts that matched the dollars contributed by MiMedx, which were then funneled to the patients.

65.     MiMedx specifically trained Vitale and other MiMedx sales representatives to use PAN to complete sales where patients would otherwise be unable to afford MiMedx products.  Moreover, sales representatives were instructed by MiMedx to wait until they received notice from MiMedx that the appropriate PAN fund was open (*i.e.*, funded by MiMedx).  Lou Roselli ("Roselli"), the Company's Senior Director of Operations, was in direct communication with PAN and sent emails to sales representatives every step of the way.  For example, on February 18, 2014, Roselli told MiMedx sales representatives that he would "keep [them] posted on

[MiMedx's] ability to reopen the VLU fund"[43] – a fund over which MiMedx *supposedly* had no control.  Roselli also told MiMedx sales representatives to let him know if they had any trouble submitting PAN applications because he could "help communicate with PAN to solve and [sic] bumps in the road . . ."[44]  By contrast, sales representatives from other companies had no assistance and no way of knowing when funds would be available through PAN.  As Roselli said, this was "our advantage."[45]

66.     Roselli would first send an email, with Taylor copied, notifying sales representatives to be prepared to submit their applications.  When the fund opened, sales representatives would receive another email from Roselli with the green light to submit their applications all at once until the funds were depleted.  When PAN applications were accepted, PAN sent confirmation to the patient's physician, and the clinical procedure using MiMedx products was then scheduled.

67.     MiMedx's senior executives – including Taylor – were well aware of the PAN scheme and the fact that the effect of this scheme was to maximize the number of MiMedx product sales supplemented by PAN grants.  MiMedx instructed its sales representatives to always indicate that a patient's income was under $50,000, so that

---

[43]   *See* Ex. E, Emails from Roselli to MiMedx sales team, at 1.

[44]   *See Id.*

[45]   *Id.* at 3.

the patient would be deemed "in need" – regardless of whether this was true. MiMedx's management also cautioned sales representatives not to alert the Company's clients that the sales representatives had knowledge the PAN's VLU/DFU fund would be opening.[46]

68.     MiMedx's ability to funnel payments through PAN incentivized doctors to use its products, which they might not otherwise choose due to concerns over high costs and their patients' inability to pay.  In this way, MiMedx profited by providing subsidies which served as kickbacks to doctors, provided MiMedx with a competitive advantage (encouraging use of its products over competitors' products), and boosted its revenue, allowing Defendants to maintain the Company's perceived growth during the Class Period.

69.     Defendants' PAN scheme also tainted federal health care insurance claims, causing harm to Medicare/Medicaid and other federal health care insurers, in violation of the AKS, FCA, and other federal statutes.  As the HHS Office of Inspector General ("HHS-OIG") has explained, federal health care insurers and other beneficiaries are harmed by such claims because the ability of manufacturers like MiMedx "to subsidize copayments for their own products may encourage manufacturers to increase prices, potentially at additional cost to federal health care

---

[46]  *Vitale Qui Tam* Complaint, at ¶143.

programs and beneficiaries who are unable to obtain copayment support."[47] Further, "an Independent Charity PAP must not function as a conduit for payments or other benefits from the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries' drug choices."[48] This means "pharmaceutical manufacturers and their affiliates should not exert any direct or indirect influence or control over the charity or its assistance program."[49] Therefore, according to the HHS-OIG, paying a federally insured patient's co-pay or co-insurance violates the AKS and FCA.[50]

### 2. Defendants Rely on Master Commercial Distributors and Suspect Physician-Owned Distributors to Inflate Revenues

70. The Company's largest commercial (non-government) distributor was CPM, a Richardson, Texas-based company designated as a nationwide "Master Distributor" of MiMedx products. CPM's owner was Mark Brooks ("Brooks"), who was a personal friend of MiMedx's Senior Vice President of Global Sales, Michael

---

[47] *See* HHS-OIG, *supra* n.42.

[48] *Id.* at 31121.

[49] *Id.*

[50] *See* OFFICE OF INSPECTOR GEN., DEP'T HEALTH & HUMAN SERVS, *Publication of OIG Special Fraud Alerts*, 59 Fed. Reg. 65372-01 (Dec. 19, 1994) (explaining that routine waiver of co-pays/co-insurance "results in (1) false claims, (2) violations of the anti-kickback statute, and (3) excessive utilization of items and services paid for by Medicare.").

Carlton ("Carlton").[51]  MiMedx's former National Sales Director, Bill Cochrane ("Cochrane"), also worked closely with CPM in a consulting role.  These relationships allowed MiMedx to exert control over CPM.

71.    Critically, the Company used CPM as part of the channel stuffing scheme and a vehicle to make quarterly numbers when the Company was falling behind its publicly issued financial guidance.  CPM purchased product in bulk from MiMedx, often within the last five days of a quarter.  As a result, CPM had large accounts receivables balances and revolving debt owed to MiMedx.

72.    Jess Kruchoski ("Kruchoski"), former Regional Sales Director of the North Central Region,[52] explained that the Company facilitated its channel stuffing arrangement with CPM by giving CPM significant product discounts, as well as

---

[51]  Defendant, Jess Kruchoski's Third Amended Counterclaim, at ¶69, *MiMedx Grp., Inc. v. Academy Med., LLC*, No. 2016 CA 013806 (Fla. Palm Bch. Cir. Ct. Jan. 17, 2019) ("*Kruchoski* State Counterclaim").

[52]  Kruchoski was employed at MiMedx from July 2012 through December 12, 2016. Kruchoski began his employment in July 2012 as an Account Executive of Government Sales for the Company's Wisconsin and Minnesota territories.  First Amended Complaint, at ¶15, *Kruchoski v. MiMedx Grp., Inc.*, No. 0:16-cv-04171-RHK-BRT (D. Minn. Dec. 15, 2016), ECF No. 4 ("*Kruchoski/Tornquist* Complaint").  In October 2013, Kruchoski was promoted to Regional Sales Director of the North Central Region, which he held through the end of his employment at MiMedx.  *See id.* Kruchoski filed a formal whistleblower complaint with the SEC declaring, under penalty of perjury, the truthfulness of his allegations.  *See* SEC, Form TCR dated December 15, 2016, *MiMedx Grp., Inc. v. Tornquist* (N.D. Ga. Mar. 14, 2017) ECF No. 40-2, pp. 2-9.

exclusive territory rights within Texas, in exchange for CPM placing large orders of MiMedx products at the end of quarters to help MiMedx meet its revenue guidance for those quarters.[53]  For example, Kruchoski stated that in March 2015, the last month of 1Q15, CPM purchased approximately $2.5 million in MiMedx products.[54]  In contrast, CPM had no purchases from MiMedx during the prior month, February 2015.[55] Similarly, in June 2015, the final month of 2Q15, CPM "purchased" approximately $2 million in MiMedx products, in contrast to approximately $100,000 in total purchases during March and April 2015 combined.[56]

73.    CPM employed a massive network of sub-distributors through which it distributed MiMedx products, many of which were suspect PODs.[57]  PODs, which were owned by physicians, profited from distributing MiMedx products used in the physician-owner's medical procedures.  The HHS-OIG has declared PODs "inherently suspect" because they exhibit "questionable features" that raise kickback-related concerns under the AKS, including corruption of medical judgment, overutilization, increased costs to federal health care programs and beneficiaries, and unfair

---

[53]  *Kruchoski* State Counterclaim, at ¶¶70-71.

[54]  *Id.*

[55]  *Id.*

[56]  *Id.*

[57]  *See* Viceroy Research Group, *supra* n.4.

competition.[58] "This is because the financial incentives PODs offer to their physician-owners may induce the physicians both to perform more procedures (or more extensive procedures) than are medically necessary and to use the [medical] devices the PODs sell in lieu of other, potentially more clinically appropriate, devices."[59] Of special concern to the HHS-OIG, and the subject of a Special Fraud Alert, was that PODs act only as shell entities in the distribution chain.[60]

74.     During the Class Period, CPM would purchase bulk orders from MiMedx at a discount and distribute them to medical providers through CPM's PODs.[61] Relabeled MiMedx products, such as "AmbioChoice" and "Amniovo," were sold by CPM to the PODs.[62]   In reality, these products were merely MiMedx's standard products, such as AmnioFix, with a different label and a sales price three-to-six times higher than the customary price.[63]   The POD owners were incentivized to use MiMedx products because they could sell them at price premiums.   In this manner, CPM,

---

[58]   HHS-OIG, *supra* n.42.

[59]   *Id.*

[60]   *Id.*

[61]   *Kruchoski* State Counterclaim, at ¶¶69-70; *see also* Ex. F, Aurelius Value, *MiMedx: Flying Too Close To The Sun* (Sept. 20, 2017); Ex. G, Aurelius Value, *An Open Letter to the MiMedx Auditors*, at 11 (Feb. 15, 2018); Ex. H, Aurelius Value, *MiMedx: Relabeled Product, PODs, and Indicted Distributors* (Apr. 26, 2018).

[62]   *See* Ex. H.

[63]   *See id.*

which had acquired the products at discounts, profited as did the PODs. MiMedx also profited from its ability to move a tremendous amount of product through CPM and its PODs, which was a significant revenue source for the Company. Without the PODs, MiMedx would not have been able to sell as much product.

75.    For example, Defendants funneled their products through CPM to a POD, Fuse Medical, Inc. ("Fuse"), a Richardson, Texas-based, publicly traded "penny stock" (OTC: FZMD) comprised of over 40 podiatrist members. Fuse's Chairman was Brooks, the owner of CPM and a personal friend of MiMedx's Carlton. According to Fuse's public filings, it had distribution agreements with both CPM and SLR, calling CPM its "principal supplier."[64]  Fuse also had a distribution agreement with a CPM affiliate, Texas AmBioMed, LLC, which was also run by Brooks (as President and COO) and registered by the FDA to store MiMedx products. Through this agreement, Fuse was authorized to distribute MiMedx's products AmnioFix and EpiFix, as well as AmbioChoice, a brand name trademarked by CPM.[65]

76.    While the Company stated in its annual filings that its "private label or 'OEM'[66] relationships" allowed the Company "to leverage the sales and distribution

---

[64]  Fuse Medical, Inc., Annual Report (Form 10-K) (Mar. 20, 2017), at 18.

[65]  *See* Ex. G.

[66]  *See* Investopedia, *Original Equipment Manufacturer (OEM)* (Reviewing Julia Kagan, Apr. 9, 2019) https://www.investopedia.com/terms/o/oem.asp

resources of [its] private label customers,"[67] the Company omitted that these "resources" included suspect PODs.   Moreover, Defendants, including Petit, specifically and repeatedly misled the market about their involvement with PODs when questions were raised about them, stating that MiMedx does "not directly sell to or distribute any of our products through PODs."[68]

77.    CPM eventually ran into problems that led to the termination of its relationship with MiMedx in June 2015.  One of CPM's major clients, Forest Park, a physician-owned hospital with ties to MiMedx,[69] soon to be embroiled in a bribery and kickback scandal of its own, became insolvent and filed for bankruptcy.  This collapse cost CPM, one of Forest Park's largest creditors, over a half-million dollars.[70]

---

[67]   MiMedx Group, Inc., Annual Report (Form 10-K) (Mar. 4, 2014) ("2013 Form 10-K"); MiMedx Group, Inc., Annual Report (Form 10-K) (Mar. 13, 2015) ("2014 Form 10-K"); MiMedx Group, Inc., Annual Report (Form 10-K) (Feb. 29, 2016) ("2015 Form 10-K")

[68]   2016 Form 10-K at 20; *see also* Edited Transcript, *MDXG – Q3 2017 MiMedx Group Inc Earnings Call*, Thomson Reuters StreetEvents (Oct. 27, 2017 2:30PM GMT) ("We do not sell through PODs, period.").

[69]   *See In re Forest Park Medical Center at Southlake, LLC*, 16-40273-rfn-11, (N.D. Tex. Apr. 29, 2016), ECF. Nos. 220, 245 (identifying MiMedx as a creditor and/or party in interest in the Forest Park bankruptcy).

[70]   *See* Viceroy Research Group, *Bankruptcy & DOJ/FBI indictments of Physician Owned Medical Center Inconvenienced MiMedx CPM channel stuffing program* (Oct. 2017), https://viceroyresearch.files.wordpress.com/2017/10/part-8-fraud-inconvenien ced-mimedx-cpm-channel-stuffing-program-1.pdf.  Viceroy "filed the information [in

In turn, this caused CPM to default on its credit terms with MiMedx, precipitating a split between the two companies and eliminating a key source of channel stuffing.[71] CPM was later acquired by Fuse, led by Brooks, which further demonstrates the close connection among those entities and MiMedx.

78.     The loss of CPM was a significant blow to MiMedx.  In response, the Company transitioned to SLR, a new Master Distributor that was also based in Dallas, Texas, in September 2015.[72]   SLR was founded in 2010 by Jerry Morrison ("Morrison"), who, as of January 12, 2015, while still working at MiMedx, was "the sole owner of the firm" and was "responsible for all operations of the firm," according to the FDA.[73]  Morrison worked at MiMedx from July 2013 to September 2015, as MiMedx's Sales Director, Surgical and Orthopedic, conveniently leaving to become SLR's President and CEO when SLR became the Company's new Master Distributor in place of CPM.  Morrison continued to have a MiMedx email address after he had

---

this report] with regulators including evidence [Viceroy] are restricted in publishing to avoid exposing the identity of former employees."  *Id.*

[71]  *See id.*

[72]  *Kruchoski* State Counterclaim, at ¶72.

[73]  *See* Ex. G, at 13.

left the Company to head up SLR.  Tierney corroborated the "close relationships" between MiMedx and SLR.[74]

79.    Prior to becoming Master Distributor, SLR had contracted with CPM to distribute MiMedx products, and some of the same sales representatives who worked for CPM also worked for SLR.  Like CPM, SLR was a "house account" essentially controlled by MiMedx and serviced by Carlton, and SLR used the same PODs as CPM.  The same channel stuffing practices that occurred through CPM continued through SLR.  According to Kruchoski, MiMedx and SLR had an agreement whereby SLR placed excess quarter-end orders for MiMedx products in exchange for financing terms that were highly favorable to SLR.[75]  Similarly, Tierney observed that MiMedx was shipping large amounts of product to SLR near the end of quarters "as part of a channel-stuffing scheme to fraudulently recognize revenue in financial statements MiMedx publicly filed with the Securities and Exchange Commission"[76] and that MiMedx was offering SLR deep discounts, free products, rebates, lenient

---

[74]  *Tierney* Complaint, at ¶8.

[75]  *Kruchoski* State Counterclaim, at ¶¶70, 73.

[76]  *Tierney* Complaint, at ¶8.

return/exchange policies, and extended payment terms in exchange for such shipments.[77]

80.    As a MiMedx whistleblower stated to Viceroy Research Group ("Viceroy"), "[a] lot of the shady stuff at the Company was happening from the top and circumventing the local reps. ***This enabled MiMedx to make the numbers a lot of quarters when they would have failed***."[78]

### 3.    Defendants Engage in Improper Revenue Recognition and Channel Stuffing with Government Accounts

#### a.    The Company Courts Lucrative Government Accounts

81.    Government accounts such as VAs provided a huge source of revenue for the Company.  The VA system is the largest integrated health care system in the United States, comprised of over 1,200 medical facilities including hospitals and outpatient clinics, serving approximately nine million enrolled veterans of U.S. military service each year.  In addition to being large sources of sales,[79] such accounts were advantageous because sales were not contingent upon the ability to gain reimbursement from third-party insurers.

---

[77]  *Id*. at ¶9.

[78]  *See* Viceroy Research Group, *supra* n.4.

[79]  Transcript of Michael Carlton Deposition, *Mid-South Biologics, LLC, v. MiMedx Grp., Inc.*, No. 17-cv-02028-JTF (W.D. Tenn. Jan. 13, 2017), ECF. No. 43-3, ("Carlton Dep."), 41:14-15.

82.     In order to sell products to government agencies like the VA, a company is often part of the FSS program.  A company can sell products through its own FSS contract, if it qualifies, or through another company's FSS contract.  This has innumerable benefits, including the ability to avoid costs associated with obtaining reimbursements from third-party insurers.  According to Vitale, "[u]nlike commercial accounts that reimbursed MiMedx products based on the square cm and subjected doctors and patients to certain reimbursement guidelines, federal accounts had no patient guidelines, meaning physicians were able to use as many products without any limitation on reimbursement."[80]  Such accounts presented a cash cow for MiMedx.

83.     To capture this segment, beginning in 2012, MiMedx made a major push to acquire direct sales representatives from ABH,[81] a subsidiary of Shire Pharmaceuticals LLC ("Shire"), which competed with MiMedx in the wound care market with a product called Dermagraft.  According to Carlton, because Shire had laid off its federal division in 2012, the sales representatives from that division were "on the street with VA business," and MiMedx hired them.[82]   The sales

---

[80]   *Vitale Qui Tam* Complaint, at ¶60 n.3.

[81]   Carlton Dep. 77:21-24.

[82]   *Id.* 63:21-25; 64: 25-2.

representatives had already serviced the VAs and were therefore able to convert such business over to MiMedx.

### b.   MiMedx Uses AvKARE to Prematurely Recognize Revenue

84.    In 2012, the Company was introduced to AvKARE, a veteran-owned business with an FSS contract.  MiMedx knew that if it could partner with AvKARE, it could get on AvKARE's FSS, which would enable it to get its products into VAs faster than by trying to acquire its own FSS (a six-to-nine month process)[83] and "push[] a lot of products in VAs."[84]  AvKARE was not previously in the wound care business but, as MiMedx had its "own people in VAs," the parties agreed to a deal, entering into a Production Distribution Agreement ("PDA") on April 19, 2012.[85]  The PDA provided that AvKARE would purchase products from MiMedx, and then sell the same products to the VA pursuant to AvKARE's FSS.

85.    The Company disclosed the PDA to the market and stated that AvKARE was one of its "independent" distributors "who sell [MiMedx's] products to their customers or sub-distributors, contractually take title to the products and assume all

---

[83]  *Id*. 62:16-19; 64:20-21.

[84]  *Id*. 54:13.

[85]  *Id.* 54:14-24; MiMedx Group, Inc., Annual Report (Form 10-K) (Mar. 15, 2013) ("2012 Form 10-K"), at Ex. 10.56.

risks of ownership at the time of shipment."[86] MiMedx further stated that distributors such as AvKARE "are obligated to pay us the contractually agreed upon invoice price within specified terms regardless of when, if ever, they sell the products" and "do not have any contractual rights of return or exchange other than for defective product or shipping error."[87] As such, the Company represented that it "records revenues from sales to our independent stocking distributors at the time the product is shipped to the distributor."[88] Such statements were patent falsehoods.

86. Unbeknownst to investors, as the Company later admitted, MiMedx and AvKARE had an implicit side arrangement that allowed MiMedx to exercise almost complete control over the distribution and sale of MiMedx products to VAs. Even after booking the sale of a product to AvKARE, MiMedx maintained control of the product and responsibility for re-selling it to VAs. This was confirmed by Carlton's testimony that "***AvKARE didn't sell the product. They didn't do anything. They just made it easier to sell***. . . . AvKARE just made it easier to do business. They didn't

---

[86] *See, e.g*., Letter from Senken to Martin James, Senior Assistant Chief Accountant, SEC (Feb. 8, 2017) at 2.

[87] *Id.*

[88] *See* 2016 Form 10-K; *see also* 2012 Form 10-K; 2013 Form 10-K; 2014 Form 10-K; 2015 Form 10-K (containing substantially similar statements regarding revenue recognition).

have sales guys."[89]  Thus, AvKARE was a mere pass-through, used by MiMedx as a means to an FSS and an intermediary to inflate MiMedx's financial statements. MiMedx retained performance obligations and a risk of loss for products supposedly sold to AvKARE.

87.     At the direction of MiMedx management, MiMedx sales representatives were responsible for ordering products under AvKARE's account through the Company's online customer relationship management platform at SalesForce.com ("SalesForce").[90]  This happened regardless of whether AvKARE had requested the orders.  Such orders would then be "billed" to AvKARE's account and MiMedx would ship the products directly to VAs prior to the payment of those products.[91]  To conceal this scheme, MiMedx and AvKARE would exchange false sales documents for the bogus VA sales.[92]  MiMedx would send an invoice to AvKARE, and AvKARE would, in turn, cut a dummy purchase order to MiMedx, even though AvKARE had

---

[89]   Carlton Dep. 49:6-7.

[90]   *Fox* Counterclaim, at ¶28.

[91]   *Kruchoski* State Counterclaim, at ¶¶20-23.

[92]   *Id.*

not requested or initiated the order.[93]  MiMedx and AvKARE even shared a fax number to facilitate this process.[94]

88.   MiMedx sales representatives were also responsible for setting up consignment arrangements with VAs through AvKARE.   In theory, these arrangements would enable VA doctors to have the products available on hospital shelves for use as needed, and AvKARE would continue to own the products until the VAs in effect purchased them by using them in a medical procedure.

89.   But MiMedx, not AvKARE, continued to be responsible for the consignment products shipped to the VAs.  As explained by Michael Fox ("Fox"),[95] former Area Vice President for the Company's Central Area, MiMedx owed substantial performance obligations to AvKARE to ensure the resale of those products

---

[93]  *Id.*

[94]  *See, e.g.*, Ex. I, Viceroy Research Group, *Viceroy's MiMedx Greatest Hits*, at 25 (May 11, 2018) (showing an AvKARE invoice from a VA hospital with a MiMedx employee listed as the "Vender Point of Contact" and MiMedx's fax number listed before AvKARE's phone number); *see also* Aurelius Value, *An Open Letter to MiMedx Auditors* (Feb. 15, 2018).

[95]  Fox was employed at MiMedx from July 2012 through December 29, 2016.  *See* Second Amended Counterclaim, at ¶¶14, 96, *MiMedx Grp., Inc. v. Fox*, No. 1:16-cv-11715 (N.D. Ill. Jan. 31, 2018) ECF No. 147 ("*Fox* Counterclaim").  Fox served as Regional Sales Director for the Company's Central territories from July 2012 to October 2013.  *Id.* at ¶¶14, 16.  From October 2013 to December 2015, Fox served as Area Vice President for the Company's Central area.   *Id.* at ¶¶16, 46-47.  From December 2015 to December 29, 2016, Fox served as National Vice President, Federal and Academic Centers.  *Id.* at ¶¶47, 96.

to VAs.[96]  MiMedx's sales representatives, many of whom were transplanted from ABH, "made the VA business tick."[97]  In fact, MiMedx disseminated a document entitled "AvKARE Code of Conduct" to its sales force that required MiMedx sales representatives to "represent MiMedx products [at VAs] on behalf of AvKARE."[98]

90.    Moreover, AvKARE's obligation to pay MiMedx was implicitly excused until the products were later re-sold to VAs.[99]  "At no point in the distribution channel did AvKARE exercise physical control over the 'consignment' product involved in the scheme, nor did AvKARE assume the risks and rewards of ownership, or otherwise play a role in reselling the product to VAs."[100]  As Fox stated, "[t]hese undisclosed agreements were necessary to ensure AvKARE's cooperation with the fraudulent scheme."[101]

91.    In conjunction with their ongoing sales and marketing obligations, MiMedx sales representatives were responsible for monitoring, documenting, and

---

[96]  *Id.* at ¶30.

[97]  Carlton Dep. 45:22-8; 63:21-25; 64:3-24.

[98]  *Fox* Counterclaim, at ¶29.

[99]  *Id.*

[100]  *Kruchoski* State Counterclaim, at ¶26.

[101]  *Fox* Counterclaim, at ¶30.

reconciling products that had been shipped to VAs.[102]  If MiMedx was able to re-sell the product to a VA, MiMedx's sales representatives were responsible for preparing purchase orders from the VA.  "When the 'consignment' product on the shelves of the VA was actually ordered and used by the VA, MiMedx sales reps would generate a purchase order for the product actually ordered, and submit it directly to MiMedx, ***not*** AvKARE – even though product had been previously invoiced to AvKARE by MiMedx and was ostensibly owned by AvKARE."[103]  MiMedx could then collect from AvKARE based on the VA purchase order.  On the other hand, if the sales representatives could not locate the products, or if the products were damaged, then MiMedx was required to credit AvKARE for them.[104]

92.    MiMedx sales representatives would receive full sales commissions only if the product was ultimately resold to VAs.[105]  Thus, the Company's compensation structure facilitated the scheme by directly incentivizing MiMedx sales representatives to continue marketing the products to VAs, in order to receive full commissions upon resale to VAs.  Critically, the Company's compensation practices acknowledged

---

[102] *Id.* at ¶29.

[103] *Kruchoski* State Counterclaim, at ¶24.

[104] *Fox* Counterclaim, at ¶30.

[105] *See Kruchoski* State Counterclaim, at ¶¶77-81.

MiMedx's continuing performance obligations even after the products were sold to AvKARE.

93.     The Company's arrangements with AvKARE violated both GAAP and the Company's stated accounting policy and materially inflated the Company's financial statements for nearly six years.  *See* Section IX.  By recognizing revenue from AvKARE at the time of such shipment, the Company gave the false appearance that it was selling more product than it was actually selling.[106]  The purported sales to AvKARE should not have been recognized as revenue at the time of shipment because the Company retained liability and material performance obligations for the products sold.  If these obligations went unfulfilled, the Company was responsible for issuing credits to AvKARE, ultimately reducing realized revenues.  Further, as Defendants acknowledged but did not follow, consignment sales should have been recognized when the product was used by the VA, not when it was shipped to the VA.[107]

94.     The Company's arrangement with AvKARE also facilitated a massive channel stuffing scheme, which boosted the Company's revenue at the end of financial quarters, allowing it to meet its aggressive growth targets and inflate quarterly financial results.  MiMedx employees leveraged their access to VAs to stuff

---

[106] *Kruchoski* State Counterclaim, at ¶39.

[107] Letter from Senken, on behalf of MiMedx, to Martin James, Senior Assistant Chief Accountant, SEC (Apr. 18, 2017).

the shelves with excess MiMedx products.  While the government and investors were in the dark about the scheme, according to multiple former employees, "MiMedx's executive officers and senior management direct[ed] and pressur[ed] MiMedx sales representatives and sales managers to create bogus orders for EpiFix grafts for delivery to VA hospitals throughout the country, typically at the end of a financial reporting quarter."[108]  "These orders, which the VA did not request or otherwise initiate, were generally well in excess of what the VA would ordinarily use in the foreseeable future, and in some cases, in very expensive sizes that the particular VA hospitals rarely, if ever, had ordered or used before."[109]

95.    According to both Fox and Kruchoski, MiMedx internally tracked the amount of products that had been shipped to VAs, invoiced to AvKARE, and booked as MiMedx revenue, but continued to sit on VA shelves unused.[110]  The Company referred to this metric as "AvKareShippedNotImplanted," reflecting phantom revenue created through channel stuffing.[111]

---

[108] *Fox* Counterclaim, at ¶28; *Kruchoski* State Counterclaim, at ¶20.

[109] *Kruchoski* State Counterclaim, at ¶20.

[110] *Fox* Counterclaim, at ¶¶28-33; *Kruchoski* State Counterclaim, at ¶¶21-25.

[111] *Kruchoski* State Counterclaim, at ¶51.

### C.     Defendants Ramp Up Their Fraudulent Revenue Scheme to Keep MiMedx's Growth Story Alive

96.     The Company reported remarkable revenue growth through the improper sales, distribution, and accounting practices discussed above.   Annual revenues increased dramatically year after year, jumping over 300%, for example, from 2012 to 2014.  *See* Section VIII.A below.  Defendants were determined to continue this rapid growth trend.

97.     As the Class Period wore on, the Company's channel stuffing efforts grew.  According to Fox, the Company accelerated the scheme beginning in 3Q14.[112] During that quarter, Cashman, Roselli, and Mark Diaz ("Diaz"), MiMedx's Executive Vice President of Sales Operations, directed the Company's senior sales managers to significantly increase products shipped to VAs through AvKARE, even if the VAs did not need or request the products.   These efforts continued after 3Q14 and led to significant amounts of excess MiMedx product sitting on VA shelves.[113]

98.     Later on, in June 2015, MiMedx lost its master commercial distributor, CPM, due to the fallout from the Forest Park scandal.  The Company had relied on

---

[112] *Fox* Counterclaim, at ¶¶39-40.

[113] Notably, the Company used to report on its major distributors' percentage of account receivables balance but curiously stopped reporting such information to investors in 2014, just as their channel stuffing scheme gained steam.

CPM as an important revenue source.[114]   Defendants revealed CPM's departure,

without naming it directly, on October 12 and 13, 2015.  While Petit downplayed the

Company's loss of CPM as merely a "strategic step" or "adjustment" in the distributor

network, this was a significant blow.  CPM had been an important "house account,"

with a massive web of PODs and other sub-distributors, through which MiMedx had

been able to stuff and move product, helping MiMedx make its quarterly numbers.

During the Company's 3Q15 earnings call on October 29, 2015, Petit later admitted

that this distributor "had been with us a while and it was just time for us to go our

separate ways.   That probably cost us a bit.  Well, it did cost us some revenue in the

quarter . . ."  Taylor added that "[t]hey were our largest distributor outside of the

federal side of things.  So you can think from our past case, you can see how big that

product line was, but it was substantial."

99.    To absorb this loss, during the second half of 2015, Defendants shifted

much of the Company's commercial channel stuffing efforts from CPM to SLR.[115]

SLR had agreed to place excess quarter-end orders for Company products on

financing terms that were highly favorable to SLR.[116]  As detailed above, these terms

---

[114] *Kruchoski* State Counterclaim, at ¶¶68-71.

[115] *Id*. at ¶72.

[116] *Id.* at ¶73.

included deep discounts, free products, rebates, lenient return/exchange policies, and extended payment terms in exchange for quarter-end orders that exceeded their needs. Some of the excess orders were stored at the residence of a former MiMedx sales representative who had left the Company to work for SLR.[117]  The product was kept by this SLR employee in freezers that were provided by MiMedx.

100.   Despite these efforts, by 4Q15, Defendants were "way behind" on their aggressive revenue forecast for the quarter, so they increased their reliance on AvKARE.  As the quarter came to a close, Roselli called multiple employees who handled VA accounts, and instructed them to add as much MiMedx product as possible to the shelves of the VA hospitals in their territories.[118]  As Roselli admitted to Kruchoski, "we're short overall."[119]  And despite Kruchoski's concerns as to the legality of this practice and the fact that it was jeopardizing VA accounts, Roselli

---

[117] *See id.* at ¶74.

[118] Defendant's Second Amended Verified Answer, Affirmative Defenses, and Counterclaims for Declaratory Judgment, Injunctive Relief, Damages, and Attorneys' Fees, *MiMedx Grp., Inc. v. Tornquist*, No. 1:27-cv-00399-LMM (N.D. Ga. June 25, 2018) ("*Tornquist* Counterclaim"), ECF No. 146, at ¶64.  Luke Tornquist ("Tornquist"), a former Account Executive, was employed at MiMedx from October 2013 through December 12, 2016.  During this time, Tornquist held the position of Account Executive of MiMedx's Greater Minneapolis territory.  *Id.* at ¶12.

[119] *Kruchoski* State Counterclaim, at ¶50.

made clear that he was communicating a "company directive" from Petit's "mouth" to stuff the channel or face dire consequences in January:

> No, I – look, I get it. I – I've sat on the other side and I've been asked to do it, you know.  And then I'm on the other side asking everybody to do it, too, you know. What I'll tell you is that – I mean, if you can do it, you know, and just don't want to do it, and orders come through – this is – ***this is right out of Pete's [Petit's] mouth.***  So this is the – Pete says – I [unintelligible] – I fully understand the risk that we are taking. We share that same risk with him. ***And he said:  But this is a company directive.*** So if they can help they need to help. And if they don't and orders come through between now and [a team meeting at the end of January] – this is the only time I've heard him cuss. He said: Their ass is grass. So I'm just – I'm just putting it out there. I don't want to see anybody in trouble because an order came in in January that he didn't want to come in, you know.[120]

101.   In such a way, Roselli revealed to Kruchoski that "Petit was directing that at a minimum he wanted sales expected for the first quarter of 2016 to be submitted to MiMedx as current-quarter sales [in 4Q15].  However, based on the actual volume of channel stuffing MiMedx was demanding of its sales representatives, the practice extended well beyond the acceleration of sales by a quarter."[121]

102.   Through these tactics, the Company was able to meet its guidance for 4Q15, achieving revenue of $51,835,000.  But by the end of 2015, over "$10 million of MiMedx products were sitting on VA hospitals' shelves which those hospitals had

---

[120] *Fox* Counterclaim, at ¶50; *Kruchoski* State Counterclaim, at ¶45.

[121] *Kruchoski* State Counterclaim, at ¶49.

neither bought nor requested."[122]   Moreover, Defendants had pulled significant sales from 1Q16 into 4Q15 at Petit's directive, leaving them in a precarious position.

103.   Near the end of 1Q16, Steve Blocker ("Blocker"), MiMedx's Area Vice President for the Central Area, instructed several MiMedx employees to put as much product as possible on the shelves of the Minneapolis VA Health Care System ("Minneapolis VA") to hit a target for 1Q16.[123]   However, Blocker admitted to Kruchoski that MiMedx products were already "spilling out of every cabinet available to us" at VA hospitals, causing "questions the amount of product that's being used," which Blocker said he had previously communicated to Cashman.[124]   Yet, Blocker was required to "***do ten percent growth on top of – you want me to provide real growth on a false number and I can't – I can't do that*. . . .**"[125]

104.   Blocker had explained to Cashman that there were impediments to hitting the phony number they had asked him to hit ($3.7 million), including par levels (*i.e.*,

---

[122] *Tornquist* Counterclaim, at ¶¶60-63.

[123] *Fox* Counterclaim, at ¶54.  Corroborating the Kruchoski and Blocker conversations above, Tornquist was also instructed by Blocker, near the end of March 2016, to put as much MiMedx product as possible on the shelves of the Minneapolis VA to hit a target for 1Q16.  *See Tornquist* Counterclaim, at ¶65.

[124] *Fox* Counterclaim, at ¶54.

[125] *Id.*

inventory limits) at certain hospitals.[126]   While some VA employees were "free to do whatever [they] want[ed]," "[p]eople that don't have carte blanche at their facilities are starting to get, you know, questions."[127]   Blocker had also received warnings from VA employees not to "send this much again."[128]

105.   In response, Cashman suggested that Blocker try one of the Company's favorite tactics, using "healing reviews" (discussed above) to influence VA decision-makers to accept more products.[129]   Blocker described this exchange as follows during a call with Kruchoski:

> And [Cashman's] response was:  Well *do they have healing reviews* down at those accounts?
>
>          *        *        *
>
> And I said I – and I said: Chris [Cashman] – I said: In all fairness – I said, you know:  A healing review has no bearing on providing any extra shelf space or alleviating the concerns of some, you know, floor manager or department manager who's *looking at how many grafts are spilling out of every cabinet available to us*.  I said:  And what it helps with is when chief of surgery or chief of staff comes down and questions the amount of product that's being used, I go:  *That doesn't help us in any capacity for what's being, you know, stuffed in our VAs*. . . .[130]

---

[126] *Id.*

[127] *Id.*

[128] *Id.*

[129] *Id.*

[130] *Id.*

106.  During the same call, Kruchoski and Blocker agreed that the Company's reported revenue through AvKARE was "not a real number," "dishonest," and "built on false growth" through channel stuffing.[131] However, as Blocker explained, if he didn't hit that phony growth number, there was "***an insinuation that there will be hell to pay. And, you know, Pete [Petit] says: Well, you don't want to be on the wrong end and not hit your number, you know***."[132]

107.  In addition to pressuring employees to stuff VA shelves, Cashman and Diaz launched a new initiative to achieve revenue targets in March 2016. Cashman and Diaz had determined that the most efficient method of channel stuffing involved 7x7 cm EpiFix, the Company's most expensive graft, which sold for around $6,700. Customer demand for those grafts was usually low because of their large size (roughly the size of an iPhone), which limited their use in medical procedures.[133]

108.  In March 2016, Fox participated in a conference call with Cashman, Diaz, Roselli, and Kevin Lilly ("Lilly") to discuss the new initiative, involving delivery of 7x7 cm EpiFix grafts to targeted VAs in shoebox-sized packages. Fox expressed major concerns with this scheme, stating that MiMedx would be shipping

---

[131] *Id.* at ¶55.

[132] *Id.*

[133] *Kruchoski* State Counterclaim, at ¶¶61-64; *Fox* Counterclaim, at ¶¶56-57.

out products that no one ever used.  Fox said that everyone on the call admitted that the grafts would all have to be shipped back.  Cashman responded, "***Mike, we understand your concerns.  Duly noted, but we are going to do this***."  Cashman explained that the code name for this scheme would be the "Limb Salvage Initiative."[134]

109.   Despite Fox's objections, MiMedx proceeded with the Limb Salvage Initiative devised by Cashman and Diaz.  Between March 22 and March 31, 2016, the Company sent 7x7 cm EpiFix grafts to 20 VA hospitals across the country, representing approximately $2 million to $2.4 million of excess product.  MiMedx billed AvKARE and booked revenue for these grafts at the time of shipment.  The plan was that most of these grafts would be slowly returned to the Company in order to spread out losses and conceal them with revenue in future fiscal quarters.[135] Accordingly, most of these grafts remained unused and unpurchased by VAs as of November 2016.[136]

110.   Despite the Company's best efforts, including the Limb Salvage Initiative, the Company could not salvage its financial results in 1Q16.  On April 10,

---

[134] *Fox* Counterclaim, at ¶57.

[135] *Id.* at ¶63.

[136] *Kruchoski* State Counterclaim, at ¶67; *see also* Ex. I, at 27 (photo of over 20 7x7 EpiFix grafts at VA facility).

2016, the Company announced that, after 17 straight quarters of meeting or exceeding revenue guidance, it had missed revenue guidance in 1Q16 by $2 million.  The Company misleadingly spun the miss, stating that it was not "systemic to advanced wound care or the SSO business" but rather the "consequence of our own initiatives to make changes in order to continue orderly growth in the future."[137]  Petit insisted that "[t]his is a problem that was strictly caused by our growing pains. . . . [w]e believe we will recover from this quickly," while Cashman reassured that "we had a transitional quarter, but it was because of operational issues and not anything fundamental."[138]  However, unbeknownst to the market, Defendants' improper sales and distribution practices were catching up with them.

111.   Defendants' desperate need to boost revenue also caused them to stuff clinics and doctor's offices with unordered product.  For example, according to Village Podiatry, MiMedx engaged in "fraudulent sales tactics – channel stuffing. . . . [MiMedx's] sales staff would purposely overstock the shelves of [Village Podiatry's]

---

[137] MiMedx Group, Inc., Current Report (Form 8-K) (Apr. 10, 2016), Ex. 99.1.

[138] Edited Transcript, *MDXG – Q1 2016 MiMedx Group Inc Corporate Sales Call*, Thomson Reuters StreetEvents (Apr. 11, 2016 3:00PM GMT).

locations – without any request from [Village Podiatry] – presumably to show higher sales revenue numbers."[139]

112.    The Company even went so far as to send out and intercept unauthorized orders.  On September 29, 2016, just one day before the end of 3Q16, the Company made a massive shipment of 135 oversized skin grafts to a FedEx location in Las Vegas, and billed a Las Vegas plastic surgeon's office $270,000 for the shipment. Neither the plastic surgeon nor anyone at his office had ordered the shipment, and the plastic surgeon refused to pay for it.  Following the surgeon's refusal to pay, a security video at the FedEx office showed that a representative for a company that did business with MiMedx picked up the shipment the following day.[140]

113.    The Company did whatever it had to do to meet the quarterly numbers.

114.    At the end of quarters, for example, the Company held meetings to meet the numbers.  The meetings took place in a conference room at the Company's headquarters in Marietta, Georgia to discuss how much product could be sold to make the Company's forecasts before the end of the quarter.  The meetings were attended by Cashman, Diaz, Carlton, Roselli, Lilly, MiMedx's Senior Vice President of Sales,

---

[139] Defendant's Opposition to Plaintiff's Motion for Partial Summary Judgment, at 5-6, *MiMedx Grp., Inc. v. Village Podiatry Grp., LLC*, No. 17EV000617 (Ga. Fulton Cty. Ct. Aug. 14, 2017).

[140] *See* Gretchen Morgenson, Joseph Walker, & Charley Grant, *Highflying Medical Firm, a Help to Wounded Veterans, Falls to Earth*, WALL ST. J. (July 23, 2018).

and the Company's Area Vice Presidents, including employees such as Ricky Palmer and Nick Andolino. Petit and Taylor would also make appearances at these meetings.

115. At these meetings, the high side numbers and low side numbers were written on a board in the meeting room. The numbers represented the maximum and minimum amounts Area Vice Presidents needed to sell in their regions. This was done because MiMedx did not want to exceed the total number needed to meet the forecast by too much. This is consistent with the Company's financial results throughout the Class Period, which show that the Company consistently made forecasts by a narrow margin. *See* Section IX.B.

116. As these events demonstrated, the Company's channel stuffing was carefully orchestrated by senior management to achieve quarterly revenue targets.

## D. Defendants' Scheme Catches Up to Them

### 1. MiMedx Customers Are Overstuffed

117. For years, the Company had been stuffing customer shelves with far more product than they could use. As of late 2017, MiMedx inventory dating back to 2013 still remained on VA shelves.[141] MiMedx employees were physically running out of room at VAs to stuff additional products, which was problematic because the

---

[141] *See* Ex. J, Email from Anonymous MiMedx Employee to "Attorneys, Journalists & Mr[.] Petit" (Oct. 10, 2017), at 4.

Company needed to keep stuffing to continue to grow sales and revenues as they had promised the market they would.  Essentially, as Kruchoski explained, "***we're trying to chase a growing number – but trying to grow on a number that was built on false growth***."[142]

118.   Moreover, VA employees began to question the massive quantities of MiMedx inventory sitting on their shelves.  As Blocker and Kruchoski observed, MiMedx products were "spilling out of every cabinet available" at VAs[143] and the VA shelves were "absolutely overflowing."[144]  This led VA employees to ask questions of MiMedx sales representatives, threatening their relationships with these facilities.  As confirmed by Fox, MiMedx's sales force was reporting that "VA hospital representatives [were] questioning the amount of AvKARE tissues on their shelves."[145]  For example, on June 14, 2016, Rhonda Jones, a VA purchasing agent, emailed Hal Purdy, MiMedx's former Senior Account Executive for VA Hospitals, complaining of unordered and unwanted MiMedx products sent to her facility despite the fact that the Dallas VA Medical Center ("Dallas VA") had previously refused to enter into a consignment agreement with MiMedx:

---

[142] *Fox* Counterclaim, at ¶55.

[143] *Id.* at ¶54.

[144] *Kruchoski* State Complaint, at ¶46.

[145] *Fox* Counterclaim, at ¶41.

Hal, I just got a call this morning that a box of AMNIOFIX arrived at the Dallas VA w/ no PO# [purchase order number]? The warehouse sent the box to my counterpart up by the O.R. and he called inquiring did I have this sent in. I knew nothing about this and had one nurse's name Winston and the vendor was MIMEDX. He said that he was told by the rep that a consignment order would be shipped in overnight and conversation supposedly happened yesterday. ***You and I have gone over this many times that there is NO LEGAL CONSIGNMENT here currently and until Central Office makes a decision, no product will be shipped in here without PREAUTHORIZATION of stock purchased UP FRONT or by CASE eaches [sic] purchased. I asked that the 4 line items be returned to MIMEDX immediately.*** We will get the clinician what they need, we just need to work together and do it the right way. ***Please enlighten me of why this was done AGAIN?*** The time and other folks time to help figure this out is ridiculous. I thought it was very clear the last time we talked of the process. All the clinician has to do is put a consult for a surgery date to order in for the case or IF he wants it stocked on the shelf, we need to get together and I can go over it again. Very frustrated. Please call or email regarding this matter . . .[146]

119.    Vitale encountered a similar issue when the Dorn VA appointed a new Assistant Chief of Prosthetics, Christopher Clay Jones ("Jones"). In May 2016, Jones raised an issue with Vitale concerning over $400,000 of excess MiMedx products sitting on the Dorn VA shelves, which the Dorn VA had not purchased.[147] The product had been shipped by MiMedx on consignment, although the parties had no

---

[146] Ex. K, Viceroy Research Group, *MiMedx caught red-handed circumventing VA regulations*, at 6 (Nov. 2017).

[147] *Vitale* 2019 Complaint, at ¶¶23-26.

consignment agreement in place.[148] Jones informed Vitale that the Dorn VA could no longer hold MiMedx products on consignment without a consignment agreement.[149]

## 2. The Company Avoids Returns

120.    Accordingly, either because of a lack of VA shelf space or because VAs were cracking down, the Company needed to devise new tactics to deal with the tremendous volume of excess product the Company had been shipping to the VAs. According to Fox, "MiMedx [had] the intent of slowly feathering back returns of its product over time, concealing the return of product it had previously recognized as revenue by balancing those returns against actual revenue in future reporting periods."[150] However, there was simply too much overstuffed product to return in this manner. Such returns would significantly reduce the Company's accounts receivable and profits, raising a red flag or jeopardizing the Company's ability to meet financial projections in the quarter ahead. MiMedx therefore strictly controlled what returns it would process in a particular quarter. Kruchoski added that, "[t]o avoid detection of the scheme, return of 'consignment' product by the VA had to be approved by upper management."[151]

---

[148] *Id.*

[149] *Id.*

[150] *Fox* Counterclaim, at ¶36.

[151] *Kruchoski* State Counterclaim, at ¶29.

121.   The Company avoided such returns by transferring the product to other facilities[152] or instructing Company employees to conceal it, either by hiding the product at VA hospitals or even in their homes or cars.[153]  When Vitale reached out to MiMedx regarding the $400,000 of excess MiMedx product sitting on the Dorn VA shelves to see what he should do with it, Vitale was told that it could not be shipped back to the Company until further notice, and that he should "hide" the products at the Dorn VA.[154]  When Vitale stated that he could not do so, the Company directed him to store the products at his house, despite the fact that, due to the medical-grade nature of the products, they needed to be stored in a controlled environment.[155]  According to Vitale, MiMedx did not want the product returned to MiMedx at that time because it would have had an adverse effect on the Company's 2Q16 financial statements.[156]

122.   Approximately six months later, MiMedx finally directed Vitale to ship the product back to MiMedx, which he did through UPS on November 30, 2016.  An employee at MiMedx received and signed for the shipment on December 2, 2016.  However, MiMedx claimed the shipment was never received and directed Vitale to

---

[152] *Fox* Counterclaim, at ¶65.

[153] *See, e.g.*, Ex. F, at 10-13.

[154] *Vitale* 2019 Complaint, at ¶30.

[155] *Id.* at ¶¶30-31.

[156] *Id.* at ¶29.

file a loss of shipment claim on the delivery insurance, in order to receive an insurance payment for the "lost" product, rather than properly reporting it as a lost sale and taking a corresponding hit to the Company's financial statements. As discussed below, Vitale's refusal to do so led to his termination.

123. Fox and Kruchoski also confirmed that employees were asked to hide products until MiMedx was ready to authorize their return in order to conceal losses associated with those returns. For example, MiMedx directed sales representatives to hide the grafts that were previously shipped to VA facilities as part of the Limb Salvage Initiative at their personal residences or in their cars.[157]

### 3.    The Company Loses Track of Inventory

124. The massive quantities of product sitting at hospitals and medical facilities, coupled with efforts to conceal excess product, caused MiMedx employees to lose track of inventory. Tierney reported directly to Petit that MiMedx management had an established practice of fraudulently concealing the fact that a large amount of product shipped by MiMedx on consignment was missing from customers' shelves.

125. According to Tierney, MiMedx management instructed employees to mark consignment product as present at customers' facilities even though it was, in

---

[157] *Fox* Counterclaim, at ¶64; *Kruchoski* State Counterclaim, at ¶22.

fact, missing.[158]  Specifically, out of approximately 19,000 outstanding consignment tissues, Tierney observed that a substantial number had been falsely recorded (*i.e.*, "tagged") as present and accounted for on third-party shelves, when, in fact, the tissues were missing.[159]  In his report to the Company's compliance hotline, Tierney made clear that he was refusing to engage in the practice of mistagging those tissues as present.  Tierney understood that the Company had improperly recognized revenue for such consignment tissues upon shipment, and therefore the Company sought to conceal the missing tissues to avoid issuing credits to the third parties.  "The practice of concealing missing tissues – and hence preventing the issuance of credits – was part and parcel of MiMedx's fraudulent revenue recognition scheme."[160]  In his report to Petit, Tierney made clear that he was refusing to engage in this scheme.

126.    The Company's inability to track inventory had become a big problem by the end of 2015.  On December 9, 2015, Roselli sent an email to Fox and several other senior MiMedx executives expressing concerns over inventory reconciliation problems at VAs.[161]  Roselli conveyed that MiMedx could not find 511 tissues placed on VA shelves.  Failure to locate this inventory and obtain purchase orders from VAs

---

[158] *Tierney* Complaint, at ¶13.

[159] *Id.*

[160] *Id.*

[161] *See* Ex. L, Email from Lou Roselli (Dec. 9, 2015 4:36 PM).

would mean that AvKARE was entitled to a credit for the inventory, which would have a detrimental impact on MiMedx's 4Q15. As Roselli stated, "If we can not [sic] reconcile the federal inventory and AvKare pushes us for a credit on 511 tissues you can imagine what will happen to the quarter."[162] Petit, Taylor, and Cashman were made aware of the problem.

127. The inventory reconciliation problems did not abate. For example, on November 1, 2016, Kruchoski had a conversation with Roselli regarding missing MiMedx grafts that had been shipped to the Minneapolis VA which could obligate the Company to issue a substantial credit to AvKARE.[163] Kruchoski linked this problem with the fact that the shelves of this VA facility had been stuffed and "*overinflated*" for the past two years:

> Kruchoski:   *– this is like – this is this enormous snowball because we were asked to put product on the shelf.*
>
> Roselli:      Jess, *I don't disagree with you at – one iota on that whole process and what happened*. What I'm trying to do is a completely different thing. I'm trying to clean up the books and say: What you told us was left as implanted, no PO, Luke, we need to get paid on so AvKARE stops hounding me about when this conversion's complete. . . .[164]

---

[162] *Id.*

[163] *Fox* Counterclaim, at ¶65.

[164] *Id.*

128.   Given the vast quantity of channel stuffing through AvKARE, resulting in a huge amount of unused products sitting on VA shelves, Defendants understood that they would need an exit strategy in the event their relationship with AvKARE soured.  Moreover, AvKARE needed additional assurance that it would not get stuck with the financial responsibility for a tremendous volume of unsold or missing MiMedx product that it allowed the Company to stuff.  Thus, to alleviate these concerns, in 2015, the parties amended their PDA to include a so-called inventory "buyback" provision.  In effect, but unbeknownst to investors at the time, the amended PDA allowed MiMedx to absorb and conceal excess or missing inventory that was being stuffed through AvKARE over future quarters instead of reserving for the excess or missing inventory immediately causing negative financial harm.

129.   In practice, the impact and purpose of the buyback provision played out over the course of 2016.  As pressure mounted against the Individual Defendants, they began to "clean up the books," as explained by Roselli, and the Company was transitioning to its own FSS as part of this effort.  To blunt the impact of repurchasing the sheer volume of stuffed product left sitting on VA shelves, however, the Company began to increase its "allowance of product returns" in 2016.[165]  Of significance, "the

---

[165] *See* MiMedx response 12 to SEC comment letter, https://www.sec.gov/Archives/edgar/data/1376339/000137633917000066/filename1.htm.

Company increased its allowance for product returns to 3.4% of net sales in 2016 when compared to 1.8% of net sales in 2015 ***throughout the year*** to recognize the estimated liability for future returns related to the AvKARE contract.  As of December 31, 2016, approximately $3.7 million [or 76%] of the balance in this account was estimated to be required for the potential AvKARE termination liability."  Later, when the Company issued its FY16 financial results on February 23, 2017, it revealed a $1.8 million charge in connection with increasing sales returns and allowances reserves for AvKARE.

130.    When pressed by securities analysts following this disclosure, Petit and Senken falsely denied any link between this charge and channel stuffing and claimed the issue was minor.  In truth, the $1.8 million charge was just an increase on top of another $1.9 million (for a total liability of $3.7 million) that the Company already had reserved for AvKARE.  Additionally, the Company's 2016 Form 10-K disclosed that $8.3 million was added to the allowance for product returns (*i.e.*, additions charged to expense or revenue) and $4.7 million was written off in the same account during 2016 (*i.e.*, the actual return credit was issued), resulting in an FY16 ending balance of $4.9 million.  In other words, MiMedx added $8.3 million to the allowance for product returns during 2016 and deducted $4.7 million for actual returns.  Accordingly, the combined disclosures reveal that a sum of approximately $6.3

million was provisioned for future AvKARE returns during 2016, which demonstrates the significant channel stuffing with AvKARE and represents a far greater amount than the $1.8 million Petit and Senken led investors to believe was a minor issue.[166]

131.   As a result of the fraudulent conduct alleged herein, the Company has been forced to restate financial results from FY12 through 3Q17, including the time period in which the AvKARE relationship was wound down and eventually ended in June 2017.  Additionally, the Company has now admitted that it has "undertaken a comprehensive review of its historical VA sales and has recorded an obligation of $8 million in connection with a potential issue that it self-disclosed to the VA concerning the eligibility of one of its products for inclusion in the Company's [FSS]."[167]  In other words, on top of everything else, the Company was improperly selling AmnioFix to the VA.  The Company has also indefinitely delayed the release of any financial results following 3Q17, pending the Company's internal investigation.

---

[166] The $6.3 million is estimated by multiplying the $8.3 million of total provision added in 2016 to the allowance for product returns by 76%, which was the percentage AvKARE represented of the $4.9 million ending balance for the allowance for product returns at December 31, 2016.  These numbers may of course be impacted by the Restatement which impacts these accounts.

[167] MiMedx Group, Inc., Current Report (Form 8-K) (Apr. 11, 2019), Ex. 99.1.

### E.     Defendants' Illicit Sales Practices and Pervasive Accounting Fraud Fuel MiMedx's Growth

132.   In less than a decade, MiMedx grew into a $2 billion company, generating more than $200 million per year.  The Company's annual revenues grew exponentially, on a continual year-over-year basis, from 2011 to 2016: (a) FY11: $7.76 million; (b) FY12: $27.10 million; (c) FY13: $59.18 million; (d) FY14: $118.22 million; (e) FY15: $187.30 million; and (f) FY16: $245.02 million.  This represented an increase of over 3,000% from 2011 to 2016.

133.   As detailed above, this growth was the product of Defendants' fraud, a fiction achieved through a host of illicit sales and accounting practices, including the careful manipulation of financial results to achieve guidance and maintain the appearance of consistent growth.  While the Company was able to meet or beat Defendants' lofty revenue guidance in all but one quarter during the nearly six years covered by the Restatement, this was often within a relatively small margin of $2 million or less, the product of careful quarter-end manipulation through channel stuffing and premature revenue recognition.

134.   Defendants falsely reported and misleadingly trumpeted the Company's financial results, while concealing the fraudulent practices driving such results.  *See* Section VIII.A below.  Petit even admitted to shareholders that the Company's consistently "flawless" growth was implausible yet assured investors it was not:

- 78 -

We have met or exceeded our revenue forecasts for 26 of the last 27 quarters, and increased sequential revenue for 27 straight quarters. That is almost seven years! MiMedx has just been selected by *Fortune Magazine* as the 5th fastest growing public company in revenues, profits and shareholder returns, putting us ahead of Facebook and Amazon. There are only a few healthcare companies out of thousands that have a track record of this nature. ***I have been told that MiMedx's performance has been so flawless that people think we must be doing something "wrong.***"

135.   Defendants' false and misleading statements and omissions had the intended effect of artificially inflating the Company's stock price. As the market would later learn, however, Defendants were indeed "doing something 'wrong'" to achieve the Company's apparent success. As the truth leaked out over time, *see* Section V below, the Company's stock price plummeted, falling from a Class Period high of $18.25 per share, to $3.93 per share on July 2, 2018, resulting in millions in investor losses.

### F.   Employees Begin to Protest the Company's Fraudulent Scheme and Face Retaliation from Executives

136.   During the Class Period, the Individual Defendants and other executives continued to increase pressure on employees to engage in improper sales and distribution practices. Several MiMedx employees began to protest, and raise questions about the legality of those practices to upper management, including complaints made directly to Petit, Taylor, and Cashman. In response, Defendants threatened, terminated, sued, and/or publicly attacked those employees who had the

- 79 -

audacity to object.  Ultimately, several employees filed claims against Defendants and

spoke out against them in the media.  For example:

- **Michael Fox**:  Concerned with the Company's aggressive channel stuffing through AvKARE, Fox repeatedly raised objections to Cashman, Carlton, Diaz, and Roselli, telling them that revenue reported from AvKARE was a "false performance number" used to boost MiMedx's stock price.[168]  In multiple conversations, Roselli, Diaz, and other Area Vice Presidents acknowledged such, calling AvKARE revenue a "bullshit number" for Wall Street.[169]  Accordingly, during 3Q15, Fox refused to participate and "directed his sales force to not order" products through AvKARE for shipment to VA hospitals "unless the sales representative felt there was a need for the product."[170]  When Petit became aware of Fox's objections, Petit personally reprimanded Fox during a meeting of the Company's senior leadership in Atlanta, Georgia on or around October 7, 2015, for objecting to, and refusing to participate in, MiMedx's fraudulent revenue recognition scheme through AvKARE.[171]  Approximately two months after Petit's reprimand, in December 2015, Fox was demoted to a position with no impact on MiMedx's quarterly revenue projections, and therefore his lack of cooperation with the channel stuffing scheme no longer mattered to the Company.[172]  On December 29, 2016, Cashman and Kuntz informed Fox that his employment was terminated, after two of Fox's former subordinates, Kruchoski and Tornquist, came forward and formally reported MiMedx's fraudulent channel stuffing scheme.[173]  The Company then sued

---

[168] *Fox* Counterclaim, at ¶42.

[169] *Id.* at ¶43.

[170] *Id.* at ¶41.

[171] *Id.* at ¶45.

[172] *Id.* at ¶47.

[173] *Id.* at ¶¶92-94.

Fox on February 22, 2017.  On January 31, 2018, Fox filed a counterclaim against the Company related to Defendants' channel stuffing and improper revenue recognition.  The Company publicly denied the counterclaim.

- **Jon Vitale**:  After the Dorn VA complained of unordered inventory, Vitale was told to "hide" the products at the Dorn VA and, when Vitale refused, to store the products at his house.[174] According to Vitale, MiMedx did not want the product returned at that time because it would adversely affect the Company's 2Q16 financial statements.[175]  About six months later, MiMedx directed Vitale to ship the product back to MiMedx and then to file a loss of shipment claim on the delivery insurance, rather than properly report the returned product as a lost sale.[176]  Vitale repeatedly questioned this request via email, telephone, and text message. On December 13, 2016, Vitale received a phone call from a senior MiMedx employee telling him that Deborah Dean ("Dean") (Executive Vice President of Compliance) "said if you send one more fucking email you will be fired."[177]  Vitale then filed the insurance claim and wrote that "I am the shipper & I believe MiMedx is attempting insurance fraud."[178]  Shortly thereafter, on December 29, 2016, Cashman called Vitale and fired him.[179] After his termination, Vitale filed a *qui tam* complaint under seal on behalf of himself and the United States against MiMedx on January 19, 2017.[180]  The complaint detailed facts regarding the Company's kickback scheme through PAN and violations of the FCA and AKS, as discussed, in pertinent part, above.  On

---

[174] *Vitale* 2019 Complaint, at ¶¶24-30.

[175] *Id.* at ¶29.

[176] *Id.* at ¶32.

[177] *Id.* at ¶46.

[178] *Id.* at ¶47.

[179] *Id.* at ¶¶50, 53.

[180] *Vitale Qui Tam* Complaint.

November 6, 2018, the DOJ filed a Statement of Interest in *Vitale Qui Tam*,[181] in effect rebutting MiMedx's arguments for dismissal and requesting that if the court were to dismiss *Vitale Qui Tam*, "any such dismissal be without prejudice to the United States" so that any future actions by the United States against MiMedx would not be precluded.[182]   On January 21, 2019, Vitale filed a separate complaint against MiMedx in South Carolina state court related to the Company's channel stuffing through AvKARE.[183]

- **Tom Tierney**:  In spring 2017, Tierney reported to Cashman and Kuntz his belief that MiMedx was "using SLR to obtain bogus revenue."[184]  In response, Cashman told Tierney to "let it go."[185] On August 5, 2017, Tierney reported directly to Petit that MiMedx management had been fraudulently concealing a large amount of missing consignment product by mistagging the consignment tissues as "present."   Tierney also reported "guaranteed reimbursement" and "marketing the spread" schemes through the Company's compliance hotline on September 15, 2017 and later to Haden and Dean.[186]  He received no follow-up.  Ultimately, Tierney elevated his complaints by submitting a "Dear Pete" letter to Petit and Haden on January 12, 2018.[187]  Just 11 days later, on January 23, 2018, Tierney was fired by MiMedx.[188]  Following his termination, on July 16, 2018, Tierney filed a whistleblower suit with the U.S. Department of Labor against MiMedx, Petit, Taylor, Cashman, Kuntz, and Haden, alleging that he was wrongfully

---

[181] United States' Statement of Interest, at 1, *United States, ex rel., Vitale v. MiMedx Grp., Inc.*, No. 3:17-cv-00166-RBH (D.S.C. Nov. 6, 2018) ECF No. 68.

[182] *See id.* at 1-2, 5-15.

[183] *See Vitale* 2019 Complaint.

[184] *Tierney* Complaint, at ¶9.

[185] *Id.*

[186] *Id.* at ¶¶14-15.

[187] *Id.*, at ¶18.

[188] *Id.* at ¶20.

terminated by those defendants in retaliation for reporting the fraudulent conduct discussed above. Tierney has also participated in the SEC's investigation into MiMedx's fraudulent channel stuffing scheme "involving its public and private sales channels, including SLR."[189]

137.    The Company's efforts to silence dissenting employees even led to threats against them. Kruchoski and Tornquist were two additional employees who suffered severe retaliation by MiMedx after reporting the Company's fraud. Beginning in late December 2015, Kruchoski pushed back against the "company directive" to stuff channels, expressing concerns to Roselli about the legality of this directive.[190]  In January 2016, Kruchoski called his supervisor, Blocker, who had recently replaced Fox as Area Vice President for MiMedx's Central Area, to express concerns about the Company's aggressive channel stuffing practices.[191]  Despite Kruchoski's complaints, MiMedx's channel stuffing persisted.

138.    Moreover, in fall 2016, MiMedx denied Kruchoski and his subordinate, Tornquist, a full commission on a huge amount of channel-stuffed product ($461,000) they had convinced the Minneapolis VA to purchase, after it had been sitting on the shelves of the Minneapolis VA.[192]  Taylor and Lilly informed Kruchoski, on October

---

[189] *Id.* at ¶¶10, 19.

[190] *Krushoski* State Counterclaim, at ¶¶40-46.

[191] *See Kruchoski/Tornquist* Complaint, at ¶57.

[192] *Id*. at ¶57.

31, 2016, that Kruchoski and Tornquist were not entitled to part of the commission because MiMedx did not identify the sale as "growth" but rather, as Taylor put it, "an acceleration of the same revenue that [MiMedx] had already recognized."[193]  Taylor admitted to Kruchoski that the revenue previously recognized by the Company was "*phony growth*" because MiMedx previously had to credit AvKARE for the product, meaning the Company's net revenue on the transaction was zero.[194]

139.   On November 2, 2016, Kruchoski sent an email titled, "Complaint – Jess Kruchoski and Luke Tornquist" to Petit, Taylor, and Cashman, along with Lilly, Blocker, and Haden.  Kruchoski demanded that the Company investigate and rectify improper revenue recognition practices through AvKARE and other distributors.[195]

140.   The very next day, on November 3, 2016, Tornquist[196] received a phone call from Blocker regarding Tornquist's joint complaint with Kruchoski.  Blocker conveyed *that this would "not be good for" Tornquist*, *reminded Tornquist that he*

---

[193] *Id.* at ¶78.

[194] *Id.*

[195] *See* Ex. M, at 3-4, Email from Kruchoski to Haden (Nov. 4, 2016).

[196] Tornquist filed a formal whistleblower complaint with the SEC declaring, under penalty of perjury, the truthfulness of his allegations.  *See* SEC, Form TCR dated December 15, 2016, *MiMedx Grp., Inc. v. Tornquist* (N.D. Ga. Mar. 14, 2017) ECF No. 40-2, pp. 2-9.

*had a wife and children, and cautioned Tornquist to "think of [his] family."*[197] The same day, Blocker also called Kruchoski and *said that he and Tornquist "should think about their families,"* or words to that effect.[198]

141.   On November 4, 2016, Kruchoski sent an email to Haden, stating, "I have gained full realization that the *company is misrepresenting our revenue*[,]" "I was told by a member of upper management that *Pete Petit[] insisted this [channel stuffing] occur and that anyone who did not comply would be negatively treated*[,]" and "I believe that *Mimedx is reporting Government revenue before it has been either [sic] realized*, and is deliberately delaying the reporting of returns so as to report net profits.  This results in false or misleading statements to the SEC, shareholders, and the investing community."[199]

142.   The morning of December 12, 2016, Petit, Taylor, and Cashman, along with other senior executives including Dean, Carlton, Lilly, Blocker, Kuntz, and Fox, held an emergency meeting in the executive board room of MiMedx's Marietta, Georgia headquarters.[200]   During the meeting, Petit stated that Kruchoski and

---

[197] *See Tornquist* Counterclaim, at ¶81.

[198] *See id.* at ¶82.

[199] Ex. M, at 1-2.

[200] *See Fox* Counterclaim, at ¶84.

Tornquist would be sorry that they engaged in "this action."[201] Petit also stated, in an aggressive tone while slamming his hand on a binder lying on the table, that Kruchoski and Tornquist would feel immense pain for what they were doing.[202] Further, Petit stated that Kruchoski and Tornquist would be *"financially hit," "their families and futures will feel it," and they would be "hurt professionally and with every possible resource available."*[203] Finally, Petit added that Kruchoski and Tornquist "and any other who did similarly *would be dealt with quickly and harshly*."[204]

143.    True to Petit's word, Defendants quickly retaliated against Kruchoski and Tornquist.  On the same day of the "emergency meeting," MiMedx terminated Kruchoski and Tornquist.  A day later, the Company filed lawsuits against both of them.[205] Kruchoski and Tornquist subsequently filed whistleblower claims against the Company, which the Company publicly denied, and began to reveal Defendants' fraud.

---

[201] *Id.*

[202] *Id.*

[203] *Id.*

[204] *Id.*

[205] *See MiMedx Grp., Inc. v. Tornquist*, No. 1:17-cv-00399-LMM (N.D. Ga. Dec. 13, 2016); *MiMedx Grp., Inc. v. Academy Med., LLC*, No. 50-2016-CA-013806-XXXX-MB (Fla. Palm Beach Cir. Ct. Dec. 13, 2016).

V.    **THE TRUTH OF DEFENDANTS' FRAUD BEGAN TO LEAK OUT, BUT DEFENDANTS CONTINUED TO MISLEAD INVESTORS BY DOWNPLAYING AND DENYING THE FRAUD**

A.    **News of Defendants' Fraud Began to Emerge from Whistleblowers and Other Sources, Attracting Attention from Government Authorities**

144.   During the Class Period, the multi-faceted fraudulent scheme orchestrated by Petit, Senken, Taylor, and Cashman, grew so large that it could no longer be kept a secret.  As news of the fraud began to slowly leak out publicly, Defendants embarked on a misleading campaign to downplay, deny, and conceal the truth from investors.  However, the leak turned into a flood of reports that attracted scrutiny from various governmental agencies, including the DOJ, SEC, VA, and HHS. This created a snowball effect that gradually led to the Company's downfall and eviscerated its stock price, which had been buoyed throughout the Class Period by Defendants' fraud.

145.   The problems began to unfold publicly in mid-2014, as a result of a lawsuit by a top executive from one of the Company's competitors in the wound care business, Organogenesis.  On July 24, 2014, a *qui tam* complaint against MiMedx was filed under seal by Antonio S. Montecalvo ("Montecalvo"), Organogenesis's Director of Customer Support Services, who "learned and observed, in documents and emails, the conduct of sales representatives and other employees of [MiMedx], in selling,

marketing, and promoting [EpiFix]."[206]  Montecalvo observed, among other things, that MiMedx was engaged in "unlawful practices . . . with respect to its marketing and sale of EpiFix, including paying illegal kickbacks to medical providers," in violation of the FCA and AKS.[207]  Montecalvo's observations are detailed, in pertinent part, above.

146.   Then after the close of trading on December 31, 2014, MiMedx issued a press release announcing it had received a civil subpoena from the HHS-OIG, "in connection with a civil investigation into matters primarily related to the Company's sales and marketing activities."

147.   On the news of the HHS-OIG investigation and subpoena, the Company's stock price fell 15.52%, from a close of $11.53 on December 31, 2014, to a close of $9.74 per share on January 2, 2015, on above-average volume of 5.4 million shares.

148.   The stock price decline would have been even worse, but in the press release announcing the investigation on December 31, 2014, Petit denied awareness of any problems, stating that "I can assure you that the corporate officers at MiMedx are not aware of anything that would stimulate this investigation . . . we screen all of our

---

[206] *Montecalvo* Complaint, at ¶3.

[207] *Id.* at ¶¶4, 19, 21.

applicants very carefully," and pointed to the Company's "robust compliance program."  Further, Petit falsely stated:

> *We have been very focused on the thoroughness of our compliance policies and our staff adhering to those policies.  For instance, MiMedx employees participate in a thorough training program regarding our policies and the standards that have been established and enforced to assure their understanding and adherence to our compliance programs*.  Employees may convey anonymously and directly to senior management and our Board of Directors any form of concern, complaint or inquiry related to our compliance programs or other issues.  With the significant growth we are experiencing, this has been and continues to be an initiative in which we devote considerable time, attention and resources.

149.   Petit also pointed to an ongoing investigation into the sales and marketing practices of competitor ABH, manufacturer of wound care product Dermagraft, which "lead to a review of other [wound care] industry participants, particularly in view of the fact that several industry participants, including MiMedx and some of our competitors, have hired former ABH employees."  Petit added that all ABH employees hired by MiMedx were "screen[ed] . . . very carefully" and that MiMedx "sought additional input from some former ABH corporate management who joined MiMedx and who were familiar with the suspected violations and the individuals involved."

150.   Then, after the market opened on January 2, 2015, the Company hosted a conference call "to present prepared remarks and respond to questions regarding its

receipt of the civil subpoena" from HHS-OIG announced the previous trading day.

During the conference call, Petit again denied any knowledge of wrongdoing, stating,

"I can safely say that none of our executives are aware of anything that would

stimulate an inquiry of this nature." Separately, in response to an analyst inquiry

about the nature of the subpoena, Petit stated:

> [G]enerally at this point, although we've had discussions with the OIG, we are still somewhat in the dark. We know that it relates to sales and marketing practices. And I would think same kind of things, perhaps, that the ABH Shire Group was scrutinized over.
>
> *      *      *
>
> I don't want it to sound trite, because I'm certainly not. And I respect immensely this kind of inquiry and subpoena. But as companies grow and mature, particularly when they grow as fast as we have, there's going to be scrutiny and there should be. And it's now our turn.

151.   In response to the Company's conference call, Craig-Hallum Capital

Group ("Craig-Hallum") issued a report on January 5, 2015, discussing the HHS-

OIG's subpoena. According to the report, "the subpoena carries the most weight and

will have the biggest impact on the stock's performance over the near-term."

152.   On March 23, 2015, MiMedx issued a press release that tied the HHS-

OIG subpoena to the *Montecalvo qui tam* complaint which alleged unlawful practices.

Specifically, MiMedx stated that it "has received notice from the Department of

Justice that it has declined at this time to intervene in the [*Montecalvo*] *qui tam* action

- 90 -

that gave rise to the issuance of a subpoena to MiMedx from [HHS], Office of Inspector General ('OIG') a few months ago." The release further claimed that MiMedx had "extensively cooperated with the government in responding to the [HHS] subpoena . . . [and] rapidly produc[ing] responsive documents needed by the OIG to conduct its investigation."

153.   Petit added that "we are confident that we have not engaged in wrongdoing which would support a qui tam action." He continued, "[t]his inquiry has certainly allowed us to comprehensively evaluate all aspects of our compliance programs and reaffirm the effectiveness of our policies and standards. We are pleased that we have continually maintained a culture of compliance and diligently stressed adherence within our organization."

154.   Months later, on October 12, 2015, MiMedx issued another press release stating that the *Montecalvo qui tam* action had been dismissed. In the press release, Petit suggested to the market that the Company was vindicated and that the suit was simply an "egregious" "business tactic" by Montecalvo's employer, Organogenesis:

> As we suspected, this case was brought by an individual who is an executive at one of our major competitors, Organogenesis, acting as the relator or plaintiff. ***In all my years in healthcare, I have never seen business tactics more egregious than what has been perpetrated by this competitor in approaching numerous government agencies to take action against MiMedx.*** Even though their CEO departed this company last December, it appears their interactions with the VA, CMS, FDA and

DOJ began as early as 2012.  Unfortunately, while it has been costly, we have resolved this last matter.

\*      \*      \*

**We believe the underlying claims of the relator in this case were without merit and full of ridiculous innuendo.  In my judgement, they were predominately outright lies.**  It is quite unfortunate that our government had to expend its resources on such an investigation.  But ultimately, the system worked as it should and the case was dismissed.  We are pleased with the result, and we are especially appreciative of the professional manner in which the DOJ conducted its thorough investigation and the speed at which they came to their conclusions.  I am very pleased with the way our management assisted the government with its investigation and expedited the process.  As mentioned in our March 23rd press release, we provided in excess of 100,000 lines of electronic data to the government, and we quickly produced the required documents.

155.  Also on October 12, 2015, the Company issued a press release announcing 3Q15 financial results.  In the press release, Petit revealed that "[d]uring the quarter, we made certain adjustments regarding our network of distributors supporting our offerings for the surgical, orthopedic and spine market sectors.  Revenue could have been even stronger if not for the short-term effect of these strategic steps in our distributor network."

156.  The following day, October 13, 2015, the Company held its Analyst Day conference call wherein the Company revealed that it had parted ways with a large U.S. distributor, likely referring to CPM, which negatively impacted its 3Q15 results by $2 million to $3 million.

157.    In response to the uncertainty around the departure of its distributor, the Company's stock price fell 14.23%, from a closing price of $9.84 per share on October 12, 2015, to a closing price of $8.44 on October 13, 2015, on unusually high volume of 2.43 million shares.  The stock price continued to fall 5.81% the following day, October 14, 2015, closing at $7.95 per share on unusually high volume of 3.26 million shares.  The total stock price decline over this two-day period was 19.21% per share.  This decline would have been worse if Defendants revealed the true scope and importance of their fraud and dependence on CPM and its network of sub-distributors, including PODs, to facilitate their improper sales and distribution practices, including channel stuffing.

158.    Also on October 13, 2015, Canaccord Genuity issued a report commenting on the Company's Analyst Day which noted that "Q3/15 was negatively impacted by distribution changes" which included the "elimination of a stocking distributor[] negatively impact[ing] results in the quarter by $2M - $3M."

159.    Likewise, on October 14, 2015, Lake Street Capital Markets ("Lake Street") issued a report noting that "in line revenue would have been even better had the company not decided to part ways with its largest U.S. distributor and go direct." The report commented that the pre-release of third quarter revenue "overshadow[ed] long-term positives."

160.   On April 10, 2016, MiMedx announced its financial results for 1Q16. While MiMedx recorded "record revenue" for the quarter, the Company recorded its first revenue miss after 17 quarters of meeting or exceeding its revenue guidance.  The press release quoted Petit who misleadingly stated, "[w]e are disappointed that our revenue fell short of our forecasted guidance by about two million dollars."  The shortfall was attributed to "growing pains" resulting from the initial effects of the installation of a Sales Management System on the sales organization, the realignment of certain sales management to prepare SSO for autonomous growth, and the assimilation of Stability Biologics.  In an effort to alleviate investor concerns in light of ongoing scrutiny into the Company's business practices, Petit emphasized that the "first quarter issues resulting in our lower than expected revenues are not competitive related or systemic to advanced wound care or our SSO business."

161.   The following day, on April 11, 2016, the Company hosted a conference call to discuss its 1Q16 financial results.  Petit, Cashman, and Senken used the conference call as another opportunity to downplay the unexpected earnings miss. Once again, Petit adamantly attributed the miss to "major information system upgrades" that would allow Company growth, but "created annoyances week by week with our sales organization in terms of new activities they had to complete."  Cashman

also emphasized it was a "transitional quarter" and that "we take our ability to accurately project our sale performance very seriously."

162. As a result of the unexpected revenue miss, the price of MiMedx common stock dropped 8.79%, from a close of $8.99 per share on April 8, 2016, to a close of $8.20 per share on April 11, 2016, on unusually high trading volume. The price of MiMedx stock would have dropped further had Defendants admitted that the Company's revenue miss for 1Q16 was the result of losing a key stuffing partner instead of falsely attributing the miss to "system upgrades."

163. On April 11, 2016, Motley Fool published an article titled, "What Has MiMedx Group Shares Dropping 10% Today?" attributing the stock drop to "lower-than-expected first quarter sales," and acknowledging that investors "hate downside surprises."

164. On April 19, 2016, Lake Street released a report "reducing [its] price target, lowering it from $15 to $12," in response to the Company's April 10, 2016 pre-announcement.

165. On December 15, 2016, following their termination as detailed above in Section IV.F, Kruchoski and Tornquist filed a lawsuit against MiMedx and Petit.[208] The suit alleged that Kruchoski and Tornquist were terminated as retaliation for

---

[208] *See Kruchoski/Tornquist* Complaint.

formally declaring their concerns over Defendants' channel stuffing scheme which they claimed were designed to inflate the Company's revenue and give the impression of continuous growth.[209]   The Company responded on the same day with a press release in which Petit disparaged the allegations as "not factual and fallacious."  Petit claimed that the channel stuffing allegations had been submitted to the Company's Board to "thoroughly review the issues" and, he further stated:

> [I]n the process of doing that investigation, we found out that these two individuals [Kruchoski and Tornquist] had been selling competitive products and other products for over a year into our accounts.  Therefore, earlier this week, their employment was terminated and lawsuits filed against them for their breach of their duty of loyalty and contractual obligations to the Company.

166.   In response to Kruchoski and Tornquist's allegations, the Company's stock price fell 6.43%, from a close of $9.18 on December 15, 2016, to a close of $8.59 on December 16, 2016, on above-average volume of 2.11 million shares. Defendants' continued lies buoyed the stock price, which would have fallen further had Defendants revealed, what the Company would later admit, that MiMedx improperly recognized revenue and, as a result, its financial statements could not be relied upon.

---

[209] *Id.* at ¶¶17-27.  The case was subsequently voluntarily dismissed by Tornquist and Kruchoski and brought as counterclaims in the Georgia and Florida cases brought by MiMedx, discussed above.  *See* Rule 41(a)(1) Notice of Dismissal, *Kruchoski v. MiMedx Grp.*, No. 0:16-cv-04171-RHK-BRT (D. Minn. Feb. 7, 2017) ECF No. 32.

167.   On December 19, 2016, Petit, Taylor, Senken, and Cashman hosted a call with investors to discuss the Company's 2017 business plan and outlook.  Petit opened the call by referencing the *Kruchoski/Tornquist* litigation and stated, "I hope I made it clear that Management is not a bit concern[ed] about the outcome of the lawsuit. It will run its course.  We have done nothing to these two employees other than terminate them for breaches of their contract with us."  In further attempt to assuage the fears of investors, Petit stated, in relevant part:

> We're trying to get focused but I haven't been able to find anything [alleged in the lawsuit] that's necessarily an issue.  If we find that one of our employees has violated regulations, our policies, et cetera, et cetera, they'll be terminated.  Two of them already have.  But the process of reviewing what these allegations are, if we find violations of our policies or VA policies or a lot of anything people will be terminated.

168.   During the call Petit also referenced the procedures in place to ferret out improper conduct, stating:

> When we have allegations of any kind come across through a hotline or up to a Dear Pete letter, or other sources through our compliance line, we investigate those because we don't want those kind of issues going on within the Company either.  And that's somewhere in the chain of command between myself, Bill, and so on.  So that process has taken place also and we've seen some issues.

169.   In discussing the Audit Committee's review of improper conduct at the executive level, Cashman stated that "[w]e haven't seen any compliance issues at our

- 97 -

level yet, so." Petit confirmed, "Yes, the allegations made in the lawsuit we don't see those."

170.   In an effort to further emphasize the Company's position that the litigation has no merit, Taylor misleadingly stated, "some of the claims are so outlandish that we question whether any real due diligence was performed before these claims were made.  One claim is that we're supposedly recogniz[ing] revenue with VAs without a PO.  That's completely false."

171.   Less than two weeks later, on December 27, 2016, MiMedx announced "[p]reliminary [i]nvestigation [f]indings" by its Audit Committee related to the channel stuffing allegations made by Kruchoski and Tornquist.  The Company assured investors that there was no credible evidence whatsoever that its prior financial reporting was incorrect in any respect, stating:

> ***As the Company has previously stated publicly, management believes the claims made in the lawsuit brought by these former employees, including claims made about the Company's sales practices, are without merit, and the Company does not anticipate any material effect on the Company's financial statements resulting from these allegations.***
>
> The Audit Committee is working closely with independent counsel and its external auditors to conduct an extensive internal investigation into the claims alleged in the lawsuit.  The Audit Committee has provided preliminary findings to the Board of Directors and Company management, but the investigation into the claims is ongoing. ***The Audit Committee has advised the Company's management and the Board of Directors that it has found no credible evidence to indicate that any***

***changes to previously issued financial statements are necessary in light
of these allegations.***

172.  Despite Defendants' reassuring public statements, the Company's
mounting problems had begun to attract scrutiny from the SEC.  On January 9, 2017,
the SEC submitted a comment letter to MiMedx regarding the Company's financial
arrangements with AvKARE.  The SEC asked MiMedx to "tell us the significant
terms of your agreement with AvKare, including payment terms and rights of return"
and the Company's "policies for recognizing revenues for sales to them."  MiMedx
responded to the SEC comment letter on January 23, 2017.

173.  On February 23, 2017, MiMedx issued a press release announcing its
financial results for the year ended December 31, 2016, and disclosed that full-year
revenue was $1.8 million lower than expected due to the "transition of certain
government accounts from a distributor's [FSS] contract to our own FSS."  According
to the contract, the Company was required to repurchase AvKARE's remaining
inventory within 90 days of the expiration of the agreement.  During the conference
call held later that day, Petit and Senken denied any link between the $1.8 million
reduction in revenue and allegations of channel stuffing.  Petit stressed that the miss
was only a "small amount" or "0.6%" change to projected revenue.

174.  Also during the call, Petit discussed the Audit Committee's investigation
and preliminary findings and reiterated that it was "***management's position that the***

*allegations are not factual.*"  He added, "*I believe MiMedx's reputation and that of its executives and board is such that this nonsense will soon dissipate*."

175.   Analysts reacted positively to Defendants' misleading but optimistic statements regarding the Company's financial performance and relationship with AvKARE.  For example:

(a)   On February 23, 2017, Craig-Hallum issued a report stating that the "AvKare [r]elated [r]evenue [a]djustment [m]akes [s]ense," was "part of [the Company's] long-term strategy of shifting to a direct sales channel[,]" and "is not indicative of underlying issues in [the Company's] sales channel."

(b)   The next day, on February 24, 2017, AEGIS Capital Corp maintained its "Buy" rating on MiMedx's stock, relying on Defendants' assertion that the situation with AvKARE "was a planned phase out beginning in 2015 and is similar to other change outs done in the past," and, although AvKARE is "mentioned in the ongoing whistle-blower lawsuit against [the Company], . . . CEO Pete Petite [sic] stated on the call that the incidents are unrelated."

(c)   Also on February 24, 2017, Lake Street reiterated its "Buy" rating on MiMedx's stock, noting that the Company was "Still a Compelling Growth Story" and that "[m]anagement continues to expect 2017 revenue of $302-307 million and adjusted EPS of $0.31-0.33."

176.   A few days later, on March 1, 2017, MiMedx issued a press release asserting that the Audit Committee's investigation into the Company's alleged financial fraud was complete.   According to Defendants, the investigation had formally absolved the Company of any wrongdoing, confirming the "preliminary" findings hastily reported after the channel stuffing allegations by Kruchoski and Tornquist.  Specifically, the press release stated:

> The Audit Committee worked closely with independent counsel to conduct an extensive investigation into the claims alleged by these former employees. The Audit Committee has completed its investigation and confirmed there is no credible evidence of any wrongdoing on behalf of members of MiMedx management*. **The lawsuits with these former employees are ongoing and management continues to believe that the employees' legal claims and accompanying allegations are without merit.***

> The Audit Committee's findings have been submitted to and approved by the Company's Board of Directors.   ***The Audit Committee's investigation determined that the Company has appropriately recognized revenue and found no credible evidence to indicate that any changes to the Company's previously issued financial statements are necessary in light of the former employees' allegations.***

177.   Later that month, on March 20, 2017, the SEC sent a comment letter to MiMedx regarding the Company's 2016 Form 10-K, following up on previous correspondence from January 23 and February 8, 2017.  Among other things, the SEC requested a summary of the Audit Committee's internal investigative findings relating to revenue recognition.  Analysts at Audit Analytics noted that "the SEC request for a

summary of the findings, in a publicly available comment letter, is not a common occurrence."

178.  Meanwhile, MiMedx and its outside counsel alluded to ongoing government investigations, by and communications with, the SEC and/or other agencies in litigation against Fox, which MiMedx did not disclose to investors at that time.  On March 30, 2017, MiMedx issued a discovery request to Fox for "Documents and Communications to or from Securities and Exchange Commission . . . regarding MiMedx."  This indicated that the SEC and Fox had been communicating about matters relating to Fox's channel stuffing allegations against MiMedx.  Separately, MiMedx's defense counsel at Wargo French LLP sent a letter to counsel for Kruchoski and Tornquist on April 3, 2017, complaining that MiMedx "continue[s] to be hampered by . . . you reaching out to governmental authorities concerning [Kruchoski and Tornquist's] claims . . . ."[210]

179.  On April 18, 2017, MiMedx provided a letter in response to the SEC and a publicly redacted summary of Audit Committee findings requested by the SEC. Suspiciously, MiMedx also invoked a confidential treatment request pursuant to SEC Rule 83, asking that "the redacted portions be maintained in confidence, and not be made part of any public record and not be disclosed to any person (other than the

---

[210] *Fox* Counterclaim, at ¶¶101-102.

Staff)."  SEC Rule 83 (17 C.F.P. §200.83) sets forth a procedure to request that information disclosed to the SEC be withheld even if requested by the public under the Freedom of Information Act ("FOIA").

180.   On May 23, 2017, before the market opened, Joe Munda ("Munda"), a securities analyst from First Analysis, issued a report stating the Company's valuation "appears stretched" and cited concerns about the Company's "evolving and confusing" relationship with AvKARE and a lack of clarity on the impact of MiMedx's litigation with former employees alleging channel stuffing and improper revenue recognition.  The report also expressed concern over the "transition of VA customers from AvKARE's FSS to MiMedx's given MiMedx's obligation to buy back AvKARE's remaining inventory soon after the contract's expiration."  The report further noted that upon review of the PDA, AvKARE did not have any contractual rights to return product other than for defect or a shipping error.  Munda also raised questions to management prior to issuance of his report that remain unanswered concerning the Company's prosthetic procurement request document and the reasoning behind slight differences in pricing between FSS contacts.  In the report, Munda downgraded MiMedx's stock from equal weight to underweight.

181. In response to this news and Munda's downgrade, the Company's stock price fell 4.95%, from a close of $14.33 on May 22, 2017, to a close of $13.62 on May 23, 2017, on unusually high trading volume of 2.47 million shares.

182. In a Form 8-K filed on August 10, 2017, the Company revealed that it had "effectively dismissed" Cherry Bekaert, effective August 4, 2017, replacing it with Ernst & Young as the new independent registered public accounting firm for FY17. The Company gave no reason for this sudden change, but falsely suggested it was routine audit changes and that there "were no disagreements with Cherry Bekaert on any matters of accounting principles or practices, financial statement disclosure or auditing scope and procedures which, if not resolved to the satisfaction of Cherry Bekaert, would have caused Cherry Bekaert to make reference to the matter in their report."

183. On August 17, 2017, the Company issued a lengthy press release "[p]rovid[ing] [an] [u]pdate on [l]itigation with [t]erminated [e]mployees," in which they continued their campaign of denials and retaliation, aggressively attacking the terminated employees and defended the Company against their counterclaims and assertions related to channel stuffing. Among other things, the press release misleadingly claimed that:

- an independent three month investigation found "[n]o credible evidence of incorrect processes, procedures or wrongdoing by the Company or MiMedx management" or "to indicate that any changes to the Company's previously issued financial statements were necessary in light of the former employees' allegations"; and

- the Company was not notified of any *qui tam* or private whistle-blower suits, but if they were filed against the Company, the Company believes it would be able defeat them based on the investigation it has already conducted.

184. On August 21, 2017, The Capitol Forum published an article, "MiMedx: Channel Stuffing Accusations Resurface in Recent Counterclaim; Former Employees Corroborate Allegations; A Close Look at Potential Risk." The article discussed allegations made by former MiMedx employees that the Company was engaged in channel stuffing through a distribution agreement with AvKARE. According to the article, which referenced a counterclaim filed by Kruchoski, channel stuffing at VAs was "systematic and top-down" in nature.

185. On September 7, 2017, The Capitol Forum released a follow-up article that revealed for the first time that the VA-OIG was conducting an investigation of the Company. The VA-OIG disclosed this investigation when it denied a FOIA request submitted by The Capitol Forum due to what it called "an ongoing law enforcement investigation."

186. In response to news of the VA-OIG's investigation, the Company's stock price fell 5.60%, from a close of $16.43 per share on September 6, 2017, to a close of

$15.51 per share on September 7, 2017, on above average volume of 3.7 million shares.  On September 8, 2017, the stock price continued to fall an additional 8.19%, closing at $14.24 per share on above average volume of 4.70 million shares.  The total stock price decline over this two-day period was 13.33%.

187.  The stock price decline would have been worse, but on September 7, 2017, the same day The Capitol Forum article was released, the Company issued another lengthy press release reporting "[f]urther [d]evelopments in its [c]ivil [l]itigation [a]gainst [f]ormer [e]mployees."  The press release again misleadingly downplayed former employees' channel stuffing allegations, and threatened short sellers making arguments based on their allegations.  Among other things, the press release misleadingly claimed that:

- although the Company "has been aware for some time" of an ongoing investigation by the VA-OIG, the Company is not a target of the investigation and is assisting government with the investigation; and

- some of the terminated Company employees provided gifts and meals to employees of VAs potentially in violation of federal law and MiMedx policies, but none of the Company's executives directed them (or anyone) to do so.

188.  In response to negative news surrounding MiMedx, commentators began publishing online blogs and research reports exposing additional details on MiMedx's fraud, based on independent research, including interviews with former MiMedx

employees and business associates and FOIA requests to government agencies.  In response, Defendants embarked on a campaign of rebuttals and retaliation against the commentators in press releases, prominent postings on MiMedx's website, shareholder communications, and public conference calls.  Moreover, Defendants sought to deflect public scrutiny and divert attention by publicly and aggressively blaming and attacking the commentators and former employees for their violations of the law, which Defendants sought to defame as "short sellers," seeking only to profit from the decline of MiMedx's stock price.  And, as it had with former employees, the Company filed lawsuits against some of the commentators, baselessly alleging "defamation" and related claims in an effort to prevent the stock price from declining further.

189.   On September 20, 2017, Aurelius Value ("Aurelius") published a report titled, "MiMedx:  Flying Too Close to the Sun" questioning whether MiMedx had engaged in improper channel stuffing in violation of GAAP.  In the article, Aurelius also revealed new information about special arrangements between MiMedx and its distributors and the Company's recruitment of ABH's sales team.  The report further summarized its findings regarding channel stuffing and kickback risks, stating, in part:

> Undisclosed related party transactions and entanglements with distributors, including a key MiMedx distributor that has been controlled by an insider. These relationships are especially problematic because

secret ties to distributors have featured prominently in historical channel stuffing schemes.

Detailed allegations that MiMedx's channel stuffing scheme relies on at least three more distributors who have undisclosed special agreements involving millions in discounted product and favorable financing terms as "house accounts." Not only does the alleged scheme now extend significantly beyond VAs, but MiMedx has allegedly manipulated its financials through multiple avenues to hit sales targets.

190.   Also on September 20, 2017, Viceroy published a 35-page exposé titled, "MiMedx's employment of kickback & bribery scheme inducers makes it uninvestible." The article compiled internal MiMedx documents, including excerpted communications between employees, which revealed that improper conduct was pervasive and directed by senior management.

191.   In response to the Aurelius and Viceroy reports, the Company's stock price fell 6.23%, from a close of $13.16 per share on September 19, 2017, to a close of $12.34 per share on September 20, 2017, on well above-average volume of 10.26 million shares.

192.   The stock price decline would have been even greater, but on the same day, September 20, 2017, MiMedx pushed back, issuing a press release "[r]espond[ing] to [d]eceptive [s]hort [s]eller [r]eports" by Viceroy and Aurelius. In the press release, Petit stated that the articles "have virtually no basis in fact, are

littered with innuendo and contain many statements that are simply not correct." Petit continued, stating:

> This has all the markings of a concerted short seller attack by numerous entities attempting to short our stock and profit from fictitious information and innuendos. **We believe that Viceroy Research and Aurelius Value are relying on misinformation from former MiMedx employees terminated for cause.** Unfortunately, neither organization appears to have done adequate due diligence and fact-finding before publishing their so-called "research reports."

193.   Under fire from short sellers, the Company sought to assuage investor concern by issuing a press release on September 21, 2017, concerning "its interactions with the [SEC]." The press release stated, in part, that the Company "already satisfactorily addressed a comment letter from the SEC earlier this year, which letter covered a variety of topics, including the Company's revenue recognition policies and procedures" resulting in a close-out letter from the SEC on April 27, 2017. Separately, the press release revealed that the Company received a subpoena from the SEC regarding "former employees' allegations [of channel stuffing in December 2016], and primarily is related to the matters that were the subject of the Company's previously disclosed internal investigation." In response to the subpoena, the press release stated that the Company "is working with the SEC in its investigation of these accusations and supplying all of the documents requested, including those obtained through the civil lawsuit discovery process to help the Commission understand what

has transpired," and "engaged a nationally recognized expert in revenue recognition who reviewed and confirmed the Company's revenue recognition practices to be proper."

194.   MiMedx also held a shareholder call on September 21, 2017, to discuss various topics including the "orchestrated short seller activity and the remedies the Company is seeking to have this unlawful practice of pushing fabricated information to shareholders in concert with coordinated short selling activity cease."  During the call, Petit touted his experience as public company officer and compliance with the "well-defined regulations and laws associated with comments" made by him or MiMedx.  Further, Petit went to great lengths to downplay the accuracy of recent revelations and the "tremendous amount of experience" he has dealing with the short-seller "phenomenon."  Petit misleadingly claimed that "*[w]hat has happened to us in the last few weeks is a classic case of a coordinated and well-organized short-sell attack by a number of organizations*."  Petit described the extreme efforts taken to prove MiMedx was not engaged in the alleged conduct and emphasized that the Company's rapid revenue growth and the strength of the Company's compliance systems, stating, in part:

> Almost immediately, we went to the regulatory agencies that would be involved since these salespeople involved were selling to the Veterans Administration hospitals. We went straight to the Veterans Administration and made contact with the Office of the Inspector

General. We were in the process of preparing a similar package for the SEC when they contacted us.

We have been working with the SEC through their subpoena. We have passed on all the information through our civil litigation process and our data gathering through depositions and the data we obtained throughout the written records.

*Again, our organization has done the right thing.* And this painful process will soon pass. *I do not believe there will be anything that dismantles our rapid revenue and profit growth. I'll say that again. I do not believe there will be anything that transpires that dismantles our rapid revenue and profit growth. There are very few public companies that have the quality, compliance systems and the disciplines to administer them as we do.*

195.    In response to questions about MiMedx's policies and procedures governing kickbacks and other alleged improper conduct during the September 21, 2017 shareholder call, Taylor misleadingly stated:

We have policies and procedures that explicitly prohibit that kind of behavior. *We also have controls in place that should that behavior occur, we can typically pick it up.* But if people operate outside of our controls, if they do something on their own, where we have no way of verifying what they've done or no knowledge of it, those are the kind of situations that we're talking on here. *Because we have strong controls, we have strong policies that prohibit that kind of thing.* So what we discussed in our press release was things that we found out after we did the discovery and so forth in our lawsuits. So those are the kind of things that we're seeing, and we've been very open and transparent with those things with the particular regulatory agencies, when we bring -- when we find those occurrences.

196.    Petit further explained why MiMedx was "comfortable" with its current operations, stating, in pertinent part:

Number one, our audit committee, the board, outside law firm, auditors, and again, an outside consultant on revenue recognition, poured through – as well as executive management poured through all these process, procedures, all the communications we could get our hands on, and subsequent communications we've gotten our hands on. I think that we know very well what was going on. And the board's report is public. We've made that public many, many months ago. ***And believe me, this board is a group of individuals that are very independent, this management group, Bill and I are on the board. But I can tell you if there was malfeasance, Bill Taylor and Pete wouldn't be here today.*** And if I was on the board, I'd vote the same way.

Second thing is this qui tam action. 3 years ago, we had a competitor who we were taking market share from in a very rapid rate, do a number of things that summer. And one of it was to file a qui tam action against us that was done by one of their executives. There were literally hundreds of accusations, very -- some of them very similar to all of these in there. We went through the subpoena from the Department of Justice. We met with them. We exposed all of our records, and all of that. And that was dealt with a matter of few months. The government failed to step into that suit, and the suit was dropped.

197.   At the end of the call, Petit reiterated that "[w]e have nothing" at

MiMedx to be concerned about.  He continued, "[a]nd if we did, we'd be going public

with it."  He further stated:

We've gone through investigations internal[ly].  We publicized that to shareholders.  I've been around too long.  I've been doing this for 36 years.  I'm not going to jeopardize my – what future I have left with things that – if there's malfeasance involved.  As far as we know, this company is, and the things that this executive group knows and our board knows and our auditors and everybody else, this company has no issues, except we got some terminated employees that are making up issues.

198.  Also, on September 21, 2017, MiMedx filed a lawsuit against DBW Partners LLC (d/b/a The Capitol Forum) and others associated with The Capitol Forum based on The Capitol Forum's September 7, 2017 article regarding an investigation by the VA.  The lawsuit alleged libel, slander, defamation, false light, tortious interference with business relations, and violations of the Lanham Act.  In a press release announcing the lawsuit, the Company claimed that, "MiMedx approached the VA with this information [allegations of channel stuffing made by former employees] earlier this year.  The Company explicitly informed The Capitol Forum that, to its knowledge, MiMedx was not the target of any investigation; yet, The Capitol Forum still published its confusing and misleading article."  Petit also called The Capitol Forum a "'shill' for short sellers by posing as an investment advisor through publishing information and providing opinions that could negatively impact MiMedx and its shares."

199.  On September 21, 2017, PiperJaffray issued positive commentary citing the Company's "rapid growth profile," and questioning the materiality and accuracy of published reports.

200.  On September 25, 2017, Munda issued a report maintaining his underweight rating, but lowered the price target to $9 from $11 based on "elevated risk."  In the report, Munda stated that "we continue to be ignored on conference calls

as our list of unanswered questions grows."  The report reiterated concern over an

increasing risk that the Company may "lose the ability to sell products to the [VA]

considering in aggregate the information surrounding MiMedx's business with the

VA."  In the report, Munda cited the recent disclosure of subpoenas from the VA-OIG

and SEC as a source of additional risk for the Company.  Munda also referenced the

absence of Senken as concerning considering "negative reports appear to focus on

channel stuffing and improper revenue recognition."

201.  On September 27, 2017, Aurelius published another report titled,

"MiMedx:  Undisclosed Details Undermine 'Independent Investigation'" claiming

certain members of the Company's Audit Committee and outside counsel, both of

which were involved in the investigation, were not actually independent.   As

explained more fully below, Petit touted the independence of the Company's internal

investigation from the beginning even though the board members had longstanding

ties to, and were closely intertwined with, MiMedx and Petit, thus compromising their

independence and impartiality.  For example, the article disclosed that:

- Several Audit Committee members were long-standing members of MiMedx's Board during the Class Period, approving and executing MiMedx's fraudulent financial statements throughout the Class Period.  Others had close relationships with Petit dating back to two previous companies run by Petit before he joined MiMedx, Matria and Healthdyne.  Like MiMedx, Healthdyne and

Matria were embroiled in accounting and Medicare-related fraud under Petit's watch.

- The Chairman of the Audit Committee conducting the investigation, J. Terry Dewberry ("Dewberry"), had a close personal and professional relationship with Petit spanning nearly 40 years. In fact, the two were fraternity brothers at Georgia Tech University, when Dewberry served as Petit's "little brother." In an interview, Petit stated that he and Dewberry were "very close" and that Dewberry "has been a member of the executive team for all of *our* businesses over the years." Dewberry also served on the board of Matria while Petit was Chairman and CEO of that company.

- Like Dewberry, Audit Committee member Joseph G. Bleser ("Bleser"), was also a board member of Matria while Petit was Chairman and CEO.

- The Company's supposedly "independent counsel" working on the external investigation, Troutman Sanders LLP ("Troutman"), was also MiMedx's corporate counsel. Further, Troutman represented Petit's former companies, Healthdyne and Matria, and its founder, Carl E. Sanders, served on the board of both Healthdyne and Matria.

202. In response to new found concerns over the independence of MiMedx's internal investigation, the Company's stock price fell 3.25%, from a close of $12.32 per share on September 26, 2017, to a close of $11.92 per share on September 27, 2017, on above-average volume of 3.36 million shares.

203. Two days later, on September 29, 2017, in reaction to the mounting avalanche of bad press, MiMedx issued a press release, "MiMedx Exposes False,

Misleading and Fabricated Allegations by Short Sellers," attempting to refute reports

of MiMedx improprieties.  The press release quoted Petit, stating:

> I encourage all MiMedx shareholders to thoroughly review and consider
> our document posted today on our website. As you are aware, MiMedx
> and all other public companies are governed by federal regulations
> prohibiting the dissemination of false and misleading information about
> the Company; unfortunately, organizations like Viceroy Research and
> Aurelius Value are not held to those standards and often such
> organizations have little to no accountability for the misinformation they
> publish. Both the Viceroy Research report and the Aurelius Value report
> indicate that either they are short in MDXG, or that the reader should
> assume they are short in MDXG.

204.   Defendants' array of aggressive pushback and retaliation continued on

October 4, 2017, when MiMedx filed a lawsuit against Viceroy and Sparrow Fund

Management LP ("Sparrow Fund") (which was thought by MiMedx to be a partner of

Aurelius) and others for libel, slander, defamation, false light, and tortious

interference with business relations.  In a press release filed the same day, Petit stated

that Viceroy and Sparrow Fund had tried to "manipulate the market and serve their

financial interest in driving down the price of MiMedx stock" by making knowingly

false statements about MiMedx.

205.   On October 9, 2017, MiMedx issued a press release announcing that the

Board of Directors authorized an additional $10 million for the Company's share

repurchase program, bringing the total authorized amount to $110 million.  Petit

commented that the share repurchase program "in light of the short seller attacks . . .

Board of Directors believes the stock repurchases continue to be an extremely positive investment for MiMedx." In the press release, Petit also downplayed the Company's improper conduct by attacking "recent deceptive and contrived attacks on [MiMedx] stock." However, in reality, Defendants sought to manipulate and inflate the stock price further to offset the impact of the revelations of their fraud.

206.   During the Company's 3Q17 earnings call on October 11, 2017, Petit continued to downplay and minimize "silly news" and to point the finger at purported short sellers and other Company critics, stating, in part:

> I want to again remind you that approximately 3 years ago, your company went through a semi-confusing period when we discussed -- when we disclosed the fact that we had a qui tam lawsuit. . . . We responded very quickly with all of our data and information and review of our compliance and management systems. We met with members of the Department of Justice. Department of Justice views - intervened in the qui tam lawsuit, and the plaintiff dropped the suit and the suit was dismissed. This issue did not disrupt our growth and operations at all. We used to call that period of time our qui tam show. Now we have our short sales circus to contend with. I will submit to you that we believe this will also run its course in a relatively short period of time. We look forward to finish enough the information we're providing the SEC and having further discussions with them. In the meantime, MiMedx should continue to perform very effectively and efficiently. Please be patient with us as we get through this new growing pain even though it is a circus.

207.   On October 23, 2017, Munda suspended his price target for MiMedx, and stated that the Company had been excluding First Analysis from asking questions on multiple calls, and instead spent substantial time sparring with short sellers and filing

lawsuits.  Munda also noted "unanswered questions" asked to management prior to the May 23, 2017 report about MiMedx regarding its dealings with VA hospitals and how the Company accounted for sales through its distributors.  The report also raised new questions in response to Defendants' rebuttals, including how much revenue is directly attributed to improper conduct of former employees who provided meals and gifts to VA employees and whether the Company's ability to sell to the government is at risk.

208.   The following day, October 24, 2017, Citron Research ("Citron") posted a video on YouTube regarding MiMedx.  In the video, Citron's Managing Editor, Andrew Left, discussed research supporting Defendants' use of third parties to inflate MiMedx's financial statements.   The video was accompanied by the following summary, as well as a "MiMedx Addendum" providing further detail:

> Citron would not enter into a "noisy" game unless we can add insight into the short thesis and create a better-informed marketplace for mentioned stock.

> We believe the research that has been done on MiMedx but the many columnists accurately captures *the many dark sides of MiMedx and their use of captive 3rd parties to inflate their financials*.

> In this report, Citron introduces another shadowy company that was started by a MiMedx employee and a MiMedx consultant BUT is in an unrelated industry. The only problem is – they are registered with the FDA to house MiMedx products.

Citron has read emails and lawsuits from the many employees who have been intimidated by MiMedx management to conduct dirty business.

Citron will not let the tactics of MiMedx aggressive management intimidate the truth out of the market.

209.   In response to the news disclosed by Munda and Citron, the Company's stock price fell 11.37%, from a closing price of $13.90 per share on Friday, October 20, 2017, to a closing price of $12.32 per share on Monday, October 23, 2017, on above-average volume of 4.52 million shares.  On October 24, 2017, the Company's stock price continued to fall 8.28%, closing at $11.30 per share with well above average trading volume of 10.84 million shares.  The total stock price decline over this two-day period was 18.71%.

210.   The stock price decline would have been worse, however, during this time Defendants began to push back.  In response to the Citron report, MiMedx posted "Short Selling Commentary" on the section of the website it designed to inform investors of short selling activity and the impact on its stock price.  According to the post, "illegal short selling must be confronted and stopped."

211.   On November 16, 2017, Viceroy issued a report entitled, "MiMedx vendors soliciting up-coding of Medicare incentives."  In the report, MiMedx is alleged to have fraudulently exploited the insurance reimbursement system through the manipulation of coding.  Additionally, the report claimed MiMedx engaged in

- 119 -

illegal settlement terms in its litigation against former employees.  The report claims that MiMedx sent legal material to its former employees requesting that they not contact regulatory agencies and included in its settlement terms that they retract prior statements in direct violation of federal regulations.  Further, MiMedx was able to hide its improper conduct on confidentiality grounds.

212.   On November 20, 2017, after the market opened, MiMedx issued a press release announcing that it added new materials to its website concerning the "[m]isinformation [d]isseminated [t]hrough [s]hort [s]ellers."  This dramatic and highly unusual step by a publicly traded company – creating an entire page dedicated to bashing short-sellers and labeling them liars which caught the market's attention and raised concerns regarding the legitimacy of allegations against the Company.  This unorthodox defense, coupled with the significant time and resources Defendants, in particular Petit, were devoting to growing allegations of fraudulent conduct, raised concerns for the Company's future.

213.   In response, the Company's stock price dropped 6.43%, from a close of $11.82 on Friday, November 17, 2017, to a close of $11.06 on Monday, November 20, 2017, on trading volume of 2.25 million shares.

214.   On November 30, 2017, Defendants continued their campaign attacking "short sellers," stating in a letter to shareholders that "MiMedx has been the subject of

an illegal, unscrupulous and massive short seller attack." Among other false and misleading statements, Petit falsely attributed the decline in MiMedx's stock price to the misappropriation of confidential information and the efforts of terminated employees to extort the Company. To further squash fears, Petit again focused on the conclusions of the Audit Committee of the Board of Directors and associated outside counsel and external auditors who reviewed ten years of audited financials that were released earlier in the year, and the SEC's ultimate closure of its investigation to misleadingly show the Company had already been cleared of fraudulent conduct.

215. Not long after, on February 15, 2018, Aurelius published "An Open Letter to the MiMedx Auditors," which was addressed to EY, MiMedx's independent auditor at that time, having replaced Cherry Bekaert. The letter relied on evidence received from former MiMedx employees, as well as MiMedx whistleblower litigation, and stated that there was a "serious and pervasive fraud" within the Company. The letter further stated that MiMedx, through its primary VA distributor, AvKARE, has been "abus[ing its] accounting policy" of recognizing revenue when it is distributed as opposed to when it is actually utilized by "hit[ting] sales targets by filling shelves before the end of quarters with excess product that neither AvKARE nor the VA had requested."

216.    In response to this news of a pervasive accounting fraud, the Company's stock price declined 6.22%, falling from a close of $15.43 per share on February 15, 2016 to a close of $14.47 per share on February 16, 2018.

### B.    As Public Scrutiny Intensified, MiMedx Was Forced to Launch Another Internal Investigation into Its Sales and Distribution Practices

217.    Before the market opened on February 20, 2018, MiMedx announced that it had postponed the release of its financial results and Form 10-K for 4Q and FY17, respectively, due to "an internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company" including "the accounting treatment of certain distributor contracts." This disclosure came after years of denials, threats, terminations, and a prior internal audit of the very same practices currently at issue. The Company once again stated that the investigation was being conducted by "independent legal and accounting advisors" engaged by the Audit Committee of the MiMedx Board.

218.    In response to this shocking news, the Company's stock price plummeted 39.53%, from a close of $14.47 per share on Friday, February 16, 2018 to a close of $8.75 per share on Monday, February 20, 2018, on well above-average volume of 21.80 million shares.

219.   Likewise on February 20, 2018, Motley Fool published an article titled, "Why MiMedx Group, Inc. is Crashing Today."  The article attributed the stock decline to the announcement that management was delaying the filing of its 4Q and FY17 financial results which "caught traders off guard."  The article further noted that "Management did communicate that this investigation is not expected to have a material impact" on 2018 revenue guidance.

220.   PiperJaffray also issued a report on February 20, 2018 in response to the Company's announcement of an internal investigation, commenting that "we are encouraged that the company reiterated guidance and mentioned the cash position." While acknowledging that the postponement was "concerning," PiperJaffray continued to "recommend shares to investors with a higher tolerance" until more information was available from the investigation.

221.   The next day, February 22, 2018, *The Wall Street Journal* released an article titled, "MiMedx, Fast-Growing Developer of Tissue Graft Products, Didn't Report Payments to Doctors."  The article stated that MiMedx had unreported payments to more than 20 doctors, despite a 2013 federal law, the Sunshine Act, requiring most drug and medical-device makers to disclose such payments. According to the article, MiMedx claimed that it had received "an opinion from CMS which confirms that MiMedx does not have a need to report [such payments] at this

time" due to the nature of its products (human tissue).  Contrary to this statement, however, a CMS spokesman told *The Wall Street Journal* that it does not provide such opinions, only general guidance.

222.   The following day, February 23, 2018, the Company, held a conference call in which Petit, Cashman, and Taylor discussed the postponement of the Company's 2017 Form 10-K and Audit Committee investigation into its sales and distribution practices.   On the call, Defendants expressed uncertainty as to the timeframe of the investigation.  Petit stated that "the timeframe for the completion has not been determined" and Taylor added that "we're only able to say that the internal investigation will review matters related to current and prior period ma[tt]ers."

223.   During the February 23, 2018 call, Defendants misleadingly sought to reassure investors that the Company's operations would not be affected by the investigation and downplayed allegations as a fiction driven by "illegal short-sellers with a value destructive agenda."  Petit also stated that first quarter 2018 ("1Q18") was going well and reaffirmed guidance for fiscal year 2018 ("FY18"), stating, "[w]e certainly believe you can expect our revenue growth to continue at a rapid rate.  The company reiterated revenue guidance for the year of $383 million to $387 million.  Also, our cash flow remains very strong and we anticipate that to continue."

- 124 -

Defendants stated that they were not taking any live questions from analysts or investors during the conference call.

224.   Despite Defendants' denials and reassurances, the price continued to plummet.  As the market processed the Audit Committee investigation discussed during the Company's conference call on February 23, 2018.  The Company's stock price fell 11.82%, from a close of $8.88 per share on February 22, 2018, to a close of $7.83 per share on February 23, 2018, on well above-average volume of 14.09 million shares.

225.   In a report issued February 23, 2018, Lake Street described Defendants' conference call as similar to the "*Mythbusters* episode that tested whether a keg of beer could explode with lethal force if placed on an open fire. . . . [C]ampers may not want to be anywhere near something that could explode, . . . [a]nd that is exactly what investors are thinking when they look at MiMedx."   Accordingly, Lake Street downgraded MiMedx stock to "Hold" and lowered its price target for the second time in three days, from $12 to $9.

226.   Shortly after the market opened on the following business day, February 26, 2018, *Bloomberg* released an article titled, "U.S. Probes MiMedx's Federal Contracts, Accounting" stating that, according to multiple sources, the DOJ was investigating whether the Company "overcharged the government for its tissue-repair

products" and looking into the Company's "distribution practices – Including whether it inappropriately booked sales of products that hadn't been ordered, a practice known as channel stuffing." The article further reported that the SEC enforcement division's "Denver office has been working with federal prosecutors in Manhattan" regarding the Company's distribution practices.

227.  With respect to channel stuffing, the *Bloomberg* article noted that "[s]everal former employees, in lawsuits and interviews with *Bloomberg*, allege the company has inflated its financials by recognizing revenue on products that had been shipped to certain distributors but not used." In particular, the article stated that, in addition to two former MiMedx employees who alleged channel stuffing in a lawsuit against MiMedx (Kruchoski and Tornquist), "[t]hree other former employees, who asked not to be identified, told *Bloomberg* in interviews that company executives at times asked salespeople to meet targets by shipping products that hadn't been ordered."

228.  In addition to channel stuffing, the *Bloomberg* article stated that:

In a second line of inquiry, federal agents are said to be looking into the company's sales to the government. MiMedx charged government customers higher prices for what was essentially the same product it was selling to others, according to two former employees. One of them said that late last year, the Federal Bureau of Investigation collected emails, sales reports, marketing materials, pricing charts and pay details as part of an inquiry into MiMedx's government sales.

- 126 -

229.   The *Bloomberg* article added that the DOJ was looking into whether these sales practices violated the FCA, "the government's primary tool for policing fraud against federal agencies," and that MiMedx could face "significant penalties."

230.   In response to the disclosure of the DOJ investigation and possible FCA violations, the Company's stock price continued to fall 6.13%, from a close of $7.83 per share on Friday, February 23, 2018, to a close of $7.35 per share on Monday, February 26, 2018, on well above-average volume of 23.99 million shares.

231.   Also on February 26, 2018, Motley Fool published an article titled, "Here's Why MiMedx Group Inc. is Crashing Again."   The article referenced the *Bloomberg* article released earlier in the day regarding the DOJ's investigation into MiMedx's sales practices as the reason for the stock price decline.   In response to the lack of clarity into the Company's conduct, the article advised that "[g]iven the huge uncertainty, I still think the smart move is to monitor this story from a safe distance."

232.   On the same day, Seeking Alpha published an article titled, "MiMedx Sinks After Conference Call, Marc Cohodes' Throwdown."   The article claimed that in response to a video posted by Cohodes on the social media platform Periscope, MiMedx "ignored the elephant in the room while trying to shoo away the mouse," resulting in a switch from a long to short position in the Company.   The article also

stated that "[s]hareholders deserve some color on the high SG&A expense, especially in light of current allegations."

233.    The following day, February 27, 2018, the Company issued a press release responding to the *Bloomberg* article.  The Company began the press release by emphasizing that it "is not aware of any investigation of MiMedx by the [DOJ]," stating that the DOJ declined to intervene in a *qui tam* suit against the Company three years ago.  The Company denied the article's allegations of channel stuffing and improper payments, blaming them on "a concerted, illegal short selling attack since September [2017]" and retaliation by terminated MiMedx employees "acting in concert with this group of short sellers to distort information and negatively impact the Company's stock price."  The Company directed news writers to its "effective[]" rebuttals of such allegations on the MiMedx website.  In addition to these denials, the press release reassured investors that the accusations should not affect performance and that "management remains confident in the Company's ability to deliver operational and clinical success in the months and years to come."  Specifically, the Company again reaffirmed its 2018 revenue guidance:  "[B]ased on information available to date, the independent investigation by [MiMedx's] Audit Committee and their legal and accounting advisors should not have a material impact on the Company's 2018 revenue guidance of $383 million to $387 million."

234.   Then, approximately two weeks after denying any knowledge of a DOJ investigation, the Company revealed that it was, in fact, under investigation by the DOJ.  The Company filed a Form 8-K before the market closed on March 15, 2018, revealing that, in addition to an ongoing investigation by the SEC, to which the Company was "continu[ing] to provide documents" in response to a 2017 subpoena, "the Company was recently informed that, in parallel with the SEC's investigation, the U.S. Department of Justice is also reviewing these matters on a preliminary basis. MiMedx will continue to cooperate with these regulatory agencies."

235.   The Company further revealed that it was delaying the filing of its 2017 Form 10-K in connection with its internal Audit Committee investigation into sales and distribution practices.  The press release stated:

> As previously announced, the Audit Committee of the Company's Board of Directors is conducting an independent investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices, including allegations made by certain former employees and short sellers.  As a result, the Company has delayed the filing of its Form 10-K for the year ended December 31, 2017.  The Company looks forward to the completion of the Audit Committee's investigation.

236.   These revelations spurred PiperJaffray, an analyst that had "been standing by MiMedx . . . despite numerous short selling reports," to announce on March 15, 2018 that it was suspending coverage of the Company (including its stock

price rating, stock price target, and financial estimates) until the DOJ, SEC, and internal Audit Committee investigations are completed.

237.   Defendants attempted to dilute the negative news by again providing misleadingly positive statements about the Company's financial performance.   On March 15, 2018, the same day as the Form 8-K and Aurelius report referenced above, the Company issued a press release in which Petit stated, "This year started off strong, and we have continued to see momentum build through the quarter.  With our current revenue pace and more than two-thirds of the first quarter completed, we are confident in our expectation that we *will exceed* $92 million in revenue for the first quarter of 2018."

238.   On March 30, 2018, the Company announced that its lenders had modified the Company's credit agreement to prohibit any borrowing until its 2017 Form 10-K was filed.  MiMedx downplayed this by stating that it had not used the credit facility and did not intend to do so in the future.

239.   Despite the myriad problems the Company was facing, Defendants continued to mislead investors.  On April 26, 2018, the Company issued another press release seeking to reassure the market that the Company was enjoying overwhelmingly strong sales and financial results.  Incredibly, the Company *raised guidance* for 2018, with Petit stating:

The first quarter [2018] revenue growth is a clear demonstration of the strength of our product lines, our sales management system and the talent we have assembled in our sales and other key functions within our organization. Based upon our strong first quarter performance, we have raised our full year revenue guidance from a previous range of $383 million to $387 million to a revised range of $389 million to $394 million.

240.   Petit also stated that MiMedx's stock price was "***undervalued***" and compared MiMedx to another company whose stock traded at 22 times earnings. The press release further assured investors that the Company would submit a plan to NASDAQ in order to regain compliance by May 1, 2018.

241.   In a April 26, 2018 report, Craig-Hallum observed that Defendants' "announcement that first quarter revenue exceeded the pre-released range on an un-reviewed basis was akin to a golfer stating that he shot 10 under par, but played by himself and didn't have a scorecard. It sounds good, but outside confirmation would be preferred." Nonetheless, Craig-Hallum maintained its rating and price target on the stock, citing the Company's strong guidance for 2Q and FY18.

242.   Defendants' false statements concerning the valuation of the Company successfully (and misleadingly) buoyed the stock price, causing the stock price to remain inflated in reaction to the Company's raised guidance for 2018.

243.   Also on April 26, 2018, Seeking Alpha published an article titled, "MiMedx: More Explosive Price Action Might Soon Be Here," which discussed the

higher than average trading volume and "surprisingly positive price action." The article attributed the "wild price movement" to the pre-announcement of projected 1Q18 financial results that were above expectations.

244.   Bad news continued to leak out despite Defendants' concerted efforts to convince investors that the Company continued to perform exceptionally well notwithstanding the Audit Committee investigation and delayed FY17 financial results.  On May 8, 2018, the DOJ released a statement that a federal grand jury in Greenville, South Carolina had returned an Indictment against two doctors and a nurse practitioner from the Dorn VA, as discussed above.[211]  The DOJ charged them with conspiracy to knowingly commit health care fraud involving benefits received from MiMedx, through which the Dorn VA defendants "***became employees, agents, or independent contractors of MiMedx***."  According to the Indictment, the alleged conspiracy occurred from "at least in or about 2012" and involved the Dorn VA defendants' receipt of meals, salaries, trips, gifts, and other in-kind inducements from MiMedx to induce them to order, purchase, and use MiMedx products, which caused "the excessive use of MiMedx products on VA patients in South Carolina."  The Indictment further alleged that the Dorn VA defendants participated in speaking engagements on behalf of MiMedx with the goal of increasing sales to VA facilities.

---

[211] *Supra*, n.16 (discussing the *Becker* Indictment).

245.   In response to the MiMedx-related DOJ Indictment, the Company's stock price fell 7.50%, from a close of $8.01 per share on May 8, 2018, to a close of $7.41 per share on May 9, 2018, on unusually high trading volume of over 7.15 million shares.

246.   On May 10, 2018, MiMedx issued a press release commenting on the DOJ's Indictment two days prior and trying to deflect the negative attention away from the Company.  The press release stated that the Company had "cooperated" with the VA on the matter, and "will continue to cooperate fully with all legal and regulatory authorities."  The press release further stated:

> Although the indictment does reference speaker fees paid by the Company to the former VA employees who were indicted and other interactions between persons who were MiMedx employees at the time of the alleged events, it is important to note that MiMedx was not indicted. . . . Furthermore, the Company has fully cooperated with the VA Office of Inspector General, which conducted the investigation in this matter.  The Company will continue to cooperate fully with all legal and regulatory authorities.

247.   On June 6, 2018, the Company's Board formed a Special Litigation Committee initially comprised of three purportedly independent directors:  Luis Aguilar, Bleser, and Larry W. Papasan, who resigned shortly thereafter, on June 21, 2018, and was replaced by Neil Yeston.  Among other things, the Special Litigation Committee was authorized to evaluate and investigate shareholder demands and retain outside litigation counsel.

- 133 -

C.    **Defendants Announced a Massive Six-Year Accounting Restatement and Executive Resignations**

248.   After almost a year and half of downplaying, denials, deflection, and retaliation, before the market opened on June 7, 2018, MiMedx dropped a bombshell confirming that nearly six years of the Company's financial statements were materially misstated.  The Company issued a press release stating that its internal investigation had shown that its reported financial results for fiscal years 2012-2016 and the first three quarters of 2017 were not reliable and would have to be restated.  MiMedx also stated that all communications and financial information with respect to fourth quarter 2017 ("4Q17") and 1Q18 were no longer reliable and withdrew its 2018 guidance, after misleadingly reaffirming and then raising it earlier in the year.

249.   The Company tied the need to restate revenue information discovered during the Company's ongoing Audit Committee investigation.  Specifically, the press release stated that the investigation had "primarily been focused on the accounting treatment afforced to [certain] sales and distribution practices" and found that "certain implicit arrangements" between the Company and two unnamed distributors had "modified the explicit terms of the contracts [with MiMedx], impacting revenue recognition during the specified periods."  The press release provided no other details on the matter, but added that "[t]he Audit Committee investigation is ongoing, continues to evaluate sales and distribution practices at other distributors and

- 134 -

customers, and may ultimately result in the identification of additional issues, broaden the scope of financial items or periods required to be restated, may result in additional actions taken by the Company, and may affect the preliminary conclusions expressed [in the June 7 press release]." The Company was unable to estimate when it would file the restated financial statements or a Form 10-K for FY17 and subsequent interim periods.

250.    In the same press release, the Company announced that Senken and the Company's Controller and Treasurer, Cranston, had left the Company effective June 6, 2018. Edward J. Borkowski, an Executive Vice President of the Company, was named interim CFO in place of Senken.

251.    In response to the Company's massive Restatement and the departure of Senken and Cranston, the Company's stock price plunged another 23.39%, falling from $8.21 per share at the close of trading on June 6, 2018, to $6.29 per share at the close of trading on June 7, 2018, on well-above average trading volume of 16.0 million shares.

252.    On the heels of the announcement of a pending Restatement, the Company's wholesale senior leadership shake-up continued on July 2, 2018. Before the market opened, the Company issued a press release announcing that Petit and Taylor resigned effective June 30, 2018. Taylor also resigned as a Director of the

Company, while Petit resigned as Chairman but remained a Director.  The Company

specifically linked these resignations to the Company's internal investigation findings,

stating:

> These resignations . . . are based on the Board of Directors' business
> judgement regarding the Company's leadership and direction, and arise,
> in part, from information the Audit Committee has identified through its
> previously announced independent investigation. This investigation is
> ongoing and there may be other actions taken based, at least in part, on
> information from the investigation.

253.   In response to the resignations of Petit and Taylor, the Company's stock

price plummeted ***38.50%***, from a close of $6.39 per share on Friday, June 29, 2018, to

a close of $3.93 per share on Monday, July 2, 2018, on well-above average trading

volume of 14.547 million shares.

## VI.   THE TRUTH CONCERNING DEFENDANTS' FRAUD CONTINUED TO BE REVEALED AFTER THE CLASS PERIOD

254.   News of the Company's pervasive fraud continued to leak out after the

close of the Class Period.  After the market closed on July 2, 2018, *The Atlanta*

*Journal-Constitution* published an article titled, "MiMedx's internal probe prompts

CEO Petit's resignation."  The article quoted Petit, who proffered that stories of

inflated revenue were "bogus" and further called the short sellers who accused the

Company of channel stuffing "wealthy thieves."  The article further quoted Petit as

claiming that "[t]his is all stuff trumped up to drive the stock price

down." Ultimately, the article explained that the resignations of Petit and Taylor were not voluntary, but instead were the result of information obtained from the Audit Committee's internal investigation.

255. On July 5, 2018, Seeking Alpha published an article titled, "Cohodes Predicts MiMedx Bankruptcy 'Imminent' . . ." which discussed the Company's potential bankruptcy and attributed the Company's more than 30% stock price decrease on July 2, 2018 (discussed above) to Petit stepping down as CEO.

256. On July 26, 2018, *The Wall Street Journal* published an article titled, "Highflying Medical Firm, a Help to Wounded Veterans, Falls to Earth." The article detailed problems and improprieties at MiMedx, corroborating the allegations set forth above, including alleged channel stuffing, mislabeling, and unreported payments to doctors, and MiMedx's retaliatory practices towards former employees who reported improprieties.

257. After the market closed on July 26, 2018, MiMedx disclosed that on July 10, 2018, it notified NASDAQ that the Company would be unable to bring its SEC filings up to date by the initial August 28, 2018 deadline previously communicated by NASDAQ, and that, in response, it received a letter from NASDAQ on July 20, 2018, regarding a potential delisting of the Company's stock unless the Company requests a

hearing before a panel by July 27, 2018.  MiMedx said it would submit a hearing request by that date, and that the hearing was expected to occur 30-45 days thereafter.

258.   In response to the Company's admission that it could not comply with NASDAQ requirements, the stock price fell 13.54%, from a close of $4.80 per share on July 26, 2018, to a close of $4.15 per share on July 27, 2018.

259.   On September 20, 2018, MiMedx issued a press release blaming Petit, Senken, Taylor, and Cranston for misconduct uncovered by the Audit Committee's internal investigation.  The Company announced that Petit resigned from the MiMedx Board effective immediately, following his previously announced resignations as CEO and Chairman on July 2, 2018.  Moreover, the Company stated that Petit's resignation – and the prior resignations of Senken, Taylor, and Cranston – would be treated as terminations "for cause" based on information identified in the Audit Committee's ongoing independent investigation.  The Company further announced that, because Petit, Senken, Taylor, and Cranston "engaged in, among other things, conduct detrimental to the business or reputation of the company," the Company was forfeiting all of their outstanding equity and incentive awards and clawing back certain compensation.  The Company characterized these actions as "necessary steps to prepare MiMedx for its next chapter and a stronger future," and stated that the Audit

Committee's investigation was still ongoing and "there may be other actions taken based, as least in part, on information from the investigation."

260.   Also on September 20, 2018, *The Atlanta-Journal Constitution* reported that the Minneapolis VA parted ways with four podiatrists and a dermatologist over "improprieties" involving MiMedx products, as confirmed by a spokesman of the VA. The spokesman stated that the doctors "engaged in behavior [involving MiMedx products] that is not in line with the norms and values of the [VA] department," but provided no further details as to the nature of the improprieties.  The article noted that the Company "is under fire amid accusations of 'channel stuffing' by ex-employees – lobbying friendly doctors and medical staffers to overstock and over-use products, thereby inflating revenue reports and driving up stocks," and that the Company "remains under scrutiny" from the DOJ, SEC, and VA.  Research firm Aurelius later reported that three of the removed Minneapolis VA doctors were Guy J. Werkhoven, Eric W. Affeldt, and Gregory T. Rifleman, each of whom had jointly authored a clinical study, cited on the Company's website, regarding MiMedx's skin graft product EpiFix.

261.   On October 5, 2018, *The Wall Street Journal* published an article titled, "MiMedx Kept Cheaper Products Out of Its Offering to VA Hospitals."  The article reported that MiMedx was under investigation by the DOD's Criminal Investigative

Service in connection with the Company's financial arrangements with a surgeon (Dr. Eric D. Martin) at the Augusta VA, and that a grand jury had been commissioned to hear testimony on the matter "to determine whether Dr. Martin received compensation from the company without proper clearance." The article added that, "Dr. Martin has been a big user of MiMedx products, especially its injectables . . . . In one month he used almost $1 million of the products."

262. In addition to the arrangements with Dr. Martin, the article reported that "[MiMedx] sales representatives were required by Mr. Petit to host lunches and dinners with doctors, meetings he called 'healing reviews.'" Based on internal MiMedx spreadsheets reviewed for the article, MiMedx employees had hosted "hundreds of company meals" to "thousands of doctors over ten months in 2016." When questioned about these practices, MiMedx and Petit "declined to comment." The article also reported that "the company's questionable practices toward federal hospitals were more extensive than previously known," including limiting their available EpiFix products to larger, more expensive sizes than those offered to private hospitals.

263. The Company's stock price fell in response to the news reported in *The Wall Street Journal* on October 5, 2018. The price dropped 12.4%, from a close of

$6.45 per share on October 4, 2018, to a close of $5.65 per share on October 5, 2018, on above average trading volume of approximately 3.83 million shares.

264.   MiMedx dropped another bombshell on November 7, 2018, announcing by press release that it had received a delisting notification from NASDAQ "as a result of the interim progress report submitted by the Company on October 31, 2018." The progress report disclosed to NASDAQ further information on the extreme magnitude of the Company's revenue recognition problems, which the Company now admitted would require a review of "*all* of the Company's sales" dating back to 2012. Specifically, the Company explained that, in its interim progress report, "the Company indicated that it has now determined that, for the Restatement period [2012-2017], *it must conduct an assessment of revenue recognition for all of the Company's sales*, which will prolong the amount of time it will take for the Company to prepare the restated financial statements." As a result of the NASDAQ delisting, MiMedx shares would be relegated to the "over the counter market" operated by OTC Markets Group Inc., effective November 8, 2018.

265.   In response to this news of the NASDAQ delisting and the Company's admission that it would need to review all sales dating back to 2012, MiMedx's share price was eviscerated, plummeting *41.16%* from a close of $6.22 per share on November 6, 2018, to a close of $3.66 per share on November 7, 2018, on extremely

high trading volume of approximately 28.26 million shares.  The stock price continued to fall an additional 19.40% the following day, closing at $2.95 per share on November 8, 2017, on trading volume of over 39.50 million shares.

266.   On December 5, 2018, MiMedx released a slew of bad news detailing additional fallout from the unraveling of the Company's accounting fraud.  First, the Company announced that Cashman, a key figure in the fraud, "will be departing the organization," as part of what the Company termed a "broad-based organizational realignment program" that would also eliminate Cashman's position as CCO.  No other details were provided regarding Cashman's termination.

267.   MiMedx provided details on its "organizational realignment program" intended to "simplify and streamline our organizational structure, and reduce costs in order to improve profitability and liquidity."  As part of the realignment, the Company announced that it would be firing nearly a quarter (24%) of its total workforce – about half of which would be sales personnel – among other cost-cutting measures.

268.   The Company explained that the dramatic organizational realignment was driven by, among other things, changes to business practices exposed by the Audit Committee's investigation.   These required changes had reduced the Company's sales and revenue that were previously manipulated and inflated by the

fraudulent practices detailed herein, in turn hurting profitability and liquidity.  The

press release stated:

> The wound care market in which the Company operates is undergoing a
> transition as it adapts to a changing regulatory environment for human
> cells, tissues, and cellular and tissue-based products (HCT/Ps), as well as
> to recent third-party payer decisions eliminating health insurance
> coverage for certain uses of amniotic tissue products. Moreover, ***the
> Audit Committee's independent investigation has required changes to
> business practices to address issues identified in the investigation***.
> ***MiMedx's realignment program was developed largely in response to
> these changes that have resulted in a material softening in the
> Company's recent revenue performance and expected near-term sales
> forecast***.

269.   The press release also stated that the Company "has expanded the scope

of work" in connection with the preparation of its Restatement (FY12 to 3Q17) and

was "unable to estimate the expected completion date at this time" or "provide any

financial performance-related information."  The Company added that "[t]he Audit

Committee's independent investigation is still ongoing, and there may be other actions

taken based, at least in part, on information from the investigation.  The Company

continues to incur significant legal and accounting-related expenses related to, among

other things, the Audit Committee's independent investigation and other legal matters,

the Company's work to prepare its restated financial statements and the

implementation of improved business controls."  The press release also implied that

Petit, Taylor, and Senken, and former Controller Cranston, had previously impeded

the Restatement process, which was alleviated by their firing "for cause" in mid-2018, and further stated:

> As previously disclosed, the Compensation Committee and the Board determined that the separations of the Company's former CEO [Petit], COO [Taylor], CFO [Senken] and Corporate Controller [Cranston] should be treated as "for cause" and that these former executive officers had engaged in, among other things, conduct detrimental to the business or reputation of the Company. ***The departures of these former executives have enabled the Company to progress in the preparation of its financial statements.***

270.   Also on December 5, 2018, MiMedx announced that its independent auditor, EY, had informed the Company's Audit Committee on December 4, 2018 that it had "resigned from the engagement to audit the Company's financial statements for the years ended December 31, 2017 and 2018, effective immediately." EY had served as auditor for less than a year-and-a-half, after replacing former auditor Cherry Bekaert, which suspiciously departed in August 2017.

271.   In response to this tidal wave of bad news, MiMedx's stock price collapsed, falling ***59.32%***, from a close of $2.95 per share on December 4, 2018, to a close of $1.20 per share on the next trading day, December 6, 2018 (after reaching an all-time low of $0.95 mid-day), on unusually heavy trading volume of over 29.27 million shares.

272.   In a Form 8-K filed with the SEC on December 7, 2018, the Company elaborated on EY's resignation, conveying EY's stunning assessment of the pervasive,

ongoing fraud at MiMedx.  Specifically, MiMedx further disclosed that, during the time of EY's engagement as independent auditor, EY had advised MiMedx, in relevant part, that:

- "*the internal controls necessary for the Company to develop reliable financial statements do not exist*";

- "[a]lthough EY could accept representations from the current Interim CEO and Interim CFO based on their knowledge, EY advised the Company that *EY is unable to rely on representations from them* because, as of the date of the resignation, the current Interim CEO and Interim CFO, in turn, would have needed to rely on representations from certain legacy management personnel still in positions that could affect what is reflected in the Company's books and records.  At the time of EY's resignation, the Audit Committee's independent investigation was still ongoing";

- "the Company . . . need[ed] to significantly expand the scope of its audit, due to *material allegations of inappropriate financial reporting, material allegations of noncompliance with laws and regulations*, the findings to date from the independent investigation conducted by the Audit Committee into these allegations, and the lack of internal controls necessary for the Company to develop reliable financial statements"; and

- "information has come to EY's attention that EY has concluded *materially impacts the reliability of previously issued financial statements*, and the issues raised by this information have not been resolved to EY's satisfaction prior to its resignation."

273.  On April 11, 2019, after the market closed, and more than ten months after the announcement of the Restatement, MiMedx issued a press release disclosing that "[t]he Company continues to work diligently to complete the financial

restatement," but was unable to provide clarity on the timelines for completion of its

financial restatement or selection of a new auditor.  The press release further stated:

> *Due to the depth, breadth and complexity of issues identified through the Audit Committee's investigation, the scope of work in connection with the preparation of the Company's restated financial statements was expanded.* Investigative efforts initially focused on the accounting practices around specific distributors between 2012 and 2017. Additional concerns related to other customer accounts resulted in the need to analyze the Company's revenue recognition practices for all years from 2012 to 2018; the Company is nearing the end of that review. At the same time, the Company has implemented improved processes and controls to monitor sales practices, authorize credits and returns, recognize revenue, and is advancing the Company's financial restatements in an expedited manner in order to regain compliance with Securities and Exchange Commission (SEC) reporting obligations.

274.   In addition to the expanded internal investigation, MiMedx also disclosed

"a comprehensive review of its historical VA sales" and that the Company "has

recorded an obligation of $8 million in connection with a potential issue that it self-

disclosed to the VA concerning the eligibility of one of its products for inclusion in

the Company's Federal Supply Schedule (FSS) contract."  According to the Company,

the expanded internal investigation was ongoing.

275.   Finally, MiMedx revealed that it "intends to seek capital" for the

implementation of its long-range strategic plan and "to provide liquidity to fund the

costs associated with the ongoing Audit Committee investigation, the Restatement of

the Company's financial statements and the near-term efforts by the Company to

address certain contingent liabilities relating to pending and threatened lawsuits, pending governmental investigations and other legal proceedings."

## VII. THE MIMEDX DEFENDANTS ACTED WITH SCIENTER

### A. The Individual Defendants Acted with Scienter

276. The Individual Defendants – Petit, Taylor, Senken, and Cashman – acted with scienter. Each of them knew, or recklessly disregarded, that statements issued or disseminated in the name of the Company were materially false and misleading, and omitted material facts, for the reasons set forth above. The facts set forth in this section, and throughout this pleading as a whole, strongly support and establish a strong inference of each Individual Defendant's scienter.

#### 1. The Individual Defendants Were Active Participants in the Fraud

277. The Individual Defendants were active and culpable participants in the fraud. They either directed or possessed direct information about the Company's illicit sales and distribution practices, including channel stuffing and other improper conduct, and knew of the true facts surrounding MiMedx's inflated financial results. As such, they knew or recklessly disregarded the fact that materially false and misleading information was disseminated to the investing public during the Class Period.

- 147 -

278.   Examples of the Individual Defendants' direct knowledge of and involvement in the fraud include:

- A former MiMedx employee stated that **Petit** was personally involved with channel stuffing at VA and DOD facilities and "knows of the issues and the lengths he has instructed people to avoid credits that would have destroyed most quarter sales" and "knows the events about the revenue and the conduct of [MiMedx] individuals is true including the distributors with obscene orders at the end of the quarters." This employee said that the "shelf stuffing problems . . . had been going on to my knowledge since 2012/13."[212]

- On or about February 28, 2014, **Taylor** and other MiMedx executives received email correspondence regarding the PAN scheme and MiMedx's manipulation of funds contributed to PAN.

- In 3Q14, **Cashman** and others directed the Company's senior sales managers to significantly increase the amount of products shipped to VAs through AvKARE, even if the VAs did not need or request the products.

- During 2015, Fox repeatedly objected to the Company's AvKARE channel stuffing and improper revenue recognition to **Cashman**.

- On October 7, 2015, **Petit** personally reprimanded Fox for objecting to, and refusing to participate in, MiMedx's fraudulent revenue recognition scheme through AvKARE.

- On or about December 9, 2015, **Petit**, **Taylor**, and **Cashman** were informed that the Company may need to credit AvKARE for channel-stuffed product that the Company had placed on VA shelves, given the Company had already recognized revenue for it.

---

[212] Ex. J, at 3-5.

**Petit**, in particular, was personally "involved" with this problem according to Roselli.

- **Cashman** implemented a channel stuffing scheme involving the delivery of 7x7 cm EpiFix grafts to VA hospitals at the end of 1Q16. When Fox objected in March 2016, **Cashman** responded, "Mike, we understand your concerns. Duly noted, but we are going to do this."[213]

- On or about March 22, 2016, in the face of aggressive sales demands, Blocker explained to **Cashman** that MiMedx products were already "spilling out of every cabinet available to us" at VA hospitals, causing "questions the amount of product that's being used." In response, Cashman suggested that Blocker try one of the Company's favorite tactics, using "healing reviews" to influence VA decision makers.[214]

- On October 31, 2016, **Taylor** informed Kruchoski that he was not entitled to commissions on the sale of certain channel-stuffed product because, according to **Taylor**, this was "phony growth" given that it represented an acceleration of the same revenue that MiMedx had already recognized and MiMedx previously had to credit AvKARE for the product.

- On November 2, 2016, **Petit, Taylor,** and **Cashman** directly received an internal complaint from Kruchoski and Tornquist describing channel stuffing and improper revenue recognition in relation to AvKARE and other distributors.[215]

- According to an internal report by Kruchoski and Tornquist on November 4, 2016, **Petit** "insisted" on an "elaborate scheme of loading government facilities that the government has not purchased" and "anyone who did not comply would be negatively

---

[213] *Fox* Counterclaim, at ¶57.

[214] *Id.* at ¶54.

[215] *See* Ex. M, at 3-4.

treated."[216]    He also had direct conversations with upper management including **Taylor** regarding the scheme.[217]

- On December 12, 2016, **Petit**, **Taylor**, and **Cashman** participated in a meeting with Fox regarding the internal channel stuffing complaint by Kruchoski and Tornquist.

- **Senken** submitted letters to the SEC in response to their comment letters regarding the Company's accounting procedures with respect to AvKARE and other distributors, which concealed the Company's accounting improprieties and improper distribution practices.

- In spring 2017, Tierney communicated to **Cashman** that MiMedx was "using SLR to obtain bogus revenue" through channel stuffing practices.[218]  In response, Cashman told Tierney to "let it go."[219]

- On August 5, 2017, Tierney reported to **Petit** that MiMedx management had an established practice of fraudulently concealing the fact that a large amount of consignment tissue was missing from the shelves of third parties; and, on January 12, 2018, Tierney submitted a report to Petit and the MiMedx Board (which included **Taylor**) detailing channel stuffing and fraudulent revenue recognition practices, among other illicit practices, which Tierney described as "a mind-boggling level of sales and accounting irregularities" and a "'win at all cost culture' that was 'taking over MiMedx, a culture fostered by the tone and conduct of senior management at the highest levels.'"[220]  Tierney was fired 11 days after the second report.

---

[216] *Id.* at 1-2.

[217] *Id.*

[218] *Tierney* Complaint, at ¶9.

[219] *Id.*

[220] *Id.* at ¶18.

- As CFO, **Senken**, was responsible for leading, directing and managing the finance and accounting teams, including overseeing the preparation of all financial reporting, forecasting and budgets. Given the extent to which Defendants' fraudulent actions concerned areas central to Senken's expertise and job responsibilities, it is impossible that Defendants' improper channel stuffing, revenue recognition, accounting, and financial reporting could have occurred without Senken's knowledge.

- **Petit** and **Senken** undertook the affirmative obligation to obtain knowledge in order to ensure MiMedx's disclosures to the market were truthful by executing SOX certifications.

- According to **Petit**, "Dear Pete" letters submitted by Company employees were investigated by **Petit** and **Taylor**, and thus they understood the truth of what was reported in the letters and were responsible for covering up the truth.

279. Moreover, the Individual Defendants' role in the fraud is evident from their terminations by the Company as the second Audit Committee investigation was underway. Petit, Taylor, and Senken were all fired by the Company "for cause" because, according to the Company, they each "had engaged in, among other things, conduct detrimental to the business or reputation of the Company."[221] Cashman was also terminated under suspicious circumstances – the very same day that "the Audit Committee's independent investigation [] required changes to business practices to address issues identified in the investigation."[222] Additionally, the Company's

---

[221] MiMedx Group, Inc., Current Report (Form 8-K) (Feb. 20, 2018), Ex. 99.1.

[222] *See* MiMedx Group, Inc., Current Report (Form 8-K) (June 6, 2018), Ex. 99.1, 99.2.

December 5, 2018 press release suggested that Petit, Taylor, and Senken had hampered the Company's ability to progress in its efforts to accurately restate its financials, reiterating that they had previously been dismissed for cause and that their departures "have enabled the Company to progress in the preparation of its financial statements."

280.  Moreover, at the time of EY's resignation, EY indicated that Petit, Senken, and Taylor were responsible for improper "revenue recognition under certain distributor contracts," which ultimately necessitated the Restatement.  Specifically, the Form 8-K issued on December 7, 2018 made clear that EY had "a disagreement" with "certain members of the Company's prior senior management who were subsequently separated from the Company . . . for cause" (*i.e.*, Petit, Senken, and Taylor).  And the Audit Committee, after discussing the disagreement with EY and based on interim findings of its independent investigation, concluded that the Company's previously issued consolidated financial statements could no longer be relied upon.  This further demonstrates Petit's, Senken's, and Taylor's understanding of the Company's revenue recognition practices and involvement in the Company's improper revenue recognition scheme.[223]

---

[223] *Id.*

### 2.     The Magnitude of Fraud Supports the Individual Defendants' Scienter

281.   The sheer magnitude of the fraud, leading to a massive, multi-year financial Restatement and numerous investigations, also supports the Individual Defendants' scienter.  The fraud here was so pervasive that it permeated MiMedx's entire enterprise and, as the highest ranking officers of that enterprise, it was impossible for the Individual Defendants to have no knowledge of it during Class Period.

282.   Moreover, EpiFix and AmnioFix were the Company's most important products, which generated a vast majority of its revenue.  AvKARE, CPM, and SLR were the primary Company distributors for such products.  It is thus reasonable to infer that the Individual Defendants knew, or recklessly disregarded, that the Company's sales and distribution practices with respect to such critical products and distributors were improper.

283.   The following facts evidence the breadth and severity of Defendants' fraud and also support their scienter:

- The massive Restatement, which will involve a review of ***all of the Company's sales*** dating back to 2012, covers nearly six years of the Company's financial statements, and implicates at least 13 financial accounts. As reported by Audit Analytics, the period of

time affected by the Restatement is four times longer than the average, indicating a substantial and long-standing problem.[224]

- The Company's change in business practices to address issues raised in the second Audit Committee investigation, which led to a material softening in the Company's revenue performance.

- The ongoing investigations by a host of federal agencies into the Company, including the DOJ, SEC, and VA, evidence the severity of the fraud.

- EY's noisy resignation before completion of its audit and findings that "internal controls necessary for the Company to develop reliable financial statements do not exist," the Company needed to "significantly expand the scope of its audit" due to material allegations of inappropriate financial reporting, noncompliance with laws and regulations, findings from the Company's ongoing internal investigation, and the lack of internal controls."

- The Company's expansion of the scope of work in connection with the preparation of the Company's restated financial statement "[d]ue to the *depth, breadth and complexity of issues identified* through the Audit Committee's investigation . . . ."

- The Company's need to implement "*corrective processes to define, remediate, and enhance internal procedures for business health and sustainability*," which included a "restructured and bolstered pricing committee; tightened policies, procedures and governance of credit; the establishment of an independent compliance department reporting to the Board of Directors; the assessment and initial implementation of remediation of Sarbanes Oxley-related controls; hiring a Vice President of Internal Audit to develop an internal audit function for the Company" and its

---

[224] *See* Nicole Hallas & Derrick Coleman, *Five Years of Restatements Following Internal Investigation for MiMedx Group, Inc.*, Audit Analytics (June 25, 2018), https://www.auditanalytics.com/blog/five-years-of-restatements-following-internal-investigation-for-mimedx-group-inc/.

implementation of "improved processes and controls to monitor sales practices, authorize credits and returns, recognize revenue."

### 3. Defendants' Aggressive Campaign to Cover Up, Deny, and Downplay the Fraud Supports Scienter

284.   The Individual Defendants' scienter is also supported by their actions as the fraud unraveled.  They went to great lengths to cover up and conceal the fraud, discourage internal whistleblowers and outside critics through threats and retaliation, and loudly defend themselves in press releases, shareholder letters, postings on the Company website, and public conference calls as described in Sections IV.F, V.  This striking behavior – highly unusual for a public company – strongly supports a consciousness of guilt.

285.   MiMedx threatened and fired multiple employees who objected to the Company's channel stuffing, kickbacks, and other improper practices, including Kruchoski, Tornquist, Fox, Vitale, and Tierney.  Several were then sued and publicly rebuked by the Company, and Petit in particular, in retaliation for their dissent.  Some of these firings occurred shortly after the employees submitted what the Company termed a "Dear Pete" letter, a formalized Company procedure in which employees could contact Petit directly about problems at the Company, presumably so he could correct them.  Instead, the Dear Pete letters earned them a pink slip from Petit, and the Company's fraud continued unabated.

286.   For example, Kruchoski and Tornquist were fired after objecting to the Company's channel stuffing and revenue recognition practices.  The Company then sued them, attacked their credibility, and denied their claims, as discussed above.  During a public conference call on December 19, 2016, Petit represented that, unlike Kruchoski and Tornquist, he was "thoroughly versed" in the GAAP and revenue recognition principles at issue:

> Our two former employees [Kruchoski and Tornquist] have no real knowledge of public accounting, generally accepted the accounting principles, revenue recognition criteria and thing of that nature. I believe they've created these allegations in order to extract a favorable settlement from the company because they were in turn creating violations of their agreements with the company.
>
> Please remember that I had been Chairman now or CEO of public companies now for 35 years. ***Over these decades, I've become thoroughly versed in all these principles that are being highlighted.***

287.   Later in the call, Petit confirmed that internal complaints "of any kind," such as those of Kruchoski and Tornquist, were investigated by Petit and Taylor: "When we have allegations of any kind come across through a hotline or up to a Dear Pete letter, or other sources through our compliance line, we investigate those because we don't want those kind of issues going on within the Company either.  And that's somewhere in the chain of command between myself, Bill, and so on."

288.   MiMedx also conducted a supposed Audit Committee investigation into the allegations by Kruchoski and Tornquist, which was announced on December 27,

- 156 -

2016.  But this was a white-washed affair with no real intent to address the fraudulent conduct detailed by the two employees.  Less than two weeks after Kruchoski and Tornquist sued the Company, MiMedx announced "preliminary investigation findings" by the Audit Committee, falsely assuring investors that there was no credible evidence whatsoever that its prior financial reporting was not incorrect in any respect, which the Company later confirmed on March 1, 2017.  This was hardly a surprise given the background of the Audit Committee, as well as its "independent" auditor, Cherry Bekaert, and legal counsel, Troutman.  Most had longstanding ties to, and were closely intertwined with, MiMedx and Petit, thus compromising their independence and impartiality.

289.   As discussed above, as the news leaked out, Defendants also embarked on a public campaign of denial, rebuttals, and pushback in press releases, prominent postings on MiMedx's website, shareholder communications, and conference calls. Petit and Taylor were personally involved in this campaign.  One of their primary tactics was to deflect public scrutiny and divert attention, blaming and defaming a group of "short sellers" supposedly working together to fabricate bad news about the Company and profit from the resulting stock price decline.

290.   Additionally, on October 9, 2017, MiMedx announced that its Board of Directors authorized an additional $10 million for the Company's Share Repurchase

Program (bringing the total to $110 million since 2014) in a desperate effort to further manipulate the stock price and reassure investors of MiMedx's supposedly strong balance sheet and cash flows in light of supposed "short seller" allegations regarding the Company's fraud.  Petit stated in the announcement:

> The recent deceptive and contrived attacks on our stock have caused the MiMedx shares to become very undervalued in my opinion.  I believe it is a very prudent use of our capital to acquire our shares at this point, and our high growth profile in both revenues and profits should produce an extremely anti-dilutive result from our stock repurchases.

> We share the frustration from the short selling activity with all of our shareholders, and we are aggressively pursuing avenues that will expose these illegal activities.

291.   Around the same time, the Company created a lengthy web page entitled, "Short Selling Commentary" with attacks and rebuttals against allegations by short sellers, which was prominently linked on the main page of MiMedx's corporate website.  In the same vein, Petit sent a lengthy letter to MiMedx shareholders on November 30, 2017 attempting to attack and rebut short sellers.  Suspiciously, the Company removed all "Short Selling Commentary" from its website around the time that public revelations of the Company's fraud began to snowball in early 2018.  This conduct is highly suggestive of the Individual Defendants' state of mind.

292.   The Company also filed lawsuits against a number of the supposed short sellers, alleging "defamation" and related claims in connection with the release of

reports criticizing the Company. These lawsuits were subsequently dropped by the Company or dismissed as the fraud continued to unravel, further exposing the Company's baseless cover-up tactics.

### 4. The Individual Defendants' Own Public Statements Support Scienter

293. During the Class Period, each of the Individual Defendants made public statements in which they discussed matters related to the alleged fraud. *See* Section VIII. Specifically, the Individual Defendants made statements regarding: (a) the Company's "impressive and "sustainable" growth profile; (b) the Company's use of and relationships with its distributors; (c) Defendants' focus on ensuring MiMedx employees acted in compliance with all ethical and legal standards; (d) denials and pushback to allegations of financial fraud and corporate malfeasance; (e) their response to regulatory inquiries; and (f) the results of the Company's first Audit Committee Investigation. Defendants were asked and answered detailed questions about these matters during every quarterly earnings calls with securities analysts throughout the Class Period. These statements were echoed in numerous press releases and SEC filings. This supports the Individual Defendants' investigation, analysis, and direct personal knowledge of such matters.

294. The Individual Defendants were fixated on increasing sales and revenue growth and beating financial guidance during the Class Period, and consistently

trumpeted these metrics to the market.  *See* Section VIII.A.  Specifically, Petit, touted the Company's "record revenue" each quarter.   This supports the Individual Defendants' direct knowledge of such matters, as well as their motive to engage in channel stuffing and other improper sales and accounting practices necessary to achieve financial objectives, and in turn maintain a positive market perception and keep the Company's stock price artificially inflated.  To the extent the Individual Defendants did not have such knowledge, they were reckless in their statements to investors in their responses.

### 5.    The Conduct of ABH Informed Defendants of Improper Practices

295.   Starting in 2012, Defendants hired new employees from ABH and its parent company Shire even though in 2011, the DOJ initiated an investigation into ABH for the unlawful inducement of clinics and doctors to use its products.  Indeed, the very employees that Defendants were courting for MiMedx were tainted by past fraudulent conduct including illicit bribery and kickback practices.   The DOJ's investigation should have raised a red flag into their hiring causing the Individual Defendants to look into the allegations alleged against ABH and confirm that such conduct would not occur at MiMedx.

296.   On January 11, 2017, the DOJ announced that Shire had agreed to pay $350 million to settle federal and state FCA allegations concerning ABH.  This was

the largest FCA settlement in history against a medical device company and should have raised additional red flags for MiMedx about its sales and distribution practices. The allegations, which stemmed from six whistleblower (*qui tam*) lawsuits in which the DOJ intervened, were strikingly similar to key aspects of MiMedx's fraudulent scheme alleged herein, including illegal "kickbacks and other unlawful methods to induce clinics and physicians to use or overuse its product Dermagraft."

297. Petit even addressed this conduct in a December 31, 2014 press release, stating that all ABH employees hired by MiMedx were "screen[ed] . . . very carefully" and that MiMedx "sought additional input from some former ABH corporate management who joined MiMedx and who were familiar with the suspected violations and the individuals involved." The necessity for these extra steps during the hiring process and the information obtained should have given clear indication to the Individual Defendants that the allegations raised in the whistleblower litigation and short seller reports were accurate.

**6. The Individual Defendants' Compensation Incentivized Their Fraud**

298. The Individual Defendants were incentivized to commit the fraudulent acts alleged herein by the Company's compensation structure for its executives and senior management. For example, in the Company's April 12, 2016 proxy form filed with the SEC, the Company disclosed that Petit's, Senken's, and Taylor's

compensation packages were each split into three components: (a) base salary; (b) annual cash incentives; and (b) long-term equity incentives.

299.   Annual cash incentives for Petit, Senken, and Taylor[225] were determined by the Company's Management Incentive Plan ("MIP"), which was "designed to incentivize and reward achievement of the current year's financial and operational goals."[226] The 2015 MIP, for example, provided that cash incentive bonuses would be earned dependent on several variables, each of which was measured on a sliding scale: (a) Adjusted EBITDA, which depended on whether the Company hit Adjusted EBITDA targets set by its Board and was weighted at 10% of the bonus; (b) revenue performance, which depended on whether revenue targets were hit and was weighted at *80%* of the bonus; and (c) individual objectives, which were key operational measures and/or milestone outcomes specific to the individual's position, and were weighted at 10% of the bonus. Additionally, if the Adjusted EBITDA threshold and revenue targets were *both* achieved, Defendants could earn additional "Excess" bonuses.

300.   For Petit, Taylor, and Senken, their 2015 cash bonuses, which were based on the exact same inflated financial metrics that are subject to this action, constituted

---

[225] Cashman's specific compensation was not disclosed in the Company's SEC filings.

[226] MiMedx Group, Inc., Other Definitive Proxy Statements (Form Def 14A) (Apr. 12, 2016).

*92%, 87%, and 72% of their 2015 salaries*, respectively.[227]   As these individuals collectively earned *millions* in incentive payments during the Class Period for sham financial achievements, it is no surprise that in September 2018, the Board of Directors decided to take "all required action" to cause any further incentive awards to these individuals due under the 2016 incentive award plan to be forfeited.  This clawback of Petit's, Taylor's, and Senken's incentive compensation was significant because it formed a majority of their annual compensation.  Further, this clawback ties directly to the Company's false revenues, which were the very performance measures from which the incentive compensation was based.

301.   Moreover, that Petit, Taylor, and Senken received a substantial portion of their pay in equity incentives also incentivized them to inflate the stock price as much as possible.  For example, in 2014, Petit, Taylor, and Senken received approximately 59%, 53%, and 44% of their compensation in "long term" equity grants, respectively.  Yet on the Company's April 25, 2014 earnings call, Petit stated that: "[a]lso [I] want you to keep in mind that MiMedx is a type of corporate entity that at some point will become part of a large health care organization.  There will be a point where some

---

[227] Petit's, Taylor's, and Senken's cash incentives in 2013 and 2014 were similarly substantial percentages of their salaries: Petit received *113%* of his salary, plus an additional $400,000 "discretionary" bonus in 2014 and 63% in 2013; Taylor received *113% of his salary* in 2014 and 62% in 2013; and Senken received 82% of his salary in 2014 and 45% in 2013.

corporate entity makes our board of directors an offer we cannot refuse." Plainly, Petit and the other Individual Defendants expected during the Class Period that the Company would be acquired, and that they would not be required to hold their MiMedx shares long-term. Accordingly, the Individual Defendants were incentivized to maintain short-term inflation in MiMedx's stock price to ensure they received the highest possible payout for their shares when MiMedx was acquired.

### B.   MiMedx Acted with Scienter

302. MiMedx also acted with scienter in issuing false and misleading statements and omitting material facts during the Class Period. Each Individual Defendant's scienter – supported by numerous facts detailed above – was imputed to MiMedx because each of the Individual Defendants was an agent who acted on behalf, and for the benefit, of MiMedx, and with MiMedx's authority.

303. In addition to the Individual Defendants, numerous other high-level MiMedx employees were complicit in, and had knowledge of, or recklessly disregarded, materially false and misleading statements and omissions concerning the Company's pervasive accounting fraud, channel stuffing, kickbacks, and other improper sales and distribution practices. The wrongdoing alleged herein did not constitute single acts of low-level employees, but rather, ongoing methods of doing business throughout MiMedx, from the top to the bottom of the corporate structure.

As high-level employees who, like the Individual Defendants, acted as agents on behalf, and for the benefit, of MiMedx, with MiMedx's authority, the scienter of such high-level MiMedx employees was imputed to MiMedx.  Because they had the requisite scienter, MiMedx had the requisite scienter.

304.   As detailed herein, numerous facts demonstrate the scienter of such high-level MiMedx employees.  For example:

- **<u>Lou Roselli, Director of Sales Operations</u>**:  Roselli communicated directly with Petit on several occasions about inventory reconciliation issues with AvKARE.   Through email correspondence, Roselli furnished information to Petit about MiMedx procuring product sales after the Company had already recognized revenue for those same products.  Roselli  pressured senior managers to significantly increase the amount of product shipped to VA facilities through AvKARE even though he was aware that such products were not requested, thus enabling MiMedx to book the revenue during that quarter, even though MiMedx (not AvKARE) remained responsible for attempting to "resell" the products in future quarters.  Roselli also participated in quarter-end meetings at the Company's headquarters to discuss methods to achieve the Company's revenue forecasts.  Further, Roselli implemented the PAN scheme whereby Defendants manipulated charitable donations to PAN in order to cover patient copays of MiMedx products, in violation of the FCA and AKS.[228]

---

[228] In addition, beginning in 2016, MiMedx required sales representatives to submit weekly reports including both sales metrics and the number of patients eligible for PAN grants in order to more closely monitor the PAN scheme.  These weekly reports were "rolled up" to MiMedx's Regional Sales Directors who, in turn, created regional reports sent to MiMedx's regional vice presidents for regions East, Midwest, and West.  This alerted them to the exact number of PAN applicants who would be seeking coverage for MiMedx-related treatments.

- **John E. Cranston, Controller and Treasurer**:  The Company's Board of Directors determined that Cranston (along with Petit, Taylor, and Senken) engaged in "conduct detrimental to the business or reputation of the company" after his misconduct was uncovered during the Company's internal investigation into the Company's sales and distribution practices.  As a result, the Board of Directors determined that his resignation should be treated as termination "for cause" and forfeited all of his outstanding equity and incentive awards and clawed back certain of his compensation.

- **Deborah Dean, Executive Vice President of Compliance**: Dean directed sales manager Vitale to stop sending emails regarding the filing of an insurance claim for a lost shipment of returned MiMedx product.  Vitale repeatedly questioned the request to file an insurance claim as improper rather than reporting the returned product as a lost sale and taking a financial hit.  Dean also participated in the emergency meeting with MiMedx leadership at the Georgia headquarters wherein the allegations raised by Kruchoski and Tornquist of a fraudulent channel stuffing scheme were discussed.

- **Alexandra Haden, General Counsel and Secretary**:  Haden received emails from Regional Sales Director Kruchoski outlining in specific detail MiMedx's AvKARE-related accounting fraud. In response to these email communications and the joint report of improper conduct submitted by Kruchoski and Tornquist, Haden conducted an interview wherein she was provided additional detail about the Company's fraudulent revenue recognition scheme. Moreover, Haden knew from conversations with former employees of issues with the Company's commercial distributors sales practice that were resulting in complaints from hospitals.

- **Michael Carlton, Senior Vice President of Global Sales**: Carlton testified that AvKARE was not an independent distributor with its own sales force, but instead, AvKARE made it easier for MiMedx to sell products.  In response to push-back Carlton received regarding his channel stuffing directives from Area Vice

President Fox, Carlton demoted Fox to a position that did not
require meeting sales quotas or impact the Company's quarterly
revenue projections.  Carlton also managed the accounts of the
Company's Master Distributors ("house accounts"), CPM and
SLR, and participated in quarter-end meetings at the Company's
headquarters to discuss methods to achieve the Company's
revenue forecasts.

- **Mark Diaz, Executive Vice President of Sales Operations**:
Diaz directed senior sales managers to significantly increase the
amount of MiMedx product shipped to VAs through AvKARE.
This enabled MiMedx to book increased revenue during the
current quarter when numbers were not meeting the Company's
expectations.  Diaz received numerous objections from his
subordinate Fox in response to the Company's aggressive channel
stuffing through AvKARE and, in 2015, admitted during
conversations with Roselli and other Area Vice Presidents that the
AvKARE revenue did not reflect actual sales.  Along with
Cashman, Diaz orchestrated the Limb Salvage Initiative, which
involved channel stuffing deliveries of shoebox-sized shipments
of 7x7 cm EpiFix to targeted VAs.  In addition, Diaz participated
in quarter-end meetings at the Company's headquarters to discuss
methods to achieve the Company's revenue forecasts.

- **Kevin Lilly, Senior Vice President of Sales**:  Lilly participated
in discussions with Cashman, Diaz, and Roselli regarding the
orchestration of the Limb Salvage Initiative and was involved in
discussions with Fox regarding his concern over shipping
products that historically no one uses.  Lilly also had knowledge
through his discussions with the accounting and finance
department, as well as several members of senior management,
about the decision not to pay Kruchoski and Tornquist their
growth commissions, because the sales to the Minneapolis VA at
issue had already been recognized when the product was
originally shipped to AvKARE.  Moreover, Lilly participated in
quarter-end meetings at the Company's headquarters to discuss
methods to achieve the Company's revenue forecasts, and an
emergency meeting with MiMedx leadership at the Company's

- 167 -

headquarters wherein Petit discussed the allegations raised by Kruchoski and Tornquist concerning the Company's fraudulent channel stuffing scheme.

- **Matt Bloemer, Government Market Development Manager**: Matt Bloemer ("Bloemer") called Regional Sales Directors such as Kruchoski, during December 2015, following a "company directive" to stuff channels, to determine how much product MiMedx could place on VA hospital shelves before the end of the month. Bloemer, who was fully aware of concerns of channel stuffing, stated that the purpose of this request was that MiMedx was "way behind" on its projected revenue. Bloemer further communicated to Kruchoski that upper management was unwilling to put requests encouraging channel stuffing in writing due to their knowledge that the practices were improper.

- **Steve Blocker, Area Vice President for the Central Area**: Blocker communicated with Kruchoski regarding Kruchoski's concerns that MiMedx was aggressively stuffing channels and the similarities between the practices occurring at MiMedx and its competitor Osiris which was sued by the DOJ and SEC for inflating its revenue. While at the same time recognizing that MiMedx products were already "spilling out of every cabinet" at VA hospitals, Blocker pressured his MiMedx subordinates to meet aggressive sales demands and to put as much MiMedx product as possible on VA shelves. Blocker communicated directly with Cashman about the high levels of inventory already at the hospitals, which was preventing sales representatives from reaching the projected sales numbers, and knew that hospitals were issuing warnings not to send additional products. Further, Blocker admitted during telephone calls with Kruchoski that the Company's reported revenue through AvKARE was not accurate but was "built on false growth" created by channel stuffing. Blocker also acknowledged the existence of consequences for failing to hit numbers.

## VIII.  THE MIMEDX DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

305.  As detailed in Sections IV-VI, Defendants' fraudulent scheme so permeated the Company's operations that Defendants could not make *any* statement during the Class Period that concerned the Company's revenue, growth, inventory, EBITDA and related financial metrics, distribution and sales network, relationships with physicians, corporate culture, or business model *without* those statements being knowingly or recklessly false and misleading or omitting material facts – *i.e.*, that the Company's entire financial profile was a sham, that it had improperly recognized revenue, and that its sales were inflated through channel stuffing and other improper sales tactics.

306.  Nevertheless, in addition to the fraudulent financial reporting and violations of GAAP discussed in Section IX below, several categories of Defendants' materially false and misleading statements were particularly prevalent during the Class Period.  These statements concerned: (a) the Company's "impressive" and "sustainable" growth profile; (b) the Company's use of, and relationships with, its distributors; (c) Defendants' focus on ensuring MiMedx employees acted in compliance with all pertinent regulations and legal standards and with "integrity"; and

(d) denials, in no uncertain terms, that any allegations of financial fraud or corporate malfeasance at MiMedx were baseless.

A.    **The MiMedx Defendants Made False and Misleading Statements and Omitted Material Facts Regarding the Company's Growth**

307.   Throughout the Class Period, Defendants touted the Company's history of exponential sales and revenue growth as clear evidence of the Company's future success and its strong management and investment potential. These statements, made in all, or nearly all, of the Company's quarterly press releases, investor presentations, earning calls, and presentations at external conferences, were materially false and misleading and omitted material facts when made. In truth, as Defendants knew, MiMedx's "growth story" was founded not on sustainable increases in sales or revenue generating accounts, but was the result of its fraudulent revenue scheme and improper sales and distribution practices. A sampling of Defendants' materially false and misleading statements promoting MiMedx's "growth story" during the Class Period is set forth below.

**2013 Growth Statements**

308.   From the very beginning of the Class Period, Defendants trumpeted the Company's "excellent" revenue and sales growth, while concealing from investors the fraudulent and improper accounting, sales, and distribution practices that drove that

growth.  On the Company's 4Q and FY12 earnings call held on March 7, 2013, Petit

boasted that "[r]evenues [in FY 2012] more than tripled" and that "***revenue growth***

***accelerated dramatically*** during the year as we gain[ed] market presence in the wound

care market for EpiFix allografts."  In the accompanying press release issued on the

same day, Petit emphasized that "2012 was an excellent year by all measurements. We

increased revenues quarter-over-quarter, produced revenue growth of over three times

the previous year, improved our gross profit margins by over 40 percentage points."

Petit also highlighted the fact that the "EpiFix wound care allograft [was] gaining

physician acceptance in numerous [VA] Hospitals."

309.    In its May 1, 2013 press release announcing 1Q13 results, the Company

stated that it had "***recorded record revenue***," while Petit bragged that the Company

had "increased revenue three fold over the prior year first quarter." On the Company's

earnings call the same day, Petit added "***we exceeded our quarter revenue forecast***

***for the fifth straight quarter***."   Senken also stated on the call that the Company

"experienced significant growth over prior year in wound care, which increased 434%

and surgical and sports medicine, which increased 133%."

310.    In the Company's July 31, 2013 press release, Petit was quoted as saying,

"[t]his was our ***7th straight quarter of meeting or exceeding our revenue forecast***."

In the same press release, the Company touted that "[r]evenue increased more than 175%."

311.   The Company's October 30, 2013 press release announced results for 3Q13, with Petit bragging that "[o]ur 2013 year-to-date *wound care revenue is up by nearly 260%*" and, on the Company's earnings call the same day, Petit boasted of "*eight consecutive quarters of beating or exceeding those revenue guidance goals*."

### 2014 Growth Statements

312.   Defendants continued communicating their deceptive "growth story" to investors throughout 2014.  On the Company's 4Q and FY13 earnings call held on February 26, 2014,  Petit trumpeted the fact that 2013 revenue was "2.2 times our 2012 revenue" and "fourth quarter of 2013 was [the] *ninth consecutive quarter* where we met or exceeded our revenue goal."

313.   In the Company's April 25, 2014 press release announcing 1Q14 results, Petit stated that "revenue growth was extremely solid" and, on the earnings call the same day, added that "[w]e had our *10th consecutive quarter* of meeting or exceeding our revenue guidance," with Senken noting an "increase of 69% . . . over prior year first quarter."

314.   The Company's July 28, 2014 press release announced its "*11th consecutive quarter* of meeting or exceeding revenue guidance," with Petit boasting

that "[o]ur second quarter results were excellent" and "[w]e achieved ***impressive top line growth*** and solid improvements to our bottom line."

315.    On the October 30, 2014 earnings call, Petit stated that in 3Q14 "[w]ound care sales grew about 184%, very significant" and "[i]t's our ***12th consecutive quarter, leading or exceeding revenue guidance***."  Senken added that the Company saw an "increase of 108% . . . over prior year third quarter revenue," and Taylor stated that quarter-to-quarter growth was "more than our entire revenue just eight quarters ago."

## 2015 Growth Statements

316.    In the Company's February 26, 2015 press release announcing results for 4Q and FY14, Petit promoted the fact that "[t]he fourth quarter was our ***thirteenth consecutive quarter of meeting or exceeding revenue guidance***" and "full year revenue was double last year's revenue and fourth quarter revenue was a 120% increase over last year's fourth quarter revenue."

317.    On the Company's April 28, 2015 earnings call, Petit announced that 1Q15 "was the ***14th consecutive quarter of MiMedx meeting or exceeding our revenue guidance***," and Senken added that this was "an increase of 108% . . . over prior year first quarter revenue."

318.   In the Company's July 30, 2015 press release announcing 2Q15 results, Petit further stated the "revenue growth was 104% over the same period in 2014" and, on the earnings call the same day, he also boasted that "[t]his marks our ***fifteenth consecutive quarter of meeting or exceeding revenue guidance***."

319.   After the Company announced its results for 3Q15, Petit appeared on the October 20, 2015 episode of the CNBC show "Mad Money" and confidently asserted that "[w]e've got ***16 straight quarters of beating or exceeding revenue growth***." The Company made a similar statement in a press release dated December 16, 2015.

**2016 Growth Statements**

320.   Defendants held to their false and misleading growth story in 2016. On January 10, 2016, for example, when the Company issued a press release announcing its results for 4Q and FY15, Petit emphasized that "it is our ***17th consecutive quarter of [meeting or exceeding our revenue forecasts]***, and we also exceeded analyst consensus guidance for our revenues." During a conference call on February 24, 2016, Cashman stated that "MiMedx has had a ***consistent sustainable growth*** . . . [t]his is a significant endeavor going back to . . . Q4 of 2011 and . . . we will continue to manage and put the resources in place to ensure that this trend continues."

321.   As Defendants increasingly stuffed their distribution channels, their aggressive sales targets based on prior quarters' inflated results were harder and

harder for sales representatives to realize, even with channel stuffing and other improper practices in play. In 1Q16, the Company finally hit a speed bump, missing revenue guidance for the first time in 17 quarters. Nevertheless, Defendants stuck to their growth story, downplaying the miss by falsely attributing it to a one-time transitional period between sales tagging systems. On an April 11, 2016 conference call, Petit stated that "we do not believe this miss is a result of any of our competitors taking market share. . . . We also do not believe it is related to any issues with some systemic change in the demographics, treatment protocols or reimbursement for advanced wound care[,]" insisting, "[t]his is a problem that was *strictly caused by our growing pains*. . . . We believe we will recover from this quickly." In response to analyst questions, Petit firmly declared that "[t]here is nothing systemically wrong with advanced wound care; there is nothing systemically wrong with our product lines or issues like that." On the same call, Cashman also reassured the market that "[w]e take our ability to accurately project our sales performance very seriously and we are unable to do so for the first time in a very long time. . . . *we had a transitional quarter, but it was because of operational issues and not anything fundamental*. We are very excited about what the year will bring and how we will continue to drive some very strong growth."

- 175 -

322.   A few weeks later, on a May 5, 2016 conference call, Taylor continued the effort to quell any concerns stemming from the 1Q16 guidance miss, remarking that, "[i]f you look at our history, we've got ***very strong, sustainable growth***.  We've had ***18 straight quarters now of sequential growth*** and 17 of 18 quarters of meeting or beating our revenue guidance."  On May 24, 2016, Petit asserted that "[w]e've had four years and one quarter of meeting or exceeding our revenue guidance.  We had ***exceptional high revenue growth during this period***.  We had our first miss in the first quarter of this year when our revenues grew at 31% and still have the goal of about 34%.  We have a higher gross profit margins and excellent financial leverage. . . . We have a very experienced and effective management team."

323.   Continuing their false narrative, Defendants issued a press release on July 26, 2016 announcing that "Q2 2016 revenue exceeds . . . upper end of guidance." During the Company's earnings call on the same day, Petit boasted that "***MiMedx has a solid five-year track record of growing revenues quarter-over-quarter***."  Shortly thereafter, during a conference call on August 11, 2016, Cashman told the market "[f]rom the standpoint of our growth, we've had 19 consecutive quarters of sequential growth."

324.   In the Company's October 10, 2016 press release announcing 3Q16 results, Petit stated "[t]his makes 20 consecutive quarters of sequential revenue growth

and 19 of 20 quarters of meeting or exceeding our revenue guidance."  During the Company's 3Q16 earnings call on October 27, 2016, Petit added:  "I would like to think that our third quarter should be viewed as good solid performance. . . . we exceed[ed] our revenue guidance for a record of $64.4 million which was a 31% increase over third quarter of 2015."  The same day, the Company issued a press release quoting Petit:  "It is always gratifying to exceed our revenue guidance, and continue to add to our record of *20 consecutive quarters of sequential revenue growth*."  Petit also called this record "*impressive.*"

### 2017 Growth Statements

325.   In 2017, despite growing scrutiny into the Company's business practices, Defendants doubled down on their efforts to mislead the market regarding the Company's growth prospects.  The Company issued a press release on January 9, 2017, announcing that revenues for both 4Q and FY16 were "in the upper range of MiMedx guidance," along with Petit's ever present tally of quarterly growth: "[t]he fourth quarter of 2016 makes *21 consecutive quarters of sequential revenue growth* and 20 of 21 quarters of meeting or exceeding our revenue guidance."  On the February 23, 2017 earnings call, Cashman and Taylor both highlighted the Company's sales growth, with Cashman stating:  "Wound Care grew 32% fourth quarter over

- 177 -

prior year's quarter and 30% year-over-year, while SSO grew 44% fourth quarter over prior year's quarter and 32% year-over-year."

326.   In an April 13, 2017 press release, Petit claimed that 1Q17 "will *mark 25 consecutive quarters of sequential revenue growth* and 24 of the last 25 quarters of meeting or exceeding our revenue guidance."  On April 28, 2017, the Company held an earnings call to discuss 1Q17 results.  Petit stated, "our first quarter revenues exceeded the upper end of our guidance . . . [t]hat's a 36% increase over first quarter of 2016."  Cashman added, "[w]e grew revenues 36% year-over-year overall, and revenues were strong in both of our market focuses of Wound Care and SSO."

327.   The Company issued a press release on July 26, 2017, announcing the "Q2 2017 revenue grew 33% over Q2 2016 revenue" and marked "25 of 26 quarters of meeting or exceeding revenue guidance," with Petit adding, "[t]he second quarter was our *26th consecutive quarter of sequential revenue growth*."

328.   During the Company's September 21, 2017 conference call, Petit emphasized that "Our cash flows have been *extremely strong.*  Therefore, we have not put product on distributors' shelves that did not move through the system in a reasonable amount of time."

329.   Shortly before the Company released its results for 3Q17, Petit stated, in a September 26, 2017 interview on the Fox Business Network, "we've performed

- 178 -

exceptionally well, ***we're the 5th fastest-growing public company in America at this point in time***." On October 10, 2017, the Company issued a press release announcing that "Q3 2017 revenue grew 31% over Q3 2016 revenue." Petit was also quoted in the October 26, 2017 press release as follows: "Our third quarter results were impressive and ***showed extremely strong growth in revenue, robust increases in profit, solid reduction of accounts receivable DSOs and substantive increase in our cash flow from operations***." Petit continued: "Based on all factors for measuring an organization's performance, this was an outstanding quarter. I am extremely pleased with the momentum our sales organization has built, and it continues to strengthen quarter over quarter." Taylor added: "Our revenue performance for the third quarter marks ***27 consecutive quarters of sequential revenue growth*** and 26 of the last 27 quarters of meeting or exceeding our revenue guidance."

330. On October 11, 2017, Taylor emphasized to investors that the growth MiMedx had built was "sustainable," saying, "Building a sustainable organization is a process that when done well generates long-term predictable success. We've quietly been building our systems and organization with a focus on doing the right thing and making our market-leading products available to clinicians across the country and soon across the world. These processes and procedures have been created ***to form the***

- 179 -

*foundation for sustainable business.* This year has been a year where the fruits of these many years of disciplined labor have generated a ***strong predictable company***."

331.    During the October 27, 2017 earnings call for 3Q17, Cashman added "***we are not growing by chance.*** We have a purposeful strategic plan and well-defined processes that focus our management and their teams to be able to provide these results."

332.    On November 1, 2017, in a letter responding to an inquiry by the SEC, MiMedx made the following additional false and misleading statements regarding the Company's growth:

> MiMedx expects third-quarter revenue to total roughly $84.6 million, ahead of its guidance range of $79-80 million, representing a growth rate of 31% year over year. MiMedx was recently named by Fortune Magazine as the fifth fastest growing public company in the country, and has demonstrated 27 straight quarters of incremental revenue growth. Earnings have likewise been strong, and the company has set the realistic earnings per share target of $1 per share by 2020. MiMedx's total return price has increased nearly six fold over the past five years, and net income has increased significantly over the same time horizon.

333.    On November 30, 2017, Petit stated in a press release that "October and November have been very strong revenue months for the Company, and we expect our revenue performance in December to be equally strong. . . we expect to . . . surpass our previously published guidance for the fourth quarter and full year 2017." The same day, Petit sent a letter to shareholders boasting that "the operational performance

of your Company has been stellar.  We have met or exceeded our revenue forecasts for 26 of the last 27 quarters, and ***increased sequential revenue for 27 straight quarters***.  ***That is almost seven years***!"  Petit continued:  "MiMedx has just been selected by Fortune Magazine as the 5th fastest growing public company in revenues, profits and shareholder returns, putting us ahead of Facebook and Amazon.  ***There are only a few healthcare companies out of thousands that have a track record of this nature***."

334.   In a press release dated December 13, 2017, Petit stated, "[o]ur sales organization continues to build momentum, and we expect that to continue on a quarter over quarter basis throughout 2018. . . . However, as is our common practice, we utilize what we believe to be a conservative approach in providing our 'Guidance.'"

### 2018 Growth Statements

335.   Defendants continued to mislead the market that the Company was experiencing consistent and predictable growth in early 2018, even as reports of Defendants' fraud became increasingly numerous.  On January 7, 2018, the Company issued a press release announcing results for 4Q and FY17, which quoted Petit as follows:  "The fourth quarter of 2017 makes ***28 consecutive quarters of sequential revenue growth*** and 27 of 28 quarters of meeting or exceeding our revenue guidance. .

. . [w]e forecasted December to be a solid growth month, and ***our sales force more than lived up to our expectations with a robust month to close out the year***. . . . We anticipate 2018 to be another year of highly predictable quarter over quarter revenue growth[.]"

336.   In a January 9, 2018 interview on Fox Business Network, Petit stated that "[w]e've just shipped over a – this summer shipped our millionth allograft.  And we've been in business ten years and had very rapid growth, we'll be up near $400 million in revenues this coming, this year and ***expect that kind of growth rate to continue for a while.***"

337.   Taylor stated during an April 26, 2018 conference call that "[o]ur detailed planning, territory management, discipline, education, execution and accountability, particularly through the use of our Sales Management System, or SMS, ***continues to drive predictable and sustainable results***."

338.   In fact, Defendants were so committed to maintaining the Company's false growth story that just two months prior to the Company's announcement it would be restating nearly years of financial statements, the Company issued a press release on April 26, 2018 announcing it was ***raising*** its guidance for 2018.  Petit stated, "The first quarter [2018] revenue growth is a clear demonstration of the strength of our product lines, our sales management system and the talent we have

assembled in our sales and other key functions within our organization.  Based upon

our strong first quarter performance, we have raised our full year revenue guidance

from a previous range of $383 million to $387 million to a revised range of $389

million to $394 million."

339.    In truth, the statements above regarding the Company's growth (¶¶308-

338) were materially false and misleading when made and omitted material facts.  The

true facts, which were then known to, or recklessly disregarded by, Defendants, were

as follows:

(a)    the Company's sales and revenue growth was substantially the

result of fraudulent and improper accounting, sales, and distribution practices.  Indeed,

the Company conceded in its June 7, 2018 press release that the Company's

previously issued consolidated financial statements relating to each of the fiscal years

ended December 31, 2012, 2013, 2014, 2015, and 2016, and the interim periods ended

March 31, June 30, and September 30, 2017 would be restated and that those figures

as well as all communications and financial information with respect to 4Q17 and

1Q18 "should no longer be relied upon" and Defendants' financial statements were

not in conformity with GAAP;

(b)    Defendants knew that the Company's highly touted quarter-after-

quarter revenue growth was substantially the result of channel stuffing and other

improper sales and distribution practices that inflated the Company's revenues as necessary to achieve its previously promised revenue targets, such that the Company's growth was not "sustainable," as it promised investors;

(c)   the Company's status as "the 5th fastest growing public company in America" was based on false and misleading financial metrics inflated by the Company's fraudulent revenue scheme and other improper sales and distribution practices; and

(d)   the "growing acceptance" of MiMedx's products among physicians and government facilities was largely attributable to MiMedx's provision of improper inducements (*e.g.*, wining and dining, providing gifts, paid travel, and lucrative speaking engagements) to physicians and staff responsible for purchasing decisions, as well as the Company's offer of "reimbursement guarantees" to physicians and assistance in "gaming their reimbursement" for MiMedx products from insurers (*i.e.*, "marketing the spread").

## B.   The MiMedx Defendants Made False and Misleading Statements and Omitted Material Facts Regarding the Company's Distributors

340.   An integral element of Defendants' channel stuffing and revenue manipulation scheme during the Class Period was Defendants' misrepresentation of its relationships with, and reliance on, its distributors – the entities capable of facilitating

- 184 -

Defendants' scheme by purchasing inventory beyond what would be required by or saleable to the end users (physicians and hospitals).  In order to better conceal their off-the-books arrangements with certain distributors and promote MiMedx's "growth story," Defendants repeatedly issued false and misleading statements that minimized the importance of distributors in MiMedx's sales network, concealed the fact that important "independent" distributor partners were really no more than pass-through entities controlled by MiMedx, and misrepresented that its distribution practices complied with applicable laws and regulations.

### 1. The MiMedx Defendants Falsely Represented that the Company's Major Distributors Were "Independent"

341.  As described in Sections IV.B-C, MiMedx's influence over its distributors was central to allowing MiMedx to perpetrate its fraud.  Without off-the-books deals with willing distribution partners largely (if not entirely) under the control of MiMedx, Defendants would have had a significantly more difficult time recording false sales and orders.  Yet throughout the Class Period, Defendants consistently misrepresented to investors and analysts that its distribution partners were wholly independent from MiMedx.  For example, MiMedx's Form 10-K for 4Q and FY12, filed with the SEC on March 15, 2013, stated that "[t]he Company sells its products primarily through a combination of *independent* stocking distributors and representatives in the U.S. and independent distributors in international markets."  In

- 185 -

the same filing, MiMedx stated that it had "assembled a network of ***independent*** sales representatives and stocking distributors to sell our MiMedx-labeled surgical products domestically." Similar representations were made in the Company's Forms 10-K for 2015 (filed February 29, 2016), 2016 (filed March 1, 2017), and 2017 (filed March 2, 2018) and Forms 10-Q for the quarters ended May 1, 2015; August 7, 2015; November 6, 2015; May 10, 2016; August 2, 2016; November 8, 2016; May 1, 2017; July 31, 2017; October 31, 2017; and May 10, 2018.

342. After questions were raised concerning distributorships owned by MiMedx employees and/or their family members, Defendants insisted the distributors were independent. During the Company's September 21, 2017 conference call, Taylor falsely told a questioning analyst:

> ***We've never had a distributorship that was owned by employees or family of employees.*** The only one we have is we have a former employee that is a distributor of ours now. But we've never sold products to or recognize[d] revenue from any arrangement as you described. We've never had anything like that. . . . We have policies and procedures that explicitly prohibit that kind of behavior. We also have controls in place that should that behavior occur, we can typically pick it up. But if people operate outside of our controls, if they do something on their own, where we have no way of verifying what they've done or no knowledge of it, those are the kind of situations that we're talking on here. Because we have strong controls, we have strong policies that prohibit that kind of thing. . . . [W]e've been very open and transparent with those things with the particular regulatory agencies, when we bring – when we find those occurrences.

This did not quell concerns.  Viceroy published several reports detailing MiMedx's use of employee-owned distributors.  On October 26, 2017, Defendants posted a response titled, "Short Selling Commentary," on their website calling Viceroy's claim "FALSE" and claiming that the entities identified by Viceroy were merely "sales agents," which "do not purchase product, nor hold any inventory."[229]

343.    Defendants were particularly adamant that AvKare, MiMedx's long-time distributor to the VAs and federal accounts, was entirely independent and that its contract was well-vetted.  In the Company's March 15, 2013 Form 10-K, it specified that its distribution relationship with AvKare was "different than our other distribution relationships in that we have our own sales force selling into those accounts," but AvKare "handl[ed] all the back-office paperwork and contracting matters" with respect to government accounts.

344.    On the Company's March 9, 2017 earnings call, Taylor falsely assured investors that "[o]ur road to safety is that every aspect of our agreement with AvKARE and their status with the VA, our status with the VA has been thoroughly [vetted] over the last couple of months because of these allegations that were made against us.  And we're fine, we're clear."  On November 7, 2017, the Company issued

---

[229] *See* Ex. N, Viceroy Research, *MiMedx: Palmer-Gedden* (Oct. 27, 2017).

a "Demand for Correction" to a November 2, 2017 Cohodes report[230] including, *inter*

*alia*, the following statements:

- "Cohodes Statement: MDXG has an established pattern of selling to a related party entity and lying that it's separate."  MiMedx: "Believe the Auditors.  **This is another Cohodes Lie.**" (emphasis in original).

- "Cohodes Statement:  Insinuation of wrong-doing: 'MDXG instructs VA prosthetics agents to fax, both MDXG and AvKare POs to MDXG[.]'  MiMedx: This eliminates administrative errors.  Cohodes does not understand simple business procedures."

- "Cohodes Statement: 'VA Prosthetic agents send POs, not Avkare, so MDXG CFO LIED[.]'  MiMedx:  MiMedx sold products to the VA themselves in addition to AvKARE.  **This is another Cohodes Lie.**" (emphasis in original).

- "Cohodes Statement: 'MDXG is "sole point of contact" and AVkare does not "re-sell," so MDXG LIED to the SEC[.]'  MiMedx:  **This is another Cohodes Lie.**" (emphasis in original).

- "Cohodes Statement: 'AVkare is just an "intermediary"'  MiMedx: . . .  **This is another Cohodes Lie.**" (emphasis in original).

- "Cohodes Statement: 'DISTORTION of SEMANTICS: "How can MDXG reduce inventory that AVkare purchased in the past if they are separate entities and AVkare owns the inventory?'  MiMedx:  Read the AvKARE agreement!  **This is another Cohodes Lie**." (emphasis in original).

---

[230] *See* Ex. O, petite parker the barker, *MiMedx Demand for Correction to Cohodes Report Dated Nov 2, 2017* (Nov. 7, 2017).

345.   Then, on November 14, 2017, MiMedx posted to its website denying Viceroy's claim that MiMedx "completely circumvented AvKare during throughout their relationship" [sic] and that "Avkare had no role to play beyond providing MiMedx an FSS number," claiming the statements were "**FALSE**."

346.   The statements in ¶¶341-345 above were materially false and misleading when made and omitted material facts.  The true facts, which were then known to or recklessly disregarded by Defendants, were as follows:

(a)   the Company used a network of Master Distributors and sub-distributors, including multiple entities set up by employees or under employees' family members' names, to engage in channel stuffing and other improper practices for the purpose of inflating the Company's sales and revenues;[231]

(b)   MiMedx's primary federal distributor, AvKARE, was only contracted so that MiMedx could use its FSS, and as MiMedx Senior Vice President of Global Sales Carlton testified in another action, "AvKare didn't sell the product. They didn't do anything.  They just made it easier to sell."  Far from AvKARE handling the back office paperwork for MiMedx, **MiMedx** employees submitted purchase orders for VA accounts through SalesForce.  These sales representatives

---

[231] *See also* Ex. N (showing MiMedx's claim to be false, as several employee-owned "sales agents" were, in fact, **distributors** registered with the FDA to store MiMedx products).

were instructed to falsely tell VAs they were doing so on AvKARE's behalf.  MiMedx would then ship the products directly to the VAs.  Pursuant to an implicit arrangement made off-the-books, MiMedx had complete control to use AvKARE's VA access to place unrequested product on hospital shelves.  Indeed, MiMedx employees were responsible for monitoring, documenting, and reconciling products that had been shipped to the VAs.  AvKARE exchanged false sales documents with MiMedx to conceal the scheme;

(c)     A key MiMedx "master" distributor, CPM, was owned by Brooks, a personal friend of Carlton, and MiMedx's former National Sales Director, Cochrane, also worked closely with CPM in a consulting capacity.  MiMedx shipped many orders placed by CPM directly to customers rather than CPM or any sub-distributors, and treated CPM as a "house account"; and

(d)     SLR, which took over from CPM as a primary MiMedx distributor, was headed by a former MiMedx employee, Morrison.  Morrison acted as President and CEO of SLR while still employed at MiMedx.  In exchange for assisting MiMedx with its channel stuffing scheme, SLR was given undisclosed, highly favorable financing terms, including deep discounts, free products, rebates, lenient return and exchange policies, and extended payment terms.

## 2. The MiMedx Defendants Concealed the True Extent of MiMedx's Reliance on Distributor Sales

347.  As the Class Period progressed, Defendants also attempted to conceal their channel stuffing activities by misrepresenting the extent to which the Company relied on sales through a few major distributors, rather than direct sales agents.  In its Form 10-K filed on March 13, 2015, for example, the Company stated that, aside from its federal account distributor, AvKARE, "[n]o one distributor comprised over 5% of our revenues."  It made materially similar statements in subsequent Forms 10-K for 2015 (filed February 29, 2016), 2016 (filed March 1, 2017), and 2017 (filed March 2, 2018) and Forms 10-Q for the quarters ended May 1, 2015; August 7, 2015; November 6, 2015; May 10, 2016; August 2, 2016; November 8, 2016; May 1, 2017; July 31, 2017; October 31, 2017; and May 10, 2018.

348.  On July 27, 2017, Taylor told investors that the Company had made a "focused effort over the past four years" to "focus our energies on direct sales rather than adding additional distributors," and that as a result, "we've expanded our customer base by several fold and drastically reduced our dependence on distributors to the point where the sales to distributors *are no longer material nor have they been for quite some time.*"  Senken later added that the Company's days' sales outstanding ("DSOs") had improved because "we've purposely moved away from selling through distributors, which tend to drag out your DSOs."

- 191 -

349.    During the Company's September 21, 2017 shareholder conference call,

Petit also minimized the Company's use of distributors, stating:

> We're down near 70 days [DSOs] at this point. . . . Our cash flows have
> been extremely strong.   Therefore, we have not put product on
> distributors' shelves that did not move through the system in a
> reasonable amount of time.  ***In addition, our sales to distributors over
> the last 3 or 4 years have dropped dramatically because our business
> model is to make as many sales directly to end user customers as
> possible.  We're now down to the point where we have less than 5% of
> annual revenues with distributors.***

350.    On October 27, 2017, Senken reiterated on the Company's 3Q17

earnings call that "revenue from distributors" "again represent[ed] less than 5% of

year-to-date revenue."  He later added, "As we said before, we've got less than 5% of

our revenue is with distributors and typically the more distributors you have, the more

DSO grows."

351.    The statements in ¶¶347-350 were materially false and misleading and

omitted material facts when made.  The truth, which was known to, or recklessly

disregarded by, Defendants, was that:

(a)    MiMedx was heavily reliant on a few primary distributors –

particularly those under MiMedx control, like AvKARE, CPM, and SLR – to generate

and inflate revenue to meet its stated revenue targets each quarter.  MiMedx's figures

purposely misclassified agents of distributors and distributors themselves as "sales agents" to minimize the amount of revenue reported attributable to distributors;[232] and

(b)    MiMedx's primary commercial distributors like CPM actually set up webs of dozens of distribution LLCs all registered to the same corporate address. This allowed MiMedx to count the revenue from each LLC separately.

### 3.    The MiMedx Defendants Falsely Represented that the Company Did Not Use Physician-Owned Distributors

352.   As discussed above, federal health care laws make it illegal to provide "kickbacks" to physicians for their use of particular medical products, including by providing financial incentives to PODs.  During the Class Period, Defendants falsely represented that MiMedx did not include PODs in its distribution network. Defendants also falsely represented that MiMedx did not have a business relationship with Forest Park, a physician-owned hospital that was involved in a kickback scandal of its own, as discussed above.  For example:

- **March 1, 2017**:  In its 2016 Form 10-K filed with the SEC, the Company stated unequivocally that "***we do not directly sell to or distribute any of our products through PODs.***"

- **October 17, 2017**:  MiMedx posted on its website denying Viceroy's claims that MiMedx had "business relationships" with individuals from Forest Park, stating, "This is FALSE.  ***MiMedx does not have business relationships with the indicted Forest Park individuals***.  As mentioned previously, MiMedx does not

---

[232] *See* Ex. N.

control to whom our distributors sell products. If one of these individuals or the companies purchase MiMedx product from a distributor, it does not create a direct business relationship with MiMedx."

- **October 27, 2017**:  During the Company's earnings call, Senken was asked by a securities analyst:  "[D]o you currently sell products through physician-owned distributors?"  Senken answered unequivocally:  "I wonder where that question came from.  ***No. N-O***."

- **October 27, 2017**:  During the same earnings call, Petit stated:  "***We do not sell through PODs, period***.  All this stuff in Texas is just a lot of noise, but they'll dig up a name and they'll relate it through another social media matter and tie them together and say that's an indication of channel stuffing, or something else."

- **November 9, 2017**:  During an exchange with an analyst at the Canaccord Genuity Medical Technology and Diagnostics Forum, Petit responded to the question "how much of your business comes from PODs or stocking distributors?" with:  "***PODs is basically none that we know of***....We sell to distributor[s] and may have PODs roped in.  We don't have the visibility, so we can't confirm that."

353.   The statements in ¶352 above were materially false and misleading and omitted material facts when made.  In truth, as Defendants knew, MiMedx regularly distributed its products through PODs, including Fuse,[233] and had a business relationship with Forest Park.[234]   Indeed, MiMedx sales personnel, as well as

---

[233] *See* Ex. P, Marc Cohodes, *MiMedx and Fuse Medical*, (Apr. 30, 2018).

[234] *See In re Forest Park Medical Center at Southlake, LLC*, 16-40273-rfn-11, (N.D. Tex. Apr. 29, 2016), ECF. Nos. 220, 245 (MiMedx identified as a creditor and/or party in interest).

personnel from MiMedx's controlled distributors, were often involved in setting up the PODs or were listed as members of the PODs in corporate formation documents.

**C. The MiMedx Defendants Made False and Misleading Statements and Omitted Material Facts Related to the Company's Compliance Programs and "Culture of Integrity"**

354. As discussed above, the alleged fraud was so pervasive that it permeated all of the Company's operations; indeed, Defendants built MiMedx on improper business practices. Nevertheless, throughout the Class Period, Defendants went to patients, doctors, regulators, analysts, and investors and brazenly touted the Company's compliance programs, proper business practices, and "culture of integrity."

**1. The MiMedx Defendants Falsely Invoked the AdvaMed Code as the Basis for MiMedx Policies**

355. The Advanced Medical Technology Association ("AdvaMed") is a trade organization which represents medical technology companies like MiMedx.[235] As part of the organization's mission, AdvaMed works to "facilitate ethical interactions between Companies and those individuals or entities involved in the provision of health care services and/or items to patients, which purchase, lease, recommend, use, arrange for the purchase or lease of, or prescribe Companies' Medical Technologies in

---

[235] *See* AdvaMed, *Revised and Restated Code of Ethics* 1 (July 1, 2009) ("AdvaMed Code").

the United States ('Health Care Professionals')." *Id.* AdvaMed has promulgated the

AdvaMed Code as a set of standards by which its members should operate, which

provides, in pertinent part:

> "A Company may not interfere with a Health Care Professional's independent clinical decision-making or provide coverage, reimbursement and health economics support as an unlawful inducement. For example, a Company should not provide free services that eliminate an overhead or other expense that a Health Care Professional would otherwise of business prudence or necessity have incurred as part of its business operations if doing so would amount to an unlawful inducement. Further, a Company should not suggest mechanisms for billing for services that are not medically necessary, or for engaging in fraudulent practices to achieve inappropriate payment."; (P.9-10)

> \* \* \*

> "A Company may make monetary or Medical Technology donations for charitable purposes, such as supporting indigent care, patient education, public education, or the sponsorship of events where the proceeds are intended for charitable purposes. Donations should be motivated by bona fide charitable purposes and should be made only to bona fide charitable organizations or, in rare instances, to individuals engaged in genuine charitable activities for the support of a bona fide charitable mission. Companies should exercise diligence to ensure the bona fide nature of the charitable organization or charitable mission."; (P.11)

> \* \* \*

> "Companies adopting the Code are required to communicate the Code's provisions to their employees, agents, dealers and distributors with the expectation that they will adhere to them. It is important that these entities are informed that AdvaMed has revised its Code of Ethics and that they are aware of the ethical standards reflected in it."; and (P.15)

356.   Throughout the Class Period, Defendants repeatedly assured investors that the Company had adopted, and was in compliance with, the AdvaMed Code.  For example, the Company's Forms 10-K for fiscal years 2012, 2013, 2014, 2015, and 2016 all included substantially the same statement:

> As part of a Company-wide compliance plan, we have incorporated the principles of the AdvaMed Code in our standard operating procedures, sales force training programs, and relationships with health care professionals. . . . We have incorporated these principles into our relationships with healthcare professionals under our consulting agreements, and our policies regarding payment of travel and lodging expenses, research and educational grant procedures and sponsorship of third-party conferences. . . . In addition, we have conducted training sessions on these principles.

357.   Taylor also falsely stated during the Company's March 25, 2014 earnings call that "we take compliance very seriously here at MiMedx and ***we take care to ensure that our business relationships with physicians meet the AdvaMed guidelines and all applicable laws***."  In addition, on October 12, 2015, Taylor stated in a Company press release:  "Our culture embraces and demands the utmost in business integrity and ethics.  We have a comprehensive compliance program, and we continually stress adherence to our policies in every way possible.  As the leader in our sector of healthcare, we are constantly striving to improve in all areas.  We believe we are setting the industry standard for ethical business practices and hope that all

industry participants will follow suit. This certainly is in the best interest of patients, physicians, service providers and all others involved in advanced wound care."

358. In truth, the statements in (¶¶354-357) were materially false and misleading when made and omitted material facts. The true facts, which were then known to, or recklessly disregarded by, Defendants, were as follows:

(a) Defendants engaged in a campaign of influence, encouraging inducements to physicians to encourage the use of MiMedx products, such as through PODs, such as "healing reviews," reimbursement guarantees, and efforts to "market the spread," which directly contradicted the AdvaMed Code;

(b) Defendants actively fostered a corporate culture in which sales were to be achieved through any means necessary, such that MiMedx sales representatives were often required to act unethically and in violation of the AdvaMed Code (or ignore others doing so), or risk losing their jobs; and

(c) Defendants manipulated a charitable organization, PAN, by making donations to PAN for the purpose of covering health care insurance co-pays related to the sale of MiMedx products in direct violation of the AdvaMed Code.

2.      **The MiMedx Defendants Falsely Represented that
Compliance with the Company's Stated Policies and
Applicable Health Care Laws and Regulations Was
an Important Part of the Company's Operations**

359.    Throughout the Class Period, Defendants emphasized to investors and analysts that MiMedx had a culture of integrity and compliance with laws and regulations, and that adherence to those principles were greatly important to management.  For example:

- **Petit, September 5, 2013**: "Relatively, the way that MiMedx conducts their sales related to regulatory matters, I would characterize us as conservative."

- **Petit, February 26, 2014**: "We have a culture of success and the culture of integrity, both of those go a long way in producing continuing results therefore expected by end of this year 2014 there should be no question at all as to who the new leader relative to advanced wound care sector of healthcare is [sic]."

- **Taylor, March 24, 2014**: "All of our relationships with health care professionals are structured so as to comply with applicable law and regulatory guidance, as well as ethical principles and best practices."

- **Petit, December 31, 2014**: "I can assure you that the corporate officers at MiMedx are not aware of anything that would stimulate this [HHS-OIG] investigation. We have continually maintained and improved a robust compliance program.  We have been very focused on the thoroughness of our compliance policies and our staff adhering to those policies.  For instance, MiMedx employees participate in a thorough training program regarding our policies and the standards that have been established and enforced to assure their understanding and adherence to our compliance programs. Employees may convey anonymously and directly to

- 199 -

senior management and our Board of Directors any form of concern, complaint or inquiry related to our compliance programs or other issues. With the significant growth we are experiencing, this has been and continues to be an initiative in which we devote considerable time, attention and resources."

- **Petit, December 31, 2014:** "We screen all of our applicants very carefully. With respect to former ABH applicants, we sought additional input from some former ABH corporate management who joined MiMedx and who were familiar with the suspected violations and the individuals involved.

- **Petit, January 2, 2015**: "We are all very knowledgeable about healthcare rules and regulations. We know the advantages of setting up robust compliance programs and training all personnel on them. We have a compliance officer and we have a compliance hotline. We have all employees sign a document clearly stating that they have been trained on all of our compliance processes and procedures. . . . We enforce our compliance policies and we've taken disciplinary action against the employees for noncompliance . . . ."

- **Petit, April 28, 2015**: "However, it's very noteworthy that OIG reached its conclusion in a relatively short four-month period. . . . I hope this gives you some insight on how well managed and professional our business activities are and how focused we are on honesty, integrity."

- **Senken, June 3, 2015**: "And so several years ago we put in place what we feel are very robust systems and processes in the area of compliance, risk management, and financial reporting in anticipation of the growth that we are now experiencing."

- **Taylor, October 12, 2015**: "Our culture embraces and demands the utmost in business integrity and ethics. We have a comprehensive compliance program, and we continually stress adherence to our policies in every way possible. . . . We believe

we are setting the industry standard for ethical business practices and hope that all industry participants will follow suit."

- **Senken, January 14, 2016**:  "We stated at this conference that we felt very confident that our compliance programs were robust enough to prove out that the accusations that were made in this…action were unfounded. . . .  We said it was going to be cleared up.  We said it was going to be cleared up promptly and it was, very unusual to have a circumstance like that happen."

- **Senken, February 24, 2016**: "We just completed our team meeting, our national sales meeting in January, a four-day event.  And in there, one of the major sessions we have is around compliance and we go through skits, we go through the rules, we emphasize examples of what to do, what not to do, how to get yourself out of a circumstance that you don't want to be in.  We take these programs very seriously and that's why when we had the issue around [HHS-]OIG Subpoena that came to us in the tail end of 2014.  We cleared that matter very quickly because we take these programs seriously."

- **Taylor, December 19, 2016**: "It is very disappointing to have allegations such as this come up, particularly when *the Management team's focus is always on integrity and doing the right thing*. . . . *It's a very important focus that all of our management team subscribes to and adheres to*. We also trained all of our personnel, and in particular our sales team, that if they ever had concerns about anything that could potentially be an issue, they have [a] channel to utilize to voice their concerns.  Specifically, they can write a letter to the CEO, either anonymously or citing their name."

- **Petit, December 19, 2016**: "When we have allegations of any kind come across through a hotline or up to a Dear Pete letter, or other sources through our compliance line, we investigate those because we don't want those kind of issues going on within the Company either.  And that's somewhere in the chain of command between myself, Bill, and so on."

- 201 -

- **MiMedx, August 17, 2017**:  "MiMedx'[s] policy is to promote high standards of integrity by conducting its affairs honestly and ethically.  MiMedx requires all employees to sign and adhere to a code of conduct, and holds compliance training on a regular basis.  MiMedx also provides a confidential toll-free compliance hotline for employees to report unethical or illegal conduct and has established a procedure, which is available on our website, where any person may submit a good faith report or concern regarding business, accounting or auditing matters to the Company or its Board of Directors."

- **MiMedx, September 7, 2017**:  "MiMedx policies in regard to interactions with health care providers prohibit providing any gifts at all to health care providers, and its policies in regards to interactions with federal employees place stringent limits on providing meals to federal employees per federal law.  There has not been any testimony that the Company's executives directed anyone to behave in such a manner."

- **Petit, September 21, 2017**:  "To have the quality of board members that we have, and that includes a recent member who was a former SEC Commissioner for 8 years to the Bush and Obama administrations, you have to give us some credit for having a great deal of business expertise and honesty and integrity. . . . Again, you don't get to be the fastest growing public company in the United States with incompetence or corporate malfeasance."

- **Taylor, September 21, 2017**:  "We have policies and procedures that explicitly prohibit that kind of behavior.  We also have controls in place that should that behavior occur, we can typically pick it up.  But if people operate outside of our controls, if they do something on their won, where we have no way of verifying what they've done or no knowledge of it, those are the kind of situations that we're talking on here.  Because we have strong controls, we have strong policies that prohibit that kind of thing."

- **Petit, October 11, 2017**: "We're a group of individuals with core values of integrity and behave in an honest manner. When you have a track record of behavior that we've exhibited over the decades, you're always going to prevail. MiMedx is going to continue to perform very strongly."

- **Petit, October 13, 2017**: "Short sellers should simply ask our terminated employees why they did not report these "supposed" incidents of wrong doing or malfeasance at the time they were supposedly happening through the corporate compliance systems. In one solution, their phone calls could go straight to the Board of Directors. In the other case, a "Dear Pete" letter could come straight to the Chairman's office without anyone seeing the document."

- **Petit, October 27, 2017**: "I'm a person of honesty and integrity as [are] our other executives in this company. We always strive [for] doing the right thing, which is sometimes not the easiest thing."

- **Cashman, October 27, 2017**:  "And we like the direct model…we put a lot of time into training and compliance, and all the things that we're talking about today…."

- **Petit, November 14, 2017**: "MiMedx will continue to expose the false allegations and contrived innuendo propagated by these illegal short-sellers, especially those that are associated with the Company's compliance with regulatory requirements."

- **MiMedx Representative, November 30, 2017**: "This company has been run ethically, with integrity, and our processes are buttoned up."

- **MiMedx, May 10, 2018**: "The Company maintains a robust compliance program that, among other processes and procedures, monitors the activities of our sales representatives. Those who do not comply with the Company's policies and procedures are subject to disciplinary action. The indictment includes allegations against the named individuals regarding the payment of speaker

fees by the Company.  On occasion, MiMedx engages providers to perform services on its behalf, such as providing scientific and clinical education presentations.  Where the Company engages providers for services, the Company's policy is to pay the providers consistent with the fair market value of the services.  Further, the MiMedx policy requires speakers to attest to the receipt of any required authorization from their institutions to speak on the Company's behalf, a strict policy outlined in all contractual arrangements."

360.   In truth, the statements above regarding the Company's compliance programs, ethical standards, and integrity (¶359) were materially false and misleading when made and omitted material facts.  The true facts, which were then known to Defendants, were as follows:

(a)   far from being a product of management integrity and efforts to always "do the right thing," the Company's sales and revenue growth was substantially the result of, and inflated by, fraudulent and improper accounting, sales, and distribution practices;

(b)   not only were the highly touted MiMedx compliance programs not enforced, but violations of those programs were implicitly, if not explicitly, encouraged by Defendants and MiMedx management to generate sales;

(c)   Defendants actively fostered a sales-at-all-costs corporate culture wherein MiMedx sales representatives were often encouraged to engage in (or ignore

others' engagement in) improper sales and distribution practices or risk losing their jobs; and

(d)     MiMedx did not provide effective channels for employees to voice concerns about improper or illegal practices at the Company.  Instead, employees were actively discouraged from speaking up about known problems and fraudulent practices.  When employees did speak out, as through Defendants' much-touted "Dear Pete" letters, Defendants and MiMedx management ensured these employees were marginalized, threatened, fired, and, in many instances, even brought litigation against them.

### D.     The MiMedx Defendants Made Materially False and Misleading Statements and Omitted Material Facts in Their Efforts to Deny, Downplay, and Conceal the Fraud

361.   Finally, as reports of malfeasance at MiMedx surfaced – and ultimately, as their scheme unraveled – Defendants made a host of materially false and misleading statements covering up, downplaying, and outright denying the existence of any misconduct.  As detailed above, Defendants went to great lengths to dismiss the allegations of illegal conduct against them as baseless, both through outright denials and a smear campaign against internal whistleblowers, former employees who publicly raised concerns, and other critics of the Company.  These statements were

made in press releases, shareholder letters, postings on the Company website, and public conference calls.[236]

362.   Each time Defendants issued a statement denying the allegations of these individuals that MiMedx was engaged in channel stuffing, improper revenue recognition, and violations of federal health care regulations and laws, those statements were false and misleading, or omitted material facts because, as Defendants knew:

(a)   the Company's sales and revenue growth was substantially the result of fraudulent and improper accounting, sales, and distribution practices;

(b)   Defendants engaged in channel stuffing and other improper sales practices to increase sales and inflate the Company's revenues;

(c)   Defendants employed inducements and even manipulated charitable donations, in violation of multiple federal statutes, to increase sales and inflate the Company's revenues;

---

[236] For purposes of avoiding repetition, Lead Plaintiff incorporates as false and misleading all statements by Defendants denying, downplaying, and concealing the alleged wrongdoing that are described in Sections IV-VII, as well as in the documents referenced in this Complaint.

(d)     the Company's purported "consistent" and "impressive" sales and revenue growth during the Class Period, was unsustainable because it was premised on fraudulent and improper accounting, sales, and distribution practices; and

(e)     as explained in Section IX, the Company's financial results were not prepared in conformity with GAAP due to improper revenue recognition and material misstatements concerning revenue and other financial metrics in particular periods.

363.   In addition to their own denials of wrongdoing, Defendants continually referred analysts and investors to the conclusions of MiMedx's Audit Committee's "independent" internal investigation of alleged malfeasance, completed with the assistance of "external counsel," as proof that the allegations were not credible.  For example, in a March 1, 2017 press release, the Company stated:

> The Audit Committee worked closely with independent counsel to conduct an extensive investigation into the claims alleged by these former employees.  The Audit Committee has completed its investigation and confirmed there is no credible evidence of any wrongdoing on behalf of members of MiMedx management.

364.   And in a September 21, 2017 press release, the Company stated that:

> The Company believes that the matters related to the [SEC] subpoena were reviewed as part of the completed investigation conducted by the Audit Committee of the MiMedx Board of Directors, independent outside legal counsel, the Company's independent auditors, and executive management.

365.   On November 30, 2017, Petit sent MiMedx shareholders a letter decrying

short seller reports of misconduct, and bemoaning that:

> Even though MiMedx has had ten years of audited financial statements
> by reputable accounting firms, some people still do not understand the
> strengths of those reviews and audits.  Perhaps an audit by a Big 4
> Auditing Firm rather than a regional firm will help people understand
> that all of these allegations of financial manipulations are "trumped up"
> and ***fraudulent***.[237]

366.   These statements (¶¶363-365), and all those like them, were materially

false and misleading and omitted material facts when made.  The truth, as Defendants

knew or were reckless in not knowing, was that:

(a)   the investigation done by the Audit Committee was not

"independent," as the Chairman of the Audit Committee at the time the investigation

was initiated and completed was Dewberry, Petit's personal friend and fraternity little

brother, who had been a member of the executive team for numerous of Petit's

businesses;

---

[237] However, as detailed above, the Company's Big 4 Auditing Firm, EY, ultimately
resigned without completing a single audit of the Company's financial statements due
to, among other things, the non-existence of internal controls to develop reliable
financial statements and the findings from the Company's Audit Committee
investigation.

(b)     the "external counsel" that led the investigation was the Company's own securities counsel, Troutman.  Troutman also served as securities counsel for Petit's prior companies, Healthdyne and Matria; and

(c)     MiMedx's "ten years of audited financial statements" by "reputable" accounting firm Cherry Bekaert were unreliable, as Cherry Bekaert was a long-time client of MiMedx and Petit and knowingly or recklessly failed to conduct appropriate audits of the Company's financials.

### E.     The MiMedx Defendants' False and Misleading Statements Violated Item 303 of Regulation S-K

367.   In addition to violating their duty to disclose the full truth to the market, Defendants' failure to disclose the true circumstances surrounding the statements alleged to be false in Sections VIII.A-D violated Item 303 of Regulation S-K, 17 C.F.R. §229.303 ("Item 303").  Item 303 requires an issuer to "[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. §229.303(a)(3)(ii).

368.   The SEC has explained that "[o]ne of the most important elements necessary to an understanding of a company's performance, and the extent to which reported financial information is indicative of future results, is the discussion and analysis of known trends, demands, commitments, events and uncertainties."

Commission Guidance Regarding Management's Discussion and Analysis of

Financial Condition and Results of Operations, Securities Act Release No. 8350, 68

Fed. Reg. 75,056, 75,061 (Dec. 19, 2003).  Thus, SEC guidance requires management

to make two assessments where a trend or uncertainty is known:

> 1.  Is the known trend . . . or uncertainty likely to come to fruition? If management determines that it is ***not reasonably likely to occur***, no disclosure is required.
>
> 2.  If management cannot make that determination, it must evaluate objectively the ***consequences of the known trend*** . . . or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant's financial condition or results of operations is ***not reasonably likely to occur***.

*See* Certain Investment Company Disclosures, Securities Act Release No. 6835, 54

Fed. Reg. 22,427, 22,430 (May 24, 1989) ("1989 SEC Release").

369.    The SEC has made clear for decades that, in addition to the identification

of such "known trends or uncertainties," Item 303 specifically requires disclosure of

the expected ***impact*** that any such trends or uncertainties are expected to have on a

company's prospective financial performance.  The SEC has stated that "Item 303

***require[s] disclosure of forward-looking information***," including, at a minimum,

disclosure of the "***reasonably likely material effects on operating results***."  1989 SEC

Release at 22,428-29.

370.   Here, Defendants violated Item 303 by failing to disclose the accounting fraud and improper sales and distribution practices alleged herein, which were "*reasonably likely material effects on operating results*."

## IX.   THE MIMEDX DEFENDANTS' GAAP VIOLATIONS, ACCOUNTING RESTATEMENT, INEFFECTIVE INTERNAL CONTROLS, AND MATERIALLY FALSE AND MISLEADING FINANCIAL STATEMENTS

371.   Defendants could not have successfully executed their channel stuffing and improper revenue recognition scheme without the Company also committing material violations of GAAP,[238] SEC reporting rules, and SOX – all of which

---

[238] GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time.  SEC Regulation S-X (17 C.F.R. §210.4-01(a)(1)) ("Regulation S-X") states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosures.  Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. §210.10-01(a).  On June 30, 2009, the FASB issued the Statement of Financial Accounting Standards No. 168, *The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles – a replacement of FASB Statement No. 162*.  FASB Accounting Standards Codification ("ASC") became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC, effective for financial statements issued for reporting periods that ended after September 15, 2009.  The ASC did not change existing U.S. GAAP.

Defendants falsely represented MiMedx complied with during the Class Period. This section demonstrates that none of those representations were true.

372.  Indeed, the breadth of the accounting fraud that took place at MiMedx was breathtaking, and the fallout from the new Audit Committee's investigation into Defendants' actions similarly dramatic.  In addition to Petit, Senken, and Taylor, as well as the Company's (now former) Controller being terminated for cause, MiMedx's Audit Committee investigation into the Company's sales and distribution practices has determined at least 13 different financial accounts and metrics have been materially misstated, including: net sales, cost of sales, gross margin, operating income, income before taxes, income taxes, net income, earnings per share ("EPS"), Adjusted EBITDA, accounts receivables and related reserves, returns allowances, inventories, and other financial items.  The Company's reported DSOs was also necessarily misstated because the two accounts used to calculate the DSOs – sales and accounts receivable – were false.  MiMedx's SG&A during the Class Period were also materially false, as detailed herein.

373.  On June 7, 2018, MiMedx issued a Form 8-K announcing that its previously issued consolidated financial statements and financial information relating to each of the fiscal years ended December 31, 2012, 2013, 2014, 2015, and 2016, and each of the interim periods within such years, along with the unaudited condensed

consolidated financial statements included in the Company's Forms 10-Q for the quarters ended March 31, 2017; June 30, 2017; and September 30, 2017 (collectively, the "Non-Reliance Periods"), ***should be restated*** – an acknowledgement that the information in the original filings had been false and needed to be corrected. Investors were instructed to ***no longer rely upon*** any consolidated financial statements and other financial information, press releases, investor presentations, or other communications related to financial disclosures concerning the Non-Reliance Periods. The Company also stated that all communications and financial information with respect to 4Q17 and 1Q18 should no longer be relied upon and withdrew all prior financial guidance issued for 2018.

## A.  MiMedx's Reported Financial Results Were False and Not Prepared in Accordance with GAAP

374.  During the Class Period, MiMedx reported its financial results in its Forms 10-K[239] and 10-Q[240] and related earnings releases filed with the SEC.  These

---

[239]  These included the Company's Forms 10-K for 2012 (filed March 15, 2013); 2013 (filed March 4, 2014); 2014 (filed March 13, 2015); 2015 (filed February 28, 2016); and 2016 (filed March 1, 2017).

[240]  These included the Company's Forms 10-Q for 2013 (1Q13 filed May 10, 2013, 2Q13 filed August 8, 2013, 3Q13 filed November 8, 2013); 2014 (1Q14 filed May 12, 2014, 2Q14 filed August 11, 2014, 3Q14 filed November 10, 2014); 2015 (1Q15 filed May 1, 2015, 2Q15 filed August 7, 2015, 3Q15 filed November 6, 2015); 2016 (1Q16 filed May 10, 2016, 2Q16 filed August 2, 2016, 3Q16 filed November 8, 2016); and

filings represented that the financial information contained therein fairly stated the Company's financial results and that the results were prepared in accordance with GAAP.  As admitted through the Restatement announcement, these representations were false and misleading as the financial results were not fairly stated and were not prepared in accordance with GAAP.  For example, the Forms 10-K issued during the Class Period made the following or virtually identical statements:

> The discussion and analysis of our financial condition and results of operations are based on our financial statements, ***which have been prepared in accordance with U.S. generally accepted accounting principles***.

Similarly, the Forms 10-Q issued during the Class Period made the following or virtually identical false statements:

> The accompanying unaudited condensed consolidated financial statements ***have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP")***…..In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a ***fair presentation of the results of operations for the periods presented have been included***.

> 375.   The Company's false and misleading financial results issued during the

Class Period are summarized in the table below:

---

2017 (1Q17 filed May 1, 2017, 2Q17 filed July 31, 2017, 3Q17 filed October 31, 2017).

| ($ in Thousands, Except Per Share Data and Days Sales Outstanding) | Net Sales | Cost of Sales | Gross Margin | SG&A Expense | Operating Income (Loss) | Income (Loss) Before Income Tax Provision | Income Tax (Provision) Benefit | Net Income (Loss) | Diluted Earnings Per Share | Adjusted EBITDA | Accounts Receivable, Net | Allowance for Doubtful Accounts | Allowance for Product Returns | Inventory, Net | Days Sales Outstanding |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 4Q 2012 | $ 10,509 | $ 1,689 | $ 8,820 | $ 8,409 | $ (972) | $ (1,605) | $ - | $(1,605) | $ (0.02) | $ 431 | $ 7,654 | $ 49 | $ 89 | $ 3,023 | 65 |
| FY 2012 | $ 27,054 | $ 5,188 | $ 21,865 | $ 20,971 | $ (5,355) | $ (7,662) | $ - | $(7,662) | $ (0.09) | $ 2,394 | $ 7,654 | $ 49 | $ 89 | $ 3,023 | |
| 1Q 2013 | $ 11,556 | $ 1,905 | $ 9,651 | $ 8,369 | $ (227) | $ (1,570) | $ (50) | $(1,620) | $ (0.02) | $ 1,119 | $ 9,822 | $ 76 | $ 112 | $ 3,956 | 76 |
| 2Q 2013 | $ 13,515 | $ 2,198 | $ 11,316 | $ 10,868 | $ (744) | $ (757) | $ - | $ (757) | $ (0.01) | $ 1,165 | $ 11,762 | $ 44 | $ 162 | $ 4,220 | 79 |
| 3Q 2013 | $ 16,116 | $ 2,113 | $ 14,002 | $ 12,711 | $ (256) | $ (260) | $ (47) | $ (307) | $ - | $ 1,856 | $ 13,707 | $ 115 | $ 187 | $ 4,533 | 78 |
| 4Q 2013 | $ 17,994 | $ 3,111 | $ 14,883 | $ 14,277 | $ (1,412) | $ (1,424) | $ (3) | $(1,427) | $ (0.01) | $ 1,327 | $ 16,093 | $ 407 | $ 215 | $ 3,881 | 82 |
| FY 2013 | $ 59,181 | $ 9,328 | $ 49,853 | $ 46,226 | $ (2,639) | $ (4,012) | $ (100) | $(4,112) | $ (0.04) | $ 5,467 | $ 16,093 | $ 407 | $ 215 | $ 3,881 | |
| 1Q 2014 | $ 19,559 | $ 2,977 | $ 16,582 | $ 15,852 | $ (891) | $ (912) | $ (10) | $ (922) | $ (0.01) | $ 1,976 | $ 18,967 | $ 526 | $ 305 | $ 3,639 | 87 |
| 2Q 2014 | $ 25,573 | $ 2,740 | $ 22,833 | $ 21,193 | $ (392) | $ (400) | $ 10 | $ (390) | $ - | $ 2,894 | $ 20,500 | $ 678 | $ 270 | $ 4,229 | 72 |
| 3Q 2014 | $ 33,518 | $ 3,348 | $ 30,170 | $ 24,192 | $ 3,731 | $ 3,722 | $ (22) | $ 3,700 | $ 0.03 | $ 7,298 | 23,304 | $ 1,201 | $ 677 | $ 4,739 | 63 |
| 4Q 2014 | $ 39,573 | $ 3,600 | $ 35,973 | $ 29,243 | $ 4,652 | $ 4,642 | $ (810) | $ 3,832 | $ 0.03 | $ 8,510 | 26,672 | $ 1,750 | $ 841 | $ 5,133 | 61 |
| FY 2014 | $118,223 | $12,665 | $105,558 | $ 90,480 | $ 7,100 | $ 7,052 | $ (832) | $ 6,220 | $ 0.05 | $20,678 | 26,672 | $ 1,750 | $ 841 | $ 5,133 | |
| 1Q 2015 | $ 40,767 | $ 5,148 | $ 35,619 | $ 29,308 | $ 4,247 | $ 4,233 | $ (146) | $ 4,087 | $ 0.04 | $ 8,767 | 31,001 | $ 2,010 | $ 944 | $ 4,248 | 68 |
| 2Q 2015 | $ 45,679 | $ 5,089 | $ 40,590 | $ 32,651 | $ 5,652 | $ 5,653 | $ (223) | $ 5,430 | $ 0.05 | $10,562 | 39,448 | $ 2,504 | $ 1,030 | $ 3,860 | 78 |
| 3Q 2015 | $ 49,015 | $ 4,979 | $ 44,036 | $ 34,901 | $ 6,714 | $ 6,709 | $ (158) | $ 6,551 | $ 0.06 | $11,796 | 46,778 | $ 3,132 | $ 1,529 | $ 5,653 | 86 |
| 4Q 2015 | $ 51,835 | $ 4,986 | $ 46,849 | $ 36,524 | $ 7,751 | $ 7,683 | $ 5,695 | $13,378 | $ 0.12 | $12,867 | 53,755 | $ 3,270 | $ 1,262 | $ 7,460 | 93 |
| FY 2015 | $187,296 | $20,202 | $167,094 | $133,384 | $ 24,364 | $ 24,278 | $ 5,168 | $29,446 | $ 0.26 | $43,992 | 53,755 | $ 3,270 | $ 1,262 | $ 7,460 | |
| 1Q 2016 | $ 53,367 | $ 7,946 | $ 45,421 | $ 40,648 | $ 1,467 | $ 1,411 | $ (214) | $ 1,197 | $ 0.01 | $ 9,073 | 53,882 | $ 3,872 | $ 1,651 | $ 17,967 | 91 |
| 2Q 2016 | $ 57,342 | $ 7,394 | $ 49,948 | $ 42,772 | $ 3,561 | $ 3,450 | $ (1,475) | $ 1,975 | $ 0.02 | $10,073 | 54,861 | $ 4,086 | $ 2,191 | $ 17,207 | 86 |
| 3Q 2016 | $ 64,429 | $ 7,997 | $ 56,432 | $ 48,179 | $ 4,703 | $ 4,616 | $ (1,295) | $ 3,321 | $ 0.03 | $11,357 | 63,427 | $ 4,350 | $ 2,262 | $ 18,313 | 89 |
| 4Q 2016 | $ 69,877 | $ 9,070 | $ 60,807 | $ 48,398 | $ 8,715 | $ 8,630 | $ (3,149) | $ 5,481 | $ 0.05 | $13,902 | 67,151 | $ 4,842 | $ 4,894 | $ 17,814 | 86 |
| FY 2016 | $245,015 | $32,407 | $212,608 | $179,997 | $ 18,446 | $ 18,107 | $ (6,133) | $11,974 | $ 0.11 | $44,405 | 67,151 | $ 4,842 | $ 4,894 | $ 17,814 | |
| 1Q 2017 | $ 72,607 | $ 8,743 | $ 63,864 | $ 52,951 | $ 6,185 | $ 6,040 | $ (1,713) | $ 4,327 | $ 0.04 | $12,403 | 66,846 | $ 6,769 | $ 5,037 | $ 16,050 | 83 |
| 2Q 2017 | $ 76,412 | $ 8,631 | $ 67,781 | $ 55,314 | $ 7,213 | $ 7,064 | $ 1,005 | $ 8,069 | $ 0.07 | $14,168 | 60,738 | $ 7,219 | $ 3,461 | $ 15,033 | 72 |
| 3Q 2017 | $ 84,573 | $ 9,599 | $ 74,974 | $ 60,233 | $ 8,842 | $ 13,073 | $ 4,384 | $17,457 | $ 0.15 | $15,629 | 59,581 | $ 6,960 | $ 3,479 | $ 10,419 | 65 |

376. The Company's acknowledgement that it must restate the above financials for all periods in the Class Period is an admission that these numbers were false when originally issued.  Pursuant to GAAP, as set forth in ASC 250 – *Accounting Changes and Error Corrections*, restatement of previously issued financial statements is ***only*** allowed when a Company makes "[a]n error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that ***existed at the time the financial statements were prepared***." ASC 250-10-20. MiMedx's announcement of its Restatement was not due to a change in reporting entity or a change in

- 215 -

accounting principle, but rather to correct errors in previously issued financial statements approved by Defendants.

377.    The need to restate all financials reported during the Class Period demonstrates that the Company admits that the misstatements in the financials were material, as only ***materially*** misstated financial statements need to be corrected and reissued on a retroactive basis.[241]  Indeed, based on the Company's representations, it is evident that the Restatement will impact key financial metrics (sales, A/R, gross margin, income, EPS) in MiMedx's largest product category, Wound Care (75% of MiMedx's total revenue in 2016), as the Company has tied the need to restate to the sales and distribution practices at the Company, including two distributors where the implicit terms of their arrangements modified the explicit terms of the distribution contracts.  As discussed further below, there is no doubt that AvKARE is one of the two distributors referenced by the Company – and revenue from AvKARE accounted for 40% of the Company's annual revenues in 2012, 56% in 2013, 34% in 2014, and 24% in 2015.  These amounts are unquestionably material.

---

[241] *See, e.g.*, ASC Topic 250, Accounting Changes and Error Corrections, SEC Topic 1-M, and SEC Staff Accounting Bulletin Topic 1-N, Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements.

378.   In addition to being quantitatively material, MiMedx's Class Period financial statements were also qualitatively material. The SEC has directed that:

> The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.

SEC Staff Accounting Bulletin: Codification of Staff Accounting Bulletins' Topic 1-M, *Materiality* ("SEC Topic 1-M").

379.   SEC Topic 1-M also stresses that materiality requires qualitative, as well as quantitative, considerations.  SAB Topic 1-M notes that misstatements that hide the failure to meet revenue or earnings expectations can be an indicator of qualitative materiality.  Here, the Company's misstated financials enabled them to tout that the Company "met or exceeded revenue guidance" in every quarter but one during the Class Period, which they otherwise could not have claimed.

380.   SEC Topic 1-M also states, "the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide guidance as to whether investors regard quantitatively small misstatements as material."  On February 20, 2018, the Company's stock price plummeted by 39.53%, when MiMedx announced that it had postponed the release of its financial results and Form 10-K for 4Q and FY17 due to "an internal investigation into current and prior-period matters

relating to allegations regarding certain sales and distribution practices at the Company," including "the accounting treatment of certain distributor contracts." Moreover, on June 7, 2018, MiMedx stock plunged another 23.39%, when the Company confirmed that nearly six years of its financial statements were materially misstated and stated that all communications and financial information with respect to 4Q17 and 1Q18 were no longer reliable. The Company also withdrew its 2018 guidance.

381.    Also, as disclosed in the Company's Form 14A proxy statements, Petit, Senken, and Taylor received annual bonuses throughout the Class Period pursuant to MIP as a result of the Company's inflated revenue and Adjusted EBITDA results. Critically, the bonus payouts achieved during the Class Period were heavily based upon meeting or exceeding revenue and Adjusted EBITDA targets. Had the Company reported its true financial condition appropriately under GAAP during the Class Period, it would have resulted in lower Adjusted EBITDA and revenue numbers and lower bonus payouts to these three Defendants, another qualitative materiality factor under SAB Topic 1-M. Notably, as part of the ongoing Audit Committee investigation, the Company has determined it will claw back compensation paid to Petit, Senken, and Taylor based upon the final results of the Company's Restatement.

382.  Finally, whether or not the misstatement arises from an item capable of precise measurement or whether it arises from an estimate is a qualitative materiality factor that must be considered under SEC Topic 1-M.  Here, the accounting misstatements and omissions described herein arise from a fraudulent revenue recognition scheme, which included side arrangements with distributors, channel stuffing, and premature revenue recognition, with the goal of ensuring the Company would achieve or exceed Wall Street expectations.  There was no judgment required to know the sales were improper and had to be reversed under GAAP.

## B.    MiMedx Violated GAAP Rules for Recognizing Revenue

383.  During the Class Period, MiMedx violated basic revenue recognition rules under GAAP through its improper accounting, sales, and distribution practices orchestrated through implicit sales arrangements with key distributors and other customers to prematurely recognize revenue.  MiMedx was required, but failed, to follow the revenue recognition rules found in the Financial Accounting Standards Board ("FASB") Accounting Standards Codification Topic 605, *Revenue Recognition* ("ASC 605").[242]

---

[242] In 2003, the SEC issued Staff Accounting Bulletin No. 104 ("SAB 104"), codified as Staff Accounting Bulletin Topic 13 ("SAB Topic 13"), which set out the SEC staff's view on the appropriate criteria that needs to be met to recognize revenue. SAB 104/SAB Topic 13 was codified in to ASC 605-10-S99-1 as part of the FASB ASC Codification.

384.   Under ASC 605, revenue can only be appropriately recognized under GAAP when it is both: (a) "realized" (or "realizable") and (b) "earned."[243]  ASC 605-10-25-1.  Critically, ASC 605 lists four criteria that ***all*** must be met before revenue can be appropriately recognized under GAAP.   These four criteria, which are necessary for revenue to be appropriately "realized" and "earned," are:

(a)   "Persuasive evidence of an arrangement exists";

(b)   "Delivery has occurred or services have been rendered";

(c)   "The seller's price to the buyer is fixed or determinable"; and

(d)   "Collectability is reasonably assured."

ASC 605-10-S99-1.

385.   As detailed in Section IX.A and discussed further below, MiMedx violated all of these four criteria.   Through Defendants' fraudulent revenue recognition and channel stuffing scheme, the Company prematurely recognized revenue where purchase orders did not exist or were fabricated for the sales ("persuasive evidence of an arrangement" violation), title and risk of loss had not

---

[243] Pursuant to ASC 605, "revenue and gains are ***realized*** when products (goods and services), merchandise, or other assets are exchanged for cash or claims to cash," while "revenue and gains are ***realizable*** when related assets received or held are readily convertible to known amounts of cash or claims to cash."  *Id*.   Similarly, revenue is "earned" when an "entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues."  *Id*.

passed to the distributor ("delivery" violation), future performance obligations existed to appropriately earn the revenue ("persuasive evidence of an arrangement," "delivery," and "price is fixed or determinable" violations), and payment was not required until the product was resold by the distributor ("delivery," "price is fixed or determinable," and "collectability" violations).

386.   Defendants' channel stuffing and improper revenue recognition created a materially misleading picture for investors, enabling the Company to meet or exceed revenue guidance virtually every quarter.  Such practices made a huge difference. Tellingly, however, in eight quarters, the Company exceeded its quarterly revenue guidance by less than $500,000 (*i.e.*, Q1 2012; Q1 2013; Q2 2013; Q3 2013, Q1 2014; Q2 2016; Q3 2016; Q1 2017), as highlighted in yellow in the chart below:

| | | Actual Net Sales | Revenue Guidance / Outlook Range |
|---|---|---|---|
| Q1 | 31-Mar-12 | $ 3,705,808 | $3.6 million |
| Q2 | 30-Jun-12 | $ 4,884,256 | $4.9 million |
| Q3 | 30-Sep-12 | $ 7,954,046 | $6.4 million |
| Q4 | 31-Dec-12 | $ 10,509,663 | $8.1 million |
| YE | 31-Dec-12 | $ 27,053,773 | $20 to $25 million |
| Q1 | 31-Mar-13 | $ 11,556,493 | $10.5 to $11.5 million |
| Q2 | 30-Jun-13 | $ 13,514,743 | $11.5 to $13.5 million |
| Q3 | 30-Sep-13 | $ 16,115,708 | $13.5 to $16.0 million |
| Q4 | 30-Dec-13 | $ 17,993,790 | $14.5 to $19.0 million |
| YE | 30-Dec-13 | $ 59,180,734 | $57 to $60 million |
| Q1 | 31-Mar-14 | $ 19,559,188 | $18 to $19.5 million |
| Q2 | 30-Jun-14 | $ 25,573,198 | $21.5 to $23.5 million |
| Q3 | 30-Sep-14 | $ 33,517,762 | $30 to $32 million |
| Q4 | 30-Dec-14 | $ 39,572,852 | $37.3 to $38.3 million |
| YE | 30-Dec-14 | $ 118,223,000 | $116 to $117 million |
| Q1 | 31-Mar-15 | $ 40,767,000 | $40 to $41 million |
| Q2 | 30-Jun-15 | $ 45,679,000 | $44.0 to $46 million |
| Q3 | 30-Sep-15 | $ 49,015,000 | $47 to $50 million |
| Q4 | 30-Dec-15 | $ 51,835,000 | $49.5 to $52.5 million |
| YE | 30-Dec-15 | $ 187,296,000 | $185 to $188 million |
| Q1 | 31-Mar-16 | $ 53,367,000 | $55.5 to $58 million |
| Q2 | 30-Jun-16 | $ 57,342,000 | $55.7 to $57 million |
| Q3 | 30-Sep-16 | $ 64,429,000 | $62 to $64 million |
| Q4 | 30-Dec-16 | $ 69,877,000 | $69.4 to $72.9 million |
| YE | 30-Dec-16 | $ 245,015,000 | $244.5 to $248 million |
| Q1 | 31-Mar-17 | $ 72,607,000 | $69.5 to $72.5 million |
| Q2 | 30-Jun-17 | $ 76,412,000 | $73.5 to $75 million |
| Q3 | 30-Sep-17 | $ 84,573,000 | $79 to $80 million |
| Q4 | 30-Dec-17 | $ 90,900,000 | $87 to $88 million |
| YE | 30-Dec-17 | $ 324,500,000 | $320.6 to $321.6 million |

387.  These results were achieved by improperly recognizing revenue from

several types of sales.

## 1.      Consignment Sales

388.  MiMedx granted material sales concessions to its distributors that in

effect made the nature of the parties' arrangement a consignment sale, rather than a

sale to a distributor.  ASC 605 describes the problematic nature of consignment sales

and accordingly provides that products delivered under a consignment arrangement do

not qualify for revenue recognition because title "does not pass to the consignee":

> Products delivered to a consignee pursuant to a consignment
> arrangement are not sales and do not qualify for revenue recognition
> until a sale occurs. The staff believes that revenue recognition is not
> appropriate because the seller retains the risks and rewards of ownership
> of the product and title usually does not pass to the consignee.

ASC 605-10-S99-1.

389.   Further, even if title did somehow pass to the distributor, ASC 605

cautions that the arrangement of the transaction could in substance still be that of a

consignment or financing. *Id*. ASC 605 iterates that consignment sales require a

careful analysis of the facts and circumstances of the transaction and that any **one or**

**more** of the following characteristics would preclude revenue recognition even if title

had passed to the distributor:

(a)   the buyer has the right to return the product and:

(i)   the buyer does not pay the seller at the time of sale, and the buyer is not obligated to pay the seller at a specified date or dates;

(ii)   the buyer does not pay the seller at the time of sale but rather is obligated to pay at a specified date or dates, and the buyer's obligation to pay is contractually or implicitly excused until the buyer resells the product or subsequently consumers or uses the product;

(iii)   the buyer's obligations to the seller would be changed (*e.g.*, the seller would forgive the obligation or grant a refund) in the event of theft or physical destruction or damage of the product;

(iv)     the buyer acquiring the product for resale does not have economic substance apart from that provided by the seller; and

(v)     the seller has significant obligations for future performance to directly bring about resale of the product by the buyer.

ASC 605-10-S99-1.

390.   MiMedx's sales to its distributors violated multiple of these provisions and their contingent nature meant the Company could only recognize revenue when its distributors sold such products to end customers or on a "sell-through" basis.[244]  For example, along with the return rights, the distributor was "implicitly excused" from paying MiMedx until the products were ultimately sold and used by the end customer. Further, MiMedx retained significant obligations for future performance to bring about the resale of the products.  As noted above, these contingencies precluded revenue recognition until the contingencies were resolved and, as a result, MiMedx falsely recognized revenue upon shipment to its distributors.

391.   Indeed, the Company conceded in its June 7, 2018 Form 8-K that MiMedx should only have recognized revenue under GAAP when the product was sold to the end customer and cash for the product was collected.  The Form 8-K stated, "[t]he accounting misstatements will also require adjustments to the periods in which

---

[244] "Sell-in" is where a company records revenue immediately when the product is sold to its independent distributor.  "Sell-through" is where a company only records revenue after the product is sold through to the end customer.

such revenues were recognized so that such revenues for product sold are recognized in the period in which such amounts were actually collected."

## 2.    Right of Return Sales

392.    MiMedx also violated the revenue recognition rules for sales it made to distributors that were granted an implicit right to return merchandise (a "right of return").   When a right of return exists, ASC 605-15-25-1 sets forth specific conditions that must *all* be met prior to the recognition of revenue for these types of transactions:

> If an entity sells its product but gives the buyer the right to return the product, revenue from the sales transaction shall be recognized at time of sale only if *all* of the following conditions are met:
>
> a.    The seller's price to the buyer is substantially fixed or determinable at the date of sale.
>
> b.  The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product.
>
> c.  The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage of the product.
>
> d.  The buyer acquiring the product for resale has economic substance apart from that provided by the seller.
>
> e.  The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer.
>
> f.  The amount of future returns can be reasonably estimated.

393. Multiple of the above conditions were not met, precluding revenue recognition under ASC 605 where the Company's distributors were granted a right of return. For example, MiMedx knew that, regardless of its express contract terms with distributors, certain distributors had undisclosed side agreements that allowed them to delay payment for the products until the distributor resold the product. ASC 605-15-25-1 clearly and concisely states that "[i]f the buyer does not pay at the time of sale and the buyer's obligation to pay is contractually or *implicitly excused* until the buyer resells the product" then revenue cannot be recognized. MiMedx willfully ignored this provision, recognizing the revenue anyway.

394. In addition, revenue recognition is precluded under a right of return if the seller retains "significant obligations for future performance to directly bring about resale of the product by the buyer." Yet, MiMedx's implicit side arrangement with AvKARE included material performance obligations to ensure products were resold to VA hospitals, and provided that AvKARE's obligation to pay was excused if products were not resold. In recognizing revenue on distributor sales that included a right of return, MiMedx violated GAAP.

395. Moreover, even if MiMedx's sales with rights of return somehow satisfied all of the conditions set forth in GAAP for proper revenue recognition (which they did not), MiMedx was still required to have been able to reasonably estimate the

amount of product that would have ultimately been returned to appropriately record revenue, something it could not do.  GAAP requires that the costs or losses associated with estimated returns be recorded at the same time the revenue is recognized.  ASC 605-15-25-2.[245]  But as described in Section IV.D, MiMedx's egregious channel stuffing led to lost products, inventory spilling out of cabinets, and problems reconciling inventory at VA hospitals.  Further, MiMedx asked its sales representatives to delay and feather back returns so they could spread out the losses associated with those returns.  Worse still, MiMedx avoided returns through tactics such as transferring the returns to other facilities or instructing employees to conceal them by hiding product at VA hospitals or in their homes and cars.  MiMedx's recognition of revenue when it clearly could not make a reasonable estimate of returned product, and even manipulated the timing of its future returns to help the Company achieve guidance, violated GAAP.

### C.    MiMedx Made Materially False and Misleading Disclosures of Its Revenue Recognition Policies in Its Financial Statements

396.  MiMedx's financial statement disclosures were both materially misleading and contained a material omission, rendering them inadequate and in

---

[245] Notably, ASC 605-15-25-3 provides factors that may impair the ability of a company to make a reasonable estimate of future returns, including "*[r]elatively long periods* in which a particular product may be returned."

violation of GAAP.  MiMedx was required by GAAP and SEC rules, including ASC 605-10-S99-1 and ASC Topic 235, *Notes to Financial Statements* ("ASC 235"), to disclose in detail its revenue recognition accounting policy in the footnotes to its financial statements in each of its publicly issued Forms 10-K and 10-Q.  Specifically, ASC 235-10-50-3 thereof states that "the disclosure should encompass important judgments as to the appropriateness of principles relating to recognition of revenue." Further, ASC 605-10-S99-1, citing SAB Topic 13.B, Disclosures, states "that changes in estimated returns recognized in accordance with FASB ASC Subtopic 605-15 should be disclosed, if material (*e.g.*, a change in estimate from two percent of sales to one percent of sales)."

397.   In each of its Forms 10-Q and 10-K during the Class Period, MiMedx disclosed its revenue recognition policy as a significant or critical accounting policy. For example, MiMedx's Forms 10-K for 2013, 2014, 2015, and 2016 made the following disclosures concerning its revenue recognition policy, which is very similar to those found in the interim periods of those years:[246]

---

[246] Each Form 10-Q and 10-K issued by MiMedx during the Class Period made similar disclosures concerning the Company's revenue recognition policy, which falsely assured investors MiMedx appropriately recognized revenues in accordance with GAAP.

<u>2013 Form 10-K, 2014 Form 10-K, and 2015 Form 10-K</u>

The Company sells its products primarily through a combination of a direct sales force, independent stocking distributors and third - party representatives in the U.S. and independent distributors in international markets.  The Company recognizes revenue when title to the goods and risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance.  In cases where the Company utilizes distributors or ships products directly to the end user, it recognizes revenue according to the shipping terms of the agreement provided all revenue recognition criteria have been met.  A portion of the Company's revenue is generated from inventory maintained at hospitals or with field representatives.  For these products, revenue is recognized at the time the product has been used or implanted.  The Company records estimated sales returns, discounts and allowances as a reduction of net sales in the same period revenue is recognized.

<u>2016 Form 10-K:</u>

We sell our products primarily through a combination of a direct sales force, independent stocking distributors and third - party representatives in the U.S. and independent distributors in international markets. We recognize revenue when title to the goods and risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. We record revenues from sales to our independent stocking distributors at the time the product is shipped to the distributor. Our stocking distributors, who sell the products to their customers or sub-distributors, contractually take title to the products and assume all risks of ownership at the time of shipment. Our stocking distributors are obligated to pay us the contractually agreed upon invoice price within specified terms regardless of when, if ever, they sell the products. Our stocking distributors do not have any contractual rights of return or exchange other than for defective product or shipping error; however, in limited situations, we do accept returns or exchanges at our discretion.

<p style="text-align:center">*      *      *</p>

We continually evaluate new and current customers, including our stocking distributors, for collectability based on various factors including past history with the customer, evaluation of their credit worthiness, and current economic conditions. We only record revenue when collectability is reasonably assured. A portion of the Company's revenue is generated from inventory maintained at hospitals or physician's offices.

We make estimates of potential future sales returns, discounts and allowances related to current period product revenue and these are reflected as a reduction of revenue in the same period revenue is recognized.

398.   As Defendants knew, or were reckless in not knowing, MiMedx's disclosed revenue recognition policy was false and misleading and in violation of GAAP rules cited above.  MiMedx's revenue recognition policy assured investors that the Company was recognizing revenue appropriately under the provisions of ASC 605, when it was not.

399.   Rather, MiMedx's revenue recognition policy as disclosed to investors was false and misleading and omitted material facts, for at least the following reasons:

(a)     Defendants had embarked on a fraudulent revenue recognition scheme, which included channel stuffing with its distributors – including primary distributors AvKARE, SLR, and CPM – and other customers;

(b)     Defendants possessed implicit side arrangements with certain of its distributors, outside the terms of their contracts;

- 230 -

(c)    MiMedx's products were not all sold through "independent" stocking distributors and third-party representatives;

(d)    revenue was recognized before "title to the goods and risk of loss" transferred to the customer;

(e)    revenue was recognized even though MiMedx had "material remaining performance obligations required of the Company" to appropriately earn the revenue;

(f)    MiMedx was inappropriately recognizing revenue even though certain stocking distributors were not "obligated to pay [MiMedx] the contractually agreed upon invoice price within specified terms" if the distributor did not sell the product to the end customer;

(g)    MiMedx was recording revenue before "collectability is reasonably assured";

(h)    the Company's disclosed revenue recognition policy falsely represented its return policies with distributors, where the distributors had implicit return rights that were significantly greater than the only return rights MiMedx disclosed which were for defective products or shipping errors;

(i)    "sales returns" credits for missing or otherwise unaccounted for MiMedx products were recorded in different periods than the periods in which MiMedx recognized the revenue or the returns were not recorded at all; and

(j)    as a result, the Company's revenues were improperly inflated throughout the Class Period.

400.   In addition to requiring the disclosure of a company's revenue recognition accounting policy, ASC 605-10-S99-1 requires additional disclosures in the Management Discussion and Analysis of Forms 10-Q and 10-K for the following types of revenue transactions or events, which MiMedx failed to do during the Class Period:

- shipments of product at the end of a reporting period that significantly reduce customer backlog and that reasonably might be expected to result in lower shipments and revenue in the next period. (*i.e.*, channel stuffing practices);

- granting of extended payment terms that will result in a longer collection period for accounts receivable (regardless of whether revenue has been recognized);

- changing trends in shipments into, and sales from, a sales channel or separate class of customer that could be expected to have a significant effect on future sales or sales return; and

- an increasing trend towards sales to a different class of customer, such as a reseller distribution channel that has a lower gross profit margin than existing sales that are principally made to end users.

- 232 -

401.   As described herein, MiMedx engaged in a number, if not all, of the above-described events, including improper revenue recognition resulting from a breathtaking channel stuffing scheme that included significant sales concessions and return rights, well outside the fine print of the explicit contracts, and all motivated by a "win at all costs" company culture.  Defendants failed to inform investors of their channel stuffing practices and the resulting risks those practices could cause to future revenues, including a cessation of the Company's consistent revenue growth.  Indeed, the Company has now admitted its consistent revenue growth was a sham, stating that changes to its business practices (*i.e.*, no more fraudulent channel stuffing sales) has "resulted in a material softening in the Company's recent [2018] revenue performance and expected near-term sales forecast."[247]

402.   Further, while MiMedx disclosed that revenue was reported net of a provision for potential future sales returns, it failed to disclose the actual return policy, *e.g.*, the significant length of time for such returns or that returns were avoided completely and falsely represented returns were appropriately "reflected as a reduction of revenue in the same period revenue is recognized."  Such failure resulted in an

_____

[247] MiMedx Group, Inc., *MiMedx Announces Organizational Realignment Program* (Dec. 5, 2018).

actionable omission as the investing public did not have any way in which to discern

MiMedx's return policy or the impact of the right to return on recorded sales.

### 1.   MiMedx Concealed Its Improper Recognition of AvKARE Revenue

403.   One of the primary ways that MiMedx inflated revenues during the Class

Period was through its federal distributor, AvKARE.  By recognizing revenue

immediately upon shipment to AvKARE before all four revenue recognition criteria

specified in ASC 605 were met, MiMedx could inflate its quarterly revenues.  Indeed,

MiMedx would recognize revenue on sales to AvKARE even though title and risk of

loss still remained with MiMedx, a direct violation of GAAP revenue recognition

criteria (*i.e.*, that delivery has occurred).[248]  Further, MiMedx would retain

responsibility for procuring the resale of the product, and AvKARE's obligation to

pay MiMedx was implicitly excused until the products were re-sold.  In addition,

MiMedx would agree to an implicit right of return on the sales where it agreed to

provide credits back to AvKARE for any lost or damaged inventory even though

MiMedx had already recognized the revenue.

---

[248] ASC 605-10-S99-1 states that "delivery generally is not considered to have occurred unless the customer has taken title and assumed the risk and rewards of ownership of the products specified in the customer's purchase order or sales agreement."

404.   Given these significant sales concessions, MiMedx falsely recognized revenue to AvKARE on a "sell-in" basis, as opposed to a "sell-through" basis, even though the revenue recognition criteria had not been met at the time MiMedx shipped product to AvKARE.  In essence, MiMedx's relationship with AvKARE was more akin to a sales agent relationship, rather than that of a traditional distributor.  Under ASC 605, an "arrangement" did not exist because MiMedx's implicit arrangement with AvKARE resulted in the sales being consignment sales for which revenue recognition is not appropriate because "the seller retains the risks and rewards of ownership of the product and title usually does not pass to the consignee."

405.   Defendants' efforts to conceal this implicit side arrangement with AvKARE resulted not only in materially false financials, but also in the issuance of materially false and misleading statements to investors, analysts, and regulators concerning its relationship with AvKARE.

406.   For example, in a letter to the SEC dated January 23, 2017, Senken concealed the Company's implicit arrangements and activities with AvKARE, stating instead:

> The Company respectfully refers the Staff to the copy of the Company's agreement with AvKare, Inc…which is filed as Exhibit 10.60 to the Company's Form 10-K for the fiscal year ended December 31, 2015. . . . Under the current terms of the Agreement, title to the products passes to AvKare upon shipment with payment terms of 45 days.  All shipments to AvKare are processed based upon an authorized purchase order from

AvKare. ***AvKare has no right to return products sold under the Agreement except in cases of defect or nonconformity***.

<div align="center">

\*      \*      \*

</div>

The Company recognized revenue for sales under the Agreement upon shipment as (a) persuasive evidence of an arrangement exists; (b) delivery has occurred; (c) the price to the buyer is fixed or determinable; and (d) collectability is reasonably assured.  Also, please note that the Company's Net sales as reported in its filings are the amount of sales generated by the Company after the deduction of allowances for damaged or missing goods, returns, and any discounts allowed.

407.   In a separate letter to the SEC dated February 8, 2017, Senken provided the following false and misleading response to the SEC's question as to "why you record sales to distributors based upon shipping terms to them and not upon sale to the end user customer.  Tell us the nature of your sales returns, discounts, and allowances . . . ."  He stated:

We record revenues from sales to our independent stocking distributors at the time the product is shipped to the distributor.  Our stocking distributors, who sell the products to their customers or sub-distributors, ***contractually take title to the products and assume all risks of ownership at the time of shipment.  Our stocking distributors are obligated to pay us the contractually agreed upon invoice price within specified terms regardless of when, if ever, they sell the products.  Our stocking distributors do not have any contractual rights of return or exchange other than for defective product or shipping error***; however in limited situations, we do accept returns or exchanges at our discretion. . . . ***We only record revenue when collectability is reasonably assured***.

<div align="center">

- 236 -

</div>

408.   On the Company's February 23, 2017 earnings call, Senken had the following exchange with a securities analyst, falsely characterizing the Company's relationship with AvKARE as follows:

> Q: "From my understanding, if you ship, there's no returns on your end, but if let's say, a VA facility were to return, would AvKare assume possession of that product?"
>
> Senken:   So in our relationship with AvKare, AvKare issues us a purchase order, and we ship products.  So AvKare takes possession of it at the time we ship it. . . .
>
> Q: "[S]o if one of those facilities were to return the product, right, who would assume responsibility? AvKare?
>
> Senken:  "***That is AvKare's responsibility***."

409.   On March 1, 2017, the Company's 2016 10-K stated that "[a]t the end of the term [of the AvKARE agreement], the parties expect AvKARE's inventory to be minimal, based upon AvKARE's obligation to use commercially reasonable efforts to achieve target sales levels over the remaining term of the agreement."

410.   In his April 18, 2017 letter to the SEC, Senken stated that "[t]he Company considers AvKARE an independent stocking distributor," and that "our independent stocking distributors purchase product from the Company at a price which is a discount off of list price, contractually take title to the products when they are shipped, and then re-sell the products to their customers.  Independent stocking distributors are obligated to pay us regardless of when, if ever, the sell the products."

Senken also claimed that "[l]ike our other distributors, AvKARE has no right to return products sold under our agreement except in cases of defect or nonconformity. However…[d]uring 2016, the terms of the AvKARE contract were amended and the Company determined that it was possible that the contract would not renew and that there was a higher likelihood that there would be a terminal return liability at the end of the contract.  Therefore, the Company increased its allowance for product returns to 3.4% of net sales in 2016 when compare to 1.8% of net sales in 2015 throughout the year to recognize the estimated liability for future returns related to the AvKARE contract."

411.   In the same letter, Senken stated that pursuant to the Company's consignment agreements, "title to the inventory remains with the Company until the product, which has been segregated by the consignee, is withdrawn and therefore purchased by the consignee.  Consignee accepts all risk of loss and full responsibility for any product in the consignment inventory that may be opened, lost, stolen or damaged.  The Company recognizes revenue when we are notified that product has been used or implanted."

412.   As Defendants knew, or were reckless in not knowing, the statements in ¶¶403-411 were materially false and misleading and omitted material facts when made, for the following reasons:

- 238 -

(a)     Defendants had embarked on a fraudulent revenue recognition scheme, which included channel stuffing with its distributors – including AvKARE;

(b)     Defendants' written (and publicly filed) Agreement with AvKARE did not control the parties' relationship; rather, MiMedx utilized implicit side arrangements with AvKARE that granted AvKARE undisclosed rights of return and provided that MiMedx retained risk of loss before "title to the goods and risk of loss" transferred to the end customer;

(c)     revenue from AvKARE was recognized even though MiMedx had "material remaining performance obligations required of the Company" to appropriately earn the revenue;

(d)     MiMedx was inappropriately recognizing revenue even though AvKARE was *not* "obligated to pay [MiMedx] the contractually agreed upon invoice price within specified terms" if the product was not sold to an end customer;

(e)     pursuant to MiMedx and AvKARE's side agreement, MiMedx set up consignment arrangements at several VA facilities under AvKARE's name, but would retain all title to, and risk from, the non-sale of MiMedx products until they were utilized;

(f)     the reason for MiMedx's increase in its allowance for product returns to 3.4% of net sales was not just because it anticipated the end of its contract

with AvKARE.  Rather, MiMedx had lost track of over 500 grafts that it had placed on VA shelves under AvKARE's account, and it was trying to conceal the credit it would have to provide AvKARE for those grafts;

(g)     the Company knew it would be required to credit AvKARE for any inventory that MiMedx had already recognized revenue on, and that it would be MiMedx sales reps who were required to sell any AvKARE inventory remaining at the end of the contract; and

(h)     the Company has admitted to inappropriate revenue recognition with respect to two distributors where "certain implicit arrangements modified the explicit terms of the contracts, impacting revenue recognition during specified periods."  Given the revenue recognition failures described herein with AvKARE, the fact AvKARE was MiMedx's largest customer during the Class Period, and that the initial distribution agreement with AvKARE was signed in April 2012, there is no doubt AvKARE is one of the two distributors referred to in the Restatement announcement on June 7, 2018.

## 2.     MiMedx Concealed Its Improper Recognition of CPM and SLR Revenue

413.   In addition, MiMedx also advanced its fraudulent revenue scheme  with commercial distributors, including CPM and SLR.  With these distributors, MiMedx effectively controlled the distributors by their related party ties and could count on the

distributors to make large, unneeded orders at quarter-end to help facilitate achieving or exceeding Wall Street revenue guidance.  MiMedx enticed CPM and SLR with incentives that induced the distributors to purchase more products than they otherwise would have agreed upon.  But recording revenue immediately on these large, bulk orders was improper, as significant sales concessions as described below made the transactions consignment-type sales, which precluded recognizing revenue until the product was sold to the end customer.

414.   The material sales concessions offered on quarter-end channel stuffing sales led to large accounts receivable balances and revolving debt owed to MiMedx demonstrating the distributors were receiving extended payment terms or implicitly receiving concessions to not pay within the normal terms of the contract.  In fact, CPM's ultimate demise resulted in the distributor defaulting on its credit terms with MiMedx, further supporting a lack of economic substance on CPM's ability to pay without the significant discounts and exclusive territory rights MiMedx offered.  Indeed, SLR essentially took the place of CPM after the Forest Park collapse and placed excess orders for MiMedx products on financing terms that were highly favorable to it.  As discussed above, these favorable terms included deep discounts, free products, rebates, lenient return/exchange policies, and extended payment terms in exchange for quarter-end orders that exceeded their needs.  Some of the excess

orders were stored at the residence of a former MiMedx sales representative who had left the Company to work for SLR.  The product was kept by this SLR employee in freezers that were provided by MiMedx.

415.   Defendants actively concealed these sales concessions from investors. For example on the Company's July 30, 2015 earnings call, analyst Munda asked whether to expect "that we're at the peak of DSOs here."   Senken misleadingly responded: "As Bill mentioned, and I don't like to bring this out, in case any customer is listening, we target around 75 days.  We were doing better than that.  ***And it's not that we offer extended terms, we don't.  And we haven't changed our terms, whether that be distributor or otherwise***. . . . And even though our terms say, we don't care, if you don't get reimbursed you still owe it to us.  Practically speaking, the payments are a reflection of how quickly they get reimbursed.  And that's a big part of what's happening."

416.   Finally, as discussed above, MiMedx has admitted as part of the Restatement announcement that at least two distributors improperly recognized revenue where the implicit arrangements modified the explicit terms of the contracts. Further, MiMedx also admitted with its Restatement announcement it would be adjusting revenues with these distributors to not recognize the revenue until cash was actually collected for the sales.  Finally, the April 2019 investigation update disclosed

concerns of improper revenue recognition practices for "other customer accounts" during the years 2012 through 2018.  As a result, this implicates the problematic sales made to CPM and SLR where material sales concessions precluded revenue recognition until all four criteria for appropriate revenue recognition under ASC 605 were met.  Further, Defendants failed to disclose to investors the tremendous amount of quarter-end channel stuffing sales with CPM and SLR and the resulting financial risks those practices could cause to future revenues in violation of GAAP and SEC disclosure rules.

### D.    MiMedx's GAAP Violations of Related Party Standards

417.   MiMedx was also required under GAAP to disclose in its Forms 10-Q and 10-K that its distributors qualified as related parties.  As discussed herein, MiMedx essentially controlled AvKARE, CPM, and SLR, qualifying these distributors as related parties under GAAP.  For example, MiMedx orchestrated its improper revenue recognition and channel stuffing scheme through material sales concessions made to these distributors to facilitate meeting or exceeding revenue guidance.  Related party agreements can be inherently problematic from an accounting perspective and pose increased risks of material misstatement, as their substance might differ materially from their form.[249]

---

[249] PCAOB Release No. 2014-002, June 10, 2014.

418.   This was certainly the case with AvKARE.  MiMedx and AvKARE possessed an undisclosed side arrangement, which allowed MiMedx to exercise almost complete control over AvKARE's distribution and sale of MiMedx products. MiMedx retained performance obligations and risk of loss for products sold to AvKARE, making AvKARE merely a pass-through entity used to fraudulently inflate MiMedx's financial results.  Even after booking the sale of a product to AvKARE, MiMedx maintained control of the product and responsibility for re-selling it to VAs.

419.   Similarly, the CEO of distributor CPM was a personal friend of Carlton, and former MiMedx employee Cochrane worked with CPM in a consulting role, allowing MiMedx to exert control over CPM.  This led to a mutually beneficial arrangement wherein CPM placed bulk orders with MiMedx for its products, ensuring MiMedx met its quarterly revenue targets, and then sold the product to its PODs at three-to-six times higher than the customary price.  Tellingly, one of the PODs to which CPM sold was Fuse, where Brooks served as Chairman.

420.   SLR was also a problematic related party entity.  MiMedx employee Morrison founded SLR, and it was run by his wife while he still worked at MiMedx from July 2013 to September 2015 – the point when SLR became MiMedx's sole Master Distributor and he left the Company to become SLR's president.  Like CPM, SLR was a "house account" essentially controlled by MiMedx, which ensured that

SLR placed excess orders for MiMedx products with significant sales concessions, including deep discounts, free products, rebates, lenient return/exchange policies, and extended payment terms.

421.    MiMedx's ability to control these distributors qualified them as related parties under the accounting guidance of ASC 850, *Related Party Disclosures*.  ASC 850 provides disclosure requirements for related party transactions and certain common control relationships.  The overall objective of ASC 850 is to disclose transactions with related parties so that "users of the financial statements can evaluate their significance."  ASC 850-10-10-1.  Specifically, ASC 850 provides examples of related party transactions, which includes affiliate relationships like MiMedx held with AvKARE, CPM, and SLR.  ASC 850-10-20 Glossary.  ASC 850 defines an "affiliate" as "[a] party that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an entity."  And ASC 850 defines "control" as "[t]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity through ownership, by contract, or otherwise."

422.    As it engaged in related party contracts, MiMedx was required under ASC 850-10-50 to disclose the following:

(a)    the nature of the relationship(s) involved;

(b)      a description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements;

(c)      the dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period; and

(d)      amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

423.   SEC disclosure rules also require specific disclosures on related party transactions.  For example, SEC Regulation S-X Rule 5-03 requires that "***amounts earned from transactions with related parties shall be disclosed***."[250]

424.   In violation of GAAP, MiMedx failed to inform investors of its related party ties to its main distributors and that its now admitted massive accounting fraud was facilitated through premature revenue recognition with distributors it controlled that were given significant sales concessions to inflate financial performance.

---

[250] Regulation S-X Rule 5-03, *Income Statements*; §210.4-08(k).

### E.     MiMedx Improperly Accounted for Payments Made to PAN

425.    As detailed in Section IV.B.1, the Company's donations to PAN were used to improperly induce sales to customers.  Given the true purpose of these donations, MiMedx falsely reported the donations as SG&A expenses rather than as reductions to net sales.  As a result, MiMedx overstated its net sales through the disguised PAN donations in order to help the Company meet or exceed revenue guidance in all but one quarter during the Class Period.  This violated ASC 605-50-45-2, which specifically addresses how companies should characterize cash consideration given to a customer:

> Cash consideration (including a sales incentive) given by a vendor to a customer is presumed to be a reduction of the selling prices of the vendor's products or services, and, therefore, shall be characterized as a reduction of revenue when recognized in the vendor's income statement.

426.    The payments made to PAN by MiMedx were not independent charitable donations that PAN would then distribute as it saw fit, including to MiMedx's competitors.  Instead, MiMedx directed its PAN donations to offset co-pays and co-insurance for its own products.  In essence, the donations encouraged additional sales, but lowered the amount of money MiMedx would ultimately receive for those sales (*e.g.*, sales discounts).  Consequently, the "donations" should actually have been accounted for as reductions to sales, *not* SG&A expenses.  Because SG&A expenses are not included in the calculation of gross margin, MiMedx's purposeful

misclassification resulted in falsely overstated revenue and gross margin – two key metrics closely followed by analysts and investors every quarter.

### F.   MiMedx Admitted Material Weaknesses in its Internal Controls

427.   The Company's Restatement announcement also revealed the existence of material weaknesses in internal controls over financial reporting ("ICFR"). MiMedx concluded that its ICFR were ineffective for all periods that are being restated – the Non-Reliance Periods (*i.e.*, December 31, 2012 through September 30, 2017).  Accordingly, the Company announced that it will restate its disclosures for the affected periods to include the identification of material weaknesses related to its announced Restatement.  As the June 7, 2018 Form 8-K makes clear:

> The Company has previously concluded in certain of the periods requiring restatement that its controls over financial reporting ***were effective***.  In the period ending December 31, 2016, the Company previously concluded that its controls over financial reporting were ineffective due to material weaknesses in certain internal controls over tax accounting.[251]  ***As a result of material weaknesses relating to the Restatement described above, the Company has now concluded that its controls over financial reporting were ineffective in all of the Non-Reliance Periods.  Accordingly, the Company will restate its disclosures for the affected periods to include the identification of material weaknesses related to its restatement.***

---

[251] MiMedx's 2016 Form 10-K disclosed its ICFR were ineffective due to a material weakness in income tax accounting.  However, the Company misleadingly did not disclose any additional material weaknesses in its accounting for revenue or its ineffective control environment.

428.   MiMedx management was responsible for establishing and maintaining effective ICFR and disclosure controls pursuant to SOX.  SOX required MiMedx management to perform annual assessments of MiMedx's ICFR and disclosure controls and to issue a report on whether MiMedx's ICFR were effective and free from material weaknesses.[252]

429.   As noted above, MiMedx has admitted its annual assessments of the Company's ICFR and disclosure controls were false and misleading as the Company will report material weaknesses in ICFR and ineffective disclosure controls when its final restatement is issued.  A material weakness, as defined in the Public Company Accounting Oversight Board ("PCAOB"), Auditing Standard No. 5 ("AS 5") is a:

> deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.[253]

430.   Control deficiencies that are determined to be a material weakness must be disclosed in management's annual report on its assessment of the effectiveness of

---

[252] SEC Final Rule: Management's Report on Internal Control over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports, Release Nos. 33-8238; 34-47986; IC-26068; File Nos. S7-40-02; S7-06-03, Effective Date: August 14, 2003.

[253] An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements, AS 5. A7.

ICFR.[254]  Management may not disclose that it has assessed ICFR as effective if there

is one or more control deficiencies determined to be a material weakness in ICFR.[255]

431.  AS 5 also provides indicators of material weaknesses in ICFR that

include the following:

> ***Identification of fraud, whether or not material, on the part of senior
> management***;
>
> ***Restatement of previously issued financial statements to reflect the
> correction of a material misstatement***;
>
> Identification by the auditor of a material misstatement of financial
> statements in the current period in circumstances that indicate that the
> misstatement would not have been detected by the company's internal
> control over financial reporting; and
>
> Ineffective oversight of the company's external financial reporting and
> internal control over financial reporting by the company's audit
> committee.

432.  The findings from the ongoing Audit Committee investigation

demonstrate that Defendants' fraudulent revenue recognition scheme was allowed to

be carried out because there was a complete lack of ***any*** internal controls to prepare

reliable financial statements.  As EY's resignation and representations to MiMedx

made clear, the internal controls necessary for the Company to develop reliable

financial statements during the Non-Reliance periods ***did not exist***.  And now

---

[254] Management's Report on Internal Control Over Financial Reporting, Exchange Act
Release No. 34-54976 at 41 (Dec. 20, 2006).

[255] *Id.*

MiMedx must go back and review "***all of the Company's sales***" since 2012 for proper revenue recognition as part of the Restatement – further cementing that Defendants' statements about the Company's effective internal controls during the Class Period were false.

433.   Indeed, MiMedx has disclosed as part of its Audit Committee investigation that new internal controls have been put in place to help prevent future instances of the fraudulent accounting that occurred during the Class Period, which include the following:

- established an Ethics and Compliance Committee and newly established positions of Chief Accounting Officer and Internal Auditor;

- restructured and bolstered its pricing committee;

- tightened policies, procedures, and governance of credit;

- established an independent compliance department reporting to the Board of Directors;

- hired a Vice President of Internal Audit to develop an internal audit function for the Company; and

- implemented improved processes and controls to monitor sales practices, authorize credits and returns, and recognize revenue.

434.   Also, the findings from the Audit Committee investigation have demonstrated the fraudulent accounting was driven by former MiMedx senior management's "win at all cost" culture that disregarded abiding by fundamental

accounting rules governing revenue recognition.  In fact, EY in its resignation remarks stated it resigned in part due to a "disagreement" with prior MiMedx senior management and could not rely on representations from the current Interim CEO and CFO because they would have had to rely on representations from legacy management.  Further, the Company has treated the terminations of Petit, Senken, Taylor and Cranston as "for cause" based on information identified in the Audit Committee's investigation.  As a result, a material weakness in the Company's overall control environment existed during the Class Period that will be reported when a final Restatement is issued by the Company.

435.   The importance of a Company's control environment in establishing effective internal controls is articulated in the Committee of Sponsoring Organizations ("COSO"), *Internal Control – Integrated Framework* ("COSO Framework").[256] According to the COSO Framework, the control environment sets the tone of the entire structure of internal control and has a pervasive impact on all business activity:

> The control environment sets the tone of an organization, influencing the control consciousness of its people.  It is the foundation for all other components of internal control, providing discipline and structure. Control environment factors include the integrity, ethical values and competence of the entity's people; management's philosophy and operating style; the way management assigns authority and

---

[256] During the Class Period, MiMedx's Forms 10-K represented that management's internal control evaluations were based on the COSO Framework.

responsibility, and organizes and develops its people; and the attention and direction provided by the board of directors.[257]

436.   As a result, deficiencies affecting the control environment are strong indicators of a material weakness.  Circumstances that may indicate that a company's control environment is ineffective include without limitation, "Identification of fraud of any magnitude on the part of senior management."[258]

437.   The concept of "tone at the top" has become widely accepted within the accounting profession and the field of corporate governance to describe the attitude and actions of an entity's senior management toward internal financial controls and the control environment.  SEC Staff Accounting Bulletin No. 99 ("SAB 99") refers to "tone at the top" as:

> The tone set by top management – the corporate environment or culture within which financial reporting occurs – is the most important factor contributing to the integrity of the financial reporting process. Notwithstanding an impressive set of written rules and procedures, if the tone set by management is lax, fraudulent financial reporting is more likely to occur.[259]

438.   There can be no doubt that the "tone" set by MiMedx senior management during the Class Period facilitated a now admitted almost six year accounting

---

[257] COSO Framework at 23.

[258] Exchange Act Release No. 54976 (Dec. 20, 2006) at 44-45.

[259] SAB 99.  *See also* Report of the National Commission on Fraudulent Financial Reporting (Oct. 1987); Report and Recommendations of the Blue Ribbon Committee on Improving the Effectiveness of Corporate Audit Committees (Feb. 1999).

Restatement.  The Audit Committee findings determined the top three executives all have been terminated for cause due to conduct detrimental to the Company and the retaliation carried out by these executives towards any skeptics that questioned their accounting practices, including former employees, further illustrates the inappropriate "tone" they set during the Class Period.

439.   In light of the above, Defendants' repeated assurances during the Class Period that the Company's internal controls functioned properly to prevent or detect material misstatements in its financial statements, were false and misleading when made.  Specifically, the Forms 10-K and 10-Q issued during the Class Period falsely stated that the Company's ICFR and disclosure controls were effective when they were not.  For example, the Forms 10-K made the following or virtually identical statements:

Disclosure Controls and Procedures

We maintain "disclosure controls and procedures" within the meaning of Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, or the Exchange Act…..As required by Rule 13a-15(b) of the Exchange Act, prior to filing this Annual Report on Form 10-K, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K. ***Based on their evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure***

***controls and procedures were effective*** as of the end of the period covered by this Annual Report on Form 10-K.

Management's Report on Internal Control over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act). Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2015. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control-Integrated Framework (2013). ***Our management has concluded that, as of December 31, 2015, our internal control over financial reporting is effective based on these criteria.***

440.   Similarly, the Forms 10-Q issued during the Class Period falsely represented that the Company's disclosure controls were effective and that there were no changes in internal controls during the quarterly period that materially affected the Company's ICFR. For example, the Forms 10-Q made the following or virtually identical statements:

Disclosure Controls and Procedures

Our management, with the participation of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") has evaluated the effectiveness of our disclosure controls and procedures as of September 30, 2015. Based on this evaluation***, our CEO and CFO concluded that our disclosure controls and procedures were effective*** as of September 30, 2015.

Changes in Internal Control Over Financial Reporting

There were no changes in our internal controls over financial reporting that occurred during the three-month period ended September 30, 2015

that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

441.   In reality, not only were the ICFR ineffective, but as EY later concluded, the internal controls needed for the Company to develop reliable financial statements *do not exist*.  While the Company's 2016 Form 10-K and Forms 10-Q for the first three quarters of 2017 did conclude that its disclosure controls and ICFR were ineffective, this was *only* with regard to a material weakness in its income tax accounting.  For reasons detailed above, Defendants improperly omitted additional material weaknesses in ICFR that existed in the Company's revenue recognition area and were the result of an ineffective control environment.

### G.   Petit and Senken Falsely Certified the Accuracy of the Company's Financial Statements Through Their Sarbanes-Oxley Certifications and Other Statements

442.   Despite their massive fraudulent revenue recognition scheme, the non-existent internal controls, the multitude of GAAP violations, and the Company's false financial reporting, Petit and Senken executed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), attached to each Form 10-K and 10-Q they signed during the Class Period, stating "*that information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company*" and separate certifications stating that they had reviewed each of the filings, that each filing did "*not contain any untrue statement[s of a material fact]*"

or "***omit to state a  material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered***," that the financial results were "***fairly present[ed] in all material respects***," and that MiMedx's internal controls "***provide[d] reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles***." Petit and Senken also certified that they had disclosed to the Company's auditors and Audit Committee "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information" and "any fraud, whether or not material, that involves management or other employees who have a significant role in…internal control over financial reporting."

443.   These were patently false, as the Company's financial statements were not fairly reported, were materially misstated, and failed to disclose the myriad improper sales and distribution practices the Company was engaged in and its accounting improprieties.  Through their SOX certifications, Defendants misleadingly indicated to investors that they had "reasonable assurance regarding the reliability of financial reporting" and that the financial statements were prepared in accordance

- 257 -

with GAAP, despite their knowledge that there was no reliability, and the Company's financial reporting violated GAAP. Defendants' SOX certifications were false and also demonstrate their scienter.

## X. CHERRY BEKAERT'S CRITICAL ROLE IN THE COMPANY'S FRAUD

444.   Cherry Bekaert was MiMedx's external auditor from 2008 until its dismissal on August 4, 2017. During the Class Period, Cherry Bekaert repeatedly issued clean audit opinions concerning the accuracy of MiMedx's financial statements despite blatant improper revenue recognition through fraudulent accounting, sales, and distribution practices at MiMedx. Similarly, with the exception FY16, Cherry Bekaert issued clean audit opinions regarding the effectiveness of MiMedx's non-existing internal controls.[260] Cherry Bekaert *failed* to report that not only did MiMedx have material weaknesses in ICFR over its accounting for revenue or an ineffective control environment in ICFR, but as EY later concluded, such ICFR were non-existent. This illustrates Cherry Bekaert's complicity in Defendants' fraudulent scheme.

---

[260] In its 2016 Form 10-K, MiMedx admitted that the Company's ICFR was ineffective as of December 31, 2016, due to a material weakness in the design of the Company's controls over the tax accounting related to an overstatement of an excess tax benefit which, if undetected, would have resulted in an understatement of income taxes payable. As a result of this material weakness in income tax accounting, Cherry Bekaert issued an adverse audit opinion over MiMedx's ICFR as of December 31, 2016.

445. Auditing standards were specifically designed to ensure that false financial statements and material weaknesses are brought to the attention of investors.[261] PCAOB standards are also designed to ensure that a registrant's (*i.e.*, MiMedx) external auditors fulfill their obligations when auditing and reviewing financial statements and other information contained in SEC filings. An audit is a specific type of attestation service performed by qualified Certified Public Accountants.[262] The results of an audit are expressed by a Certified Public Accounting firm in the form of an audit opinion. For example, Cherry Bekaert, as part of its audits of MiMedx's financial statements and ICFR, issued audit opinions attesting that MiMedx's financial statements complied with GAAP and attesting to the effectiveness of MiMedx's ICFR, as detailed below.

---

[261] The PCAOB was given the responsibility to establish professional audit standards applicable to audits of public companies, and has now adopted, amended, and expanded upon the auditing standards and interpretations previously issued by the American Institute of Certified Public Accountants ("AICPA") (referred to herein as "AU__"), and has also promulgated additional auditing standards (referred to herein as "AS__"). Auditing standards "provide a measure of audit quality and the objectives to be achieved in an audit." AU §150.01.

[262] "In an attest service, the practitioner expresses a conclusion about the reliability of a written assertion that is the responsibility of another party, the asserter." AICPA *Statement on Standards for Consulting Services No. 1* (1992). To "attest" means "to establish or verify." Thus, through its audit, Cherry Bekaert was verifying that the financial statements were prepared in accordance with GAAP. GAAP is recognized by the SEC and the accounting profession as the uniform set of rules, conventions, and procedures necessary to define accepted accounting practice at a particular time.

446.   Auditing standards require that an auditor "state whether, in his opinion the financial statements are presented in conformity with generally accepted accounting principles and to identify those circumstances in which such principles have not been consistently observed." AU §110.01.  The standards make clear that, rather than rely on subjective opinion, in performing an audit "[s]ufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit." AU §150.02.  Thus, an audit includes procedures to gather evidence, through which the auditor can certify that the financial statements comply with GAAP, opine that they do not comply, or state that the auditor is unable to form an opinion on compliance.  *Id*.  In conducting the audit, the auditor is required to exercise professional skepticism which requires "[g]athering and objectively evaluating audit evidence."  AU §§230.07, 230.08.

447.   Under PCAOB standards, Cherry Bekaert was required to plan and perform audit procedures to obtain reasonable assurance about whether MiMedx's financial statements were free of material misstatement, whether caused by error or fraud, and whether material weaknesses in MiMedx's ICFR existed.  AU §150.01, AS 5.03.  PCAOB Standards note that "reasonable assurance" means a "high level" of assurance and that reasonable assurance is obtained by reducing audit risk to an

appropriately low level through applying due professional care, including obtaining sufficient appropriate audit evidence.  AU §230.10, AS 8.03.  Due professional care requires the auditor to use "the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence."  AU §230.07.  Further, Cherry Bekaert was required to appropriately plan the audit to understand the events, conditions, and company activities that might reasonably be expected to have a significant effect on the risk of material misstatement.  AS 12.7.  In obtaining an understanding of the company, the auditor should evaluate whether significant changes in the company from prior periods, including changes in its ICFR, affect the risk of material misstatements.  For reasons detailed herein, Cherry Bekaert failed in its professional obligations to follow these fundamental auditing concepts and issued materially false and misleading audit opinions concerning MiMedx's financial statements and effective ICFR during the Class Period.

448.   In certifying the Company's annual reports, Cherry Bekaert knew that investors relied on its audit opinions with respect to MiMedx's financial statements and the effectiveness of the Company's ICFR when deciding whether or not to invest in the Company.   This concept of public trust was reiterated by a former Commissioner of the SEC, in relevant part, as follows:

> Under the federal securities laws, accountants act as gatekeepers to the public securities markets.  These laws require, or permit the Commission to require, that independent public accountants certify financial information filed with the Commission.  As we all know, without an opinion from an independent auditor, a company cannot satisfy the statutory and regulatory requirements for audited financial statements.[263]

449.  As discussed above, in the Restatement announcement, MiMedx admitted that over five years of financial statements audited and reviewed by Cherry Bekaert would need to be restated based on improper revenue recognition, and admitted the Restatement would impact up to at least 13 different financial accounts.  Further, the Restatement announcement also revealed that MiMedx's ICFR was ineffective in all of the Non-Reliance Periods (*i.e.*, December 31, 2012 through September 30, 2017) due to material weaknesses.  By way of these statements, MiMedx admitted that, ***despite Cherry Bekaert's original certifications and audit opinions***, MiMedx's financial statements for the fiscal years ended December 31, 2012, 2013, 2014, 2015, and 2016 were materially misstated and did not comply with GAAP.  Similarly, MiMedx admitted that, ***despite Cherry Bekaert's assertion to the***

---

[263] Speech by SEC Commissioner: Remarks Before the AICPA National Conference on Current SEC and PCAOB Developments by Commissioner Elisse B. Walter (Dec. 9, 2009).

*contrary*, MiMedx's ICFR were not effective as of December 31, 2012, 2013, 2014, 2015, and 2016 due to the announced Restatement.[264]

### A. Cherry Bekaert's Failure to Comply with PCAOB Standards Over MiMedx's Financial Statements

450. Cherry Bekaert failed to conduct its audits in accordance with PCAOB standards. The red flags associated with MiMedx's fraudulent revenue recognition scheme and the public disclosures made by MiMedx as part of the ongoing Audit Committee investigation has made it abundantly clear that Cherry Bekaert participated in Defendants' fraud and put its financial interests ahead of its professional obligations by failing to comply with PCAOB standards.

451. First, MiMedx has admitted that it issued false financial statements for over a five-year period that will need to be restated due to improper revenue recognition. During this period, Cherry Bekaert repeatedly assured investors they could rely on such financial statements. The magnitude and egregiousness of MiMedx's fraudulent revenue violations demonstrates Cherry Bekaert failed in its professional obligations to audit the Company's financial statements. For example,

---

[264] As discussed above, MiMedx's 2016 Form 10-K did disclose its ICFR were ineffective due to a material weakness in income tax accounting. However, the Company did not disclose any additional material weaknesses in its accounting for revenue or its ineffective control environment. Similarly, Cherry Bekaert only issued its adverse audit opinion on the Company's ICFR due to the material weakness in income tax accounting.

MiMedx has now admitted it must go back and reassess the revenue recognition for *all* the Company's sales during the Restatement period (*i.e.* 1Q12 through 3Q17). As discussed in Section IX.B, MiMedx was blatantly violating basic revenue recognition rules through its fraudulent accounting, sales, and distribution practices with the Company's key distributors to prematurely recognize revenue. As discussed below, auditing standards required Cherry Bekaert to substantively test MiMedx's revenues especially given the fraud risk factors associated with revenue recognition. Given the egregious nature of MiMedx's revenue violations, which required no judgment to understand their impropriety, Cherry Bekaert failed in its professional obligations and defrauded investors.

452. One of the distributors with which improper revenue recognition occurred was AvKARE. Cherry Bekaert knew that MiMedx sales to AvKARE were material as AvKARE was MiMedx's largest customer for the years ended December 31, 2015, 2014, 2013, and 2012 at approximately 24%, 34%, 56%, and 40%, respectively, of MiMedx's total revenue. In addition, AvKARE represented approximately 53%, 55%, 33%, and 29%, respectively, of MiMedx's total accounts receivable for the years ended December 31, 2015, 2014, 2013, and 2012.

453. Such a significant customer would have required Cherry Bekaert to understand MiMedx's revenue recognition policy with AvKARE and substantively

test that the Company's sales with AvKARE were being recorded consistent with the contract terms and appropriately under GAAP. Yet, Cherry Bekaert failed in its audits of MiMedx to appropriately test the Company's revenue recognition policies and procedures (including AvKARE) and associated internal controls. As discussed in detail below, if performed, basic audit procedures over MiMedx's quarter-end sales would have raised significant red flags that the Company was prematurely recognizing revenue in violation of GAAP. Also, despite red flags of channel stuffing, including allegations set forth in whistleblower complaints, short seller reports and government investigations, Cherry Bekaert blessed the Company's financial results, lending a false credibility to MiMedx management's rebuttal of these channel stuffing allegations. Cherry Bekaert's disregard of its professional standards has now been exposed through the Restatement impacting at least 13 different financial accounts and the fact MiMedx has to reassess its revenue recognition on all sales recorded since 2012.

454.   In addition, Cherry Bekaert knew, or should have known, from reviewing the AvKARE contract and its related amendments that the contract called for AvKARE to pay on orders within 45 days from the date of invoice or receipt of goods, whichever is later.[265] However, a DSO calculation based on AvKARE's actual sales and accounts receivable for 2012 through 2015 would have showed drastically higher

---

[265] April 19, 2012 AvKARE, Inc. Product Distribution Agreement.

DSO numbers than 45 days.  For example, even as reported by the Company (but misstated as detailed above), AvKARE's DSO numbers for 2012, 2013, 2014, and 2015 were approximately 137, 97, 80, and 125, respectively.  This should have raised a significant red flag to Cherry Bekaert in regards to the AvKARE contract and whether or not MiMedx was entering into sales concessions with AvKARE (*i.e.* "implicit arrangements") outside the terms of the contract and inappropriately recognizing revenue.  As disclosed by MiMedx, a major reason for the Company's need to restate its financial statements is due to false revenue recognition on sales and distribution practices with distributors where certain implicit arrangements modified the explicit terms of the contracts.

455.   PCAOB standards required Cherry Bekaert to obtain sufficient competent evidential matter through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit.  AU §150.02.  Further, PCAOB standards required Cherry Bekaert to exercise "[d]ue professional care," which "requires the auditor to exercise professional skepticism" – "an attitude that includes a questioning mind and a critical assessment of audit evidence."  AU §§230.07, 316.13.  Importantly, in exercising professional skepticism, the auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest.  AU §230.09.

456.   Further, PCAOB standards specifically identify one area where the risk of material misstatement due to fraudulent financial reporting should be presumed by auditors, like Cherry Bekaert, for all audits.  That area is revenue recognition.  AS 12.68.  As management is in a unique position to perpetrate fraud, PCAOB standards required Cherry Bekaert to expand the scope of its audit procedures to specifically address key fraud risks including revenue recognition.  For example, a former Director of PCAOB Enforcement and Investigations noted, "[r]evenue often is a key metric for public company investors and is a financial reporting area prone to manipulation by management."[266]  Cherry Bekaert either failed to identify the risk of improper revenue recognition in planning its audit or failed to perform required auditing procedures to address the risk.  Some of the audit procedures Cherry Bekaert should have considered related to the risk of improper revenue recognition included:

- Performing substantive analytical procedures relating to revenue using disaggregated data, for example, comparing revenue reported by month and by product line or business segment during the current reporting period with comparable prior periods. Computer-assisted audit techniques may be useful in identifying unusual or unexpected revenue relationships or transactions.

- Confirming with customers certain relevant contract terms and the absence of side agreements, because the appropriate accounting

---

[266] PCAOB Announces Settled Disciplinary Action Against PricewaterhouseCoopers LLP Partner for Audit Failures (July 7, 2014), https://pcaobus.org/News/Releases/Pages/07072014_Stone.aspx.

often is influenced by such terms or agreements.  For example, acceptance criteria, delivery and payment terms, the absence of future or continuing vendor obligations, the right to return the product, guaranteed resale amounts, and cancellation or refund provisions often are relevant in such circumstances.

- Inquiring of the entity's sales and marketing personnel or in-house legal counsel regarding sales or shipments near the end of the period and their knowledge of any unusual terms or conditions associated with these transactions.

- Being physically present at one or more locations at period end to observe goods being shipped or being readied for shipment (or returns waiting processing) and performing other appropriate sales and inventory cutoff procedures.

AU §316.54 (footnote omitted).

457.    Cherry Bekaert could not have reasonably performed all of these revenue recognition procedures or it would have uncovered MiMedx's fraudulent revenue violations.    Indeed, performing *any* of the above procedures should have raised significant red flags for Cherry Bekaert that MiMedx was fraudulently recognizing revenues.    A well-known fraud risk is that companies will engage in unusual transactions at quarter ends in order to achieve earnings targets.   AU §316.85.A.2. Here, MiMedx manipulated end-of-quarter sales terms and inappropriately recognized revenue for years, while Cherry Bekaert continued to issue clean bills of health on the Company's financial results.    The egregious nature of the Company's basic revenue recognition violations, over an extreme length of time, makes it a virtual certainty that

Cherry Bekaert could not have performed all of the above procedures or was complicit in the fraudulent revenue practices of the Company. For example, due to a heightened risk of fraud, many of these auditing procedures are geared towards ensuring that sales near the end of a reporting period (*i.e.*, sales cutoff procedures) are tested for appropriate revenue recognition, including the review for unusual terms or conditions that would prohibit recognizing the revenue.

458. The allegations detailed herein make it a virtual certainty Cherry Bekaert could not have complied with PCAOB standards in testing MiMedx's quarter-end sales. For example, the simple audit procedure of sending sales and accounts receivable confirmations to MiMedx's main distributors to identify potential side agreements or analyzing revenues for these distributors by month to identify any potential quarter-end spikes in sales should have alerted Cherry Bekaert to significant red flags in MiMedx's accounting. The fact that EY found the Company's internal controls to be non-existent, coupled with the Company's admission that it must conduct an assessment of revenue recognition for all of the Company's sales during the period Cherry Bekaert audited the Company, evidences that Cherry Bekaert failed in its duties as an auditor under PCAOB standards.

459. Similarly, Cherry Bekaert also was required under PCAOB standards to evaluate the business rationale for any significant unusual transactions. For example,

when MiMedx was entering into sales with distributors where the implicit arrangements modified the explicit terms of the contracts (*e.g.*, side agreements, consignment sales, additional performance obligations, rights of return, and sales outside normal course of business), Cherry Bekaert was required to gain an understanding of the business rationale for such transactions and whether that rationale (or the lack thereof) suggests that the transactions may have been entered into to engage in fraudulent financial reporting or conceal misappropriation of assets. AU §316.66.

460.   PCAOB standards further provide that in evaluating the business rationale for significant, unusual transactions, "[t]he auditor should consider [among other things] . . . [w]hether management is placing more emphasis on the need for a particular accounting treatment than on the underlying economics of the transaction" and "[w]hether the transactions involve previously unidentified related parties or parties that do not have the substance or the financial strength to support the transaction without assistance from the entity under audit." AU §316.67. This guidance was pertinent for MiMedx's fraudulent channel stuffing sales made to distributors essentially under their control (*i.e.*, undisclosed related parties) to facilitate meeting or exceeding revenue guidance in all but one quarter of the nearly six years covered by the Restatement.

461.   Cherry Bekaert was also required to obtain more evidence to support its audit when the risk of material misstatement increased as it would have with MiMedx's growing revenues over the Class Period.  For example, AS 15, *Audit Evidence*, states that the quantity of audit evidence needed is affected by the risk of material misstatement:

> The quantity of audit evidence needed is affected by the following: ***Risk of material misstatement (in the audit of financial statements) or the risk associated with the control (in the audit of internal control over financial reporting)***. As the ***risk increases***, the amount of evidence that the auditor should obtain ***also increases***. For example, ordinarily ***more evidence*** is needed to respond to significant risks.

462.   Further, as discussed above, PCAOB standards expressly note that auditors should not be satisfied with less than persuasive evidence because of a belief that management is honest. Cherry Bekaert was required to obtain more persuasive evidence in areas of heightened risk.  AS 13.9.  Importantly, this meant Cherry Bekaert was precluded from using management representations as a substitute for the application of other audit procedures necessary to afford a reasonable basis for an opinion regarding MiMedx's financial statements and ICFR.  AU §333.02.  And if a management representation is contradicted by other audit evidence, the auditor should investigate the circumstance and consider the reliability of the representation made. AU §333.04.  In this regard, Cherry Bekaert was required to take into account all relevant audit evidence, regardless of whether it appears to corroborate or contradict

the assertions in MiMedx's financial statements. AS 14.03. For example, Cherry Bekaert violated PCAOB standards by failing to reconcile MiMedx's public representations that it was recognizing revenue appropriately under the terms of its distributors contracts with the fact that these distributors had side arrangements outside the terms of their contract and were paying significantly later than called for in the contracts.

463. Further, as evidenced by the basic revenue recognition violations admitted to by MiMedx as part of the announced Restatement and the detailed allegations herein, Cherry Bekaert failed to obtain the appropriate evidential matter in support of its opinions, in part, due to at least the following audit failures:

- failing to appropriately test MiMedx's revenue recognition policies and procedures and associated internal controls, over which MiMedx's current auditor (EY) recently resigned, in part because, the necessary internal controls for MiMedx to develop reliable financial statements didn't exist;

- failing to modify and/or increase the nature, timing, and extent of their testing over the risk of improper revenue recognition, including substantive quarter-end sales cutoff testing, in order to obtain reasonable assurance that MiMedx's financial statements were not materially misstated and prepared in accordance with GAAP; and

- failing to apply the requisite professional skepticism and due professional care to management's representations regarding its revenue recognition policies with its distributors, including AvKARE, CPM, and SLR.

- 272 -

464.   In addition, PCAOB standards require auditors to exercise heightened scrutiny when encountering and testing related party transactions.  As discussed in Section IV, sales made by MiMedx to certain distributors that were effectively under their control (AvKARE, CPM, and SLR) qualified as related parties and, as a result, the sales were susceptible to fraud and inappropriate manipulation.  AU §§334.07, 334.09, *Related Parties* ("AU 334") states:

> The auditor should place emphasis on testing material transactions with parties he knows are related to the reporting entity . . . apply the procedures [the auditor] considers necessary to obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements.

465.   In June 2014, the PCAOB issued Auditing Standard No. 18 *Related Parties* ("AS 18") to replace AU 334 because the PCAOB's oversight activities at the time were indicating continuing weaknesses in auditors' scrutiny of related party transactions.[267]  Like AU 334, AS 18 again warned auditors of the risks of related party transactions, including that "such transactions potentially provide more of an opportunity for management to act in its own interests, rather than in the interests of the Company and its investors."[268]  Further, AS 18 reiterated that "the objective of the auditor is to obtain sufficient appropriate audit evidence to determine whether related

---

[267] PCAOB Release No. 2014-002, at 2.

[268] PCAOB Release No. 2014-002, at 4.

parties and relationships and transactions with related parties have been properly identified, accounted for, and disclosed in the financial statements."  AS 18.2.

466.   Despite these professional standards requiring Cherry Bekaert to place extra emphasis on material transactions with related parties, including whether such transactions have been properly accounted for, Cherry Bekaert still offered its approval for sales with related parties that violated basic revenue recognition principles.  These related party distributors did not have the "substance or financial strength" to complete and pay for the sale until the product was ultimately sold through to the patient and, therefore, title and risk of loss had not transferred to the distributor at the time revenue was inappropriately recognized.  AU §316.67.

467.   Cherry Bekaert was required to also comply with AU §317, *Illegal Acts by Clients*, during the Class Period.  In this regard, Cherry Bekaert was aware of two former MiMedx employees, Kruchoski and Tornquist, filing a whistleblower complaint on December 15, 2016 alleging fraudulent revenue recognition practices through a channel stuffing scheme.[269]  As a result, AU §317 required Cherry Bekaert to "obtain an understanding of the nature of the act, the circumstances in which it occurred, and sufficient other information to evaluate the effect on the financial

---

[269] *See generally Kruchoski/Tornquist* Complaint.

statements." AU §317.10.   In addition, AU §317.11 identifies additional audit

procedures that may be necessary to determine if a potential illegal act has occurred:

- examine supporting documents, such as invoices, canceled checks, and agreements and compare with accounting records;

- confirm significant information concerning the matter with the other party to the transaction or with intermediaries, such as banks or lawyers;

- determine whether the transaction has been properly authorized; and

- consider whether other similar transactions or events may have occurred, and apply procedures to identify them.

468.   Cherry Bekaert failed to comply with the auditing requirements of AU

§317 by either failing to identify the events detailed in the whistleblower complaints

as a potential illegal act that could materially impact MiMedx's financial reporting or

failing to adequately perform the required auditing procedures for a potential illegal

act to appropriately determine that MiMedx's financial statements were not materially

misstated.  Notably, MiMedx, in less than two weeks' time, on December 27, 2016,

announced preliminary investigation findings by the Company's Audit Committee, in

conjunction with its auditor Cherry Bekaert, that it had found no credible evidence

implicating the Company's previously issued financial statements.  Cherry Bekaert

knew, or was reckless in not knowing, as an auditor of public companies, that an

appropriate, comprehensive investigation on broad allegations concerning improper

- 275 -

revenue recognition could not reach an affirmative conclusion is less than two weeks' time.  As discussed above, the quick exoneration of the Company's revenue practices was hardly a surprise and should have been a red flag to Cherry Bekaert given the conflicts of interest with the law firm conducting the investigation (Troutman, MiMedx's corporate counsel).  In fact, a whitepaper authored in 2013 by EY and Squire Sanders LLP recognizes that "issues are present when using the company's regular outside counsel with strong ties to management."[270]  The publication further opines that, as a general rule, the use of independent outside counsel with no (or non-material) prior relationships with the company or its management is indicated when:

- the allegations under investigation involve serious misconduct or the conduct of senior officers;

- the impact upon the company is potentially damaging;

- the accuracy of the company's financial statements is implicated, particularly if a restatement is possible;

- regulators or prosecutors may be asked to rely upon the investigation;

- the investigation is triggered at the request of external auditors' action pursuant to Section 10A; or

---

[270] Joseph Walker, Frank M. Placenti & Gabriel Colwell, *The Audit Committee's Evolving Role In Overseeing Corporate Investigations*, SQUIRE PATTON BOGGS (Sept. 2013) https://www.squirepattonboggs.com/en/insights/publications/2013/09/the-audit-committees-evolving-role-in-overseeing.

- use of the company's in-house investigatory resources is otherwise inappropriate due to the nature of the matter being investigated.

469.   Despite a number of the above items being present, Cherry Bekaert ignored this guidance and the alarming red flag that MiMedx's regular corporate counsel was conducting the investigation. By failing to raise concerns about Troutman's independence to appropriately conduct the investigation, Cherry Bekaert was complicit in Defendants' fraudulent rebuttal of these allegations.  Ultimately, and unsurprisingly, the white-washed investigation falsely found no credible evidence that MiMedx's prior financial reporting was incorrect in any respect.  Correspondingly, Cherry Bekaert agreed with the Company's conclusions and ultimately issued a clean audit opinion on the Company's false financial statements included in its 2016 Form 10-K.

470.   The audit failures of Cherry Bekaert concerning MiMedx audits are also supported by the PCAOB's inspection process of Cherry Bekaert, which identified deficiencies in Cherry Bekaert's audits of public registrants during the Class Period. For example, the PCAOB's "Report on 2015 Inspection of Cherry Bekaert LLP" issued on September 29, 2016 ("2015 PCAOB Report")[271] found audit deficiencies in

---

[271] *Available at* https://pcaobus.org/Inspections/Reports/Documents/104-2016-183-Cherry-Bekaert.pdf.

Cherry Bekaert's audit procedures over "revenue recognition" and "revenue allowances." 2015 PCAOB Report at 5.  Specifically, the PCAOB found that Cherry Bekaert failed "to perform sufficient procedures to identify and test the design and operating effectiveness of controls over revenue recognition" and failed "to perform sufficient procedures to test revenue allowances." *Id.*  This warning from the PCAOB put Cherry Bekaert on notice for future audits, including any audits of MiMedx, that it needed to improve its audit procedures over revenue recognition and related sales allowances to ensure being in compliance with PCAOB standards.

471.   However, Cherry Bekaert did not heed the PCAOB's warnings because similar audit deficiencies were found in the PCAOB's "Report on 2017 Inspection of Cherry Bekaert LLP," issued on July 26, 2018 ("2017 PCAOB Report").[272]   The PCAOB found that Cherry Bekaert failed to perform sufficient audit procedures and thus failed to gain sufficient competent evidence to support its unqualified opinions. *See* 2017 PCAOB Report at 4.  Similar to some of the deficiencies found in the 2015 PCAOB Report, the audit failures included a failure to perform sufficient procedures over sales, sales-related estimates, accounts receivable, and the evaluation of the

---

[272] *Available at* https://pcaobus.org/Inspections/Reports/Documents/104-2018-114-Cherry-Bekaert-LLP.pdf.

severity of a control deficiency for a sales-related estimate, along with other items. *See id.* at 5.

472.   As part of the 2017 inspection, the PCAOB reviewed the audits of five Cherry Bekaert clients and noted significant audit deficiencies with four of those five clients.   2017 PCAOB Report 3-6.   Specifically, "Issuer B" identified in the 2017 PCAOB Report included the following audit deficiencies:

- "the failure, in an audit of ICFR, to perform sufficient procedures to test the design and operating effectiveness of controls over the occurrence, completeness, and valuation of sales and sales-related estimates (AS 2201.39, .42, .44, and .B9);

- the failure, in an audit of ICFR, to perform sufficient procedures to identify and test the design and operating effectiveness of controls over the existence and valuation of accounts receivable (AS 2201.39, .42, and .44);

- the failure, in an audit of ICFR, to perform sufficient procedures to evaluate the severity of a control deficiency related to a sales-related estimate (AS 2201.62-.63);

- the failure, in an audit of ICFR, to perform sufficient procedures to test the design and operating effectiveness of controls over the valuation of certain assets acquired and liabilities assumed, and controls over purchase consideration related to a business combination transaction (AS 2201.39, .42, and .44); and

- the failure to perform sufficient procedures to test the valuation of certain assets acquired and purchase consideration recorded related to a business combination transaction, including the failure to test the accuracy and completeness of issuer-provided data used by an issuer-engaged specialist (AS 1210.12; AS 2502.05, .26, and .28; AS 2810.03)."

473.   These above deficiencies identified by the PCAOB on Issuer B support that Issuer B was Cherry Bekaert's 2016 audit of MiMedx.  The PCAOB found issues with Cherry Bekaert's audit of Issuer B in the areas of reviewing the work of a specialist and failing to perform sufficient procedures over the valuation of assets and liabilities in a business combination.  *See* 2017 PCAOB Report at 5, A-1 and A-8.

474.   In addition, as noted above, the PCAOB found issues with Cherry Bekaert's audit of Issuer B over sales, sales-related estimates, and accounts receivable. In fact, the PCAOB noted that the deficiencies found in one of the five audits it examined was so significant that the issuer ***announced an intention to restate*** and ***report material weaknesses in ICFR***.  *See* 2017 PCAOB Report at 3 ("The inspection team identified matters that it considered to be deficiencies in the performance of the work it reviewed.  One of the deficiencies relates to auditing an aspect of an issuer's financial statements that the issuer announced an intention to restate and report a material weakness in ICFR after the primary inspection procedures were conducted from August 14, 2017 to August 17, 2017.").

475.   Moreover, the timing of the PCAOB's 2017 inspection of Cherry Bekaert, which started in August 2017 and concluded with a final report in July 2018, lines up with MiMedx's Restatement announcement made in June 2018.  For example, the PCAOB started their inspection of Cherry Bekaert in August 2017, and then

Cherry Bekaert received a draft report from the PCAOB in May 2018.[273]  2017 PCAOB Report at 13-14.  Then, MiMedx announced an intention to restate and report material weaknesses in ICFR in June 2018 and a month later in July 2018 the PCAOB issued its final report on Cherry Bekaert.  Notably, the Restatement announced by MiMedx in June 2018 was due primarily to improper revenue recognition, which lines up with the PCAOB's audit deficiencies found with Issuer B in the areas of sales, sales-related estimates and accounts receivable.  Further, Cherry Bekaert only had 35 public clients at the time of the PCAOB's inspection in August 2017 making it unlikely a large number of its clients publicly announced the need to restate historical financial statements because of improper revenue recognition between August 2017 and July 2018.  Notably, Viceroy issued a research report in December 2018 where it referred to the 2017 PCAOB Report of Cherry Bekaert as "scathing" and made reference to Cherry Bekaert's audits of MiMedx, including the question of how Cherry Bekaert was able to audit MiMedx's financials when EY recently quit on the basis that MiMedx's internal controls "do not exist."[274]

---

[273] The May 2018 draft report to Cherry Bekaert is non-public.

[274] Viceroy Research Group, *Ebix – Goodwill Hunting* (Dec. 11, 2018), https://viceroyresearch.files.wordpress.com/2018/12/ebix-12-11-2018.pdf.

## B.  Cherry Bekaert's Failure to Comply with PCAOB Standards Over MiMedx's ICFR

476.  Cherry Bekaert also failed to adequately comply with PCAOB standards when auditing MiMedx's ICFR.  Despite Cherry Bekaert's Audit Report(s) assertion(s) that MiMedx's ICFR were effective, the truth was the Company had material weaknesses due to its false financial statements that were orchestrated by a complete absence of internal controls over the revenue recognition area and an ineffective control environment, including an inadequate tone at the top.  Cherry Bekaert was required to follow PCAOB AS 5 when performing its audits on MiMedx's ICFR.  Under AS 5, Cherry Bekaert was required to audit MiMedx's assessment of its internal controls and also independently reach its own conclusion about the effectiveness of MiMedx's internal controls.  AS 5.1 and 5.3.  AS 5 further describes specific procedures an auditor must perform over a company's control environment due to the control environment's significance in maintaining effective internal controls:[275]

> Because of its importance to effective internal control over financial reporting, the auditor must evaluate the control environment at the company.  As part of evaluating the control environment, the auditor should assess –

---

[275] The critical importance of a company's control environment and its tone at the top to establishing effective internal controls is further discussed in Section IX.F above.

- Whether management's philosophy and operating style promote effective internal control over financial reporting;

- Whether sound integrity and ethical values, particularly of top management, are developed and understood; and

- Whether the Board or audit committee understands and exercises oversight responsibility over financial reporting and internal control.

AS 5.25.

477.   Under AS 5, "if one or more material weaknesses exist, a company's internal control over financial reporting cannot be considered effective."  AS 5.2.

Indicators of material weaknesses in a company's ICFR include the following:

- Identification of fraud, whether or not material, on the part of senior management;

- Restatement of previously issued financial statements to reflect the correction of a material misstatement;

- Identification by the auditor of a material misstatement of financial statements in the current period in circumstances that indicate that the misstatement would not have been detected by the company's internal control over financial reporting; and

- Ineffective oversight of the company's external financial reporting and internal control over financial reporting by the company's audit committee.

AS 5.69.

478.   MiMedx's ICFR was ineffective because its control environment was virtually non-existent as the Company's leadership was solely focused on maximizing

- 283 -

sales and not on ensuring compliance with GAAP.  The Company's CEO, CFO, COO, and Corporate Controller/Treasurer have all now been fired "for cause" for conduct detrimental to the Company.[276]  Despite being MiMedx's auditor since 2008, Cherry Bekaert failed to identify that the Company's control environment and its tone at the top were ineffective and allowed MiMedx to materially overstate financial results for over a five-year period.  Had Cherry Bekaert performed a proper evaluation of MiMedx's ICFR, it would have uncovered that MiMedx's control environment was overly driven by generating sales, resulting in senior management's lack of significant appreciation for ICFR and accounting rules governing revenue recognition.

479.    The recent resignation of MiMedx's independent auditor, EY, on December 4, 2018, further demonstrates Cherry Bekaert's failure to follow PCAOB standards in conducting its audits over MiMedx's ICFR from FY12 through FY16.  For example, while EY was engaged as MiMedx's auditor, it advised the Company that the internal controls necessary for the Company to develop reliable financial statements *did not exist*.  Further, MiMedx has now admitted it must go back and reassess the revenue recognition for *all of the Company's sales* as part of the announced Restatement.  These shocking admissions by the Company go to the heart

---

[276] The September 20, 2018 Form 8-K at Exhibit 99.1 stated MiMedx's Board and Compensation Committee found that the four separate employees engaged in, among other things, "conduct detrimental to the business or reputation of the Company."

of Cherry Bekaert's audit opinions issued during the Class Period that MiMedx was maintaining effective internal controls and recognizing revenue appropriately as nothing short of a joke.  They demonstrate that Cherry Bekaert's audit process amounted to no audit at all, and that Cherry Bekaert simply approved or recklessly disregarded the internal control failures and GAAP violations of a client that was too valuable to lose until MiMedx ultimately fired them.  Consequently, Cherry Bekaert failed to conduct its audits in accordance with PCAOB standards.

### C.   Cherry Bekaert's False and Misleading Statements

480.   Cherry Bekaert's clean audit opinions certifying the accuracy of MiMedx's financial statements and effectiveness of the Company's ICFR were false for fiscal years 2013-2016.  However, as herein specified and in accordance with 28 U.S.C. §1658, Cherry Bekaert is liable to Lead Plaintiff and the Class for those opinions it issued for fiscal years 2013-2016.  As discussed above, MiMedx has admitted that all of these Cherry Bekaert-approved financial statements and effective internal controls cannot be relied upon and must be restated.

481.   As a result, the Audit Reports issued by Cherry Bekaert and included in MiMedx's Forms 10-K for fiscal years 2013-2015 contained the following virtually identical materially false and misleading statements:

- In our opinion, the financial statements referred to above ***present fairly, in all material respects, the consolidated financial***

*position of MiMedx Group, Inc. and subsidiaries as of December 31 [of the audited fiscal year* and the previous fiscal year]*, and the consolidated results of their operations and their cash flows for each of the years in the three-year period ended December 31 [of the audited fiscal year], in conformity with accounting principles generally accepted in the United States of America*. Also in our opinion, the related consolidated financial statement schedule for each of the three years in the period ended December 31 [of the audited fiscal year], when considered in relation to the basic consolidated financial statements taken as a whole, *presents fairly, in all material respects*, the information set forth therein.

- We also have audited, *in accordance with the standards of the Public Company Accounting Oversight Board* (United States of America), MiMedx Group, Inc.'s internal control over financial reporting as of December 31 [of the audited fiscal year], based on criteria established in *Internal Control—Integrated Framework* (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report [date of the report] *expressed an unqualified opinion*.

- In our opinion, MiMedx Group, Inc. *maintained, in all material respects, effective internal control over financial reporting as of December 31 [of the audited fiscal year]*, based on criteria established in Internal Control—Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

- We have also audited, *in accordance with the standards of the Public Company Accounting Oversight Board* (United States of America), the consolidated balance sheets of MiMedx Group, Inc. and subsidiaries as of December 31 [of the audited fiscal year and the previous fiscal year], and the related consolidated statements of operations, stockholders' equity, and cash flows for the [audited fiscal year and the two previous fiscal years], and our report [date of the report] *expressed an unqualified opinion*.

- ***We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).***

482.   Cherry Bekaert also made the following false statement included in the

Company's 2013 Form 10-K as Exhibit 23.1 issued on March 4, 2014:

- We hereby consent to the incorporation by reference in the Registration Statements (Form S-8 Nos. 333-153255, 333-183991, and 333-189784, and Form S-3 No. 333-189785) of our reports dated March 4, 2014, included in this Annual Report on Form 10-K of MiMedx Group, Inc. and Subsidiaries (the Company) relating to the consolidated balance sheets of the Company as of December 31, 2013 and 2012, and the related consolidated statements of operations, stockholders' equity, and cash flows and the related consolidated financial statement schedule for each of the three years in the period ended December 31, 2013, and the ***effectiveness*** of internal control over financial reporting for the Company as of December 31, 2013.

483.   Cherry Bekaert also made the following false statements included in the

Company's 2016 Form 10-K issued on March 1, 2017:

- In our opinion, the consolidated financial statements referred to above ***present fairly, in all material respects, the consolidated financial position of MiMedx Group, Inc. and subsidiaries as of December 31, 2016 and 2015, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2016, in conformity with accounting principles generally accepted in the United States of America***. Also, in our opinion, the related consolidated financial statement schedule for each of the three years in the period ended December 31, 2016, when considered in relation to the basic consolidated financial statements taken as a whole, ***presents fairly, in all material respects***, the information set forth therein.

- 287 -

- We also have audited, ***in accordance with the standards of the Public Company Accounting Oversight Board*** (United States), MiMedx Group, Inc.'s internal control over financial reporting as of December 31, 2016, based on criteria established in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated March 1, 2017 expressed an adverse opinion.

- A material weakness is a control deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. ***The following material weakness has been identified and included in management's assessment***. Management has identified a material weakness in the design of the Company's controls over the tax accounting related to an overstatement of an excess tax benefit which if undetected would have resulted in an understatement of income taxes payable. Specifically, management did not have adequate supervision and review of certain technical tax accounting performed by a third party tax specialist in 2016. ***This material weakness was considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2016 financial statements, and this report does not affect our report dated March 1, 2017, on those financial statements***.  In our opinion, because of the effect of the material weakness described above on the achievement of the objectives of the control criteria, MiMedx Group, Inc. has not maintained effective internal control over financial reporting as of December 31, 2016, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

- We have also audited, ***in accordance with the standards of the Public Company Accounting Oversight Board*** (United States), the consolidated balance sheets and the related consolidated statements of operations, stockholders' equity, and cash flows of

MiMedx Group, Inc., and our report dated March 1, 2017, *expressed an unqualified opinion*.

- *We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).*

484.    These statements were materially false and misleading and omitted material facts for the reasons discussed above, including:

(a)    MiMedx's financial statements did not "present fairly, in all material respects, the consolidated financial position of MiMedx . . . and the consolidated results of their operations and their cash flows" and were not prepared in conformity with GAAP due to material misstatements of at least the following financial accounts: sales, cost of sales, gross margin, operating income, income before taxes, income taxes, net income, EPS, adjusted EBITDA, accounts receivable and related reserves, returns allowances, inventories, and other financial items in particular periods;

(b)    MiMedx did not maintain effective ICFR in all material respects for fiscal years 2013-2016, and MiMedx's material weaknesses in ICFR for FY16 were not limited to the design of the Company's controls over the tax accounting related to an overstatement of an excess tax benefit; and

- 289 -

(c)     Cherry Bekaert did not conduct its 2013, 2014, 2015, and 2016 audits of MiMedx's financial statements and ICFR in accordance with the standards of the PCAOB and falsely expressed unqualified audit opinions.

### D.     Cherry Bekaert Acted with Scienter

485.    As described above, Cherry Bekaert acted knowingly, or at the very least recklessly, in providing unqualified audit opinions that: (a) the financial statements contained in MiMedx's annual reports on Forms 10-K for fiscal years 2013 through 2016 presented fairly, in all material respects, the financial position and results of MiMedx's operations; and (b) MiMedx maintained, in all material respects, effective internal controls for fiscal years 2013 through 2016.  Cherry Bekaert also acted with knowledge of, or reckless disregard as to, MiMedx's true financial condition when it chose to violate PCAOB standards and not expand the scope of its audits during the Class Period.  Cherry Bekaert knew, or recklessly disregarded, the fact, that investors would rely on its audit opinions and the effectiveness of the Company's internal controls when deciding whether or not to invest in the Company, but provided its false unqualified audit opinions anyway.

486.    Events taking place after MiMedx removed Cherry Bekaert as its auditor confirm that innumerable red flags should have put Cherry Bekaert on notice of Defendants false and misleading financial statements.  First, the sheer magnitude of

the Company's intended restatement – covering five years of financial statements and at least 13 impacted accounts – suggests that any qualified auditor adhering to PCAOB standards would have detected Defendants' fraud or *at a minimum* expanded its audits. Cherry Bekaert's successor, EY, was only engaged as MiMedx's auditor for a relatively brief time (August 2017 to December 2018) before it advised the Company that the internal controls necessary for the Company to develop reliable financial statements *do not exist* at MiMedx. EY also advised the Company during its brief engagement that it needed "to significantly expand the scope of its audit." If EY could come to these damning conclusions during an engagement of approximately a year and a half, it strains credulity to imagine Cherry Bekaert did not know or reasonably suspect the same during the *five years* of audits it performed during the Class Period.

487. Second, MiMedx had two primary commercial products: EpiFix, the primary product in MiMedx's "Wound Care" segment, and AmnioFix, the primary product in MiMedx's "SSO" segment. Throughout the Class Period, Wound Care represented 55-75% of MiMedx's total revenue, while SSO represented 20-25% of total revenue. Because these were MiMedx's *only* significant products, Cherry Bekaert's audit responsibilities would necessarily entail a detailed examination of how revenues (both past and future) from these products were generated and the ICFR that

MiMedx had in place to track those revenues.  Similarly, MiMedx had only a few major customers during the Class Period.  Revenues from AvKARE represented 40%, 56%, 34%, and 24%, in 2012, 2013, 2014, and 2015 respectively.  Similarly, AvKARE represented 29%, 33%, 55%, and 53% of MiMedx's total accounts receivable in 2012, 2013, 2014, and 2015, respectively. CPM and SLR were each MiMedx's largest commercial distributor at different points during the Class Period. These customers were so significant to MiMedx's revenues that they should have been given particular scrutiny, including confirmation of their accounts receivable and sales during Cherry Bekaert's audits.  Cherry Bekaert was either reckless in **not** collecting evidence of sales and receivables from these entities, or did so, and would undeniably have been put on notice of Defendants' misdoings.

488.   For example, had Cherry Bekaert performed a simple DSO calculation based on that information, it would have discovered that AvKARE's DSO numbers for the Non-Reliance time periods were between two and three times as high as provided in the parties' contract.  Either MiMedx did not perform these basic analyses, in which case it was reckless as to the validity of its stated audit opinions and obligations under the PCAOB, or it **did** perform the analyses, and knew that something was amiss with MiMedx's statements concerning its relationship with, and revenue from, AvKARE.

489.   Similarly, had Cherry Bekaert performed any analyses of CPM and SLR, it would have discovered their extensive reliance on PODs such as Fuse.  At the very least, it should have conducted an investigation into CPM during the course of its 2015 audit, as in October 2015, MiMedx suddenly and suspiciously announced that it would no longer be selling to CPM, one of its two largest customers.  As PODs were a well-known cause for scrutiny in light of regulator concerns over illegal kickbacks to physicians, Cherry Bekaert was required to pay particular attention to POD transactions and understand the risks to MiMedx's industry and business in planning its audits.  This was particularly true as Defendants insisted that MiMedx did not sell to or through PODs, including in the very financial statements Cherry Bekaert was purportedly auditing.  At a minimum, Cherry Bekaert was severely reckless in not knowing that these statements were false.

490.   Third, MiMedx's dramatic growth from the very start of the Class Period would have raised red flags for any competent auditor.  MiMedx's annual revenues increased exponentially over the Class Period, including over 300% from 2012 to 2014 alone.  Revenue recognition is specifically identified under PCAOB standards as an area where the risk of material misstatement due to fraudulent financial reporting should be presumed by auditors, and subject to expanded audit procedures.

491.   Fourth, PCAOB standards required Cherry Bekaert to obtain competent evidential matter through inspection, observation, inquiries, and confirmations to afford a reasonable basis for its audit opinion of MiMedx.  Had Cherry Bekaert done so, by requesting sales order and accounts receivable confirmations and verifying consignment arrangements with the VAs, conducting standard revenue analyses, inquiring about MiMedx's fortuitous ability to **meet** or **just** beat its revenue targets nearly every quarter, or being physically present at one or more of MiMedx's distribution locations, it would undeniably have known about MiMedx's improper revenue recognition and channel stuffing.  If it did not perform these standard auditing steps, it was at a minimum severely reckless in issuing its unqualified audit opinions of MiMedx.

492.   Fifth, compliance with PCAOB standards required Cherry Bekaert to view MiMedx's related party transactions with heightened scrutiny, as they are particularly susceptible to fraud.  MiMedx's primary distributors during the Class Period, AvKARE, CPM, and SLR were **all** related parties, and as such the Company's sales to those entities should have been highly scrutinized.  As these entities were critically important to MiMedx's revenue, Cherry Bekaert was either reckless in not investigating whether the entities were "related parties," and simply taking Company

- 294 -

management's representations at face value, or it knew that they were related parties and that MiMedx's public statements to the contrary were false.

493.   Sixth, Cherry Bekaert was aware since at least 2014 of allegations that MiMedx was engaged in unlawful sales practices, including illegal kickbacks to medical providers, because MiMedx was sued in a *qui tam* complaint by an executive of MiMedx competitor Organogenesis and received a civil subpoena from the HHS-OIG in connection "with a civil investigation into matters primarily related to the Company's sales and marketing activities."

494.   Seventh, when Kruchoski and Tornquist filed their whistleblower action against MiMedx on December 15, 2016 alleging that MiMedx had fraudulently recognized revenue and engaged in channel stuffing, MiMedx announced the Audit Committee's "preliminary investigation" into the allegations had found no credible evidence in *less than two weeks*.  Cherry Bekaert, as the Company's long-standing auditor, should have known that a reasonable investigation into possible financial fraud could not have been concluded, even preliminarily, in such a short amount of time.  Indeed, under new leadership, the Company announced that its investigation into the very same channel-stuffing and accounting fraud allegations would require it to examine *every sale* completed during the five-year Non-Reliance period.  That investigation has gone on for more than a year to date with no end in sight,

- 295 -

demonstrating that Cherry Bekaert knew of, or was reckless to the potential for, fraud at MiMedx when it issued its clean audit opinion in MiMedx's 2016 Form 10-K just a few months later.

495.   Finally, Cherry Bekaert's scienter is also suggested by its history of inadequate audits of public registrants during the Class Period.  Deficiencies noted by the PCAOB included failure to perform sufficient procedures to identify and test the design and operating effectiveness of controls over revenue recognition.  At a minimum, Cherry Bekaert had received the 2015 PCAOB Report by September 29, 2016, and was on notice that it needed to improve its audit procedures over revenue recognition and revenue allowances, including any future audits of MiMedx, to ensure being in compliance with PCAOB standards.  Further, the 2017 PCAOB Report confirmed the existence of severe audit deficiencies during the time of Cherry Bekaert's MiMedx audits, including a failure to perform sufficient procedures over sales, sales-related estimates, accounts receivable, and the evaluation of the severity of a control deficiency for a sales-related estimate.

## XI.   LOSS CAUSATION

496.   As detailed throughout and herein, Defendants' fraudulent scheme and false and misleading statements, individually and collectively, inflated MiMedx's stock price throughout the Class Period by failing to disclose that, among other things,

the Company's sales and revenue growth were substantially the result of fraudulent and improper accounting, sales, and distribution practices, including a massive channel stuffing scheme, that caused the Company's financial results for fiscal years 2012 to 2016 and the first three quarters of 2017 to be materially misstated.  These false and misleading statements had the intended effect and caused, or were a substantial contributing cause of, MiMedx's common stock trading at artificially inflated levels during the Class Period, reaching as high as $18.25 per share on January 29, 2018.

497.   As stated above in Sections V-VI, the relevant truth about the Company, its improper sales and distribution practices, and fraudulent revenue scheme began to be revealed through a series of partial disclosures, causing the price of MiMedx common stock to decline dramatically.   These partial disclosures resulted in statistically significant price declines in MiMedx's common stock as more fully summarized in the chart below:

| Partial Disclosures[277] | Date of Stock Reaction | MDXG % | NASDAQ % | NASDAQ Biotech Industry% |
|---|---|---|---|---|
| On December 31, 2014, MiMedx issued a press release announcing a civil subpoena from the HHS-OIG in connection with its investigation into the Company's sales and marketing activities. | January 2, 2015 | -15.52% | -0.18% | 0.83% |
| On October 13, 2015, MiMedx hosted an analyst day wherein the Company discussed parting ways with its largest US distributor. | Oct. 13, 2015 Oct. 14, 2015 | -14.23% -5.81% | -0.87% -0.29% | -3.22% 0.89% |
| On April 10, 2016, MiMedx issued a press release announcing that 1Q16 revenue fell short of forecasted guidance by $2 million. | April 11, 2016 | -8.79% | -0.36% | -1.65% |
| On December 15, 2016, Tornquist and Kruchoski filed a lawsuit against MiMedx and Petit for their termination in response to declaring concerns about a channel stuffing scheme to inflate revenue. | December 16, 2016 | -6.43% | -0.36% | 0% |
| On May 23, 2017, Munda issued a report concerning the Company's relationship with AvKARE. | May 23, 2017 | -4.95% | 0.09% | -0.16% |
| On September 7, 2017, *The Capital Forum* issued an article reporting on an investigation into MiMedx's channel stuffing by the VA-OIG. | Sept. 7, 2017 Sept. 8, 2017 | -5.60% -8.19% | 0.08% -0.59% | 0.27% -0.37% |

[277] Each of these events has been determined to be statistically significant based on the use of an event study. An event study is a commonly used methodology which measures how much a stock price rises or falls in response to new, company-specific information. An event study employs a statistical regression analysis that determines how much of a stock price change is explained by market and sector (industry) factors, rather than company-specific information. If a stock's return is statistically significant (as all the returns are in the chart), it indicates that the stock price movement cannot be attributed to market factors, sector factors, or to random volatility, but rather, was caused by new, company-specific information.

| Partial Disclosures[277] | Date of Stock Reaction | MDXG % | NASDAQ % | NASDAQ Biotech Industry% |
|---|---|---|---|---|
| On September 20, 2017, Aurelius issued a report questioning MiMedx's improper channel stuffing in violation of GAAP and the Company's reliance on distributors. Viceroy also issued a 35-page report discussing improper kickback and bribery schemes. | September 20, 2017 | -6.23% | -0.08% | 0.84% |
| On September, 27, 2017, Aurelius issued a report claiming MiMedx's internal investigation was not independent. | September 27, 2017 | -3.25% | 1.15% | 0.65% |
| On October 23, 2017, Munda issued a report concerning MiMedx excluding its analysts from asking questions on calls and noting unanswered questions about its dealings with the VA. The next day, on October 24, 2017, Citron posted a video on YouTube concerning use of third parties to inflate financials. | Oct. 23, 2017 Oct. 24, 2017 | -11.37% -8.28% | -0.64% 0.18% | -1.17% -0.82% |
| On November 20, 2017, MiMedx issued a press release on its website responding to recent short seller reports raising investor concerns about the impact on the Company. | November 20, 2017 | -6.43% | 0.12% | -0.95% |
| On February 15, 2018, Aurelius issued an "Open Letter to the MiMedx Auditors" regarding improper accounting practices amounting to a "serious and pervasive fraud." | February 16, 2018 | -6.22% | -0.23% | -0.37% |
| On February 20, 2018, MiMedx announced an internal investigation into certain sales and distribution practices and the postponement of its 2017 Form 10-K. | February 20, 2018 | -39.53% | -0.07% | -1.05% |

| Partial Disclosures[277] | Date of Stock Reaction | MDXG % | NASDAQ % | NASDAQ Biotech Industry% |
|---|---|---|---|---|
| On February 23, 2018, *The Wall Street Journal* reported improper payments to more than 20 doctors for the use of MiMedx products. The Company also hosted a conference call wherein the Company downplayed the delay in the filing of its 2017 Form 10-K but expressed uncertainty in the timeframe for the investigation. | February 23, 2018 | -11.82% | 1.77% | 2.11% |
| On February 26, 2018, a *Bloomberg* article disclosed the DOJ investigation into MiMedx for overcharging the government for its products. | February 26, 2018 | -6.13% | 1.15% | 0.73% |
| On May 8, 2018, the DOJ released a statement that a federal grand jury returned an Indictment against two doctors and a nurse for conspiracy to commit health care fraud involving benefits received from MiMedx employees. | May 9, 2018 | -7.49% | 1.01% | 1.42% |
| On June 7, 2018, MiMedx disclosed that nearly six years of financials were materially incorrect following its internal investigation requiring the Restatement. The Company also announced that Senken and Cranston had departed the Company. | June 7, 2018 | -23.39% | -0.69% | -0.81% |
| On July 2, 2018, MiMedx disclosed that Petit and Taylor resigned from their positions. | July 2, 2018 | -38.50% | 0.77% | 0.90% |
| On, July 26, 2018, MiMedx disclosed that it notified NASDAQ that it would be unable to bring its filings up to date by August 28, 2018 and in response received a potential delisting notice. | July 27, 2018 | -13.54% | -1.46% | -2.08% |

| Partial Disclosures[277] | Date of Stock Reaction | MDXG % | NASDAQ % | NASDAQ Biotech Industry% |
|---|---|---|---|---|
| On October 5, 2018, *The Wall Street Journal* issued an article reporting on MiMedx keeping cheaper products out of its VA hospitals and disclosing that MiMedx was under investigation by the DOD Criminal Investigative Service in connection with its financial agreements with a surgeon at the Augusta VA. | October 5, 2018 | -12.4% | -1.15% | -0.96% |
| On November 7, 2018, MiMedx announced it received a delisting notice from NASDAQ effective November 8, 2018, and provided an update on its internal investigation, stating it would now review all of the Company's sales dating back to 2012. | Nov. 7, 2018 Nov. 8, 2018 | -41.16% -19.4% | 2.64% -0.48% | 2.44% -0.98% |
| On December 5, 2018, MiMedx announced a massive reorganization, Cashman's termination, revenue softening, and additional information on the internal investigation which revealed improper business practices. EY also resigned effective immediately stating a lack of internal controls. | December 6, 2018 | -59.32% | 0.44% | 0.39% |

498. The timing and magnitude of the above declines in the price of MiMedx common stock in response to the partial disclosures detailed above (and more fully detailed in Sections V-VI) negates any inference that the losses suffered by Lead Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. This

is further evidenced by the chart above, which demonstrates clear divergence of the Company's common stock price from the NASDAQ Composite Index and the NASDAQ Biotechnology Industry Index[278] stock price as the revelation of the truth became known to the market.

499.   As further detailed above in Sections V-VI, these stock drops would have been even more significant had the full truth regarding MiMedx's improper sales and distribution practices and fraudulent revenue scheme been known.  However, in the face of market concerns regarding these practices, Defendants continued to make false and misleading statements downplaying, denying, and concealing the fraud in order to maintain an appearance of the Company's legitimacy and to artificially prop up its stock price.  These false and misleading statements and omissions, among others, had the intended effect of preventing the market from learning the full truth and keeping MiMedx's stock price artificially inflated throughout the Class Period.

500.   In sum, as detailed above, the rapid declines served to remove artificial inflation from the price of MiMedx common stock, and were direct and foreseeable consequences of the revelation of the falsity of Defendants' Class Period misrepresentations and omissions to the market and a materialization of the risks

---

[278] These indices were cited as benchmarks for MiMedx's stock performance in MiMedx's 2016 Form 10-K, filed with the SEC on March 1, 2017 (the Company's most recent annual filing).

concealed by Defendants' fraud. Thus, the revelations of truth, as well as the resulting clear market reactions, support a reasonable inference that the market understood that Defendants' prior statements were false and misleading and omitted material information. In short, as the truth was revealed, the price of MiMedx common stock quickly plummeted as the artificial inflation was removed and Lead Plaintiff and the Class were damaged, suffering true economic loss.

501. Accordingly, the economic losses, *i.e.*, damages, suffered by Lead Plaintiff and members of the Class were a direct and proximate result of Defendants' fraudulent scheme and misrepresentations and omissions that artificially inflated the price of MiMedx common stock and the subsequent significant declines in the value of MiMedx common stock as the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the marketplace.

## XII. PRESUMPTION OF RELIANCE

502. A class-wide presumption of reliance is appropriate with respect to the claims in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because such claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects, as well as a massive fraudulent scheme – information that

Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of Defendants' material Class Period omissions set forth above, that requirement is satisfied here.

503. A class-wide presumption of reliance is also appropriate with respect to the claims in this action under the fraud-on-the-market doctrine. As a result of Defendants' materially false and misleading statements, the Company's publicly traded common stock traded at artificially inflated prices during the Class Period on a market that was open, well-developed, and efficient at all times. Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's publicly traded common stock relying upon the integrity of the market price of such common stock and the market information relating to MiMedx, and have been damaged thereby.

504. At all relevant times, the market for the Company's common stock was an efficient market for the following reasons, among others:

(a)     as a regulated issuer, MiMedx regularly made public filings with the SEC and related press releases, and was eligible to file Forms S-3 with the SEC during the Class Period;

- 304 -

(b)     MiMedx regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, and other similar reporting services;

(c)     MiMedx was followed by several securities analysts employed by major brokerage firms, such as Canaccord Genuity, Brean Capital, LLC, UBS Securities LLC, and PiperJaffray, among others, who wrote research reports concerning MiMedx that were distributed to the brokerage firms' sales forces, entered the public marketplace, and were publicly available; and

(d)     the Company's common stock met the requirements for listing, and were listed and actively traded, on the NASDAQ during the Class Period, a highly efficient and automated market.

505.   As a result of the foregoing, the market for the Company's common stock promptly digested current information regarding MiMedx from all publicly available sources and reflected such information in the price of the Company's common stock.

506.   Under these circumstances, all purchasers or acquirers of the Company's common stock during the Class Period suffered similar injury through their purchases or acquisitions of the Company's common stock at artificially inflated prices.

- 305 -

507. At the times they purchased or otherwise acquired the Company's common stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

508. As a result of the above circumstances, the presumption of reliance applies.

509. In sum, Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)   Defendants made public misrepresentations during the Class Period;

(b)   the misrepresentations were material;

(c)   the Company's common stock traded in an efficient market;

(d)   the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e)   Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's common stock between the time Defendants misrepresented material facts and the time the true facts were disclosed, without knowledge that the facts were misrepresented.

## XIII.  NO SAFE HARBOR

510.  The  federal  statutory  safe  harbor  providing  for  forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this Complaint.  Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them.  To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Such cautions were loudly absent from MiMedx's Class Period filings.

511.  The  Company's  supposed  risk  warnings,  both  individually  and collectively, failed to warn the market of the true risks detailed herein.  These warnings were not meaningfully different from year-to-year, but, instead, were merely boilerplate language that failed to develop with time as the very risks they sought to warn of began to materialize.  Therefore, these "cautions" were untethered to the known  problems  at  hand,  rendering  them  meaningless.  Given  the  scope  and magnitude of Defendants' fraud, as detailed herein, the risk warnings were themselves false and misleading and did not shield Defendants from liability.  The risk warnings were false and misleading because they did not disclose that Defendants were actually

embroiled in the very circumstances about which they purportedly warned, and Defendants had actual knowledge of material adverse facts undermining such disclosures.

512.   Moreover, to the extent that any statements pleaded herein are forward-looking, Defendants are liable for them because, at the time each of them was made, the particular speaker knew it was false or misleading, for the reasons detailed herein, and/or the forward-looking statement was authorized and/or approved by an executive officer of MiMedx who knew it was false or misleading when made.

## XIV.  LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

513.   Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons or entities that purchased or otherwise acquired the publicly traded common stock of MiMedx between March 7, 2013 and June 29, 2018, inclusive, and who were damaged thereby.  Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

514.   Because MiMedx has millions of shares of stock outstanding and because the Company's shares were actively traded on the NASDAQ during the Class Period,

members of the Class are so numerous that joinder of all members is impracticable. According to the Company, 111,034,873 shares of MiMedx common stock were outstanding as of October 13, 2017. While the exact number of Class members can only be determined by appropriate discovery, Lead Plaintiff believes that Class members number at least in the hundreds, if not the thousands, and that they are geographically dispersed.

515.   Lead Plaintiff's claims are typical of the claims of the members of the Class because Lead Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

516.   Lead Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel experienced and competent in class actions and securities litigation. Lead Plaintiff has no interests that are contrary to, or in conflict with, the members of the Class that Lead Plaintiff seeks to represent.

517.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

518.    Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class.  Among the questions of law and fact common to the Class are:

(a)    whether Defendants violated the federal securities laws as alleged herein;

(b)    whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c)    whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d)    whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e)    whether and to what extent MiMedx's financial statements during the Class Period failed to comply with GAAP;

(f)    whether Cherry Bekaert's audits of MiMedx's financial statements during the Class Period were conducted in accordance with PCAOB standards;

(g)    whether Defendants acted willfully, with knowledge or recklessness, in omitting and/or misrepresenting material facts;

(h)     whether Cherry Bekaert abandoned its duty of independence as MiMedx's auditor;

(i)     whether the market prices of the Company's common stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(j)     whether the members of the Class have sustained damages as a result of the decline in value of the Company's common stock when the truth was revealed and the artificial inflation came out of the stock price, and, if so, what is the appropriate measure of damages.

## COUNT I

### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST THE MIMEDX DEFENDANTS

519.   Lead Plaintiff repeats and re-alleges the allegations set forth above in Sections I-IX and XI-XIV as though fully set forth herein.  This claim is asserted against the MiMedx Defendants.

520.   During the Class Period, the MiMedx Defendants, and each of them, carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did:  (a) deceive the investing public, Lead Plaintiff, and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of the

Company's publicly traded common stock; and (c) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire the Company's publicly traded common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the MiMedx Defendants, and each of them, took the actions set forth herein.

521.   The MiMedx Defendants:  (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers or acquirers of the Company's common stock in an effort to artificially inflate, and maintain the artificial inflation of, the market price of the Company's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  The MiMedx Defendants are sued as primary participants in the wrongful and illegal conduct charged herein.  The Individual Defendants are also sued as controlling persons of MiMedx, as alleged below.

522.   In addition to the duties of full disclosure imposed on the MiMedx Defendants as a result of their making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would

be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, sales, financial condition, and operational performance, so that the market prices of the Company's publicly traded common stock would be based on truthful, complete, and accurate information.

523. The MiMedx Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial and operational results and prospects as specified herein.

524. The MiMedx Defendants each employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the Company's financial and operational strength, which included the making of, or the participation in the making of, untrue statements of material facts about the Company's financial and operational results and prospects and omitting to state material facts necessary to make the statements made about the Company's financial and operational results and prospects not misleading in light of

the circumstances under which they were made, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers or acquirers of the Company's common stock during the Class Period.

525.   The Individual Defendants' primary liability and controlling person liability arise from the following facts, among others:  (a) the Individual Defendants were high-level executives at the Company during the Class Period; (b) the Individual Defendants, by virtue of their responsibilities and activities as senior executive officers were privy to, and participated in, the creation, development, and reporting of the Company's financial condition; (c) the Individual Defendants enjoyed significant personal contact and familiarity with, were advised of, and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial and operational results and prospects at all relevant times; and (d) the Individual Defendants were aware of the Company's dissemination of information to the investing public that they knew or recklessly disregarded was materially false and misleading and omitted material facts.

526.   Each of the MiMedx Defendants had actual knowledge of the material misrepresentations and omissions of material fact set forth herein, or acted with reckless disregard for the truth, in that each failed to ascertain and disclose such facts,

even though such facts were available to each of them.  The MiMedx Defendants'

material misrepresentations and omissions of material fact were done knowingly or

with recklessness and for the purpose and effect of concealing information regarding

the Company's true financial and operational results and prospects from the investing

public and supporting the artificially inflated price of its common stock.  If the

MiMedx Defendants did not have actual knowledge of the material misrepresentations

and omissions of material fact alleged, they were reckless in failing to obtain such

knowledge by deliberately refraining from taking those steps necessary to discover

whether their statements were materially false or misleading or omitted material facts.

527.   As a result of the MiMedx Defendants' dissemination of materially false

and misleading information and failure to disclose material facts, as set forth above,

the market price of the Company's common stock was artificially inflated during the

Class Period.  In ignorance of the fact that market price of the Company's publicly

traded common stock was artificially inflated, and relying directly or indirectly on the

materially false and misleading statements made by the MiMedx Defendants, or upon

the integrity of the market in which the stock traded, and/or on the absence of material

adverse information that was known to, or disregarded with recklessness by, the

MiMedx Defendants, but not disclosed in public statements by the MiMedx

Defendants during the Class Period, Lead Plaintiff and other members of the Class

acquired the Company's publicly traded common stock during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the stock price declines set forth above.

528.   At the time of such material misrepresentations, Lead Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true.  Had Lead Plaintiff and other members of the Class and the marketplace known of the Company's fraudulent practices, the true nature and prospects of the Company's financial and operating results and prospects, or the Company's true intrinsic value, which were not disclosed by the MiMedx Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their MiMedx publicly traded common stock during the Class Period; or, if they had purchased or otherwise acquired such stock during the Class Period, they would not have done so at the artificially inflated prices at which the shares were purchased or otherwise acquired.

529.   By virtue of the foregoing, the MiMedx Defendants, and each of them, have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

530.   As a direct and proximate result of the MiMedx Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in

connection with their respective purchases or acquisitions and sales of the Company's publicly traded common stock during the Class Period, as evidenced by the stock price declines set forth above, when the artificial inflation was removed from the price of the Company's stock.

## COUNT II

### FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST CHERRY BEKAERT

531.   Lead Plaintiff repeats and re-alleges the allegations set forth above in Sections I-VI and X-XIV as though fully set forth herein.  This claim is asserted against Cherry Bekaert.

532.   During the Class Period, Cherry Bekaert alone, or in concert with others, carried out a plan, scheme, and course of conduct that was intended to and, throughout the Class Period, did:  (a) deceive the investing public, Lead Plaintiff, and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of the Company's publicly traded common stock; and (c) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire the Company's publicly traded common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan, and course of conduct, Cherry Bekaert took the actions set forth herein.

- 317 -

533.   Cherry Bekaert:  (a) employed devices, schemes, and artifices to defraud;
(b) made untrue statements of material fact and/or omitted to state material facts
necessary to make the statements not misleading; and (c) engaged in acts, practices,
and a course of conduct that operated as a fraud and deceit upon the purchasers or
acquirers of the Company's publicly traded common stock in an effort to artificially
inflate, and maintain the artificial inflation of, the market price of the Company's
publicly traded common stock in violation of Section 10(b) of the Exchange Act and
Rule 10b-5 promulgated thereunder.  Cherry Bekaert is being sued as a primary
participant in the wrongful and illegal conduct charged herein.

534.   In addition to the duties of full disclosure imposed on Cherry Bekaert as a
result of making affirmative statements and reports, or participating in the making of
affirmative statements and reports to the investing public, it had a duty to promptly
disseminate truthful information that would be material to investors in accordance
with the standards of the PCAOB so that the market prices of the Company's publicly
traded common stock would be based on truthful, complete, and accurate information.

535.   Cherry Bekaert, individually and/or in concert with others, directly and/or
indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the
mails, engaged and participated in a course of conduct to conceal adverse material
information that resulted in misstatements and omissions of material facts about the

Company's financial statements, reporting, and ICFR for fiscal years 2013 through 2016, as specified herein. Cherry Bekaert employed devices, schemes, and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices, and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and the omission of material facts necessary in order to make the statements made about the Company not misleading.

536. Cherry Bekaert knew, or was reckless in not knowing, that MiMedx's reported annual financial statements and results for fiscal years 2013 through 2016, which were disseminated to the investing public, were materially misstated and included omissions of material fact that were not presented in accordance with GAAP, and that Cherry Bekaert's audits and/or reviews were not performed in accordance with PCAOB standards. Therefore, each of Cherry Bekaert's unqualified or "clean" audit reports concerning MiMedx's misstated financial reports for fiscal years 2013 through 2016 was materially false and misleading.

537. As a result of Cherry Bekaert's clean audit opinions of MiMedx's misstated financial reports for fiscal years 2013 through 2016 and Cherry Bekaert's own false and misleading statements and omissions in its clean audit reports, the market price of the Company's publicly traded common stock was artificially inflated

during the Class Period.  Had Cherry Bekaert not violated principles and standards of the PCAOB, it would have detected the material weakness in MiMedx's ICFR and the fraudulent revenue recognition and material misstatements in MiMedx's financial statements and reporting for fiscal years 2013 through 2016.

538.   Instead, Cherry Bekaert acted with knowledge or reckless disregard as to (a) the false and misleading nature of the certifications it provided; (b) the false and misleading nature of MiMedx's financial statements and reports and ineffective internal controls; (c) its failure to conduct proper audit tests and examinations of the books, records, and financial statements of MiMedx; and (d) the false representations that its financial statements had been properly audited in accordance with PCAOB standards.

539.   In violation of PCAOB standards, Cherry Bekaert failed to expand the scope of its audits notwithstanding its knowledge or reckless ignorance of innumerable red flags that put it on notice of the Company's illicit sales and distribution practices, improper revenue recognition, and other accounting practices, and of the misstatements and material omissions by the MiMedx Defendants.  Cherry Bekaert had "a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud."  AU110.02.  If there is a material misstatement,

whether by fraud or mistake, the auditor's procedures need to be designed and performed to detect it.

540.  Cherry Bekaert's fraudulent devices, schemes, artifices, and deceptive acts, practices, and course of conduct included:  (a) failing to test appropriately MiMedx's revenue recognition policies and procedures and associated internal controls, which did not even exist; (b) failing to modify and/or increase the nature, timing, and extent of its testing to obtain reasonable assurances that MiMedx's financial statements were not materially misstated and were prepared in accordance with GAAP; and (c) failing to apply the requisite professional skepticism and due professional care to MiMedx management's representations regarding MiMedx's revenue recognition policies with respect to MiMedx's distributors.

541.  Cherry Bekaert's conduct represents an extreme departure from the professional standards that should have been applied.  Cherry Bekaert knew that its audit reports would be relied upon by investors in MiMedx publicly traded common stock.  Had Cherry Bekaert exercised due professional care and professional skepticism, it would have determined that MiMedx's internal controls over revenue recognition did not exist, its accounting treatment of certain sales and distribution practices was improper, and its books and records were consistently falsified to conceal the Company's true financial condition.

- 321 -

542.   During the Class Period, Lead Plaintiff and the Class were unaware of Cherry Bekaert's conduct and unaware of the fact that the market price of MiMedx's common stock was artificially inflated during the Class Period.  Had Lead Plaintiff and the Class known of the unlawful scheme and unlawful course of conduct, they would not have purchased MiMedx publicly traded common stock, or if they had, they would not have done so at the artificially inflated prices paid for such stock.

543.   By virtue of the foregoing, Cherry Bekaert violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and is liable to Lead Plaintiff and the Class for damages suffered in connection with their purchases of MiMedx publicly traded common stock during the Class Period.

## COUNT III

### FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

544.   Lead Plaintiff repeats and re-alleges the allegations set forth above in Sections I-IX and XI-XIV as though fully set forth herein.  This claim is asserted against the Individual Defendants.

545.   The Individual Defendants acted as controlling persons of MiMedx within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions with the Company, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of the Company's fraudulent

practices and the Company's actual results and future prospects, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are materially false and misleading and omitted material facts. The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

546.   In addition, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

547.   As set forth above, the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases or acquisitions of the Company's

common stock during the Class Period, as evidenced by, among others, the common stock price declines set forth above, when the artificial inflation was released from the Company's common stock price.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff, on its own behalf and on behalf of the Class, prays for relief and judgment, as follows:

A.    Declaring that this action is a proper class action and certifying Lead Plaintiff as Class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Class Counsel for the proposed Class;

B.    Awarding compensatory damages in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.    Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D.    Such other and further relief as the Court deems appropriate.

## JURY TRIAL DEMANDED

Lead Plaintiff hereby demands a trial by jury.

DATED:  May 1, 2019          ROBBINS GELLER RUDMAN
                               & DOWD LLP


                            _s/ John C. Herman_
                            JOHN C. HERMAN
                              (Georgia Bar No. 348370)
                            PETER M. JONES
                              (Georgia Bar No. 402620)
                            CARLTON R. JONES
                              (Georgia Bar No. 940540)
                            MAREN DALE
                              (Georgia Bar No. 672981)
                            Monarch Tower, Suite 1650
                            3424 Peachtree Road, N.E.
                            Atlanta, GA  30326
                            Telephone:  404/504-6500
                            404/504-6501 (fax)
                            jherman@rgrdlaw.com
                            pjones@rgrdlaw.com
                            cjones@rgrdlaw.com
                            mdale@rgrdlaw.com

                            ROBBINS GELLER RUDMAN
                              & DOWD LLP
                            ARTHUR C. LEAHY
                            HILLARY B. STAKEM (_pro hac vice_
                            pending)
                            655 West Broadway, Suite 1900
                            San Diego, CA  92101
                            Telephone:  619/231-1058
                            619/231-7423 (fax)
                            artl@rgrdlaw.com
                            hstakem@rgrdlaw.com

- 325 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
JACK REISE
STEPHEN R. ASTLEY
ELIZABETH A. SHONSON
BAILIE L. HEIKKINEN
ANDREW T. REES
120 East Palmetto Park Road, Suite 500
Boca Raton, FL  33432
Telephone:  561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
sastley@rgrdlaw.com
eshonson@rgrdlaw.com
bheikkinen@rgrdlaw.com
arees@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

CAVANAGH & O'HARA
JOHN T. LONG
2319 West Jefferson Street
Springfield, IL  62702
Telephone:  217/544-1771
217/544-9894 (fax)

*Additional Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 1st day of May 2019, I electronically filed the

foregoing document with the Clerk of Court by using the CM/ECF system, and a copy

of the foregoing pleading has been electronically mailed to all attorneys of record.


*/s/ John C. Herman*
JOHN C. HERMAN