UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| In re MIMEDX GROUP, INC. SECURITIES LITIGATION | Case No. 1:18-cv-00830-WMR |
| This Document Relates To: ALL ACTIONS. | COMPLAINT – CLASS ACTION<br>**JURY TRIAL DEMANDED** |

**SECOND AMENDED CONSOLIDATED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS**

# TABLE OF CONTENTS

Page


I. SUMMARY OF THE ACTION .......... 1

II. SOURCES SUPPORTING LEAD PLAINTIFF'S ALLEGATIONS .......... 11

III. JURISDICTION AND VENUE .......... 17

IV. PARTIES .......... 18

A. Lead Plaintiff .......... 18

B. Defendants .......... 19

1. MiMedx and the Individual Defendants .......... 19

2. Cherry Bekaert .......... 23

V. SUBSTANTIVE ALLEGATIONS .......... 23

A. Background of the Company .......... 23

B. MiMedx Drove Revenue Through Improper Sales and Distribution Practices .......... 26

1. MiMedx Offers Inducements to Secure Sales .......... 27

a. The Company Targets Health Providers with a Campaign of Influence .......... 27

b. MiMedx Markets Its Products by Guaranteeing and Gaming Reimbursement .......... 30

2. Defendants Manipulate Charitable Contributions to Gain Sales .......... 35

C. Defendants Employ a Massive Fraudulent Revenue Recognition Scheme .......... 42

1. The Company's Fraudulent Revenue Scheme with Government Accounts ....................................................43

a. The Company Courts Lucrative Government Accounts ....................................................................43

b. The MiMedx Sales Force Is Tasked with Effectuating the Side Deal with AvKARE..........................................49

c. Defendants Carefully Monitor Revenue Generated Through Their Side Arrangement with AvKARE .........52

d. Defendants Accelerated Their Fraudulent Revenue Scheme Through Distributor AvKARE ..........................57

e. Defendants' VA Scheme Unravels.................................64

(1) MiMedx Customers Are Overstuffed...................64

(2) The Company Avoids Returns .............................65

(3) The Company Loses Track of Inventory .............67

2. Defendants Rely on Other Distributors to Further Inflate Revenues ..........................................................................71

a. Defendants Use Close Ties with Master Distributor CPM for End-of-Quarter Revenue Infusions .................71

b. When Defendants Lost CPM, They Turned to Distributors SLR and Stability to Continue Their Fraudulent Revenue Scheme .........................................79

(1) Fraudulent Revenue Recognition Through SLR..80

(2) Fraudulent Revenue Recognition Through Stability ..............................................................84

c. Fraudulent Revenue Recognition Through First Medical ....................88

D. Defendants Desperately Attempt to Conceal Their Fraud Through a Campaign of Lies And Retaliation ....................92

1. As the Fraudulent Scheme Accelerates, Employees Begin to Protest Internally ....................93

2. The Company's Controller Reports Improper Revenue Recognition Practices Leading to ACI ....................94

3. Kruchoski and Tornquist Are Threatened and Fired for Reporting Defendants' Fraud and the Company Conducts ACII....................100

4. The SEC Begins to Ask Questions and Defendants Continue to Lie About Their Financial Arrangements....................105

E. EY Replaces Cherry Bekaert and Immediately Raises Questions About the Company's Distributor Relationships and Accounting Practices....................109

VI. THE TRUTH OF DEFENDANTS' FRAUD LEAKED OUT THROUGHOUT THE CLASS PERIOD BUT DEFENDANTS CONTINUED TO MISLEAD INVESTORS....................111

A. News of Defendants' Fraud Began to Emerge from Whistleblowers and Other Sources, Attracting Attention from Government Authorities....................111

B. As Public Scrutiny Intensified, MiMedx Was Forced to Delay Its 2017 Form 10-K and Launch ACIII....................146

C. Defendants Announced a Massive Six-Year Accounting Restatement and Executive Resignations....................157

VII. THE TRUTH CONCERNING DEFENDANTS' FRAUD CONTINUED TO BE REVEALED AFTER THE CLASS PERIOD........165

A. Additional Media, and the Company Itself, Reported Improprieties Involving the Sale of MiMedx Products to VAs, and Linked Petit, Taylor, and Senken to the Fraud ..........165

B. The Company Was Delisted by NASDAQ ..........168

C. EY Resigned and MiMedx Was Forced to Change Its Business Practices ..........169

D. The Company's Audit Committee Confirmed Defendants' Extensive Misconduct During the Class Period, Including Improper Revenue Recognition in Violation of GAAP ..........173

E. MiMedx Vigorously Opposed Petit's Bid to Regain Control of the Company by Emphasizing Defendants' Class Period Misconduct ..........176

F. Federal Authorities Prosecute Defendants for Securities Fraud and the Restatement Is Issued ..........178

VIII. THE MIMEDX DEFENDANTS' ADDITIONAL MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT ..........182

A. The MiMedx Defendants Made False and Misleading Statements and Omitted Material Facts Regarding the Company's Growth ..........183

B. The MiMedx Defendants Made False and Misleading Statements and Omitted Material Facts Regarding the Company's Distributors ..........196

1. Defendants Falsely Claimed the Company's Distribution Partners Were "Independent" ..........197

2. Defendants Falsely Represented That MiMedx Did Not Do Business With Physician-Owned Distributors ..........209

C. The MiMedx Defendants Made False and Misleading Statements and Omitted Material Facts Related to the Company's Compliance Programs and "Culture of Integrity" .........210

D. The MiMedx Defendants' False and Misleading Statements Violated Item 303 of Regulation S-K .............................................219

IX. THE MIMEDX DEFENDANTS ACTED WITH SCIENTER ..................221

A. The Individual Defendants Directed and Carried Out the Fraud......222

B. Defendants' Actions to Conceal Their Fraud Further Establish Their Scienter .........................................................................229

C. Defendants Created an Inappropriate Tone at the Top .....................233

D. The Individual Defendants' Own Statements Support Scienter .......243

E. The Individual Defendants' Compensation Incentivized Their Fraud.............................................................................................246

F. Petit's Additional Misconduct Further Supports His Scienter..........250

X. THE MIMEDX DEFENDANTS' GAAP VIOLATIONS, ACCOUNTING RESTATEMENT, INEFFECTIVE INTERNAL CONTROLS, AND MATERIALLY FALSE AND MISLEADING FINANCIAL STATEMENTS......................................................................254

A. MiMedx's Reported Financial Results Were False and Not Prepared in Accordance with GAAP ..............................................254

B. Defendants' Misstatements Were Material......................................263

C. MiMedx Violated GAAP Rules for Recognizing Revenue..............276

1. Consignment Sales................................................................280

2. Right of Return Sales............................................................283

D. MiMedx Improperly Recognized Revenues from Key Distributors ....287

E. MiMedx Made Materially False and Misleading Disclosures of Its Revenue Recognition Policies in Its Financial Statements ....289

F. MiMedx's GAAP Violations of Related Party Standards ....296

G. MiMedx Admitted Material Weaknesses in its Internal Controls ....301

H. Petit and Senken Falsely Certified the Accuracy of the Company's Financial Statements Through Their Sarbanes-Oxley Certifications and Other Statements ....316

XI. CHERRY BEKAERT'S CRITICAL ROLE IN THE COMPANY'S FRAUD ....318

A. The Purpose of Auditing Standards and the Auditor's Report ....323

B. Cherry Bekaert's Failure to Comply with PCAOB Standards over MiMedx's Financial Statements ....327

1. Cherry Bekaert Failed to Properly Consider the Risk of Fraud in Planning and Performing its Audits ....328

a. Cherry Bekaert Failed to Appropriately Audit AvKARE Sales ....333

b. Cherry Bekaert Failed to Appropriately Audit CPM and SLR Sales ....342

c. Cherry Bekaert Failed to Appropriately Audit Stability Sales ....351

d. Cherry Bekaert Failed to Appropriately Audit First Medical Sales ....353

2. Cherry Bekaert Failed to Abide by Related Party Auditing Standards During the Class Period ....356

3. Cherry Bekaert Ignored Red Flags Associated with Whistleblower Complaints and Two Separate Audit Committee Investigations That Were Inadequate and Lacked Independence ....................359

a. The Andersen Complaint and ACI ....................359

b. The Tornquist/Kruchoski Complaint and ACII ....................365

4. The PCAOB Found That Cherry Bekaert Violated Auditing Standards ....................372

C. Cherry Bekaert's Failure to Comply with PCAOB Standards over MiMedx's ICFR ....................378

D. Cherry Bekaert Is Not Absolved of Liability Because of Misrepresentations by Former MiMedx Management ....................385

E. Cherry Bekaert Was Motivated to Turn a Blind Eye Due to Its Lucrative Audit Fees from MiMedx ....................388

F. Cherry Bekaert's False and Misleading Statements ....................389

XII. LOSS CAUSATION ....................394

XIII. PRESUMPTION OF RELIANCE ....................404

XIV. NO SAFE HARBOR ....................408

XV. LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS ....................409

COUNT I FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST THE MIMEDX DEFENDANTS ....................412

COUNT II FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST CHERRY BEKAERT ....................418

COUNT III FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS.......424

PRAYER FOR RELIEF .......................................................................................425

JURY TRIAL DEMANDED ................................................................................426

By and through its undersigned counsel, Lead Plaintiff Carpenters Pension Fund of Illinois ("Lead Plaintiff") brings this federal securities class action against Defendants MiMedx Group, Inc. ("MiMedx" or "Company"), Parker H. Petit ("Petit"), Michael J. Senken ("Senken"), and William C. Taylor ("Taylor"), (together, "MiMedx Defendants"), and Cherry Bekaert LLP, formerly known as Cherry Bekaert & Holland, L.L.P. ("Cherry Bekaert") (collectively, "Defendants"), upon personal knowledge as to those allegations concerning Lead Plaintiff and, as to all other matters, upon the investigation of counsel, which included, without limitation, counsel's review and analysis of the factual sources described in Section II below.

## I. SUMMARY OF THE ACTION

1. When Petit was appointed as Chief Executive Officer ("CEO") in 2009, MiMedx was a relatively small skin-graft manufacturer with less than $1,000 in revenue. In 2011, the Company acquired a proprietary process that allowed it to develop and mass-produce its two primary commercial products: EpiFix and AmnioFix. The Company rapidly took off, reporting explosive growth from 2012 to 2017.

2. From the first quarter of 2012 ("1Q12") through the third quarter of 2017 ("3Q17"), the Company met or exceeded revenue guidance in all but one

quarter. The Company's reported annual revenue in 2016 was over $245 million, an approximate ***3,000%*** increase over annual revenue in 2011, just five years earlier. Fueled by this growth, the Company's stock price surged ***254%*** during the Class Period. The Company's rapid growth led MiMedx to be named the fifth-fastest growing public company in America by *Fortune* magazine in September 2017. According to Petit, this put MiMedx "ahead of Facebook and Amazon." Elaborating on the Company's track record, Petit boasted: "***I have been told that MiMedx's performance has been so flawless that people think we must be doing something 'wrong***.'"

3. Unbeknownst to investors, during the "Class Period" – from March 7, 2013 through June 29, 2018 – the Company's remarkable growth and "flawless" performance were actually predicated on myriad improper and illicit sales and distribution practices, as well as a massive accounting fraud perpetrated at the behest of its executive leadership – Petit, Senken (Chief Financial Officer ("CFO")), and Taylor (Chief Operating Officer ("COO")). As the Company later admitted, Defendants set an inappropriate "tone at the top" at MiMedx, "emphasized short-term business goals over compliance and ethics," "***purposely took action to disregard revenue recognition rules under GAAP and manipulate the timing and recognition of revenue***, acted against employees who raised concerns about the

Company's practices[,] and marginalized the Company's legal and accounting departments and advisors." As one former employee succinctly described, the Company's "win at all cost" culture led to "a mind boggling level of sales and accounting irregularities."

4. As part of its "win at all cost" culture, Defendants trained sales representatives to infiltrate, influence, and offer illegal inducements to doctors and associated staff to encourage the use of MiMedx products and become ambassadors for the Company. Defendants also employed an array of schemes to secure and guarantee reimbursement for their costly products from third-party payors (*i.e.*, Medicare/Medicaid and large private insurers), which was critical to customer uptake. The Company even went so far as to unlawfully cover patients' co-pays and co-insurance through a coordinated scheme to funnel MiMedx's purported charitable contributions to cover such costs. These practices, which violated multiple federal laws, enabled the Company to increase demand for MiMedx products and grow revenue.

5. To further propel the Company's growth, Defendants orchestrated a massive fraudulent revenue scheme in violation of Generally Accepted Accounting Principles ("GAAP"). Defendants used their close relationships with supposedly independent distributors to engage in a multitude of improper revenue recognition

practices, to artificially inflate the Company's sales, achieve revenue guidance, and maintain the appearance of consistent growth.

6. In 2012, for example, the Company partnered with AvKARE, Inc. This relationship gave the Company a lucrative opportunity to grow its sales at United States Department of Veteran Affairs ("VA") facilities through a fixed-price, indefinite-quantity contract. Without third-party reimbursement concerns, sales to the VA's large network of facilities yielded tremendous profit. The Company's relationship with AvKARE, however, was not what it seemed. Defendants told investors that AvKARE was an independent distributor. In reality, it was a pass-through and a front used to prematurely and improperly recognize revenue and channel stuff excess inventory at the ends of financial reporting quarters. This enabled Defendants to create an illusion that the Company's quarterly revenues and profits were soaring.

7. Likewise, the Company relied on its non-VA, commercial distributors to provide bogus but needed revenue injections at the ends of quarters. The Company's "Master Distributors," CPM Medical, Inc. ("CPM") and SLR Medical Consulting, LLC ("SLR"), were known as "house accounts" and had close relationships with Company leadership, who had entered into improper side arrangements with them. They served as essential co-conspirators, funneling

MiMedx products through a network of sub-distributors, many of which were Physician Owned Distributors ("PODs"), a form of distributorship found to be "inherently suspect" by the United States Department of Health and Human Services ("HHS") due to kickback concerns. MiMedx relied on these distributors and their nefarious network to take significant quantities of (often-unneeded) product at quarter-end to inflate the Company's sales and revenues, and in turn, its financial performance. In return, MiMedx provided them with highly favorable, off-book terms, including reduced prices, special financing, and lax return policies. The distributors and their sub-distributors then profited by selling MiMedx products at a premium.

8. Defendants concealed from investors their illicit sales practices, improper revenue recognition, and side arrangements with distributors. Quarter after quarter, they falsely attributed MiMedx's revenue growth to the strength of their product, superior management, and extolled the Company's strong compliance and "culture of integrity." Defendants' misstatements and omissions misled investors and artificially inflated the Company's stock price. But the Company's growth story was an intentional sham, predicated on fraud that was unsustainable.

9. Defendant Cherry Bekaert, the Company's supposedly independent auditor, allowed the fraudulent scheme to continue unabated for years. As an

independent auditor, Cherry Bekaert was required to ***skeptically and objectively*** audit MiMedx and render an opinion on whether MiMedx's financial statements "fairly present[ed], in all material respects, the financial condition and results of operations of the Company." Cherry Bekaert recklessly disregarded growing red flags of MiMedx's accounting improprieties and failed to perform key procedures required under pertinent auditing standards. Indeed, in three inspections while Cherry Bekaert was MiMedx's auditor, the Public Company Accounting Oversight Board ("PCAOB") found significant deficiencies in Cherry Bekaert's audits. Cherry Bekaert's MiMedx audits were so deficient that they were tantamount to no audit at all. Yet, Cherry Bekaert helped Defendants conceal their fraud for years through the issuance of false "clean" audit opinions, which provided the Company's financial statements with a veneer of legitimacy and misled investors.

10. Due to the scale and pervasiveness of the fraud, as the Class Period wore on, it became increasingly difficult to make it appear that MiMedx was growing at the same rate. Although it was becoming impossible to achieve "real growth on a false number," Defendants directed employees to continue the improper channel stuffing or there would "be hell to pay." VA facilities were flooded with MiMedx products, with shelves "absolutely overflowing" and grafts "spilling out of every cabinet available."

11. Ultimately, Defendants' torrent of fraudulent practices caught up with them. While the Company had planned to "feather back" overstuffed product as returns against revenue in future reporting periods, there was simply too much product to return without raising a red flag or jeopardizing the Company's ability to meet financial projections in the quarter ahead. Employees, including the Company's former Controller, began expressing concern about the legality of the Company's sales and revenue recognition practices to upper management, including Defendants. In response, Defendants engaged in a massive cover-up, swiftly threatening, terminating, and even suing those who dared come forward. Defendants' egregious tactics led several former employees to report the fraud to the United States Securities and Exchange Commission ("SEC") and file civil whistleblower claims against the Company.

12. In the midst of the ongoing whistleblower litigation and intensifying scrutiny from the SEC, the Company suspiciously replaced Cherry Bekaert with Ernst & Young LLP ("EY" or "Ernst & Young") on August 4, 2017. Within a few months, EY raised serious questions over the Company's relationship with AvKARE and the adequacy of two prior Audit Committee investigations into the Company's accounting practices ("ACI" and "ACII"), which had been white-washed, and refused to complete the Company's 2017 annual audit.

13. Without sign-off from EY, on February 20, 2018, the Company was forced to announce a third Audit Committee investigation into the Company's sales and distribution practices ("ACIII"), and that the Company was postponing the release of its financial results for fiscal year 2017 ("FY17"). Despite repeated (and false) assurances from the Company's executives that the Company had done nothing wrong and was enjoying strong sales and financial results, the truth behind the Company's meteoric rise continued to be exposed, causing the stock price to plummet.

14. On June 7, 2018, the Company announced that ACIII had revealed that MiMedx's reported financial results for fiscal years 2012 to 2016 and the first three quarters of 2017 could no longer be relied upon and would have to be restated – indicating that nearly six years of the Company's financial results were false. As ACIII unfolded, Defendants Petit, Taylor, and Senken were terminated from the Company for cause because "they engaged in, among other things, conduct detrimental to the business or reputation of the company" and the Company took steps to claw back their compensation. The Company's stock was also delisted from the NASDAQ Global Select Market ("NASDAQ").

15. MiMedx announced more shocking news on December 5, 2018, revealing that EY had resigned. In a filing with the SEC two days later, the Company

ominously disclosed that EY had warned that "internal controls necessary for the Company to develop reliable financial statements ***do not exist***." MiMedx further disclosed that EY had advised that the Company needed "to significantly expand the scope of its audit, due to ***material allegations of inappropriate financial reporting, material allegations of noncompliance with laws and regulations***, the findings to date from the independent investigation conducted by the Audit Committee into these allegations [ACIII], and the lack of internal controls necessary for the Company to develop reliable financial statements."

16. The Company finally released a summary of ACIII on May 23, 2019, substantially corroborating the allegations set forth herein. As the Company stated, ACIII, which the Audit Committee conducted over 15 months with an independent law firm (King & Spalding LLP) and auditor (KPMG LLP), reached the "unmistakable conclusion" that:

> Mr. Petit and certain members of his former management team engaged in serious wrongdoing, including disregarding revenue recognition rules under [GAAP]; engaging in revenue "management;" making material misstatements to regulators, the Board, the Audit Committee and the Company's outside auditors; taking actions to investigate or silence whistleblowers; and setting an inappropriate "tone at the top." . . . This misconduct has harmed MiMedx and its shareholders – the Company is a defendant in a multitude of lawsuits, faces regulatory inquiries and has had its stock delisted from Nasdaq.

17. Moreover, ACIII found that "the timing and improper recognition of revenue ***allowed the Company to meet its published guidance***. Absent these apparent revenue management activities, the Company's results would have fallen short of guidance in these periods."

18. Defendants' fraud led to investigations by the SEC, United States Department of Justice ("DOJ"), and the VA. On November 26, 2019, the DOJ and SEC announced two separate securities fraud actions against Defendants, substantially corroborating that Defendants engaged in a massive fraudulent scheme, knowingly inflated the Company's revenue from a network of distributors, and made a litany of false and misleading statements in order to deceive shareholders as to the Company's true financial performance during the Class Period. Petit and Taylor were both indicted for criminal securities fraud offenses, carrying penalties of up to 20 years in federal prison, while MiMedx, Petit, Taylor, and Senken were sued for civil securities fraud offenses.

19. The Restatement was finally issued on March 17, 2020, taking the Company nearly two years to complete. Defendants' fraud was so pervasive that the Restatement required adjustments to almost ***every*** financial account on MiMedx's balance sheets and income statements, and to the Company's revenue recognition on ***all*** sales dating back to 2012. The Restatement demonstrated, for example, that

Defendants fraudulently inflated the Company's earnings per share ("EPS") by ***143%*** between 2014 and 2016.

20. The unraveling of Defendants' fraud eviscerated the Company's stock price as the news leaked out through a series of partial disclosures. Ultimately, the Company admitted that, as a result of Defendants' misconduct, "[t]he stock price has fallen substantially, and the Company's market value is down more than $1 billion since February 2018." To recover the significant damages that Defendants inflicted on investors, Lead Plaintiff brings this action under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 promulgated thereunder, on behalf of itself and all persons or entities that purchased or otherwise acquired the common stock of MiMedx during the Class Period, and who were damaged thereby (the "Class").

## II. SOURCES SUPPORTING LEAD PLAINTIFF'S ALLEGATIONS

21. Although discovery has not yet commenced in this action, Lead Plaintiff's allegations are substantiated by numerous sources, including the Company's own public admissions and information uncovered during multiple investigations into the Company's misconduct. The allegations are based on a substantial investigation including the review and analysis of the following, without limitation:

- the Company's Restatement and 10-K for the year ending December 31, 2018, filed with the SEC on March 17, 2020, which contains findings from ACIII, as well as corrected financial figures for fiscal years 2012, 2013, 2014, 2015, 2016, and first-presented figures for fiscal years 2017 and 2018;[1]

- a summary of findings of the Company's Audit Committee during the 15-month ACIII, which was conducted with assistance from independent counsel (King & Spalding) and auditors (KPMG), and included the review of over 1.5 million documents, significant amounts of other data, and 2,750 hours of video, and interviews with over 85 witnesses, many of them multiple times;[2]

- the DOJ's criminal indictment of Petit and Taylor for securities fraud,[3] following an extensive investigation and discovery by the DOJ and the United States Postal Inspection Service ("USPIS"), which involved at least 650,000 documents, thousands of video and audio recordings, and materials filed in connection with the *Petit/Taylor* Indictment, including:

    - extensive memoranda by EY concerning evidence uncovered by the Audit Committee during ACIII, including documents MiMedx produced to the SEC, communications with the Company's Board of Directors, interviews of MiMedx employees, and data analysis of MiMedx's operations and inventory;[4]

---

[1] *See* Ex. 1, MiMedx Group, Inc., Annual Report (Form 10-K), Items 7.01, 8.01, 9.01, Ex. 99.1 (Mar. 17, 2020) ("2018 Form 10-K").

[2] *See* Ex. 2, MiMedx Group, Inc., Current Report (Form 8-K) (May 23, 2019).

[3] *See* Ex. 3, Department of Defense Indictment ("*Petit/Taylor* Indictment"), *United States v. Petit*, No. 19-cr-00850-JSR (S.D.N.Y. Nov. 25, 2019), ECF. No. 1 ("*Petit/Taylor*").

[4] *See* Ex. 4, Exhibit to Notice of Filing Redacted Versions of Defendants' Joint Motion to Compel Discovery and Set Disclosure Deadlines and Supporting Exhibits

- sworn affidavits filed by the USPIS supporting applications for warrants to search electronic devices, servers, and accounts through which Petit and Taylor communicated;[5] and

- notes of the DOJ's interviews with and/or statements from seventeen individuals, including employees and distributors of MiMedx, Cherry Bekaert, and EY;[6]

- the SEC's securities fraud complaint against the Company, Petit, Taylor, and Senken, following an extensive investigation and discovery by the SEC that included the review of e-mail correspondence, memoranda, and phone conversations by and

---

J, M, and Q, *United States v. Petit*, No. 19-cr-00850-JSR (S.D.N.Y. Feb. 10, 2020), ECF. No. 38-4; Ex. 5, Exhibit to Notice of Filing Further Redacted Version of Exhibit J(R) in Support of Defendants' Joint Motion to Compel Discovery and Set Disclosure Deadlines, *United States v. Petit*, No. 19-cr-00850-JSR (S.D.N.Y. Feb. 10, 2020), ECF No. 40-1; Ex. 6, Exhibit to Notice of Filing Redacted Versions of Defendants' Joint Motion to Compel Discovery and Set Disclosure Deadlines and Supporting Exhibits J, M, and Q, *United States v. Petit*, No. 19-cr-00850-JSR (S.D.N.Y. Feb. 10, 2020), ECF No. 38-3.

[5] *See* Ex. 7, Exhibit N to Notice of Defendants Parker H. Petit and William Taylor's Joint Motion to Compel Discovery and Set Disclosure Deadlines, *United States v. Petit*, No. 19-cr-00850-JSR (S.D.N.Y. Jan. 22, 2020), ECF No. 24-14; Ex. 8, Exhibit O to Notice of Defendants Parker H. Petit and William Taylor's Joint Motion to Compel Discovery and Set Disclosure Deadlines, *United States v. Petit*, No. 19-cr-00850-JSR (S.D.N.Y. Jan. 22, 2020), ECF No. 24-15; Ex. 9, Exhibit P to Notice of Defendants Parker H. Petit and William Taylor's Joint Motion to Compel Discovery and Set Disclosure Deadlines, *United States v. Petit*, No. 19-cr-00850-JSR (S.D.N.Y. Jan. 22, 2020), ECF. No. 24-16; Ex. 10, Ex. I to Notice of Defendants Parker H. Petit and William Taylor's Joint Motion to Compel Discovery and Set Disclosure Deadlines, *United States v. Petit*, No. 19-cr-00850-JSR (S.D.N.Y. Jan. 22, 2020), ECF No. 24-9.

[6] *See* Ex. 11, Exhibit T to Notice of Defendants Parker H. Petit and William Taylor's Joint Motion to Compel Discovery and Set Disclosure Deadlines, *United States v. Petit*, No. 19-cr-00850-JSR (S.D.N.Y. Jan. 22, 2020), ECF No. 24-20.

among the Individual Defendants, other MiMedx executives, and principals of the Company's distributors;[7]

- findings of the Company's Special Litigation Committee ("SLC"), following an investigation, conducted with assistance from independent counsel (Steptoe & Johnson LLP) and accounting experts (AlixPartners, LLP) separate from those engaged by the Audit Committee during ACIII, finding that MiMedx "lacked adequate internal controls over accounting and financial reporting," and determining there was sufficient evidence to show that the Individual Defendants breached their fiduciary duties, following an investigation that included 52 interviews of current and former MiMedx directors, officers, employees, and outside advisors, and the review of several hundred thousand documents;[8]

- whistleblower claims filed by several former employees of the Company, based on numerous sources such as internal Company e-mails, memoranda, and phone calls, and their own personal experiences as described herein, including:

    - Jess Kruchoski's ("Kruchoski") and Luke Tornquist's ("Tornquist") claims against Defendants concerning their channel stuffing and improper revenue recognition through AvKARE and other distributors, which were submitted to the SEC under penalty of perjury;[9]

---

[7] *See* Ex. 12, Complaint and Jury Demand ("SEC Complaint"), *SEC v. MiMedx Grp., Inc.*, No. 1:19-cv-10927 (S.D.N.Y. Nov. 26, 2019), ECF No. 1.

[8] *See* Ex. 13, Report of the Special Litigation Committee of the Board of Directors of MiMedx Group, Inc., June 28, 2019 ("SLC Report"), *In re MiMedx Grp., Inc. Shareholder Derivative Litig.*, 18-cv-00486 (N.D. Ga.) ECF No. 99-1.

[9] *See* SEC Form TCR dated December 15, 2016 ("*Kruchoski/Tornquist* SEC Form TCR"), *MiMedx Grp., Inc. v. Tornquist,* No. 1:17-cv-00399-LMM (N.D. Ga. Mar. 14, 2017), ECF No. 40-2; First Amended Complaint and Jury Demand ("*Kruchoski/Tornquist* Complaint"), *Kruchoski v. MiMedx Grp., Inc.*, No. 0:16-cv-04171-RHK-BRT (D. Minn. Dec. 15, 2016) ECF No. 4; Defendant's Second

  - Michael Fox's ("Fox") claims against Defendants concerning their excess shipment of product to VAs and improper revenue recognition through AvKARE;[10] and

  - Jon Vitale's ("Vitale") claims against Defendants in connection with, among other things, an illegal kickback scheme involving a charitable foundation;[11]

- additional MiMedx SEC filings, including:

  - a proxy statement filed on May 31, 2019, confirming the findings of ACIII (based on the extensive investigation summarized above), and disclosing that the Restatement would impact numerous aspects of the Company's financial statements;[12]

---

Amended Verified Answer, Affirmative Defenses, and Counterclaims for Declaratory Judgment, Injunctive Relief, Damages, and Attorneys' Fees ("*Tornquist* Counterclaim"), *MiMedx Grp., Inc. v. Tornquist*, No. 1:27-cv-00399-LMM (N.D. Ga. June 25, 2018), ECF No. 146; Counter-Plaintiff, Jess Kruchoski's Fourth Amended Counterclaim ("*Kruchoski* Counterclaim"), *MiMedx Grp., Inc. v. Academy Med., LLC*, No. 2016 CA 013806 (Fla. Palm Bch. Cir. Ct. June 4, 2019), ECF No. 291.

[10] *See* Second Amended Counterclaim ("*Fox* Counterclaim"), *MiMedx Grp., Inc. v. Fox*, No. 1:16-cv-11715 (N.D. Ill. Jan. 31, 2018), ECF No. 147.

[11] Complaint ("*Vitale* 2019 Complaint"), *Vitale v. MiMedx Grp., Inc.*, No. 3:19-cv-00529-RBH (D.S.C. Feb. 19, 2019), ECF No. 1-1; Complaint ("*Vitale Qui Tam* Complaint"), *United States, ex rel., Vitale v. MiMedx Grp., Inc.*, No. 3:17-cv-00166-RBH (D.S.C. Jan. 19, 2017), ECF No. 1.

[12] *See* Ex. 14, (MiMedx Group, Inc., Schedule 14A (Form DEFC14A) (May 31, 2019).

- proxy material filed on June 3, 2019, confirming Petit's wrongdoing and the harm he caused MiMedx and its shareholders;[13]

- proxy material filed on June 5, 2019 commenting that the Company believes that Petit "is unfit to serve" on the Board based on his prior wrongdoings and termination for cause;[14]

- a shareholder presentation filed on June 5, 2019, illustrating the decline in common stock value in response to revelations of the fraud detailed herein, including statements that "Petit's conduct has harmed MiMedx and shareholders," causing with the Company's stock to drop "to a low of $1.15/share in December 2018 from more than $17/share before the accounting issues were revealed in early 2018";[15] and

- proxy material filed on June 10, 2019, pointing to ACIII's findings demonstrating that Petit and certain members of his management team engaged in longstanding material misconduct, harming MiMedx and its shareholders;[16]

- disclosures by EY during its resignation as the Company's external auditor, including disclosures relating to deficiencies in

---

[13] *See* Ex. 15, (MiMedx Group, Inc., Schedule 14A (Form DEFA14A) (June 3, 2019).

[14] *See* Ex. 16, (MiMedx Group, Inc., Schedule 14A (Form DEFA14A ) (June 5, 2019).

[15] *See* Ex. 17, MiMedx Group, Inc., Schedule 14A (Form DEFA14A), at 10, 18 (June 5, 2019).

[16] *See* Ex. 18, MiMedx Group, Inc., Schedule 14A (Form DEFA14A) (June 10, 2019).

the Company's accounting and internal controls;[17]

- sources filed in other litigation involving MiMedx and its former customers and competitors, including sworn deposition testimony from certain MiMedx executives relating to MiMedx's relationship with AvKARE and improper revenue recognition practices;
- internal Company correspondence and other documents;
- press releases and other publications disseminated by Defendants and other related non-parties;
- securities analyst reports, news articles, websites, and other publicly available information concerning Defendants and other related non-parties; and
- interviews with factual sources, including multiple individuals formerly employed by the Company and/or their counsel, a securities analyst, and financial and accounting experts.

22. Lead Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## III. JURISDICTION AND VENUE

23. The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§78j(b) and 78t(a), and Rule 10b-5 promulgated thereunder by the SEC, 17 C.F.R. §240.10b-5. This Court has

[17] *See* Ex. 19, MiMedx Group, Inc., Current Report (Form 8-K), Items 4.01(a), 9.01, Ex. 16.1 (Dec. 7, 2018).

jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and Section 27 of the Exchange Act, 15 U.S.C. §78aa.

24. Venue is proper in this District pursuant to 28 U.S.C. §1391(b)-(c) and Section 27 of the Exchange Act because MiMedx transacts business and the principal office of the Company is located in this District, many of the acts and practices complained of herein occurred in substantial part in this District, and Defendants disseminated materially false and misleading statements complained of herein to MiMedx shareholders from this District.

25. In connection with the challenged conduct, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, without limitation, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## IV. PARTIES

### A. Lead Plaintiff

26. Lead Plaintiff Carpenters Pension Fund of Illinois was appointed to serve as Lead Plaintiff in this action by Order of this Court dated January 16, 2019 [ECF No. 42]. As shown in the certification filed contemporaneously herewith and incorporated herein, Lead Plaintiff purchased or otherwise acquired MiMedx common stock at artificially inflated prices during the Class Period and suffered

economic losses when true facts about the Company's operating and financial condition leaked out, and the artificial inflation was removed from the price of MiMedx common stock.[18]

**B. Defendants**

**1. MiMedx and the Individual Defendants**

27. Defendant MiMedx is a Florida corporation with its principal place of business located in Marietta, Georgia. From April 25, 2013 through November 7, 2018, MiMedx's common stock was publicly traded on the NASDAQ under the ticker symbol "MDXG." Effective November 8, 2018, MiMedx's common stock was delisted from NASDAQ and began trading on the over-the-counter market operated by OTC Markets Group Inc. under the same ticker symbol.

28. Defendant Petit joined MiMedx as CEO, President, and Chairman of the Board of Directors ("Chairman") on February 24, 2009. Petit was terminated from those positions for cause, effective June 30, 2018.

29. Defendant Senken was CFO of MiMedx from January 15, 2010 through June 6, 2018, and was subsequently terminated from the Company for cause and departed on June 30, 2018, after serving in a transitional role.

---

[18] *See* Certification of Carpenters Pension Fund of Illinois, attached hereto as Ex. 20.

30. Defendant Taylor joined MiMedx on September 22, 2009, as COO and President, and was also named a Director of MiMedx on October 25, 2011. Taylor was terminated from those positions for cause and departed the Company effective June 30, 2018.

31. Defendants Petit, Senken, and Taylor are collectively referred to herein as the "Individual Defendants."

32. During and prior to the Class Period, the Individual Defendants, as senior executive officers of MiMedx and as further detailed herein, were privy to confidential and proprietary information concerning MiMedx. Because of their positions with MiMedx, the Individual Defendants had access to non-public information about the Company's business operations, financial condition, markets, and present and future business prospects via access to internal corporate documents, conversations, and connections with other corporate officers and employees, attendance at management and/or Board meetings and committees thereof, and via reports and other information provided to them in connection therewith. As such, the Individual Defendants had access to material adverse, non-public information concerning the financial condition and prospects of the Company, as discussed in detail below. Because of their possession of such information, the Individual

Defendants knew or recklessly disregarded that the adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

33. The Individual Defendants are liable as direct participants in the wrongs complained of herein. The Individual Defendants participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the material misstatements contained therein and material omissions therefrom, and were aware of their materially false and misleading nature. Each of the Individual Defendants had access to the material, adverse undisclosed information about the Company's business prospects, financial condition, and performance as particularized herein, and knew or recklessly disregarded that these material adverse facts rendered the representations made by or about MiMedx and its business, which were issued or adopted by the Company, materially false and misleading.

34. In addition, the Individual Defendants, by reason of their status as senior executive officers, were "controlling persons" within the meaning of Section 20(a) of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions

of control, the Individual Defendants were able to, and did, directly or indirectly, control the conduct of the Company's business.

35. As senior executive officers and controlling persons of a publicly traded company whose common stock was registered with the SEC pursuant to the Exchange Act, traded on the NASDAQ, and governed by the federal securities laws during the Class Period, the Individual Defendants had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially misleading or untrue so that the market price of the Company's common stock would be based upon truthful and accurate information. The Individual Defendants' material misrepresentations and omissions of material fact during the Class Period violated these specific requirements and obligations.

36. The Individual Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers or acquirers of the Company's publicly traded common stock by disseminating materially false and misleading statements and/or concealing material adverse facts. The scheme deceived the investing public regarding the Company's operating and

financial condition and the intrinsic value of MiMedx common stock, causing Lead Plaintiff and other members of the Class to purchase or otherwise acquire MiMedx common stock at artificially inflated prices.

### 2. Cherry Bekaert

37. Defendant Cherry Bekaert is a certified public accounting firm headquartered in Richmond, Virginia, with an office in Atlanta, Georgia. Cherry Bekaert served as MiMedx's external auditor for fiscal years 2008 through 2016. Cherry Bekaert was "dismissed" by MiMedx effective August 4, 2017.

## V. SUBSTANTIVE ALLEGATIONS

### A. Background of the Company

38. MiMedx is a biomedical company based in Marietta, Georgia that holds itself out as the "leading global supplier of amniotic tissue products."[19] The Company designs, manufactures, and sells products derived from human placental tissues (the thin, moist tissues that protect the fetus), donated by mothers after childbirth. These products are sold in the form of sheets or wraps to be applied to a patient's skin (often referred to as "grafts" or "tissues") or in the form of micronized powders to be applied to a patient's skin either topically or by injection. They are

[19] MiMedx Group, Inc., Annual Report (Form 10-K), at 2 (Mar. 1, 2017) ("2016 Form 10-K").

intended to enhance healing, modulate inflammation, or minimize scar tissue formation in patients.

39. Approximately one year after MiMedx was formed, on February 24, 2009, the Company appointed Petit as Chairman, CEO, and President. When Petit joined the Company, MiMedx was a relatively small skin-graft manufacturer with less than $1,000 in revenue. In 2011, the Company acquired a proprietary sterilization process called "PURION" from Surgical Biologics, LLC which was designed to maximize production yield while minimizing processing costs. Employing the newly acquired PURION process, the Company developed its two primary commercial products during the Class Period: EpiFix and AmnioFix.

40. EpiFix is a Wound Care product configured for external use. It is intended to treat inflammation and chronic wounds, including diabetic foot ulcers ("DFUs"), venous leg ulcers ("VLUs"), arterial ulcers, burns, and surgical wounds. EpiFix is sold in a sheet (graft) form, in 13 different sizes including three mesh configurations. During the Class Period, prices ranged from approximately $895 per graft to $6,700 per graft, with the most expensive being the 7x7 cm graft.[20] EpiFix is also sold in an injectable, micronized powder form, in three different sizes.

---

[20] *See* Ex. 21, Viceroy Research Group, *MiMedx's employment of kickback & bribery scheme inducers makes it uninvestable* (Sept. 20, 2017), at 34.

41. AmnioFix is a Surgical, Sports Medicine & Orthopedics ("SSO") product configured for internal, surgical use. It is intended to treat inflammation, minimize scar tissue formation, and treat conditions such as tendonitis, plantar fasciitis, lateral epicondylitis, medical epicondylitis, bursitis, strains, and sprains. Like EpiFix, AmnioFix is sold both in sheet form (AmnioFix and AmnioFix Wrap) and injectable, micronized powder form (AmnioFix Injectable). Unlike EpiFix, however, AmnioFix is not covered by Medicare, Medicaid, or private insurance.

42. MiMedx operates one business segment, called Regenerative Biomaterials, which includes all of its products. However, MiMedx reports revenue in two separate product categories: Wound Care and SSO. Throughout the Class Period, Wound Care represented the larger of the two categories, with 55%-75% of total revenue (primarily from sales of EpiFix), compared to SSO, which comprised 20%-25% of total revenue (primarily from sales of AmnioFix).

43. The majority of the Company's revenues come from domestic sales to health care customers throughout the United States. These customers can be broken into two general categories: government customers and private "commercial" customers. The Company's government customers include hospitals and other health care facilities operated by the VA and United States Department of Defense

("DOD"). MiMedx's commercial customers, on the other hand, are privately owned and operated health care providers such as hospitals, clinics, and doctors' offices.

### B. MiMedx Drove Revenue Through Improper Sales and Distribution Practices

44. To achieve the continuous growth that Petit regularly spoke of, Defendants "emphasized short-term business goals over compliance and ethics . . . , acted against employees who raised concerns about the Company's practices and marginalized the Company's legal and accounting departments and advisors."[21] As Tom Tierney, a former Regional Sales Director in MiMedx's Surgical products, described, MiMedx had a "win at all cost" company culture, with "***a mind boggling level of sales and accounting irregularities.***"[22] As part of this culture, the Company admitted in the Restatement:

> The Company failed to establish a tone at the top that demonstrated a commitment to integrity and ethical values, resulting in activity by senior management, members of the sales group and others that was

---

[21] Ex. 2, at Ex. 99.1.

[22] Ex. 22, Gretchen Morgenson, Joseph Walker & Charley Grant, *Highflying Medical Firm, a Help to Wounded Veterans, Falls to Earth*, WALL ST. J., July 23, 2018, at 4. Another MiMedx whistleblower added, "[y]ou can't fathom the amount of fraud that was happening." Ex. 23, Viceroy Research Group, *More whistleblowers come forward with details of MiMedx sales scheme* (Oct. 10, 2017), at 5. Further corroborating the investigative reporting to date, the whistleblower stated: "Everything in the Aurelius and Viceroy reports, I can attest to." *Id.* Viceroy Research Group ("Viceroy") "notified the SEC/DOJ of these concerns as [they] were informed local invoices will prove MiMedx is conducting this activity." *Id.*

inconsistent with both the accounting applied and applicable regulatory requirements.[23]

### 1. MiMedx Offers Inducements to Secure Sales

#### a. The Company Targets Health Providers with a Campaign of Influence

45. During the Class Period, the Company took the position that all of its products are "minimally manipulated" human tissues and therefore qualified as "361 HCT/Ps," meaning products that are regulated solely under Section 361 of the Public Health Service Act (21 C.F.R. §361) and were exempt from United States Food and Drug Administration ("FDA") and other pharmaceutical regulations and guidelines.[24] Because of the perceived lack of regulations, Defendants set an inappropriate tone at the top, encouraging and training MiMedx sales representatives to work loosely and aggressively in a lawless environment they referred to as the "Wild West." Growing business and beating competitors were key objectives at

[23] Ex. 1, at 81; *see also* Ex. 2, at 5, Ex. 99.1.

[24] The FDA, to the contrary, has declared that the Company's injectables do not qualify as 361 HCT/Ps, as they are not minimally manipulated. *See* Letter from Mary A. Malarkey to Bill Taylor, Surgical Biologics – Untitled Letter (Aug. 28, 2013), https://www.fda.gov/biologicsbloodvaccines/guidancecomplianceregulatoryinformation/complianceactivities/enforcement/untitledletters/ucm367184.htm; Ex. 1, at 7, 18. Thus, the Company was required to obtain a Biologics License Application from the FDA for its injectables, which it never did during the Class Period.

MiMedx, and therefore the Company expected its employees to generate revenue at all costs.[25]

46. The Company trained its sales force to ingratiate themselves with health care personnel so they would become interested in MiMedx products and advocate their use at health care facilities. As explained by former MiMedx employee Vitale,[26] MiMedx's sales strategy was designed to get its sales representatives into physician offices in a "consulting" capacity.[27] This allowed MiMedx to have "direct interaction with patients, clinic staff responsible for treating patients, and billing

---

[25] Moreover, when questions later began to emerge, the Company maintained that, as 361 HCT/Ps, its products were not governed by the Physician Payments Sunshine Act ("Sunshine Act"), which is a federal statute implemented to increase transparency surrounding drug manufacturers' financial relationships with physicians and hospitals.

[26] Vitale worked at MiMedx from January 27, 2014 to December 29, 2016, as a sales representative and sales manager responsible for portions of MiMedx's South Carolina territory. *See Vitale* 2019 Complaint, at ¶¶9, 20, 55. Vitale served three of the Company's federal accounts, including the Wm. Jennings Bryan Dorn VA Medical Center in Columbia, South Carolina ("Dorn VA"), and approximately 15 commercial accounts in South Carolina, primarily wound care centers and private physician offices. *See Vitale Qui Tam* Complaint, at ¶¶60-61. Vitale was terminated after refusing the Company's request to file an improper insurance claim on excess, channel-stuffed product returned to the Company by Dorn VA. *See Vitale* 2019 Complaint, at ¶¶22-60.

[27] *See Vitale Qui Tam* Complaint, at ¶64.

staff" responsible for processing the paperwork needed to obtain insurance reimbursements.[28]

47. This was part of an "influence campaign" that was "designed to get potential customers to approve the use of MiMedx products in their facility and then expand the use of those products to new patients, uses, and product lines."[29] The influence campaign began with wining and dining health care personnel responsible for purchasing decisions.[30] As Vitale explained, he and other sales representatives were trained to create a relationship with customers by bringing free lunches to the office and taking physicians to dinner.[31] In addition, based on comments from former MiMedx employees and internal MiMedx documents, *The Wall Street Journal* determined that "Company sales representatives were required by Mr. Petit to host lunches and dinners with doctors, meetings he called 'healing reviews.'"[32] For example, an internal MiMedx spreadsheet reviewed by *The Wall Street Journal*

---

[28] *Id.*

[29] *Id.* at ¶69.

[30] *Id.* at ¶65.

[31] *Id.*

[32] *See* Gretchen Morgenson, *MiMedx Kept Cheaper Products Out of Its Offerings to VA Hospitals*, WALL ST. J. (Oct. 5, 2018), https://www.wsj.com/articles/mimedx-kept-cheaper-products-out-of-its-offerings-to-va-hospitals-1538731801; *see also Fox* Counterclaim, at ¶54; *Vitale Qui Tam* Complaint, at ¶65.

and provided to federal investigators, "show[ed] hundreds of company meals hosting thousands of doctors over 10 months in 2016."[33] MiMedx representatives also used speaker programs to reward physicians and solicit new customers. The Company's speaker programs paid customer physicians between $600 and $5,000 per "speech," to "read PowerPoint slide decks prepared by MiMedx extolling the benefits of the [C]ompany's products to fellow physicians."[34] Defendants' inducements violated a host of federal statutes, particularly when made to VA employees, as detailed below.[35]

**b. MiMedx Markets Its Products by Guaranteeing and Gaming Reimbursement**

48. The Company depends heavily on its customers having the ability to obtain reimbursement for the costs of its products from third-party sources. The Company states that its "growth substantially depends on adequate levels of third-

[33] *See* Morgenson, *supra* n.32.

[34] *See Vitale Qui Tam* Complaint, at ¶68.

[35] On May 8, 2018, for example, the DOJ announced that employees at the Dorn VA were indicted by a federal grand jury for knowingly committing health care fraud and other criminal acts related to MiMedx. *See* Department of Defense Indictment ("*Becker* Indictment"), *United States v. Becker*, No. 6:18-cr-00481-DCC (D.S.C. May 8, 2018) ("*Becker*"); DOJ Press Release, U.S. Attorney's Office, District of South Carolina, *Federal Grand Jury Indictments* (May 8, 2018), https://www.justice.gov/usao-sc/pr/federal-grand-jury-indictments-70. Ultimately, the *Becker* defendants entered into a Pretrial Diversion Agreement with the DOJ in late 2018/early 2019.

party reimbursement for [its] products"[36] and its "success in obtaining third-party reimbursement for [its] products is a significant competitive advantage."[37]

49. Aside from government accounts, the Company's EpiFix customers rely on reimbursement from insurers, including federal insurance programs (*e.g.*, Medicare/Medicaid) and private insurance companies.[38] Federal insurance programs have prescribed coverage criteria and reimbursement rates, while private insurance companies have their own coverage criteria and negotiate payment levels.[39] The ability of MiMedx's customers to obtain reimbursement for EpiFix was critical to the Company's ability to drive sales, particularly because EpiFix was far more expensive than traditional wound care products.[40]

50. To encourage adoption of its products, the Company alleviated reimbursement concerns by offering doctors and hospitals an improper "reimbursement guarantee."[41] As Vitale stated, for example, "MiMedx promised customers that if they used the company's reimbursement specialists, who were

[36] 2016 Form 10-K, at 9.

[37] *Id.* at 11.

[38] *Id.* at 9.

[39] *Id.*

[40] *Vitale Qui Tam* Complaint, at ¶67.

[41] *Id.* at ¶103.

trained certified coders, to submit claims and pursue insurance appeals, then MiMedx would waive payment on any claim rejected by an insurer."[42] In other words, the Company provided customers with a guarantee that MiMedx would cover denied reimbursements as long as the customer followed the Company's guidance and directives.[43] If a reimbursement estimate was inaccurate, and customers failed to receive reimbursement, then MiMedx would cover the cost of the product by providing free products, credits, or debt forgiveness.[44] MiMedx called this initiative the "Reimbursement Hotline Service Guarantee Program."[45]

51. MiMedx also told health care providers that they were not required to pay MiMedx until they received reimbursement from an insurer (*i.e.*, they only had to "pay when paid"). This was evidenced, for example, by the Company's business relationship with Village Podiatry, an Atlanta-based podiatric health care provider with several centers across Georgia, between 2013 and 2016.[46] According to John

---

[42] *Id.*

[43] *See* Ex. 24, Reimbursement Hotline Service Guarantee, Exhibit 3 to John P. Minahan Deposition, *MiMedx Grp., Inc. v. Village Podiatry Grp., LLC*, No. 17EV000617 (Ga. Fulton Cty. Sept. 20, 2017) ("*Village Podiatry*").

[44] *Id.*

[45] *See* Transcript of John P. Minahan Deposition taken on July 20, 2017, *Village Podiatry* ("Minahan Dep."), 110:21-22.

[46] Minahan Dep. 47:10-16; 91:2-6.

P. Minahan ("Minahan"), the CFO of Village Podiatry's parent company, MiMedx and Village Podiatry had an off-balance sheet arrangement.[47] MiMedx shipped inventory to Village Podiatry centers but Village Podiatry would only pay MiMedx for this inventory if Village Podiatry was reimbursed from an insurer.[48] If the insurer did not reimburse Village Podiatry, on the other hand, it was not obligated to pay MiMedx for the products it used.[49] In instances like this, the Company would treat the transaction as a "no charge evaluation," which meant neither the doctor nor the patient would have to pay for it, and it would be booked as a selling, general, and administrative ("SG&A") expense. Such practices were designed to encourage the doctor to continue using MiMedx products in the future.

52. The Company also trained its sales representatives to encourage doctors to use more MiMedx grafts, and larger MiMedx grafts, than were necessary to treat patients' conditions by marketing the reimbursements available for such grafts.[50] For example, sales representatives provided physicians' offices with a document

---

[47] *Id.* 91:9-11.

[48] *Id.* 120:7-11.

[49] *Id.* 47:10-16, 91:2-6; *see also* petite parker the barker, *How close is MiMedx to the end of death row?* (Nov. 22, 2017), http://petiteparkerthebarker.com/how-close-is-mimedx-to-the-end-of-death-row.

[50] *See* Ex. 25, Viceroy Research Group, *Viceroy activates 'The Honeypot' – Parker H. Petit & MiMedx caught red-handed*, at 4 (Dec. 14, 2017).

titled, "Epifix Medicare Office Reimbursement Made Easy."[51] This document instructed doctors to submit EpiFix reimbursement claims to Medicare for the maximum amount of billable units and detailed the spread between the cost of EpiFix and the Medicare reimbursement rate, *i.e.*, the profit the doctor would receive.[52]

53. Each of these practices violated multiple federal statutes because they resulted in false claims submitted to federal health care programs.[53] In particular, they violated the Anti-Kickback Statute ("AKS")[54] and the False Claims Act

---

[51] *Id.*

[52] *Id.*

[53] *See, e.g.*, Centers for Medicare & Medicaid Services, *Laws Against Health Care Fraud Resource Guide* (Sept. 2015); DOJ Press Release, Office of Public Affairs, *Pharmaceutical Manufacturers to Pay $421.2 Million to Settle False Claims Act Cases* (Dec. 7, 2010), https://www.justice.gov/opa/pr/pharmaceutical-manufacturers-pay-4212-million-settle-false-claims-act-cases ("The difference between the resulting inflated government payments and the actual price paid by healthcare providers for a drug is referred to as the 'spread.' . . . Because payment from the Medicare and Medicaid programs was based on the false inflated prices, the government alleged that the defendants caused false claims to be submitted to federal healthcare programs[.]").

[54] The AKS, 42 U.S.C. §1320a-7b, makes it a crime to knowingly and willingly offer, pay, solicit, or receive anything of value (directly or indirectly) in order to induce or reward referrals of items or services reimbursable by a federal health care program.

("FCA")[55] by inducing the use of MiMedx products over others, enabling the Company's customers to profit from or, at a minimum, accept products without normal financial risk, because a customer only paid MiMedx if an insurer paid the customer.[56]

### 2. Defendants Manipulate Charitable Contributions to Gain Sales

54. While the Company's scheme induced medical providers to use MiMedx products, they were not accessible to all patients even if covered by insurance. Patients still incurred out-of-pocket costs for using such products,

---

[55] The FCA, 31 U.S.C. §3729, *et seq*., protects the federal government from being overcharged or sold substandard goods or services by imposing civil liability on any person who knowingly submits, or causes the submission of, a false or fraudulent claim to the federal government (including federal health care programs such as Medicare or Medicaid), which, in the health care context, includes billing for unnecessary services and billing for services or items that were not rendered.

[56] *See* OFFICE OF INSPECTOR GEN., DEP'T HEALTH & HUMAN SERVS., *Special Fraud Alert: Physician-Owned Entities* (Mar. 26, 2013), at 1, https://oig.hhs.gov/fraud/docs/alertsandbulletins/2013/pod_special_fraud_alert.pdf ("Special Fraud Alert") ("One purpose of the anti-kickback statute is to protect patients from inappropriate medical referrals or recommendations by health care professionals who may be unduly influenced by financial incentives."); *see also* OFFICE OF INSPECTOR GEN., DEP'T HEALTH & HUMAN SERVS., *Supplemental Special Advisory Bulletin: Independent Charity Patient Assistance Programs*, 79 Fed. Reg. 31120-01 (May 30, 2014) (The HHS-OIG has explained, "[f]or purposes of the [AKS], 'remuneration' includes the transfer of anything of value, directly or indirectly, overtly or covertly, in cash or in kind. The [AKS] . . . cover[s] any arrangement where one purpose of the remuneration was to give or obtain money for the referral of services or to induce further referrals.").

including co-payments (a fixed amount that a patient owes for a treatment), co-insurance (a fixed percentage of a treatment owed by a patient), and deductibles (a fixed amount owed by a patient during a given time period). Patients who could not afford these out-of-pocket costs might not elect to use MiMedx's products. Medical providers might also reject MiMedx's products based on concerns that they could not collect these out-of-pocket costs from patients.

55. MiMedx came up with a way to address this – it would illegally subsidize co-payments and co-insurance for its products and thereby induce medical providers to use them. Such subsidies violated the FCA, AKS, and other federal statutes. Therefore, to avoid detection, MiMedx subsidized such payments indirectly, by manipulating charitable donations to the Patient Access Network Foundation ("PAN"). PAN is a charitable organization that seeks to help federally and commercially insured patients with out-of-pocket expenses.

56. Distributions from PAN are issued from "disease funds" that cover insurance-related costs associated with specific types of diseases.[57] Among its programs, PAN covers certain insurance-related costs on behalf of wound care patients in the Medicare program. During the Class Period, PAN operated funds for

[57] *Vitale Qui Tam* Complaint, at ¶109.

donations related to the treatment of DFUs and VLUs, two conditions that MiMedx's EpiFix grafts were frequently used to treat.[58] As of January 2017, the DFU fund and VLU fund each awarded up to $3,500 per patient annually.[59] Patients seeking assistance from these funds were required to submit an application to PAN demonstrating financial need, which meant that the patient earned less than $50,000 per year. As grants could only be awarded when the funds were "open" – *i.e.*, sufficiently funded by donations from PAN contributors – grants were awarded to eligible applicants on a first-come, first-serve basis until the available money was exhausted.[60]

57. MiMedx realized it could direct its PAN donations to cover co-payments for its own products. The Company did so by coordinating the submission of patient applications, which would be held by its sales representatives until MiMedx donated to the PAN fund.[61] After the donations were made, in effect opening the fund, MiMedx sales representatives submitted the patient applications

58 *Id*. at ¶110.

59 *Id.*

60 *Id*. at ¶145.

61 *Id*. at ¶170.

for co-payment amounts that matched the dollars contributed by MiMedx, which were then funneled to the patients.[62]

58. MiMedx specifically trained its sales representatives to use PAN to complete sales where patients would otherwise be unable to afford MiMedx products. Moreover, sales representatives were instructed by MiMedx to wait until they received notice from MiMedx that the appropriate PAN fund was open (*i.e.*, funded by MiMedx). Lou Roselli ("Roselli"), the Company's Senior Director of Operations, was in direct communication with PAN and sent e-mails to sales representatives every step of the way,[63] including telling MiMedx sales representatives that he would "keep [them] posted on [MiMedx's] ability to reopen the VLU fund"[64] (over which MiMedx *supposedly* had no control). Roselli also told MiMedx sales representatives to let him know if they had any trouble submitting PAN applications because he could "help communicate with PAN to solve and [sic] bumps in the road."[65] By contrast, sales representatives from other companies had

---

[62] *Id.*

[63] *See* Ex. 26, E-mails from Roselli to MiMedx sales team, at 1-3.

[64] *Id.* at 1.

[65] *See id.*

no assistance and no way of knowing when funds would be available through PAN. As Roselli said, this was "our advantage."[66]

59. Roselli would first send an e-mail, with Taylor copied, notifying sales representatives to be prepared to submit their applications.[67] When the fund opened, sales representatives would receive another e-mail from Roselli with the green light to submit their applications all at once until the funds were depleted. When PAN applications were accepted, PAN sent confirmation to the patient's physician, and the clinical procedure using MiMedx products was then scheduled.

60. MiMedx instructed its sales representatives to always indicate that a patient's income was under $50,000, so that the patient would be deemed "in need"[68] – regardless of whether this was true. MiMedx's management also cautioned sales representatives not to alert the Company's clients that the sales representatives had knowledge that PAN's VLU/DFU fund would be opening.[69]

---

[66] *Id.* at 3.

[67] *See id.*

[68] *Vitale Qui Tam* Complaint, at ¶130.

[69] *Vitale Qui Tam* Complaint, at ¶143. In addition, beginning in 2016, MiMedx required sales representatives to submit weekly reports including both sales metrics and the number of patients eligible for PAN grants in order to more closely monitor the PAN scheme. These weekly reports were "rolled up" to MiMedx's Regional Sales Directors who, in turn, created regional reports sent to MiMedx's regional vice presidents for regions East, Midwest, and West. This alerted them to the exact

61. MiMedx's ability to funnel payments through PAN incentivized doctors to use its products, which they might not otherwise choose due to concerns over high costs and their patients' inability to pay. In this way, MiMedx profited from providing these illegal subsidies – essentially kickbacks to doctors – as they gave MiMedx a competitive advantage (encouraging use of its products over competitors' products), and boosted the Company's revenue, allowing Defendants to maintain the illusion of the Company's consistent growth during the Class Period.

62. Defendants' PAN scheme also tainted federal health care insurance claims, causing harm to Medicare/Medicaid and other federal health care insurers, in violation of the AKS, FCA, and other federal statutes. As the HHS Office of Inspector General ("HHS-OIG") has explained, federal health care insurers and other beneficiaries are harmed by such claims because the ability of manufacturers like MiMedx "to subsidize copayments for their own products may encourage manufacturers to increase prices, potentially at additional cost to federal health care programs and beneficiaries who are unable to obtain copayment support."[70] Further, "an Independent Charity PAP must not function as a conduit for payments or other

---

number of PAN applicants who would be seeking coverage for MiMedx-related treatments.

[70] *See* Special Fraud Alert, *supra* n.56.

benefits from the pharmaceutical manufacturer to patients and must not impermissibly influence beneficiaries' drug choices."[71] This means "pharmaceutical manufacturers and their affiliates should not exert any direct or indirect influence or control over the charity or its assistance program."[72] Therefore, according to the HHS-OIG, paying a federally insured patient's co-pay or co-insurance violates the AKS and FCA.[73]

63. In fact, the illegality of this practice is supported by PAN's settlement with the DOJ in October 2019.[74] The DOJ found that PAN violated the AKS through a similar kickback scheme involving pharmaceutical companies.[75] Moreover, the

---

[71] *Id.* at 31121.

[72] *Id.*

[73] *See* OFFICE OF INSPECTOR GEN., DEP'T HEALTH & HUMAN SERVS, *Publication of OIG Special Fraud Alerts*, 59 Fed. Reg. 65372-01 (Dec. 19, 1994) (explaining that routine waiver of co-pays/co-insurance "results in (1) false claims, (2) violations of the anti-kickback statute, and (3) excessive utilization of items and services paid for by Medicare.").

[74] DOJ Press Release, U.S. Attorney's Office, District of Massachusetts, *Foundations Resolve Allegations of Enabling Pharmaceutical Companies to Pay Kickbacks to Medicare Patients* (Oct. 25, 2019), https://www.justice.gov/usao-ma/pr/foundations-resolve-allegations-enabling-pharmaceutical-companies-pay-kickbacks-medicare.

[75] *See id.* In addition, on November 6, 2018, the DOJ filed a Statement of Interest in *Vitale Qui Tam*, in effect rebutting MiMedx's arguments for dismissal and requesting that if the court were to dismiss *Vitale Qui Tam*, "any such dismissal be without prejudice to the United States" so that any future actions by the United States against MiMedx would not be precluded. United States' Statement of Interest, at

Company admitted in the Restatement that it did not have "effective, documented and continuous risk assessment process and related controls to properly monitor, identify and analyze regulatory compliance risks, including compliance with applicable regulations around product pricing, payments to medical professionals, and related activities . . ."[76]

**C. Defendants Employ a Massive Fraudulent Revenue Recognition Scheme**

64. While Defendants' improper sales practices enabled the Company to get an edge on the competition and boost sales, they were alone insufficient to drive the massive revenue growth Defendants were set on achieving. Accordingly, Defendants cultivated special arrangements with MiMedx's Master Distributors that allowed MiMedx to prematurely recognize revenue and facilitated a massive channel stuffing scheme. This scheme involved shipping out or otherwise placing significant quantities of merchandise in the Company's sales channels in order to record revenue for such shipments or placements, even though they were not true sales and could not be recognized as such under GAAP. The improper channel stuffing, which

---

14, *United States, ex rel., Vitale v. MiMedx Grp., Inc.*, No. 3:17-cv-00166-RBH (D.S.C. Nov. 6, 2018), ECF No. 68.

[76] Ex. 1, at 82.

routinely occurred at the end of financial quarters, was carefully orchestrated by Defendants to help the Company achieve their promised revenue forecasts.

### 1. The Company's Fraudulent Revenue Scheme with Government Accounts

#### a. The Company Courts Lucrative Government Accounts

65. Government accounts such as VAs provided a huge source of revenue for the Company. The VA system is the largest integrated health care system in the United States, comprised of over 1,200 medical facilities including hospitals and outpatient clinics, serving approximately nine million enrolled veterans of U.S. military service each year. In addition to being a large source of sales,[77] such accounts were advantageous because sales were not contingent upon the ability to gain reimbursement from third-party insurers.

66. Beginning in 2012, the Company made a major push to obtain lucrative government business. It grew its sales force by acquiring direct sales representatives from ABH,[78] a subsidiary of Shire Pharmaceuticals LLC ("Shire"), which competed with MiMedx in the wound care market with a product called Dermagraft.

---

[77] Transcript of Michael Carlton Deposition, *Mid-South Biologics, LLC v. MiMedx Grp., Inc.*, No. 2:17-cv-02028-JTF-egb (W.D. Tenn. Jan. 13, 2017), ECF No. 43-3, ("Carlton Dep."), 41:14-15.

[78] Carlton Dep. 78:21-24.

According to MiMedx's Senior Vice President of Global Sales, Michael Carlton ("Carlton"), because Shire had laid off its federal division in 2012, the sales representatives from that division were "on the street with VA business," and MiMedx hired them.[79] The sales representatives had already serviced the VAs and were therefore able to convert such business over to MiMedx.[80]

67. In order to sell products to government agencies like the VA, a company often enters into a contract with the agencies under the Federal Supply Schedule ("FSS") program.[81] Access to an FSS contract was thus key to MiMedx obtaining lucrative VA accounts. It had innumerable benefits, including the ability to avoid costs associated with obtaining reimbursements from third-party insurers. According to Vitale, "[u]nlike commercial accounts that reimbursed MiMedx products based on the square cm and subjected doctors and patients to certain reimbursement guidelines, federal accounts had no patient guidelines, meaning

---

[79] *Id.* 79:22-25; 80:1-2.

[80] *Id.* 63:4-5.

[81] According to the VA: "The VA Federal Supply Schedule (FSS) Program establishes long-term government-wide contracts that allow VA facilities and other government agencies to acquire a vast array of medical equipment, supplies, services, and pharmaceuticals directly from commercial suppliers." VA, Office of Procurement, Acquisition and Logistics (OPAL), *Prospective Contractors*, https://www.va.gov/opal/nac/fss/prospective.asp (last visited Mar. 23, 2020).

physicians were able to use as many products without any limitation on reimbursement."[82] Such accounts presented a cash cow for MiMedx.

68. In 2012, MiMedx did not have its own FSS contract with the VA. Accordingly, the Company was introduced to AvKARE, a veteran-owned distribution business with an FSS contract in place.[83] MiMedx knew that if it could partner with AvKARE, it could get onto AvKARE's FSS, which would enable it to get MiMedx products into VAs faster than if MiMedx tried to acquire its own FSS (a six-to-nine month process)[84] and "push[] a lot of products in VAs."[85] AvKARE had not previously been in the wound care business but, as MiMedx now had its "own people in VAs," the parties agreed to a deal, entering into a Production Distribution Agreement ("PDA") on April 19, 2012.[86] The PDA provided that AvKARE would purchase products from MiMedx, and then sell the same products

---

[82] *Vitale Qui Tam* Complaint, at ¶60 n.3.

[83] Carlton Dep. 57:20-25; 58:1-7; 59:25; 60:1-21.

[84] *Id*. 62:16-19; 64:20-21.

[85] *Id*. 54:13.

[86] *Id*. 54:14-24; MiMedx Group, Inc., Annual Report (Form 10-K), Ex. 10.56. (Mar. 15, 2013) ("2012 Form 10-K").

to the VA pursuant to AvKARE's FSS. From that time on, Petit personally managed almost all interactions with AvKARE's principals.[87]

69. The Company disclosed the PDA to the market and stated that AvKARE was one of its "independent" distributors "who sell [MiMedx's] products to their customers or sub-distributors, contractually take title to the products and assume all risks of ownership at the time of shipment."[88] MiMedx further stated that distributors such as AvKARE "are obligated to pay us the contractually agreed upon invoice price within specified terms regardless of when, if ever, they sell the products" and "do not have any contractual rights of return or exchange other than for defective product or shipping error."[89] The Company represented that it "records revenues from sales to our independent stocking distributors at the time the product is shipped to the distributor."[90] Such statements were false.

---

87 *See* SEC Complaint, at ¶135 (the SEC refers to AvKARE as "Distributor E").

88 *See, e.g.*, Letter from Senken to Martin James, Senior Assistant Chief Accountant, SEC (Feb. 8, 2017) at 2.

89 *Id.*

90 *See* 2016 Form 10-K; *see also* 2012 Form 10-K; MiMedx Group, Inc., Annual Report (Form 10-K) (Mar. 4, 2014) ("2013 Form 10-K"); MiMedx Group, Inc., Annual Report (Form 10-K) (Mar. 13, 2015) ("2014 Form 10-K"); MiMedx Group, Inc., Annual Report (Form 10-K) (Feb. 29, 2016) ("2015 Form 10-K") (containing substantially similar statements regarding revenue recognition).

70. Unbeknownst to investors, AvKARE was a mere pass-through. As the Company later admitted, MiMedx and AvKARE had an undisclosed side arrangement that allowed MiMedx to exercise almost complete control over the distribution and sale of MiMedx products to VAs. Even after booking the sale of a product to AvKARE, MiMedx maintained control of the product and responsibility for selling it to VAs. This was confirmed by Carlton, who testified that "***AvKare didn't sell the product. They didn't do anything. They just made it easier to sell***. . . . AvKare just made it easier to do business. They didn't have sales guys."[91] Thus, AvKARE was not an "independent" distributor for MiMedx; it was simply a means to an FSS and an intermediary used to inflate MiMedx's financial statements.

71. Moreover, through ACIII, the Company has admitted that MiMedx and AvKARE had a "course of dealing" contrary to the PDA, whereby AvKARE was not obligated to pay the Company until its products were used by VAs. The Company further admitted that former members of the Company's senior

[91] Carlton Dep. 59:6-7, 15-16; *see also* Ex. 10, at ¶12(c) (USPIS confirming that "[a]lthough AvKare nominally acted as a distributor . . . in practice, AvKare employees played little role in marketing or distributing MiMedx products. Rather, MiMedx maintained what the company called a 'federal sales force,' whose members were responsible for interacting with VA employees, monitoring the stock of MiMedx product on the shelves at VA hospitals, and keeping track of when tissue was implanted in patients.").

management, including Petit, Taylor, Senken, and Cranston, were well aware of this course of dealing:

> [T]he Investigation found evidence that demonstrated, among other things, that former members of senior management, including Mr. Petit, the Company's former Chief Operating Officer, William C. Taylor, the Company's former Chief Financial Officer, Michael J. Senken, and the Company's former Controller, John Cranston, were aware of the Company's course of dealing with its largest distributor [AvKARE] and that this course of dealing was inconsistent with the explicit terms of the contract. Former members of senior management were also aware that this course of dealing included detailed procedures, established as early as 2012, to determine when the distributor would pay for the Company's products.[92]

72. As a result of this course of dealing, the Audit Committee confirmed that the Company improperly recognized a significant amount of AvKARE revenue

---

[92] Ex. 2, at 3; Ex. 14, at 22; *see also* Ex. 6, at 3-4 (citing evidence uncovered by the Audit Committee supporting Petit's and Taylor's "Awareness of the AvKARE Course of Dealings and GAAP Implications"). The Company's interim CFO Edward J. Borkowski ("Borkowski"), who replaced Senken, also found "the same things that [the Audit Committee's accounting firm] KPMG found, where there is a propensity for product to be sold where the customer doesn't have to pay until they get reimbursed by the payer. [This is the] [n]umber 1 reason why the [C]ompany had late payments and the number 2 reason is that customers would take bulk shipment in exchange for extended payment terms." Ex. 5, at 3; *see also* SEC Complaint, at ¶¶169-170; Ex. 7 at 10; Ex. 8, at 13; Ex. 10, at 8-9; *Kruchoski* Counterclaim, at ¶34; *Fox* Counterclaim, at ¶30.

for an extended period of time, one of the primary reasons for the Company's decision to issue the Restatement.[93]

**b. The MiMedx Sales Force Is Tasked with Effectuating the Side Deal with AvKARE**

73. To carry out the parties' side arrangement, MiMedx sales representatives were directed to fulfill AvKARE's responsibilities for selling MiMedx products to VAs and obtaining purchase orders from VAs, which allowed MiMedx to be paid. Indeed, MiMedx even disseminated a document entitled "AvKARE Code of Conduct" to its sales force that required MiMedx sales representatives to "represent MiMedx products [at VAs] on behalf of AvKARE."[94]

74. MiMedx sales representatives were responsible for setting up consignment arrangements with VAs through AvKARE. In theory, these arrangements would enable VA doctors to have the products available on hospital

---

93 *See* Ex. 2, at 2-3; Ex. 14, at 22-23; Ex. 27, Ltr. from the Company's General Counsel and Secretary, Alexandra O. Haden ("Haden"), to Wayne Bush, Director, Nasdaq Listings Qualifications, dated July 10, 2018, at 1; Ex. 6, at 1-2 (observing that the Restatement was necessitated in part by "MiMedx's business practices with AvKare varying significantly from the contract," including "[i]nvestigational evidence" from ACIII that "AvKare paid MiMedx after receiving payment from the VA . . . MiMedx retained significant responsibility of the product after the sale to AvKare . . . [and] AvKare had a right of return throughout the relationship with MiMedx even in situations in which tissues got lost, or implanted").

94 *Fox* Counterclaim, at ¶29.

shelves for use as needed, and AvKARE would continue to own the products until the VAs in effect purchased them by using them in a medical procedure. But MiMedx, not AvKARE, continued to be responsible for the consignment products shipped to the VAs.

75. In fact, MiMedx management directed sales representatives to order products under AvKARE's account through the Company's online customer relationship management platform at SalesForce.com ("SalesForce").[95] This happened regardless of whether AvKARE had requested the orders.[96] Such orders would then be "billed" to AvKARE's account and MiMedx would ship the products directly to the VA prior to payment for those products.[97] To conceal the scheme, MiMedx and AvKARE exchanged false sales documents for the bogus VA sales: MiMedx would send an invoice to AvKARE, and AvKARE would then cut a dummy purchase order to MiMedx, even though AvKARE had not requested or

---

95 *See id.* at ¶28.

96 *Id.*

97 *Kruchoski* Counterclaim, at ¶¶27-29.

initiated the order.[98] MiMedx and AvKARE even shared a fax number to facilitate this process.[99]

76. MiMedx's substantial performance obligations involved MiMedx sales representatives monitoring and documenting products shipped to VAs.[100] As Kruchoski stated: "When the 'consignment' product on the shelves of the VA was actually ordered and used by the VA, MiMedx sales reps would generate a purchase order for the product actually ordered, and submit it directly to MiMedx, ***not*** AvKARE – even though product had been previously invoiced to AvKARE by MiMedx and was ostensibly owned by AvKARE."[101] MiMedx could then collect from AvKARE based on the VA purchase order. MiMedx referred to this arrangement as the "'pay on PO' methodology" for AvKARE.[102]

77. In turn, MiMedx sales representatives would receive their full sales commissions for VA product placement only if the product was ultimately used by

---

98 *Id.* at ¶31.

99 *See, e.g.*, Ex. 28, Viceroy Research Group, *Viceroy's MiMedx Greatest Hits*, at 25 (May 11, 2018) (showing an AvKARE invoice from a VA hospital with a MiMedx employee listed as the "Vender Point of Contact" and MiMedx's fax number listed before AvKARE's phone number); *see also* Ex. 29, Aurelius Value, *An Open Letter to MiMedx Auditors* (Feb. 15, 2018).

100 *See Fox* Counterclaim, at ¶¶29-30; *Kruchoski* Counterclaim, at ¶30.

101 *Kruchoski* Counterclaim, at ¶32.

102 Ex. 10, at ¶23 (citing e-mail to Petit, Taylor, and others).

VAs.[103] A January 21, 2014 memorandum circulated to Petit and others by a MiMedx employee explains that a delay in paying sales commissions was tied to the fact that "[t]here is an obvious lag from the time the product is implanted to when the Federal facility places the [purchase order] with AvKare. This extends the time when MiMedx gets paid."[104] Thus, the Company's compensation structure facilitated the scheme by directly incentivizing MiMedx sales representatives to continue marketing products to VAs so they would receive full commissions upon the VAs' use of the products. The Company's compensation practices also acknowledge its continuing performance obligations (ensuring that the VA used the products) even after the products were sold to AvKARE.

### c. Defendants Carefully Monitor Revenue Generated Through Their Side Arrangement with AvKARE

78. Petit and Taylor caused MiMedx to closely manage and track the payment process for the side arrangement they had reached with AvKARE.[105] Each weekday from late 2012 to July 2017, AvKARE sent MiMedx a daily report listing

---

[103] *See Kruchoski* Counterclaim, at ¶32; *Fox* Counterclaim, at ¶31.

[104] Ex. 10, at ¶23.

[105] *See* SEC Complaint, at ¶¶148-150.

each product for which AvKARE had received a purchase order from the VA, the price paid by the VA, and the patient treated with the product.[106]

79. The Company's Audit Committee confirmed that, in accordance with Company procedures known to former members of senior management, including Petit, Taylor, Senken, and Cranston:

> [T]he distributor [AvKARE] sent the Company a daily written report listing each tissue that the distributor's customer had just purchased from the distributor and for which the customer would soon be paying the distributor. Each week the distributor would remit scheduled payments to the Company for only those tissues that the distributor's customer had previously purchased. The Company tracked and monitored these daily reports and reconciled the payments that the Company received from the distributor to the tissues purchased by the distributor's customers (compiled from the daily reports).
>
> Weekly summaries of this reconciliation process were distributed to various Company personnel, including members of the Finance and Accounting group. ***This reconciliation process demonstrated that payment by the distributor to the Company was predicated on purchases made by the distributor's customer [the VA]***.[107]

80. Indeed, the report was sent to a group of up to three MiMedx employees called the "reconciliation group" or "federal reconciliation group" ("Reconciliation Group"), which reported to one of the Company's Executive Vice Presidents (who

---

[106] *See id.* at ¶151.

[107] *See* Ex. 2, at 3; Ex. 14, at 22.

in turn reported directly to Taylor).[108] Personnel from the Reconciliation Group then e-mailed the Executive Vice President each day to report the total dollar value of VA purchase orders.[109] At times, the Executive Vice President forwarded the e-mail to Petit, Taylor, Senken, and others.[110]

81. Compiling data from the daily reports of VA purchase orders, the Reconciliation Group created "Weekly Revenue" tables, which were circulated each Monday to the Executive Vice President, the Controller, and another MiMedx accounting employee, and sometimes forwarded to Petit, Taylor, and Senken.[111] Approximately ten days after the close of each week, AvKARE paid MiMedx the total cash amount identified in the Weekly Revenue table, to the penny.[112] Employees from the Reconciliation Group then confirmed that AvKARE's payment matched the anticipated amount.[113] This reconciliation process reflected the parties' side arrangement where AvKARE's payments to MiMedx were predicated on purchases by the VA.

---

108 *See* SEC Complaint, at ¶152.

109 *See id.* at ¶153.

110 *See id.*

111 *See id.* at ¶154.

112 *See id.* at ¶155.

113 *See id.*

82. In addition to tracking the AvKARE reconciliation process through the daily and weekly reporting described above, Petit and Taylor required MiMedx sales staff to do quarterly physical inventory counts at each VA facility.[114] MiMedx used a metric titled "AvKareShippedNotImplanted" to track the amount of product that was shipped to VAs, invoiced to AvKARE, and booked as MiMedx revenue, but continued to sit on VA shelves unused.[115]

83. MiMedx also tracked inventory that was used by the VA, but not subject to a purchase order, using a metric titled "Implanted No PO."[116] MiMedx sales representatives reported such inventory to MiMedx's Reconciliation Group.[117] Because AvKARE was not required to pay MiMedx until the VA issued a purchase order, MiMedx tasked its sales representatives with researching and resolving "Implanted No PO" issues.[118] They worked with the VA medical staff to get VA physicians to submit the paperwork necessary for the VA to issue a purchase order to AvKARE.[119]

---

[114] *See id*. at ¶163.

[115] *Fox* Counterclaim, at ¶¶28-33; *Kruchoski* Counterclaim, at ¶¶28-33, 59.

[116] *See* SEC Complaint, at ¶164.

[117] *See id.*

[118] *See id.*

[119] *See id.*

84. If the issue could not be resolved, and the inventory was determined to be missing, then MiMedx simply credited AvKARE for the value of the missing inventory.[120] Similarly, if MiMedx sales representatives reported that products were dropped or damaged, then MiMedx credited AvKARE the value of the loss.[121] Indeed, ACIII confirmed that "the Company routinely issued credits to [AvKARE] for lost, damaged or missing tissues."[122] And if MiMedx sales representatives learned that a VA facility wanted to return a product, then MiMedx accepted the return and credited AvKARE's accounts receivable balance.[123] In sum, MiMedx retained risk of loss on all sales to AvKARE.[124]

85. AvKARE made payments in accordance with this side agreement from at least January 2013 through the end of the parties' relationship in July 2017.[125] At

---

[120] *See* SEC Complaint, at ¶¶145, 165.

[121] *See id.* at ¶145, 166.

[122] Ex. 2, at 4; Ex. 14, at 23; Ex. 6, at 5-6 (describing evidence uncovered by the Audit Committee that Petit and Taylor had "Awareness of Credits Issued to AvKare for Returned[,] Lost[,] and Damaged Tissue").

[123] *See* SEC Complaint, at ¶¶146, 167.

[124] *See id.* at ¶168.

[125] *See id.* at ¶156.

no point during that period did AvKARE make payments consistent with the terms of the PDA.[126]

**d. Defendants Accelerated Their Fraudulent Revenue Scheme Through Distributor AvKARE**

86. Defendants' premature revenue recognition was accompanied by significant channel stuffing. Beginning in third quarter 2014 ("3Q14"), the Company accelerated its channel stuffing efforts through AvKARE.[127] During that quarter, senior management including Roselli and Mark Diaz ("Diaz"), MiMedx's Executive Vice President of Sales Operations, directed the Company's senior sales managers to significantly increase products shipped to VAs through AvKARE, even if the VAs did not need or request the products, in order to inflate revenue.[128] These efforts led to significant amounts of excess MiMedx product sitting on VA shelves.[129] Defendants' channel stuffing through AvKARE continued into 2015.[130]

---

[126] *See id.*

[127] *Fox* Counterclaim, at ¶¶39-40.

[128] *See id.*; Ex. 30, Aurelius Value, *MiMedx: Flying Too Close To The Sun* (Sept. 20, 2017), at 3; Ex. 31, E-mail from Jess Kruchoski, Regional Sales Director, MiMedx, to Lexi Haden, General Counsel & Secretary, MiMedx (Nov. 4, 2016), at 1.

[129] *See id*.

[130] *See id*. at ¶41.

87. By fourth quarter 2015 ("4Q15"), Defendants were "way behind" on their aggressive revenue forecast for the quarter, so they leaned on AvKARE even more.[131] As the quarter came to a close, Roselli called multiple employees who handled VA accounts with instructions to add as much MiMedx product as possible to the shelves of the VA hospitals in their territories.[132] As Roselli admitted to Kruchoski, former Regional Sales Director of the North Central Region,[133] on one such call, "we're short overall."[134] And despite Kruchoski's concerns over the legality of this practice and the fact that it jeopardized VA accounts, Roselli made

---

[131] *Kruchoski* Counterclaim, at ¶49.

[132] *Tornquist* Counterclaim, at ¶38. Tornquist, a former Account Executive, was employed at MiMedx from October 2013 through December 12, 2016. During this time, Tornquist held the position of Account Executive of MiMedx's Greater Minneapolis territory. *Id*. at ¶7.

[133] Kruchoski was employed at MiMedx from July 2012 through December 12, 2016. Kruchoski began his employment in July 2012 as an Account Executive of Government Sales for the Company's Wisconsin and Minnesota territories. *Kruchoski/Tornquist* Complaint, at ¶15. In October 2013, Kruchoski was promoted to Regional Sales Director of the North Central Region, which he held through the end of his employment at MiMedx. *See id.* Kruchoski, along with Tornquist, filed formal whistleblower complaints with the SEC declaring, under penalty of perjury, the truthfulness of his allegations. *See Kruchoski/Tornquist* SEC Form TCR, pp. 2-9.

[134] *Kruchoski* Counterclaim, at ¶58; Ex. 7, at ¶¶18-19 (citing an audio recording of the call reviewed by the USPIS).

clear that he was communicating a "company directive" from Petit to stuff the channel or face dire consequences in January:

> No, I – look, I get it. I – I've sat on the other side and I've been asked to do it, you know. And then I'm on the other side asking everybody to do it, too, you know. What I'll tell you is that – I mean, if you can do it, you know, and just don't want to do it, and orders come through – this is – ***this is right out of [Pete Petit's] mouth***. So this is the – Pete says – I [unintelligible] – I fully understand the risk that we are taking. We share that same risk with him. ***And he said: But this is a company directive***. So if they can help they need to help. And if they don't and orders come through between now and [a team meeting at the end of January] – this is the only time I've heard him cuss. He said: Their ass is grass. So I'm just – I'm just putting it out there. I don't want to see anybody in trouble because an order came in in January that he didn't want to come in, you know.[135]

88. These tactics helped the Company meet its guidance for 4Q15, achieving revenue of $51,835,000. But by the end of 2015, over "$10 million of MiMedx products were sitting on VA hospitals' shelves which, those hospitals had neither bought nor requested."[136] Moreover, Defendants had pulled significant sales from first quarter 2016 ("1Q16") into 4Q15 at Petit's direction, leaving them in a precarious position.

---

[135] *Fox* Counterclaim, at ¶50; *Kruchoski* Counterclaim, at ¶53; Ex. 7, at ¶¶18-19. Later in the call, Roselli added that "[b]y – by June – by June, we're gonna take credit for all this stuff back anyways. We're [sic] bring all this back. It's – we're gonna credit AvKare." *Id*. at ¶18.

[136] *Tornquist* Counterclaim, at ¶38.

89. As a result, Defendants were forced to further increase the Company's channel stuffing in order to show more growth in 1Q16. Near the end of 1Q16, Steve Blocker, MiMedx's Area Vice President for the Central Area ("Blocker"), instructed several MiMedx employees, including Kruchoski, to put as much product as possible on the shelves of the Minneapolis VA Health Care System ("Minneapolis VA") to hit a target for 1Q16.[137] Blocker admitted to Kruchoski that MiMedx products were already "spilling out of every cabinet available to us" at VA hospitals, causing "questions [about] the amount of product that's being used," which Blocker said he had previously communicated to the Company's Chief Commercialization Officer, Christopher M. Cashman ("Cashman").[138] Yet, Blocker was required to "***do ten percent growth on top of – you want me to provide real growth on a false number and I can't – I can't do that***."[139]

90. Blocker had explained to Cashman that there were impediments to hitting the phony number they had asked him to hit ($3.7 million), including par

[137] *Fox* Counterclaim, at ¶54. Corroborating the Kruchoski and Blocker conversations above, Tornquist was also instructed by Blocker, near the end of March 2016, to put as much MiMedx product as possible on the shelves of the Minneapolis VA to hit a target for 1Q16. *See Tornquist* Counterclaim, at ¶38.

[138] *Fox* Counterclaim, at ¶54.

[139] *Id.*

levels (*i.e.*, inventory limits) at certain hospitals.[140] While some VA employees were "free to do whatever [they] want[ed]," "[p]eople that don't have carte blanche at their facilities [were] starting to get, you know, questions."[141] Blocker had also received warnings from VA employees not to "send this much again."[142]

91. In response, Cashman suggested that Blocker try one of the Company's favorite tactics, using "healing reviews" (discussed above) to influence VA decision-makers to accept more products.[143] Blocker described this exchange as follows during a call with Kruchoski:

> And [Cashman's] response was: Well ***do they have healing reviews*** down at those accounts?
>
> * * *
>
> And I said I – and I said: Chris [Cashman] – I said: In all fairness – I said, you know: A healing review has no bearing on providing any extra shelf space or alleviating the concerns of some, you know, floor manager or department manager who's ***looking at how many grafts are spilling out of every cabinet available to us***. I said: And what it helps with is when chief of surgery or chief of staff comes down and questions the amount of product that's being used, I go: ***That doesn't help us in any capacity for what's being, you know, stuffed in our VAs.***[144]

---

[140] *Id.*

[141] *Id.*

[142] *Id.*

[143] *Id.*

[144] *Id.* at ¶55.

92. During the same call, Kruchoski and Blocker agreed that the Company's reported revenue through AvKARE was "not a real number," "dishonest," and "built on false growth" through channel stuffing.[145] However, as Blocker explained, if he didn't hit that phony growth number, there was "***an insinuation that there will be hell to pay. And, you know, Pete [Petit] says: Well, you don't want to be on the wrong end and not hit your number, you know***."[146]

93. In addition to pressuring employees to stuff VA shelves, Cashman and Diaz launched a new initiative to achieve revenue targets in March 2016.[147] Cashman and Diaz had determined that the most efficient method of channel stuffing involved 7x7 cm EpiFix, the Company's most expensive graft, which sold for around $6,700.[148] Customer demand for those grafts was usually low because of their large size (roughly the size of an iPhone), which limited their use in medical procedures.[149]

94. In March 2016, Fox[150] participated in a conference call with Cashman, Diaz, Roselli, and Lilly to discuss the new initiative, involving delivery of 7x7 cm

---

145 *Id.*

146 *Id.*

147 *Id.* at ¶56.

148 *Id.*; Ex. 21, at 34.

149 *Kruchoski* Counterclaim, at ¶¶69-72; *Fox* Counterclaim, at ¶¶56-57.

150 Fox was employed at MiMedx from July 2012 through December 29, 2016. *See Fox* Counterclaim, at ¶¶14, 96. Fox served as Regional Sales Director for the

EpiFix grafts to targeted VAs in shoebox-sized packages.[151] Fox expressed major concerns with this scheme, stating that MiMedx would be shipping out products that no one ever used.[152] Fox said that everyone on the call admitted that the grafts would all have to be shipped back.[153] Cashman responded, "***Mike, we understand your concerns. Duly noted, but we are going to do this***."[154] Cashman explained that the code name for this scheme would be the "Limb Salvage Initiative."[155]

95. Despite Fox's objections, MiMedx proceeded with the Limb Salvage Initiative devised by Cashman and Diaz. Between March 22 and March 31, 2016, the Company sent at least 315 7x7 cm EpiFix grafts to 17 VA hospitals across the country, representing approximately $2 million to $2.4 million of excess product.[156] MiMedx billed AvKARE and booked revenue for these grafts at the time of

---

Company's Central territories from July 2012 to October 2013. *Id.* at ¶¶14, 16. From October 2013 to December 2015, Fox served as Area Vice President for the Company's Central area. *Id.* at ¶¶16, 46-47. From December 2015 to December 29, 2016, Fox served as National Vice President, Federal and Academic Centers. *Id.* at ¶¶47, 96.

[151] *Fox* Counterclaim, at ¶57.

[152] *See id.*

[153] *See id.*

[154] *See id.*

[155] *See id.*

[156] *See id.* at ¶¶60-62.

shipment.[157] The plan was that most of these grafts would be returned slowly to the Company in order to spread out losses and conceal them with revenue in future fiscal quarters.[158] Most of these grafts remained unused and unpurchased by VAs as of December 2016.[159]

**e. Defendants' VA Scheme Unravels**

**(1) MiMedx Customers Are Overstuffed**

96. Defendants' scheme eventually began to catch up with them, both financially as the Company was struggling to top its own falsely reported growth, and operationally as MiMedx began suffering the negative effects of years stuffing customer shelves with far more product than they could use. Indeed, MiMedx employees were physically running out of room at VAs to stuff additional products. Essentially, as Kruchoski explained, "***we're trying to chase a growing number – but trying to grow on a number that was built on false growth***."[160]

97. Moreover, VA employees began to question the massive quantities of MiMedx inventory sitting on their shelves. MiMedx products were "spilling out of

---

[157] *See id.* at ¶62.

[158] *See id.* at ¶63.

[159] *See id.* at ¶64.

[160] *Id.* at ¶55.

every cabinet available" at VAs,[161] and the shelves were "absolutely overflowing."[162] This led VA employees to ask questions of MiMedx sales representatives, threatening their relationships with these facilities. MiMedx's sales force reported that "VA hospital representatives [were] questioning the amount of AvKARE tissues on their shelves."[163]

98. By late 2017, MiMedx inventory dating back to 2013 still remained on VA shelves.[164]

**(2) The Company Avoids Returns**

99. Accordingly, either because of a lack of VA shelf space or because VAs were cracking down, the Company needed to devise new tactics to deal with the tremendous volume of excess product the Company had been shipping to the VAs. According to Fox, "MiMedx . . . [had] the intent of slowly feathering back returns of its product over time, concealing the return of product it had previously recognized as revenue by balancing those returns against actual revenue in future

---

161 *Id.* at ¶54.

162 *Kruchoski* Counterclaim, at ¶54.

163 *Fox* Counterclaim, at ¶41; *see also* Ex. 32, Viceroy Research Group, *MiMedx caught red-handed circumventing VA regulations*, at 6 (Nov. 21, 2017); *Vitale* 2019 Complaint, at ¶¶23-26.

164 *See* Ex. 33, E-mail from Anonymous MiMedx Employee to "Attorneys, Journalists & Mr[.] Petit" (Oct. 10, 2017), at 4; *see also* Ex. 6, at 5.

reporting periods."[165] However, there was just too much overstuffed product for MiMedx to feather back – the returns would significantly reduce the Company's accounts receivable and profits, raising suspicions and/or jeopardizing the Company's ability to meet financial projections in the quarter ahead.[166] MiMedx therefore strictly controlled what returns it would process in a particular quarter and, "[t]o avoid detection of the scheme, return of 'consignment' product by the VA had to be approved by upper management."[167]

100. The Company avoided the return of such excess product by transferring it to other facilities[168] or instructing Company employees to conceal it, by hiding it at VA facilities or even in their homes or cars.[169] Fox and Kruchoski confirmed that employees were asked to hide products until MiMedx was ready to authorize their return, in order to conceal losses associated with their return.[170] For example,

---

165 *Fox* Counterclaim, at ¶36.

166 *Id.*

167 *Kruchoski* Counterclaim, at ¶37.

168 *Fox* Counterclaim, at ¶65.

169 *See, e.g.*, Ex. 30, at 10-13; *Kruchoski Counterclaim*, at ¶30.

170 *See Fox* Counterclaim, at ¶64; *Kruchoski* Counterclaim, at ¶30.

MiMedx directed sales representatives to hide grafts in their homes or cars, after they were shipped to VA facilities as part of the Limb Salvage Initiative.[171]

### (3) The Company Loses Track of Inventory

101. Between the massive quantities of product sitting at hospitals and medical facilities and Defendants' haphazard efforts to conceal excess product, by late 2015, the Company had a big problem with lost inventory.[172] On December 9, 2015, Roselli sent an e-mail to Fox and several other senior MiMedx executives expressing concerns over inventory reconciliation problems at VAs – including 511 missing tissues that had been placed on VA shelves.[173] Failure to locate the missing inventory and obtain purchase orders from the VAs would mean that AvKARE was entitled to a credit for those 511 tissues, to the detriment of MiMedx's 4Q15 financial results. As Roselli stated, "If we can not [sic] reconcile the federal inventory and AvKare pushes us for a credit on 511 tissues you can imagine what will happen to the quarter."[174]

---

[171] *See id.*

[172] *See* Ex. 22, at 4.

[173] *See* Ex. 34, E-mail from Lou Roselli, Director, Sales Operations, MiMedx, to Tom Dion, Mike Fox, Nick Andolino, Brian Luse (Dec. 9, 2015).

[174] *Id.*

102. Petit, Taylor, and Cashman were informed of the problem.[175] Petit and Taylor received a December 11, 2015 e-mail from an unspecified source stating that "[e]ach quarter we credit AvKare a significant amount of revenue."[176] Petit responded on the same day, stating that "these problems are caused by one thing . . . lack of management. Begin routinely focusing on these issues and holding your subordinates accountable. We are monitoring these metrics and so should you. The metrics will move in the right direction if they are managed."[177]

103. Given their vast quantity of channel stuffing through AvKARE, Defendants understood that they would need an exit strategy because the Company was transitioning to direct VA sales under the Company's own FSS. Moreover, AvKARE needed additional assurance that it would not be stuck with the financial responsibility for a tremendous volume of unsold or missing MiMedx product that it allowed the Company to stuff. Thus, to alleviate these concerns, in 2015, the parties amended their PDA to include a so-called inventory "buyback" provision. Unbeknownst to investors at the time, the amended PDA effectively allowed

---

[175] Ex. 6, at 5.

[176] *See id.*

[177] *Id.* EY noted "additional evidence to support similar instances that implicate Petit, [redacted], and Taylor." *Id.*; *see also Fox* Counterclaim, at ¶65.

MiMedx to absorb and conceal excess or missing inventory that was being stuffed through AvKARE over future quarters instead of reserving or recording a write-off for the excess or missing inventory, which would have caused immediate financial harm.

104. In addition to the buyback, pressure mounted against the Individual Defendants to "clean up the books," as explained by Roselli.[178] To blunt the impact of simply repurchasing the vast volume of stuffed "AvKARE" product left sitting on VA shelves, the Company also began to increase its "allowance for product returns" in 2016. Significantly, "the Company increased its allowance for product returns to 3.4% of net sales in 2016 when compared to 1.8% of net sales in 2015 throughout the year to recognize the estimated liability for future returns related to the AvKARE contract.[179] As of December 31, 2016, approximately $3.7 million [or 76%] of the balance in this account was estimated to be required for the potential AvKARE termination liability."[180] Further, when the Company issued its fiscal year 2016 ("FY16") financial results on February 23, 2017, it revealed a $1.8 million

[178] *Fox* Counterclaim, at ¶65.

[179] *See* Ltr. from Senken to Martin James, the SEC's Senior Assistant Chief Accountant, dated Apr. 18, 2017, at 6 (responding to SEC comment letter).

[180] *Id.*

charge in connection with increasing sales returns and allowances reserves for AvKARE. When pressed by securities analysts on this disclosure, Petit and Senken falsely denied any link between this charge and channel stuffing and claimed the issue was minor. In truth, however, the $1.8 million charge was the tip of the iceberg. In reality, at least $6.3 million was provisioned for future AvKARE "returns," which demonstrates the significant channel stuffing with AvKARE.[181]

105. Additionally, the Company "conducted a comprehensive review of its pre- and post-award VA sales under its FSS contract" in 2018-2019 and found that, "at December 31, 2018, it had accrued an obligation of $6.9 million in connection with a potential issue that it self-disclosed to the VA concerning the eligibility of one of its products for inclusion in the Company's FSS contract."[182] In other words, on top of everything else, the Company was improperly selling AmnioFix to the VA. On May 17, 2020, the Company disclosed that it had "reached an agreement in principle with the [DOJ] to resolve a *qui tam* matter relating to the [VA eligibility] issue" and warned that "any resulting negative impact to our contractual relationship

[181] The $6.3 million is 76% of the $8.3 million of total provision added in 2016 to the allowance for product returns balance disclosed in the Company's 2017 Form 10-K.

[182] Ex. 1, at 30.

with the VA going forward may adversely affect our business, results of operations and financial condition."[183]

### 2. Defendants Rely on Other Distributors to Further Inflate Revenues

106. As detailed above in Section V.C.1.e, towards the end of 2014 and throughout 2015 and 2016, the Company was finding it increasingly difficult to achieve continued revenue growth built on top of false growth. To do this, Defendants not only accelerated their revenue scheme through AvKARE, but also relied on arrangements with other distributors to stuff its product, boost revenue and make quarterly numbers when the Company was falling behind its publicly issued financial guidance.

#### a. Defendants Use Close Ties with Master Distributor CPM for End-of-Quarter Revenue Infusions

107. At the beginning of the Class Period, the Company's largest commercial (non-government) distributor was CPM, a Richardson, Texas-based company designated as a nationwide "Master Distributor" of MiMedx products and treated as a "house account" of MiMedx, enabling it to receive discounted product

[183] *Id.* at 30, 74.

and highly favorable financing terms.[184] CPM's owner Mark Brooks ("Brooks") had a close relationship with MiMedx and its executives,[185] which allowed MiMedx to exert control over CPM, facilitating the Company's channel stuffing scheme.

108. CPM employed a massive network of sub-distributors through which it distributed MiMedx products, many of which were suspect PODs.[186] PODs profited from distributing MiMedx products used in the physician-owner's medical procedures. The HHS-OIG has declared PODs "inherently suspect" because they exhibit "questionable features" that raise kickback-related concerns under the AKS, including corruption of medical judgment, overutilization, increased costs to federal health care programs and beneficiaries, and unfair competition.[187] "This is because the financial incentives PODs offer to their physician-owners may induce the physicians both to perform more procedures (or more extensive procedures) than are medically necessary and to use the [medical] devices the PODs sell in lieu of other, potentially more clinically appropriate, devices."[188] Of special concern to the HHS-

---

[184] *See* Ex. 30, at 2, 6; Ex. 29, at 10.

[185] *Kruchoski* Counterclaim, at ¶77.

[186] *See* Ex. 21, Viceroy Research Group, *supra* n.22.

[187] Special Fraud Alert, *supra* n.56.

[188] *Id.*

OIG, and the subject of a Special Fraud Alert, is that PODs act only as shell entities in the distribution chain.[189]

109. During the Class Period, CPM purchased bulk orders from MiMedx at a discount and distributed them to medical providers through CPM's PODs.[190] Relabeled MiMedx products, such as "Ambiochoice" and "Amniovo," were sold by CPM to the PODs.[191] In reality, these products were merely MiMedx's standard products, such as AmnioFix, with a different label and a sales price three-to-six times higher than customary.[192] POD owners were thereby incentivized to use MiMedx products because they could sell them at price premiums, and both they and CPM, which had acquired the products at a steep discount, profited.[193] MiMedx also profited from its ability to move a tremendous amount of product through CPM and

---

[189] *Id.*

[190] *Kruchoski* Counterclaim, at ¶¶77-79; *see also* Ex. 30, at 12-14; Ex. 29, at 11; Ex. 35, Aurelius Value, *MiMedx: Relabeled Product, PODs, and Indicted Distributors* (Apr. 26, 2018).

[191] *See* Ex. 35, at 5-6.

[192] *See id.*

[193] *Id.*

its PODs, creating a significant revenue source for the Company.[194] Without the PODs, MiMedx would not have been able to sell as much product.[195]

110. While the Company stated in its annual filings that its "private label or 'OEM'[196] relationships" allowed the Company "to leverage the sales and distribution resources of [its] private label customers,"[197] the Company made several material omissions related to these statements, including that, among other things, these resources involved suspect PODs and facilitated the Company's improper revenue recognition through quarter-end sales designed to inflate financial results and achieve quarterly revenue guidance. Moreover, Defendants, including Petit,

---

194 *Id.*

195 For example, Defendants funneled their products through CPM to a POD, Fuse Medical, Inc. ("Fuse"), a Richardson, Texas-based, publicly traded "penny stock" (OTC: FZMD) comprised of over 40 podiatrist members. Fuse's Chairman was Brooks, the owner of CPM and a personal friend of MiMedx's Carlton. According to Fuse's public filings, it had distribution agreements with both CPM and SLR (discussed further below), calling CPM its "principal supplier." Fuse Medical, Inc., Annual Report (Form 10-K), at 18 (Mar. 20, 2017). Fuse also had a distribution agreement with a CPM affiliate, Texas AmBioMed, LLC, which was also run by Brooks (as President and COO) and registered by the FDA to store MiMedx products. Through this agreement, Fuse was authorized to distribute MiMedx's products AmnioFix and EpiFix, as well as AmbioChoice, a brand name trademarked by CPM. *See* Ex. 29.

196 *See* Investopedia, *Original Equipment Manufacturer (OEM)* (reviewing Julia Kagan, May 8, 2019), https://www.investopedia.com/terms/o/oem.asp.

197 2013 Form 10-K; 2014 Form 10-K; 2015 Form 10-K.

specifically and repeatedly misled the market about their involvement with PODs, stating that MiMedx does "not directly sell to or distribute any of our products through PODs."[198]

111. Defendants leveraged their close relationship with CPM to improperly recognize revenue and achieve the Company's quarterly revenue guidance.[199] For example, the DOJ found that "if [CPM] had not purchased approximately $3 million of MiMedx product during the first quarter of 2015, MiMedx would not have reached its revenue guidance that quarter of $40 million to $41 million.[200]

112. Likewise, near the end of the second quarter of 2015 ("2Q15"), Petit and Taylor approached CPM with another large sales proposal.[201] However, CPM had ordered far more than it needed the previous quarter.[202] To induce another large sale despite CPM's oversupply, Petit and Taylor agreed to pay Brooks a $200,000 "consulting fee," although both of them knew that Brooks had not performed, and

---

[198] 2016 Form 10-K at 20; *see also* Edited Transcript, *MDXG – Q3 2017 MiMedx Group Inc. Earnings Call*, Thomson Reuters StreetEvents (Oct. 27, 2017 2:30 PM GMT) ("We do not sell through [PODs].").

[199] *See Petit/Taylor* Indictment, at ¶20.

[200] *Id.*; *see also Kruchoski* Counterclaim, at ¶¶78-79.

[201] *See* SEC Complaint, at ¶¶59-61 (the SEC refers to CPM as "Distributor B"); *Petit/Taylor* Indictment, at ¶¶22-26 (the DOJ refers to CPM as "Distributor-1").

[202] *See Petit/Taylor* Indictment, at ¶21.

would not perform, any consulting services in exchange for the payment.[203] Given this inducement, CPM submitted a purchase order in the amount requested by Petit and Taylor, approximately $2.1 million.[204] However, the purchase order did not match the products identified by Taylor as available for shipment by the end of the quarter.[205] At MiMedx's request, CPM submitted a revised purchase order in the same amount, but only consisting of products that MiMedx had available for shipment by the end of the quarter.[206] This included $1.2 million in products that CPM did not want and intended to exchange with MiMedx in the future.[207] Because the sale was subject to these exchange rights, MiMedx's recognition of approximately $1.2 million in CPM revenue in 2Q15 was both premature and improper.[208]

---

[203] *See id.* at ¶¶23-24; SEC Complaint, at ¶¶63-70.

[204] *See SEC* Complaint, at ¶75; *Petit/Taylor* Indictment, at ¶¶25-26; *see also Kruchoski* Counterclaim, at ¶79.

[205] *See id*.

[206] *See* SEC Complaint, at ¶¶75-76, 79; *Petit/Taylor* Indictment, at ¶¶26, 28; Ex. 6, at 11; *Kruchoski* Counterclaim, at ¶¶78-79.

[207] *See* SEC Complaint, at ¶79.

[208] *See id.* at ¶¶79-81; *Petit/Taylor* Indictment, at ¶25.

113. In addition, MiMedx improperly recognized revenue from the sham "consulting fee" ($200,000) paid to Brooks to induce the above order.[209] MiMedx recognized this as an expense, but failed to make a corresponding reduction to revenue, thus overstating CPM revenue by an additional $200,000 ($1.4 million total) in 2Q15.[210] While the parties executed an amended "consulting agreement" in connection with the payment, Brooks never performed any consulting work for MiMedx in exchange for the payment.[211]

114. At Taylor's direction, MiMedx carefully managed the exchange of CPM's unwanted products in order to conceal the Company's improper revenue recognition in 2Q15. In July 2015, a MiMedx executive sent an e-mail asking: "Has it been discussed how the [CPM] returns will be managed?"[212] Another MiMedx executive responded: "We have to manage timing for 2 reasons; our inventory

---

[209] *See* SEC Complaint, at ¶¶65, 79-81; *Petit/Taylor* Indictment, at ¶¶23-24.

[210] *See* SEC Complaint, at ¶¶68-70.

[211] *See id.* at ¶¶65-66, 68; *Petit/Taylor* Indictment, at ¶¶23, 26. The amended consulting agreement also awarded Brooks a total of 17,455 shares of restricted MiMedx stock and four additional monthly payments of $5,000 each. *See Petit/Taylor* Indictment, at ¶¶23, 26; SEC Complaint, at ¶¶61, 64. Petit later agreed to pay two of the additional monthly payments based on phony invoices that Brooks submitted to MiMedx in or about September 2015, despite the fact that Brooks never provided any consulting services. *See Petit/Taylor* Indictment, at ¶29.

[212] *Petit/Taylor* Indictment, at ¶30; Ex. 6, at 12.

rebuild and ***revenue recognition issue***. Bill [Taylor] wants to ship the [CPM] replacement product in August over a 2-3 week period in 4 shipments. We have auditors here in the end of July looking at the books. No more emails on this. Let's meet."[213]

115. CPM eventually ran into problems that led to the termination of its relationship with MiMedx during the second half of 2015. One of CPM's major clients was Forest Park Medical Center ("Forest Park"), a physician-owned hospital that also had direct ties to MiMedx as a debtor of MiMedx.[214] Forest Park became insolvent and later filed for bankruptcy.[215] This collapse cost CPM, one of Forest Park's largest creditors, over a half-million dollars.[216] In turn, this caused CPM to default on its credit terms with MiMedx, precipitating a split between the two

---

[213] *Id.*

[214] *See In re Forest Park Medical Center at Southlake, LLC*, 4:16-BK-40273-rfn-11 (Bankr. N.D. Tex. Apr. 29, 2016), ECF Nos. 220, 245 (identifying MiMedx as a creditor and/or party in interest in the Forest Park bankruptcy).

[215] *See* Viceroy Research Group, *Bankruptcy & DOJ/FBI indictments of Physician Owned Medical Center inconvenienced MiMedx CPM channel stuffing program* (Oct. 13, 2017), https://viceroyresearch.files.wordpress.com/2017/10/part-8-fraud-inconvenienced-mimedx-cpm-channel-stuffing-program-1.pdf. Viceroy "filed the information [in this report] with regulators including evidence [Viceroy] are restricted in publishing to avoid exposing the identity of former employees." *Id.* at 13.

[216] *See id.* at 5.

companies and eliminating a key avenue for MiMedx's channel stuffing.[217] CPM was later acquired by Fuse which also had close ties to MiMedx,[218] as discussed above.

116. Defendants revealed CPM's departure, without naming it directly, on October 12 and 13, 2015. While Petit falsely downplayed the Company's loss of CPM as merely a "strategic step" or "adjustment" in the distributor network, this was a significant blow. CPM was the Company's second largest customer from 2012 to 2014 (behind AvKARE), and served as an important revenue source, as later admitted on October 29, 2015.[219]

### b. When Defendants Lost CPM, They Turned to Distributors SLR and Stability to Continue Their Fraudulent Revenue Scheme

117. To absorb the loss of CPM during the second half of 2015, Defendants shifted much of the Company's commercial channel stuffing efforts from CPM to two other commercial distributors, SLR and Stability Biologics ("Stability").[220]

---

[217] *See id.* at 1, 4-5.

[218] *See* Ex. 29.

[219] SEC Complaint, at ¶58.

[220] *See Petit/Taylor* Indictment at ¶¶31, 43 (the DOJ refers to SLR and Stability as "Distributor-2" and "Distributor-3," respectively); *see also Kruchoski* Counterclaim, at ¶80 (discussing the shift from CPM to SLR).

### (1) Fraudulent Revenue Recognition Through SLR

118. In or about September 2015, SLR replaced CPM as the Company's Master Distributor for commercial sales.[221] SLR was a Dallas, Texas company founded by Jerry Morrison ("Morrison") in 2010.[222] While at SLR, Morrison also worked at MiMedx from approximately July 2013 to August 2015 as the Company's Sales Director, Surgical and Orthopedic.[223] Just as SLR was poised to take over for CPM, Morrison left MiMedx to work exclusively at SLR,[224] but continued to have a MiMedx e-mail address after he left the Company. Upon leaving MiMedx, Morrison received a severance package and a $15,000 per month consulting agreement from MiMedx, at the direction of Petit and Taylor.[225]

---

[221] *Petit/Taylor* Indictment, at ¶¶31-32; SEC Complaint, at ¶¶87 (the SEC refers to SLR as "Distributor C"); *Kruchoski* Counterclaim, at ¶80.

[222] *Kruchoski* Counterclaim, at ¶76; Ex. 29, at 13 (FDA document stating that Morrison was "the sole owner of [SLR]" and was "responsible for all operations of [SLR]").

[223] *See* SEC Complaint, at ¶¶87-89 (SLR was "owned by a former MiMedx sales representative who separated from MiMedx in August 2015" and who "ran [SLR] as a side business during his MiMedx employment"); *Petit/Taylor* Indictment, at ¶31 (SLR "was owned and operated by a former MiMedx employee").

[224] *See* Ex. 10, at ¶14(d).

[225] *See* SEC Complaint, at ¶89.

119. Prior to becoming the Company's Master Distributor, SLR had contracted with CPM to distribute MiMedx products, and some of the same sales representatives for CPM also worked for SLR. Like CPM, SLR was a "house account" essentially controlled by MiMedx and serviced directly by Carlton. SLR also used some of the same PODs as CPM.[226] Along with the Morrison relationship, these similarities made it easy for the Company to transition to SLR when its relationship with CPM ended.

120. In the third quarter of 2015 ("3Q15"), Petit and Taylor began negotiating the Company's first direct sale to SLR, which primarily involved a then-new product called OrthoFlo.[227] OrthoFlo was an injectable, amniotic liquid intended to treat patients with orthopedic and sports injuries, and required storage in specialized freezers.[228] To facilitate the sale, Petit and Taylor directed the Company to purchase specialized freezers for SLR to store a large quantity of OrthoFlo.[229] SLR then agreed to a massive $4.6 million order of OrthoFlo during the final week

---

[226] *See* Ex. 30, at 2, 6, 8.

[227] *See Petit/Taylor* Indictment, at ¶32; SEC Complaint, at ¶91.

[228] *See Petit/Taylor* Indictment, at ¶¶32, 35; SEC Complaint, at ¶¶19, 91.

[229] *See Petit/Taylor* Indictment, at ¶35; SEC Complaint, at ¶94; Ex. 10, at ¶14(c); Ex. 11, at 19.

of 3Q15.[230] This was the second largest order in MiMedx's history and accounted for nearly 10% of its quarterly revenue.[231] Petit and Taylor dictated the timing and size of the order to ensure that MiMedx met its revenue guidance in 3Q15.[232]

121. Petit and Taylor understood, however, that SLR could not pay for the product within 30 days, as required by the parties' distribution agreement.[233] SLR had limited capital and operating history, and would not be able to make any significant payments until it could generate cash flow by selling the product.[234] Therefore, Petit and Taylor agreed with Morrison that MiMedx would be flexible on the payment term and that SLR was not required to pay within 30 days.[235] Petit and Taylor also assured Morrison that SLR could exchange units (vials) of OrthoFlo in

---

[230] *See Petit/Taylor* Indictment, at ¶32; SEC Complaint, at ¶¶92, 94; Ex. 10, at ¶14(b).

[231] *See Petit/Taylor* Indictment, at ¶¶32-33; SEC Complaint, at ¶95.

[232] *See Petit/Taylor* Indictment, at ¶¶32, 35.

[233] *See id.*; SEC Complaint, at ¶97.

[234] *See Petit/Taylor* Indictment, at ¶¶33, SEC Complaint, at ¶¶88, 97; *see also* Ex. 6, at 13 (MiMedx employees questioned SLR's ability to pay for the order). SLR generated less than $500,000 in annual revenue prior to becoming a MiMedx distributor. *See* SEC Complaint, at ¶88.

[235] *See Petit/Taylor* Indictment, at ¶34; Ex. 10, at ¶14(c) n.3 (Morrison confirmed in an interview that MiMedx was "'flexible' with SLR's payment schedule, notwithstanding the firm 30-day payment deadline referenced in the sale contract").

the future if the market for certain sizes turned out to be better than for others.[236] Nevertheless, and as discussed in Section X below, MiMedx improperly recognized approximately $4.6 million of revenue upon shipment of the product to SLR in 3Q15.[237]

122. By the end of November 2015, SLR had paid for only about $10,000 of its $4.6 million order placed in 3Q15.[238] Further, Morrison advised Petit that SLR was having trouble distributing the product, was unable to obtain a commercial loan, and needed an infusion of capital to pay for the product.[239] To address this problem, which threatened to expose the Company's fraudulent accounting, in 4Q15, Petit orchestrated a secret $1.5 million loan to SLR from a trust fund that Petit had established for his family (the "Petit Trust").[240] Petit was personally involved throughout the lending process, including setting up a shell company for the loan.[241]

---

[236] *See* SEC Complaint, at ¶98.

[237] *See Petit/Taylor* Indictment, at ¶33; *see also Kruchoski* Counterclaim, at ¶81 (noting an agreement "whereby [SLR] would make end of the quarter order[s] of MiMedx products at MiMedx's request on highly favorable financing terms").

[238] *See Petit/Taylor* Indictment, at ¶37.

[239] *Id.* at ¶¶37-38; SEC Complaint, at ¶103.

[240] *See id.*; Ex. 10, at ¶¶14(f)-(g).

[241] *See Petit/Taylor* Indictment, at ¶¶39-40; SEC Complaint, at ¶¶106-108; Ex. 6, at 13 (describing e-mail evidence confirming that Petit was aware of the loan).

123. Pursuant to its deal with Petit, SLR used the loan proceeds in substantial part to make payments to MiMedx totaling approximately $1.2 million in December 2015.[242] MiMedx then authorized a new shipment to SLR on December 30, 2015 (the next-to-last day of 4Q15) and improperly recognized additional revenue of approximately $1 million from that shipment in 4Q15.[243]

124. Pursuant to the parties' side arrangement, SLR ultimately exchanged much of the product purchased from MiMedx, including over 40% of the $4.6 million order placed in 3Q15, and failed to pay off its balance to MiMedx until late 2017.[244]

#### (2) Fraudulent Revenue Recognition Through Stability

125. In addition to SLR, during the second half of 2015, MiMedx began using a Tennessee-based commercial distributor, Stability, to help make up for the revenue shortfall resulting from the winding down of MiMedx's relationship with

---

[242] *See Petit/Taylor* Indictment, at ¶40; SEC Complaint, at ¶107.

[243] *See* SEC Complaint, at ¶¶6, 109.

[244] *See* Ex. 10, at ¶13(h); Ex. 6, at 13.

CPM.[245] Through sales to Stability, the Company further inflated revenue to ensure that it would continue to meet its quarterly revenue guidance.[246]

126. Like SLR, Stability was used as a vehicle to stuff MiMedx's new OrthoFlo product into the sales channel. Near the end of 3Q15, for example, Petit requested that Stability make its first purchase from MiMedx, a massive $2.2 million order primarily consisting of OrthoFlo.[247] On or about September 18, 2015, a MiMedx sales executive sent an e-mail informing Petit and Taylor that a principal from Stability had agreed to the purchase.[248] The e-mail stated that the Stability principal was "excited to work with us [MiMedx] and he asked me 'what can I personally do for you.' I told him we [MiMedx] will need to move a significant amount of [OrthoFlo] liquid into his freezer and he said 'it's done.' This couldn't have happened at a better time."[249]

127. Thereafter, sales employees at MiMedx informed Stability of the specific product types and quantities immediately available for shipment, so

[245] *Petit/Taylor* Indictment, at ¶¶19, 43 (the DOJ refers to Stability as "Distributor 3").

[246] *See id.*; SEC Complaint, at ¶113 (the SEC refers to Stability as "Distributor D").

[247] *See Petit/Taylor* Indictment, at ¶¶43-45; SEC Complaint, at ¶¶114-119.

[248] *See Petit/Taylor* Indictment, at ¶43; SEC Complaint, at ¶116.

[249] *Id.*; *see also* Ex. 6, at 12.

Stability could order them before the end of the quarter (3Q15).[250] Accordingly, on September 29 and 30, 2015, the last two days of the quarter, Stability submitted purchase orders totaling approximately $2.2 million, although Stability never wanted or intended to sell most of the product.[251] The purchase orders stated that payments were due on a fixed 30-day term.[252] In reality, Stability and MiMedx had not yet even signed a distribution agreement, and had substantial, unresolved disagreements over essential sales terms, including when payments were due.[253] Petit, Taylor, and Stability understood, however, that payment for the 3Q15 sale would not be due within a fixed 30-day term, as stated in the purchase orders.[254] Moreover, Petit and Taylor struck an undisclosed side agreement with Stability's CEO whereby Stability could return any unwanted product to MiMedx in a subsequent quarter and swap it for product of equal value.[255] Because the sale was subject to these terms, the Company's recognition of revenue from the sale in 3Q15

---

[250] *See Petit/Taylor* Indictment, at ¶45; SEC Complaint, at ¶¶118-120.

[251] *See id.*

[252] SEC Complaint, at ¶118.

[253] *See id.* at ¶¶118, 120; *Petit/Taylor* Indictment, at ¶47.

[254] *See* SEC Complaint, at ¶118; *Petit/Taylor* Indictment, at ¶51.

[255] *See* SEC Complaint, at ¶119; *Petit/Taylor* Indictment, at ¶¶48-49.

($2.2 million) was premature and improper.[256] Petit adopted the same off-book terms when he sold $450,000 in product to Stability on the final day of the next quarter (4Q15) – at which point, the parties still had not signed a distribution agreement.[257]

128. MiMedx had significant internal discussions as to whether Stability would ever be able to pay MiMedx.[258] Indeed, Stability never paid for any of the product sold by MiMedx in 4Q15, and only paid for about 10% of the product sold by MiMedx in 3Q15.[259] Moreover, Stability returned half of the product in accordance with the parties' secret arrangement, and exchanged some of it for other MiMedx product.[260]

129. By the end of 4Q15, Petit was recommending that MiMedx acquire Stability.[261] On January 13, 2016, MiMedx acquired Stability for a combined $10

---

[256] *Petit/Taylor* Indictment, at ¶47; SEC Complaint, at ¶¶113, 120-121.

[257] *Petit/Taylor* Indictment, at ¶¶46-47, 50-52; SEC Complaint, at ¶¶7, 124-127, 129.

[258] *See* Ex. 6, at 12.

[259] *See Petit/Taylor* Indictment, at ¶¶46, 51; Ex. 6, at 12. Stability's only payment to MiMedx was for a small portion of the 3Q15 sale (approximately $225,000), after MiMedx's accounting department raised concerns about Stability's lack of payment. *See id.*

[260] *Petit/Taylor* Indictment, at ¶50.

[261] *See Petit/Taylor* Indictment, at ¶46.

million in cash and stock, plus assumed debt.[262] Following the acquisition, MiMedx consolidated Stability's financial statements into its own, which had the practical effect of eliminating Stability's accounts receivable balance owed to MiMedx (approximately $2.4 million).[263] The parties finally signed a distribution agreement on January 20, 2016, but left the agreement undated.[264]

**c. Fraudulent Revenue Recognition Through First Medical**

130. The Company's revenue inflation scheme extended internationally to First Medical, a Saudi Arabian distributor that purchased MiMedx product to sell to medical facilities run by the Saudi Arabian government, including the Saudi Ministry of Health.[265] The Company had a contingent payment agreement with First Medical, whereby MiMedx gave First Medical extended payment terms contingent on use of the MiMedx's products.[266] In violation of GAAP, the Company

---

[262] *See* MiMedx Group, Inc., Current Report (Form 8-K), Ex. 99.2 (Jan. 13, 2016); SEC Complaint, at ¶132.

[263] *See id.*

[264] *See* SEC Complaint, at ¶126; *Petit/Taylor* Indictment, at ¶47.

[265] *See* SEC Complaint, at ¶31 (the SEC refers to First Medical as "Distributor A"); *Petit/Taylor* Indictment, at ¶53 (the DOJ refers to First Medical as "Distributor-4").

[266] *See* Ex. 2, at 2-3 (referring to First Medical as an "international distributor" from which the Company improperly recognized revenue); Ex. 14, at 22-23 (same); *Petit/Taylor* Indictment, at ¶¶19, 53-59; Ex. 8, at ¶¶17-18; SEC Complaint, at ¶¶31-57.

improperly recognized $1.905 million in revenue from sales to First Medical in 2Q15 and $2.5 million in revenue from them near the end of 4Q15.[267]

131. The contingent nature of the sales was evidenced in a series of e-mails between MiMedx and First Medical. On June 15, 2015, a MiMedx sales executive sent an e-mail to First Medical, at Taylor's direction, offering $1.905 million worth of products.[268] The sales executive stated that, after speaking with Taylor, MiMedx was willing to extend payment terms provided shipment occurred on June 29 (the next-to-last day of 2Q15).[269] MiMedx would allow First Medical to return the products at "no cost" if First Medical did not receive a tender award from the Saudi government allowing it to sell the products to state-sponsored hospitals in Saudi Arabia.[270]

132. Ten days later, on June 25, 2015, First Medical e-mailed both Taylor and the MiMedx sales executive stating that First Medical was not obligated to pay

---

[267] *See id.*; *see also* Ex. 6, at 1-2 (observing the Restatement was necessitated in part by MiMedx's "[e]xtended payment terms with First Medical" and that "[f]ormer management engaged in overseeing the company's revenues resulting in inconsistencies with GAAP . . . [that] occurred with AvKARE, First Medical, and other customers").

[268] *See* SEC Complaint, at ¶¶34-35.

[269] *See id.* at ¶¶36-37.

[270] *See id.* at ¶37.

unless First Medical was able to sell the product.[271] First Medical then submitted a $1.905 million purchase order referencing the payment terms set forth in the e-mail.[272] As a result of this contingent payment arrangement with First Medical, MiMedx improperly recognized $1.9 million in revenue in 2Q15.[273]

133. In December 2015, Taylor struck a similar side deal with First Medical.[274] Taylor assured First Medical that it would have no losses from the sale, promising that MiMedx sales representatives would assist First Medical in selling the product and that MiMedx would take back the product if First Medical failed to receive a tender award from the Saudi government.[275] Following Taylor's assurances, First Medical submitted a $2.54 million purchase order on December 20, 2015.[276]

134. The following day, on December 21, 2015, Taylor sent an e-mail to First Medical's principal designed to conceal the contingent payment terms that

---

[271] *See id.* at ¶¶38-39.

[272] *See id.* at ¶39.

[273] *See id.* at ¶¶41-42.

[274] *See* SEC Complaint, at ¶48.

[275] *See Petit/Taylor* Indictment, at ¶54; Ex. 2, at 3; SEC Complaint, at ¶49.

[276] *See Petit/Taylor* Indictment, at ¶55; SEC Complaint, at ¶47.

Taylor had offered during negotiations.[277] The e-mail falsely stated that First Medical's purchase order would be subject to a fixed 180-day payment term.[278] Just four seconds later, Taylor sent a second e-mail to the same person, entitled "Purchase Order – Clarification," confirming the true arrangement:

> Further to my email that I just sent relative to the Purchase order 212-2015. We understand that it is expected that the 2016 tender will be issued in March 2016, and it is expected to be as big, or bigger than the tender that was issued to [First Medical] in 2015. ***In the event the tender is delayed, or for some unlikely event does not occur, MiMedx will give [First Medical] additional extended payment terms if request[ed], and will assist [First Medical] in selling the product or another option would be to repurchase the product.*** We will continue supporting sales efforts in the territory by continued training . . . . Thank you again for a strong partnership with MiMedx. Please feel free to contact me at any time with any questions. Best regards, Bill.[279]

135. Through their off-book arrangements with First Medical and the other distributors described above, Defendants were able to carefully manipulate the Company's financial results to achieve revenue guidance and maintain the appearance of consistent growth. Indeed, while the Company was able to meet or beat Defendants' lofty revenue guidance in all but one quarter during the over five

---

[277] *See Petit/Taylor* Indictment, at ¶¶55-57; SEC Complaint, at ¶48; Ex. 8, at ¶139(c).

[278] *See id*.

[279] *Petit/Taylor* Indictment, at ¶57; SEC Complaint, at ¶49; *see also* Ex. 2, at 3; Ex. 8, at ¶17.

years covered by the Restatement, it often did so with a relatively small margin of $2 million or less, the product of careful quarter-end manipulation through channel stuffing and premature revenue recognition. Defendants' manipulation was confirmed by ACIII, which concluded that "the timing and improper recognition of revenue ***allowed the Company to meet its published guidance***."[280]

### D. Defendants Desperately Attempt to Conceal Their Fraud Through a Campaign of Lies And Retaliation

136. Questions began to be asked regarding Defendants' fraudulent revenue recognition scheme. Company employees raised concerns ultimately leading to three Audit Committee investigations (ACI, ACII, and ACIII) and regulatory scrutiny. Desperate to conceal their fraud, Defendants lied to major stakeholders and regulators and retaliated against employees who came forward. This enabled them to keep their fraud under wraps for a while, but as disclosed below, their false front ultimately crumbled.

[280] Ex. 2, at 3; Ex. 14, at 23 (same); *see also Petit/Taylor* Indictment, at ¶19 ("PETIT, TAYLOR, and others caused MiMedx to report these fraudulently inflated revenue figures to the investing public . . . in order to ensure that the reported figures fell within MiMedx's publicly announced revenue guidance, and to fraudulently convey to the investing public that MiMedx was accomplishing consistent growth quarter after quarter, as PETIT and TAYLOR had falsely touted to the investing public."); Ex. 6, at 11 (evidence from ACIII showed that "Petit, Taylor, [redacted] watched the revenue numbers closely and ensured that the company hit the revenue number . . .").

### 1. As the Fraudulent Scheme Accelerates, Employees Begin to Protest Internally

137. During the Class Period, several MiMedx employees questioned the legality of the Company's sales practices, including in complaints made directly to Petit, Taylor, and Senken and other members of management (*i.e.*, Cashman, Roselli, Carlton, and Diaz).

138. Concerned with the Company's aggressive channel stuffing through AvKARE, Fox repeatedly raised objections to Cashman, Carlton, Diaz, and Roselli, telling them that revenue reported from AvKARE was a "false performance number" used to boost MiMedx's stock price.[281] In multiple conversations, Roselli, Diaz, and other Area Vice Presidents acknowledged as much, calling AvKARE revenue a "bullshit number" for Wall Street.[282] Finally, in 3Q15, Fox refused to participate in MiMedx's scheme, and "directed his sales force to not order" products through AvKARE for shipment to VA hospitals "unless the sales representative felt there was a need for the product."[283] When Petit became aware of Fox's objections, Petit personally reprimanded Fox during an October 7, 2015 meeting of the Company's

---

[281] *Fox* Counterclaim, at ¶42.

[282] *Id*. at ¶43.

[283] *Id*. at ¶41.

senior leadership in Atlanta, Georgia.[284] Approximately two months after Petit's reprimand, Fox was demoted to a position with no impact on MiMedx's quarterly revenue projections, where his lack of cooperation with the channel stuffing scheme no longer mattered to the Company.[285] Ultimately, he was terminated a year later after Kruchoski and Tornquist reported the Company's fraud.

139. Likewise, Kruchoski, who reported to Fox until Fox's demotion, began pushing back against the "company directive" to stuff channels in December 2015, expressing concerns to Roselli about the legality of this directive.[286] In January 2016, Kruchoski called his supervisor, Blocker, who had recently replaced Fox as Area Vice President for MiMedx's Central Area, to express concerns about the Company's aggressive channel stuffing practices.[287] Despite Kruchoski's and Fox's complaints, MiMedx's channel stuffing persisted.

### 2. The Company's Controller Reports Improper Revenue Recognition Practices Leading to ACI

140. In late 2015/early 2016, Mark Andersen ("Andersen"), who reported directly to Senken and served as MiMedx's Controller from approximately August

---

[284] *Id.* at ¶45.

[285] *Id.* at ¶47.

[286] *Kruchoski* Counterclaim, at ¶¶48-60.

[287] *See Kruchoski/Tornquist* Complaint, at ¶61.

2015 to January 2016, complained internally about the Company's improper revenue recognition practices. On December 15, 2015, following an Audit Committee meeting, Senken called Andersen and Cranston into his office.[288] Senken said that if they could not come up with a method to get $5 million in the Company's bad debt reserve (an issue discussed at the Audit Committee meeting), then Senken would replace them with someone who could.[289] In response, Andersen "stated very directly and openly to Mike [Senken] that the real concern was revenue recognition and that we were having the wrong discussion with the Audit Committee."[290]

141. On January 18, 2016, Andersen sent an e-mail to Senken with the subject line, "Revenue Recognition and Controls," complaining of certain transactions involving four of the Company's largest distributors: AvKARE, SLR, Stability, and First Medical.[291] Andersen stated that each of those distributors failed to satisfy GAAP criteria that would allow MiMedx to recognize revenue at the time of shipment.[292] Andersen also identified internal control deficiencies related to sales

---

[288] *See* Ex. 11, at 1.

[289] *See id.*

[290] *See id.* at 1-2.

[291] SEC Complaint, at ¶220; Ex. 7, at ¶22.

[292] *See id.*

personnel extending payment terms and other incentives to customers.[293] The e-mail stated in part:

> I am concerned about MiMedx's revenue recognition and the $187.3 million in revenue that we are reporting for full year 2015. This weekend I have learned new information. . . . Along with my concerns over revenue recognition, I am also concerned about the effectiveness of MiMedx's internal controls over financial reporting. . . . I am reporting these accounting and internal control concerns to you in good faith[.][294]

142. Specifically, Andersen stated that revenue attributed to AvKARE in 2015 was inflated because AvKARE "has a right of return and doesn't meet all of the exception criteria, and implicitly doesn't pay MiMedx until the tissue has been implanted."[295] Andersen also questioned the timing of revenue recognition for sales to AvKARE in years prior to 2015.[296] He further questioned revenue recognition for $4.5 million in sales to SLR, $2.4 million in sales to Stability, and a 2Q15 sale to First Medical.[297]

---

[293] *See id.*

[294] Ex. 6, at 6; Ex. 7, at ¶22.

[295] Ex. 7, at ¶22.

[296] *See id.*

[297] *See id.*

143. The following day, on January 19, 2016, Senken had "another hostile meeting" with Andersen, Cranston, and another MiMedx employee.[298] Senken asked Andersen to explain his concerns.[299] In response, Andersen shared GAAP references supporting his concerns regarding revenue recognition.[300] Senken responded that Andersen did not have all the facts and circumstances and that "these practices were just normal business and were the way things had always been done at MiMedx [sic]."[301]

144. Also on January 19, 2016, Senken forwarded Andersen's e-mail to the Chairman of the Company's Audit Committee, J. Terry Dewberry ("Dewberry"), along with "management's draft response" to Andersen's complaint, which Senken had prepared with the assistance of Petit and Taylor ("Management Response").[302] The Management Response rejected Andersen's contentions and questioned his understanding of the facts.[303] The Management Response failed to disclose the true

---

298 *See* Ex. 11, at 2.

299 *See id.*

300 *See id.*

301 *See id.*

302 SEC Complaint, at ¶221.

303 *See id.*

facts and circumstances surrounding MiMedx's transactions with the distributors at issue.[304]

145. On or about January 20, 2016, while Cherry Bekaert was engaged in the Company's 2015 annual audit, Senken informed Cherry Bekaert about Andersen's complaint.[305] Senken then met again with Andersen and Cranston on January 21, 2016, which was "a repeat of the discussion [with Andersen] from two days prior."[306] Based on the Company's accounting issues, Andersen refused to sign a management representation letter in connection with the Company's 2015 audit.[307] Petit, Taylor, and Senken caused MiMedx to remove Andersen from the Controller position so he would not have to sign the letter.[308]

146. Based on the Management Response and a meeting among Andersen and certain members of the Audit Committee on February 11, 2016, the Audit Committee [ACI] concluded Anderson's allegations lacked merit.[309] MiMedx

---

[304] *See id.* at ¶¶224-225.

[305] *See id.* at ¶228.

[306] *See* Ex. 11, at 2.

[307] *See* Ex. 7, at ¶24; *see also* Ex. 11, at 2.

[308] *See* SEC Complaint, at ¶226.

[309] *See* Ex. 7, at ¶24.

negotiated a severance package with Andersen, who ceased working on the same day as his meeting with the Audit Committee.[310]

147. Cherry Bekaert never met with Andersen or looked into his concerns any further, blindly accepting Defendants' representations.[311] In an effort to protect itself, however, Cherry Bekaert added a new representation to the management representation letter, which Petit signed on or about February 29, 2016.[312] The new representation falsely stated: "Furthermore, all sales recorded by the Company to new distributors in 2015 ([SLR], [Stability], and [First Medical]) have met the four criteria for revenue recognition pursuant to ASC 605, *Revenue Recognition*."[313] Yet, as discussed further in Section XI.B, Cherry Bekaert was aware of numerous red flags that demonstrated sales to MiMedx's new distributors in 2015 were inappropriate. After receiving this letter, Cherry Bekaert issued a clean audit opinion for 2015, notwithstanding its knowledge of Andersen's complaint.

---

310 *See id.*; Ex. 7, at ¶24.

311 *See* Ex. 11, at 7, 11.

312 *See* SEC Complaint, at ¶235.

313 *Id.*

### 3. Kruchoski and Tornquist Are Threatened and Fired for Reporting Defendants' Fraud and the Company Conducts ACII

148. In fall 2016, MiMedx denied Kruchoski and his subordinate, Tornquist, a full commission on a huge amount of channel-stuffed product ($461,000) they had convinced the Minneapolis VA to purchase, that had been sitting on the shelves of the Minneapolis VA.[314] Taylor and Lilly informed Kruchoski, on October 31, 2016, that Kruchoski and Tornquist were not entitled to part of the commission because MiMedx did not identify the sale as "growth" but rather, as Taylor put it, "an acceleration of the same revenue that [MiMedx] had already recognized."[315] Taylor admitted to Kruchoski that the revenue previously recognized by the Company was "***phony growth***" because MiMedx previously had to credit AvKARE for the product, meaning the Company's net revenue on the transaction was zero.[316]

149. On November 2, 2016, Kruchoski sent an e-mail to Petit, Taylor, Cashman, and others, entitled, "Complaint – Jess Kruchoski and Luke Tornquist".[317]

---

[314] *See Kruchoski/Tornquist* Complaint, at ¶¶67-68; *Kruchoski* Counterclaim, at ¶¶84-86.

[315] *Kruchoski* Counterclaim, at ¶86.

[316] *Id.*

[317] *See* Ex. 31, at 3-4.

Kruchoski demanded that the Company investigate and rectify improper revenue recognition practices concerning AvKARE and other distributors.[318]

150. The next day, on November 3, 2016, Tornquist received a phone call from Blocker regarding his joint complaint with Kruchoski. Blocker conveyed that ***maintaining the complaint would "not be good for" Tornquist, reminded Tornquist that he had a wife and children, and cautioned Tornquist to "think of [his] family***."[319] Blocker also called that day to say that ***he and Tornquist "should think about their families***."[320]

151. On November 4, 2016, Kruchoski e-mailed General Counsel Haden, stating, "I have gained full realization that the ***company is misrepresenting our revenue***[,]" "I was told by a member of upper management that ***Pete Petit[] insisted this [channel stuffing] occur and that anyone who did not comply would be negatively treated***[,]" and "I believe that ***Mimedx is reporting Government revenue before it has been either [sic] realized***, and is deliberately delaying the reporting of returns so as to report net profits. This results in false or misleading statements to

---

318 *See id.*

319 *Tornquist* Counterclaim, at ¶81.

320 *See id.* at ¶82.

the SEC, shareholders, and the investing community."[321] Counsel for Kruchoski and Tornquist also sent MiMedx a demand letter describing a variety of improper and illegal conduct related to MiMedx's relationship with AvKARE, including channel stuffing, improper revenue recognition, and health care fraud.[322]

152. On the morning of December 12, 2016, Petit and Taylor, along with other senior executives including Cashman, Dean, Carlton, Lilly, Blocker, Kuntz, and Fox, held an emergency meeting in the executive board room of MiMedx's Marietta, Georgia headquarters.[323] During the meeting, Petit stated that Kruchoski and Tornquist would be sorry that they engaged in "this action."[324] Petit also stated, in an aggressive tone while slamming his hand on a binder lying on the table, that Kruchoski and Tornquist would feel immense pain for what they were doing.[325] Further, Petit stated that Kruchoski and Tornquist would be "***financially hit***," "***their families and futures will feel it***," and they would be "***hurt professionally and with***

[321] Ex. 31, at 1-2.

[322] *See* SEC Complaint, at ¶236.

[323] *See Fox* Counterclaim, at ¶84.

[324] *Id.*

[325] *Id.*

***every possible resource available***."[326] According to Petit, Kruchoski and Tornquist "and any other who did similarly ***would be dealt with quickly and harshly***."[327]

153. True to Petit's word, Defendants quickly retaliated against Kruchoski and Tornquist. On the same day as the "emergency meeting," MiMedx terminated their employment. The next day, the Company filed lawsuits against both of them.[328]

154. On December 15, 2016, Tornquist and Kruchoski filed a formal whistleblower complaint with the SEC declaring, under penalty of perjury, the truthfulness of their allegations.[329] On the same day, Kruchoski and Tornquist filed civil claims against MiMedx in federal court.[330] As discussed in Section VI.A, the Company promptly released public statements denying the allegations.

155. Around the same time, the Company's Audit Committee commenced ACII.[331] The Audit Committee used the Company's existing corporate counsel, Troutman Sanders LLP ("Troutman"), to assist with conducting interviews and

---

[326] *Id.*

[327] *Id.* at ¶¶83-84.

[328] *See MiMedx Grp., Inc. v. Tornquist*, No. 1:17-cv-00399-LMM (N.D. Ga. Dec. 13, 2016); *MiMedx Grp., Inc. v. Academy Med., LLC*, No. 50-2016-CA-013806-XXXX-MB (Fla. Palm Beach Cir. Ct. Dec. 13, 2016).

[329] *See Kruchoski/Tornquist* SEC Form TCR.

[330] *See Kruchoski/Tornquist* Complaint.

[331] *See* SEC Complaint, at ¶237.

reviewing documents.[332] Once again, Petit, Taylor, and Senken concealed material information from, and provided misleading information to, the Audit Committee about the Company's side arrangements with AvKARE.[333] For example, at Taylor's direction in December 2016, one of MiMedx's executive vice presidents provided incomplete and misleading information to Troutman and the Audit Committee regarding the Company's Reconciliation Group.[334]

156. Only a couple of weeks after opening ACII, on December 27, 2016, Defendants announced its preliminary findings, stating that the Audit Committee has "advised the Company's management and the Board of Directors that it has found no credible evidence to indicate that any changes to previously issued financial statements are necessary in light of these [the Kruchoski and Tornquist] allegations." Just two days later, on December 29, 2016, Cashman and Kuntz informed Fox (to whom Kruchoski and Tornquist once reported) that his employment was terminated.[335] The Company sued Fox on February 22, 2017. On January 31, 2018,

---

[332] *See id.*; Ex. 36, Aurelius Value, *MiMedx: Undisclosed Details Undermine 'Independent' Investigation*, SEEKING ALPHA (Sept. 27, 2017). Troutman also served as securities counsel for two of Petit's prior companies, Healthdyne and Matria. *See id.* at 5.

[333] *See* SEC Complaint, at ¶¶239-242.

[334] *See id.* at ¶240.

[335] *Fox* Counterclaim, at ¶¶92-94.

Fox filed a counterclaim against the Company related to Defendants' channel stuffing and improper revenue recognition. The Company publicly denied the accusations.

### 4. The SEC Begins to Ask Questions and Defendants Continue to Lie About Their Financial Arrangements

157. A few weeks after Kruchoski and Tornquist filed their complaint with the SEC, the SEC issued comment letters to MiMedx, dated January 9 and 25, 2017. The comment letters inquired about the Company's financial arrangements with AvKARE and other distributors, including revenue recognition. Senken responded to the SEC on behalf of the Company in publicly filed letters dated January 23 and February 8, 2017. In those letters, set forth in Section V.D.4, Senken materially misstated the Company's distributor arrangements and revenue recognition practices as MiMedx's Audit Committee later confirmed.[336]

158. On February 8, 2017, in response to questions during ACII, AvKARE submitted a statement through its counsel admitting the side agreement with MiMedx: "[T]he parties' course of dealing has been that AvKare pays invoices in the order of oldest first, but only as AvKare is paid by VA; that while it is not a part

---

[336] *See* Ex. 2, at 4.

of the written contract, MiMedx has always reimbursed AvKare for lost or missing products."[337]

159. In light of ACII, Cherry Bekaert again attempted to protect itself by adding a new representation to the Company's management representation letter regarding the 2016 annual audit, dated March 1, 2017.[338] Despite the statement from AvKARE's counsel and whistleblower complaints, the representation falsely asserted that: "There are no: . . . [s]ide agreements or other arrangements (either written or oral) that have not been disclosed to you, including any related to payment terms with [AvKARE] and their Product Distribution Agreement."[339] After Petit and Senken signed the letter,[340] Cherry Bekaert issued a clean audit opinion as to the presentation of the Company's 2016 financial statements.

160. As detailed below, on March 1, 2017, MiMedx issued a press release announcing that ACII was complete. According to Defendants, ACII had formally absolved the Company of any wrongdoing, confirming the "preliminary" findings

---

[337] Ex. 6, at 4.

[338] SEC Complaint, at ¶252.

[339] *See id.*

[340] *See id.* at ¶253.

hastily reported after the channel stuffing allegations by Kruchoski and Tornquist. Specifically, the press release stated:

> The Audit Committee has completed its investigation and confirmed there is no credible evidence of any wrongdoing on behalf of members of MiMedx management. . . . The Audit Committee's findings have been submitted to and approved by the Company's Board of Directors. The Audit Committee's investigation determined that the Company has appropriately recognized revenue and found no credible evidence to indicate that any changes to the Company's previously issued financial statements are necessary in light of the former employees' allegations.

161. Later that month, on March 20, 2017, the SEC sent a comment letter to MiMedx regarding the Company's 2016 Form 10-K, following up on its previous correspondence. Among other things, the SEC requested a summary of the Audit Committee's findings during ACII. Analysts at Audit Analytics noted that "the SEC request for a summary of the findings, in a publicly available comment letter, is not a common occurrence."[341] *See* Nicole Hallas & Derrick Coleman, *Five Years of Restatements Following Internal Investigation for MiMedx Group, Inc.*, AUDIT ANALYTICS (June 25, 2018), https://www.auditanalytics.com/blog/five-years-of-restatements-following-internalinvestigation-for-mimedx-group-inc/.

---

[341] *See* Nicole Hallas & Derrick Coleman, Five Years of Restatements Following Internal Investigation for MiMedx Group, Inc., AUDIT ANALYTICS (June 25, 2018), https://www.auditanalytics.com/blog/five-years-of-restatements-following-internalinvestigation-for-mimedx-group-inc/.

162. On April 18, 2017, MiMedx responded to the SEC letter and publicly filed a redacted summary of the Audit Committee findings requested by the SEC. Suspiciously, MiMedx invoked a confidential treatment request pursuant to SEC Rule 83, asking that "the redacted portions be maintained in confidence, and not be made part of any public record and not be disclosed to any person (other than the Staff)."[342]

163. According to the SEC, MiMedx's letter failed to disclose the Company's side arrangement with AvKARE despite multiple responses directly discussing the Company's relationship with AvKARE.[343] Rather, the letter "falsely represented" that: (a) the Company's independent stocking distributors, including AvKARE, "purchase product from the Company at a price which is a discount off of list price, contractually take title to the products when they are shipped, and then re-sell the products to their customers . . . [and] are obligated to pay us regardless of when, if ever, they sell the products"; and (b) AvKARE "has no right to return

[342] SEC Rule 83 (17 C.F.P. §200.83) sets forth a procedure to request that information disclosed to the SEC be withheld even if requested by the public under the Freedom of Information Act ("FOIA").

[343] SEC Complaint, at ¶255.

products sold under our agreement except in cases of defect or nonconformity."[344] Petit, Taylor, and Senken prepared the letter, and it was signed by Senken.[345]

### E. EY Replaces Cherry Bekaert and Immediately Raises Questions About the Company's Distributor Relationships and Accounting Practices

164. In the midst of the unraveling fraud, including investigations, whistleblower litigation, and the SEC's request for ACII findings, MiMedx effectively dismissed Cherry on August 4, 2017 and replaced it with EY as the Company's independent auditor for FY17.

165. Just a few months later, in or around January 2018, EY raised a variety of questions about the Company's relationship with AvKARE in connection with EY's annual audit of the Company for FY17.[346] These included questions about the adequacy of ACI and ACII, during Cherry Bekaert's time as outside auditor.[347]

166. On or about February 6, 2018, EY informed the Audit Committee that its questions remained unresolved and that it would not complete MiMedx's 2017 annual audit until another internal investigation into the Company's AvKARE-

---

344 *Id.*

345 *See id.*

346 *See id.* at ¶257.

347 *See id.*

related accounting was conducted, and until the current and historic allegations impacting MiMedx's revenue recognition practices were resolved.[348]

167. Petit, Taylor, and Senken responded by preparing a memorandum for EY designed to persuade them that the prior accounting was appropriate.[349] The memo offered false and misleading explanations of the accounting and concealed the true facts and circumstances regarding the Company's side arrangements with AvKARE, including the facts described in Section V.C.1 above.

168. Unswayed by the false and misleading memo, EY confirmed to MiMedx in February 2018 that it would not complete its FY17 audit until the internal investigation was concluded.[350] EY's actions were in stark contrast to those of Cherry Bekaert, which had delivered clean audit opinions of MiMedx's misstated financial reports for fiscal year 2012 ("FY12") through FY16, even after being informed of the complaints lodged by Andersen and Kruchoski/Tornquist and the letter from AvKARE's counsel during the course of ACI and ACII.[351] Following

---

[348] *See id.* at ¶258.

[349] *See id.* at ¶259.

[350] *See id.* at ¶260.

[351] *See* Section XI.B.3.

EY's pronouncement, the Company was forced to launch ACIII, delay its 2017 Form 10-K, and reveal issues with its sales and distribution practices.

## VI. THE TRUTH OF DEFENDANTS' FRAUD LEAKED OUT THROUGHOUT THE CLASS PERIOD BUT DEFENDANTS CONTINUED TO MISLEAD INVESTORS

### A. News of Defendants' Fraud Began to Emerge from Whistleblowers and Other Sources, Attracting Attention from Government Authorities

169. Despite Defendants' best efforts at concealment, news of the fraud began to slowly leak to the public through a variety of sources, including, among others: *qui tam* and whistleblower suits; news articles; and online blogs and research reports based on authors' independent research, including interviews with former MiMedx employees and business associates and FOIA requests to government agencies. These sources revealed previously unknown facts concerning the Company's true business practices and fraudulent revenue recognition scheme.

170. In response, Defendants embarked on a misleading campaign to downplay, deny, and conceal the truth from investors. Defendants vociferously attempted to rebut all allegations of wrongdoing through Company press releases, prominent postings on MiMedx's website, shareholder communications, and public conference calls. Defendants sought to deflect public scrutiny by aggressively blaming and attacking former employees and online commentators, disparaging

them as liars and "short sellers" seeking only to profit from the decline of MiMedx's stock price. And, as it had with former employees, the Company filed meritless lawsuits against some of the commentators, asserting defamation and related claims.

171. As detailed below in Section VI, Defendants' statements denying and downplaying the fraud were themselves materially false and misleading misstatements and omissions. Defendants' misstatements and omissions attempting to cover-up the truth were effective for a time, concealing their misconduct and buoying the Company's stock price. Eventually, Defendants' massive, multi-faceted fraud could no longer be concealed. Mounting reports of Defendants' improper business practices and fraudulent revenue scheme attracted scrutiny from various governmental agencies, including the DOJ, SEC, VA, and HHS, creating a snowball effect that gradually led to the Company's downfall and eviscerated its stock price.

172. The problems first began to unfold publicly in mid-2014, as a result of a lawsuit by a top executive from one of the Company's competitors in the wound care business, Organogenesis. On July 24, 2014, a *qui tam* complaint against MiMedx was filed under seal by Antonio S. Montecalvo ("Montecalvo"), Organogenesis' Director of Customer Support Services, who "learned and observed, in documents and emails, the conduct of sales representatives and other employees

of [MiMedx], in selling, marketing, and promoting [EpiFix]."[352] Montecalvo observed, among other things, that MiMedx was engaged in "unlawful practices . . . with respect to its marketing and sale of EpiFix," including "paying illegal kickbacks to medical providers," in violation of the FCA and AKS.[353]

173. Then, after the close of trading on December 31, 2014, MiMedx issued a press release announcing it had received a civil subpoena from the HHS-OIG, "in connection with a civil investigation into matters primarily related to the Company's sales and marketing activities."

174. On the news of the HHS-OIG investigation and subpoena, which were linked to the *Montecalvo* Complaint, the Company's stock price fell 15.52%, from a close of $11.53 on December 31, 2014, to a close of $9.74 per share on January 2, 2015, on above-average volume of 5.4 million shares.

175. The stock price decline would have been even worse, but in the press release announcing the investigation on December 31, 2014, Petit falsely denied any problems, stating "I can assure you that the corporate officers at MiMedx are not aware of anything that would stimulate this investigation" and as a result "[w]e

---

[352] False Claims Act *Qui Tam* Complaint, at ¶119, *United States, ex rel. Montecalvo v. MiMedx Grp., Inc.*, No. 14-01260-RCL (D.D.C. July 24, 2014) ECF No. 1 ("*Montecalvo* Complaint"), at ¶3.

[353] *Id.* at ¶¶4, 19, 21.

expect this investigation will confirm that our policies and procedures are working as intended." Petit continued:

> We have continually maintained and improved a robust compliance program. We have been very focused on the thoroughness of our compliance policies and our staff adhering to those policies. For instance, MiMedx employees participate in a thorough training program regarding our policies and the standards that have been established and enforced to assure their understanding and adherence to our compliance programs.

176. Then, after the market opened on January 2, 2015, the Company hosted a conference call "to present prepared remarks and respond to questions regarding its receipt of the civil subpoena" from HHS-OIG announced the previous trading day. During the conference call, Petit again denied any knowledge of wrongdoing, stating, "I can safely say that none of our executives are aware of anything that would stimulate an inquiry of this nature."

177. In response to the Company's conference call, Craig-Hallum Capital Group ("Craig-Hallum") issued a report on January 5, 2015, discussing the HHS-OIG's subpoena and linking it to the decline in the Company's stock price. According to the report, "the subpoena carries the most weight and will have the biggest impact on the stock's performance over the near-term."

178. On March 23, 2015, MiMedx issued a press release that tied the HHS-OIG subpoena to the *Montecalvo* Complaint and stated that it "has received notice

from the Department of Justice that it has declined at this time to intervene in the [*Montecalvo*] *qui tam* action that gave rise to the issuance of a subpoena to MiMedx from [HHS], Office of Inspector General ('OIG') a few months ago."

179. Petit falsely stated that "we are confident that we have not engaged in wrongdoing which would support a qui tam action." He continued, "[t]his inquiry has certainly allowed us to comprehensively evaluate all aspects of our compliance programs and reaffirm the effectiveness of our policies and standards. We are pleased that we have continually maintained a culture of compliance and diligently stressed adherence within our organization."

180. Months later, on October 12, 2015, MiMedx issued another press release stating that the *Montecalvo* Complaint had been dismissed. Petit falsely stated: "We believe the underlying claims of the relator in this case were without merit and full of ridiculous innuendo. In my judgement, they were predominately outright lies."

181. Also, after the market closed on October 12, 2015, the Company issued a press release announcing 3Q15 financial results. In the press release, Petit revealed that "[d]uring the quarter, we made certain adjustments regarding our network of distributors supporting our offerings for the surgical, orthopedic and spine market

sectors. Revenue could have been even stronger if not for the short-term effect of these strategic steps in our distributor network."

182. The following day, October 13, 2015, the Company held its Analyst Day conference call wherein the Company revealed that it had parted ways with a distributor (later determined to be CPM), which negatively impacted the Company's 3Q15 results by $2 million to $3 million.

183. In response to the uncertainty around the departure of its distributor, the Company's stock price fell 14.23%, from a closing price of $9.84 per share on October 12, 2015, to a closing price of $8.44 on October 13, 2015, on unusually high volume of 2.43 million shares. The stock price continued to fall 5.81% the following day, October 14, 2015, closing at $7.95 per share on unusually high volume of 3.26 million shares. The total stock price decline over this two-day period was 19.21% per share. This decline would have been worse if Defendants revealed the true scope of their fraud and dependence on CPM and its network of sub-distributors, including PODs, to facilitate their improper sales and distribution practices, including channel stuffing.

184. The market tied the Company's stock drop to the loss of a major distributor. On October 13, 2015, Canaccord Genuity issued a report commenting on the Company's Analyst Day which noted that "Q3/15 was negatively impacted

by distribution changes" which included the "elimination of a stocking distributor[] negatively impact[ing] results in the quarter by $2M - $3M."

185. Likewise, Lake Street Capital Markets ("Lake Street") issued a report the following day noting that "in line revenue would have been even better had the company not decided to part ways with its largest U.S. distributor and go direct." The report commented that the pre-release of third quarter revenue "Overshadow[ed] Long-Term Positives."

186. Expanding on the Company's Analyst Day revelations, Petit later admitted, during the Company's 3Q15 earnings call on October 29, 2015, that the distributor (*i.e.*, CPM) "had been with us a while and it was just time for us to go our separate ways. That probably cost us a bit. Well, it did cost us some revenue in the quarter . . . ." Taylor added during the same call that "[t]hey were our largest distributor outside of the federal side of things. So you can think from our past case, you can see how big that product line was, but it was substantial."

187. On April 10, 2016, MiMedx issued a press release announcing its financial results for 1Q16. While MiMedx recorded "record revenue" for the quarter, the Company recorded its first revenue miss after 17 quarters of meeting or exceeding its revenue guidance. Petit stated, "[w]e are disappointed that our revenue fell short of our forecasted guidance by about two million dollars."

188. Defendant Petit misleadingly attributed this shortfall to "growing pains" resulting from the initial effects of the installation of a Sales Management System on the sales organization, the realignment of certain sales management to prepare SSO for autonomous growth, and the assimilation of Stability. In an effort to alleviate investor concerns regarding the Company's business practices, Petit further falsely emphasized that the "first quarter issues resulting in our lower than expected revenues are not competitive related or systemic to advanced wound care or our SSO business." In reality, as Defendants knew but failed to disclose, the shortfall was the result of Defendants' systemic channel stuffing practices and fraudulent revenue recognition scheme catching up to them. They had pulled ahead sales from 1Q16 into 4Q15 to address the loss of CPM and, despite ramping up their channel stuffing efforts, they were struggling to achieve continued growth on a false number.

189. The following day, on April 11, 2016, the Company hosted a conference call to discuss its 1Q16 financial results. Petit spoke on behalf of the Company (as did Senken) and used the conference call as another opportunity to downplay the unexpected earnings miss. Once again, Petit misleadingly attributed the miss to "major information systems upgrades" that would eventually permit further Company growth, and failed to disclose that the Company's growth was

predicated on a quickly unraveling fraudulent revenue recognition scheme. In addition, Petit misleadingly stated that: "[W]e do not believe this miss is a result of any of our competitors taking market share"; "We also do not believe it is related to any issues with some systemic change in the demographics, treatment protocols or reimbursement for advanced wound care"; "This is a problem that was strictly caused by our growing pains"; "We believe we will recover from this quickly"; and "There is nothing systemically wrong with advanced wound care . . . [or] our product lines or issues like that."

190. As a result of the unexpected revenue miss, the price of MiMedx common stock dropped 8.79%, from a close of $8.99 per share on April 8, 2016, to a close of $8.20 per share on April 11, 2016, on unusually high trading volume. The price of MiMedx stock would have dropped further had Defendants admitted that the Company's revenue miss for 1Q16 was the result of Defendants' unsustainable fraud and the inability to continue to demonstrate growth on a false number rather than "major information systems upgrades."

191. On April 11, 2016, The Motley Fool published an article titled, "What Has MiMedx Group Shares Dropping 10% Today?" attributing the stock drop to "[l]ower-than-expected first-quarter sales," and acknowledging that investors "hate downside surprises."

192. On April 19, 2016, Lake Street released a report "reducing [its] price target, lowering it from $15 to $12," in response to the Company's April 10, 2016, pre-announcement.

193. On December 15, 2016, following MiMedx's termination of Kruchoski and Tornquist, and retaliatory suits filed against them by the Company, described above in Section V.D.3, Kruchoski and Tornquist filed a lawsuit against MiMedx and Petit.[354] The suit alleged that Kruchoski and Tornquist were terminated as retaliation for formally declaring their concerns over Defendants' channel stuffing scheme, which they claimed were designed to inflate the Company's revenue and give the impression of continuous growth.[355]

194. On the same day, the Company misleadingly responded with a press release in which Petit falsely characterized the allegations as "not factual and fallacious." Petit claimed that the channel stuffing allegations had been submitted to the Company's Board to "thoroughly review the issues" (ACII), and misled the market by asserting Kruchoski and Tornquist were terminated due to their sale of competitors' products, not the concerns they raised about Defendants' conduct:

> [I]n the process of doing that investigation, we found out that these two individuals [Kruchoski and Tornquist] had been selling competitive

---

[354] *See generally Kruchoski/Tornquist* Complaint.

[355] *Id.* at ¶¶17-27.

> products and other products for over a year into our accounts. Therefore, earlier this week, their employment was terminated and lawsuits filed against them for their breach of their duty of loyalty and contractual obligations to the Company.

195. In response to Kruchoski's and Tornquist's allegations, the Company's stock price fell 6.43%, from a close of $9.18 on December 15, 2016, to a close of $8.59 on December 16, 2016, on above-average volume of 2.11 million shares. Defendants' continued lies buoyed the stock price, which would have fallen further had Defendants revealed what the Company would later admit: (i) MiMedx had engaged in improper sales and distribution practices; (ii) MiMedx had improperly recognized revenue and, as a result, its financial statements could not be relied upon; and (iii) Kruchoski and Tornquist had been fired and sued by the Company in retaliation for raising the Company's fraudulent practices with Defendants.

196. On December 19, 2016, Petit, Taylor, and Senken (along with Cashman) hosted a call with investors to discuss the Company's 2017 business plan and outlook. Petit referenced the *Kruchoski/Tornquist* litigation and falsely stated, "I hope I made it clear that Management is not a bit concern[ed] about the outcome of the lawsuit. It will run its course. We have done nothing to these two employees other than terminate them for breaches of their contract with us."

197. During the call Petit also referenced the procedures in place to ferret out improper conduct at Mimedx, falsely stating:

> When we have allegations of any kind come across through a hotline or up to a Dear Pete letter, or other sources through our compliance line, we investigate those because we don't want those kind of issues going on within the Company either. And that's somewhere in the chain of command between myself, Bill, and so on. So, that process has taken place also and we've seen some issues.

198. In reference to the *Kruchoski/Tornquist* litigation, Cashman added, on behalf of the Company: "We haven't seen any compliance issues at our level yet, so." Petit falsely stated, "Yes, the allegations made in the lawsuit we don't see those." Taylor agreed, emphasizing that, "some of the claims are so outlandish that we question whether any real due diligence was performed before these claims were made. One claim is that we're supposedly recogniz[ing] revenue with VAs without a PO. That's completely false . . . ."

199. Less than two weeks later, on December 27, 2016, MiMedx announced "Preliminary Investigation Findings" of ACII related to the channel stuffing allegations made by Kruchoski and Tornquist. The Company falsely assured investors that there was no credible evidence whatsoever that its prior financial reporting was incorrect in any respect, stating:

> As the Company has previously stated publicly, management believes the claims made in the lawsuit brought by these former employees, including claims made about the Company's sales practices, are without merit, and the Company does not anticipate any material effect on the Company's financial statements resulting from these allegations.

* * *

> The Audit Committee has advised the Company's management and the Board of Directors that it has found no credible evidence to indicate that any changes to previously issued financial statements are necessary in light of these allegations.

200. On February 23, 2017, MiMedx issued a press release announcing its financial results for the year ended December 31, 2016, and held a conference call later that day. During the call, Petit reiterated the preliminary findings of ACII and reiterated that it was "management's position that the allegations are not factual." Petit also commented on the expiration of MiMedx's contract with AvKARE on June 30, 2017, with a "three month wind-down period through September 30, 2017[,]" and revealed that MiMedx was "required to repurchase any inventory of AvKare's that may be remaining, which we expect to be minimal." Petit assured investors that MiMedx planned for the repurchase at the end of AvKARE's contract, stating, in relevant part:

> Because the end of the contract is nearing, we felt it was prudent to increase our sales returns and allowances reserves specifically for AvKare, which has the effect of reducing our Q4 revenue by $1.8 million. Over the last year, we've continued to rapidly reduce the inventory that AvKare's purchased, which is located at approximately 100 VA facilities around the country. If we assist AvKare in doing an effective job of reducing this inventory, some of our reserves will flow back into our revenue.

201. During the question and answer portion of the call, Petit confirmed that the revenue reduction was unrelated to allegations of channel stuffing and the

subsequent investigation, stating, "[i]t's related to . . . the termination date of the AvKare contract and the legal agreement associated with that." And, in an attempt to further explain the intricacies associated with estimating liability at the end of the contract in accordance with GAAP, Senken stated:

> [W]e attempted to estimate as best as possible what we thought was in the AvKare inventory prior to that prerelease of revenue. But as Pete mentioned earlier, our inventory is in 100 different facilities and a number of different departments within those facilities. And so, we undertook a process over the course of January in terms of somewhat validating what we could figure out in terms of what was sitting in stock, looking at it in terms of what the demand was and what the usage was in each one of those facilities and then came to this conclusion that, conservatively speaking, we wanted to make sure that we had everything covered.
>
> And so it was really from a GAAP perspective that we had to go through that process. Quite frankly, our thoughts internally are that there's enough demand out there that most, if not all, of that product can be utilized. But again, you have to be somewhat conservative, and that's where we were.

202. Analysts reacted positively to Defendants' misleading but optimistic statements regarding the Company's financial performance and relationship with AvKARE. For example:

(a) On February 23, 2017, Craig-Hallum issued a report stating that the "AvKare Related Revenue Adjustment Makes Sense," was "part of [the Company's] long-term strategy of shifting to a direct sales channel," and "is not indicative of underlying issues in [the Company's] sales channel."

(b) The next day, on February 24, 2017, AEGIS Capital Corp. maintained its "Buy" rating on MiMedx's stock, relying on Defendants' assertion that the situation with AvKARE "was a planned phase out beginning in 2015 and is similar to other change outs done in the past," and, although AvKARE is "mentioned in the ongoing whistle-blower lawsuit against [the Company], . . . CEO Pete Petite [sic] stated on the call that the incidents are unrelated."

(c) Also on February 24, 2017, Lake Street reiterated its "Buy" rating on MiMedx's stock, noting that the Company was "Still A Compelling Growth Story" and that "[m]anagement continues to expect 2017 revenue of $302-307 million and adjusted EPS of $0.31-0.33."

203. A few days later, on March 1, 2017, Defendants issued a false press release stating that ACII had formally absolved the Company of any wrongdoing:

> The Audit Committee worked closely with independent counsel to conduct an extensive investigation into the claims alleged by these former employees. The Audit Committee has completed its investigation and confirmed there is no credible evidence of any wrongdoing on behalf of members of MiMedx management. The lawsuits with these former employees are ongoing and management continues to believe that the employees' legal claims and accompanying allegations are without merit.
>
> The Audit Committee's findings have been submitted to and approved by the Company's Board of Directors. The Audit Committee's investigation determined that the Company has appropriately recognized revenue and found no credible evidence to indicate that any

changes to the Company's previously issued financial statements are necessary in light of the former employees' allegations.

204. On May 23, 2017, before the market opened, Joe Munda ("Munda"), a securities analyst from First Analysis, issued a report stating the Company's valuation "appears stretched" and cited concerns about the Company's "evolving and confusing" relationship with AvKARE and a lack of clarity on the impact of MiMedx's litigation with former employees alleging channel stuffing and improper revenue recognition.[356] The report was based on non-public facts gathered during Munda's own investigation into the Company, which included conversations with former MiMedx sales representatives, VA personnel, and other industry participants.

205. In response to this news and Munda's downgrade, the Company's stock price fell 4.95%, from a close of $14.33 on May 22, 2017, to a close of $13.62 on May 23, 2017, on unusually high trading volume of 2.47 million shares.

206. In a Form 8-K filed on August 10, 2017, the Company revealed that the Audit Committee had "effectively dismissed" Cherry Bekaert, effective August 4, 2017, by replacing it with Ernst & Young as the Company's new independent registered public accounting firm for FY17. The Company gave no reason for this

---

[356] *See* Ex. 37, Joseph Munda, *Valuation Appears Stretched, Channel Transition Unclear; Move to Underweight*, FIRST ANALYSIS (May 23, 2017).

sudden change, but falsely suggested it was a routine audit change and that there "were no disagreements with Cherry Bekaert on any matters of accounting principles or practices, financial statement disclosure or auditing scope and procedures which, if not resolved to the satisfaction of Cherry Bekaert, would have caused Cherry Bekaert to make reference to the matter in their report." In reality, the Company's dismissal of Cherry Bekaert for EY was anything but routine. Rather, it was driven by heightened scrutiny from the market and regulatory authorities, such as the SEC, into the Company's sales, distribution and accounting practices.

207. On August 17, 2017, the Company issued a misleading press release "Provid[ing] [an] Update on Litigation with Terminated Employees," in which the Company continued its campaign of denials and retaliation, aggressively attacking the terminated employees and defending itself against the terminated employees' counterclaims and assertions related to channel stuffing. Among other things, the press release misleadingly claimed that an independent, three-month investigation found "[n]o credible evidence of incorrect processes, procedures or wrongdoing by the Company or MiMedx management" or "to indicate that any changes to the Company's previously issued financial statements were necessary in light of the former employees' allegations."

208. On September 7, 2017, The Capitol Forum released a follow-up article that revealed for the first time that the VA-OIG was conducting an investigation of the Company. The VA-OIG disclosed this investigation when it denied a FOIA request submitted by The Capitol Forum due to what it called "an ongoing law enforcement investigation."

209. In response to news of the VA-OIG's investigation, the Company's stock price fell 5.60%, from a close of $16.43 per share on September 6, 2017, to a close of $15.51 per share on September 7, 2017, on above-average volume of 3.7 million shares. On September 8, 2017, the stock price continued to fall an additional 8.19%, closing at $14.24 per share on above-average volume of 4.7 million shares. The total stock price decline over this two-day period was 13.33%.

210. The stock price decline would have been worse, but on September 7, 2017, the same day that The Capitol Forum article was released, the Company issued another lengthy press release reporting "Further Developments in its Civil Litigation Against Former Employees." The press release again misleadingly downplayed former employees' channel stuffing allegations, and threatened short sellers making arguments based on prior allegations. Among other things, the press release misleadingly claimed that although the Company "has been aware for some time" of an ongoing investigation by the VA-OIG, the Company is not a target of the

investigation and is assisting the government with the investigation. Further, the press release misleadingly claimed that, while "some of the terminated individuals provided gifts and meals to employees of the VA that potentially result in violations of federal law and MiMedx policies[,]" none of the Company's executives directed them (or anyone) to do so.

211. On September 20, 2017, Aurelius Value ("Aurelius") published a report titled, "MiMedx: Flying Too Close to the Sun," which questioned whether MiMedx had engaged in improper channel stuffing, based on Aurelius' research including communication with a former MiMedx sales representative.[357] Among other things, the report discussed:

> [MiMedx's] [u]ndisclosed related party transactions and entanglements with distributors, including a key MiMedx distributor that has been controlled by an insider. These relationships are especially problematic because secret ties to distributors have featured prominently in historical channel stuffing schemes[; and]
>
> Detailed allegations that MiMedx's channel stuffing scheme relies on at least three more distributors who have undisclosed special agreements involving millions in discounted product and favorable financing terms as "house accounts." Not only does the alleged scheme now extend significantly beyond the VA, but MiMedx has allegedly manipulated its financials through multiple avenues to hit sales targets.[358]

[357] *See* Ex. 30.

[358] *Id.* at 2.

212. Also on September 20, 2017, Viceroy published a 35-page exposé titled, "MiMedx's Employment of Kickback & Bribery Scheme Inducers Makes It Uninvestible."[359] The article compiled non-public internal MiMedx documents, including excerpted communications between employees, which revealed that improper conduct at MiMedx was pervasive and directed by senior management.[360]

213. In response to the Aurelius and Viceroy reports, the Company's stock price fell 6.23%, from a close of $13.16 per share on September 19, 2017, to a close of $12.34 per share on September 20, 2017, on well above-average volume of 10.26 million shares.

214. The stock price decline would have been even greater, but on the same day, September 20, 2017, MiMedx issued a press release "Respond[ing] to Deceptive Short Seller Reports" from Viceroy and Aurelius. In the press release, Petit misleadingly insisted that the articles "have virtually no basis in fact, are littered with innuendo and contain many statements that are simply not correct." Petit also falsely stated:

> This has all the markings of a concerted short seller attack by numerous entities attempting to short our stock and profit from fictitious information and innuendos. We believe that Viceroy Research and Aurelius Value are relying on misinformation from former MiMedx

---

[359] *See* Ex. 21.

[360] *See id.*

> employees terminated for cause. Unfortunately, neither organization appears to have done adequate due diligence and fact-finding before publishing their so-called "research reports."

215. The Company sought to assuage investor concern by issuing a press release on September 21, 2017, addressing "its interactions with the [SEC]." The press release misleadingly stated, in part, that the Company had "already satisfactorily addressed a comment letter from the SEC earlier this year, which letter covered a variety of topics, including the Company's revenue recognition policies and procedures" resulting in a close-out letter from the SEC on April 27, 2017. Separately, the press release revealed that the Company received a subpoena from the SEC regarding "former employees' [Kruchoski's and Tornquist's] allegations, and primarily is related to the matters that were the subject of the Company's previously disclosed internal investigation [ACII]." The press release misleadingly added that, during the ACII, the Company had "engaged a nationally recognized expert in revenue recognition who reviewed and confirmed the Company's revenue recognition practices to be proper." As to the subpoena, the Company claimed that it was "working with the SEC in its investigation of these accusations and supplying all of the documents requested, including those obtained through the civil lawsuit discovery process to help the Commission understand what has transpired" and "providing our fullest cooperation to the Commission." In reality, as ACIII later

revealed, Defendants had lied to regulators, including the SEC, failing to disclose their true relationships with distributors and revenue recognition practices. Moreover, given the innumerable red flags that Defendants' revenue practices were fraudulent, Cherry Bekaert engaged the revenue recognition expert as a patina of protection, but Defendants also provided the expert with false information, which then formed the basis of the expert's analysis.

216. MiMedx also held a shareholder call on September 21, 2017, to discuss various topics including the "orchestrated short seller activity and the remedies the Company is seeking to have this unlawful practice of pushing fabricated information to shareholders in concert with coordinated short selling activity cease." During the call, Petit went to great lengths to downplay the accuracy of recent revelations, misleadingly describing them as "a coordinated and well-organized short-sell attack by a number of organizations." Petit described the extreme efforts taken to prove MiMedx was not engaged in the alleged misconduct and emphasized the Company's rapid revenue growth and strong compliance systems, stating in part:

> Again, our organization has done the right thing. And this painful process will soon pass. I do not believe there will be anything that dismantles our rapid revenue and profit growth. I'll say that again. I do not believe there will be anything that transpires that dismantles our rapid revenue and profit growth. There are very few public companies that have the quality, compliance systems and the disciplines to administer them as we do.

217. In response to questions during the September 21, 2017 shareholder call about certain MiMedx employees providing kickbacks and other alleged improper conduct, Taylor misleadingly stated:

> We have policies and procedures that explicitly prohibit that kind of behavior. We also have controls in place that should that behavior occur, we can typically pick it up. But if people operate outside of our controls, if they do something on their own, where we have no way of verifying what they've done or no knowledge of it, those are the kind of situations that we're talking on here. Because we have strong controls, we have strong policies that prohibit that kind of thing.

218. Petit further explained why MiMedx was "comfortable" with its current operations, and misleadingly highlighted the comprehensiveness and independence of ACII, stating in pertinent part:

> Number one, our audit committee, the board, outside law firm, auditors, and again, an outside consultant on revenue recognition, poured through – as well as executive management poured through all these process, procedures, all the communications we could get our hands on, and subsequent communications we've gotten our hands on. I think that we know very well what was going on. And the board's report is public. We've made that public many, many months ago. And believe me, this board is a group of individuals that are very independent, this management group, Bill and I are on the board. But I can tell you if there was malfeasance, Bill Taylor and [I] wouldn't be here today. And if I was on the board, I'd vote the same way.
>
> Second thing is this qui tam action. 3 years ago, we had a competitor who we were taking market share from in a very rapid rate, do a number of things that summer. And one of it was to file a qui tam action against us that was done by one of their executives. There were literally hundreds of accusations, very -- some of them very similar to all of these in there. We went through the subpoena from the Department of

> Justice. We met with them. We exposed all of our records, and all of that. And that was dealt with a matter of few months. The government failed to step into that suit, and the suit was dropped.

219. At the end of the call, Petit falsely stated that "[w]e have nothing in this corporation at MiMedx to be concerned about. And if we did, we'd be going public with it." He further stated:

> We've gone through investigations internal[ly]. We publicized that to shareholders. I've been around too long. I've been doing this for 36 years. I'm not going to jeopardize my – what future I have left with things that – if there's malfeasance involved.
>
> As far as we know, this company is, and the things that this executive group knows and our board knows and our auditors and everybody else, this company has no issues, except we got some terminated employees that are making up issues.

220. Also, on September 21, 2017, in order to sow confusion and deflect from their conduct, Defendants filed a lawsuit against DBW Partners LLC (d/b/a The Capitol Forum) and others associated with The Capitol Forum based on The Capitol Forum's September 7, 2017, article regarding an investigation by the VA. The lawsuit alleged libel, slander, defamation, false light, tortious interference with business relations, and violations of the Lanham Act. In a press release announcing the lawsuit, the Company claimed that "MiMedx approached the VA with this information [allegations of channel stuffing made by former employees] earlier this year. The Company explicitly informed The Capitol Forum that, to its knowledge,

MiMedx was not the target of any investigation; yet, The Capitol Forum still published its confusing and misleading article." In the press release, Petit called The Capitol Forum a "'shill' for short sellers by posing as an investment advisor through publishing information and providing opinions that could negatively impact MiMedx and its shares."

221. On September 27, 2017, Aurelius published another report titled, "MiMedx: Undisclosed Details Undermine 'Independent' Investigation."[361] Contrary to Petit's statements touting the independence of ACII, the report disclosed that certain Audit Committee members and the "independent counsel" involved in ACII had longstanding ties to, and were closely intertwined with, MiMedx and Petit, thus compromising their independence and impartiality.[362] For example, the report disclosed that:

- Several Audit Committee members were long-standing members of MiMedx's Board during the Class Period, approving and executing MiMedx's fraudulent financial statements throughout the Class Period. Others had close relationships with Petit dating back to two previous companies run by Petit before he joined MiMedx, Matria, and Healthdyne. Like MiMedx, Healthdyne, and Matria were embroiled in accounting and Medicare-related fraud under Petit's watch.[363]

---

[361] *See* Ex. 36.

[362] *See id.* at 6.

[363] *See id.* at 3-5.

- The Chairman of the Audit Committee during ACII, Dewberry, had a close personal and professional relationship with Petit spanning nearly 40 years. In fact, the two were fraternity brothers at Georgia Tech University, when Dewberry served as Petit's "little brother." In an interview, Petit stated that he and Dewberry were "very close" and that Dewberry "has been a member of the executive team for all of our businesses over the years." Dewberry also served on the board of Matria while Petit was Chairman and CEO of that company.[364]

- Like Dewberry, Audit Committee member Joseph G. Bleser ("Bleser"), was also a board member of Matria while Petit was Chairman and CEO.[365]

- Troutman, the supposedly "independent counsel" working on ACII, was also MiMedx's corporate counsel. Further, Troutman represented Petit's former companies, Healthdyne and Matria, and its founder, Carl E. Sanders, served on the board of both Healthdyne and Matria.[366]

222. In response to revelations that the ACII had not, in fact, been independent, the Company's stock price fell 3.25%, from a close of $12.32 per share on September 26, 2017, to a close of $11.92 per share on September 27, 2017, on above-average volume of 3.36 million shares.

223. Two days later, on September 29, 2017, in reaction to the mounting avalanche of bad press, MiMedx issued a press release, "MiMedx Publishes

[364] *See id.* at 3.

[365] *See id.* at 5.

[366] *See id.*

Document on its Website Exposing False and Misleading Information Distributed By Viceroy Research and Aurelius Value," again attempting to refute reports of MiMedx improprieties. The press release quoted Petit, stating:

> I encourage all MiMedx shareholders to thoroughly review and consider our document posted today on our website. As you are aware, MiMedx and all other public companies are governed by federal regulations prohibiting the dissemination of false and misleading information about the Company; unfortunately, organizations like Viceroy Research and Aurelius Value are not held to those standards and often such organizations have little to no accountability for the misinformation they publish. Both the Viceroy Research report and the Aurelius Value report indicate that either they are short in MDXG, or that the reader should assume they are short in MDXG.

224. Additionally, from approximately September 29, 2017 through June 8, 2018, MiMedx devoted an entire section of its corporate website to attacking and rebutting statements by Viceroy, Aurelius, and others who were labeled "illegal short sellers." The section, titled, "Short Selling Commentary," was prominently linked on the main page of MiMedx's corporate website and promoted in Company press releases. MiMedx explained that"[w]e have designated this space on our website to place information that will inform shareholders of the short selling activities in our stock. . . . [I]llegal short selling must be confronted and stopped."

225. Defendants' aggressive pushback and retaliation also included a lawsuit filed on October 4, 2017 against Viceroy and Sparrow Fund Management LP ("Sparrow Fund") (which was thought by MiMedx to be a partner of Aurelius) and

others for libel, slander, defamation, false light, and tortious interference with business relations. In a press release filed the same day, Petit claimed that Viceroy and Sparrow Fund had tried to "manipulate the market and serve their financial interest in driving down the price of MiMedx stock" by making knowingly false statements about MiMedx.

226. During the Company's 3Q17 earnings call on October 11, 2017, Petit continued to downplay and minimize "silly news" and to point the finger at purported short sellers and other Company critics, stating, in part:

> I want to again remind you that approximately 3 years ago, your company went through a semi-confusing period when we discussed – when we disclosed the fact that we had a qui tam lawsuit. . . . We responded very quickly with all of our data and information and review of our compliance and management systems. We met with members of the Department of Justice. Department of Justice views – intervened in the qui tam lawsuit, and the plaintiff dropped the suit and the suit was dismissed. This issue did not disrupt our growth and operations at all. We used to call that period of time our qui tam show. Now we have our short sales circus to contend with. I will submit to you that we believe this will also run its course in a relatively short period of time. We look forward to finish enough [sic] the information we're providing the SEC and having further discussions with them. In the meantime, MiMedx should continue to perform very effectively and efficiently. Please be patient with us as we get through this new growing pain even though it is a circus.

227. On October 23, 2017, analyst Munda suspended his price target for MiMedx, explaining that the Company had been excluding First Analysis from asking questions on multiple calls, instead spending substantial time sparring with

short sellers and filing lawsuits.[367] Munda further noted "unanswered questions" management had been asked about MiMedx's dealings with VAs and how the Company accounted for sales through its distributors. The report also raised new questions in response to Defendants' rebuttals, including how much revenue was directly attributed to improper conduct of former employees who provided meals and gifts to VA employees and whether the Company's ability to sell to the government is at risk.

228. On October 24, 2017, Citron Research ("Citron") posted a video on YouTube regarding MiMedx.[368] In the video, Citron's Managing Editor, Andrew Left, discussed existing research supporting Defendants' use of "undisclosed third-party distributors to circumvent anti-kickback laws or to channel stuff and juice the numbers."[369] Left added:

> We are here to say we have uncovered more research to prove that these are not "bad apples," but rather, MiMedx has started a chain – a system – I don't care what you want to call them of distributors, physician-owned distributors, agents, wife owned distributors or companies that just sell sham fake products in order to cover up that they are holding

---

[367] *See* Ex. 38, Joseph Munda, *Remain at Underweight and Suspend Price Target*, FIRST ANALYSIS (Oct. 23, 2017).

[368] *See* Ex. 39, *Citron Chimes in on MiMedx. Countdown to Formal Investigation. $3 Price Target*, CITRON RESEARCH (Oct. 24, 2017).

[369] *See id.*; Ex. 40, Citron Research, *Citron Chimes In On MiMedx. Countdown To Formal Investigation. $3 Price Target*, SEEKING ALPHA (Oct. 25, 2017).

> on to MiMedx inventory. . . . MiMedx [is] confusing the numbers and not presenting the truth to Wall Street.[370]

229. The video was accompanied by a "MiMedx Addendum" posted the same day on Citron's website, stating in part:

> Citron would not enter into a "noisy" game unless we can add insight into the short thesis and create a better-informed marketplace for mentioned stock.
>
> We believe the research that has been done on MiMedx but the many columnists accurately captures the many dark sides of MiMedx and their use of captive 3rd parties to inflate their financials.
>
> In this report, Citron introduces another shadowy company that was started by a MiMedx employee and a MiMedx consultant BUT is in an unrelated industry. The only problem is – they are registered with the FDA to house MiMedx products.
>
> Citron has read emails and lawsuits from the many employees who have been intimidated by MiMedx management to conduct dirty business.
>
> Citron will not let the tactics of MiMedx aggressive management intimidate the truth out of the market.[371]

230. The Company's stock price fell 11.37%, from a closing price of $13.90 per share on Friday, October 20, 2017, to a closing price of $12.32 per share on Monday, October 23, 2017 (the date of the Munda report), on above-average volume of 4.52 million shares. The following day, (the date of the Citron video and

---

[370] *See id.*

[371] *See* Ex. 41, MiMedx Addendum, CITRON RESEARCH (Oct. 24, 2017).

addendum), the Company's stock price fell another 8.28%, closing at $11.30 per share with well above average trading volume of 10.84 million shares. The total stock price decline over this two-day period was 18.71%.

231. During the morning of November 16, 2017, Viceroy issued a report entitled, "MiMedx vendors soliciting up-coding of Medicare incentives."[372] The report, citing e-mails from MiMedx employees to physicians, revealed that MiMedx fraudulently exploited the insurance reimbursement system by manipulating the insurance codes used for medical procedures involving MiMedx products (*i.e.*, up-coding), in order to claim an excessive amount of insurance money for such procedures.[373] Also, the report revealed that MiMedx sent legal material to its former employees requesting that they not contact regulatory agencies, included in its settlement terms that the former employees retract prior statements in direct violation of federal regulations, and hid its improper conduct on confidentiality grounds.[374]

---

[372] *See* Ex. 42, Viceroy Research Group, *MiMedx vendors soliciting up-coding of Medicare incentives* (Nov. 16, 2017).

[373] *See id.* at 3-5.

[374] *See id.* at 6-7.

232. In response, the Company's stock price dropped 4.86%, from a close of $11.94 on November 15, 2017, to a close of $11.36 on November 16, 2017, on trading volume of 3.34 million shares.

233. On November 20, 2017, after the market opened, MiMedx issued a press release announcing that it added new materials to its website concerning the November 16 Viceroy report, which the press release referred to as "Misinformation Disseminated Through Short Sellers."[375] This caught the market's attention regarding Viceroy's allegations against the Company. Moreover, the Company's unorthodox defense, coupled with the significant time and resources Defendants, in particular Petit, were devoting to growing allegations of fraudulent conduct, raised concerns regarding the Company's future.

234. In response, the Company's stock price dropped 6.43%, from a close of $11.82 on Friday, November 17, 2017, to a close of $11.06 on Monday, November 20, 2017, on trading volume of 2.25 million shares.

235. On November 30, 2017, Petit continued to defend the Company in a ten-page letter to shareholders. Among other false and misleading statements, Petit

[375] *See* Ex. 43, *MiMedx Adds New Materials To Its Website Exposing Misinformation Disseminated Through Short Sellers*, PR NEWSWIRE (Nov. 20, 2017).

adamantly denied the "channel stuffing allegation as well as all the numerous other allegations," insisted that the Company was "extremely transparent with information to our shareholders," and falsely attributed the decline in MiMedx's stock price to a "massive short sell attack." To further squash fears, Petit again focused on ACII and Cherry Bekaert's audits to misleadingly claim the Company had already been cleared of fraudulent conduct. Specifically, Petit stated in part (with emphasis in original):

- "I have been told that MiMedx's performance has been so flawless that people think we must be doing something 'wrong.' In my 36 years of being the Chairman and/or CEO of various publicly traded healthcare companies, I have only known a few companies that performed as well as MiMedx. This can only be accomplished in rare situations, where there is an extremely efficient and effective technology platform with products that are cost effective and very clinically effective. When you combine that with a very experienced and effective management team, you have a very strong combination for success."

- "[O]ver the last several months, MiMedx has been the subject of an illegal, unscrupulous and massive short sell attack."

- "One thing that I want you to <u>clearly</u> <u>understand</u> is that our stock price decline is <u>not</u> primarily as a result of all of this fictitious, inaccurate and false media and tweeting. It is my opinion that that type of publicity would have taken our stock price down somewhat, but not to the extent it has been. What has taken our stock price down dramatically is the <u>coordinated</u> illegal <u>daily</u> trading by these hedge funds and individuals participating in this activity. . . . This gives the <u>very</u> <u>false</u> impression that the stock price decline is being caused by this new and apparently true information."

- "Again, please understand clearly that even through there is a horrendous amount of false and contrived negative information, I do not believe it is the primary driver of our stock decline. The primary driver is <u>illegal</u> <u>stock</u> <u>manipulation</u> through the market on certain days."

- "In my opinion, MiMedx has been extremely transparent with information to our shareholders relative to our terminated sales employees and their unfounded allegations. We have press releases dated December 15, 2016, December 27, 2016, December 30, 2016, March 1, 2017, August 17, 2017 and September 7, 2017 on this subject. We have kept shareholders very appraised of our civil litigation activities. We have kept shareholders appraised of the conclusions of the Audit Committee of our Board and their outside legal counsel and our external auditors. In addition, a nationally recognized expert in revenue recognition was engaged to provide additional information to the company."

- "Adding still more fuel to the fire are the 'shill' publications that are reporting on alleged 'facts' about the Company which are not really facts at all, but rather false and misleading information."

- "Obviously, this recent illegal short selling attack has been a confusing scenario for our shareholders and our employees. Since the individuals and corporate entities who are participating in the short selling activities have not been held very accountable in the past, they are prone to say <u>anything</u> and <u>everything</u> to create false innuendo. The allegations are getting to the point of being 'ridiculous.'"

- "In my opinion, these terminated employees should not be considered credible sources of information because of their history. However, these particular illegal short sellers apparently do not care about credible sources for their information. They will still treat our terminated employees' stories as fact. See our press release dated September 7, 2017."

- "[W]e will have our 2017 audit complete and the press release and 10K filed towards the end of February 2018. Even though MiMedx has had ten years of audited financial statements by reputable accounting firms, some people still do not understand the strengths of those reviews and audits. Perhaps an audit by a Big 4 Auditing Firm rather than a regional firm will help people understand that all of these allegations of financial manipulations are 'trumped up' and <u>fraudulent</u>. Of course, that should <u>not</u> have to be the case."

- "However, the final review and sign off by the [SEC] of their investigation should be the ultimate closure document. As we have stated, we are keeping the SEC intimately informed with data and information flow as these allegations continue to be created. . . . I empathize with the Commission and their staff because of their having seen and heard all of this unscrupulous and false 'noise.' However, I am certain they are beginning to realize that they are talking to some dishonest and cunning 'sales persons.' In terms of the short sellers, I am certain the Commission understands who they are and their motivations."

- "Now, relative to this most significant allegation of 'channel stuffing,' let me add the following. When you have ten years of audited financial statements, you have 26 out of 27 quarters where the Company met or exceeded its revenue estimates, a pristine balance sheet with no debt, strong cash flows which have been used to buy back over $100 million of the Company's stock which is about 9% of the Company, you cannot be fraudulently selling product to customers who are not using the product and getting paid for it themselves. If you fraudulently sell product, the cash flow will slow down quickly because customers are not going to pay for product that is not going to be used and for which they will not get paid. This channel stuffing allegation as well as all the numerous other allegations are unfounded. We answer all the relevant allegations that are publicized particularly those that relate to regulations and laws by posting factual information and truthful responses to the section of our website entitled 'Short Selling Commentary.'"

236. On February 15, 2018, Aurelius published "An Open Letter to the MiMedx Auditors" to "express our concerns about the risks of serious and pervasive fraud at MiMedx Group, Inc. and your firm's audit thoroughly testing these risks in light of facts and allegations that have emerged." The letter further stated that MiMedx, through AvKARE, was "abus[ing its] accounting policy" regarding revenue recognition and "filling shelves before the end of quarters with excess product that neither AvKARE nor the VA had requested" in order to hit sales targets. The letter relied on "exhaustive forensic research," including evidence received from former MiMedx employees and "certain whistleblower documents involving tissue tagging irregularities."

237. In response to this partial revelation of the Company's pervasive accounting fraud, the Company's stock price declined 6.22%, falling from a close of $15.43 per share on February 15, 2018 to a close of $14.47 per share on February 16, 2018.

### B. As Public Scrutiny Intensified, MiMedx Was Forced to Delay Its 2017 Form 10-K and Launch ACIII

238. Before the market opened on February 20, 2018, MiMedx announced that it had postponed the release of its financial results for 4Q and FY17. The Company explained that this delay was due to launch of ACIII, which it described as "an internal investigation into current and prior-period matters relating to

allegations regarding certain sales and distribution practices at the Company," including "the accounting treatment of certain distributor contracts," conducted by "independent legal and accounting advisors" engaged by the Audit Committee. The Company continued to mislead investors, however, by stating that "based on information available to date . . . the outcome of such investigation should not have a material impact on revenue guidance for 2018."

239. In response to this shocking news, the Company's stock price plummeted 39.53%, from a close of $14.47 per share on Friday, February 16, 2018 to a close of $8.75 per share on Monday, February 20, 2018, on well above-average volume of 21.80 million shares.

240. The Motley Fool published an article on the same day, February 20, 2018, titled, "Why MiMedx Group, Inc. is Crashing Today." The article specifically attributed the decline to the announcement that management was delaying the filing of its 4Q and FY17 financial results which "caught traders off guard." The article further noted that "[m]anagement did communicate that this investigation [ACIII] is not expected to have a material impact" on 2018 revenue guidance, which had the effect of averting an otherwise disastrous stock price decline.

241. PiperJaffray also issued a report on February 20, 2018, commenting that "we are encouraged that the company reiterated guidance and mentioned the

cash position." While acknowledging that the postponement was "concerning," PiperJaffray continued to "recommend shares to investors with a higher risk tolerance" until more information was available from ACIII.

242. Before the market opened on February 22, 2018, *The Wall Street Journal* released an article titled, "MiMedx, Fast-Growing Developer of Tissue Graft Products, Didn't Report Payments to Doctors." The article stated that upon review of doctor's disclosures, it determined that MiMedx had unreported payments to more than 20 doctors, despite a 2013 federal law, the Sunshine Act, requiring most drug and medical-device makers to disclose such payments. According to the article, MiMedx claimed that it had received "an opinion from CMS which confirms that MiMedx does not have a need to report [such payments] at this time" due to the nature of its products (human tissue). Contrary to this statement, however, a CMS spokesman told *The Wall Street Journal* that it does not provide such opinions, only general guidance.

243. The following day, February 23, 2018, the Company held a conference call to discuss ACIII and postponement of the Company's 4Q and FY17 financial results. Defendants did not take any live questions from analysts or investors during the call. Rather, Taylor stated that they were addressing only pre-selected "primary questions that we've received from a number of our analysts." On the call, Petit and

Taylor expressed uncertainty as to the duration and scope of ACIII. In particular, Petit stated that:

> The Audit Committee of our Board of Directors has engaged King & Spalding as its legal counsel to conduct an independent investigation [ACIII] with the assistance of KPMG, another Big 4 accounting firm, as a forensic accountant. While the timeframe for the completion has not been determined, the audit committee is working closely with its advisers to complete the investigation in as timely a manner as possible.

244. Taylor added:

> So with the first question, how long would this investigation take?
>
> The board and their independent advisers are working to complete this in as timely [a] manner as possible. Because this is an independent investigation [ACIII], management is not in control of that time line.
>
> Second question, whether – is there a certain period of time in particular that is in question?
>
> And the answer on that one is, at this point in time, we're only able to say that the internal investigation [ACIII] will review matters related to current and prior period manners – matters, excuse me.
>
> The next question was whether the company's review of certain distributor contracts are all-compassing [sic], or are there specific partners that are being looked at.
>
> Well, while we are limited to what we can say, I can tell you that the independent investigation [ACIII] will look at matters related to allegations about sales and distributor practices. Company executives are also reviewing the accounting treatment of certain distributor contracts.

245. During the same call, Defendants misleadingly sought to reassure investors: "We certainly believe you can expect our revenue growth to continue at

a rapid rate. The company reiterated revenue guidance for the year of $383 million to $387 million. Also, our cash flow remains very strong and we anticipate that to continue." Petit falsely suggested, once again, that the Company was merely a victim of "illegal short-sellers with a value destructive agenda."

246. Taylor also falsely stated: "The audit committee's independent investigation [ACIII] should not affect our operational performance . . . . As I addressed in my remarks, we've been experiencing rapid growth over the last few years . . . . We expect to continue to deliver operational . . . successes in the months and years to come."

247. Despite Defendants' denials and reassurances, the Company's stock price continued to plummet as the market processed Petit's and Taylor's statements regarding the scope and duration of ACIII. The stock price fell 11.82%, from a close of $8.88 per share on February 22, 2018, to a close of $7.83 per share on February 23, 2018, on well above-average volume of 14.09 million shares.

248. In a report issued February 23, 2018, Lake Street described Defendants' conference call as similar to the "*Mythbusters* episode that tested whether a keg of beer could explode with lethal force if placed on an open fire. . . . [C]ampers may not want to be anywhere near something that could explode, . . . [a]nd that is exactly what investors are thinking when they look at MiMedx." Accordingly, Lake Street

downgraded MiMedx stock to "Hold" and lowered its price target for the second time in three days, from $12 to $9.

249. Shortly after the market opened on the following business day, February 26, 2018, *Bloomberg* released an article titled, "U.S. Probes MiMedx's Federal Contracts, Accounting" stating that, according to multiple sources, the DOJ was investigating whether the Company "overcharged the government for its tissue-repair products" and looking into the Company's "distribution practices – including whether it inappropriately booked sales of products that hadn't been ordered, a practice known as channel stuffing." The article further reported that the SEC Enforcement Division's "Denver office has been working with federal prosecutors in Manhattan" regarding the Company's distribution practices.

250. With respect to channel stuffing, the *Bloomberg* article noted that "[s]everal former employees, in lawsuits and interviews with *Bloomberg*, allege the company has inflated its financials by recognizing revenue on products that had been shipped to certain distributors but not used." In particular, the article stated that, in addition to two former MiMedx employees who alleged channel stuffing in a lawsuit against MiMedx (Kruchoski and Tornquist), "[t]hree other former employees, who asked not to be identified, told *Bloomberg* in interviews that company executives at

times asked salespeople to meet targets by shipping products that hadn't been ordered."

251. The *Bloomberg* article also stated that:

> In a second line of inquiry, federal agents are said to be looking into the company's sales to the government. MiMedx charged government customers higher prices for what was essentially the same product it was selling to others, according to two former employees. One of them said that late last year, the Federal Bureau of Investigation collected emails, sales reports, marketing materials, pricing charts and pay details as part of an inquiry into MiMedx's government sales.

252. The *Bloomberg* article added that the DOJ was looking into whether these sales practices violated the FCA, "the government's primary tool for policing fraud against federal agencies," and that MiMedx could face "significant penalties."

253. In response to the disclosures regarding the DOJ and SEC investigations and new information revealed from former employees, the Company's stock price continued to fall 6.13%, from a close of $7.83 per share on Friday, February 23, 2018, to a close of $7.35 per share on Monday, February 26, 2018, on well above average volume of 23.99 million shares.

254. Also on February 26, 2018, The Motley Fool published an article titled, "Here's Why MiMedx Group Inc. is Crashing Again." The article linked in the *Bloomberg* article released earlier in the day as the reason for the stock price decline. In response to the lack of clarity into the Company's conduct, the article advised

that, "[g]iven the huge uncertainty, I still think the smart move is to monitor this story from a safe distance."

255. The following day, February 27, 2018, the Company issued a misleading press release responding to the *Bloomberg* article. The Company began the press release by emphasizing that it "is not aware of any investigation of MiMedx by the [DOJ]," stating that the DOJ had declined to intervene in a *qui tam* suit against the Company three years ago. The Company denied the article's allegations of channel stuffing and improper payments, blaming them on "a concerted, illegal short selling attack since September [2017]" and retaliation by terminated MiMedx employees "acting in concert with this group of short sellers to distort information and negatively impact the Company's stock price." The Company directed news writers to its "effective[]" rebuttals of such allegations on the MiMedx website. In addition to these denials, the press release reassured investors that the accusations should not affect performance and that "management remains confident in the Company's ability to deliver operational and clinical success in the months and years to come." Specifically, the Company again reaffirmed its 2018 revenue guidance: "[B]ased on information available to date, the independent investigation by [MiMedx's] Audit Committee and their legal and accounting advisors [ACIII]

should not have a material impact on the Company's 2018 revenue guidance of $383 million to $387 million."

256. Then, approximately two weeks later, on March 15, 2018, the Company admitted that it was, in fact, under investigation by the DOJ. Through a Form 8-K, the Company stated that it was "continu[ing] to provide documents" in response to a 2017 subpoena, "the Company was recently informed that, in parallel with the SEC's investigation, the U.S. Department of Justice is also reviewing these matters on a preliminary basis. MiMedx will continue to cooperate with these regulatory agencies."

257. These revelations spurred PiperJaffray, an analyst that had "been standing by MiMedx . . . despite numerous short selling reports," to announce on March 15, 2018, that it was suspending coverage of the Company (including its stock price rating, stock price target, and financial estimates) until ACIII and investigations by the DOJ and SEC were completed.

258. Defendants attempted to dilute the negative news by again providing misleadingly positive statements about the Company's financial performance. On March 15, 2018, the Company issued a misleading press release in which Petit falsely stated, "This year started off strong, and we have continued to see momentum build through the quarter. With our current revenue pace and more than two-thirds

of the first quarter completed, we are confident in our expectation that we will exceed $92 million in revenue for the first quarter of 2018."

259. Despite the myriad problems the Company was facing, Defendants continued to mislead investors. On April 26, 2018, the Company issued another press release seeking to reassure the market that the Company was enjoying overwhelmingly strong sales and financial results. Incredibly, in order to further buoy the stock price, the Company ***raised guidance*** for 2018, with Petit falsely stating:

> The first quarter [2018] revenue growth is a clear demonstration of the strength of our product lines, our sales management system and the talent we have assembled in our sales and other key functions within our organization. Based upon our strong first quarter performance, we have raised our full year revenue guidance from a previous range of $383 million to $387 million to a revised range of $389 million to $394 million.

260. Petit also misleadingly stated that MiMedx's stock price was "undervalued" and compared MiMedx to another company whose stock traded at 22 times earnings. The press release further assured investors that the Company would submit a plan to NASDAQ in order to regain compliance by May 1, 2018.

261. Also on April 26, 2018, Seeking Alpha published an article titled, "MiMedx: More Explosive Price Action Might Soon Be Here," which discussed the higher than average trading volume and "surprisingly positive price action." The

article attributed the "wild price movement" to the pre-announcement of projected first quarter 2018 ("1Q18") financial results that were above expectations.

262. Bad news continued to leak out despite Defendants' concerted efforts to convince investors that the Company continued to perform exceptionally well notwithstanding ACIII and its delayed FY17 financial results. On May 8, 2018, the DOJ released a statement that a federal grand jury in Greenville, South Carolina had returned the *Becker* Indictment, as discussed above.[376] The DOJ stated that employees at the Dorn VA were indicted by a federal grand jury for knowingly committing health care fraud and other criminal acts related to MiMedx.[377]

263. In response to the DOJ's MiMedx-related *Becker* Indictment, the Company's stock price fell 7.49%, from a close of $8.01 per share on May 8, 2018, to a close of $7.41 per share on May 9, 2018, on unusually high trading volume of over 7.15 million shares.

264. On June 6, 2018, the Company's Board formed the SLC, initially comprised of three purportedly independent directors: Bleser, Luis A. Aguilar ("Aguilar"), and Larry W. Papasan ("Papasan"), two of whom, Bleser and Papasan,

---

[376] *See supra* n.35.

[377] *See id.*

were longtime members of the Audit Committee.[378] Among other things, the SLC was authorized to evaluate and investigate certain shareholder demands made in the context of shareholder derivative litigation, which alleged that certain directors and officers of the Company were liable for breaches of fiduciary duties, corporate waste, and unjust enrichment.

### C. Defendants Announced a Massive Six-Year Accounting Restatement and Executive Resignations

265. Before the market opened on June 7, 2018, and following almost three-and-a-half years of Defendants' denial, deflection, and retaliation, the other shoe finally dropped. The Company issued a press release announcing that ACIII, which was ongoing at the time, had shown that the Company's reported financial results for fiscal years 2012-2016 and the first three quarters of 2017 were not reliable and would have to be restated. MiMedx also stated that all communications and financial information with respect to fourth quarter 2017 ("4Q17") and 1Q18 were no longer reliable and withdrew its increased 2018 guidance.

---

[378] Bleser and Papasan later resigned from the SLC. Papasan resigned shortly after the SLC was formed, on June 21, 2018, and was replaced by another MiMedx director, Neil S. Yeston ("Yeston"). Bleser resigned from the SLC on October 3, 2018 and was never replaced, leaving Aguilar and Yeston as the only two members.

266. The Company tied the Restatement to its revenue recognition practices. Specifically, the press release stated that ACIII had "primarily been focused on the accounting treatment afforded to [certain] sales and distribution practices" and found that "certain implicit arrangements" between the Company and two unnamed distributors had "modified the explicit terms of the contracts [with MiMedx], impacting revenue recognition during the specified periods."

267. In the same press release, the Company announced that Senken and the Company's Controller and Treasurer, Cranston, had left the Company effective June 6, 2018. Borkowski, an Executive Vice President of the Company, was named interim CFO.

268. In response to these announcements, the Company's stock price plunged another 23.39%, falling from $8.21 per share at the close of trading on June 6, 2018, to $6.29 per share at the close of trading on June 7, 2018, on well-above average trading volume of 16 million shares.

269. On the heels of the announcement of the Restatement, the Company's wholesale senior leadership shake-up continued. On July 2, 2018, before the market opened, the Company issued a press release announcing that Petit and Taylor had resigned from their executive positions at MiMedx, effective June 30, 2018. Taylor also resigned as a Director of the Company, and Petit resigned as Chairman of the

Board. David Coles was named interim CEO in place of Petit. The Company specifically linked the resignations to findings during ACIII, stating:

> These resignations . . . are based on the Board of Directors' business judgement regarding the Company's leadership and direction, and arise, in part, from information the Audit Committee has identified through its previously announced independent investigation [ACIII]. This investigation is ongoing and there may be other actions taken based, at least in part, on information from the investigation.

270. In response to the resignations of Petit and Taylor, the Company's stock price plummeted ***38.50%***, from a close of $6.39 per share on Friday, June 29, 2018, to a close of $3.93 per share on Monday, July 2, 2018, on well above average trading volume of 14.547 million shares.

271. After the market closed on July 2, 2018, *The Atlanta Journal-Constitution* published an article titled, "MiMedx's internal probe prompts CEO Petit's resignation." The article quoted Petit, who proclaimed that stories of inflated revenue were "bogus" and that the short sellers who accused the Company of channel stuffing were no more than "wealthy thieves." The article further quoted Petit as claiming that "[t]his is all stuff trumped up to drive the stock price down." The article explained that the resignations of Petit and Taylor were not voluntary, but instead were the result of information uncovered in the then-ongoing ACIII.

272. Defendants' statements covering up, downplaying, and outright denying the existence of any misconduct, as detailed above in ¶¶175-176, 179-180, 188-189, 193-194, 196-201, 203, 206-207, 214-220, 223-226, 233, 235, 242-246, 255, 258, and 271, were materially false and misleading and omitted material facts. The Company has admitted as much, stating:

> [T]he evidence [uncovered in ACIII] demonstrated that after questions began to be raised regarding the Company's accounting practices, Messrs. Petit, Taylor, Senken and Cranston made material misstatements and omissions about the Company's course of dealing with its largest distributor, as well as the Company's corresponding revenue recognition practices, to a number of key stakeholders and regulators, including the Division of Corporation Finance of the U.S. Securities and Exchange Commission (the "SEC"), the Board, the Audit Committee and the Company's outside auditors.[379]

273. Each time Defendants issued a statement denying that MiMedx was engaged in illicit sales and distributions practices, channel stuffing, improper revenue recognition, or violations of federal health care regulations and laws, those statements were false and misleading or omitted material facts because, as Defendants knew, but failed to disclose:

(a) Defendants had engaged in "longstanding material misconduct," including channel stuffing and other improper sales practices, entering into

[379] Ex. 2, at 4.

undisclosed side agreements with MiMedx distributors, and actively concealing such arrangements from a number of key stakeholders and regulators in order to increase sales and inflate the Company's revenues;

(b) Defendants knew that the Company's highly touted revenue growth was substantially the result of channel stuffing and other improper sales and distribution practices that inflated the Company's revenues as necessary to achieve its previously promised revenue targets, such that the Company's growth was not "sustainable";

(c) as the Company admitted in June 2019, "Mr. Petit and certain members of his management team disregarded accounting rules; undertook improper actions to manage and manipulate the timing and recognition of revenue" and as a result, "the Company under Mr. Petit's leadership recognized revenues in the wrong accounting reporting period, and in certain instances, improperly recognized revenue altogether." Indeed, the Restatement admits that Defendants prematurely recognized revenue on approximately $870 million of sales from 2012 through 3Q17;

(d) absent Defendants' "apparent revenue management activities, the Company's results would have fallen short of earnings guidance in these periods," as acknowledged by the Company in June 2019;

(e) Defendants employed inducements and even manipulated charitable donations to PAN, in violation of multiple federal statutes, to increase sales and inflate the Company's revenues;

(f) the allegations made by Viceroy, Aurelius, and other analysts and journalists were the same as multiple MiMedx employees had raised internally, before being subjected to secret surveillance by Petit, Taylor and other senior managers, penalized and marginalized for raising objections to the improper practices they were required by Defendants to employ, fired, and/or sued;

(g) as explained in Section X, the Company's financial results were not prepared in conformity with GAAP due to improper revenue recognition and material misstatements concerning revenue and other financial metrics in particular periods;

(h) as the Company admitted in the Restatement, Defendants "failed to establish a tone at the top that demonstrated a commitment to integrity and ethical values, resulting in activity by senior management, members of the sales group and others that was inconsistent with both the accounting applied and applicable regulatory requirements";

(i) the Board and senior management, as conceded in the Restatement, "failed to appropriately respond to allegations of improper accounting

activities, improper sales practices, and activities consistent with retaliation against employees who raised concerns of such inappropriate accounting and sales activity"; and, in sum,

(j) as stated by the Company in June 2019, "Mr. Petit and certain members of his former management team engaged in serious wrongdoing, including disregarding revenue recognition rules under [GAAP]; engaging in revenue 'management;' making material misstatements to regulators, the Board, the Audit Committee and the Company's outside auditors; taking actions to investigate or silence whistleblowers; and setting an inappropriate 'tone at the top.' . . . This misconduct has harmed MiMedx and its shareholders – the Company is a defendant in a multitude of lawsuits, faces regulatory inquiries and has had its stock delisted from Nasdaq."[380]

274. In addition to their own denials of wrongdoing, Defendants continually referred analysts and investors to the conclusions of the "independent" ACII, completed with the assistance of "external counsel."

275. These statements (¶¶194, 199-200, 203, 207, 215, 218-219, and 235), and all those like them, were materially false and misleading and omitted material

[380] *See* Ex. 15.

facts when made. The truth, as Defendants knew or were reckless in not knowing, was that:

(a) ACII was not "independent," as the Chairman of the Audit Committee at the time ACII was initiated and completed was Dewberry, Petit's personal friend and fraternity little brother, who had been a member of the executive team for numerous of Petit's businesses, and the Audit Committee also included Bleser, who was a board member of troubled company Matria while Petit was Chairman and CEO and the Company's "independent counsel," Troutman Sanders, was also MiMedx's corporate counsel and represented Petit's prior companies;

(b) Petit misrepresented to Troutman and the Audit Committee the accuracy of information that AvKARE had provided during the "independent" ACII. As the Company later admitted in its Restatement, "[i]n early 2017, after the Audit Committee had retained counsel to investigate the allegations made by these former employees, Mr. Petit forwarded to the Board a set of written responses in which counsel for the Company's largest distributor [AvKARE] explicitly stated that it only paid the Company for tissues after receiving payment from the distributor's customer. Mr. Petit misled the Board about the accuracy of the information provided by the distributor's counsel";

(c) as the Audit Committee later admitted in May 2019 and in the Company's Restatement, ACII "cannot be relied upon" and Petit, Taylor, Senken, and Cranston "made material misstatements and omissions" to key stakeholders and regulators, including the SEC and FDA; and

(d) MiMedx's "ten years of audited financial statements" by "reputable" accounting firm Cherry Bekaert were unreliable, as Cherry Bekaert knowingly or recklessly failed to conduct appropriate audits of the Company's financials.

# VII. THE TRUTH CONCERNING DEFENDANTS' FRAUD CONTINUED TO BE REVEALED AFTER THE CLASS PERIOD

## A. Additional Media, and the Company Itself, Reported Improprieties Involving the Sale of MiMedx Products to VAs, and Linked Petit, Taylor, and Senken to the Fraud

276. On July 23, 2018, *The Wall Street Journal* published an article titled, "Highflying Medical Firm, a Help to Wounded Veterans, Falls to Earth." The article detailed problems and improprieties at MiMedx, relying on statements made by former MiMedx employees and Defendants' responses to questions about the Company's practices and employee criticisms, and corroborating the allegations set forth above, including alleged channel stuffing, mislabeling, and unreported payments to doctors, and MiMedx's retaliatory practices towards former employees who reported improprieties.

277. After the market closed on July 26, 2018, MiMedx disclosed that on July 10, 2018, it had notified NASDAQ that the Company would be unable to bring its SEC filings up to date by the August 28, 2018 deadline previously communicated by NASDAQ, and that, in response, it had received a letter from NASDAQ on July 20, 2018, regarding a potential delisting of the Company's stock unless the Company requested a hearing before a panel by July 27, 2018. MiMedx said it would submit a hearing request by that date, and that the hearing was expected to occur 30-45 days thereafter.

278. In response to the Company's admission that it could not comply with NASDAQ requirements, the stock price fell 13.54%, from a close of $4.80 per share on July 26, 2018, to a close of $4.15 per share on July 27, 2018.

279. On September 20, 2018, MiMedx issued a press release blaming Petit, Senken, Taylor, and Cranston for misconduct uncovered in the then-ongoing ACIII. The Company stated that Petit's resignation – and the prior resignations of Senken, Taylor, and Cranston – would be treated as terminations "for cause" based on information identified in ACIII. The Company further announced that, because Petit, Senken, Taylor, and Cranston "engaged in, among other things, conduct detrimental to the business or reputation of the company," the Company was

forfeiting all of their outstanding equity and incentive awards and clawing back certain compensation.

280. On October 5, 2018, *The Wall Street Journal* published an article titled, "MiMedx Kept Cheaper Products Out of Its Offerings to VA Hospitals." Based on an "examination of the embattled company's dealings" with VA hospitals and hospitals run by the DOD, the article reported that MiMedx was under investigation by the DOD's Criminal Investigative Service in connection with the Company's financial arrangements with a surgeon at the Augusta VA, and that a grand jury had been commissioned to hear testimony on the matter "to determine whether [the surgeon] received compensation from the company without proper clearance." The article added that the surgeon "has been a big user of MiMedx products, especially its injectables . . . . In one month he used almost $1 million of the products."

281. In addition, the article reported that "[MiMedx] sales representatives were required by Mr. Petit to host lunches and dinners with doctors, meetings he called 'healing reviews.'" Based on internal MiMedx spreadsheets reviewed for the article, MiMedx employees had hosted "hundreds of company meals" to "thousands of doctors over ten months in 2016." When questioned about these practices, MiMedx and Petit "declined to comment." The article also reported that "the company's questionable practices toward federal hospitals were more extensive than

previously known," including limiting their available EpiFix products to larger, more expensive sizes than those offered to private hospitals.

282. The Company's stock price fell another 12.4% in response to the news reported in *The Wall Street Journal*, from a close of $6.45 per share on October 4, 2018, to a close of $5.65 per share on October 5, 2018, on above average trading volume of approximately 3.83 million shares.

**B. The Company Was Delisted by NASDAQ**

283. MiMedx dropped another bombshell on November 7, 2018, announcing by press release that it had received a delisting notification from NASDAQ "as a result of the interim progress report submitted by the Company on October 31, 2018." The progress report disclosed to NASDAQ further information on the extreme magnitude of the Company's revenue recognition problems, which the Company now admitted would require a review of "***all of the Company's sales***" dating back to 2012. Specifically, the Company explained that in its interim progress report, "the Company indicated that it has now determined that, for the Restatement period [2012-2017], it must conduct an assessment of revenue recognition for all of the Company's sales, which will prolong the amount of time it will take for the Company to prepare the restated financial statements." As a result of the NASDAQ

delisting notification, MiMedx shares would be relegated to the "'over the counter' market" operated by OTC Markets Group Inc., effective November 8, 2018.

284. In response to this news and the Company's admission that it would need to review all sales dating back to 2012, MiMedx's share price plummeted ***41.16%*** from a close of $6.22 per share on November 6, 2018, to a close of $3.66 per share on November 7, 2018, on extremely high trading volume of approximately 28.26 million shares. The stock price continued its steep decline the next day, falling 19.40% to close at $2.95 per share on November 8, 2018, on trading volume of over 39.5 million shares.

### C. EY Resigned and MiMedx Was Forced to Change Its Business Practices

285. On December 5, 2018, MiMedx released a slew of bad news detailing additional fallout from the unraveling of the Company's massive fraud. First, the Company announced that Cashman, a key figure in the fraud, would "be departing the organization," pursuant to "leadership changes" that would eliminate the position of Chief Commercialization Officer.

286. MiMedx also provided details on a "broad-based organizational realignment program" intended to "simplify and streamline our organizational structure, and reduce costs in order to improve profitability and liquidity." As part of the realignment, the Company announced that it would be firing nearly a quarter

(24%) of its total workforce – about half of which would be sales personnel – among other cost-cutting measures.

287. The Company explained that the dramatic organizational realignment was driven by, among other things, changes to business practices exposed by ACIII. These required changes had reduced the Company's sales and revenue that were previously manipulated and inflated by the fraudulent practices detailed herein, in turn hurting profitability and liquidity. The press release stated:

> The wound care market in which the Company operates is undergoing a transition as it adapts to a changing regulatory environment for human cells, tissues, and cellular and tissue-based products (HCT/Ps), as well as to recent third-party payer decisions eliminating health insurance coverage for certain uses of amniotic tissue products. Moreover, the Audit Committee's independent investigation [ACIII] has required changes to business practices to address issues identified in the investigation. MiMedx's realignment program was developed largely in response to these changes that have resulted in a material softening in the Company's recent revenue performance and expected near-term sales forecast.

288. The press release also stated that the Company had "expanded the scope of work" in connection with the preparation of the Restatement (FY12 to 3Q17) and was "unable to estimate the expected completion date" or "provide any financial performance-related information." The Company added that:

> The Audit Committee's independent investigation [ACIII] is still ongoing, and there may be other actions taken based, at least in part, on information from the investigation. The Company continues to incur significant legal and accounting-related expenses related to, among

> other things, the Audit Committee's independent investigation and other legal matters, the Company's work to prepare its restated financial statements and the implementation of improved business controls."

289. The press release also implied that Petit, Taylor, Senken, and Cranston had previously impeded the Restatement process, a problem alleviated by their firing "for cause" in mid-2018, and further stated:

> As previously disclosed, the Compensation Committee and the Board determined that the separations of the Company's former CEO [Petit], COO [Taylor], CFO [Senken] and Corporate Controller [Cranston] should be treated as "for cause" and that these former executive officers had engaged in, among other things, conduct detrimental to the business or reputation of the Company. The departures of these former executives have enabled the Company to progress in the preparation of its financial statements.

290. Also on December 5, 2018, MiMedx announced that its independent auditor, EY, had "resigned from the engagement to audit the Company's financial statements for the years ended December 31, 2017 and 2018, effective immediately." EY had served as auditor for less than a year-and-a-half, after replacing former auditor Cherry Bekaert.

291. In response to this wave of bad news, MiMedx's stock price collapsed completely, falling ***59.32%***, from a close of $2.95 per share on December 4, 2018, to a close of $1.20 per share on the next trading day, December 6, 2018 (after reaching an all-time low of $0.95 mid-day), on unusually heavy trading volume of over 29.27 million shares.

292. In a Form 8-K filed with the SEC on December 7, 2018, the Company elaborated on EY's resignation, conveying EY's stunning assessment of the pervasive fraud at MiMedx. Specifically, MiMedx further disclosed that, during the time of EY's engagement as independent auditor, EY had advised MiMedx, in relevant part, that:

- "the internal controls necessary for the Company to develop reliable financial statements do not exist";

- "[a]lthough EY could accept representations from the current Interim CEO and Interim CFO [Coles and Borkowski, respectively] based on their knowledge, EY advised the Company that EY is unable to rely on representations from them because, as of the date of the resignation, the current Interim CEO and Interim CFO, in turn, would have needed to rely on representations from certain legacy management personnel still in positions that could affect what is reflected in the Company's books and records. At the time of EY's resignation, the Audit Committee's independent investigation [ACIII] was still ongoing";

- "the Company . . . need[ed] to significantly expand the scope of its audit, due to material allegations of inappropriate financial reporting, material allegations of noncompliance with laws and regulations, the findings to date from the independent investigation conducted by the Audit Committee into these allegations [ACIII], and the lack of internal controls necessary for the Company to develop reliable financial statements"; and

- "information has come to EY's attention that EY has concluded materially impacts the reliability of previously issued financial statements, and the issues raised by this information have not been resolved to EY's satisfaction prior to its resignation."

293. On April 11, 2019, after the market closed, and more than ten months after the announcement of the Restatement, MiMedx issued a press release disclosing that "[t]he Company continues to work diligently to complete the financial restatement," but was unable to provide clarity on the timelines for completion of the Restatement or selection of a new auditor. The press release further stated:

> Due to the depth, breadth and complexity of issues identified through the Audit Committee's investigation [ACIII], the scope of work in connection with the preparation of the Company's restated financial statements was expanded. Investigative efforts initially focused on the accounting practices around specific distributors between 2012 and 2017. Additional concerns related to other customer accounts resulted in the need to analyze the Company's revenue recognition practices for all years from 2012 to 2018; the Company is nearing the end of that review. At the same time, the Company has implemented improved processes and controls to monitor sales practices, authorize credits and returns, recognize revenue, and is advancing the Company's financial restatements in an expedited manner in order to regain compliance with Securities and Exchange Commission (SEC) reporting obligations.

### D. The Company's Audit Committee Confirmed Defendants' Extensive Misconduct During the Class Period, Including Improper Revenue Recognition in Violation of GAAP

294. On May 23, 2019, the Company issued a press release and SEC Form 8-K disclosing a partial summary of the Audit Committee's findings in ACIII.[381] According to the Company, the Audit Committee conclusively found "extensive

[381] *See* Ex. 2.

misconduct" and "evidence of material wrongdoing on the part of the Company's prior senior management team," including Petit, Taylor, and Senken.[382] The "extensive misconduct" and "material wrongdoing" uncovered by the Audit Committee are detailed throughout this pleading and in Exhibit 2.

295. A day after announcing the summary of ACIII findings, the Company reached an agreement with BDO USA, LLP to replace EY as independent auditor, nearly six months after EY had resigned.

296. A few weeks later, on July 1, 2019, the Company disclosed that the ACIII findings were substantially corroborated by the SLC[383] following a year-long investigation into shareholder derivative claims against Petit, Taylor, Senken, Cranston, Haden, Cashman, and certain directors of the Company. These disclosures were made in a "Report of the [SLC]" filed in the shareholder derivative

---

[382] Ex. 2, at Item 9.01, Ex. 99.1.

[383] At this time, the SLC was comprised of Company directors (Aguilar and Yeston) and assisted by counsel (Steptoe & Johnson) and accountants (AlixPartners) that were different than those of the Audit Committee during ACIII. As noted above, when the SLC was originally formed in June 2018, it was comprised of Company directors Aguilar, Dewberry, and Bleser. Subsequently, Dewberry and Bleser resigned, and Yeston was appointed.

action.[384] In the report, the SLC confirmed that MiMedx "lacked adequate internal controls over accounting and financial reporting" and that:

> Consistent with the Company's public statements and the findings of the Audit Committee Investigation [ACIII], the SLC has concluded that the Company improperly recognized revenue from transactions with AvKARE and certain other customers. The SLC also evaluated the knowledge of each of the Defendants, and has determined, among other things, that Petit, Taylor, and Senken were aware of the Company's course of dealing with AvKARE and its implications for the Company's revenue recognition.[385]

297. The SLC determined that there was sufficient evidence to show that Petit, Taylor, and Senken breached their fiduciary duties of loyalty, good faith, and due care to MiMedx. Nonetheless, the SLC concluded that, in its view, the shareholder derivative action should not proceed due to the expense and distraction of the litigation, the limited availability of insurance coverage, and MiMedx's pending government investigations. The SLC also noted that Cherry Bekaert and several other individuals "refused to cooperate with the SLC's investigation" and that Petit, Taylor, and Cashman refused to be interviewed by the SLC.

---

[384] *See* Ex. 13.

[385] *See id.* at 8.

### E. MiMedx Vigorously Opposed Petit's Bid to Regain Control of the Company by Emphasizing Defendants' Class Period Misconduct

298. Meanwhile, beginning in April 2019, the Company was drawn into a public battle to prevent Petit from regaining control of the MiMedx Board through a proxy contest. During the proxy contest, MiMedx provided new details on GAAP violations the Company was attempting to address through the Restatement, involving an expanded review of 20 distributor accounts and 8,000 customer accounts from 2012 to 2018 after "additional concerns arose" with respect to revenue recognition practices:

> Based on this review, we determined that certain arrangements with the Company's distributors were not appropriately evaluated under the appropriate revenue recognition criteria applicable under GAAP. We have determined that the Company previously recognized revenue with respect to certain distributor relationships before all revenue recognition criteria were met. Specifically, we have determined that a fixed or determinable sales price did not exist, and/or collection was not reasonably assured, with respect to certain transactions where revenue was recognized at the time of shipment. Our review found that there were arrangements, or extra-contractual terms, with certain of our distributors regarding extended payment terms, return or exchange rights, and contingent payment obligations for sales to such distributors with respect to certain transactions. There were also concessions made subsequent to the shipment of inventory to the distributors and the related revenue recognition.

299. Further, the Company specified that the Restatement would impact the Company's income statement and balance sheet in numerous ways, including but

not limited to: (a) "revenue recognition"; (b) "the presentation of gross and net revenue"; (c) "certain expenses related to discounts, returns, or allowances"; (d) "general and administrative expense recognition"; (e) "losses associated with contingency exposures"; (f) "income tax"; (g) "the amount of reported cash"; (h) "reported accounts receivable and inventory and the related reserves on each"; and (i) "accrual balances."

300. The Company also confirmed that it "has had and continues to have material weaknesses in its internal control over financial reporting." More specifically, "the material weaknesses related to control environment and tone at the top have been effectively remediated, with the departures of Messrs. Petit, Taylor, Senken and Cranston and other senior management," while "[t]he material weakness relating to the lack or absence of internal controls necessary for the Company to develop reliable financial statements is in the process of being remediated." The Company further stated that it continued to implement corrective and remedial plans including "improved processes and controls to monitor sales practices, authorize credits and returns and recognize revenue" and "the hiring of a Vice President of Internal Audit to develop and implement an internal audit function for the Company," among other items.

301. MiMedx shareholders rejected Petit's takeover bid at the Company's annual meeting on June 17, 2019. Afterwards, in an interview with *The Atlanta Journal-Constitution*, Petit admitted that he could be "charged" by investigating authorities and "found guilty":

> Petit told *The Atlanta Journal-Constitution* after Monday's shareholder meeting that he expects to be questioned by investigators and that it is possible he could be charged. But he said, "I don't think me or any of our management knowingly did anything illegal."
>
> "I'm innocent," he said, "but I could be found guilty."

**F. Federal Authorities Prosecute Defendants for Securities Fraud and the Restatement Is Issued**

302. On November 26, 2019, the SEC and DOJ announced civil and criminal actions against Defendants for securities fraud. The SEC filed a civil complaint alleging "a wide-ranging fraud designed to artificially inflate [MiMedx's] reported revenue" that was "orchestrated" by Petit, Taylor, and Senken.[386] "This pervasive, long running fraud involved MiMedx's relationship with five of its largest

---

386 *See* SEC Complaint. Specifically, the SEC Complaint alleged several violations of the Exchange Act and the Securities Act of 1933, including violations of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder by MiMedx, Petit, Taylor, and Senken, and violations of Section 20(a) of the Exchange Act by Petit and Taylor. *See id.* at ¶¶10, 300-347.

distributors, and resulted in MiMedx misstating millions of dollars of revenue in its financial statements viewed by investors."[387]

303. As a result of these fraudulent practices, the SEC concluded that the Company materially misstated financial statements in every one of its annual Forms 10-K and quarterly Forms 10-Q, and in several of its Forms 8-K, that were filed between first quarter 2013 ("1Q13") and 3Q17.[388] In addition, the SEC found that "[w]hile directing the misstatement of MiMedx's published financial results, Petit, Taylor, and Senken consistently touted the company's artificial revenue growth in SEC filings, press releases, and analyst calls."[389]

304. On the same day, November 26, 2019, MiMedx announced that it had finalized a settlement with the SEC, agreeing to pay a civil penalty of $1.5 million. The press release stated the settlement was meant to "resolve past issues and move forward without distraction," referencing prior management terminated for cause. However, the Company made clear that the settlement only resolved the SEC's investigation of the Company, and that a parallel investigation of the Company by the DOJ remained ongoing.

---

[387] *Id.* at ¶1.

[388] *See id.* at ¶¶178-216.

[389] *Id.* at ¶8.

305. Also on November 26, 2019, the DOJ issued a press release announcing a criminal indictment against Petit and Taylor.[390] Petit and Taylor were charged with "securities fraud offenses for engaging in a scheme to fraudulently inflate MiMedx's revenue" by falsely recognizing revenue upon shipment to distributors CPM, SLR, Stability, and First Medical.[391]

306. The allegations in the *Petit/Taylor* Indictment were summarized as follows in the DOJ Press Release, in pertinent part:

> By 2015, however, it became increasingly difficult for MiMedx to reach its revenue guidance due to decreased demand from certain distributors and the increasingly aggressive revenue targets that MiMedx had publicly announced.
>
> Confronted with the difficulties faced by MiMedx in meeting its quarterly and annual revenue guidance by legitimate means, Petit and Taylor engaged in a fraudulent scheme to falsely recognize revenue upon the shipment of MiMedx product to four stocking distributors ("Distributor-1" through "Distributor-4") [CPM, SLR, Stability, and

[390] DOJ Press Release, U.S. Attorney's Office, Southern District of New York, *Former Chief Executive Officer and Chief Operating Officer of Publicly Traded Biopharmaceutical Company Charged with Accounting Fraud* (Nov. 26, 2019), https://www.justice.gov/usao-sdny/pr/former-chief-executive-officer-and-chief-operating-officer-publicly-traded ("DOJ Press Release"); *see also Petit/Taylor* Indictment.

[391] *See* DOJ Press Release. Specifically, Petit and Taylor were both charged with one count of securities fraud, in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder (carrying a maximum prison term of 20 years), and one count of conspiracy to commit securities fraud, make false filings with the SEC, and improperly influence the conduct of audits (carrying a maximum prison term of five years). *See id.*; *Petit/Taylor* Indictment, at ¶¶62-68.

> First Medical] in the second through fourth quarters of 2015. Petit and Taylor caused MiMedx to report fraudulently inflated revenue figures to the investing public in order to ensure that the reported figures fell within MiMedx's publicly announced revenue guidance, and to fraudulently convey to the investing public that MiMedx was accomplishing consistent growth quarter after quarter, as Petit and Taylor had falsely touted to the investing public.[392]

307. The DOJ press release also quoted Geoffrey S. Berman, the United States Attorney for the Southern District of New York, and Philip R. Bartlett, Inspector-In-Charge of the USPIS, which worked with the DOJ on the criminal investigation. Regarding the allegations in the *Petit/Taylor* Indictment, Berman stated that Petit and Taylor deceived "the investing public by repeatedly misrepresenting the financial condition of [MiMedx]" and "conspired, through secret agreements and financial inducements with four distributors, to misstate sales revenue."[393] Bartlett added that: "The investing public relied on Petit and Taylor's misrepresentations. Investors should not have any doubts or concerns with information distributed by a publicly traded company. The [USPIS] will not tolerate this criminal behavior and will seek out and bring to justice anyone who breaks the system of laws designed to protect the investing public."[394]

---

[392] DOJ Press Release.

[393] *Id.*

[394] *Id.*

308. The Company finally issued the Restatement on March 17, 2020, over two years after the Company stopped all financial reporting pending the ACIII. The Company confirmed that, throughout the nearly six-year Restatement period, nearly ***every*** financial account was materially misstated, including premature revenue recognition on ***all*** sales, and that the Company had several material weaknesses in its internal control over financial reporting ("ICFR"), as further detailed in Section X.[395] The fraud was so egregious that that the Company admitted it should have delayed revenue recognition on ***all distributor and customer sales dating back to 2012*** until payment was actually received, instead of on shipment (*i.e.*, that it should have followed a different "cash collection" method of accounting).[396] Further, the Company disclosed that it was implementing dozens of measures in an attempt to remediate its material weaknesses in ICFR.[397]

## VIII. THE MIMEDX DEFENDANTS' ADDITIONAL MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS OF MATERIAL FACT

309. As detailed above in Section V, Defendants' fraudulent scheme so permeated the Company's operations that Defendants could not make any statement

---

[395] *See* Ex. 1. The Company also disclosed material weaknesses in ICFR in 2018, and anticipated disclosing material weaknesses in ICFR in 2019. *See id.* at 24.

[396] *See id.* at F-27.

[397] *See id.* at 25, 80-85.

during the Class Period that concerned the Company's revenue, growth, inventory, EBITDA and related financial metrics, distribution and sales network, relationships with physicians, corporate culture, compliance, or business model without those statements being knowingly or recklessly false and misleading or omitting material facts – *i.e.*, that the Company's entire financial profile was a sham, that it had improperly recognized revenue, and that its sales were inflated through channel stuffing and other improper sales tactics.

310. Nevertheless, in addition to the statements identified in Section VI above and the fraudulent financial reporting and violations of GAAP discussed in Section X below, several categories of Defendants' materially false and misleading statements were particularly prevalent during the Class Period. These statements concerned: (a) the Company's "impressive" and "sustainable" growth profile; (b) the Company's use of, and relationships with, its distributors; and (c) Defendants' focus on ensuring MiMedx employees acted in compliance with all pertinent regulations and legal standards and with "integrity."

### A. The MiMedx Defendants Made False and Misleading Statements and Omitted Material Facts Regarding the Company's Growth

311. Throughout the Class Period, Defendants touted the Company's history of strong sales and revenue growth as clear evidence of the Company's future

success and its strong management and investment potential. These statements, made in virtually all, of the Company's quarterly press releases, investor presentations, earning calls, and presentations at external conferences, were materially false and misleading and omitted material facts when made. In truth, as Defendants knew, MiMedx's "growth story" was the result of their fraudulent revenue scheme and improper sales and distribution practices. A sampling of Defendants' materially false and misleading statements promoting MiMedx's "growth story" during the Class Period is set forth below.

**2013 Growth Statements**

***March 7, 2013 press release***

- Petit: "2012 was an excellent year by all measurements. We increased revenues quarter-over-quarter, produced revenue growth of over three times the previous year, improved our gross profit margins by over 40 percentage points."
- Petit: "EpiFix® wound care allograft [was] gaining physician acceptance in numerous [VA] Hospitals."

***March 7, 2013 earnings call***

- Petit: "Revenues [in FY 2012] more than tripled[.]"
- Petit: "[R]evenue growth accelerated dramatically during the year as we gain[ed] market presence in the wound care market for EpiFix allografts."

***May 1, 2013 Press Release***

- MiMedx: "[The Company] recorded record revenue."

- Petit: "[MiMedx] increased revenue three fold over the prior year first quarter."

*May 1, 2013 earnings call*

- Petit: "[W]e exceeded our quarter revenue forecast for the fifth straight quarter."
- Senken: "[MiMedx] experienced significant growth over prior year in wound care, which increased 434% and surgical and sports medicine, which increased 133%."

*July 31, 2013 press release*

- MiMedx: "Revenue increased more than 175%."
- Petit: "This was our 7th straight quarter of meeting or exceeding our revenue forecast."

*October 30, 2013 press release*

- Petit: "Our 2013 year-to-date wound care revenue is up by nearly 260%[.]"

*October 30, 2013 earnings call*

- Petit: "We exceeded the upper end of our revenue forecast, which puts us [at] eight consecutive quarters of beating or exceeding those revenue guidance goals[.]"

**2014 Growth Statements**

*February 26, 2014 earnings call*

- Petit: "First quarter revenue of 2013 of $59.2 million was approximately 2.2 times our 2012 revenue."
- Petit: "[F]ourth quarter of 2013 was [the] ninth consecutive quarter where we met or exceeded our revenue goal."

*April 25, 2014 press release*

- Petit: "[R]evenue growth was extremely solid[.]"

***April 25, 2014 earnings call***

- Petit: "We had our 10th consecutive quarter of meeting or exceeding our revenue guidance."
- Senken: "The company recorded revenues for the first quarter . . . of 69% or $8 million over prior year first quarter[.]"

***July 28, 2014 press release***

- MiMedx: "Highlights include: . . . 11th consecutive quarter of meeting or exceeding revenue guidance[.]"
- Petit: "Our second quarter results were excellent. We achieved impressive top line growth and solid improvements to our bottom line."

***October 30, 2014 earnings call***

- Petit: "Wound care sales grew about 184%, very significant" and "[i]t's our 12th consecutive quarter, leading or exceeding revenue guidance."
- Senken: "[The Company saw an] "increase of 108% . . . over prior year third quarter revenue[.]"
- Taylor: "We had an incremental $7.9 million in growth quarter-to-quarter, which is more than our entire revenue just eight quarters ago."

**2015 Growth Statements**

***February 26, 2015 press release***

- Petit: "The fourth quarter was our thirteenth consecutive quarter of meeting or exceeding revenue guidance[.]"

- Petit: "[F]ull year revenue was double last year's revenue and fourth quarter revenue was a 120% increase over last year's fourth quarter revenue."

***April 13, 2015 press release***

- MiMedx: "Q1 revenue [was] in upper end of $40 to $41 million Q1 2015 guidance[,]" and Q1 was the "14th consecutive quarter of meeting or exceeding revenue guidance[.]" Petit repeated these statements during the Company's April 28, 2015 earnings call.

***April 28, 2015 earnings call***

- Senken: "The company recorded revenues for the first quarter of approximately $40.8 million, an increase of 108% . . . over prior year first quarter revenue[.]" The statement was also included in the Company's April 27, 2015 press release announcing "Record Results for First Quarter of 2015."

- Taylor: "We anticipate our quarter-over-quarter growth will replicate the pattern established last year. . . . And for 3.5 years, we've shown that we can accurately project our performance quite well. . . . And then if things go the right way and you did a very good job planning and those negative things don't happen, then you exceed your guidance. It's really just that simple."

***June 3, 2015 Jefferies Global Healthcare Conference***

- Taylor: "We've got 3 1/2 years of meeting or exceeding our revenue guidance, and we've done that while we have been growing in excess of 100% annually."

- Taylor: "So the next question is how sustainable is this performance. In short, the answer is very sustainable[.]"

***July 30, 2015 press release***

- Petit: "Revenue is at the upper end of Company Q2 guidance" and "revenue growth was 104% over the same period in 2014."

***July 30, 2015 earnings call***

- Petit: "The second quarter was our 15th consecutive quarter of meeting or exceeding our revenue guidance. Our second quarter revenues were almost 80% higher than our second quarter a year ago."

***August 6, 2015 press release***

- MiMedx: "Second quarter revenue of $45.7 million grew almost 80%, which was above analyst consensus and only $321,000 below the Company's high end guidance."

***October 13, 2015 Analyst Day presentation***

- MiMedx: "16 CONSECUTIVE QUARTERS OF MEETING OR EXCEEDING QUARTERLY GUIDANCE[.]"

***October 20, 2015 interview on CNBC's "Mad Money"***

- Petit: "We've got 16 straight quarters of beating or exceeding revenue growth." MiMedx reiterated this statement in press releases dated October 29, 2015 and December 16, 2015.

***October 29, 2015 press release***

- Petit: "Our nine month revenue of $135.5 million was a 72% increase over 2014, and our third quarter revenue grew by 46% to $49 million[.]"

**2016 Growth Statements**

***January 10, 2016 press release***

- MiMedx: 2015 [was] the 4th consecutive fiscal year of meeting or exceeding revenue guidance[.]"

- Petit: "[I]t is our 17th consecutive quarter of [meeting or exceeding our revenue forecasts], and we also exceeded analyst consensus guidance for our revenues."

***February 23, 2016 earnings call***

- Petit: "[4Q15 was the] 17th consecutive quarter of meeting or exceeding our revenue guidance."

- Petit: "[V]ery few young companies can match that type of stable forecasting."

- Taylor: "After a 24% average price decrease in our biggest product line, we were still able to grow our market share in terms of revenue dollars, take business from competitors, grow the market and increase our year-over-year revenue in this business area by over 50%. We managed this transition, as we told investors we would, and the results were as we anticipated."

***May 5, 2016 Deutsche Bank Health Care Conference***

- Taylor: "If you look at our history, we've got very strong, sustainable growth. We've had 18 straight quarters now of sequential growth and 17 of 18 quarters of meeting or beating our revenue guidance."

***May 24, 2016 UBS Global Healthcare Conference***

- Petit: "We've had four years and one quarter of meeting or exceeding our revenue guidance. We had exceptional high revenue growth during this period. We had our first miss in the first quarter of this year when our revenues grew at 31% and still have the goal of about 34%. We have higher gross profit margins and excellent financial leverage. . . . We have a very experienced and effective management team."

***July 26, 2016 press release***

- MiMedx: "Q2 2016 revenue exceeds . . . upper end of guidance[.]"

***July 26, 2016 earnings call***

- Petit: "MiMedx has a solid five-year track record of growing revenues quarter-over-quarter[.]"

***October 10, 2016 press release***

- Petit: "This makes 20 consecutive quarters of sequential revenue growth and 19 of 20 quarters of meeting or exceeding our revenue guidance."

***October 27, 2016 press release***

- Petit: "It is always gratifying to exceed our revenue guidance, and continue to add to our record of 20 consecutive quarters of sequential revenue growth." Petit also called this record "impressive."

***October 27, 2016 earnings call***

- Petit: "I would like to think that our third quarter should be viewed as good solid performance. . . . [W]e exceeded our revenue guidance for a record of $64.4 million which was a 31% increase over third quarter of 2015."

**2017 Growth Statements**

***January 9, 2017 press release***

- Petit: "The fourth quarter of 2016 makes 21 consecutive quarters of sequential revenue growth and 20 of 21 quarters of meeting or exceeding our revenue guidance."

***April 13, 2017 press release***

- Petit: "[First quarter 2017 ("1Q17")] will mark 25 consecutive quarters of sequential revenue growth and 24 of the last 25 quarters of meeting or exceeding our revenue guidance."

***April 28, 2017 earnings call***

- Petit: "[O]ur first quarter revenues exceeded the upper end of our guidance . . . [t]hat's a 36% increase over first quarter of 2016."

***July 26, 2017 press release***

- MiMedx: "Q2 2017 revenue grew 33% over Q2 2016 revenue" and marked "25 of 26 quarters of meeting or exceeding revenue guidance[.]"

- Petit: "The second quarter was our 26th consecutive quarter of sequential revenue growth[.]"

***September 21, 2017 shareholder call***

- Petit: "Our cash flows have been extremely strong. Therefore, we have not put product on distributors' shelves that did not move through the system in a reasonable amount of time."

***September 26, 2017 interview on the Fox Business Network***

- Petit: "[W]e've performed exceptionally well, we're the 5th fastest-growing public company in America at this point in time."

***October 10, 2017 press release***

- MiMedx: "Q3 2017 revenue grew 31% over Q3 2016 revenue[.]"

- Taylor: "Our revenue performance for the third quarter marks 27 consecutive quarters of sequential revenue growth and 26 of the last 27 quarters of meeting or exceeding our revenue guidance."

***October 11, 2017 guidance call***

- Taylor: "Building a sustainable organization is a process that when done well generates long-term predictable success. We've quietly been building our systems and organization with a focus on doing the right thing and making our market-leading products available to clinicians across the country and soon across the world. These processes and procedures have been created to

form the foundation for sustainable business. This year has been a year where the fruits of these many years of disciplined labor have generated a strong predictable company."

***October 26, 2017 press release***

- Petit: "Our third quarter results were impressive and showed extremely strong growth in revenue, robust increases in profit, solid reduction of accounts receivable DSOs and substantive increase in our cash flow from operations. Based on all factors for measuring an organization's performance, this was an outstanding quarter. I am extremely pleased with the momentum our sales organization has built, and it continues to strengthen quarter over quarter."

***November 1, 2017 letter to the SEC***

- MiMedx: "MiMedx expects third-quarter revenue to total roughly $84.6 million, ahead of its guidance range of $79-80 million, representing a growth rate of 31% year over year. MiMedx was recently named by *Fortune Magazine* as the fifth fastest growing public company in the country, and has demonstrated 27 straight quarters of incremental revenue growth. Earnings have likewise been strong, and the company has set the realistic earnings per share target of $1 per share by 2020. MiMedx's total return price has increased nearly six fold over the past five years, and net income has increased significantly over the same time horizon."

***November 30, 2017 press release***

- Petit: "October and November have been very strong revenue months for the Company, and we expect our revenue performance in December to be equally strong. . . . [W]e expect to . . . surpass our previously published guidance for the fourth quarter and full year 2017."

***November 30, 2017 letter to shareholders***

- Petit: "[T]he operational performance of your Company has been stellar. We have met or exceeded our revenue forecasts for 26 of the last 27 quarters, and increased sequential revenue for 27 straight quarters. That is almost seven years! MiMedx has just been selected by Fortune Magazine as the 5th fastest growing public company in revenues, profits and shareholder returns, putting us ahead of Facebook and Amazon. There are only a few healthcare companies out of thousands that have a track record of this nature."

**2018 Growth Statements**

***January 7, 2018 press release***

- Petit: "The fourth quarter of 2017 makes 28 consecutive quarters of sequential revenue growth and 27 of 28 quarters of meeting or exceeding our revenue guidance. . . . We forecasted December to be a solid growth month, and our sales force more than lived up to our expectations with a robust month to close out the year. . . . We anticipate 2018 to be another year of highly predictable quarter over quarter revenue growth[.]"

***January 9, 2018 interview on Fox Business Network***

- Petit: "We've just shipped over a – this summer shipped our millionth allograft. And we've been in business ten years and had very rapid growth, we'll be up near $400 million in revenues this coming, this year and expect that kind of growth rate to continue for a while."

***April 26, 2018 earnings call***

- Taylor: "Our detailed planning, territory management, discipline, education, execution and accountability, particularly through the use of our Sales Management System, or SMS, continues to drive predictable and sustainable results."

***April 26, 2018 press release***

- Petit: "The first quarter [2018] revenue growth is a clear demonstration of the strength of our product lines, our sales management system and the talent we have assembled in our sales and other key functions within our organization. Based upon our strong first quarter performance, we have raised our full year revenue guidance from a previous range of $383 million to $387 million to a revised range of $389 million to $394 million."

312. In truth, the statements above regarding the Company's growth (¶311) were materially false and misleading when made and omitted material facts. The true facts, which were then known to, or recklessly disregarded by, Defendants, were as follows:

(a) the Company's sales and revenue growth was substantially the result of fraudulent and improper accounting, sales, and distribution practices. Indeed, the Company conceded in its June 7, 2018 press release that the Company's previously issued consolidated financial statements relating to each of the fiscal years ended December 31, 2012, 2013, 2014, 2015, and 2016, and the interim periods ended March 31, June 30, and September 30, 2017 would be restated and that those figures as well as all communications and financial information with respect to 4Q17 and 1Q18 "should no longer be relied upon" and Defendants' financial statements were not in conformity with GAAP. When the Restatement was finally issued on March 17, 2020, it acknowledged that almost ***every financial account*** presented in MiMedx's prior financial reporting was materially misstated,

including, among others: net sales, cost of sales, gross profit, SG&A expense, operating income, net income, EPS, accounts receivable, returns allowance, inventories and DSOs.[398] Indeed, the Restatement admits that Defendants prematurely recognized revenue on ***approximately $870 million in sales*** during the Non-Reliance Periods[399];

(b) as the Company admitted in 2019, Petit, Taylor, Senken, and Cranston knew that the Company's highly touted quarter-after-quarter revenue growth was substantially the result of channel stuffing and other improper sales and distribution practices and fraudulent revenue recognition that inflated the Company's revenues as necessary to achieve its previously promised revenue targets, such that the Company's growth was not "sustainable," as it promised investors;

(c) as the Company admitted in June 2019, "Mr. Petit and certain members of his management team disregarded accounting rules [and] undertook improper actions to manage and manipulate the timing and recognition of revenue" and as a result, "the Company under Mr. Petit's leadership recognized revenues in

---

[398] *See* Ex. 1.

[399] *See* Section X.

the wrong accounting reporting period, and in certain instances, improperly recognized revenue altogether"; and

(d) absent Defendants' "apparent revenue management activities, the Company's results would have fallen short of earnings guidance in these periods," as acknowledged by the Company in May 2019.

### B. The MiMedx Defendants Made False and Misleading Statements and Omitted Material Facts Regarding the Company's Distributors

313. An integral element of Defendants' channel stuffing and revenue manipulation scheme during the Class Period was Defendants' misrepresentation of its relationships with, and reliance on, its distributors – the entities capable of facilitating Defendants' scheme by purchasing inventory beyond what would be required by or saleable to the end users (physicians and hospitals). In order to better conceal their off-the-books arrangements with certain distributors and promote MiMedx's "growth story," Defendants repeatedly issued false and misleading statements that minimized the importance of distributors in MiMedx's sales network, concealed the fact that important "independent" distributor partners were really no more than pass-through entities controlled by MiMedx, and misrepresented that its distribution practices complied with applicable laws and regulations.

### 1. Defendants Falsely Claimed the Company's Distribution Partners Were "Independent"

314. As described in Section V.C, MiMedx's influence over its distributors was central to allowing MiMedx to perpetrate its fraud. Without off-the-books deals with willing distribution partners largely (if not entirely) under the control of MiMedx, Defendants would have had a significantly more difficult time recording false sales and orders. Yet, throughout the Class Period, Defendants consistently misrepresented to investors and analysts that the Company's distribution partners were wholly independent from MiMedx, and omitted material facts regarding the Company's true relationship with such partners. For example, MiMedx's Form 10-K for 4Q and FY12, filed with the SEC on March 15, 2013, stated, "The Company sells its products primarily through a combination of ***independent*** stocking distributors and representatives in the U.S. and independent distributors in international markets." In the same filing, MiMedx stated that it had "assembled a network of ***independent*** sales representatives and stocking distributors to sell our MiMedx-labeled surgical products domestically[.]" Similar misrepresentations that MiMedx's sales representatives and distributors were "independent" were made repeatedly throughout the Company's Forms 10-K filed with the SEC on March 4, 2014, March 13, 2015, February 29, 2016, and March 1, 2017 and Forms 10-Q filed with the SEC on May 10, 2013, August 8, 2013, November 8, 2013, May 12, 2014,

August 11, 2014, November 10, 2014, May 1, 2015, August 7, 2015, November 6, 2015, May 10, 2016, August 2, 2016, November 8, 2016, May 1, 2017, July 31, 2017, and October 31, 2017.

315. Defendants were equally adamant that their agreements with their "independent distributors" were appropriate and followed GAAP principles. For example, on the Company's July 30, 2015 earnings call, when asked by an analyst whether the Company was "at the peak of DSOs," Senken misleadingly responded:

> [I]t's not that we offer extended terms, we don't. And we haven't changed our terms, whether that be distributor or otherwise. . . . And even though our terms say, we don't care, if you don't get reimbursed you still owe it to us. Practically speaking, the payments are a reflection of how quickly they get reimbursed. And that's a big part of what's happening.

316. Defendants were particularly insistent that AvKARE, MiMedx's long-time distributor to the VAs and federal accounts, was entirely independent, that MiMedx's contract with AvKARE (the PDA) was well-vetted, and that AvKARE sales were appropriately recognized under GAAP. In the Company's March 15, 2013 Form 10-K, it specified that its distribution relationship with AvKARE was "different than our other distribution relationships in that we have our own sales force selling into those accounts," but AvKARE "handl[ed] all the back-office paperwork and contracting matters" with respect to government accounts.

317. Similarly, in a publicly filed letter to the SEC dated January 23, 2017, Senken stated that under the Company's agreement with AvKARE, "title to the products passes to AvKARE upon shipment with payment terms of 45 days. All shipments to AvKARE are processed based upon an authorized purchase order from AvKare. AvKare has no right to return products sold under the Agreement except in cases of defect or nonconformity." In the same letter, Senken falsely described the Company's policy for recognizing revenue from AvKARE as recognizing "revenue for sales under the Agreement upon shipment as (a) persuasive evidence of an arrangement exists; (b) delivery has occurred; (c) the price to the buyer is fixed or determinable; and (d) collectability is reasonably assured. . . . [T]he Company's Net sales as reported in its filings are the amount of sales generated by the Company after the deduction of allowances for damaged or missing goods, returns, and any discounts allowed."

318. In a publicly filed letter to the SEC dated February 8, 2017, Senken further (and falsely) described the nature of the Company's sales returns, discounts and allowances policy as follows:

> We record revenues from sales to our independent stocking distributors at the time the product is shipped to the distributor. Our stocking distributors, who sell the products to their customers or sub-distributors, contractually take title to the products and assume all risks of ownership at the time of shipment. Our stocking distributors are obligated to pay us the contractually agreed upon invoice price within

> specified terms regardless of when, if ever, they sell the products. Our stocking distributors do not have any contractual rights of return or exchange other than for defective product or shipping error; however in limited situations, we do accept returns or exchanges at our discretion. . . . We only record revenue when collectability is reasonably assured.

319. On the Company's February 23, 2017 earnings call, Senken had the following exchange with a securities analyst, falsely characterizing the Company's relationship with AvKARE as follows:

> Q: From my understanding, if you ship, there's no returns on your end, but if let's say, a VA facility were to return, would AvKare assume possession of that product?'
>
> Senken: So in our relationship with AvKare, AvKare issues us a purchase order, and we ship products. So AvKare takes possession of it at the time we ship it. . . .
>
> Q: [S]o if one of those facilities were to return the product, right, who would assume responsibility? AvKare?
>
> Senken: That is AvKare's responsibility.

320. On the Company's March 9, 2017 shareholder call, Taylor falsely assured investors that "[o]ur road to safety is that every aspect of our agreement with AvKARE and their status with the VA, our status with the VA has been thoroughly [vetted] over the last couple of months because of these allegations that were made against us. And we're fine, we're clear."

321. In the Company's April 18, 2017 letter to the SEC, Senken reiterated that "[t]he Company considers AvKARE an independent stocking distributor," and

that "our independent stocking distributors . . . contractually take title to the products when they are shipped. . . . [and] are obligated to pay us regardless of when, if ever, they sell the products."

322. In his letter, Senken also represented that "[l]ike our other distributors, AvKARE has no right to return products sold under our agreement except in cases of defect or nonconformity." He claimed that due to the Company's determination "that it was possible that the [AvKARE] contract would not renew and that there was a higher likelihood that there would be a terminal return liability at the end of the contract . . . the Company increased its allowance for product returns to 3.4% of net sales in 2016 when compared to 1.8% of net sales in 2015 . . . to recognize the estimated liability for future returns related to the AvKARE contract."

323. In the same letter, Senken further stated that pursuant to the Company's consignment agreements, "title to the inventory remains with the Company until the product, which has been segregated by the consignee, is withdrawn and therefore purchased by the consignee. Consignee accepts all risk of loss and full responsibility for any product in the consignment inventory that may be opened, lost, stolen or damaged. The Company recognizes revenue when we are notified that product has been used or implanted."

324. On July 27, 2017, Taylor told investors that the Company had made a "focused effort over the past four years" to "focus our energies on direct sales rather than adding additional distributors," and that as a result, "we've expanded our customer base by several fold and drastically reduced our dependence on distributors to the point where the sales to distributors ***are no longer material nor have they been for quite some time***." Senken later added that the Company's days' sales outstanding ("DSOs") had improved because "we've purposely moved away from selling through distributors, which tend to drag out your DSOs."

325. During the Company's September 21, 2017 shareholder conference call, Petit also minimized the Company's use of distributors, stating:

> We're down near 70 days [DSOs] at this point . . . . Our cash flows have been extremely strong. Therefore, we have not put product on distributors' shelves that did not move through the system in a reasonable amount of time. ***In addition, our sales to distributors over the last 3 or 4 years have dropped dramatically because our business model is to make as many sales directly to end user customers as possible.***

326. On November 7, 2017, the Company issued a "Demand for Correction"[400] in reference to a November 2, 2017 document posted on Marc Cohodes' website discussing the Company's improper revenue recognition through

[400] *See* Ex. 44, petite parker the barker, *MiMedx Demand for Correction to Cohodes Report dated Nov 2, 2017* (Nov. 7, 2017).

AvKARE, and the Company's false statements related to its relationship with AvKARE.[401] The Company's demand included, *inter alia*, the following statements:

- "Cohodes Statement: 'MDXG has an established pattern of selling to a related party entity and lying that it's separate[.]' MiMedx: Believe the Auditors. . . . **This is another Cohodes Lie**." (emphasis in original).

- "Cohodes Statement: Insinuation of wrong-doing: 'MDXG instructs VA prosthetics agents to fax, both MDXG and AvKare POs to MDXG[.]' MiMedx: This eliminates administrative errors. Cohodes does not understand simple business procedures."

- "Cohodes Statement: 'VA Prosthetic agents send POs, not Avkare, so MDXG CFO LIED[.]' MiMedx: MiMedx sold products to the VA themselves in addition to AvKARE. **This is another Cohodes Lie.**" (emphasis in original).

- "Cohodes Statement: 'MDXG is "sole point of contact" and AVkare does not "re-sell," so MDXG LIED to the SEC[.]' MiMedx: **This is another Cohodes Lie**." (emphasis in original).

- "Cohodes Statement: 'AVkare is just an "intermediary[.]"' MiMedx: . . . **This is another Cohodes Lie**." (emphasis in original).

- "Cohodes Statement: DISTORTION of SEMANTICS: 'How can MDXG reduce inventory that AVkare purchased in the past if they are separate entities and AVkare owns the inventory?'

[401] *See* petite parker the barker, *Petite Parker and his management team must immediately RESIGN and COME CLEAN* (Nov. 2, 2017), http://petiteparkerthebarker.com/wp-content/uploads/2017/11/Petite-Parkers-AVkare-lies.pdf

MiMedx: Read the AvKARE agreement! **<u>This is another Cohodes Lie</u>**." (emphasis in original).

327. Then, on November 14, 2017, MiMedx posted to its website denying Viceroy's claim that MiMedx "completely circumvented AvKare during throughout their relationship" [sic] and that "Avkare had no role to play beyond providing MiMedx an FSS number[,]" claiming the statements were "***FALSE***."

328. The statements in ¶¶314-327 above were materially false and misleading when made and omitted material facts. The true facts, which were then known to or recklessly disregarded by Defendants, were as follows:

(a) MiMedx was heavily reliant on a few primary distributors – particularly those under MiMedx control, like AvKARE, CPM, SLR, Stability and First Medical – to generate and inflate revenue to meet its stated revenue targets each quarter. Petit and Taylor also entered into numerous side agreements with these entities in order to obtain massive last minute sales of product under terms highly favorable to the distributors, including a right of return, as detailed below.

(b) MiMedx's primary government distributor, AvKARE, was not independent and in fact was a mere pass through, providing a means to an FSS for the Company. As the Company later admitted, MiMedx and AvKARE had a side arrangement that allowed MiMedx to exercise almost complete control over the distribution and sale of MiMedx products to VAs. Even after booking the sale of

a product to AvKARE, MiMedx maintained control of the product and responsibility for selling it to VAs.[402] This was confirmed by Carlton, who testified that "***AvKare didn't sell the product. They didn't do anything. They just made it easier to sell***. . . . AvKare just made it easier to do business. They didn't have sales guys."[403] Far from AvKARE handling the back office paperwork for MiMedx, ***MiMedx*** employees submitted purchase orders for VA accounts through SalesForce. These sales representatives were instructed to falsely tell VAs they were doing so on AvKARE's behalf. MiMedx would then ship the products directly to the VAs. Pursuant to an arrangement made off the books, MiMedx had complete control to use AvKARE's VA access to place unrequested product on hospital shelves. Indeed, MiMedx employees were responsible for monitoring, documenting, and reconciling products that had been shipped to the VAs.

(c) Defendants' written (and publicly filed) PDA with AvKARE did not control the parties' relationship; rather, MiMedx utilized a side

---

[402] *See* Section V.C.1.

[403] Carlton Dep. 59:6-7, 15-16; *see also* Ex. 10, at ¶12(c) (USPIS confirming that "[a]lthough AvKare nominally acted as a distributor . . . in practice, AvKare employees played little role in marketing or distributing MiMedx products. Rather, MiMedx maintained what the company called a 'federal sales force,' whose members were responsible for interacting with VA employees, monitoring the stock of MiMedx product on the shelves at VA hospitals, and keeping track of when tissue was implanted in patients.").

arrangement with AvKARE that granted AvKARE undisclosed rights of return, provided that MiMedx retained risk of loss before "title to the goods and risk of loss" transferred to the end customer and allowed AvKARE to only pay MiMedx after the product was sold to an end customer. Accordingly, revenue from AvKARE was inappropriately recognized even though MiMedx had "material remaining performance obligations required of the Company" to appropriately earn the revenue and MiMedx was recording revenue before "collectability is reasonably assured";

(d) the increase in MiMedx's allowance for product returns to 3.4% of net sales was not simply due to the anticipated end of its contract with AvKARE. Rather, MiMedx concealed that the return credits it was providing AvKARE were instead due to its egregious channel stuffing that led to lost products, inventory spilling out of cabinets, problems reconciling inventory at VAs, and sales representatives feathering back returns so they could spread out the losses;

(e) MiMedx routinely issued credits to AvKARE for lost, damaged, or missing tissues and AvKARE only paid MiMedx for tissues after they were sold to the corresponding VA;

(f) A primary distributor of MiMedx, CPM, was owned by Brooks, who had close ties to the Company's executives. CPM employed a massive

network of suspect PODs, which enabled it to profit from selling substantial amounts of MiMedx products. Defendants leveraged their relationship with CPM for revenue infusions at the end of quarters. For example, in June 2015, Petit and Taylor concealed a side arrangement whereby MiMedx would pay Brooks $200,000 personally to induce CPM to buy products it did not need or want during 2Q15, with the understanding that CPM could later swap the product for others the next quarter, so that MiMedx could improperly record $1.4 million in revenue;

(g) Likewise, Defendants used SLR, which took over from CPM as a primary MiMedx distributor, to stuff significant quantities of MiMedx products at quarter end in order to boost revenue. SLR was headed by a former MiMedx employee, Morrison who was still linked to the Company. For example, in September 2015, Petit and Taylor directed MiMedx to purchase freezers for SLR so that SLR could place a massive order for $4.6 million of OrthoFlo (a new MiMedx product) in the last week of 3Q15. In November 2015, Petit even facilitated a $1.5 million loan from his children to SLR through the Petit Trust to allow SLR to make partial payment on this order, which it otherwise could not make;

(h) MiMedx also relied on Tennessee-based distributor Stability to stuff OrthoFlo. Near the end of 3Q15, Petit requested that Stability make a $2.2

million purchase from MiMedx, consisting primarily of OrthoFlo. Not only was the "purchase" made before stability and MiMedx had signed a distribution agreement, and when substantial, unresolved disagreements over essential sales terms were outstanding, but Petit and Taylor struck a side agreement with Stability's CEO allowing Stability to return any unwanted product to MiMedx in a subsequent quarter;

(i) MiMedx entered into a contingent agreement with Saudi Arabian distributor First Medical which provided First Medical extended payment terms contingent on use of the MiMedx's products. In exchange, First Medical submitted purchase orders for large purchases of MiMedx product at the end of 2Q15 and 4Q15, allowing MiMedx to improperly inflate its quarterly revenue; and

(j) In its Restatement, MiMedx admitted that all sales since 2012 – approximately $870 million – were recorded prematurely in violation of GAAP, as all distributor and customer transactions should have been recognized under the cash collection method of accounting (but were not). In addition to nearly all other financial accounts reported, MiMedx's DSOs during the Non-Reliance Periods were also materially misstated.[404]

[404] *See* Section X.

### 2. Defendants Falsely Represented That MiMedx Did Not Do Business With Physician-Owned Distributors

329. As discussed above, federal health care laws make it illegal to provide "kickbacks" to physicians for their use of particular medical products, including by providing financial incentives to PODs. During the Class Period, Defendants falsely represented that MiMedx did not include PODs in its distribution network. For example:

- **March 1, 2017**: In its 2016 Form 10-K filed with the SEC, the Company stated unequivocally that "***[w]e do not directly sell to or distribute any of our products through PODs.***"

- **October 17, 2017**: MiMedx posted on its website denying Viceroy's claims that MiMedx had "business relationships" with individuals from Forest Park, stating, "This is FALSE. ***MiMedx does not have business relationships with the indicted Forest Park individuals***. As mentioned previously, MiMedx does not control to whom our distributors sell products. If one of these individuals or the companies purchase MiMedx product from a distributor, it does not create a direct business relationship with MiMedx."

- **October 27, 2017**: During the Company's earnings call, Senken was asked by a securities analyst: "[D]o you currently sell products through physician-owned distributors?" Senken answered unequivocally: "I wonder where that question came from. ***No***."

- **October 27, 2017**: During the same earnings call, Petit stated, "***We do not sell through [PODs]***. . . . [I]t's just a lot of noise, but they'll dig up a name . . . to go and say that's an indication of channel stuffing[.]"

- **<u>November 9, 2017</u>**: During an exchange with an analyst at the Canaccord Genuity Medical Technology and Diagnostics Forum, Petit responded to the question "how much of your business comes from PODs or stocking distributors?" with: "***PODs is basically none that we know of*** . . . . We sell to distributor[s] and may have PODs roped in. We don't have the visibility, so we can't confirm that."

330. The statements in ¶329 above were materially false and misleading and omitted material facts when made. In truth, as Defendants knew, MiMedx regularly distributed its products through PODs, including Fuse,[405] and had a business relationship with Forest Park.[406] Indeed, MiMedx sales personnel, as well as personnel from MiMedx's controlled distributors, were often involved in setting up the PODs or were listed as members of the PODs in corporate formation documents.

### C. The MiMedx Defendants Made False and Misleading Statements and Omitted Material Facts Related to the Company's Compliance Programs and "Culture of Integrity"

331. As discussed above, the alleged fraud was so pervasive that it permeated all of the Company's operations; indeed, Defendants built MiMedx on improper business practices. Nevertheless, throughout the Class Period, Defendants

[405] *See* Ex. 45, Marc Cohodes, *MiMedx and Fuse Medical* (Apr. 30, 2018).

[406] *See In re Forest Park Medical Center at Southlake, LLC*, No. 16-40273-rfn-11 (N.D. Tex. Apr. 29, 2016), ECF Nos. 220, 245 (MiMedx identified as a creditor and/or party in interest); Section V.C.2.a.

went to patients, doctors, regulators, analysts, and investors and brazenly touted the Company's supposedly "robust" compliance programs, strong controls, proper business practices, and "culture of integrity."

332. They emphasized to investors and analysts that MiMedx adhered to those principles were greatly important to management, who carefully assessed and monitored the Company's compliance efforts. For example:

***September 5, 2013 shareholder call***

- Petit: "Relatively, the way that MiMedx conducts their sales related to regulatory matters, I would characterize us as conservative."

***February 26, 2014 earnings call***

- Petit: "We have a culture of success and the culture of integrity, both of those go a long way in producing continuing results therefore expected by end of this year 2014 there should be no question at all as to who the new leader relative to advanced wound care sector of healthcare is."

***March 24, 2014 press release***

- Taylor: "All of our relationships with health care professionals are structured so as to comply with applicable law and regulatory guidance, as well as ethical principles and best practices."

***December 31, 2014 press release***

- Petit: "I can assure you that the corporate officers at MiMedx are not aware of anything that would stimulate this [HHS-OIG] investigation. We have continually maintained and improved a robust compliance program. We have been very focused on the thoroughness of our compliance policies and our staff adhering

to those policies. For instance, MiMedx employees participate in a thorough training program regarding our policies and the standards that have been established and enforced to assure their understanding and adherence to our compliance programs. Employees may convey anonymously and directly to senior management and our Board of Directors any form of concern, complaint or inquiry related to our compliance programs or other issues. With the significant growth we are experiencing, this has been and continues to be an initiative in which we devote considerable time, attention and resources."

- Petit: "We screen all of our applicants very carefully. With respect to former ABH applicants, we sought additional input from some former ABH corporate management who joined MiMedx and who were familiar with the suspected violations and the individuals involved."

***January 2, 2015 shareholder call***

- Petit: "We are all very knowledgeable about healthcare rules and regulations. We know the advantages of setting up robust compliance programs and training all personnel on them. We have a compliance officer and we have a compliance hotline. We have all employees sign a document clearly stating that they have been trained on all of our compliance processes and procedures. . . . We enforce our compliance policies and we've taken disciplinary action against the employees for noncompliance[.]"

***April 28, 2015 earnings call***

- Petit: "However, it's very noteworthy that OIG reached its conclusion in a relatively short four-month period. . . . I hope this gives you some insight on how well managed and professional our business activities are and how focused we are on honesty and integrity."

***June 3, 2015 Jefferies Global Healthcare Conference***

- <u>Senken</u>: "And so several years ago we put in place what we feel are very robust systems and processes in the area of compliance, risk management, and financial reporting in anticipation of the growth that we are now experiencing."

***October 12, 2015 press release***

- <u>Taylor</u>: "Our culture embraces and demands the utmost in business integrity and ethics. We have a comprehensive compliance program, and we continually stress adherence to our policies in every way possible. As the leader in our sector of healthcare, we are constantly striving to improve in all areas. We believe we are setting the industry standard for ethical business practices and hope that all industry participants will follow suit."

***January 14, 2016 JPMorgan Health Care Conference***

- <u>Senken</u>: "We stated at this conference that we felt very confident that our compliance programs were robust enough to prove out that the accusations that were made in this . . . action were unfounded. . . . We said it was going to be cleared up. We said it was going to be cleared up promptly and it was, very unusual to have a circumstance like that happen."

***February 24, 2016 RBC Capital Markets Health Care Conference***

- <u>Senken</u>: "We just completed our team meeting, our national sales meeting in January, a four-day event. And in there, one of the major sessions we have is around compliance and we go through skits, we go through the rules, we emphasize examples of what to do, what not to do, how to get yourself out of a circumstance that you don't want to be in. We take these programs very seriously and that's why when we had the issue around [HHS-]OIG Subpoena that came to us in the tail end of 2014. We cleared that matter very quickly because we take these programs seriously."

***December 19, 2016 guidance call***

- Taylor: "It is very disappointing to have allegations such as this come up, particularly when the Management team's focus is always on integrity and doing the right thing. . . . It's a very important focus that all of our management team subscribes to and adheres to. We also trained all of our personnel, and in particular our sales team, that if they ever had concerns about anything that could potentially be an issue, they have [a] channel to utilize to voice their concerns. Specifically, they can write a letter to the CEO, either anonymously or citing their name."

- Petit: "When we have allegations of any kind come across through a hotline or up to a Dear Pete letter, or other sources through our compliance line, we investigate those because we don't want those kind of issues going on within the Company either. And that's somewhere in the chain of command between myself, Bill, and so on."

***August 17, 2017 press release***

- MiMedx: "MiMedx'[s] policy is to promote high standards of integrity by conducting its affairs honestly and ethically. MiMedx requires all employees to sign and adhere to a code of conduct, and holds compliance training on a regular basis. MiMedx also provides a confidential toll-free compliance hotline for employees to report unethical or illegal conduct and has established a procedure, which is available on our website, where any person may submit a good faith report or concern regarding business, accounting or auditing matters to the Company or its Board of Directors."

***September 7, 2017 press release***

- MiMedx: "MiMedx policies in regard to interactions with health care providers prohibit providing any gifts at all to health care providers, and its policies in regards to interactions with federal employees place stringent limits on providing meals to federal employees per federal law. There has not been any testimony that the Company's executives directed anyone to behave in such a manner."

***September 21, 2017 shareholder call***

- <u>Petit</u>: "To have the quality of board members that we have, and that includes a recent member who was a former SEC Commissioner for 8 years to the Bush and Obama administrations, you have to give us some credit for having a great deal of business expertise and honesty and integrity. . . . Again, you don't get to be the fastest growing public company in the United States with incompetence or corporate malfeasance."

- <u>Petit</u>: "There are very few public companies that have the quality, compliance systems and the discipline to administer them as we do. . . . And believe me, this board is a group of individuals that are very independent, this management group, Bill and I are on the board. But I can tell you if there was malfeasance, Bill Taylor and Pete wouldn't be here today."

- <u>Taylor</u>: "We have policies and procedures that explicitly prohibit that kind of behavior. We also have controls in place that should that behavior occur, we can typically pick it up. But if people operate outside of our controls, if they do something on their own, where we have no way of verifying what they've done or no knowledge of it, those are the kind of situations that we're talking on here. Because we have strong controls, we have strong policies that prohibit that kind of thing."

***October 11, 2017 guidance call***

- <u>Petit</u>: "We're a group of individuals with core values of integrity and behave in an honest manner. When you have a track record of behavior that we've exhibited over the decades, you're always going to prevail. MiMedx is going to continue to perform very strongly."

***October 13, 2017 post on MiMedx website***

- <u>Petit</u>: "Short sellers should simply ask our terminated employees why they did not report these 'supposed' incidents of wrong doing or malfeasance at the time they were supposedly

happening through the corporate compliance systems. In one solution, their phone calls could go straight to the Board of Directors. In the other case, a 'Dear Pete' letter could come straight to the Chairman's office without anyone seeing the document."

***October 27, 2017 earnings call***

- Petit: "I'm a person of honesty and integrity as [are] our other executives in this company. We always strive [for] doing the right thing, which is sometimes not the easiest thing."

***November 14, 2017 press release***

- Petit: "MiMedx will continue to expose the false allegations and contrived innuendo propagated by these illegal short-sellers, especially those that are associated with the Company's compliance with regulatory requirements."

***November 30, 2017 analyst call***

- MiMedx representative: "This company has been run ethically, with integrity, and our processes are buttoned up."

***May 10, 2018 press release***

- MiMedx: "The Company maintains a robust compliance program that, among other processes and procedures, monitors the activities of our sales representatives. Those who do not comply with the Company's policies and procedures are subject to disciplinary action. The indictment includes allegations against the named individuals regarding the payment of speaker fees by the Company. On occasion, MiMedx engages providers to perform services on its behalf, such as providing scientific and clinical education presentations. Where the Company engages providers for services, the Company's policy is to pay the providers consistent with the fair market value of the services. Further, the MiMedx policy requires speakers to attest to the receipt of any required authorization from their institutions to

> speak on the Company's behalf, a strict policy outlined in all contractual arrangements."

333. In truth, the statements above regarding the Company's compliance programs, ethical standards, and integrity (¶332) were materially false and misleading when made and omitted material facts. The true facts, which were then known to Defendants, were as follows:

(a) Far from being a product of management integrity and efforts to always do the "right thing," MiMedx's Audit Committee determined that "Messrs. Petit and Taylor set at an inappropriate 'tone at the top' at MiMedx and emphasized short-term business goals over compliance and ethics, purposely took action to disregard revenue recognition rules under GAAP and manipulate the timing and recognition of revenue";

(b) Not only were the highly touted MiMedx compliance programs not enforced, but violations of those programs were implicitly, if not explicitly, encouraged by Defendants and MiMedx management to generate sales. This is because Defendants actively fostered a sales-at-all-costs corporate culture wherein MiMedx sales representatives were often encouraged to engage in (or ignore others' engagement in) improper sales and distribution practices or risk losing their jobs;

(c) MiMedx did not provide effective channels for employees to voice concerns about improper or illegal practices at the Company. Instead, as the Audit Committee admitted in May 2019, employees were actively discouraged from speaking up about known problems and fraudulent practices, and "Messrs. Petit and Taylor engaged in a pattern of taking action against employees who raised concerns about the Company's practices. Mr. Petit directed an internal investigation dubbed 'Project Snow White' that sought to uncover wrongdoing committed by such employees, rather than the merits of their allegations[] . . . in an effort to discredit whistleblowers or find some wrongdoing to justify re-assignment, discipline, or even termination[.]" Concerned employees were secretly surveilled, recorded, marginalized, threatened, fired, and, in many instances, even sued;

(d) The Restatement identified that "[b]oth the Board and senior management failed to appropriately respond to allegations of improper accounting activities, improper sales practices, and activities consistent with retaliation against employees who raised concerns of such inappropriate accounting and sales activity";

(e) The Company admitted in the Restatement that it "did not have an effective, documented and continuous risk assessment process and related

controls to properly monitor, identify and analyze regulatory compliance risks, including compliance with applicable regulations around product pricing, payments to medical professionals, and related activities and related risks of financial mismanagement due to error and/or fraud, including management override of controls," during the Class Period; and

(f) Not only did EY determine prior to its resignation that the "internal controls necessary for the Company to develop reliable financial statements ***do not exist***,"[407] the Company disclosed in the Restatement that "its internal control over financial reporting ***was not effective for all of the Non-Reliance Periods***," and that "[m]anagement ***did not have processes in place*** to assess whether controls within each of the five components of internal control were present and functioning as intended."[408]

## D. The MiMedx Defendants' False and Misleading Statements Violated Item 303 of Regulation S-K

334. In addition to violating their duty to disclose the full truth to the market, Defendants' failure to disclose the true circumstances surrounding the statements alleged to be false in Sections VIII.A-C violated Item 303 of Regulation S-K, 17

---

[407] MiMedx Group, Inc., Current Report (Form 8-K) (June 7, 2018).

[408] Ex. 1, at 80, 83; *see also* Section X.

C.F.R. §229.303 (“Item 303”). Item 303 requires an issuer to “[d]escribe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.”[409]

335. The SEC has explained that “[o]ne of the most important elements necessary to an understanding of a company’s performance, and the extent to which reported financial information is indicative of future results, is the discussion and analysis of known trends, demands, commitments, events and uncertainties.”[410] Thus, SEC guidance requires management to make two assessments where a trend or uncertainty is known:

> 1. Is the known trend . . . or uncertainty likely to come to fruition? If management determines that it is ***not reasonably likely to occur***, no disclosure is required.
>
> 2. If management cannot make that determination, it must evaluate objectively the ***consequences of the known trend*** . . . or uncertainty, on the assumption that it will come to fruition. Disclosure is then required unless management determines that a material effect on the registrant’s

[409] 17 C.F.R. §229.303(a)(3)(ii).

[410] *Commission Guidance Regarding Management’s Discussion and Analysis of Financial Condition and Results of Operations*, Securities Act Release No. 8350, 68 Fed. Reg. 75,056, 75,061 (Dec. 19, 2003).

> financial condition or results of operations is ***not reasonably likely to occur***.[411]

336. The SEC has made clear for decades that, in addition to the identification of such "known trends or uncertainties," Item 303 specifically requires disclosure of the expected ***impact*** that any such trends or uncertainties are expected to have on a company's prospective financial performance. The SEC has stated that "Item 303 ***require[s] disclosure of forward-looking information***," including, at a minimum, disclosure of the "***reasonably likely material effects on operating results***."[412]

337. Here, Defendants violated Item 303 by failing to disclose the accounting fraud and improper sales and distribution practices alleged herein, which were "***reasonably likely material effects on operating results***."

## IX. THE MIMEDX DEFENDANTS ACTED WITH SCIENTER

338. The Individual Defendants – Petit, Taylor, and Senken – acted with scienter. The Individual Defendants were active and culpable participants in the fraud. Each of them knew that statements issued or disseminated in the name of the

---

[411] *See Management's Discussion and Analysis of Financial Condition and Results of Operations; Certain Investment Company Disclosures*, Securities Act Release No. 6835, 54 Fed. Reg. 22,427, 22,430 (May 24, 1989) ("1989 SEC Release").

[412] 1989 SEC Release at 22,428-29.

Company were materially false and misleading, and omitted material facts, for the reasons set forth above. They either directed or possessed direct information about the Company's illicit sales and distribution practices, including side arrangements with distributors, channel stuffing, improper revenue recognition and other improper conduct, and knew of the true facts surrounding MiMedx's inflated financial results. As such, they knew that materially false and misleading information was disseminated to the investing public during the Class Period.

339. The facts set forth in this section, the Substantive Allegations section, and throughout this pleading as a whole, strongly support and establish a strong inference of each Individual Defendant's scienter.

## A. The Individual Defendants Directed and Carried Out the Fraud

340. As detailed above, Petit's, Senken's, and Taylor's active involvement in the fraud was confirmed by the Company's Audit Committee, following the 15-month ACIII, and by MiMedx in proxy materials and the Restatement. MiMedx and the Audit Committee made clear that members of former "senior management,"[413]

[413] The Company's Form 8-K summarizing findings of ACIII defines "former members of senior management" as "including Mr. Petit, the Company's former Chief Operating Officer, William C. Taylor, the Company's former Chief Financial Officer, Michael J. Senken, and the Company's former Controller, John Cranston." Ex. 2, at 3.

including Petit, Senken, and Taylor, knowingly engaged in extensive misconduct during the Class Period that necessitated the Restatement. This was strongly corroborated by the Company's own auditor (EY), the SLC Report, the SEC Complaint, and the *Petit/Taylor* Indictment, as well as documents filed in the *Petit/Taylor* case.[414]

341. The Company's findings, admissions, and actions establish the Individual Defendants: engaged in "material wrongdoing"; acted knowingly and intentionally in making misstatements and omissions to investors, regulators, and other parties; and established a tone at the top by which others were directed or forced to engage in the various fraudulent schemes described herein. As a result, the Company fired Petit, Taylor, and Senken "for cause," stating that they each "had engaged in, among other things, conduct detrimental to the business or reputation of the Company,"[415] and took steps to claw back their compensation as set forth below.

342. The Company, based on the findings of ACIII, admitted the Individual Defendants' knowledge of, and misconduct in directing, the securities fraud alleged herein, stating:

- The Individual Defendants "***were aware*** of the Company's course of dealing with its largest distributor [AvKARE] and that

---

[414] *See* Sections VII.C-D, F.

[415] MiMedx Group, Inc., Current Report (Form 8-K), Ex. 99.1 (Feb. 20, 2018).

this course of dealing was inconsistent with the explicit terms of the contract, and that, by at least early 2016, this course of dealing impacted the way in which the Company was recognizing revenue from this distributor, which was a key fact in the determination that the Company's revenue recognition was improper under GAAP."[416]

- "Former members of senior management ***were also aware*** that this course of dealing included detailed procedures, ***established as early as 2012***, to determine when the distributor [AvKARE] would pay for the Company's products."[417]

- "Former senior management ***disregarded revenue recognition rules under GAAP and directed others to take actions that caused the Company to take actions*** that caused the Company to improperly recognize revenue under GAAP, which was a key factor in the Audit Committee concluding it was necessary to restate the Company's financials, as described above."[418]

- The Individual Defendants ***engaged in other conduct*** "that appears to have been ***designed to manipulate*** the timing and recognition of revenue" and ***caused*** the Company to recognize revenue in the wrong period or improperly recognized revenue all together, allowing the Company to meet published guidance when it otherwise would have fallen short. This conduct included, but was not limited to:

    - providing a lucrative consulting agreement to a distributor in conjunction with a large purchase at the end of a reporting period;

    - instances of intentionally shipping types and volumes of product that were not needed by the customer and

[416] Ex. 2, at 3.

[417] *Id.*

[418] *Id.* at 5.

recording revenue, typically near the end of a reporting period, and facilitating such sales by agreeing at the time of shipment to allow customers to return or exchange these products in subsequent accounting periods without recording specific provisions for such return or exchanges;

- the booking of a large end of quarter sale to a distributor that the Company was in the process of acquiring and for which the Company never received payment; and

- several "side deals" with distributors and other customers, whereby the purchasers agreed to take product but were not required to pay for the product until the purchasers were successful in selling the product; however, the Company recorded revenue at the time of shipment rather than when the purchasers were obligated to pay, which was inconsistent with GAAP.[419]

- "The ***unmistakable conclusion*** reached by the independent investigation and the Audit Committee [ACIII] was that ***Mr. Petit and certain members of his former management team engaged in serious wrongdoing***, including ***disregarding revenue recognition rules under [GAAP]; engaging in revenue 'management;' making material misstatements to regulators, the Board***, the Audit Committee and the Company's outside auditors; ***taking actions to investigate or silence whistleblowers***; and ***setting an inappropriate 'tone at the top.***'"[420]

- "***This misconduct has harmed MiMedx and its shareholders*** – the Company is a defendant in a multitude of lawsuits, faces regulatory inquiries and has had its stock delisted from Nasdaq."[421]

---

[419] *Id.* at 3.

[420] Ex. 15, at 2-3.

[421] *Id.*

- ***"Mr. Petit's conduct is not the kind of conduct we would expect of a person acting in a leadership capacity at MiMedx or serving on the MiMedx Board***, and we believe Mr. Petit's presence in our boardroom would ***disrupt our attempts to regain credibility*** with the Company's key constituents."[422]

- "[T]he Audit Committee of the Board found that the evidence demonstrated that ***Mr. Petit and certain members of his management team engaged in longstanding material misconduct, which harmed MiMedx and its shareholders***."[423]

- "[T]he Company under Mr. Petit's leadership recognized revenues in the wrong accounting reporting period, and in certain instances, improperly recognized revenue altogether."[424]

343. Leading up to its annual shareholder meeting on June 17, 2019, MiMedx also highlighted several statements by independent proxy advisory firms regarding Petit's misconduct, including the following statement by Glass, Lewis & Co.: "***Mr. Petit's involvement, culpability and unwillingness to accept any responsibility for the misconduct and poor behavior . . . resulted in the Company's ill-fated position and the destruction of substantial shareholder value.***"[425]

344. Additionally, as detailed throughout this pleading, based on their extensive investigations, the Audit Committee, SEC, and DOJ found that the

---

[422] *Id.* at 3.

[423] Ex. 18, at 2.

[424] *Id.*

[425] MiMedx Group, Inc., Schedule 14A (Form DEFA14) (June 12, 2019); *see also* MiMedx Group, Inc., Schedule 14A (Form DEFA14) (June 11, 2019).

Individual Defendants developed side arrangements with the distributors, monitored the execution of those arrangements, and coordinated with those distributors to ensure that they achieved the "sales" necessary to portray revenue growth.[426] Petit, Taylor, and others "watched the revenue numbers closely and ensured that the Company hit the revenue number."[427]

345. Indeed, Petit personally managed almost all interactions with AvKARE's principals from the very beginning of the parties' relationship.[428] And Petit and Taylor were involved with dealing with any credits due to AvKARE for

---

[426] *See* Sections VII.D, F; Ex. 6, at 3-4, 6-7 (describing evidence uncovered during ACIII that Petit and Taylor "understood the [AvKARE] payment and inventory reconciliation process and were aware of updates and backlogs within the process"; "would actively manage tissues that had been implanted that did not have a PO"; instructed sales personnel "to go out and get the PO"; and had "knowledge of the AvKare course of dealings and the GAAP implications"); *id.* at 3 ("Petit understood the AvKare payment process and was intimately involved with the communication with the AvKare Vice President [redacted]. Petit would personally handle all financial and collections issues with [redacted].").

[427] Ex. 6, at 11; *see also Petit/Taylor* Indictment, at ¶19 ("PETIT, TAYLOR, and others caused MiMedx to report these fraudulently inflated revenue figures to the investing public in order to ensure that the reported figures fell within MiMedx's publicly announced revenue guidance, and to fraudulently convey to the investing public that MiMedx was accomplishing consistent growth quarter after quarter, as PETIT and TAYLOR had falsely touted to the investing public.").

[428] *See* SEC Complaint, at ¶135.

channel-stuffed product that the Company had placed on VA shelves, for which the Company had already recognized revenue.[429]

346. Likewise, throughout 2015, Petit and Taylor directly caused and participated in a scheme to fraudulently recognize revenue from sales to CPM, SLR, Stability, and First Medical, so that MiMedx could continue to meet or exceed revenue guidance. As detailed in Section V.C.2, Petit and Taylor personally entered into the undisclosed side arrangements with these distributors which included extended or otherwise flexible payment terms and or rights of return in order to book large orders at the end of quarters. They also took extreme steps to effectuate these arrangements, including the payment of consulting fees to one distributor to encourage purchase of unwanted products, the purchase of freezers to store the stuffed products, and, remarkably, a personal loan from Petit's trust so that a distributor could make payment and revenue could be recognized.[430]

347. These facts, among many others, establish that the Individual Defendants orchestrated, directed, executed, and were otherwise aware of the improper revenue recognition revenue scheme described herein.

---

[429] *Id.* at 5-6.

[430] *See* Section V.C.2.

### B. Defendants' Actions to Conceal Their Fraud Further Establish Their Scienter

348. The Individual Defendants' scienter is also evidenced by the actions they took to conceal and cover up their fraud. According to the Company:

> [T]he evidence [uncovered in ACIII] demonstrated that after questions began to be raised regarding the Company's accounting practices, Messrs. Petit, Taylor, Senken and Cranston made material misstatements and omissions about the Company's course of dealing with its largest distributor, as well as the Company's corresponding revenue recognition practices, to a number of key stakeholders and regulators, including the Division of Corporation Finance of the U.S. Securities and Exchange Commission (the "SEC"), the Board, the Audit Committee and the Company's outside auditors.[431]

349. Defendants' cover-up efforts aimed at thwarting the discovery of their fraud, as detailed in Sections V.D-E and VI, evidence knowledge of the fraud they were committing and a consciousness of guilt.[432]

350. Likewise, as further detailed above, Defendants aggressively sought to silence employees who raised concerns by threatening, firing, and, in some instances, taking legal action against them. As the Company stated:

> [T]he evidence demonstrated that Messrs. Petit and Taylor engaged in a pattern of taking action against employees who raised concerns about the Company's practices, without conducting a thorough investigation of those concerns. Instead, Messrs. Petit and Taylor focused on

---

[431] Ex. 2, at 4.

[432] Defendants' fraud and duplicitous cover-up efforts were so significant that EY was unable to proceed with their audit of FY17. *See* Ex. 19.

> disputing the employees' allegations and on seeking to discredit or find wrongdoing by the persons raising the concerns that would justify re-assignment, discipline or termination [including implementation of Project Snow White].[433]

351. In particular, the Audit Committee found during ACIII that Petit personally "directed and oversaw" a secret internal surveillance system dubbed "Project Snow White" in response to internal complaints of accounting improprieties.[434] Petit's "Project Snow White" was so extensive that it captured "***over 2,750 hours*** of video derived from a secret video surveillance system installed at the direction of [Petit], as well as telephonic recordings captured without the consent of all conversation participants."[435] According to the Company:

> [A]fter certain employees made allegations of improper accounting practices in late 2016, Mr. Petit directed and oversaw an internal investigation dubbed "Project Snow White" that focused on potential wrongdoing by these employees, rather than the merits of their allegations. As part of Project Snow White, the secret video surveillance system referenced above was installed at Mr. Petit's direction to record interviews that he, Mr. Taylor and other former members of management conducted of certain employees and those employee's discussions amongst themselves without those employees' knowledge or consent. The evidence showed that Mr. Petit directed that certain employees, whom he and other former members of senior

---

[433] Ex. 2, at 4; *see also* Ex. 6, at 2 (describing evidence uncovered in ACIII that "[w]hen questions and allegations around MiMedx accounting arose both Petit and Taylor took actions to try and silence individuals").

[434] Ex. 2, at 4.

[435] *Id.* at 2.

management perceived to hold loyalty to an employee who had raised concerns about the Company's practices, be terminated.[436]

352. Defendants even implemented a formalized Company procedure called a "Dear Pete" letter, in which employees could contact Petit directly about problems at the Company, presumably so he could correct them.[437] However, the "Dear Pete" letters submitted by Company employees were "investigated" by Petit and Taylor, who covered up the truth, fired the concerned employees and allowed the Company's fraud to continue.

353. In this manner, as discussed in Section V.D, Defendants fired and/or attempted to silence Andersen, Kruchoski, Tornquist, Vitale, Fox, and Tierney[438] when they spoke out and reported the Company's improper revenue recognition, sales, and distribution practices.

354. Defendants also attempted to obscure their fraud through a public campaign of denials, rebuttals, and pushback in press releases, prominent postings on MiMedx's website, shareholder communications, and conference calls. Petit and

---

[436] *Id.* at 4.

[437] *See* Thomson Reuters StreetEvents, Edited Transcript, MiMedx Group Inc. 2017 Outlook Conference Call (Dec. 19, 2016).

[438] *See* Ex. 22 at 4. (Tierney was fired a week after sending a detailed letter to Petit and the Board regarding various fraudulent sales and accounting practices he had witnessed).

Taylor were personally involved in this campaign. One of their primary tactics was to deflect public scrutiny and divert attention by blaming and defaming a group of "short sellers" supposedly working together to fabricate bad news about the Company and profit from the resulting stock price decline. Indeed, the Company issued several press releases defending its conduct and targeting supposed short sellers such as Viceroy and Aurelius, while maintaining an entire section of its corporate website devoted to "Short Selling Commentary."

355. The Company suspiciously removed the section of its corporate website titled "Short Selling Commentary" on or about June 8, 2018, around the time that public revelations of Defendants' fraud began to snowball.

356. The Company even filed lawsuits against a number of the supposed short sellers, alleging "defamation" and related claims in connection with the release of reports criticizing the Company, despite knowing that the reports were true. These lawsuits were subsequently dropped by the Company or dismissed as the fraud continued to unravel, and after the Individual Defendants were fired, further exposing the Company's baseless cover-up tactics.

357. On October 9, 2017, MiMedx issued a press release announcing that the Board of Directors authorized an additional $10 million for the Company's share repurchase program, bringing the total authorized amount to $110 million, "in light

of the short seller attacks and [the Company's] strong balance sheet and cash flows." In the press release, Petit downplayed the Company's improper conduct and further justified the share repurchase by stating that the "recent deceptive and contrived attacks on [MiMedx] stock have caused the MiMedx shares to become very undervalued in my opinion." In reality, the share repurchase was orchestrated by Defendants to conceal their fraud and inflate the stock price further, in order to offset the stock price decline caused by revelations of their fraud.

358. Even after Petit was ousted from the Company, he continued his misleading public campaign of blame and denial and sought to regain control of the Board at the Company's annual meeting on July 17, 2019, asserting that the reports regarding his conduct was deflection and lies by the Company, made as part of a corporate takeover.

### C. Defendants Created an Inappropriate Tone at the Top

359. Defendants' conduct as described herein also created an inappropriate tone at the top, in which revenue growth was emphasized and prioritized over ethics and compliance. As the Company stated:

- "Petit and Taylor set an inappropriate 'tone at the top' at MiMedx and emphasized short-term business goals over compliance and ethics, ***purposely took action to disregard revenue recognition rules under GAAP and manipulate the timing and recognition of revenue***, acted against employees who raised concerns about

the Company's practices and marginalized the Company's legal and accounting departments and advisors."[439]

- "Former senior management ***marginalized*** the Company's legal and accounting departments and outside legal and accounting advisors, by ***dismissing or ignoring professional advice***, ***withholding information*** from legal and accounting advisors necessary to appropriately exercise professional judgments and determinations and excluding senior legal and accounting personnel from regular senior management meetings."[440]

360. This tone set by the most senior management – Petit, Taylor, and Senken – filtered throughout the organization, leading to a host of improper sales and distribution practices at every level of the Company.

361. The inappropriate tone at the top is evidenced by the following:

- MiMedx sales representatives were encouraged and taught to work loosely and aggressively in a lawless environment they referred to as the "Wild West." Indeed, as detailed above, sales representatives were taught to employ an influence campaign and "were required by Mr. Petit to host lunches and dinners with doctors, he called 'healing reviews.'" They were also trained to offer reimbursement guarantees to its customers and instruct providers to game the reimbursement.

- Carlton stated that MiMedx was "a high pressured environment and they were slaves to the [financial number]."[441]

- The PAN scheme – in which the Company directed its PAN donations to cover co-payments of its own products. The

[439] Ex. 2, at Ex. 99.1.

[440] *Id.* at 5.

[441] Ex. 11, at 6.

Company trained sales representatives to use PAN to complete sales and maximize the number of MiMedx product sales supplemented by PAN grants. Taylor himself was copied on PAN correspondence.

- Much of the sales force hired by Defendants were former employees from ABH, a company that was indicted and ultimately paid a $350 million fine for violating the FCA due to illicit bribery and kickback practices.

- Petit's long, troubled history of building a succession of healthcare companies – Matria, Healthdyne, and MiMedx – that grew rapidly, but ultimately came under governmental scrutiny under his leadership.

- EY's findings that "internal controls necessary for the Company to develop reliable financial statements do not exist," the Company needed to "significantly expand the scope of its audit" due to material allegations of inappropriate financial reporting, noncompliance with laws and regulations, findings from the Company's ongoing internal investigation [ACIII], and the lack of internal controls."

- The Company's admission that it needed to implement "corrective processes to define, remediate, and enhance internal procedures for business health and sustainability[,]" which included a "restructured and bolstered pricing committee; tightened policies, procedures and governance of credit; the establishment of an independent compliance department reporting to the Board of Directors; the assessment and initial implementation of remediation of Sarbanes Oxley-related controls; [and] hiring a Vice President of Internal Audit to develop an internal audit function for the Company[,]" and its implementation of "improved processes and controls to monitor sales practices, authorize credits and returns, recognize revenue."

- The Company's change in business practices to address issues raised in ACIII, which led to a material softening in the Company's revenue performance in 2018.
- The Company's admissions in the Restatement that:
    - "The Company failed to establish a tone at the top that demonstrated a commitment to integrity and ethical values, resulting in activity by senior management, members of the sales group and others that was inconsistent with both the accounting applied and applicable regulatory requirements."
    - "The Company did not have an effective, documented and continuous risk assessment process and related controls to properly monitor, identify and analyze regulatory compliance risks, including compliance with applicable regulations around product pricing, payments to medical professionals, and related activities, and related risks of financial misstatement due to error and/or fraud, including management override of controls."
    - "Both the Board and senior management failed to appropriately respond to allegations of improper accounting activities, improper sales practices, and activities consistent with retaliation against employees who raised concerns of such inappropriate accounting and sales activity."

362. The inappropriate tone at the top and the culture of fraud it created at MiMedx is evidenced by the actions of high-level MiMedx employees, who assisted in the Individual Defendants' fraud by carrying out schemes and artifices to fraud, and required those who reported to them to engage in similar conduct, training employees to engage in improper sales practices, or enabled the fraud to continue by

ignoring the concerns of whistleblowers or participating in their termination from the Company. For example:

- **Chris Cashman, Chief Commercial Officer**: In December 2015, Cashman was informed (along with Petit and Taylor) that the Company may need to credit AvKARE for channel-stuffed product that the Company had placed on VA shelves, given the Company had already recognized revenue for it.[442] Likewise, during 2015, Fox repeatedly raised objections to Cashman regarding the Company's AvKARE channel stuffing and improper revenue recognition. Cashman implemented a channel stuffing scheme involving the delivery of 7x7 cm EpiFix grafts to VA hospitals at the end of 1Q16.[443] When Fox objected in March 2016, Cashman responded, "Mike, we understand your concerns.[444] Duly noted, but we are going to do this."[445] On or about March 22, 2016, in the face of aggressive sales demands, Blocker explained to Cashman that MiMedx products were already "spilling out of every cabinet available to us" at VA hospitals, causing "questions the amount of product that's being used."[446] In response, Cashman suggested that Blocker try one of the Company's favorite tactics, using "healing reviews" to influence VA decision makers.[447] On November 2, 2016, along with Petit and Taylor, Cashman directly received an internal complaint from Kruchoski and Tornquist describing channel stuffing and improper revenue recognition in relation to AvKARE and other distributors.[448] On December 12, 2016,

[442] *Fox* Counterclaim, at ¶67.

[443] *Fox* Counterclaim, at ¶56.

[444] *Id*. at ¶57.

[445] *Id*.

[446] *Id*. at ¶54.

[447] *Id*.

[448] *See* Ex. 31, at 3-4.

Cashman (along with Petit and Taylor) participated in a meeting with Fox regarding the internal channel stuffing complaint by Kruchoski and Tornquist.[449] During the meeting, Petit stated that Kruchoski and Tornquist would be sorry that they engaged in "this action" and that they would be "hurt professionally and with every possible resource available."[450]

- **John E. Cranston, Controller and Treasurer**: The Company's Board of Directors determined that Cranston (along with Petit, Taylor, and Senken) engaged in "conduct detrimental to the business or reputation of the company" after his misconduct was uncovered during ACIII into the Company's sales and distribution practices.[451] As a result, the Board of Directors determined that his resignation should be treated as termination "for cause" and forfeited all of his outstanding equity and incentive awards and clawed back certain of his compensation.[452] Further, Cranston featured heavily in the Audit Committee findings of wrongdoing during ACIII, together with Petit, Taylor, and Senken.[453] As reported by the Company on May 23, 2019, Cranston was "aware of the Company's course of dealing with its largest distributor [AvKARE] and that this course of dealing was inconsistent with the explicit terms of the contract [with AvKARE]"; "made material misstatements and omissions about the Company's course of dealing with its largest distributor, as well as the Company's corresponding revenue recognition practices, to a number of key stakeholders and regulators"; "[o]n multiple occasions . . . signed letters to the Company's outside auditors misrepresenting that the Company had no side deals or other arrangements that had not been disclosed to the outside auditors"; and "made misrepresentations

[449] *Id*. at ¶83.

[450] *Id*. at ¶84.

[451] MiMedx Group, Inc., Current Report (Form 8-K), Ex. 99.1 (Sept. 20, 2018).

[452] *Id*.

[453] *See* Ex. 2.

to the [outside accounting] expert concerning the actual course of dealing between the Company and its largest distributor."[454]

- **Lou Roselli, Director of Sales Operations**: Roselli communicated directly with Petit on several occasions about inventory reconciliation issues with AvKARE.[455] For example, in an email to Petit, Roselli "insisted that MiMedx needed to reconcile [] inventory" to "prevent massive credits back to AvKare."[456] Roselli also pressured senior managers to significantly increase the amount of product shipped to VA facilities through AvKARE even though he was aware that such products were not requested, thus enabling MiMedx to book the revenue during that quarter, even though MiMedx (not AvKARE) remained responsible for attempting to sell the products in future quarters. Roselli also participated in quarter-end meetings at the Company's headquarters to discuss methods to achieve the Company's revenue forecasts. Further, Roselli implemented the PAN scheme whereby Defendants manipulated charitable donations to PAN in order to cover patient copays of MiMedx products, in violation of the FCA and AKS.[457]

- **Alexandra Haden, General Counsel and Secretary**:[458] Haden received e-mails from Regional Sales Director Kruchoski outlining in specific detail MiMedx's AvKARE-related accounting fraud.[459] In response to these email communications and the joint report of improper conduct submitted by Kruchoski and Tornquist, Haden conducted an interview wherein she was

---

[454] *Id.*

[455] *Fox* Counterclaim, at ¶54.

[456] *Id.* at 68.

[457] Ex. 26, at 1-3.

[458] On August 5, 2019, MiMedx announced that Haden would resign from her position as General Counsel and Secretary of the Company, effective August 12, 2019.

[459] *See* Ex. 31.

provided additional detail about the Company's fraudulent revenue recognition scheme.[460] Moreover, Haden knew from conversations with former employees of issues with the Company's commercial distributors and improper sales practices that were resulting in complaints from hospitals.[461] Haden ultimately resigned from the Company effective August 12, 2019.

- **<u>Michael Carlton, Senior Vice President of Global Sales</u>**: Carlton testified that AvKARE was not an independent distributor with its own sales force, but instead, AvKARE made it easier for MiMedx to sell products. In response to push-back Carlton received regarding his channel stuffing directives from Area Vice President Fox, Carlton demoted Fox to a position that did not require meeting sales quotas or impact the Company's quarterly revenue projections.[462] Carlton also managed the accounts of the Company's Master Distributors ("house accounts"), CPM and SLR, and participated in quarter-end meetings at the Company's headquarters to discuss methods to achieve the Company's revenue forecasts.

- **<u>Mark Diaz, Executive Vice President of Sales Operations</u>**: Diaz directed senior sales managers to significantly increase the amount of MiMedx product shipped to VAs through AvKARE.[463] This enabled MiMedx to book increased revenue during the current quarter when numbers were not meeting the Company's expectations. Diaz received numerous objections from his subordinate Fox in response to the Company's aggressive channel stuffing through AvKARE and, in 2015, admitted during conversations with Roselli and other Area Vice Presidents that the AvKARE revenue did not reflect actual

---

[460] *Id.*

[461] *Id.*

[462] *Fox* Counterclaim, at ¶47.

[463] *Id.* at ¶56.

sales.[464] Along with Cashman, Diaz orchestrated the Limb Salvage Initiative, which involved channel stuffing deliveries of shoebox-sized shipments of 7x7 cm EpiFix to targeted VAs.[465] In addition, Diaz participated in quarter-end meetings at the Company's headquarters to discuss methods to achieve the Company's revenue forecasts.

- **Kevin Lilly, Senior Vice President of Sales**: Lilly participated in discussions with Cashman, Diaz, and Roselli regarding the orchestration of the Limb Salvage Initiative and was involved in discussions with Fox regarding his concern over shipping products that historically no one uses.[466] Lilly also had knowledge through his discussions with the accounting and finance department, as well as several members of senior management, about the decision not to pay Kruchoski and Tornquist their growth commissions, because the sales to the Minneapolis VA at issue had already been recognized when the product was originally shipped. Moreover, Lilly participated in quarter-end meetings at the Company's headquarters to discuss methods to achieve the Company's revenue forecasts, and an emergency meeting with MiMedx leadership at the Company's headquarters wherein Petit discussed the allegations raised by Kruchoski and Tornquist concerning the Company's fraudulent channel stuffing scheme.

- **Matt Bloemer, Government Market Development Manager**: Matt Bloemer ("Bloemer") called Regional Sales Directors such as Kruchoski, during December 2015, following a "company directive" to stuff channels, to determine how much product MiMedx could place on VA hospital shelves before the end of the month.[467] Bloemer, who was fully aware of concerns of

---

[464] *Id*. at ¶57.

[465] *Id*.

[466] *Id*. at ¶57.

[467] *Fox* Counterclaim, at ¶150.

channel stuffing, stated that the purpose of this request was that MiMedx was "way behind" on its projected revenue.[468] Bloemer further communicated to Kruchoski that upper management was unwilling to put requests encouraging channel stuffing in writing due to their knowledge that the practices were improper.

- **Steve Blocker, Area Vice President for the Central Area**: Blocker communicated with Kruchoski regarding Kruchoski's concerns that MiMedx was aggressively stuffing channels and the similarities between the practices occurring at MiMedx and its competitor Osiris which was sued by the DOJ and SEC for inflating its revenue.[469] While at the same time recognizing that MiMedx products were already "spilling out of every cabinet" at VA hospitals, Blocker pressured his MiMedx subordinates to meet aggressive sales demands and to put as much MiMedx product as possible on VA shelves.[470] Blocker communicated directly with Cashman about the high levels of inventory already at the hospitals, which was preventing sales representatives from reaching the projected sales numbers, and knew that hospitals were issuing warnings not to send additional products.[471] Further, Blocker admitted during telephone calls with Kruchoski that the Company's reported revenue through AvKARE was not accurate but was "built on false growth" created by channel stuffing. Blocker also acknowledged the existence of consequences for failing to hit numbers.[472]

363. Thus, in addition to the Individual Defendants, numerous other high-level MiMedx employees were complicit in, and had knowledge of, or recklessly

[468] *Kruchoski* Counterclaim, at ¶49.

[469] *Fox* Counterclaim, at ¶55.

[470] *See id*. at ¶54.

[471] *Id*.

[472] *Id*. at ¶55.

disregarded, materially false and misleading statements and omissions concerning the Company's pervasive accounting fraud, channel stuffing, kickbacks, and other improper sales and distribution practices. The wrongdoing alleged herein did not constitute single acts of low-level employees, but rather, ongoing methods of doing business throughout MiMedx, from the top to the bottom of the corporate structure.

364. The inappropriate tone at the top created by Defendants is also evident from the magnitude and multi-faceted nature of the fraud, which permeated the Company's entire enterprise and went unchecked for nearly six years, leading to the Restatement, multiple government investigations, and civil and criminal fraud charges by the U.S. government. Because the Individual Defendants created, encouraged and enforced the inappropriate tone and fraudulent culture where internal controls were nonexistent and ethics and compliance were trampled, they were complicit in or at the very least severely reckless in not knowing of the illicit sales and business practices that they fostered at MiMedx.

### D. The Individual Defendants' Own Statements Support Scienter

365. As detailed above in Sections VI and VIII, during the Class Period, Petit, Taylor, and Senken each made statements in which they discussed matters related to the alleged fraud. Many of these statements were made publicly, during conference calls with the Company's investors and securities analysts, including

quarterly earnings calls, in which the Individual Defendants offered prepared statements and responded to detailed questions, and in numerous Company press releases, SEC filings, and shareholder letters. Matters discussed publicly by the Individual Defendants included: (a) MiMedx's compliance with accounting, ethical, and legal standards; (b) the Company's use of and relationships with its distributors; (c) the Company's "impressive and "sustainable" growth profile; (d) denials and pushback to allegations of financial fraud and corporate malfeasance; (e) the Company's responses to regulatory inquiries; (f) the results of ACII; and (g) Defendants' understanding of accounting, including the rules related to revenue recognition.[473] By making these statements, the Individual Defendants conveyed that they had investigated and analyzed the matters on which they spoke, and had direct personal knowledge of such matters. To the extent they did not have such knowledge, they were reckless in making such statements.

366. Through their public statements, the Individual Defendants conveyed a fixation on increasing sales and revenue growth and beating financial guidance during the Class Period, and consistently trumpeted these metrics to the market.[474]

---

[473] *See* Sections VI, VIII (specifying statements by the Individual Defendants and the dates and sources of those statements).

[474] *See* Section VIII.A.

Petit, for example, touted the Company's "record revenue" each quarter.[475] These statements support the Individual Defendants' direct knowledge of such matters, as well as their motive to engage in channel stuffing and other improper sales and accounting practices necessary to achieve financial objectives, and in turn maintain a positive market perception and keep the Company's stock price artificially inflated.

367. The Individual Defendants' statements also demonstrated an understanding of accounting rules and principles, including the rules governing revenue recognition. For example, Petit and Taylor prepared an e-mail to Cherry Bekaert on February 4, 2016, regarding Andersen's concerns about revenue recognition issues at MiMedx.[476] The e-mail noted in part: "Company leadership has been managing public companies for 34 years with an impeccable track record of building strong internal controls. Management is fully aware of the rules regarding revenue recognition."[477] Consistent with this statement, Senken later confirmed to criminal authorities that "[Petit] understood the rev[enue] rec[ognition] criteria [because] he made it clear he understood it."[478]

---

[475] *See id.*

[476] *See Petit/Taylor* Indictment, at ¶¶12, 42, 52; Ex. 6, at 6.

[477] *See id.*

[478] Ex. 11, at 20.

368. Similarly, on or about March 29, 2016, after news came out about inappropriate revenue recognition practices of a MiMedx competitor, Taylor circulated a memo to the MiMedx sales force, edited by both Petit and Taylor.[479] The memo stated: "The key accounting question related to revenue recognition is when revenue can be recognized, at shipment or at payment."[480] Taylor also observed the requirements for revenue recognition at the time of shipment, including that the price be "fixed and determinable, and the invoice is collectable. . . . This means that the customer does not have a right to return the product and there is a reasonable expectation that we will be paid within a determinable period of time."[481]

**E. The Individual Defendants' Compensation Incentivized Their Fraud**

369. The Individual Defendants were incentivized to commit the fraudulent acts alleged herein by the Company's compensation structure for its executives and senior management. As the SEC observed, Petit, Taylor, and Senken "obtained salary, bonus cash payments, and equity compensation from MiMedx. . . . influenced

[479] *See Petit/Taylor* Indictment, at ¶12.

[480] *See id.*

[481] *See id.*; *see also* Ex. 6, at 6.

by MiMedx's misstated financial performance, including revenue" from approximately 2013 to 2018.[482]

370. For example, in the Company's April 12, 2016 proxy form filed with the SEC, the Company disclosed that Petit's, Senken's, and Taylor's compensation packages were each split into three components: (a) base salary; (b) annual cash incentives; and (c) long-term equity incentives. Annual cash incentives for Petit, Senken, and Taylor were determined by the Company's Management Incentive Plan ("MIP"), which was "designed to incentivize and reward achievement of the current year's financial and operational goals."[483] The 2015 MIP, for example, provided that cash incentive bonuses would be earned dependent on several variables, each of which was measured on a sliding scale: (a) adjusted EBITDA, which depended on whether the Company hit adjusted EBITDA targets set by its Board and was weighted at 10% of the bonus; (b) revenue performance, which depended on whether revenue targets were hit and was weighted at ***80%*** of the bonus; and (c) individual objectives, which were key operational measures and/or milestone outcomes specific to the individual's position, and were weighted at 10% of the bonus. Additionally,

---

[482] SEC Complaint, at ¶264.

[483] MiMedx Group, Inc., Other Definitive Proxy Statements (Form Def 14A) (Apr. 12, 2016).

if the adjusted EBITDA threshold and revenue targets were ***both*** achieved, Defendants could earn additional "Excess" bonuses.

371. For Petit, Taylor, and Senken, their 2015 cash bonuses, which were based on the exact same inflated financial metrics that are subject to this action, constituted ***92%, 87%, and 72% of their 2015 salaries***, respectively.[484] These individuals collectively earned ***millions*** in incentive payments during the Class Period for sham financial achievements.

372. Therefore, it is no surprise that in September 2018 the Board of Directors decided to take "all required action" to cause the forfeiture of any outstanding equity and cash incentive awards held by Petit, Taylor, and Senken, and to claw back certain compensation previously paid to these individuals, based on "findings that [Petit, Taylor, and Senken] engaged in among other things, conduct detrimental to the business or reputation of the Company."[485] The forfeiture and

[484] Petit's, Taylor's, and Senken's cash incentives in 2013 and 2014 were similarly substantial percentages of their salaries: Petit received ***113%*** of his salary, plus an additional $400,000 "discretionary" bonus in 2014 and 63% in 2013; Taylor received ***113% of his salary*** in 2014 and 62% in 2013; and Senken received 82% of his salary in 2014 and 45% in 2013.

[485] Similarly, the relief requested in the SEC Complaint included "disgorgement of all ill-gotten gains . . . together with prejudgment interest" and an "[o]rder that Petit and Senken reimburse MiMedx for all bonuses, incentive-based and equity-based compensation pursuant to Section 304 of the Sarbanes-Oxley Act of 2002 [15 U.S.C. § 7243(a)]" while the *Petit/Taylor* Indictment stated that Petit and Taylor "shall

clawback of Petit's, Taylor's, and Senken's incentive compensation were significant because such compensation formed a majority of their total annual compensation. Further, the forfeiture and clawback tied directly to the Company's false revenues, which were performance measures from which the incentive compensation was based. Acknowledging this connection, the Company stated that prior incentive compensation "may be based on inaccurate financial information" and decided "[a]fter the resignations of Messrs. Petit, Taylor and Senken . . . to revise the structure of [the Company's non-equity incentive] awards to deemphasize revenue" as a performance measure going forward.

373. Moreover, that Petit, Taylor, and Senken received a substantial portion of their pay in equity incentives also incentivized them to inflate the stock price as much as possible. For example, in 2014, Petit, Taylor, and Senken received approximately 59%, 53%, and 44% of their compensation in "long term" equity grants, respectively. Yet on the Company's April 25, 2014 earnings call, Petit stated that: "[a]lso [I] want you to keep in mind that MiMedx is a type of corporate entity that at some point will become part of a large health care organization. There will

---

forfeit to the United States . . . all property, real and personal, that constitutes or is derived from proceeds traceable to the commission of [their] offenses." SEC Complaint, at ¶10 & 83; *Petit/Taylor* Indictment, at ¶69.

be a point where some corporate entity makes our board of directors an offer we cannot refuse." Plainly, Petit and the other Individual Defendants expected during the Class Period that the Company would be acquired, and that they would not be required to hold their MiMedx shares long-term.[486] Accordingly, the Individual Defendants were incentivized to maintain short-term inflation in MiMedx's stock price to ensure they received the highest possible payout for their shares when MiMedx was acquired.

### F. Petit's Additional Misconduct Further Supports His Scienter

374. Petit's scienter is further supported by his conduct prior to the Class Period, in which he engaged in practices similar to those alleged herein. Prior to his MiMedx appointment in February 2009, Petit had a troubled history of building health care companies that grew rapidly, but ultimately came under governmental scrutiny under his leadership. In an article regarding Petit's background, *Bloomberg* described Petit as "***a hard-charging leader – one who didn't dwell on the rules as he pursued revenue growth***," according to about a dozen current and former

---

[486] Taylor further profited from the fraud by selling shares of his personal MiMedx stock at inflated prices. *See* SEC Complaint, at ¶¶263, 265. Taylor's sales proceeds totaled $7.98 million during the Class Period.

executives and employees of Petit's companies.[487] The same approach carried over to MiMedx, as the market has learned.

375. In 1987, the SEC sued Healthdyne, a company founded and led by Petit as chairman.[488] The SEC alleged that Healthdyne improperly recognized revenue in violation of GAAP, and made material misrepresentations and omissions in its public filings concerning revenues, earnings, and product issues.[489] The suit was based on information from former Healthdyne employees, including Healthdyne's former president, who was terminated after expressing his concerns.[490] In 1987, Healthdyne signed a consent decree to settle the case with the SEC.[491]

376. Petit's fraudulent conduct continued at his next company, Matria. In 1995, Healthdyne was split into three companies, one of which merged with another firm to form Matria.[492] Petit served as Matria's chairman from 1996 to 2008, and its president and CEO from 2000 to 2008. In 2006, Matria was sued by the DOJ for

---

[487] Anders Melin, *Federal Probes at MiMedx Carry a Familiar Ring for CEO*, BLOOMBERG (June 11, 2018).

[488] *See id.*

[489] *See id.*

[490] *See id.*

[491] *See id.*

[492] *See id.*

shipping products that had not been ordered, falsifying records, and overbilling Medicare.[493] The DOJ settled with Matria for $9 million in 2006.[494]

377. In addition to this prior history of fraud, while at MiMedx, Petit personally orchestrated the hiring of several employees from a major competitor engaged in fraud. In 2012, the Company hired these employees from a company called ABH and its parent company, Shire. Just a year earlier, in 2011, the DOJ had initiated an investigation into ABH for the unlawful inducement of clinics and doctors to use its products. Indeed, the very employees that Petit was courting for MiMedx were tainted by past fraudulent conduct including illicit bribery and kickback practices. The DOJ's investigation should have raised a red flag into their hiring causing the Individual Defendants to look into the allegations alleged against ABH and confirm that such conduct would not occur at MiMedx.

378. On January 11, 2017, the DOJ announced that Shire had agreed to pay $350 million to settle federal and state FCA allegations concerning ABH. This was the largest FCA settlement in history against a medical device company and should have raised additional red flags for MiMedx about its sales and distribution practices.

---

[493] *See id.*

[494] *See id.* Around the same timeframe, 2001 to 2008, Taylor was employed as President and CEO of a Matria subsidiary, Facet Technologies, LLC.

The allegations, which stemmed from six whistleblower (*qui tam*) lawsuits in which the DOJ intervened, were strikingly similar to key aspects of MiMedx's fraudulent scheme alleged herein, including illegal "kickbacks and other unlawful methods to induce clinics and physicians to use or overuse its product Dermagraft."

379. Petit's scienter is further supported by the USPIS's discovery of an alleged insider trading scheme in which Petit tipped off a MiMedx shareholder with inside information, allowing the shareholder to illegally profit before the Company's precipitous stock price decline on February 20, 2018 (discussed above). Specifically, the USPIS found probable cause to believe that the shareholder:

> engaged in the Insider Trading Scheme by converting material non-public ("MNPI") that PETE PETIT had obtained by virtue of his employment at Mimedx to their own use for personal gain. Through that trading, among other things, the [redacted name of shareholder] avoided at least approximately $2 million in losses by selling MiMedx stock from in and around late January to late February 2018, shortly before the MiMedx [sic] announced a delay in the release of its 10-K filing, which caused an approximately 36 percent decrease in the stock price.[495]

380. The USPIS also found that Petit lied to the Financial Industry Regulatory Authority (FINRA) when questioned about the above stock sales, and that Petit's iMessages with the shareholder "appear to have been deleted by PETE

[495] Ex. 10, at ¶15; *see also id*. at ¶¶18-20 (further detailing the scheme).

PETIT, along with dozens of other iMessages that had been stored on PETE PETIT's [C]ompany-issued phone, at some time before that phone was returned to the Company in or about August 2018."[496]

## X. THE MIMEDX DEFENDANTS' GAAP VIOLATIONS, ACCOUNTING RESTATEMENT, INEFFECTIVE INTERNAL CONTROLS, AND MATERIALLY FALSE AND MISLEADING FINANCIAL STATEMENTS

### A. MiMedx's Reported Financial Results Were False and Not Prepared in Accordance with GAAP

381. The Company has admitted that Defendants' channel stuffing and improper revenue recognition scheme violated GAAP,[497] SEC reporting rules, and SOX during the Class Period.

---

[496] *Id.* at ¶21.

[497] GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practice at a particular time. SEC Regulation S-X, 17 C.F.R. §210.4-01(a)(1) ("Regulation S-X") states that financial statements filed with the SEC that are not prepared in compliance with GAAP are presumed to be misleading and inaccurate, despite footnotes and other disclosures. Regulation S-X requires that interim financial statements must also comply with GAAP, with the exception that interim financial statements need not include disclosures that would be duplicative of disclosures accompanying annual disclosures, pursuant to 17 C.F.R. §210.10-01(a). On June 30, 2009, the FASB issued the Statement of Financial Accounting Standards No. 168, *The FASB Accounting Standards Codification and the Hierarchy of Generally Accepted Accounting Principles – a replacement of FASB Statement No. 162*. FASB Accounting Standards Codification ("ASC") became the source of authoritative U.S. accounting and reporting standards for nongovernmental entities, in addition to guidance issued by the SEC, effective for financial statements issued for reporting

382. On June 7, 2018, MiMedx issued a Form 8-K announcing that its previously issued consolidated financial statements and financial information relating to each of the fiscal years ended December 31, 2012, 2013, 2014, 2015, and 2016, and each of the interim periods within such years, along with the unaudited condensed consolidated financial statements included in the Company's Forms 10-Q for the quarters ended March 31, 2017; June 30, 2017; and September 30, 2017 (collectively, "Non-Reliance Periods"), ***should be restated*** – an acknowledgement that the information in the original filings was false and needed to be corrected. Investors were instructed to ***no longer rely upon*** any consolidated financial statements and other financial information, press releases, investor presentations, or other communications related to financial disclosures concerning the Non-Reliance Periods. The Company also stated that all communications and financial information with respect to 4Q17 and 1Q18 should no longer be relied upon and withdrew all prior financial guidance issued for 2018.

383. Further, during ACIII and in connection with the Restatement, MiMedx determined that almost every financial account presented on its balance sheets and income statements during the Class Period, as well as adjusted EBITDA, were

---

periods that ended after September 15, 2009. The ASC did not change existing U.S. GAAP.

materially misstated, including, but not limited to the following: (a) net sales; (b) cost of sales; (c) gross profit; (d) SG&A expense; (e) R&D expense; (f) operating income; (g) income before taxes; (h) income taxes; (i) net income; (j) EPS; (k) adjusted EBITDA; (l) cash; (m) accounts receivables; (n) reserves related to accounts receivable; (o) prepaid expenses; (p) other current assets; (q) returns allowance; (r) inventories; (s) reserves related to inventories; (t) accounts payable; (u) accrued expenses; (v) accumulated deficit; and (w) other financial items. The Company's reported DSOs were also necessarily misstated because the two accounts used to calculate the DSOs – sales and accounts receivable – were false.

384. For example, on May 31, 2019, the Company filed a proxy statement in advance of its 2018 annual meeting disclosing, among other things, that the Restatement would impact numerous aspects of the Company's income statements and balance sheets during the Non-Reliance Periods including, but not limited to, the following:

- revenue recognition;
- the presentation of gross revenue and net revenue and certain expenses related to discounts, returns or allowances, such as GPO fees and agency, consulting, and speaker arrangements;
- the impact of changes in revenue recognition on cost of goods sold and commissions;

- the timing of certain general and administrative expense recognition;
- the impact on losses associated with contingency exposures;
- the impact of the above on income tax;
- changes in the amount of reported cash, due to the timing of certain cash collections;
- changes to reported accounts receivable and inventory and the related reserves on each, due to the restatement of revenue recognition;
- accrual balances that are impacted by the expense and contingency determinations discussed above; and
- the related income tax effects of the above.

385. Then, on March 17, 2020, after more than a two-year delay, MiMedx filed its delayed Form 10-K that included the Company's Restatement. Notably, the 2018 Form 10-K was for the year ended December 31, 2018, even though MiMedx never filed, and does not intend to file a Form 10-K for the year ended December 31, 2017. The 2018 Form 10-K included audited financial statements for the years ended December 31, 2018 and 2017, and restated financial statements for the year ended December 31, 2016.[498] In addition, the 2018 Form 10-K included selected

[498] The 2018 Form 10-K also provided restated selected quarterly financial data (unaudited) for 1Q17, second quarter 2017 ("2Q17"), and 3Q17. *See* Ex. 1, at F-48-F-49.

unaudited consolidated financial data that has been restated for the years ended December 31, 2015 and 2014. Finally, for all Restatement adjustments prior to 2014, MiMedx made a cumulative restatement adjustment of ($16.8) million to the opening balance of accumulated deficit in the Company's statement of stockholders' equity as of December 31, 2013. Consistent with the Restatement adjustments for fiscal year 2014 ("FY14") through FY16, the Restatement adjustment of ($16.8) million for years prior to 2014 was primarily due to Defendants' revenue recognition violations.

386. As discussed further below, the Restatement confirmed that Defendants materially misstated the Company's financial results throughout the Class Period, including key financial metrics such as revenues, net income, and EPS. In addition, MiMedx admitted in the 2018 Form 10-K that its revenue recognition fraud was so egregious, the Company should have delayed revenue recognition on ***all distributor and customer sales beginning from January 1, 2012*** until payment was received from the respective distributor or customer (*i.e.*, cash collection method of accounting).[499]

---

[499] *Id.* at F-27.

387. As such, MiMedx has admitted that the financial results it reported in its Forms 10-K[500] and 10-Q[501] and related earnings releases on Forms 8-K[502] filed with the SEC were false and misleading. These filings represented that the financial information contained therein fairly stated the Company's financial results and that the results were prepared in accordance with GAAP. As admitted through the

[500] These included the Company's Forms 10-K for fiscal years 2012 (filed March 15, 2013); 2013 (filed March 4, 2014); 2014 (filed March 13, 2015); 2015 (filed February 29, 2016); and 2016 (filed March 1, 2017). The Forms 10-K were signed by Petit, Senken, and Taylor.

[501] These included the Company's Forms 10-Q for fiscal quarters in 2013 (1Q13 filed May 10, 2013, second quarter 2013 ("2Q13") filed August 8, 2013, third quarter 2013 ("3Q13") filed November 8, 2013); 2014 (first quarter 2014 ("1Q14") filed May 12, 2014, second quarter 2014 ("2Q14") filed August 11, 2014, 3Q14 filed November 10, 2014); 2015 (first quarter 2015 ("1Q15") filed May 1, 2015, 2Q15 filed August 7, 2015, 3Q15 filed November 6, 2015); 2016 (1Q16 filed May 10, 2016, second quarter 2016 ("2Q16") filed August 2, 2016, third quarter 2016 ("3Q16") filed November 8, 2016); and 2017 (1Q17 filed May 1, 2017, 2Q17 filed July 31, 2017, 3Q17 filed October 31, 2017). The Forms 10-Q were signed by Senken.

[502] These included the Company's Forms 8-K for fiscal quarters in 2012 (fourth quarter 2012 filed March 7, 2013); 2013 (1Q13 filed May 1, 2013, 2Q13 filed July 31, 2013, 3Q13 filed October 30, 2013, fourth quarter 2013 filed February 26, 2014); 2014 (1Q14 filed April 25, 2014, 2Q14 filed July 28, 2014, 3Q14 filed October 30, 2014, fourth quarter 2014 filed February 26, 2015); 2015 (1Q15 filed April 28, 2015, 2Q15 filed July 30, 2015, 3Q15 filed October 29, 2015, 4Q15 filed February 23, 2016); 2016 (1Q16 filed April 25, 2016, 2Q16 filed July 26, 2016, 3Q16 filed October 27, 2016, fourth quarter 2016 filed February 23, 2017); and 2017 (1Q17 filed April 28, 2017, 2Q17 filed July 26, 2017, 3Q17 filed October 26, 2017). The Forms 8-K were signed by Senken.

Restatement, these representations were false and misleading as the financial results were not fairly stated and were not prepared in accordance with GAAP. For example, the Forms 10-K issued during the Class Period made the following or virtually identical statements:

> The discussion and analysis of our financial condition and results of operations are based on our financial statements, ***which have been prepared in accordance with U.S. generally accepted accounting principles***.

388. Similarly, the Forms 10-Q issued during the Class Period made the following or virtually identical false statements:

> The accompanying unaudited condensed consolidated financial statements ***have been prepared in accordance with accounting principles generally accepted in the United States of America ("GAAP")*** . . . . In the opinion of management, all adjustments (consisting of normal recurring accruals) considered necessary for a ***fair presentation of the results of operations for the periods presented have been included***.

389. The Company's false and misleading financial results issued during the Class Period in Forms 10-K and 10-Q and related earnings releases are summarized in the tables below:

| ($ in Thousands, Except Per Share Data) | Net Sales | Cost of Sales | Gross Margin | SG&A Expense | R&D Expense | Operating Income (Loss) | Income (Loss) Before Income Tax Provision | Income Tax (Provision) Benefit | Net Income (Loss) | Diluted Earnings Per Share | Adjusted EBITDA |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **4Q 2012** | $ 10,509 | $ 1,689 | $ 8,820 | $ 8,409 | $ 1,136 | $ (972) | $ (1,605) | $ - | $ (1,605) | $ (0.02) | $ 431 |
| **FY 2012** | **$ 27,054** | **$ 5,188** | **$ 21,865** | **$ 20,971** | **$ 2,885** | **$ (5,355)** | **$ (7,662)** | **$ -** | **$ (7,662)** | **$ (0.09)** | **$ 2,394** |
| **1Q 2013** | $ 11,556 | $ 1,905 | $ 9,651 | $ 8,369 | $ 1,247 | $ (227) | $ (1,570) | $ (50) | $ (1,620) | $ (0.02) | $ 1,119 |
| **2Q 2013** | $ 13,515 | $ 2,198 | $ 11,316 | $ 10,868 | $ 924 | $ (744) | $ (757) | $ - | $ (757) | $ (0.01) | $ 1,165 |
| **3Q 2013** | $ 16,116 | $ 2,113 | $ 14,002 | $ 12,711 | $ 1,287 | $ (256) | $ (260) | $ (47) | $ (307) | $ - | $ 1,856 |
| **4Q 2013** | $ 17,994 | $ 3,111 | $ 14,883 | $ 14,277 | $ 1,385 | $ (1,412) | $ (1,424) | $ (3) | $ (1,427) | $ (0.01) | $ 1,327 |
| **FY 2013** | **$ 59,181** | **$ 9,328** | **$ 49,853** | **$ 46,226** | **$ 4,843** | **$ (2,639)** | **$ (4,012)** | **$ (100)** | **$ (4,112)** | **$ (0.04)** | **$ 5,467** |
| **1Q 2014** | $ 19,559 | $ 2,977 | $ 16,582 | $ 15,852 | $ 1,390 | $ (891) | $ (912) | $ (10) | $ (922) | $ (0.01) | $ 1,976 |
| **2Q 2014** | $ 25,573 | $ 2,740 | $ 22,833 | $ 21,193 | $ 1,800 | $ (392) | $ (400) | $ 10 | $ (390) | $ - | $ 2,894 |
| **3Q 2014** | $ 33,518 | $ 3,348 | $ 30,170 | $ 24,192 | $ 2,014 | $ 3,731 | $ 3,722 | $ (22) | $ 3,700 | $ 0.03 | $ 7,298 |
| **4Q 2014** | $ 39,573 | $ 3,600 | $ 35,973 | $ 29,243 | $ 1,846 | $ 4,652 | $ 4,642 | $ (810) | $ 3,832 | $ 0.03 | $ 8,510 |
| **FY 2014** | **$118,223** | **$12,665** | **$105,558** | **$ 90,480** | **$ 7,050** | **$ 7,100** | **$ 7,052** | **$ (832)** | **$ 6,220** | **$ 0.05** | **$ 20,678** |
| **1Q 2015** | $ 40,767 | $ 5,148 | $ 35,619 | $ 29,308 | $ 1,831 | $ 4,247 | $ 4,233 | $ (146) | $ 4,087 | $ 0.04 | $ 8,767 |
| **2Q 2015** | $ 45,679 | $ 5,089 | $ 40,590 | $ 32,651 | $ 2,054 | $ 5,652 | $ 5,653 | $ (223) | $ 5,430 | $ 0.05 | $ 10,562 |
| **3Q 2015** | $ 49,015 | $ 4,979 | $ 44,036 | $ 34,901 | $ 2,187 | $ 6,714 | $ 6,709 | $ (158) | $ 6,551 | $ 0.06 | $ 11,796 |
| **4Q 2015** | $ 51,835 | $ 4,986 | $ 46,849 | $ 36,524 | $ 2,341 | $ 7,751 | $ 7,683 | $ 5,695 | $13,378 | $ 0.12 | $ 12,867 |
| **FY 2015** | **$187,296** | **$20,202** | **$167,094** | **$133,384** | **$ 8,413** | **$ 24,364** | **$ 24,278** | **$ 5,168** | **$29,446** | **$ 0.26** | **$ 43,992** |
| **1Q 2016** | $ 53,367 | $ 7,946 | $ 45,421 | $ 40,648 | $ 2,496 | $ 1,467 | $ 1,411 | $ (214) | $ 1,197 | $ 0.01 | $ 9,073 |
| **2Q 2016** | $ 57,342 | $ 7,394 | $ 49,948 | $ 42,772 | $ 3,168 | $ 3,561 | $ 3,450 | $ (1,475) | $ 1,975 | $ 0.02 | $ 10,073 |
| **3Q 2016** | $ 64,429 | $ 7,997 | $ 56,432 | $ 48,179 | $ 2,919 | $ 4,703 | $ 4,616 | $ (1,295) | $ 3,321 | $ 0.03 | $ 11,357 |
| **4Q 2016** | $ 69,877 | $ 9,070 | $ 60,807 | $ 48,398 | $ 3,455 | $ 8,715 | $ 8,630 | $ (3,149) | $ 5,481 | $ 0.05 | $ 13,902 |
| **FY 2016** | **$245,015** | **$32,407** | **$212,608** | **$179,997** | **$ 12,038** | **$ 18,446** | **$ 18,107** | **$ (6,133)** | **$11,974** | **$ 0.11** | **$ 44,405** |
| **1Q 2017** | $ 72,607 | $ 8,743 | $ 63,864 | $ 52,951 | $ 4,202 | $ 6,185 | $ 6,040 | $ (1,713) | $ 4,327 | $ 0.04 | $ 12,403 |
| **2Q 2017** | $ 76,412 | $ 8,631 | $ 67,781 | $ 55,314 | $ 4,747 | $ 7,213 | $ 7,064 | $ 1,005 | $ 8,069 | $ 0.07 | $ 14,168 |
| **3Q 2017** | $ 84,573 | $ 9,599 | $ 74,974 | $ 60,233 | $ 5,481 | $ 8,842 | $ 13,073 | $ 4,384 | $17,457 | $ 0.15 | $ 15,629 |

| ($ in Thousands, Except Days Sales Outstanding) | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | Cash | Accounts Receivable, Net | Allowance for Doubtful Accounts | Allowance for Product Returns | Allowance for Obsolescence | Inventory, Net | Prepaid Expenses and Other Current Assets | Accounts Payable | Accrued Expenses | Accumulated Deficit | Days Sales Outstanding |
| **4Q 2012** | $ 6,754 | $ 7,654 | $ 49 | $ 89 | $ 159 | $ 3,023 | $ 658 | $ 1,252 | $ 991 | $ (69,684) | 65 |
| **FY 2012** | **$ 6,754** | **$ 7,654** | **$ 49** | **$ 89** | **$ 159** | **$ 3,023** | **$ 658** | **$ 1,252** | **$ 991** | **$ (69,684)** | |
| **1Q 2013** | $ 5,725 | $ 9,822 | $ 76 | $ 112 | $ 184 | $ 3,956 | $ 1,186 | $ 1,057 | $ 1,227 | $ (71,304) | 76 |
| **2Q 2013** | $ 4,194 | $ 11,762 | $ 44 | $ 162 | $ 242 | $ 4,220 | $ 1,352 | $ 1,838 | $ 1,076 | $ (72,062) | 79 |
| **3Q 2013** | $ 6,062 | $ 13,707 | $ 115 | $ 187 | $ 373 | $ 4,533 | $ 1,544 | $ 2,206 | $ 1,410 | $ (72,369) | 78 |
| **4Q 2013** | $ 44,078 | $ 16,093 | $ 407 | $ 215 | $ 322 | $ 3,881 | $ 1,337 | $ 2,491 | $ 1,406 | $ (73,796) | 82 |
| **FY 2013** | **$ 44,078** | **$ 16,093** | **$ 407** | **$ 215** | $ 322 | **$ 3,881** | **$ 1,337** | **$ 2,491** | **$ 1,406** | **$ (73,796)** | |
| **1Q 2014** | $ 43,020 | $ 18,967 | $ 526 | $ 305 | $ 323 | $ 3,639 | $ 2,279 | $ 2,617 | $ 1,369 | $ (74,718) | 87 |
| **2Q 2014** | $ 39,245 | $ 20,500 | $ 678 | $ 270 | $ 352 | $ 4,229 | $ 2,326 | $ 2,446 | $ 1,138 | $ (75,108) | 72 |
| **3Q 2014** | $ 47,253 | $ 23,304 | $ 1,201 | $ 677 | $ 425 | $ 4,739 | $ 1,968 | $ 2,759 | $ 1,990 | $ (71,408) | 63 |
| **4Q 2014** | $ 46,582 | $ 26,672 | $ 1,750 | $ 841 | $ 527 | $ 5,133 | $ 1,540 | $ 3,661 | $ 2,504 | $ (67,575) | 61 |
| **FY 2014** | **$ 46,582** | **$ 26,672** | **$ 1,750** | **$ 841** | **$ 527** | **$ 5,133** | **$ 1,540** | **$ 3,661** | **$ 2,504** | **$ (67,575)** | |
| **1Q 2015** | $ 38,696 | $ 31,001 | $ 2,010 | $ 944 | $ 552 | $ 4,248 | $ 2,341 | $ 5,379 | $ 3,615 | $ (63,488) | 68 |
| **2Q 2015** | $ 38,601 | $ 39,448 | $ 2,504 | $ 1,030 | $ 553 | $ 3,860 | $ 2,647 | $ 5,614 | $ 3,725 | $ (58,058) | 78 |
| **3Q 2015** | $ 41,073 | $ 46,778 | $ 3,132 | $ 1,529 | $ 693 | $ 5,653 | $ 2,741 | $ 7,244 | $ 4,097 | $ (51,507) | 86 |
| **4Q 2015** | $ 28,486 | $ 53,755 | $ 3,270 | $ 1,262 | $ 397 | $ 7,460 | $ 3,609 | $ 6,633 | $ 4,644 | $ (38,130) | 93 |
| **FY 2015** | **$ 28,486** | **$ 53,755** | **$ 3,270** | **$ 1,262** | **$ 397** | **$ 7,460** | **$ 3,609** | **$ 6,633** | **$ 4,644** | **$ (38,130)** | |
| **1Q 2016** | $ 15,117 | $ 53,882 | $ 3,872 | $ 1,651 | $ 604 | $ 17,967 | $ 5,774 | $ 13,059 | $ 5,137 | $ (36,933) | 91 |
| **2Q 2016** | $ 23,803 | $ 54,861 | $ 4,086 | $ 2,191 | $ 1,780 | $ 17,207 | $ 5,970 | $ 9,678 | $ 6,988 | $ (34,958) | 86 |
| **3Q 2016** | $ 18,338 | $ 63,427 | $ 4,350 | $ 2,262 | $ 708 | $ 18,313 | $ 6,212 | $ 11,162 | $ 6,664 | $ (31,637) | 89 |
| **4Q 2016** | $ 34,391 | $ 67,151 | $ 4,842 | $ 4,894 | $ 828 | $ 17,814 | $ 7,182 | $ 11,436 | $ 10,941 | $ (26,155) | 86 |
| **FY 2016** | **$ 34,391** | **$ 67,151** | **$ 4,842** | **$ 4,894** | **$ 828** | **$ 17,814** | **$ 7,182** | **$ 11,436** | **$ 10,941** | **$ (26,155)** | |
| **1Q 2017** | $ 30,924 | $ 66,846 | $ 6,769 | $ 5,037 | $ 974 | $ 16,050 | $ 8,078 | $ 10,892 | $ 9,940 | $ (21,828) | 83 |
| **2Q 2017** | $ 47,533 | $ 60,738 | $ 7,219 | $ 3,461 | $ 1,113 | $ 15,033 | $ 9,242 | $ 11,504 | $ 7,986 | $ (13,759) | 72 |
| **3Q 2017** | $ 36,522 | $ 59,581 | $ 6,960 | $ 3,479 | $ 989 | $ 10,419 | $ 7,588 | $ 8,767 | $ 8,613 | $ 3,698 | 65 |

390. The Company's Restatement of the above financials for all periods in the Class Period is an admission that these numbers were false when originally issued. Pursuant to GAAP, as set forth in ASC 250 – *Accounting Changes and Error Corrections*, restatement of previously issued financial statements is ***only*** allowed when a Company makes "[a]n error in recognition, measurement, presentation, or disclosure in financial statements resulting from mathematical mistakes, mistakes in the application of generally accepted accounting principles (GAAP), or oversight or misuse of facts that ***existed at the time the financial statements were prepared***."[503]

[503] ASC 250-10-20.

The Company has made clear that MiMedx's Restatement was not due to a change in reporting entity or a change in accounting principle, but rather to correct errors in previously issued financial statements that failed to comply with GAAP, despite being approved by Defendants.

### B. Defendants' Misstatements Were Material

391. The need to restate all financials reported during the Class Period demonstrates that the Company admits that the misstatements in the financials were material, as only ***materially*** misstated financial statements need to be corrected and reissued on a retroactive basis.[504] Indeed, the Restatement admits that Defendants prematurely recognized revenue on all sales during the Non-Reliance Periods, which totaled approximately $870 million of sales from 2012 through 3Q17, a clear indicator of materiality.

392. Further, as discussed below, one of the distributors MiMedx prematurely recognized revenue with was AvKARE, the Company's largest distributor. Revenue from AvKARE accounted for 40% of the Company's annual revenues in 2012, 56% in 2013, 34% in 2014, and 24% in 2015. Notably, MiMedx

[504] *See, e.g.*, ASC Topic 250, Accounting Changes and Error Corrections, SEC Topic 1-M, and SEC Staff Accounting Bulletin Topic 1-N, Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements.

reported more than $150 million in sales to AvKARE between 2012 and 2017. These amounts are also unquestionably material.

393. In addition, the Restatement results included in the Company's 2018 Form 10-K demonstrate quantitative materiality. The charts below summarize the financial impact of the Restatement on MiMedx's balance sheet and income statement accounts from FY14 through FY16 and on MiMedx's stockholders' equity as of December 31, 2013, which includes the FY12-FY13 Restatement adjustments:

**Restatement Adjustments to MiMedx's Balance Sheet as of December 31, 2016**[505]

| (in thousands) | As of December 31, 2016 | | |
|---|---|---|---|
| ASSETS | Previously Reported | Total Adjustments | Restated Amounts |
| Current assets: | | | |
| Cash and Cash Equivalents | $ 34,391 | $ (4,070) | $ 30,321 |
| Accounts Receivable, net | $ 67,151 | $ (65,224) | $ 1,927 |
| Inventory, net | $ 17,814 | $ (1,942) | $ 15,872 |
| Prepaid expenses | $ 5,894 | $ (4,056) | $ 1,838 |
| Other current assets | $ 1,288 | $ 8,228 | $ 9,516 |
| Total Current Assets | $ 126,538 | $ (67,064) | $ 59,474 |
| | | | |
| Property and Equipment, net | $ 13,786 | $ 199 | $ 13,985 |
| Goodwill | $ 20,203 | $ - | $ 20,203 |
| Intangible assets, net | $ 23,268 | $ (10) | $ 23,258 |
| Deferred tax asset, net | $ 9,114 | $ (9,114) | $ - |
| Other Assets | $ 354 | $ - | $ 354 |
| Total Assets | $ 193,263 | $ (75,989) | $ 117,274 |
| | | | |
| LIABILITIES AND STOCKHOLDERS EQUITY | | | |
| Current Liabilities: | | | |
| Accounts Payable | $ 11,436 | $ 976 | $ 12,412 |
| Accrued compensation | $ 12,365 | $ 326 | $ 12,691 |
| Accrued expenses | $ 10,941 | $ 8,266 | $ 19,207 |
| Current portion of earn out liability | $ 8,740 | $ (480) | $ 8,260 |
| Deferred tax liability, net | $ - | $ 1,129 | $ 1,129 |
| Income Taxes | $ 5,768 | $ (157) | $ 5,611 |
| Other current liabilities | $ 1,482 | $ - | $ 1,482 |
| Total current liabilities | $ 50,732 | $ 10,060 | $ 60,792 |
| | | | |
| Earn Out liability | $ 8,710 | $ (1,170) | $ 7,540 |
| Other liabilities | $ 821 | $ 54 | $ 875 |
| Total Liabilities | $ 60,263 | $ 8,944 | $ 69,207 |
| | | | |
| Stockholders' Equity | | | |
| Common Stock | $ 110 | $ - | $ 110 |
| Additional paid in capital | $ 161,261 | $ 220 | $ 161,481 |
| Treasury stock at cost | $ (2,216) | $ - | $ (2,216) |
| Accumulated deficit | $ (26,155) | $ (85,153) | $ (111,308) |
| Total stockholders equity | $ 133,000 | $ (84,933) | $ 48,067 |
| Total liabilities and stockholders' equity | $ 193,263 | $ (75,989) | $ 117,274 |

505 *See* Ex. 1, at F-24.

**Restatement Adjustments to MiMedx's Income Statement for the Year Ended December 31, 2016**[506]

| (in thousands except for per share information) | Year Ended December 31, 2016 | | | |
|---|---|---|---|---|
| | Previously Reported | Adjustments | Restated Amounts | % Misstated |
| Net Sales | $ 245,015 | $ (23,303) | $ 221,712 | -10% |
| Cost of sales | $ 32,407 | $ (1,469) | $ 30,938 | -5% |
| Gross Profit | $ 212,608 | $ (21,834) | $ 190,774 | -10% |
| | | | | |
| Operating Expenses: | | | | |
| SG&A Expense | $ 179,997 | $ (6,585) | $ 173,412 | -4% |
| R&D Expense | $ 12,038 | $ 2,303 | $ 14,341 | 19% |
| Amortization of intangible assets | $ 2,127 | $ 10 | $ 2,137 | 0% |
| Operating Income | $ 18,446 | $ (17,562) | $ 884 | -95% |
| | | | | |
| Other expense, net | $ (339) | $ - | $ (339) | |
| | | | | |
| Income before income tax provision | $ 18,107 | $ (17,562) | $ 545 | -97% |
| Income tax provision (expense) benefit | $ (6,133) | $ 5,978 | $ (155) | -97% |
| | | | | |
| Net Income | $ 11,974 | $ (11,584) | $ 390 | -97% |
| | | | | |
| Basic Earnings Per Share | $ 0.11 | $ (0.11) | $ - | -100% |
| Diluted Earnings Per Share | $ 0.11 | $ (0.11) | $ - | -100% |

506 *See id.* at F-21.

## Restatement Adjustments to MiMedx's Selected Balance Sheet Data as of December 31, 2015[507]

| (in thousands) | As of December 31, 2015 | | |
|---|---|---|---|
| Balance Sheet Data | Previously Reported | Total Adjustments | Restated Amounts |
| Cash and Cash Equivalents | $ 28,486 | $ (2,185) | $ 26,301 |
| Short Term Investments | $ 3,000 | $ - | $ 3,000 |
| Accounts Receivable, net | $ 53,755 | $ (53,755) | $ - |
| Inventory, net | $ 7,460 | $ - | $ 7,460 |
| Prepaid expenses | $ 3,609 | $ (2,664) | $ 945 |
| Other current assets | $ - | $ 7,260 | $ 7,260 |
| Total Current Assets | $ 96,310 | $ (51,344) | $ 44,966 |
| Total Assets | $ 135,913 | $ (66,353) | $ 69,560 |
| | | | |
| Accounts Payable | $ 6,633 | $ 354 | $ 6,987 |
| Accrued compensation | $ 15,034 | $ 242 | $ 15,276 |
| Accrued expenses | $ 4,644 | $ 5,035 | $ 9,679 |
| Deferred tax liability | $ - | $ 803 | $ 803 |
| Income Taxes | $ (67) | $ 477 | $ 410 |
| Other current liabilities | $ 533 | $ - | $ 533 |
| Total current liabilities | $ 26,777 | $ 6,911 | $ 33,688 |
| Long Term liabilities | $ 1,148 | $ - | $ 1,148 |
| | | | |
| Additional paid in capital | $ 163,133 | $ 305 | $ 163,438 |
| Accumulated deficit | $ (38,129) | $ (73,569) | $ (111,698) |
| Total stockholders equity | $ 107,988 | $ (73,264) | $ 34,724 |
| Total liabilities and stockholders' equity | $ 135,913 | $ (66,353) | $ 69,560 |
| Working Capital | $ 69,533 | $ (58,255) | $ 11,278 |

## Restatement Adjustments to MiMedx's Selected Income Statement Data for the Year Ended December 31, 2015[508]

| (in thousands except for per share information) | Year Ended December 31, 2015 | | | |
|---|---|---|---|---|
| Statement of Operations Data: | Previously Reported | Adjustments | Restated Amounts | % misstated |
| Net Sales | $ 187,296 | $ (34,165) | $ 153,131 | -18% |
| Gross Profit | $ 167,094 | $ (29,515) | $ 137,579 | -18% |
| Operating Income | $ 24,364 | $ (30,244) | $ (5,880) | -124% |
| Net income (loss) | $ 29,446 | $ (45,800) | $ (16,354) | -156% |
| Basic Earnings Per Share | $ 0.28 | $ (0.43) | $ (0.15) | -154% |
| Diluted Earnings Per Share | $ 0.26 | $ (0.40) | $ (0.14) | -154% |

---

507 *See id.* at 57.

508 *See id.* at 55.

**Restatement Adjustments to MiMedx's Selected Balance Sheet Data as of December 31, 2014**[509]

| (in thousands) | As of December 31, 2014 | | |
|---|---|---|---|
| Balance Sheet Data | Previously Reported | Total Adjustments | Restated Amounts |
| Cash and Cash Equivalents | $ 46,582 | $ (245) | $ 46,337 |
| Short Term Investments | $ 5,750 | $ - | $ 5,750 |
| Accounts Receivable, net | $ 26,672 | $ (26,672) | $ - |
| Inventory, net | $ 5,133 | $ - | $ 5,133 |
| Prepaid expenses | $ 1,540 | $ (408) | $ 1,132 |
| Other current assets | $ - | $ 2,527 | $ 2,527 |
| Total Current Assets | $ 85,677 | $ (24,798) | $ 60,879 |
| Total Assets | $ 109,259 | $ (24,910) | $ 84,349 |
| | | | |
| Accounts Payable | $ 3,661 | $ 247 | $ 3,908 |
| Accrued compensation | $ 11,523 | $ (59) | $ 11,464 |
| Accrued expenses | $ 2,504 | $ 2,289 | $ 4,793 |
| Deferred tax liability | $ - | $ 493 | $ 493 |
| Income Taxes | $ 452 | $ - | $ 452 |
| Other current liabilities | $ 264 | $ - | $ 264 |
| Total current liabilities | $ 18,404 | $ 2,970 | $ 21,374 |
| Long Term liabilities | $ 1,526 | $ - | $ 1,526 |
| | | | |
| Additional paid in capital | $ 162,433 | $ (110) | $ 162,323 |
| Accumulated deficit | $ (67,575) | $ (27,880) | $ (95,345) |
| Total stockholders equity | $ 89,329 | $ (27,880) | $ 61,449 |
| Total liabilities and stockholders' equity | $ 109,259 | $ (24,910) | $ 84,349 |
| Working Capital | $ 67,273 | $ (27,768) | $ 39,505 |

**Restatement Adjustments to MiMedx's Selected Income Statement Data for the Year Ended December 31, 2014**[510]

| (in thousands except for per share information) | Year Ended December 31, 2014 | | | |
|---|---|---|---|---|
| Statement of Operations Data: | Previously Reported | Adjustments | Restated Amounts | % misstated |
| Net Sales | $ 118,223 | $ (12,966) | $ 105,257 | -11% |
| Gross Profit | $ 105,558 | $ (12,723) | $ 92,835 | -12% |
| Operating Income | $ 7,100 | $ (10,744) | $ (5,880) | -151% |
| Net income (loss) | $ 6,220 | $ (10,963) | $ (4,743) | -176% |
| Basic Earnings Per Share | $ 0.06 | $ (0.10) | $ (0.04) | -167% |
| Diluted Earnings Per Share | $ 0.05 | $ (0.09) | $ (0.04) | -180% |

509 *See id.* at 58.

510 *See id.* at 55.

**Restatement Adjustments to MiMedx's Stockholders' Equity as of December 31, 2013**[511]

| (in thousands) | As of December 31, 2013 | | | | | |
|---|---|---|---|---|---|---|
| Cumlative Restatement Adjustments to Opening Balance of Accumulated Deficit in Statement of Stockholders' Equity | Previously Reported | | Adjustments | | Restated Amounts | |
| Common Stock | $ | 104 | $ | - | $ | 104 |
| Additional paid-in capital | $ | 147,284 | $ | - | $ | 147,284 |
| Treasury stock | $ | (25) | $ | - | $ | (25) |
| Accumulated deficit | $ | (73,795) | $ | (16,807) | $ | (90,602) |
| Total Stockholders Equity | $ | 73,568 | $ | (16,807) | $ | 56,761 |

394. As detailed in the above charts, Defendants' misstatements were quantitatively material given their significant impact on the Company's reported revenues, net income and EPS, which all exceeded the 5% rule of thumb quantitative materiality threshold referenced in SEC Staff Accounting Bulletin: Codification of Staff Accounting Bulletins' Topic 1-M, *Materiality* ("SEC Topic 1-M"). For example, between FY14 and FY16, the Company inflated revenues by $70.4 million or 13%, net income by $68.4 million or 144% and diluted EPS by $0.60 or 143%. Further, the above charts demonstrate that from FY14 through FY16, the Company inflated its accounts receivable by approximately $146 million, as delaying revenue recognition to a cash basis eliminated virtually all accounts receivable MiMedx had previously recorded during the Class Period.

[511] *See id.* at 58.

395. In addition to being quantitatively material, the misstatements in MiMedx's Class Period financial statements were also qualitatively material. SEC Topic 1-M sets forth the generally accepted methods for accountants to evaluate materiality as it relates to the financial statements of SEC registrants:

> The omission or misstatement of an item in a financial report is material if, in the light of surrounding circumstances, the magnitude of the item is such that it is probable that the judgment of a reasonable person relying upon the report would have been changed or influenced by the inclusion or correction of the item.

396. SEC Topic 1-M stresses that materiality requires qualitative, as well as quantitative, considerations. SEC Topic 1-M notes that misstatements that hide the failure to meet revenue or earnings expectations can be indicators of qualitative materiality. Here, the Company's misstated financials enabled them to represent that the Company "met or exceeded revenue guidance" in every quarter but one during the Class Period, which they otherwise could not have claimed. These practices made a huge difference. Indeed, in eight quarters, the Company only exceeded its quarterly revenue guidance by less than $500,000 (*i.e.*, 1Q12, 1Q13, 2Q13, 3Q13, 1Q14, 2Q16, 3Q16, and 1Q17), as highlighted in yellow in the chart below:

| | | Actual Net Sales | Revenue Guidance / Outlook Range |
|---|---|---|---|
| Q1 | **31-Mar-12** | **$ 3,705,808** | **$3.6 million** |
| Q2 | 30-Jun-12 | $ 4,884,256 | $4.9 million |
| Q3 | 30-Sep-12 | $ 7,954,046 | $6.4 million |
| Q4 | 31-Dec-12 | $ 10,509,663 | $8.1 million |
| YE | 31-Dec-12 | $ 27,053,773 | $20 to $25 million |
| Q1 | **31-Mar-13** | **$ 11,556,493** | **$10.5 to $11.5 million** |
| Q2 | **30-Jun-13** | **$ 13,514,743** | **$11.5 to $13.5 million** |
| Q3 | **30-Sep-13** | **$ 16,115,708** | **$13.5 to $16.0 million** |
| Q4 | 30-Dec-13 | $ 17,993,790 | $14.5 to $19.0 million |
| YE | 30-Dec-13 | $ 59,180,734 | $57 to $60 million |
| Q1 | **31-Mar-14** | **$ 19,559,188** | **$18 to $19.5 million** |
| Q2 | 30-Jun-14 | $ 25,573,198 | $21.5 to $23.5 million |
| Q3 | 30-Sep-14 | $ 33,517,762 | $30 to $32 million |
| Q4 | 30-Dec-14 | $ 39,572,852 | $37.3 to $38.3 million |
| YE | 30-Dec-14 | $ 118,223,000 | $116 to $117 million |
| Q1 | 31-Mar-15 | $ 40,767,000 | $40 to $41 million |
| Q2 | 30-Jun-15 | $ 45,679,000 | $44.0 to $46 million |
| Q3 | 30-Sep-15 | $ 49,015,000 | $47 to $50 million |
| Q4 | 30-Dec-15 | $ 51,835,000 | $49.5 to $52.5 million |
| YE | 30-Dec-15 | $ 187,296,000 | $185 to $188 million |
| Q1 | 31-Mar-16 | $ 53,367,000 | $55.5 to $58 million |
| Q2 | **30-Jun-16** | **$ 57,342,000** | **$55.7 to $57 million** |
| Q3 | **30-Sep-16** | **$ 64,429,000** | **$62 to $64 million** |
| Q4 | 30-Dec-16 | $ 69,877,000 | $69.4 to $72.9 million |
| YE | 30-Dec-16 | $ 245,015,000 | $244.5 to $248 million |
| Q1 | **31-Mar-17** | **$ 72,607,000** | **$69.5 to $72.5 million** |
| Q2 | 30-Jun-17 | $ 76,412,000 | $73.5 to $75 million |
| Q3 | 30-Sep-17 | $ 84,573,000 | $79 to $80 million |
| Q4 | 30-Dec-17 | $ 90,900,000 | $87 to $88 million |
| YE | 30-Dec-17 | $ 324,500,000 | $320.6 to $321.6 million |

397. Yet, based on ACIII's findings, MiMedx has now admitted that, absent the manipulation of the timing and recognition of revenue by former MiMedx management, the Company's results would have fallen short of guidance in numerous quarters and years during the Class Period. As an example, based on the Restatement, the chart below shows that if MiMedx had properly recorded revenues

in FY14, fiscal year 2015 ("FY15"), and FY16, then it would have missed revenue guidance in all of those years by significant amounts.

| | Reported Revenues | Revenue Guidance Range | Adjustments | Adjusted Revenues | Missed Guidance |
|---|---|---|---|---|---|
| | | | | | |
| FY 2014 | $ 118,223,000 | $116 to $117 million | $ (12,966,000) | $ 105,257,000 | **YES** |
| | | | | | |
| FY 2015 | $ 187,296,000 | $185 to $188 million | $ (34,165,000) | $ 153,131,000 | **YES** |
| | | | | | |
| FY 2016 | $ 245,015,000 | $244.5 to $248 million | $ (23,303,000) | $ 221,712,000 | **YES** |

398. As another example, the SEC has detailed specific quarter-end sales transactions by MiMedx with certain of its key distributors (First Medical, CPM, SLR, and Stability), from which the Company improperly recognized revenue during 2Q15, 3Q15, and 4Q15 in order to achieve its revenue guidance. Even excluding AvKARE's negative impact on reported revenues for these quarterly periods (which was not reported in the Restatement), had MiMedx properly recorded revenues in 2Q15, 3Q15, and 4Q15, then it would have missed revenue guidance in all of those quarters.

| | Reported Revenues | Revenue Guidance Range | Adjustments | Adjusted Revenues | Missed Guidance |
|---|---|---|---|---|---|
| | | | | | |
| Q2 2015 | $ 45,679,000 | $44.0 to $46 million | $ (3,300,000) | $ 42,379,000 | **YES** |
| | | | | | |
| Q3 2015 | $ 49,015,000 | $47 to $50 million | $ (6,800,000) | $ 42,215,000 | **YES** |
| | | | | | |
| Q4 2015 | $ 51,835,000 | $49.5 to $52.5 million | $ (3,990,000) | $ 47,845,000 | **YES** |
| | | | | | |
| FY 2015 | $ 187,296,000 | $185 to $188 million | $ (14,090,000) | $ 173,206,000 | **YES** |

399. Further, SEC Topic 1-M notes that quantitatively small misstatements may be material if management has intentionally violated GAAP. Here, MiMedx's Audit Committee confirmed "***extensive misconduct***" and "***evidence of material wrongdoing on the part of the Company's prior senior management team***," including Petit, Taylor, Senken, and Cranston. The "material wrongdoing" confirmed by the Audit Committee included, among other things, "accounting irregularities regarding the recognition of revenue under [GAAP]," necessitating the Restatement, and "material misstatements and omissions" by Petit, Taylor, Senken, and Cranston related to revenue recognition and the Company's arrangements with AvKARE. In addition, the Audit Committee uncovered other revenue management activities with distributors, ***involving former management***, that resulted in the Company recognizing revenues in the wrong accounting period, and in certain instances, improperly recognizing revenue altogether. Finally, as stated above, as a result, the DOJ has filed criminal securities fraud charges against Petit and Taylor, and the SEC has filed civil securities fraud charges against MiMedx, Petit, Taylor, and Senken. These actions further demonstrate the materiality of MiMedx's accounting fraud.

400. SEC Topic 1-M also states that "the demonstrated volatility of the price of a registrant's securities in response to certain types of disclosures may provide

guidance as to whether investors regard quantitatively small misstatements as material." On February 20, 2018, the Company's stock price plummeted by 39.53%, when MiMedx announced that it had postponed the release of its financial results and Form 10-K for 4Q and FY17 due to "an internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company [ACIII]," including "the accounting treatment of certain distributor contracts." Moreover, on June 7, 2018, MiMedx stock plunged another 23.39%, when the Company revealed that nearly six years of its financial statements were materially misstated, that all communications and financial information with respect to 4Q17 and 1Q18 were no longer reliable, and that its 2018 guidance was withdrawn.

401. Also, as discussed above in Section IX.E, Petit, Senken, and Taylor received annual bonuses throughout the Class Period pursuant to MIP as a result of the Company's inflated revenue and adjusted EBITDA results. Critically, the bonus payouts achieved during the Class Period were heavily based upon meeting or exceeding revenue and adjusted EBITDA targets. Had the Company reported its true financial condition appropriately under GAAP during the Class Period, it would have resulted in lower adjusted EBITDA and revenue numbers and lower bonus payouts to these three Defendants, another qualitative materiality factor under SAB

Topic 1-M. Notably, as a result of the findings from ACIII, the Company has determined it will claw back compensation paid to Petit, Senken, and Taylor based upon the final results of the Company's Restatement. In addition, the relief sought in the SEC Complaint includes that Petit, Senken, and Taylor "disgorge any and all ill-gotten gains, together with pre-judgment interest, derived from the[ir] improper conduct" and that "Petit and Senken reimburse MiMedx for all bonuses, incentive-based and equity-based compensation" pursuant to Section 304 of SOX.

402. SEC Topic 1-M notes another qualitative materiality factor can be whether the misstatement changes a loss into income or vice versa. For example, in FY14, Defendants originally reported net income of $6.2 million, but after the Restatement reported a net loss of $11 million, or a 176% overstatement of income. Similarly, in FY15, Defendants originally reported net income of $29.4 million, but after the Restatement reported a net loss of $16.4 million, or a 156% overstatement of income. Finally, in FY16, the Restatement resulted in MiMedx reporting a tiny amount of income ($390,000) compared to originally reported net income of $12 million, or a 97% overstatement of income.

403. Finally, whether a misstatement arises from an item capable of precise measurement or an estimate is a qualitative materiality factor that must be considered under SEC Topic 1-M. Here, the accounting misstatements and omissions arise from

a fraudulent revenue recognition scheme, which included side arrangements with distributors, material sales concessions on quarter-end sales, utter disregard of revenue recognition rules by former senior management, channel stuffing, and false revenue recognition, all with the goal of ensuring the Company would achieve or exceed Wall Street expectations. No judgment was required to know the sales were improper and had to be reversed under GAAP.

### C. MiMedx Violated GAAP Rules for Recognizing Revenue

404. During the Class Period, MiMedx violated basic revenue recognition rules under GAAP through its improper accounting, sales, and distribution practices, orchestrated through implicit sales arrangements with key distributors and other customers to prematurely recognize revenues. Indeed, as detailed above in Section VII.D, ACIII confirmed the Company's "accounting irregularities regarding the recognition of revenue under [GAAP]" and that "the Company recognized revenues in the wrong accounting periods, and in certain instances, improperly recognized revenue altogether." Further, the Company's Restatement confirmed ACIII's findings regarding Defendants' fraudulent revenue recognition scheme, including a determination that the Company, in violation of GAAP, prematurely recognized revenue ***on all sales dating back to 2012***.

405. MiMedx was required, but failed, to follow the revenue recognition rules found in the Financial Accounting Standards Board ("FASB") Accounting Standards Codification Topic 605, *Revenue Recognition* ("ASC 605").[512] Under ASC 605, revenue can only be appropriately recognized under GAAP when it is both "realized" (or "realizable") and "earned."[513] Critically, ASC 605 lists four criteria that ***all*** must be met before revenue can be appropriately recognized under GAAP. These four criteria, which are necessary for revenue to be appropriately "realized" and "earned," are:

(a) "Persuasive evidence of an arrangement exists";

(b) "Delivery has occurred or services have been rendered";

(c) "The seller's price to the buyer is fixed or determinable"; and

[512] In 2003, the SEC issued Staff Accounting Bulletin No. 104 ("SAB 104"), codified as Staff Accounting Bulletin Topic 13 ("SAB Topic 13"), which set out the SEC staff's view on the appropriate criteria that need to be met to recognize revenue. SAB 104/SAB Topic 13 was codified in to ASC 605-10-S99-1 as part of the FASB ASC Codification.

[513] ASC 605-10-25-1. Pursuant to ASC 605, "revenue and gains are ***realized*** when products (goods and services), merchandise, or other assets are exchanged for cash or claims to cash," while "revenue and gains are ***realizable*** when related assets received or held are readily convertible to known amounts of cash or claims to cash." *Id*. Similarly, revenue is "earned" when an "entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues." *Id*.

(d) "Collectability is reasonably assured."[514]

406. As discussed further below, MiMedx violated all of these four criteria. Through Defendants' fraudulent revenue recognition and channel stuffing scheme, the Company prematurely recognized revenue where: (a) purchase orders did not exist or were fabricated for the sales; (b) title and risk of loss had not passed to the distributor; (c) customers received an implicit, side arrangement to return or exchange products in a subsequent quarter; (d) future performance obligations existed to appropriately earn the revenue; and (e) payment was not required until the product was sold by the distributor.

407. In addition, as part of the Restatement, MiMedx admitted that from 2012 to 2017, Defendants' previous decision to recognize revenue at the time of shipment of product to the customer was not appropriate.[515] More specifically, in the 2018 Form 10-K, MiMedx described how its previous revenue recognition policy was false and misleading, including details on how the Company violated ***all four criteria*** required for proper revenue recognition under ASC 605. These details included, but were not limited to, the following:

> *Persuasive evidence of an arrangement exists* – "Throughout 2012-2017, although the Company may have created a legal contract upon

[514] ASC 605-10-S99-1.

[515] Ex. 1, at F-27.

the execution of a contract and/or fulfillment of a purchase order, the lack of clarity around the final terms of the arrangement ***due to pervasive side agreements with customers*** preclude the Company's sales transactions from meeting this criterion [*i.e.* persuasive evidence of arrangement] upon shipment of product."[516]

*Delivery has occurred or services have been rendered* – "[t]he Company concluded that it did not pass the risks of ownership to the customer upon shipment because customers were allowed to return products for multiple reasons, which included ***being unable to sell the product, damages which may have occurred subsequent to delivery, and dropped product***."[517]

*The seller's price to the buyer is fixed or determinable* – "At certain quarter-ends, the Company was significantly increasing sales to customers without having visibility into the level of product remaining unsold at the customer's location. This practice made it difficult to develop an appropriate estimate of future credits to be issued to customers at the time of sale, which, in turn, impacted whether the price at the time of transfer of physical possession to the customer was fixed or determinable. This previous practice in combination with the following actions of the Company preclude the price of the Company's sales transactions from being fixed or determinable upon shipment of product: a) offering customers ***an unconditional right of return*** with many items being returned over a year after the initial sale, b) offering extended payment terms to customers with days sales outstanding averaging almost 3 months; and c) ***a history of exceeding established credit limits for customers***."[518]

*Collectability is reasonably assured* – "At the time of transfer of physical possession to the customer, collectability of the sales was questionable. As noted in the Investigation and described further below, the customers' intention to pay amounts when due was uncertain in

---

[516] *Id.* at F-26.

[517] *Id.*

[518] *Id.*

> light of the conflicting messages customers received with respect to the payment terms, rights of return and lack of adherence to credit limits. Although the Company did have a process in place to establish credit limits, the evidence indicates that those credit limits were overridden by certain sales personnel and members of management."[519]

> "Accordingly, the Company has concluded that, from 2012 to 2017, its previous decision to recognize revenue at the time of shipment of the product to the customer was not appropriate. The Company has determined that the aforementioned revenue recognition criteria were met only when both of the following events had occurred: (1) the Company has fulfilled the customer's purchase order by delivering product ordered; and (2) the Company has collected payment for the product delivered."[520]

408. As discussed above, throughout the Class Period, Defendants issued false financial statements by improperly recognizing revenue before it was realized or realizable and earned. The Company's false financial results were achieved by improperly recognizing revenue from several types of sales.

**1. Consignment Sales**

409. MiMedx granted material sales concessions to at least four of its distributors that in effect made the nature of the parties' arrangement a consignment-type sale, rather than an independent sale to a distributor. ASC 605 describes the problematic nature of consignment sales and accordingly provides that products

[519] *Id.* at F-26, F-27.

[520] *Id.* at F-27.

delivered under a consignment arrangement do not qualify for revenue recognition because title "does not pass to the consignee":

> Products delivered to a consignee pursuant to a consignment arrangement are not sales and do not qualify for revenue recognition until a sale occurs. The staff believes that revenue recognition is not appropriate because the seller retains the risks and rewards of ownership of the product and title usually does not pass to the consignee.[521]

410. As discussed further below and in Section V.C, MiMedx falsely recognized revenue with its distributors on consignment-type sales where there was no obligation to pay until the products were actually used or sold, MiMedx retained risk of loss for the products, and its distributors could return any unsold products. However, MiMedx's revenue recognition policy disclosed in SEC filings falsely stated that for consignment customers, revenue was recognized at the time the product was used or implanted, as discussed in Section X.E below.

411. Further, even if title did somehow pass to the distributor, ASC 605 cautions that the arrangement of the transaction could in substance still be that of a consignment or financing.[522] ASC 605 iterates that consignment sales require a careful analysis of the facts and circumstances of the transaction and that any ***one or***

[521] ASC 605-10-S99-1.

[522] *Id.*

***more*** of the following characteristics would preclude revenue recognition even if title had passed to the distributor:

(a) the buyer has the right to return the product and:

(i) the buyer does not pay the seller at the time of sale, and the buyer is not obligated to pay the seller at a specified date or dates;

(ii) the buyer does not pay the seller at the time of sale but rather is obligated to pay at a specified date or dates, and the buyer's obligation to pay is contractually or implicitly excused until the buyer resells the product or subsequently consumes or uses the product;

(iii) the buyer's obligations to the seller would be changed (*e.g.*, the seller would forgive the obligation or grant a refund) in the event of theft or physical destruction or damage of the product;

(iv) the buyer acquiring the product for resale does not have economic substance apart from that provided by the seller; and

(v) the seller has significant obligations for future performance to directly bring about resale of the product by the buyer.[523]

412. MiMedx's sales to its distributors violated at least four of these five provisions and their contingent nature meant the Company could only recognize revenue when its distributors sold such products to end customers or on a "sell-

[523] ASC 605-10-S99-1.

through" basis.[524] For example, along with the return rights, the distributors were excused from paying MiMedx until the products were ultimately sold and used by the end customer. Further, MiMedx retained significant obligations for future performance to bring about the sale of the products to the end customer. In other instances, the distributors did not have economic substance to pay for the products unless they were sold to the end customer. As noted above, any one of these contingencies precluded revenue recognition until the contingencies were resolved and, as a result, MiMedx falsely recognized revenue upon shipment to its distributors.

### 2. Right of Return Sales

413. MiMedx also violated the revenue recognition rules for sales it made to distributors and other customers that were granted an implicit right to return merchandise (a "right of return"). When a right of return exists, ASC 605-15-25-1 sets forth specific conditions that must ***all*** be met prior to the recognition of revenue for these types of transactions:

> If an entity sells its product but gives the buyer the right to return the product, revenue from the sales transaction shall be recognized at time of sale only if ***all*** of the following conditions are met:

[524] "Sell-in" is where a company records revenue immediately when the product is sold to its independent distributor. "Sell-through" is where a company only records revenue after the product is sold through to the end customer.

a. The seller's price to the buyer is substantially fixed or determinable at the date of sale.

b. The buyer has paid the seller, or the buyer is obligated to pay the seller and the obligation is not contingent on resale of the product.

c. The buyer's obligation to the seller would not be changed in the event of theft or physical destruction or damage of the product.

d. The buyer acquiring the product for resale has economic substance apart from that provided by the seller.

e. The seller does not have significant obligations for future performance to directly bring about resale of the product by the buyer.

f. The amount of future returns can be reasonably estimated.

414. Failure to meet any of the above conditions precludes revenue recognition. In MiMedx's case, ***none*** of the above conditions were met, precluding revenue recognition under ASC 605 from sales transactions in which the Company's distributors and customers were granted a right of return. As one example, MiMedx knew that, regardless of its express contract terms with distributors, certain distributors had implicit, undisclosed side agreements that allowed them to delay payment for the products until the distributor sold the product. ASC 605-15-25-1 clearly and concisely states that "[i]f the buyer does not pay at the time of sale and the buyer's obligation to pay is contractually or ***implicitly excused*** until the buyer

resells the product," then revenue cannot be recognized. MiMedx Defendants willfully ignored this provision, recognizing the revenue anyway.

415. As another example, revenue recognition is precluded under a right of return if the seller retains "significant obligations for future performance to directly bring about resale of the product by the buyer." Yet, MiMedx's side arrangements with AvKARE and other key distributors as discussed below included material performance obligations, including that MiMedx would help ensure products were sold to end customers, and provided that the distributors were not obligated to pay if products were not sold. Taylor's March 8, 2013 e-mail to AvKARE demonstrated a side arrangement in which MiMedx retained material performance obligations on products sold to AvKARE, directing placement of such products within the 120+ VAs serviced by MiMedx, and that MiMedx would not leave AvKARE with "any losses!" from such products.

416. Indeed, ACIII's findings also establish revenue violations where MiMedx intentionally shipped types and volumes of product at quarter-end that were not needed by the customer, and facilitated such sales by agreeing the customer could return or exchange products in a subsequent quarter without recording specific

provisions for such returns or exchanges.[525] By recognizing revenue on such sales, despite the right of return, MiMedx violated GAAP throughout the Class Period.

417. Moreover, even if MiMedx's sales with a right of return somehow satisfied the conditions set forth in GAAP for proper revenue recognition (which they did not), MiMedx was still required to reasonably estimate the amount of expected returns, something it could not do. ASC 605-15-25-2 requires that the costs or losses associated with estimated returns be recorded at the same time the revenue is recognized. But as described in Section V.C.1.e, MiMedx's egregious channel stuffing led to lost products, inventory spilling out of cabinets, and problems reconciling inventory at VA hospitals. Further, MiMedx asked its sales representatives to delay and feather back returns so they could spread out the losses associated with those returns. Worse still, MiMedx avoided returns through tactics such as transferring the returns to other facilities or instructing employees to conceal them by hiding product at VA hospitals or in their homes and cars. Consequently, any minimal allowance for product returns MiMedx did establish during the Class Period was significantly understated because the Company could not make a reasonable estimate of returned product, and manipulated the timing of future returns

---

[525] Ex. 14, at 23.

to help the Company achieve guidance.[526] Indeed, MiMedx's 2018 Form 10-K disclosed that the Company's allowance for product returns was understated by $4.5 million (or 360%) at the end of 2015 and by $6.4 million (or 131%) at the end of 2016.[527]

### D. MiMedx Improperly Recognized Revenues from Key Distributors

418. As discussed further in Sections VII.D and F, the findings from ACIII, along with the *Petit/Taylor* Indictment and SEC Complaint, demonstrate that MiMedx fraudulently recognized revenues in violation of GAAP with at least five key distributors during the Class Period: AvKARE, CPM, SLR, Stability, and First Medical. MiMedx falsely recognized revenue before all four criteria for appropriate revenue recognition under ASC 605 were met, including revenue from consignment-type sales and sales in which the distributors had a right of return. For example:

- From 2012 through 3Q17, MiMedx prematurely recognized revenue on all AvKARE sales based on a side arrangement outside the terms of the parties' PDA, which allowed AvKARE

---

[526] Notably, ASC 605-15-25-3 and ASC 605-10-S99-1 provide factors that may impair the ability of a company to make a reasonable estimate of future returns, including "***[r]elatively long periods*** in which a particular product may be returned," "significant increases in or excess levels of inventory in a distribution channel (***sometimes referred to as 'channel stuffing'***)" and "the ***significance of a particular distributor*** to the registrant's (or a reporting segment's) business, sales and marketing."

[527] Ex. 1, at F-51.

to only pay MiMedx when it sold the products and where MiMedx routinely issued credits to AvKARE for lost, damaged or returned products.

- In 2Q15 and 4Q15, MiMedx falsely recognized $4.4 million in sales to First Medical where the distributor received extended payment terms and a right to return the products, and the sale was contingent on the distributor receiving a public tender from the government.

- In 2Q15, MiMedx falsely recognized $1.4 million in sales to CPM where the distributor had a side arrangement to exchange the unwanted product in 3Q15, and also received a $200,000 cash payment as an inducement for making the quarter-end sale.

- In 3Q15, MiMedx falsely recognized $4.6 million in sales to SLR where the distributor received extended payment terms, had no ability to pay MiMedx unless the product was sold, and received a right to return or exchange the product if SLR was unable to sell it.

- In 3Q15 and 4Q15, MiMedx falsely recognized $2.65 million in sales to Stability where the distributor received extended payment terms, there was no signed distribution agreement at the time of sale, and Stability had a side arrangement to return or exchange the product if MiMedx's acquisition of Stability did not occur.

419. Defendants knew the side arrangements reached with these five distributors demonstrated revenue recognition was improper, yet in utter disregard of the GAAP rules cited above, Defendants recorded revenue in order to achieve guidance and as a result misled investors. In addition, Defendants ignored the warnings in ASC 605 concerning sales with "side agreements" or "unusual terms and conditions," which can preclude appropriate revenue recognition under GAAP:

> Examples of transactions that financial management and auditors should be aware of and where such provisions may exist include "side" agreements and significant transactions with unusual terms and conditions. These contractual provisions raise questions as to whether the sales price is fixed or determinable. Side agreements could include cancellation, termination, or other provisions that affect revenue recognition. The existence of a subsequently executed side agreement may be an indicator that the original agreement was not final and revenue recognition was not appropriate.[528]

## E. MiMedx Made Materially False and Misleading Disclosures of Its Revenue Recognition Policies in Its Financial Statements

420. MiMedx's financial statement disclosures were materially false and misleading and contained material omissions, rendering them inadequate and in violation of GAAP. MiMedx was required by GAAP and SEC rules, including ASC 605-10-S99-1 and ASC Topic 235, *Notes to Financial Statements* ("ASC 235"), to disclose in detail its revenue recognition accounting policy in the footnotes to its financial statements in each of its publicly issued Forms 10-K and 10-Q. Specifically, ASC 235-10-50-3 states that "the disclosure should encompass important judgments as to the appropriateness of principles relating to recognition of revenue." Further, ASC 605-10-S99-1, citing SAB Topic 13.B, Disclosures, states "that changes in estimated returns recognized in accordance with FASB ASC

[528] ASC 605-10-S99-1.

Subtopic 605-15 should be disclosed, if material (*e.g.*, a change in estimate from two percent of sales to one percent of sales)."

421. In each of its Forms 10-Q and 10-K during the Class Period, MiMedx disclosed its revenue recognition policy as a significant or critical accounting policy. For example, MiMedx's Forms 10-K for 2013, 2014, and 2015 made the following disclosures concerning its revenue recognition policy:

> The Company sells its products primarily through a combination of a direct sales force, independent stocking distributors and third - party representatives in the U.S. and independent distributors in international markets. The Company recognizes revenue when title to the goods and risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of customer acceptance. In cases where the Company utilizes distributors or ships products directly to the end user, it recognizes revenue according to the shipping terms of the agreement provided all revenue recognition criteria have been met. A portion of the Company's revenue is generated from inventory maintained at hospitals or with field representatives. For these products, revenue is recognized at the time the product has been used or implanted. The Company records estimated sales returns, discounts and allowances as a reduction of net sales in the same period revenue is recognized.

422. Similarly, MiMedx's Form 10-K for 2016 made the following disclosures concerning its revenue recognition policy:

> We sell our products primarily through a combination of a direct sales force, independent stocking distributors and third - party representatives in the U.S. and independent distributors in international markets. We recognize revenue when title to the goods and risk of loss transfers to customers, provided there are no material remaining performance obligations required of the Company or any matters of

> customer acceptance. We record revenues from sales to our independent stocking distributors at the time the product is shipped to the distributor. Our stocking distributors, who sell the products to their customers or sub-distributors, contractually take title to the products and assume all risks of ownership at the time of shipment. Our stocking distributors are obligated to pay us the contractually agreed upon invoice price within specified terms regardless of when, if ever, they sell the products. Our stocking distributors do not have any contractual rights of return or exchange other than for defective product or shipping error; however, in limited situations, we do accept returns or exchanges at our discretion.
>
> * * *
>
> We continually evaluate new and current customers, including our stocking distributors, for collectability based on various factors including past history with the customer, evaluation of their credit worthiness, and current economic conditions. We only record revenue when collectability is reasonably assured. A portion of the Company's revenue is generated from inventory maintained at hospitals or physician's offices.
>
> We make estimates of potential future sales returns, discounts and allowances related to current period product revenue and these are reflected as a reduction of revenue in the same period revenue is recognized.

423. Each Form 10-Q issued by MiMedx during the Class Period made similar disclosures concerning the Company's revenue recognition policy, falsely assuring investors that MiMedx appropriately recognized revenues in accordance with GAAP.

424. Critically, in the 2018 Form 10-K, MiMedx disclosed its updated (and appropriate) revenue recognition policy, which confirmed that all sales from 2012

through 2017 should not have been recorded until payment was collected for the product delivered.[529] In addition, the Company's updated policy also disclosed misconduct by former executives (including Petit, Taylor, and Senken), which included the following:

> The existence of extra-contractual or undocumented terms or arrangements initiated by our former executives at the onset of the transactions, such as unconditional acceptances of returns, lack of adherence to credit limits, and concessions agreed to by our former executives subsequent to the initial transaction, such as significantly extended payment terms, granting return or exchange rights, and contingent payment obligations caused the related sales transactions to fail the ASC 605 criteria required to be met under then applicable U.S. GAAP to recognize revenue.

425. As a result, Defendants knew, or were reckless in not knowing, MiMedx's disclosed revenue recognition policy during the Class Period was false and misleading and violated the GAAP rules cited above. MiMedx's revenue recognition policy assured investors that the Company was recognizing revenue appropriately under the provisions of ASC 605, when it was not.

426. Rather, MiMedx's revenue recognition policy as disclosed to investors was false and misleading and omitted material facts, for at least the following reasons:

---

[529] Ex. 1, at 63.

(a) Defendants admitted in the Restatement that all sales since 2012 were recorded prematurely in violation of GAAP, as all distributor and customer transactions should have been recognized under the cash collection method of accounting;

(b) Defendants had embarked on a fraudulent revenue recognition scheme, which included channel stuffing with its distributors – including key distributors AvKARE, SLR, CPM, Stability, and First Medical – and other customers;

(c) Defendants possessed side arrangements with certain of its distributors, outside the terms of their contracts, that under GAAP precluded recognizing revenue "at the time the product is shipped to the distributor";

(d) MiMedx's products were not all being sold through "independent" stocking distributors and third-party representatives;

(e) revenue was recognized before "title to the goods and risk of loss" transferred to the customer;

(f) revenue was recognized even though MiMedx had "material remaining performance obligations required of the Company" to appropriately earn the revenue;

(g) MiMedx was inappropriately recognizing revenue even though certain stocking distributors were not "obligated to pay [MiMedx] the contractually agreed upon invoice price within specified terms" if the distributor did not sell the product to the end customer;

(h) MiMedx was recording revenue before "collectability is reasonably assured";

(i) the Company's disclosed revenue recognition policy falsely represented its return policies with distributors, where the distributors had implicit return rights that were significantly greater than the only return rights MiMedx disclosed which were for defective products or shipping errors;

(j) "sales returns" credits for missing or otherwise unaccounted for MiMedx products were recorded in different periods than the periods in which MiMedx recognized the revenue or the returns were not recorded at all; and

(k) as a result, the Company's revenues were improperly inflated throughout the Class Period.

427. In addition to requiring the disclosure of a company's revenue recognition accounting policy, ASC 605-10-S99-1 requires disclosures in the Management Discussion and Analysis of Forms 10-Q and 10-K for the following

types of revenue transactions or events, which MiMedx failed to make during the Class Period:

- shipments of product at the end of a reporting period that significantly reduce customer backlog and that reasonably might be expected to result in lower shipments and revenue in the next period (*i.e.*, channel stuffing practices);
- granting of extended payment terms that will result in a longer collection period for accounts receivable (regardless of whether revenue has been recognized);
- changing trends in shipments into, and sales from, a sales channel or separate class of customer that could be expected to have a significant effect on future sales or sales return; and
- an increasing trend towards sales to a different class of customer, such as a reseller distribution channel that has a lower gross profit margin than existing sales that are principally made to end users.

428. As described herein, MiMedx engaged in several fraudulent practices including improper revenue recognition resulting from a breathtaking channel stuffing scheme including significant sales concessions, extended payment terms, and return rights well outside of the Company's explicit contract terms with its key government and commercial distributors. These practices were motivated by a "win at all cost" culture at the Company. Defendants failed to inform investors of their channel stuffing practices and the resulting risks those practices could cause to future revenues, including a cessation of the Company's consistent revenue growth.

Indeed, the Company has now admitted its consistent revenue growth was a sham, stating that changes to its business practices (*i.e.*, no more fraudulent channel stuffing sales) has "resulted in a material softening in the Company's recent [2018] revenue performance and expected near-term sales forecast."[530]

429. Further, while MiMedx disclosed that revenue was reported net of a provision for potential future sales returns, it failed to disclose the actual return policy (*e.g.*, the significant length of time for such returns or that returns were avoided completely) and falsely represented that returns were appropriately "reflected as a reduction of revenue in the same period revenue is recognized." This was an actionable omission because the investing public had no way to discern MiMedx's return policy or the impact of rights of return on recorded sales.

**F. MiMedx's GAAP Violations of Related Party Standards**

430. MiMedx was also required under GAAP to disclose in its Forms 10-Q and 10-K that its distributors qualified as related parties. As discussed herein, MiMedx essentially controlled AvKARE, CPM, and SLR, qualifying them as related parties under GAAP. Related party agreements can be inherently problematic from

[530] MiMedx Group, Inc., *MiMedx Announces Organizational Realignment Program* (Dec. 5, 2018).

an accounting perspective and pose increased risks of material misstatement, as their substance might differ materially from their form.[531]

431. This was certainly the case with AvKARE. MiMedx and AvKARE possessed an undisclosed side arrangement, which allowed MiMedx to exercise almost complete control over AvKARE's distribution and sale of MiMedx products. MiMedx retained performance obligations and risk of loss for products sold to AvKARE, making AvKARE merely a pass-through entity used to fraudulently inflate MiMedx's financial results. Even after booking the sale of a product to AvKARE, MiMedx maintained control of the product and responsibility for selling it to VAs. In addition, as discussed above, MiMedx utilized up to three full-time employees in a Reconciliation Group to determine when AvKARE would pay for the product, and MiMedx's sales staff were responsible for managing the VA inventory, including performing quarterly inventory counts.

432. Similarly, the CEO of distributor CPM (Brooks) had close ties with Company executives, allowing MiMedx to exert control over CPM. This led to a mutually beneficial arrangement wherein CPM placed bulk orders with MiMedx for its products, ensuring MiMedx met its quarterly revenue targets, and then sold the

---

[531] PCAOB Release No. 2014-002 (June 10, 2014), https://pcaobus.org/Rulemaking/Docket038/Release_2014_002_Related_Parties.pdf.

product to its PODs at three-to-six times higher than the customary price. Tellingly, one of the PODs to which CPM sold was Fuse, where Brooks served as Chairman. In addition, Brooks received from MiMedx stock options and significant consulting payments (including a payment of $200,000) even though he was performing no actual consulting work. These were inducements so CPM would make large quarter-end sales, as described above.

433. SLR was also a problematic related party entity. Morrison founded SLR in 2010, and also worked at MiMedx from approximately July 2013 to August 2015. Morrison left MiMedx to become SLR's president just one month before SLR became MiMedx's sole Master Distributor on the commercial side, in September 2015. Upon Morrison's separation from the Company, he received a severance package and a $15,000 per month consulting agreement from the Company, at the direction of Petit and Taylor.

434. Like CPM, SLR was a "house account" essentially controlled by MiMedx, which ensured that SLR placed excess orders for MiMedx products with significant sales concessions, including deep discounts, free products, rebates, lenient return/exchange policies, and extended payment terms. Further, Petit even caused his son-in-law and two of his adult children to loan money to SLR through the Petit Trust to help SLR pay for MiMedx product, when it could not otherwise.

435. MiMedx's ability to control these distributors qualified them as related parties under the accounting guidance of ASC 850, *Related Party Disclosures*. ASC 850 provides disclosure requirements for related party transactions and certain common control relationships. The overall objective of ASC 850 is to disclose transactions with related parties so that "users of the financial statements can evaluate their significance."[532] Specifically, ASC 850 provides examples of related party transactions, which includes affiliate relationships like MiMedx held with AvKARE, CPM, and SLR. ASC 850-10-20 Glossary. ASC 850 defines an "affiliate" as "[a] party that, directly or indirectly through one or more intermediaries, controls, is controlled by, or is under common control with an entity." And ASC 850 defines "control" as "[t]he possession, direct or indirect, of the power to direct or cause the direction of the management and policies of an entity through ownership, by contract, or otherwise."

436. As it engaged in related party contracts, MiMedx was required under ASC 850-10-50 to disclose the following:

(a) the nature of the relationship(s) involved;

---

[532] ASC 850-10-10-1.

(b) a description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements;

(c) the dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period; and

(d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

437. SEC disclosure rules also require specific disclosures on related party transactions. For example, SEC Regulation S-X Rule 5-03 requires that "***amounts earned from transactions with related parties shall be disclosed***."[533]

438. In addition, the 2018 Form 10-K further supports Defendants' failures to properly disclose related party transactions. More specifically, the Company disclosed internal control deficiencies for related parties including, "[t]here were not adequate processes in place to ensure that the accounting department (and/or Audit

---

[533] Regulation S-X Rule 5-03, Statements of Comprehensive Income, 17 C.F.R. §210.5-03.

Committee) was aware of significant transactions with related parties so it could determine whether such transactions are appropriately approved, accounted for, and disclosed.[534] Similarly, MiMedx has now implemented the following remediation item to fix their related party failures during the Class Period: "Management has developed a set of procedures to identify and define its population of related parties, identify transactions with those related parties, and analyze such transactions to determine whether additional approval or financial statement disclosure is required."[535]

439. Accordingly, in violation of GAAP, MiMedx failed to inform investors of its related party ties to its main distributors, and failed to inform investors that its now-admitted massive accounting fraud was facilitated through premature revenue recognition from sales to such distributors, which were given significant sales concessions to inflate financial performance.

### G. MiMedx Admitted Material Weaknesses in its Internal Controls

440. The Company's Restatement announcement also revealed the existence of material weaknesses in ICFR. MiMedx concluded that its ICFR were ineffective

[534] Ex. 1, at 82.

[535] *Id.* at 84.

for all of the Non-Reliance Periods (*i.e.*, December 31, 2012 through September 30, 2017, the periods subject to the Restatement announcement). Accordingly, the Company announced that it would restate its disclosures for the Non-Reliance Periods to include the identification of material weaknesses related to the Restatement. As the Company made clear:

> The Company has previously concluded in certain of the periods requiring restatement that its controls over financial reporting ***were effective***. In the period ending December 31, 2016, the Company previously concluded that its controls over financial reporting were ineffective due to material weaknesses in certain internal controls over tax accounting.[536] ***As a result of material weaknesses relating to the Restatement described above, the Company has now concluded that its controls over financial reporting were ineffective in all of the Non-Reliance Periods. Accordingly, the Company will restate its disclosures for the affected periods to include the identification of material weaknesses related to its restatement.***[537]

441. MiMedx management was responsible for establishing and maintaining effective ICFR and disclosure controls pursuant to SOX. SOX required MiMedx management to perform annual assessments of MiMedx's ICFR and disclosure

---

[536] MiMedx's 2016 Form 10-K disclosed its ICFR were ineffective due to a material weakness in income tax accounting. However, the Company misleadingly did not disclose any additional material weaknesses in its accounting for revenue or its ineffective control environment.

[537] *See* MiMedx Group, Inc., Current Report (Form 8-K) (June 7, 2018); *see also* Ex. 1, at 5, 9, 54, 62, 80 (confirming the restatement of ICFR).

controls and to issue a report on whether MiMedx's ICFR were effective and free from material weaknesses.[538]

442. Further, the Company's Restatement has confirmed material weaknesses in ICFR and ineffective disclosure controls existed throughout the Class Period.[539] A material weakness, as defined in PCAOB, Auditing Standard No. 5 ("AS 5") is a:

> deficiency, or a combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the company's annual or interim financial statements will not be prevented or detected on a timely basis.[540]

443. A control deficiency determined to be a material weakness must be disclosed in management's annual report on its assessment of the effectiveness of ICFR.[541] Management may not disclose that it has assessed ICFR as effective if

---

[538] Management's Report on Internal Control over Financial Reporting and Certification of Disclosure in Exchange Act Periodic Reports, Exchange Act Release No. 33-8238 (Aug. 14, 2003).

[539] Ex. 1, at 80.

[540] *AS 2201: An Audit of Internal Control Over Financial Reporting That Is Integrated with An Audit of Financial Statements*, PCAOB AS 5. A7 (Nov. 15, 2007), https://pcaobus.org/Standards/Auditing/Pages/AS2201.aspx.

[541] *Management's Report on Internal Control Over Financial Reporting*, Exchange Act Release No. 34-54976 at 41 (Dec. 20, 2006).

there is one or more control deficiencies determined to be a material weakness in ICFR.[542]

444. AS 5 also provides indicators of material weaknesses in ICFR that include the following:

> ***Identification of fraud, whether or not material, on the part of senior management***;
>
> ***Restatement of previously issued financial statements to reflect the correction of a material misstatement***;
>
> Identification by the auditor of a material misstatement of financial statements in the current period in circumstances that indicate that the misstatement would not have been detected by the company's internal control over financial reporting; and
>
> Ineffective oversight of the company's external financial reporting and internal control over financial reporting by the company's audit committee.

445. The Audit Committee's ACIII findings disclosed in May 2019, and the Company's Restatement filed in March 2020, confirmed multiple material weaknesses in ICFR including: (a) former members of senior management's improper tone at the top; (b) revenue recognition; and (c) an overall lack of internal controls necessary to develop reliable financial statements. In fact, the findings demonstrate that Defendants' fraudulent revenue recognition scheme was allowed

542 *Id.*

to be carried out because there was a complete lack of ***any*** internal controls to prepare reliable financial statements.

446. As EY's resignation and representations to MiMedx made clear, the internal controls necessary for the Company to develop reliable financial statements during the Non-Reliance Periods ***did not exist***. And as a result, MiMedx had to go back and review "***all of the Company's sales***" since 2012 for proper revenue recognition as part of the Restatement, further cementing that Defendants' statements about the Company's effective internal controls during the Class Period were false.

447. Indeed, MiMedx has disclosed that, based on findings from ACIII and the Restatement, new internal controls are being put in place to help prevent future instances of the fraudulent accounting that occurred during the Class Period. Notably, Defendants' fraud during the Class Period has been so devastating, that even after the Company has begun implementing dozens of remediation items, MiMedx still plans to conclude material weaknesses will exist as of December 31, 2019, when the Company issues its 2019 Form 10-K.[543] Some of these remediation items include, but are not limited to, the following:

---

[543] Ex. 1, at 24.

- undergoing a leadership transition during the second and third quarters of 2018, during which the former CEO, CFO, COO, Controller and VP of IT were removed from the organization.
- establishing an Ethics and Compliance Committee and new positions of Chief Accounting Officer and Internal Auditor;
- new management reinforced the importance of integrity, accountability, and adherence to established internal controls, policies and procedures through the adoption of a revised Code of Business Conduct Policy;
- restructuring and bolstering the Company's pricing committee;
- new management hired consultants to evaluate the Company's compliance with regulations specific to the Life Sciences industry;
- tightening policies, procedures, and governance of credit;
- revised criteria for granting credit and periodic credit limit and terms reviews;
- establishing an independent compliance department reporting to the Board of Directors and hired a Chief Compliance Officer;
- new management is designing an Anti-Fraud Program to assess (and subsequently mitigate) the organization's susceptibility to fraud, including management override of controls;
- hiring a Vice President of Internal Audit to develop an internal audit function for the Company;
- documenting key policies and internal control procedures for significant accounting areas with an emphasis on revenue recognition issues;
- remediating and enhancing Sarbanes-Oxley controls;

- augmenting the Company's finance and accounting staff with additional personnel and evaluating the Company's personnel in key finance and accounting positions; and
- implementing improved processes and controls to monitor sales practices, authorize credits and returns, and recognize revenue.

448. Also, findings from ACIII and Restatement have demonstrated the fraudulent accounting was driven by former MiMedx senior management's "win at all cost" company culture that disregarded abiding by fundamental accounting rules governing revenue recognition. For example, ACIII observed "a recurrent trend in which former senior management emphasized short-term business goals over compliance and ethics, was not receptive to employee concerns and failed to respond appropriately to compliance issues," which set an "inappropriate 'tone at the top.'" As described further above, the inappropriate tone at the top included former senior management: (a) disregarding revenue recognition rules under GAAP; (b) manipulating the timing and recognition of revenue; (c) making material misstatements and omissions to a number of key stakeholders and regulators; (d) engaging in a pattern of taking action against employees that raised concerns; (e) overriding internal controls; and (f) marginalizing the Company's legal and accounting departments and outside legal and accounting advisors.

449. In addition, EY stated that it resigned in part due to a "disagreement" with prior MiMedx senior management and that it could not rely on representations

from the Company's then-interim CEO (Coles) and CFO (Borkowski) because they would have had to rely on representations from prior management. Further, the Company has treated the terminations of Petit, Senken, Taylor, and Cranston as terminations "for cause" based on information identified during ACIII. As a result, a material weakness in the Company's overall control environment due to an inappropriate tone at the top existed throughout the Class Period, which was confirmed when the Restatement was issued.[544]

450. For example, the 2018 Form 10-K provided additional disclosures about Defendants' "win at all cost" culture and utter disregard for the Company's control environment. These disclosures included, but were not limited to, the following:

> The Company did not have an effective, documented and continuous risk assessment process and related controls to properly monitor, identify and analyze regulatory compliance risks, including compliance with applicable regulations around product pricing, payments to medical professionals, and related activities, and related risks of financial misstatement due to error and/or fraud, including management override of controls.
>
> * * *
>
> The Company failed to establish a tone at the top that demonstrated a commitment to integrity and ethical values, resulting in activity by senior management, members of the sales group and others that was

[544] Ex. 1, at 81.

> inconsistent with both the accounting applied and applicable regulatory requirements.
>
> * * *
>
> Both the Board and senior management failed to appropriately respond to allegations of improper accounting activities, improper sales practices, and activities consistent with retaliation against employees who raised concerns of such inappropriate accounting and sales activity.

451. The importance of a Company's control environment in establishing effective internal controls is articulated in the Committee of Sponsoring Organizations ("COSO"), *Internal Control – Integrated Framework* ("COSO Framework").[545] According to the COSO Framework, the control environment sets the tone of the entire structure of internal control and has a pervasive impact on all business activity:

> The control environment sets the tone of an organization, influencing the control consciousness of its people. It is the foundation for all other components of internal control, providing discipline and structure. Control environment factors include the integrity, ethical values and competence of the entity's people; management's philosophy and operating style; the way management assigns authority and responsibility, and organizes and develops its people; and the attention and direction provided by the board of directors.[546]

---

[545] During the Class Period, MiMedx's Forms 10-K represented that management's internal control evaluations were based on the COSO Framework.

[546] COSO Framework, at 23.

452. As a result, deficiencies affecting the control environment are strong indicators of a material weakness. Circumstances that may indicate an ineffective control environment include, without limitation: "Identification of fraud of any magnitude on the part of senior management."[547]

453. The concept of "tone at the top" has become widely accepted within the accounting profession and the field of corporate governance to describe the attitude and actions of an entity's senior management toward internal financial controls and the control environment. SEC Staff Accounting Bulletin No. 99 ("SAB 99") refers to "tone at the top" as:

> The tone set by top management – the corporate environment or culture within which financial reporting occurs – is the most important factor contributing to the integrity of the financial reporting process. Notwithstanding an impressive set of written rules and procedures, if the tone set by management is lax, fraudulent financial reporting is more likely to occur.[548]

454. The Company has now admitted that the "tone" set by MiMedx senior management during the Class Period resulted in the need to restate over five years of financial statements. ACIII "uncovered evidence of ***material wrongdoing*** on the

[547] Exchange Act Release No. 54976 at 44-45 (Dec. 20, 2006).

[548] SAB 99. *See also* Report of the National Commission on Fraudulent Financial Reporting (Oct. 1987); Report and Recommendations of the Blue Ribbon Committee on Improving the Effectiveness of Corporate Audit Committees (Feb. 1999).

part of the Company's prior senior management team" and that "[f]ormer senior management disregarded revenue recognition rules under GAAP and directed others to take actions that caused the Company to take actions" that resulted in improperly recognized revenue under GAAP. Based on ACIII's findings, the top three executives of the Company (Petit, Taylor, and Senken) were terminated for cause due to conduct detrimental to the Company and the retaliation carried out by these executives towards any skeptics that questioned their accounting practices, including former employees. This further illustrates the inappropriate "tone" set by Petit, Taylor, and Senken during the Class Period. Notably, MiMedx's May 31, 2019 proxy statement disclosed:

> In management's opinion, the material weaknesses related to control environment and tone at the top have been effectively remediated, with the departures of Messrs. Petit, Taylor, Senken and Cranston and other senior management and the hiring of Messrs. Coles and Borkowski and their leadership in changing the Company's culture and tone at the top.[549]

455. Also, the Company's Restatement has now provided further disclosure concerning material weaknesses that existed in all five interrelated components of internal controls, including the control environment. Importantly, the COSO Framework, which Defendants represented it used for assessing its ICFR during the

---

[549] Ex. 14, at 80.

Class Period, establishes five interrelated components of internal controls: (a) control environment; (b) risk assessment; (c) control activities; (d) information and communication; and (e) monitoring.[550] The effectiveness of all five components is necessary and vital for a properly functioning system of internal controls. For example, a material weakness in only one of the five components, such as the control environment, results in ineffective ICFR. Here, MiMedx did not even have the processes in place to determine whether controls in all five components were present and, not surprisingly, reported material weaknesses in ***all five components*** as part of the Restatement.

456. The deficiencies regarding these material weaknesses in all five interrelated components of ICFR were disclosed in the 2018 Form 10-K, and included at least 18 individual deficiencies. As an example, some of those 18 deficiencies included the following:

> The Company did not have an effective, documented and continuous risk assessment process and related controls to properly monitor, identify and analyze regulatory compliance risks, including compliance with applicable regulations around product pricing, payments to medical professionals, and related activities, and related risks of financial misstatement due to error and/or fraud, including management override of controls.

---

[550] COSO Framework, at 12-14.

* * *

> The Company's revenue recognition methodology was not aligned with the Company's customary business practices, resulting in certain revenue events being recorded prior to the time at which all of the sales recognition criteria were met. Such misalignment was frequently due to the existence of extra-contractual or undocumented terms or arrangements ***initiated by former executives of the Company*** at the onset of sales transactions, such as sales above established distributor and customer credit limits, and concessions agreed to by ***former executives*** of the Company subsequent to the initial transaction, such as extended unusually long payment terms, granting return or exchange rights, and contingent payment obligations.

* * *

> Management did not have processes in place to assess whether controls within each of the five components of internal control were present and functioning as intended.

457. Finally, the SEC also determined that MiMedx failed to establish a system of sufficient internal accounting controls.[551] Specifically, MiMedx did not have effective controls over revenue recognition and lacked effective controls:

- to ensure that revenue was not recognized prior to the company obtaining written documentation demonstrating that persuasive evidence of an arrangement existed and the terms were fixed or determinable;
- to ensure that adequate analysis and documentation existed for distributor contracts to ensure timely and accurate recording of revenue in accordance with GAAP;

---

[551] SEC Complaint, at ¶¶285, 287.

- to ensure that sales terms and incentives were appropriately documented and communicated to MiMedx's accounting staff; and
- to ensure appropriate accounting for consignment arrangements.[552]

458. In light of the above, Defendants' repeated assurances during the Class Period that the Company's internal controls functioned properly to prevent or detect material misstatements in its financial statements were false and misleading when made. Specifically, the Forms 10-K and 10-Q issued during the Class Period falsely stated that the Company's ICFR and disclosure controls were effective, when in fact they were not. For example, the Company's Forms 10-K made the following statement, or a statement virtually identical to the following:

> Disclosure Controls and Procedures
>
> We maintain "disclosure controls and procedures" within the meaning of Rule 13a-15(e) of the Securities Exchange Act of 1934, as amended, or the Exchange Act. . . . As required by Rule 13a-15(b) of the Exchange Act, prior to filing this Annual Report on Form 10-K, we carried out an evaluation, under the supervision and with the participation of our management, including our Chief Executive Officer and Chief Financial Officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) of the Exchange Act) as of the end of the period covered by this Annual Report on Form 10-K. ***Based on their evaluation, our Chief Executive Officer and Chief Financial Officer concluded that our disclosure controls and procedures were***

[552] SEC Complaint, at ¶286.

> ***effective*** as of the end of the period covered by this Annual Report on Form 10-K.
>
> Management's Report on Internal Control over Financial Reporting
>
> Our management is responsible for establishing and maintaining adequate internal control over financial reporting (as defined in Rule 13a-15(f) under the Exchange Act). Our management assessed the effectiveness of our internal control over financial reporting as of December 31, 2015. In making this assessment, our management used the criteria set forth by the Committee of Sponsoring Organizations of the Treadway Commission ("COSO") in Internal Control-Integrated Framework (2013). ***Our management has concluded that, as of December 31, 2015, our internal control over financial reporting is effective based on these criteria.***

459. Similarly, the Company's Forms 10-Q issued during the Class Period falsely represented that the Company's disclosure controls were effective and that there were no changes in internal controls during the quarterly period that materially affected the Company's ICFR. For example, the Company's Forms 10-Q made the following statement, or a statement virtually identical to the following:

> Disclosure Controls and Procedures
>
> Our management, with the participation of our Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO") has evaluated the effectiveness of our disclosure controls and procedures as of September 30, 2015. Based on this evaluation, ***our CEO and CFO concluded that our disclosure controls and procedures were effective*** as of September 30, 2015.
>
> Changes in Internal Control Over Financial Reporting
>
> There were no changes in our internal controls over financial reporting that occurred during the three-month period ended September 30, 2015

> that have materially affected, or are reasonably likely to materially affect, our internal controls over financial reporting.

460. In reality, not only were the ICFR ineffective, but as EY later concluded, the internal controls needed for the Company to develop reliable financial statements ***did not exist***. While the Company's 2016 Form 10-K and Forms 10-Q for the first three quarters of 2017 did conclude that the Company's disclosure controls and ICFR were ineffective, this was ***only*** with regard to a material weakness in its income tax accounting. For reasons detailed above, Defendants improperly omitted additional material weaknesses in ICFR that existed in the Company's revenue recognition area, as a result of an ineffective control environment.

### H. Petit and Senken Falsely Certified the Accuracy of the Company's Financial Statements Through Their Sarbanes-Oxley Certifications and Other Statements

461. Despite the Company's massive fraudulent revenue recognition scheme, non-existent internal controls, multitude of GAAP violations, and false financial reporting, Petit and Senken executed certifications pursuant to SOX, attached to each Form 10-K and 10-Q Petit and Senken signed during the Class Period, stating that "***the information contained in the Report fairly presents, in all material respects, the financial condition and results of operations of the Company***." Petit and Senken also executed separate certifications stating that they had reviewed each of the filings; that each filing did "***not contain any untrue***

***statement[s] of a material fact*** " or " ***omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered*** "; that the financial results were " ***fairly present[ed], in all material respects*** "; and that MiMedx's internal controls " ***provide[d] reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles*** ." Petit and Senken also certified that they had disclosed to the Company's auditors and Audit Committee "all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information" and "any fraud, whether or not material, that involves management or other employees who have a significant role in . . . internal control over financial reporting."

462. These statements were patently false, as the Company's financial statements were not fairly reported, were materially misstated, and failed to disclose the myriad improper sales and distribution practices the Company was engaged in and its accounting improprieties. Through their SOX certifications, Petit and Senken misleadingly indicated to investors that they had "reasonable assurance regarding

the reliability of financial reporting" and that the financial statements were prepared in accordance with GAAP, despite their knowledge that there was no reliability, and the Company's financial reporting violated GAAP. Petit's and Senken's SOX certifications were false and also demonstrated their scienter.

## XI. CHERRY BEKAERT'S CRITICAL ROLE IN THE COMPANY'S FRAUD

463. Cherry Bekaert was MiMedx's independent, external auditor from 2008 until its dismissal on August 4, 2017. Cherry Bekaert's audits of the Company's financial statements were critical to investors:

> Under the federal securities laws, accountants act as gatekeepers to the public securities markets. These laws require, or permit the Commission to require, that independent public accountants certify financial information filed with the Commission. As we all know, without an opinion from an independent auditor, a company cannot satisfy the statutory and regulatory requirements for audited financial statements.[553]

464. As a result, Cherry Bekaert knew that investors would rely on its audit opinions and the effectiveness of the Company's internal controls when deciding whether to invest in the Company.

465. During the Class Period, Cherry Bekaert repeatedly issued clean audit opinions concerning the accuracy of MiMedx's financial statements and the

[553] Commissioner Elisse B. Walter, Remarks Before the AICPA National Conference on Current SEC and PCAOB Developments (Dec. 9, 2009).

effectiveness of MiMedx's ICFR.[554] Investors relied on these clean audit opinions, trusting that Cherry Bekaert fulfilled its role as independent auditor in compliance with PCAOB standards.[555]

466. In reality, Cherry Bekaert issued false and misleading audit opinions throughout the Class Period. Indeed, Defendants were engaged in a fraud so staggering that over five years of financial statements ***audited and reviewed by Cherry Bekaert*** had to be restated due to premature revenue recognition on all sales dating back to 2012, impacting almost every financial account presented on MiMedx's balance sheets and income statements. Further, MiMedx's ICFR were ineffective in all of the Non-Reliance Periods (*i.e.*, December 31, 2012 through

---

[554] In its 2016 Form 10-K, MiMedx admitted that the Company's ICFR were ineffective as of December 31, 2016, due to a material weakness in the design of the Company's controls over the tax accounting related to an overstatement of an excess tax benefit which, if undetected, would have resulted in an understatement of income taxes payable. As a result of this material weakness in income tax accounting, Cherry Bekaert issued an adverse audit opinion over MiMedx's ICFR as of December 31, 2016. However, Cherry Bekaert failed to disclose that additional material weaknesses existed in MiMedx's ICFR concerning its accounting for revenue, its ineffective control environment or its lack or absence of internal controls necessary to develop reliable financial statements.

[555] The PCAOB "is a nonprofit corporation established by Congress to oversee the audits of public companies in order to protect investors and the public interest by promoting informative, accurate and independent audit reports." *See* https://pcaobus.org/About. The Sarbanes-Oxley Act of 2002, which created the PCAOB, requires that auditors of U.S. public companies be subject to external and independent oversight. *See id.*

September 30, 2017) due to material weaknesses. As EY later concluded, the Company's ICFR during the Class Period were non-existent. And, as the Company admitted in the Restatement, it did not have procedures in place to assess "whether controls within each of the five components of internal control were present and functioning as intended." Accordingly, ***despite Cherry Bekaert's original certifications and audit opinions***, MiMedx's financial statements for the fiscal years ended December 31, 2012, 2013, 2014, 2015, and 2016 were materially misstated and did not comply with GAAP. Likewise, ***despite Cherry Bekaert's assertion to the contrary***, MiMedx's ICFR were not effective as of December 31, 2012, 2013, 2014, 2015, and 2016 due to the Restatement.[556]

467. Cherry Bekaert's audits of MiMedx during the Class Period were so deficient they were tantamount to no audits at all. Cherry Bekaert consistently failed to conduct its audits in accordance with PCAOB standards because it did not: properly plan and perform its audits to address key fraud risks, including revenue

[556] As discussed above, MiMedx's 2016 Form 10-K did disclose its ICFR were ineffective due to a material weakness in income tax accounting. However, the Company did not disclose any additional material weaknesses in its accounting for revenue, ineffective control environment or absence of internal controls to develop reliable financial statements. Similarly, Cherry Bekaert only issued its adverse audit opinion on the Company's ICFR due to the material weakness in income tax accounting identified by MiMedx management.

recognition; exercise due care or professional skepticism; obtain sufficient competent evidential matter; appropriately test related party transactions and potential illegal acts; properly assess the Company's ICFR; or identify areas of material weakness.

468. In addition, as listed in Section XI.C, Cherry Bekaert knew of numerous events and related allegations concerning MiMedx that occurred throughout the Class Period that would have significantly increased the audit risk that the Company's financial statements and effective ICFR were materially misstated. As described below, Cherry Bekaert ignored innumerable red flags that MiMedx's financial statements and management could not be trusted. These red flags continued to build on top of each other year after year and demonstrate Cherry Bekaert violated PCAOB standards in providing its false unqualified audit opinions throughout the Class Period.

469. Despite its knowledge of these red flags and their implications, Cherry Bekaert repeatedly failed to exercise professional skepticism and expand the scope of its audits during the Class Period. Cherry Bekaert's reckless disregard of these red flags and failure to perform appropriate audit procedures is evidenced by the fact that its successor, EY, had only been engaged as MiMedx's auditor for five months before it raised serious questions about MiMedx's revenue recognition with

AvKARE and the adequacy of ACI and ACII. And when EY's questions could not be answered adequately, it refused to complete its annual audit without further investigation into AvKARE-related accounting and current and historic allegations concerning the Company's revenue recognition practices. EY then resigned from the engagement in less than a year-and-a-half because, in part, MiMedx's internal controls to develop reliable financial statements did not exist. Because EY came to these damning conclusions so quickly, it strains credulity to imagine Cherry Bekaert did not know or reasonably suspect the same during the five years of audits it performed during the Class Period.

470. Further, as described below, Cherry Bekaert's reckless conduct is evidenced by its continuing failure to comply with PCAOB standards, including a propensity to blindly rely on management representations when it either had audit evidence contradicting the representations or it could have performed basic audit procedures exposing the falsity of those representations.

471. In summary, Cherry Bekaert failed to fulfill its critical gatekeeping function by continuously turning a blind eye to growing red flags that the Company's financial statements and effective ICFR were not accurately presented, and by providing false unqualified audit opinions. Cherry Bekaert violated the public trust, and investors were harmed as a result.

### A. The Purpose of Auditing Standards and the Auditor's Report

472. Auditing standards were specifically designed to ensure that false financial statements and material weaknesses are brought to the attention of investors.[557] PCAOB standards are also designed to ensure that a registrant's (*i.e.*, MiMedx's) external auditors fulfill their obligations when auditing and reviewing financial statements and other information contained in SEC filings. An audit is a specific type of attestation service performed by qualified Certified Public Accountants.[558] The results of an audit are expressed by a Certified Public Accounting firm in the form of an audit opinion. For example, Cherry Bekaert

[557] The PCAOB was given the responsibility to establish professional audit standards applicable to audits of public companies, and has now adopted, amended, and expanded upon the generally accepted auditing standards ("GAAS") and interpretations previously issued by the American Institute of Certified Public Accountants ("AICPA") (referred to herein as "AU"), and has also promulgated additional auditing standards (referred to herein as "AS"). "PCAOB standards" as referred herein include both AICPA issued GAAS standards (AU standards) adopted by the PCAOB and auditing standards issued by the PCAOB (AS standards). Auditing standards "provide a measure of audit quality and the objectives to be achieved in an audit." AU §150.01.

[558] "In an attest service, the practitioner expresses a conclusion about the reliability of a written assertion that is the responsibility of another party, the asserter." AICPA *Statement on Standards for Consulting Services No. 1* (Jan. 1, 1992). To "attest" means "to establish or verify." Thus, through its audit, Cherry Bekaert was verifying that the financial statements were prepared in accordance with GAAP.

issued audit opinions attesting that MiMedx's financial statements complied with GAAP and attesting to the effectiveness of MiMedx's ICFR.

473. Although an auditor's report is referred to as an audit "opinion," under GAAP and PCAOB standards, an auditor's report is unlike a subjective opinion in the ordinary usage of the term. Instead, it is based on an objective evaluation from an accounting professional, independent of the company being audited, as to whether the company's financial statements are prepared in accordance with the objective GAAP standards.

474. Because an audit opinion is not merely a subjective opinion, it is understood that financial statements either do or do not comply with GAAP, which is why a company's financial statements must be restated if they do not comply with GAAP (as in the case of MiMedx's financial statements). That is, if financial statements do not comply with the objective standards of GAAP, then an auditor ***cannot*** have a subjective opinion that the financial statements do comply with GAAP.

475. Auditing standards require that an auditor "state whether, in his opinion, the financial statements are presented in conformity with generally accepted accounting principles and to identify those circumstances in which such principles

have not been consistently observed."[559] The standards make clear that an auditor cannot rely on subjective opinion in performing an audit. Rather, "[s]ufficient appropriate evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."[560] Thus, the standards include evidence-gathering procedures enabling an auditor to certify that the financial statements comply with GAAP, opine that they do not comply with GAAP, or state that the auditor is unable to form an opinion on compliance with GAAP.[561]

476. An auditor is required to exercise professional skepticism, which requires "[g]athering and objectively evaluating audit evidence."[562] Professional skepticism is defined in the auditing standards as "an attitude that includes a questioning mind and a critical assessment of audit evidence."[563] Importantly, in exercising professional skepticism, an auditor should not be satisfied with less than persuasive evidence because of a belief that management is honest.[564] For reasons

---

[559] AU §110.01.

[560] AU §150.02.

[561] *Id.*

[562] AU §§230.07, 230.08.

[563] AU §§230.07, 316.13.

[564] AU §230.09.

discussed herein, Cherry Bekaert failed in its "professional skepticism" of MiMedx's accounting because Cherry Bekaert was presented with numerous red flags that the Company's financial statements and management could not be trusted, but nonetheless turned a blind eye in approving the false financial statements.

477. Under PCAOB standards, Cherry Bekaert was required to plan and perform audit procedures to obtain reasonable assurance about whether MiMedx's financial statements were free of material misstatement, whether caused by error or fraud, and whether material weaknesses existed in MiMedx's ICFR.[565] PCAOB standards note that "reasonable assurance" means a "high level" of assurance and that reasonable assurance is obtained by reducing audit risk to an appropriately low level through applying due professional care, including obtaining sufficient appropriate audit evidence.[566] Due professional care requires an auditor to use "the knowledge, skill, and ability called for by the profession of public accounting to diligently perform, in good faith and with integrity, the gathering and objective evaluation of evidence."[567]

---

[565] AU §150.01, AS 5.3.

[566] AU §230.10, AS 8.3.

[567] AU §230.07.

478. Further, Cherry Bekaert was required to appropriately plan the audit to understand the events, conditions, and company activities that might reasonably be expected to have a significant effect on the risk of material misstatement.[568] For instance, performance measures that create "incentives or pressures for management of the company to manipulate certain accounts or disclosures to achieve certain performance targets" increase the risk of material misstatement.[569] For reasons detailed herein, Cherry Bekaert failed in its professional obligations to follow these fundamental auditing concepts, including its disregard of the excessive emphasis MiMedx's former management placed on consistently achieving quarterly revenue guidance through significant and unusual end-of-quarter sales transactions. Instead, Cherry Bekaert turned a blind eye and issued materially false and misleading audit opinions concerning MiMedx's financial statements and effective ICFR during the Class Period.

### B. Cherry Bekaert's Failure to Comply with PCAOB Standards over MiMedx's Financial Statements

479. Cherry Bekaert failed to conduct its audits in accordance with PCAOB standards. The red flags associated with MiMedx's fraudulent revenue recognition

[568] *See* AS 12.7.

[569] AS 12.17.

scheme and the public disclosures and findings made by MiMedx, the SEC, and the DOJ have made it abundantly clear that Cherry Bekaert was severely reckless in auditing MiMedx.

480. For instance, MiMedx has now admitted it had to go back and correct the revenue recognition for ***all*** the Company's sales during the Non-Reliance Periods, which approximated $870 million. As discussed below, auditing standards required Cherry Bekaert to substantively test MiMedx's revenues and obtain sufficient independent audit evidence to ensure appropriate revenue recognition, especially given the fraud risk factors associated with revenue recognition. Yet, rather than following these professional standards, Cherry Bekaert repeatedly placed greater reliance on management representations, putting its financial interests ahead of its professional obligations.

**1. Cherry Bekaert Failed to Properly Consider the Risk of Fraud in Planning and Performing its Audits**

481. As described above, Cherry Bekaert was required to plan and perform its audits during the Class Period to obtain reasonable assurance about whether the financial statements were free of material misstatement, whether caused by error or fraud.[570] Specifically, PCAOB standards addressing fraud requires auditors to:

---

[570] *See* AU §316.01.

- Exercise professional skepticism;[571]
- Brainstorm with engagement personnel regarding the risk of material misstatements due to fraud;[572]
- Make inquiries of management and others within the entity about the risks of fraud;[573]
- Consider the results of analytical procedures performed relating to revenue to identify unusual or unexpected relationships involving revenue accounts that might indicate a material misstatement due to fraud;[574]
- Consider fraud risk factors;[575] and
- Respond appropriately to fraud risk factors through the nature, timing and extent of audit procedures.[576]

482. In addition, Cherry Bekaert knew that PCAOB standards specifically identify revenue recognition as an area where the risk of material misstatement due to fraudulent financial reporting should be presumed for all audits.[577] As management is in a unique position to perpetrate fraud, PCAOB standards required Cherry Bekaert to expand the scope of its audit procedures to specifically address

[571] *See* AU §316.13.

[572] *See* AS 12.52-53.

[573] *See* AS 12.56-57.

[574] *See* AS 12.47.

[575] *See* AS 12.65-69.

[576] *See* AU §316.52-67.

[577] *See* AS 12.68.

revenue recognition. For example, a former Director of PCAOB Enforcement and Investigations noted, "[r]evenue often is a key metric for public company investors and is a financial reporting area prone to manipulation by management."[578] Cherry Bekaert violated PCAOB standards either by failing to identify the fraud risk of improper revenue recognition in planning its audit or by failing to perform required auditing procedures to address the risk.[579] Some of the audit procedures Cherry Bekaert should have considered included:

- Performing substantive analytical procedures relating to revenue using disaggregated data, for example, comparing revenue reported by month and by product line or business segment during the current reporting period with comparable prior periods. Computer-assisted audit techniques may be useful in identifying unusual or unexpected revenue relationships or transactions.

- Confirming with customers certain relevant contract terms and the absence of side agreements, because the appropriate accounting often is influenced by such terms or agreements. For example, acceptance criteria, delivery and payment terms, the absence of future or continuing vendor obligations, the right to return the product, guaranteed amounts of sale to end customers,

[578] *PCAOB Announces Settled Disciplinary Action Against PricewaterhouseCoopers LLP Partner for Audit Failures*, PCAOB (July 7, 2014), https://pcaobus.org/News/Releases/Pages/07072014_Stone.aspx.

[579] Fraud risk factors are events or conditions that indicate "(1) an incentive or pressure to perpetrate fraud, (2) an opportunity to carry out the fraud, or (3) an attitude or rationalization that justifies the fraudulent action." AS 12.65.

and cancellation or refund provisions often are relevant in such circumstances.

- Inquiring of the entity's sales and marketing personnel or in-house legal counsel regarding sales or shipments near the end of the period and their knowledge of any unusual terms or conditions associated with these transactions.

- Being physically present at one or more locations at period end to observe goods being shipped or being readied for shipment (or returns waiting processing) and performing other appropriate sales and inventory cutoff procedures.[580]

483. Cherry Bekaert could not have reasonably performed all of these revenue recognition procedures. Otherwise, it would have uncovered MiMedx's fraudulent revenue recognition. Indeed, reasonably performing ***any*** of the above procedures would have raised significant red flags that MiMedx was fraudulently recognizing revenue.

484. In addition, Cherry Bekaert was required to substantively test sales to the Company's material distributors. Here, MiMedx was inflating revenue through five of its largest distributors, AvKARE, CPM, SLR, First Medical, and Stability, among others. Moreover, a well-known fraud risk is that companies will engage in significant and unusual transactions at quarter ends in order to achieve earnings

[580] AU §316.54 (footnote omitted).

targets.[581] MiMedx engaged in this exact conduct with each of the five distributors above, and yet Cherry Bekaert continued to issue clean bills of health on the Company's financial results throughout the Class Period. Cherry Bekaert's conduct was especially egregious given the additional red flags associated with sales to these distributors, as discussed below.

485. Due to a heightened risk of fraud, many of these auditing procedures are geared towards ensuring that sales near the end of a reporting period are tested for appropriate revenue recognition (*i.e.*, sales cutoff procedures), including reviewing for unusual terms or conditions that would prohibit recognizing the revenue.[582]

486. Similarly, performing the basic procedure of analyzing monthly revenues from MiMedx's distributors and customers to identify any quarter-end sales spikes should have alerted Cherry Bekaert of the need to perform detailed testing over MiMedx's channel stuffing practices. For example, Cherry Bekaert knew, or was reckless in not knowing, that MiMedx was engaging in significant and

[581] AU §316.85.A.2.

[582] PCAOB standards provide examples of audit procedures to appropriately respond to fraud risk factors, such as improper revenue recognition, including "[m]aking oral inquiries of major customers and suppliers in addition to sending written confirmations." AU §316.53; *see also* AU §316.54; AU §330.08.

unusual quarter-end transactions that allowed the Company to meet or exceed revenue guidance in 25 of 26 quarters through 2Q17. Importantly, Cherry Bekaert knew PCAOB standards identify a company's excessive pressure to meet financial expectations of third parties (*e.g.*, analysts, institutional investors) as a risk factor that could lead to fraudulent financial reporting.[583]

487. These warning signs, including significant and unusual quarter-end sales, should have caused Cherry Bekaert to expand the scope of its audits over MiMedx's sales to key distributors. In addition, Cherry Bekaert knew it needed to appropriately plan its audits to address a high risk of potential fraud at MiMedx given all the financial improprieties alleged against the Company, as further described in Section VI. Yet, Cherry Bekaert ignored these red flags, which continued to mount throughout the Class Period, demonstrating that MiMedx's "flawless" ability to achieve quarterly revenue guidance was the product of accounting fraud, not legitimate business growth.

**a. Cherry Bekaert Failed to Appropriately Audit AvKARE Sales**

488. AvKARE was one of the distributors through which MiMedx improperly recognized revenue. MiMedx has admitted that sales to AvKARE from

[583] *See* AU §316.85.A.2.

2012 through 3Q17 were recognized prematurely in violation of GAAP, necessitating the Restatement. Cherry Bekaert knew that MiMedx's sales to AvKARE were material as AvKARE was MiMedx's largest customer for the years ended December 31, 2015, 2014, 2013, and 2012 at approximately 24%, 34%, 56%, and 40%, respectively, of MiMedx's total revenue. In addition, AvKARE represented approximately 29%, 33%, 55%, and 53%, respectively, of MiMedx's total accounts receivable for the years ended December 31, 2015, 2014, 2013, and 2012.

489. Such a significant customer would have required Cherry Bekaert to understand MiMedx's revenue recognition policy with AvKARE and substantively test whether the Company's sales with AvKARE were recorded in a manner consistent with the parties' distribution agreement (PDA) and GAAP. The PDA, and any amendments to it, were publicly disclosed, and therefore Cherry Bekaert knew the contractual terms and requirements for MiMedx to appropriately recognize revenue with AvKARE.

490. Yet, in auditing MiMedx, Cherry Bekaert failed to appropriately test the Company's revenue recognition policies and procedures and associated internal controls for AvKARE. Specifically, based on the red flags discussed herein regarding AvKARE sales, Cherry Bekaert was severely reckless in not identifying

that MiMedx and AvKARE had a longstanding side arrangement established as early as 2012, contrary to the explicit terms of the PDA. In essence, MiMedx's side arrangement with AvKARE transformed the parties' relationship into a consignment relationship, where AvKARE did not take title to the product, returned any product it did not want, and was not required to pay MiMedx for any product unless and until it received payment from the VA. Despite these contingencies, MiMedx recognized revenue immediately upon shipment to AvKARE in violation of GAAP.

491. First, a basic audit procedure such as a DSO calculation over AvKARE's receivables would have alerted Cherry Bekaert that AvKARE was not making timely payments under the PDA, and that the parties had an "implicit arrangement" contrary to the PDA. More specifically, Cherry Bekaert knew, or should have known, from reviewing the PDA and its related amendments that the PDA called for AvKARE to pay orders within 45 days of the invoice date or the receipt of goods, whichever was later.[584] However, at no point during the Class Period did AvKARE make payments consistent with the 45-day payment term of the PDA.[585] A DSO calculation based on AvKARE's actual sales and accounts receivable for 2012 through 2015 would have shown DSO numbers drastically

[584] MiMedx Group, Inc., Annual Report (Form 10-K), Ex. 10.56 (Mar. 15, 2013).

[585] *See* SEC Complaint, at ¶156.

higher than 45 days. As reported by the Company (but misstated as detailed above), DSO numbers for AvKARE were approximately 137, 97, 80, and 125 for 2012, 2013, 2014, and 2015, respectively. These numbers should have raised a significant red flag to Cherry Bekaert that MiMedx was giving AvKARE sales concessions under an "implicit arrangement" outside the terms of the PDA, and inappropriately recognizing revenue as a result. This problematic DSO trend should have been calculated contemporaneously by Cherry Bekaert at the time of its audits. The fact that such analysis was either not performed or ignored, and the parties' side arrangement existed as early as 2012, demonstrate that Cherry Bekaert failed to conduct proper audits under PCAOB standards and was severely reckless in issuing false audit opinions throughout the Class Period.

492. Further, it would defy logic to suggest that Cherry Bekaert did not know that AvKARE's payments were untimely under the PDA. These untimely payments, pursuant to the side arrangement with MiMedx, should have been patently obvious to Cherry Bekaert from the inflated DSO numbers and past due receivables AvKARE was accumulating. Indeed, the Restatement confirmed that a significant

amount of MiMedx's billings (including those to AvKARE) were collected well after payment was due under the contractual terms.[586]

493. As a result, Cherry Bekaert failed to exercise appropriate professional skepticism and due professional care in auditing MiMedx's revenue recognition with AvKARE. Improper revenue recognition was a fraud risk factor that required Cherry Bekaert to apply professional skepticism in gathering and evaluating audit evidence, including during any sales testing for AvKARE.[587] This fraud risk factor also required Cherry Bekaert to obtain more persuasive audit evidence, and not simply rely on MiMedx management representations that no side agreements or arrangements existed.[588] Examples of applying professional skepticism in response to fraud risk factors, such as improper revenue recognition, include the following:

- "modifying the planned audit procedures to obtain more reliable evidence regarding relevant assertions"; and
- "obtaining sufficient appropriate evidence to corroborate management's explanations or representations concerning important matters, ***such as through third-party confirmation***, use of a specialist engaged or employed by the auditor, or examination of documentation from ***independent sources***."[589]

---

[586] Ex. 1, at 60.

[587] AS 13.7.

[588] AS 13.9; AU §333.02.

[589] AS 13.7.

494. Critically, PCAOB standards state that "[i]f a representation made by management is contradicted by other audit evidence, the auditor should investigate the circumstances and consider the reliability of the representation made."[590] Despite this guidance, Cherry Bekaert violated PCAOB standards by blindly relying on MiMedx's false management representations of proper revenue recognition with AvKARE and ignoring independent audit evidence that was inconsistent with such representations.

495. For example, during its FY16 audit, Cherry Bekaert reviewed ***independent*** written responses from AvKARE demonstrating that MiMedx was improperly recognizing revenue on all AvKARE sales.[591] More specifically, in response to questions during ACII, AvKARE's counsel admitted on February 8, 2017, that "the parties' course of dealing has been that AvKARE pays invoices in the order of oldest first, but only as AvKARE is paid by VA; that while it is not a part of the written contract, MiMedx has always reimbursed AvKARE for lost or missing products."[592] This glaring red flag revealed the side arrangement between AvKARE and MiMedx, evidencing the Company's improper revenue recognition.

---

[590] AU §333.04.

[591] *See* Ex. 14, at 24; Ex. 2, at 3-4; Ex. 6, at 4; SEC Complaint, at ¶274(d).

[592] Ex. 6, at 4.

However, Cherry Bekaert recklessly chose to disregard this independent audit evidence. Instead, it relied on Petit's false representation that AvKARE's response was inaccurate.[593] Cherry Bekaert's disregard of this evidence, based on the Petit representation, was especially egregious. At that time, Cherry Bekaert knew that Andersen, Kruchoski, and Tornquist had corroborated the same evidence, and that Petit personally was implicated in an accounting fraud scheme related to the same evidence.

496. In this regard, Cherry Bekaert violated PCAOB standards, including the standard that external, third-party audit evidence (here, from AvKARE's counsel) is more reliable and persuasive than a management representation.[594] In addition, Cherry Bekaert violated PCAOB standards by failing to take into account all relevant audit evidence, regardless of whether it appeared to corroborate or contradict MiMedx's management representations.[595]

497. Another red flag Cherry Bekaert ignored regarding AvKARE, during its 2016 audit, was the accounting white paper Senken prepared (with Petit's and Taylor's assistance) to address Cherry Bekaert's questions about MiMedx's revenue

---

[593] *See* SEC Complaint, at ¶¶274(d), 275(d).

[594] AS 15.8.

[595] AS 14.3; AU §333.04.

recognition practices with AvKARE. Specifically, Senken represented in the white paper that MiMedx "continues to operate under the contractual payment terms" (*i.e.*, 45 days) and "[t]here are no side agreements."[596] As discussed herein, Cherry Bekaert knew, or was reckless in not knowing, AvKARE's payment practices were significantly greater than 45 days and AvKARE had provided ***independent*** confirmation that demonstrated a side arrangement between MiMedx and AvKARE existed. In addition, Cherry Bekaert knew that Andersen, Kruchoski, and Tornquist had alleged facts demonstrating that Senken's representation was false. Finally, Senken misquoted the relevant GAAP literature, another red flag Cherry Bekaert ignored. As a result, Cherry Bekaert failed to exercise appropriate professional skepticism over Senken's representation, considering that all the evidence indicated the exact opposite. Importantly, in exercising professional skepticism, "the auditor should not be satisfied with less than persuasive evidence" that a company's financial statements are free of material misstatement "because of a belief that management is honest."[597]

498. Further, Cherry Bekaert was required to obtain more evidence to support its audits when the risk of material misstatement increased. This would have

[596] SEC Complaint, at ¶244.

[597] AU §230.09.

been the case, tremendously, with MiMedx's sales to AvKARE given the magnitude of those sales as well as the growing allegations during the Class Period that MiMedx was falsely recognizing revenue with AvKARE. For example, AS 15, *Audit Evidence*, states that the quantity of audit evidence needed is affected by the risk of material misstatement:

> The quantity of audit evidence needed is affected by the following: Risk of material misstatement (in the audit of financial statements) or the risk associated with the control (in the audit of internal control over financial reporting). As the risk increases, the amount of evidence that the auditor should obtain also increases. For example, ordinarily more evidence is needed to respond to significant risks.

499. Yet, Cherry Bekaert failed in its professional obligations to obtain sufficient audit evidence for sales to AvKARE and instead blindly relied on management representations during its audits. During EY's first audit of MiMedx after replacing Cherry Bekaert as MiMedx's auditor, EY immediately raised concerns over the Company's "revenue recognition under certain distributor contracts," including AvKARE.[598] EY refused to sign off on the Company's 2017 financial statements, and ultimately resigned as auditor. In connection with its resignation, EY advised the Company that, among other things, "information has come to EY's attention that EY has concluded materially impacts the reliability of

[598] MiMedx Group, Inc., Current Report (Form 8-K) (Dec. 7, 2018), Item 4.01(a).

previously issued financial statements, and the issues raised by this information have not been resolved to EY's satisfaction prior to its resignation."[599] This is additional, unmistakable evidence that Cherry Bekaert was severely reckless in auditing sales to AvKARE throughout the Class Period. Cherry Bekaert's reckless conduct throughout the Class Period is further cemented by EY's finding that the Company's internal controls were non-existent, and by the Company's own admission that it prematurely recognized revenue for all sales during the Non-Reliance Periods (approximately $870 million of sales).

**b. Cherry Bekaert Failed to Appropriately Audit CPM and SLR Sales**

500. In addition to AvKARE, Cherry Bekaert failed to appropriately audit sales to CPM and SLR, each of which was MiMedx's largest commercial distributor at different points during the Class Period. The significance of CPM and SLR to MiMedx's revenues required Cherry Bekaert to substantively test that sales to CPM and SLR were recorded in a manner consistent with their distribution agreements with the Company. In particular, Cherry Bekaert was required to obtain sufficient audit evidence supporting MiMedx's revenue recognition from large quarter-end sales to CPM and SLR.

---

[599] *Id.*

501. Cherry Bekaert was severely reckless in failing to properly conduct these procedures. First, Cherry Bekaert knew that the significance of both CPM and SLR to MiMedx required Cherry Bekaert to perform detailed auditing procedures to determine appropriate revenue recognition. As discussed above, Cherry Bekaert's audit testing to address the fraud risk of improper revenue recognition should have included basic procedures to analyze monthly revenues from MiMedx's largest distributors to identify any quarter-end sales spikes. This testing should have included CPM and SLR, which made large purchases at quarter-ends with material sales concessions to help MiMedx consistently achieve revenue guidance. These quarter-end spikes demanded Cherry Bekaert's close scrutiny, including sending independent confirmations to CPM and SLR to verify relevant sales terms and the absence of side agreements.[600] This would have allowed Cherry Bekaert to obtain independent audit evidence outside of any management representations, putting it on notice of Defendants' misdoings.

502. Second, Cherry Bekaert should have conducted an investigation into the Company's sales to CPM during the course of its 2015 audit, given that MiMedx suddenly and suspiciously announced in October 2015 that it would no longer be

[600] AU §316.54; AS 13.7; AU §330.08.

selling to CPM, one of its two largest customers. For example, CPM's demise was due to Forest Park's insolvency, a physician-owned hospital with ties to MiMedx. This in turn caused CPM to default on its credit terms with MiMedx, a red flag that Cherry Bekaert should have followed up on given PCAOB standards state auditors need to evaluate the financial capability of parties with respect to significant uncollected balances, especially when the balances originate from significant and unusual transactions (*i.e.*, CPM's channel stuffing quarter-end transactions).[601]

503. Third, as detailed above, MiMedx inappropriately recognized revenue on large and suspicious quarter-end sales to both CPM and SLR in 2015. These sales further demonstrate that Cherry Bekaert violated PCAOB standards during its 2015 audit and quarterly reviews by ignoring multiple red flags that MiMedx had inflated sales to CPM and SLR in order to achieve revenue guidance. For example, the Company improperly recognized $1.4 million of revenue through CPM at the end of 2Q15.[602] Cherry Bekaert knew, or was reckless in not knowing, the following red flags concerning this transaction:

- CPM's owner (Brooks) had a consulting agreement with MiMedx providing for compensation in the form of MiMedx stock options and restricted stock awards ("RSAs"). Although the agreement terminated in early 2015, the Company

---

[601] AU §316.66A.

[602] *See* SEC Complaint, at ¶¶58-85; *Petit/Taylor* Indictment, at ¶¶22-30.

suspiciously amended the agreement at the end of 2Q15 to pay Brooks an additional, one-time "consulting fee" of $200,000;

- After purchasing $3 million of MiMedx product during 1Q15 (7% of MiMedx's total 1Q15 revenue) to help MiMedx achieve revenue guidance, CPM purchased another $2.1 million of MiMedx product (5% of MiMedx's total 2Q15 revenue) during the final week of 2Q15 to again help MiMedx achieve quarterly revenue guidance; and

- On the next-to-last day of 2Q15, CPM submitted a "REVISED" $2.1 million purchase order that identified specific products that MiMedx had in stock and could ship prior to quarter-end, even though CPM did not want over half of those products ($1.2 million), intended to exchange them with MiMedx in the future, and never ordered some of them before.

504. All of these red flags should have caused Cherry Bekaert to conduct appropriate audit procedures (described in Section XI.B.1) over the significant and unusual $2.1 million quarter-end sale to CPM. For example, the fact that CPM issued a "REVISED" purchase order on the next-to-last day of 2Q15 that included products CPM had never ordered before required further testing by Cherry Bekaert to determine the reasonableness of the transaction. This should have included independent confirmation obtained of the sales terms and absence of side agreements between the Company and CPM.[603] Had Cherry Bekaert independently verified the sales terms with CPM, it would have been on notice the transaction was improper

[603] AU §316.54, AS 13.7.

and executed simply so MiMedx could achieve revenue guidance for 2Q15. In addition, the existence of a consulting agreement between MiMedx and CPM should have triggered further investigation by Cherry Bekaert that CPM was not an "independent" distributor as MiMedx claimed in its SEC filings, since CPM was receiving compensation of both MiMedx stock and cash payments.

505. Cherry also failed to perform sufficient audit procedures in connection with MiMedx's false recognition of revenue from a $4.6 million sale to SLR in 3Q15.[604] Similar to the CPM transaction in 2Q15, Cherry Bekaert violated PCAOB standards by ignoring multiple red flags that recognizing revenue on this large, unusual quarter-end transaction was especially problematic and needed to be closely scrutinized. Cherry Bekaert knew, or was reckless in not knowing, the following red flags:

- The $4.6 million transaction was the second largest sale in the history of the Company, MiMedx had never sold to SLR prior to that transaction, and SLR had less than $500,000 in annual revenue before it became a MiMedx distributor;
- The $4.6 million transaction accounted for 9.5% of MiMedx's total revenue in 3Q15, was all ordered during the last week of 3Q15 (including the last day of the quarter), and allowed MiMedx to achieve revenue guidance for the quarter;

[604] *See* SEC Complaint, at ¶¶86-112.

- The $4.6 million transaction consisted primarily of OrthoFlo, a brand new MiMedx product that SLR had no experience selling, required storage in specialized freezers that SLR had to acquire, and had unknown customer demand;

- SLR had related party ties with MiMedx including that SLR's owner was a former MiMedx sales representative who recently separated from the Company, ran SLR as a side business during his MiMedx employment, and received a $15,000 per month from a consulting agreement from MiMedx;

- SLR was a start-up distributor, making it highly unlikely SLR had the ability to pay MiMedx for the full order (if at all) until SLR was ultimately paid by its own customers, thus violating the parties' distribution agreement, which provided that SLR would pay MiMedx within 30 days; and

- SLR had not paid for the $4.6 million order on a timely basis (*i.e.*, within the parties' 30-day payment term) because SLR's receivable to MiMedx was past due by November 1, 2015 (prior to the date MiMedx filed its 3Q15 Form 10-Q on November 6, 2015).

506. All of these red flags should have resulted in Cherry Bekaert exercising heightened professional skepticism and identifying the $4.6 million sale to SLR as a significant and improper end-of-quarter channel stuffing transaction. Cherry Bekaert should have obtained sufficient evidence to corroborate any management representations concerning the sale, including third-party confirmations and documents from independent sources.[605] Cherry Bekaert also was required to gain

[605] AS 13.7.

an understanding of the business rationale for such transaction and whether that rationale (or the lack thereof) suggested that the Company entered into the transaction to engage in fraudulent financial reporting or conceal the misappropriation of assets.[606] This evidence was particularly warranted as to SLR, an entity with undisclosed, related-party ties to MiMedx that "d[id] not appear to have the financial capability to support the transaction without assistance" from the entity under audit.[607] Indeed, SLR generated less than $500,000 in annual revenue prior to becoming MiMedx's distributor during the second half of 2015. Nonetheless, MiMedx made the second largest sale in the Company's entire history to SLR at a price ($4.6 million) far exceeding SLR's annual revenue.

507. Cherry Bekaert's improper audit of this sale was supported by Cherry Bekaert partner Paul Chancey's ("Chancey") statements during an investigative interview by the DOJ on November 12, 2018.[608] Chancey admitted that, during its 2015 audit, Cherry Bekaert failed to perform any confirmation procedures in regards

[606] AU §316.66; AU §316.67.

[607] AU §316.67

[608] Chancey, as the lead engagement partner, signed on behalf of Cherry Bekaert the clean audit opinions certifying MiMedx's 2015 and 2016 financial statements. *See* Auditor Search, PCAOB, https://pcaobus.org/issuers/364066/1376339 (last visited Mar. 24, 2020).

to SLR having "economic substance" separate and apart from MiMedx, and instead relied solely on the representation of MiMedx's management.[609] This demonstrates Cherry Bekaert's violation of PCAOB standards because a significant, unusual quarter-end sale of this nature, to an undisclosed related party, required Cherry Bekaert to obtain independent audit evidence supporting the sale.[610]

508. Cherry Bekaert is not absolved by Defendants' false management representations as to SLR. For example, on or about February 4, 2016, Senken sent a letter to Cherry Bekaert, prepared with assistance from Petit and Taylor, that misleadingly stated that SLR had "paid over $1.4M since the first shipments had been made. Their payment history to date is very similar to that of other distributors." Yet, this representation should have been met with significant skepticism by Cherry Bekaert given the size and timing of the SLR sales, Andersen's allegations about the improprieties of the sales, MiMedx's related party ties with SLR, that the sales primarily consisted of brand new MiMedx product that SLR had no experience selling, that SLR had less than $500,000 in annual revenue prior to suddenly becoming MiMedx's Master Distributor, and that SLR still would have been past due on 75% of its accounts receivable balance based on the distribution

---

[609] *See* Ex. 11, at 7.

[610] AU §316.67, AS 13.7.

agreement requiring payment in 30 days. More specifically, by the time Cherry Bekaert signed its clean audit opinion over MiMedx's 2015 financial statements on February 29, 2016, SLR had only paid $1.4 million on $5.6 million of sales made in 3Q15 and 4Q15, resulting in 75% of its accounts receivable balance past due.

509. Critically, professional standards required Cherry Bekaert to test the transactions and obtain sufficient audit evidence, including third-party confirmation, rather than simply accepting management representations because of a belief that management is honest.[611] This is especially the case as to SLR, given the multiple red flags identified above. For example, the management representation that SLR's payment history was similar to other distributors would have served as an indication that multiple MiMedx distributors were not paying timely given SLR's accounts receivable balance was approximately 75% past due when Cherry Bekaert concluded its 2015 audit. Yet, as stated above, Cherry Bekaert engagement partner Chancey admitted his audit team failed to perform independent confirmation of SLR's economic substance apart from MiMedx. As a result, Cherry Bekaert ignored red flags and turned a blind eye during its 2015 audit by approving these improper sales. Moreover, SLR ultimately exchanged more than 40% of the products, and failed to

[611] AU §230.09.

pay off the outstanding balance by the time Cherry Bekaert was dismissed in August 2017, approximately 23 months after 3Q15.[612]

#### c. Cherry Bekaert Failed to Appropriately Audit Stability Sales

510. Cherry Bekaert also violated PCAOB standards regarding $2.65 million of false revenue that MiMedx recorded from sales to Stability in 3Q15 and 4Q15.[613] Cherry Bekaert ignored multiple red flags surrounding these sales, many of which were similar to the red flags surrounding the $4.6 million sale to SLR in 3Q15, discussed above. These included:

- The Company's largest sale to Stability ($2.2 million) was made in the last few days of 3Q15 and consisted primarily of OrthoFlo, a brand new MiMedx product that Stability had no experience selling, with unknown customer demand;
- Stability did not pay for the $2.2 million order on a timely basis (*i.e.*, within the parties' 30-day payment term) because Stability's receivable to MiMedx was past due by November 1, 2015 (prior to the date MiMedx filed its 3Q15 Form 10-Q on November 6, 2015);
- Like SLR, Stability was a new MiMedx distributor in 3Q15, but the parties' distribution agreement was not signed until late January 2016, and suspiciously was left undated;
- By the end of 4Q15, Stability had paid for only $225,000 (approximately 10%) of the $2.2 million sale in 3Q15, and had not sold any material amount to end customers. Nonetheless,

[612] *See* Ex. 10, at ¶14(h).

[613] *See* SEC Complaint, at ¶¶113-133.

MiMedx made another $450,000 sale to Stability on the last day of 4Q15. Stability never made another payment, and ultimately returned more than half of the total amount purchased; and

- Stability was acquired by MiMedx in January 2016, which had the practical effect of eliminating Stability's accounts receivable balance owed to MiMedx (approximately $2.4 million).

511. As a result of these red flags, Cherry Bekaert was severely reckless in ignoring that the end-of-quarter sales to Stability, involving large amounts of new and unproven product (OrthoFlo), were designed solely to help MiMedx achieve revenue guidance. Cherry Bekaert should have exercised heightened skepticism over the legitimacy of these sales. All the red flags discussed above demonstrated that the sales were significant and unusual, requiring an evaluation by Cherry Bekaert to determine if management was placing more emphasis on the need for a particular accounting treatment than on the underlying economic substance of the transaction (*i.e.*, an accounting-motivated structured transaction).[614]

512. While the DOJ found that Cherry Bekaert questioned the propriety of revenue recognized from sales to Stability,[615] Cherry Bekaert was apparently satisfied with false and misleading statements from Petit, Taylor, and Senken, including a representation that "[t]he MiMedx products were sold to [Stability]

[614] *See* AU §316.67.

[615] *See Petit/Taylor* Indictment, at ¶52.

under a signed distributor agreement similar to agreements signed with other distributors such as [CPM]."[616] However, Cherry Bekaert knew, or was reckless in not knowing, that this representation was false because MiMedx had not signed any distribution agreement with Stability until January 2016, and the agreement was suspiciously left undated. As part of its 2015 audit, Cherry Bekaert either failed to obtain a copy of the undated distribution agreement or ignored information in its possession regarding the agreement, in violation of PCAOB standards. As discussed in Section XI.B.1.a, these standards require that "[i]f a representation made by management is contradicted by other audit evidence, the auditor should investigate the circumstances and consider the reliability of the representation made."[617]

#### d. Cherry Bekaert Failed to Appropriately Audit First Medical Sales

513. Cherry Bekaert also violated PCAOB standards regarding $4.4 million of false revenue that MiMedx recorded from sales to First Medical in 2Q15 and

---

[616] *Id.*; SEC Complaint, at ¶¶229-230.

[617] AU §333.04. Similarly, Cherry Bekaert knew the management representation that Stability's 4Q15 order was placed because Stability "wanted to be assured they could continue to supply their customers if the merger agreement negotiations [with MiMedx] slowed down or were discontinued" was contradicted by evidence that Stability had not sold through ***any material amount*** of its 3Q15 order at the time it placed the 4Q15 order. Petit/Taylor Indictment, at ¶52.

4Q15.[618] Cherry Bekaert ignored multiple red flags surrounding these sales, as identified below. These included:

- The Company's improper $1.9 million sale in 2Q15 was the second large order placed by First Medical in June 2015, and this order was not secured by a line of credit as required by the distribution agreement;

- Rather than abide by the terms in the distribution agreement, First Medical's purchase order for the $1.9 million sale in 2Q15 stated the payment terms were "As per Email Dated: 25/06/2015";

- Similar to the 2Q15 sale, First Medical's first purchase order submitted on December 20, 2015 for the 4Q15 sale of $2.54 million stated the payment terms were "As per Email Dated: 25/06/2015." Then, on December 23, 2015, First Medical submitted a revised purchase order, which stated that payment terms were "6 months from the shipping date"; and

- First Medical failed to make any payments for the improper 2Q15 and 4Q15 sales until 2017.[619]

514. These red flags known to Cherry Bekaert demonstrated the quarter-end sales to First Medical were significant and unusual, thereby requiring Cherry Bekaert to obtain sufficient audit evidence and exercise appropriate skepticism concerning the transactions.[620] For example, the fact First Medical first submitted a $1.9 million

618 *See* SEC Complaint, at ¶¶31-57.

619 Ex. 10, at ¶13(g).

620 AU §316.66; AU §316.67.

order in June 2015 that was secured by a required line of credit, but then submitted an additional $1.9 million order in June again without a required line of credit, needed to be investigated by Cherry Bekaert. This was especially the case as the February 2015 distribution agreement with First Medical required a line of credit for sales orders placed. Further, Cherry Bekaert should have exercised professional skepticism concerning any potential side arrangements existing with the sales, since email communications were overriding any normal sales terms per the distribution agreement.

515. Further, in addition to the above red flags, Cherry Bekaert knew that Andersen was communicating to Senken that these sales to First Medical were inappropriate and should not have been recorded at the time of shipment. Yet, as discussed in Section XI.B.3.a, Cherry Bekaert failed to even question Andersen about any of his allegations, including these false sales to First Medical.

516. Finally, any false representations by Defendants concerning the First Medical sales, including an audit confirmation that omitted the side arrangement, does not absolve Cherry Bekaert given its violations of PCAOB standards during its 2015 audit as discussed herein. For example, besides First Medical, Cherry Bekaert during its 2015 audit would have been aware of multiple red flags associated with other fraudulent 2015 sales made to MiMedx's largest distributors (AvKARE, CPM,

SLR, and Stability) and that Andersen's allegations implicated these same sales. Yet, rather than get to the bottom of the issues, Cherry Bekaert failed to appropriately expand the scope of its audit, including a failure to interview Andersen, and instead issued a clean audit opinion over MiMedx's fraudulent 2015 financial statements.

### 2. Cherry Bekaert Failed to Abide by Related Party Auditing Standards During the Class Period

517. Cherry Bekaert also was required to closely scrutinize sales to AvKARE, CPM, and SLR due to the related-party relationships between these distributors and MiMedx. As discussed above, these distributors were effectively under MiMedx's control, qualifying them as related parties, and therefore MiMedx's sales to them were susceptible to fraud and inappropriate manipulation. AU §§334.07, 334.09, *Related Parties* ("AU 334") states:

> The auditor should place emphasis on testing material transactions with parties he knows are related to the reporting entity. . . . apply the procedures [the auditor] considers necessary to obtain satisfaction concerning the purpose, nature, and extent of these transactions and their effect on the financial statements.

518. In June 2014, the PCAOB issued Auditing Standard No. 18 *Related Parties* ("AS 18") to replace AU 334 because the PCAOB's oversight activities at the time were indicating continuing weaknesses in auditors' scrutiny of related party

transactions.[621] Like AU 334, AS 18 warned auditors of the risks of related party transactions, including that "such transactions potentially provide more of an opportunity for management to act in its own interests, rather than in the interests of the Company and its investors."[622] Further, AS 18 reiterated that "[t]he objective of the auditor is to obtain sufficient appropriate audit evidence to determine whether related parties and relationships and transactions with related parties have been properly identified, accounted for, and disclosed in the financial statements."[623]

519. Despite these professional standards requiring Cherry Bekaert to place extra emphasis on material transactions with related parties, Cherry Bekaert still approved sales by MiMedx to related parties AvKARE, CPM, and SLR that violated basic revenue recognition principles. These related party distributors did not have the "financial capability" to complete payment of MiMedx products until they were ultimately sold to end customers and, therefore, title and risk of loss did not transfer to the distributors at the time revenue was inappropriately recognized by MiMedx.[624] Evidence of this included, among other things, AvKARE making payments two to

---

[621] PCAOB Release No. 2014-002, at 2.

[622] *Id.* at 4.

[623] AS 18.2.

[624] *See* AU §316.67.

three times longer than required under its contract with MiMedx, SLR lacking capital, and CPM defaulting on its credit terms and collapsing.

520. In addition, as discussed above, Cherry Bekaert ignored red flags that MiMedx was retaining performance obligations and risk of loss for products sold to AvKARE. This made AvKARE a mere pass-through entity used to fraudulently inflate MiMedx's financial results. Further, CPM and SLR were distributors receiving cash and MiMedx stock through consulting agreements, contrary to MiMedx's false representations to investors that its distributors were "independent" third parties. Also, SLR was being run by a MiMedx employee (Morrison) until he left MiMedx when SLR became the Company's new Master Distributor following CPM's ominous departure. These factors should have increased the scrutiny and testing Cherry Bekaert placed on sales to these related-party distributors, especially the significant and unusual quarter-end sales that helped MiMedx achieve revenue guidance. The PCAOB states, for example, that "related party transactions that are also significant unusual transactions"[625] (*i.e.*, outside the normal course of business) provide an opportunity to engage in fraudulent financial reporting. Yet, in violation

[625] AU §316.85.A.2.

of PCAOB standards, Cherry Bekaert continually blessed improper sales to these distributors during the Class Period.

### 3. Cherry Bekaert Ignored Red Flags Associated with Whistleblower Complaints and Two Separate Audit Committee Investigations That Were Inadequate and Lacked Independence

521. Cherry Bekaert also was required to comply with auditing standards regarding the evaluation of potential illegal acts by MiMedx.[626] During the Class Period, Cherry Bekaert was made aware of potential illegal acts by MiMedx that were subject to multiple whistleblower complaints and two separate Audit Committee investigations, ACI and ACII. Cherry Bekaert failed to appropriately evaluate these potential illegal acts, which implicated the accuracy of MiMedx's financial statements and the effectiveness of its ICFR, and ignored red flags that ACI and ACII were inadequate and lacked independence.

#### a. The Andersen Complaint and ACI

522. First, in January 2016, MiMedx's former Controller, Andersen, sent an e-mail to Senken raising his concern that certain transactions involving multiple MiMedx distributors failed to satisfy GAAP criteria that would allow MiMedx to

---

[626] *See* AU §317, *Illegal Acts by Clients*.

recognize revenue at the time of shipment.[627] Specifically, Andersen expressed the belief that revenue that the Company was attributing to AvKARE in 2015 was inflated because AvKARE "has a right of return and doesn't meet all of the exception criteria, and implicitly doesn't pay MiMedx until the tissue has been implanted."[628] In addition, Andersen raised concerns about the recognition of revenue from 2015 sales to SLR, Stability, and First Medical, as well as pre-2015 sales to AvKARE.[629] Andersen's e-mail to Senken also referenced "concerns" that he had "shared previously."[630] Finally, Andersen alleged internal control deficiencies related to MiMedx sales personnel extending payment terms and other incentives to customers, which were not disclosed to MiMedx's accounting staff.[631]

523. As Andersen's allegations clearly met the definition of a potential illegal act with its broad implications on MiMedx's financial statements and internal controls, it required Cherry Bekaert to comply with AU §317 to examine the allegations. As a result, AU §317 required Cherry Bekaert to "obtain an understanding of the nature of the act, the circumstances in which it occurred, and

---

[627] *See* SEC Complaint, at ¶¶220-227.

[628] *See* Ex. 7, at ¶22.

[629] *See id.*

[630] *See id.*

[631] *See* SEC Complaint, at ¶220.

sufficient other information to evaluate the effect on the financial statements."[632] In addition, AU §317.11 identifies audit procedures that may be necessary to determine if a potential illegal act has occurred:

- examine supporting documents, such as invoices, canceled checks, and agreements and compare with accounting records;
- confirm significant information concerning the matter with the other party to the transaction or with intermediaries, such as banks or lawyers;
- determine whether the transaction has been properly authorized; and
- consider whether other similar transactions or events may have occurred, and apply procedures to identify them.

524. Cherry Bekaert failed to comply with the auditing requirements of AU §317 during its 2015 audit by either failing to identify the allegations detailed in the Andersen e-mail as a potential illegal act that could materially impact MiMedx's financial reporting or failing to adequately perform the required auditing procedures for a potential illegal act to appropriately determine that MiMedx's financial statements were not materially misstated.

525. Andersen's allegations were a significant red flag that MiMedx's and Cherry Bekaert's prior representations regarding the accuracy of the Company's

[632] AU §317.10.

financial statements and the effectiveness of the Company's ICFR were material misstatements. Accordingly, under AU §317, Cherry Bekaert was required, but failed, to independently examine each allegation in order to provide an appropriate audit opinion for its 2015 audit. These examinations should have included a review of supporting documentation and confirmation of significant information from the distributors identified by Andersen (*i.e.*, AvKARE, SLR, Stability, and First Medical).[633] Cherry Bekaert's failure in this regard is unmistakable given its knowledge of all the other red flags associated with the Company's revenue recognition from these same distributors (as discussed above), demonstrating that Andersen's allegations were accurate.

526. To make matters worse, Cherry Bekaert ignored that ACI was woefully inadequate and not independent, and Cherry Bekaert never even questioned Andersen about his allegations prior to issuing its 2015 audit opinion.[634] Senken, who was Andersen's direct supervisor, immediately prepared a memorandum for the Audit Committee (with assistance from Petit and Taylor) rebutting Andersen's allegations as false, rather than appropriately conducting an independent

---

[633] AU §317.11.

[634] *See* Ex. 11, at 7, 11.

investigation.[635] Senken, Petit, and Taylor then provided Cherry Bekaert with a similar memorandum rebutting the allegations just a few weeks later, in connection with Cherry Bekaert's FY15 audit.[636] In addition, Petit, Taylor, and Senken caused MiMedx to move Andersen to a new position because ***he would not sign the management representation letter for Cherry Bekaert's FY15 audit*** and negotiated a severance package with Andersen, who left MiMedx in mid-February 2016.[637] Around the same time, Petit prepared and sent yet another memorandum to Cherry Bekaert in response to questions it raised during the FY15 audit about the Company's revenue recognition with SLR.[638]

527. Yet, Cherry Bekaert should have been immediately skeptical of these memoranda prepared by Senken, Taylor, and Petit given Andersen's refusal to sign a management representation letter for Cherry Bekaert's FY15 audit and his departure from MiMedx after less than one year on the job. In addition, Cherry Bekaert ignored the red flag that MiMedx failed to conduct an independent investigation of Andersen's allegations, but rather rebutted the allegations in an

---

[635] *See* SEC Complaint, at ¶221.

[636] *See id.* at ¶229.

[637] *See id.* at ¶226; *see also* Ex. 7, at ¶24.

[638] *See* SEC Complaint, at ¶231.

alarmingly brief amount of time. Finally, Cherry Bekaert should have been highly skeptical of the memorandum prepared by Petit given that PCAOB standards addressing potential fraud warn about "nonfinancial management's executive participation in accounting decisions."[639] As a result, any false representations made by Senken, Taylor, or Petit in memoranda provided to Cherry Bekaert regarding Andersen's allegations did not absolve Cherry Bekaert from exercising professional skepticism and independently examining the allegations in accordance with AU §317, which it failed to do.

528. Cherry Bekaert failed to obtain sufficient and appropriate evidence to evaluate Andersen's allegations, as required. At minimum, Cherry Bekaert should have interviewed Andersen and exercised skepticism over the adequacy of ACI. However, in violation of PCAOB standards, Cherry Bekaert failed to do so. Chancey confirmed to the DOJ that Cherry Bekaert ***never*** met with Andersen to discuss his allegations, after Senken claimed that Andersen was unavailable.[640]

---

[639] AU §316.85.A.2.

[640] Ex. 11, at 7 (notes from the DOJ's interview with Chancey on November 12, 2018). According to notes from the DOJ's interview with another Cherry Bekaert partner, Rick Creese, he was told by Chancey specifically that Andersen had no "further concerns" after conversations with Senken. *See id.* at 11. Yet this flies in the face of Andersen's position that he was unwilling to sign the management representation letter for Cherry Bekaert's FY15 audit, his abrupt departure from the Company, and the many other red flags supporting Andersen's allegations.

Rather than demand that Andersen be made available, Cherry Bekaert ignored the guidance of AU §317.19, which states:

> If the auditor is precluded by the client from obtaining sufficient appropriate evidential matter to evaluate whether an illegal act that could be material to the financial statements has, or is likely to have, occurred, the auditor generally should disclaim an opinion on the financial statements.

529. Despite this guidance, Cherry Bekaert issued a clean audit opinion on MiMedx's 2015 financial statements without even interviewing Andersen. Its decision to rely on management representations, as opposed to getting to the bottom of the alarming revenue recognition issues raised by Andersen, demonstrates that its FY15 audit amounted to no audit at all.

**b. The Tornquist/Kruchoski Complaint and ACII**

530. Less than a year later, in November 2016, two more MiMedx employees, Kruchoski and Tornquist, complained internally about MiMedx's fraudulent revenue recognition practices and channel stuffing through AvKARE. Kruchoski and Tornquist then filed a whistleblower complaint with the SEC, declaring the truthfulness of their allegations under penalty of perjury, and a separate civil complaint on December 15, 2016.[641] The Kruchoski/Tornquist allegations prompted a second Audit Committee investigation, ACII. Similar to Andersen,

[641] *See generally Kruchoski/Tornquist* Complaint.

Kruchoski and Tornquist alleged that MiMedx was prematurely recognizing revenue with AvKARE. As a result, the allegations had broad implications as to MiMedx's financial statements and ICFR.

531. As in the case of Andersen, Cherry Bekaert failed to comply with the auditing requirements of AU §317 during its FY16 audit by either failing to identify the events detailed by Kruchoski and Tornquist as potential illegal acts that could materially impact MiMedx's financial reporting, or by failing to adequately perform the required auditing procedures to determine that MiMedx's financial statements were not materially misstated. Notably, on December 27, 2016, less than two weeks after Kruchoski and Tornquist filed their whistleblower complaints, MiMedx announced the preliminary findings of ACII. According to the Company, the Audit Committee, working in conjunction with Cherry Bekaert and Troutman, "found no credible evidence to indicate that any changes to previously issued financial statements are necessary in light of these allegations." As an auditor of public companies, Cherry Bekaert knew, or was reckless in not knowing, that an appropriate, comprehensive investigation into broad allegations of improper revenue recognition such as those of Kruchoski and Tornquist could not reach an affirmative conclusion in less than two weeks' time.

532. The quick exoneration of the Company's revenue practices was especially problematic because Cherry Bekaert knew Andersen had made similar allegations less than a year earlier, and also knew conflicts of interest existed with Troutman, which served as both "independent" counsel to the Audit Committee and MiMedx's regular corporate counsel. For example, a white paper authored in 2013 by EY and Squire Sanders LLP recognizes that "issues are present when using the company's regular outside counsel with strong ties to management."[642] The publication further opines that, as a general rule, the use of independent outside counsel with no (or non-material) prior relationships with the company or its management is indicated when:

- the allegations under investigation involve serious misconduct or the conduct of senior officers;
- the impact upon the company is potentially damaging;
- the accuracy of the company's financial statements is implicated, particularly if a restatement is possible;
- regulators or prosecutors may be asked to rely upon the investigation;
- the investigation is triggered at the request of external auditors' action pursuant to Section 10A; or

---

[642] Frank M. Placenti, Gabriel Colwell, Joseph Walker & Jeff Ferguson, *The audit committee's evolving role in overseeing corporate investigations*, at 7, SQUIRE SANDERS (Sept. 2013).

- use of the company's in-house investigatory resources is otherwise inappropriate due to the nature of the matter being investigated.

533. Despite a number of these items being present, Cherry Bekaert ignored them and the alarming red flag that MiMedx's regular corporate counsel was conducting ACII. Cherry Bekaert's conduct was especially egregious because it also knew, or was reckless in not knowing, that Troutman had previously represented other companies controlled by Petit, including Healthdyne and Matria, and that Petit had come under governmental scrutiny for practices similar to those alleged herein, during his time at both Healthdyne and Matria. In addition, the Chairman of the Audit Committee at the time ACII was initiated and completed was Dewberry, Petit's personal friend and fraternity little brother, who had been a member of the executive team for numerous of Petit's businesses, and the Audit Committee also included Bleser, who was a board member of Matria while Petit was Chairman and CEO. These red flags should have raised Cherry Bekaert's skepticism about the independence and adequacy of ACII. By ignoring these red flags, Cherry Bekaert was complicit in Defendants' fraudulent attempts to cover up and deny the facts alleged by Kruchoski and Tornquist.[643]

---

[643] In addition, the Company's Restatement has now confirmed both the Board and senior management failed to appropriately respond to allegations of improper accounting activities, improper sales practices, and activities consistent with

534. Also, during ACII, Cherry Bekaert violated PCAOB standards by placing greater reliance on Petit's management representations over independent, third party evidence from AvKARE's counsel, which admitted to the parties' secret side arrangement during ACII. This evidence proved that MiMedx was improperly recognizing revenue on all AvKARE sales, ***corroborating*** the evidence presented by Andersen, Kruchoski, and Tornquist. Thus, even when it was presented with evidence exposing MiMedx's fraudulent accounting, Cherry Bekaert turned a blind eye and looked the other way. Ultimately, and unsurprisingly, ACII found no credible evidence that MiMedx's prior financial reporting was incorrect in any respect. Correspondingly, Cherry Bekaert agreed with the Company's conclusions and ultimately issued a clean audit opinion on the Company's false financial statements included in its 2016 Form 10-K.

535. Further, that Cherry Bekaert recommended engaging a revenue recognition expert as additional protection to opine on AvKARE's revenue recognition under the amended PDA does not evidence Cherry Bekaert's innocence. First, the revenue recognition expert, as opposed to Cherry Bekaert who had been MiMedx's auditor since 2008, had no previous experience with MiMedx or its

---

retaliation against employees who raised concerns of such improper accounting and sales activities. *See* Ex. 1, at 81.

executives, including their inappropriate tone at the top. Further, the expert was brought in to address a discrete issue, ***relied exclusively*** on management's representations to learn the supposed facts about the AvKARE relationship, and did not have the benefit of being aware of a multitude of existing red flags that Cherry Bekaert was aware of, as discussed herein.

536. Second, Cherry Bekaert was required under PCAOB standards to independently reach its own conclusions to support its audit opinion, including obtaining sufficient, appropriate, and independent evidence to corroborate management's representations on important matters.[644] Yet, as discussed herein, Cherry Bekaert failed miserably in this regard as it ignored numerous red flags concerning AvKARE, including AvKARE's independent confirmation evidencing a side arrangement did exist. As a result, Cherry Bekaert should have exercised significant professional skepticism towards any management representations that no side arrangements with AvKARE existed.

537. Importantly, Cherry Bekaert's reliance on management representations during ACII can be contrasted with EY, who refused to back down when Petit, Taylor, and Senken provided a memorandum in 2018 that attempted to persuade EY

---

[644] AS 13.7.

that MiMedx's revenue recognition with AvKARE was appropriate.[645] Instead, EY demanded that an independent investigation be conducted before it would conclude its 2017 audit and ultimately resigned.[646]

538. Cherry Bekaert's violation of PCAOB standards to adequately test the potential illegal acts by MiMedx was confirmed by MiMedx's Audit Committee, which admitted in May 2019 that ACII "cannot be relied upon."[647] Specifically, following ACIII, conducted by an ***independent*** law firm with outside forensic accountants over a ***fifteen month*** period, the Audit Committee "identified additional evidence . . . including evidence corroborating some of the employees' [*i.e.*, Kruchoski's and Tornquist's] allegations and relevant information related to the Company's relationship with AvKARE not contained in the Troutman Sanders investigation [ACII] report. As a result, the findings of the earlier investigation [ACII], particularly regarding revenue recognition, ***cannot be relied upon***."[648]

539. Finally, as described above, during EY's first audit after replacing Cherry Bekaert as MiMedx's external auditor in 2017, EY raised questions about

---

645 *See* SEC Complaint, at ¶¶258-260.

646 *Id.*

647 Ex. 14, at 21.

648 *Id.*

the Company's revenue recognition under certain distributor contracts, found material issues impacting the reliability of previously issued financial statements, questioned the adequacy of ACI and ACII, concluded that the internal controls needed for the Company to develop reliable financial statements do not exist, refused to sign off on the Company's 2017 financial statements, and ultimately resigned. These events further support Cherry Bekaert's reckless disregard of the allegations of Andersen, Kruchoski, and Tornquist and its complicity in helping MiMedx hide its over five-year revenue recognition fraud from investors.

#### 4. The PCAOB Found That Cherry Bekaert Violated Auditing Standards

540. Cherry Bekaert's audit failures concerning MiMedx are also supported by the PCAOB's inspections of Cherry Bekaert, which identified deficiencies in Cherry Bekaert's audits of public registrants during the Class Period.[649] More specifically, in three consecutive PCAOB inspections of Cherry Bekaert (2012, 2015, 2017), during which it was the auditor of MiMedx, the PCAOB found deficiencies of such significance in Cherry Bekaert's audit procedures over

---

[649] The PCAOB inspects registered public accounting firms to assess compliance with the Sarbanes-Oxley Act, the rules of the PCAOB, the rules of the SEC, and professional standards, in connection with the firm's performance of audits, issuance of audit reports, and related matters involving U.S. public companies, other issuers, brokers, and dealers.

registrants' revenues that it appeared to the PCAOB inspection team that Cherry Bekaert had not obtained sufficient appropriate audit evidence to support its audit opinions. As discussed further below, this consistent failure by Cherry Bekaert to appropriately audit the revenues of its public registrants further supports its reckless conduct and failure to comply with PCAOB standards throughout the Class Period.

541. First, the PCAOB's "Report on 2012 Inspection of Cherry Bekaert LLP" issued on March 28, 2013 ("2012 PCAOB Report")[650] found deficiencies in Cherry Bekaert's audits, including a "failure to perform sufficient procedures to test revenue, including the inadequate performance of substantive analytical procedures."[651] This PCAOB finding put Cherry Bekaert on notice for future audits of MiMedx that it needed to ensure adequate performance of analytical procedures over revenues. For example, it should have analyzed MiMedx's monthly revenues, including the identification of any quarter-end sales spikes compared to prior years.

[650] *Available at* https://pcaobus.org//Inspections/Reports/Documents/2013_Cherry_Bekaert_LLP.pdf. As a public accounting firm that provides audit reports for less than 100 public issuers, Cherry Bekaert is inspected by the PCAOB triennially, or approximately every three years.

[651] 2012 PCAOB Report, at 5. Under PCAOB standards auditors are required to perform analytical procedures, which "are an important part of the audit process and consist of evaluations of financial information made by a study of plausible relationships among both financial and nonfinancial data." AU §329.02.

Yet, as discussed above, Cherry Bekaert ignored during the Class Period the red flag that MiMedx was engaging in significant and unusual quarter-end channel stuffing transactions that allowed the Company to meet or exceed revenue guidance virtually every quarter throughout the Class Period.

542. Similarly, the PCAOB's "Report on 2015 Inspection of Cherry Bekaert LLP" issued on September 29, 2016 ("2015 PCAOB Report")[652] again found deficiencies in Cherry Bekaert's audit procedures over "revenue recognition" and "revenue allowances."[653] Specifically, the PCAOB found that Cherry Bekaert failed "to perform sufficient procedures to identify and test the design and operating effectiveness of controls over revenue recognition" and failed "to perform sufficient procedures to test revenue allowances."[654] These findings by the PCAOB were another warning to Cherry Bekaert that for future audits, including any audits of MiMedx, it needed to significantly improve its procedures over revenue recognition and related sales allowances to ensure being in compliance with PCAOB standards.

---

[652] *Available at* https://pcaobus.org/Inspections/Reports/Documents/104-2016-183-Cherry-Bekaert.pdf.

[653] 2015 PCAOB Report at 5.

[654] *Id.*

543. However, Cherry Bekaert did not heed the PCAOB's warnings because similar audit deficiencies over revenues were found for a third time in the PCAOB's "Report on 2017 Inspection of Cherry Bekaert LLP," issued on July 26, 2018 ("2017 PCAOB Report").[655] The PCAOB found that Cherry Bekaert failed to perform sufficient audit procedures and thus failed to gain sufficient competent evidence to support its unqualified opinions.[656] In particular, like certain deficiencies identified in the 2012 and 2015 PCAOB Reports, the PCAOB found that Cherry Bekaert failed to perform sufficient procedures over sales, sales-related estimates, accounts receivable, and evaluating the severity of a control deficiency for a sales-related estimate, along with other items.[657]

544. As part of the 2017 inspection, the PCAOB reviewed the audits of five Cherry Bekaert clients and noted significant audit deficiencies with four of those five clients.[658] The audit of one those clients, called "Issuer B," included the following significant audit deficiencies:

- "the failure, in an audit of ICFR, to perform sufficient procedures to test the design and operating effectiveness of controls over the

---

[655] *Available at* https://pcaobus.org/Inspections/Reports/Documents/104-2018-114-Cherry-Bekaert-LLP.pdf.

[656] *See* 2017 PCAOB Report, at 4.

[657] *See id.* at 5.

[658] *See id.* at 3-6.

occurrence, completeness, and valuation of sales and sales-related estimates (AS 2201.39, .42, .44, and .B9)";

- "the failure, in an audit of ICFR, to perform sufficient procedures to identify and test the design and operating effectiveness of controls over the existence and valuation of accounts receivable (AS 2201.39, .42, and .44)";

- "the failure, in an audit of ICFR, to perform sufficient procedures to evaluate the severity of a control deficiency related to a sales-related estimate (AS 2201.62-.63)";

- "the failure, in an audit of ICFR, to perform sufficient procedures to test the design and operating effectiveness of controls over the valuation of certain assets acquired and liabilities assumed, and controls over purchase consideration related to a business combination transaction (AS 2201.39, .42, and .44)"; and

- "the failure to perform sufficient procedures to test the valuation of certain assets acquired and purchase consideration recorded related to a business combination transaction, including the failure to test the accuracy and completeness of issuer-provided data used by an issuer-engaged specialist (AS 1210.12; AS 2502.05, .26, and .28; AS 2810.03)."[659]

545. The nature and circumstances of these deficiencies support that "Issuer B" was MiMedx. The PCAOB noted that the deficiencies were so significant that the issuer ***announced an intention to restate*** and ***report material weaknesses in ICFR***.[660] This was primarily due to improper revenue recognition, which aligns with

[659] *Id.* at 5.

[660] *See id.* at 3 ("The inspection team identified matters that it considered to be deficiencies in the performance of the work it reviewed. One of the deficiencies relates to auditing an aspect of an issuer's financial statements that the issuer

Cherry Bekaert's audit deficiencies with respect to Issuer B's sales, sales-related estimates, and accounts receivable. Moreover, the timing of the PCAOB's 2017 inspection of Cherry Bekaert lines up with the Restatement. The PCAOB started its inspection in August 2017, and sent Cherry Bekaert a draft inspection report in May 2018.[661] One month later, in June 2018, MiMedx announced its intention to issue the Restatement and report material weaknesses in ICFR. A month after that, in July 2018, the PCAOB issued its final report on Cherry Bekaert identifying the above deficiencies.

546. Other facts linking Issuer B to MiMedx include:

- The PCAOB found issues with Cherry Bekaert's audit of Issuer B in reviewing the work of an issuer-engaged specialist and failing to perform sufficient procedures over the valuation of assets and liabilities in a business combination.[662] MiMedx's 2016 Form 10-K disclosed that the Company made an acquisition on January 13, 2016 of Stability and used a third party specialist to assist with the valuation of this business combination;

- Cherry Bekaert only had 35 public clients at the time of the PCAOB's inspection in August 2017, making it unlikely that clients other than MiMedx fit the description of Issuer B (*i.e.*,

---

announced an intention to restate and report a related material weakness in [ICFR] after the primary inspection procedures were conducted" from August 14 to August 17, 2017.).

[661] *See id.* at 13-14. The May 2018 draft report to Cherry Bekaert is non-public.

[662] *See id.* at 5, A-1, A-8-A-9.

other clients publicly announcing a restatement between August 2017 and July 2018); and

- Viceroy issued a December 2018 research report referring to the 2017 PCAOB Report of Cherry Bekaert as "scathing" and made reference to Cherry Bekaert's audits of MiMedx.[663] In particular, Viceroy questioned how Cherry Bekaert was able to audit MiMedx's financials when its replacement, EY, later "quit on the apparent basis that internal controls to verify MiMedx's financials 'do not exist.'"[664]

**C. Cherry Bekaert's Failure to Comply with PCAOB Standards over MiMedx's ICFR**

547. Cherry Bekaert also failed to adequately comply with PCAOB standards when auditing MiMedx's ICFR. Cherry Bekaert asserted in its audit reports that MiMedx's ICFR were effective. In truth, the Company's ICFR were materially weak. Its false financial statements stemmed from a complete absence of ICFR over revenue recognition and an ineffective control environment, including an inadequate tone at the top.

548. Specifically, Cherry Bekaert was required, but failed, to follow PCAOB AS 5 when auditing MiMedx's ICFR. Under AS 5, Cherry Bekaert was required to audit MiMedx's assessment of its internal controls, and to reach its own, independent

---

[663] Viceroy Research Group, *Ebix – Goodwill Hunting* (Dec. 11, 2018), https://viceroyresearch.files.wordpress.com/2018/12/ebix-12-11-2018.pdf.

[664] *See id.*

conclusion about the effectiveness of MiMedx's internal controls.[665] AS 5 further describes specific procedures Cherry Bekaert was required to perform over MiMedx's control environment, due to the control environment's significance in maintaining effective internal controls:[666]

> Because of its importance to effective internal control over financial reporting, the auditor must evaluate the control environment at the company. As part of evaluating the control environment, the auditor should assess –
>
> - Whether management's philosophy and operating style promote effective internal control over financial reporting;
> - Whether sound integrity and ethical values, particularly of top management, are developed and understood; and
> - Whether the Board or audit committee understands and exercises oversight responsibility over financial reporting and internal control.[667]

549. Under AS 5, "[i]f one or more material weaknesses exist, the company's internal control over financial reporting cannot be considered

[665] AS 5.1, 5.3.

[666] The critical importance of a company's control environment and its tone at the top to establishing effective internal controls is further discussed in Section X.G above.

[667] AS 5.25.

effective."[668] Indicators of material weaknesses in a company's ICFR include the following:

- "Identification of fraud, whether or not material, on the part of senior management";
- "Restatement of previously issued financial statements to reflect the correction of a material misstatement";
- "Identification by the auditor of a material misstatement of financial statements in the current period in circumstances that indicate that the misstatement would not have been detected by the company's internal control over financial reporting"; and
- "Ineffective oversight of the company's external financial reporting and internal control over financial reporting by the company's audit committee."[669]

550. MiMedx's ICFR were ineffective because its control environment was virtually non-existent, as the Company's leadership was focused on maximizing sales and achieving quarterly revenue guidance over ensuring compliance with GAAP. The Company's CEO (Petit), CFO (Senken), COO (Taylor), and Corporate Controller/Treasurer (Cranston) have all been fired "for cause" for conduct detrimental to the Company.[670] Further, during ACIII, the Audit Committee

---

[668] AS 5.2.

[669] AS 5.69.

[670] On September 20, 2018, the Company disclosed that MiMedx's Board and Compensation Committee found that Petit, Taylor, Senken, and Cranston engaged in, among other things, "conduct detrimental to the business or reputation of the

observed "a recurrent trend in which former senior management emphasized short-term business goals over compliance and ethics, was not receptive to employee concerns and failed to respond appropriately to compliance issues[,]" which set an "inappropriate 'tone at the top.'''[671]

551. Despite being MiMedx's auditor since 2008, Cherry Bekaert failed to identify that the Company's control environment was ineffective and the Company's tone at the top was inappropriate. Instead, Cherry Bekaert allowed MiMedx to materially overstate financial results for over a five-year period. This ran afoul of PCAOB standards, which warn that an ineffective control environment "might create pressures or opportunities for management to manipulate the financial statements, leading to higher risk of material misstatement."[672] Further, PCAOB standards state that auditors should modify their audit strategy to "[o]btain more persuasive audit evidence from substantive [testing] procedures due to the identification of pervasive weaknesses in the company's control environment."[673]

---

Company." MiMedx Group, Inc., Current Report (Form 8-K), Ex. 99.1 (Sept. 20, 2018).

[671] Ex. 1, at 5.

[672] AS 8.6.

[673] AS 13.6.b.

552. Yet, Cherry Bekaert failed to perform a proper evaluation of MiMedx's ICFR and ignored numerous red flags throughout the Class Period exposing MiMedx management's improper tone at the top and ineffective control environment, including: (a) Petit's past accounting and Medicare-related fraud issues at Healthdyne and Matria; (b) the *Montecalvo* Complaint; (c) the civil subpoena from HHS-OIG; (d) the hiring of ABH's sales force; (e) concerns raised by multiple MiMedx employees, including Andersen, Kruchoski, and Tornquist; (f) MiMedx suing and publicly attacking employees who raised concerns; (g) MiMedx publicly sparring with short sellers; (h) MiMedx engaging in suspicious channel stuffing sales at quarter-end to consistently achieve revenue guidance virtually every quarter; (i) MiMedx entering into and operating under a side arrangement with AvKARE that was contrary to the parties' contract (PDA) terms; (j) Petit's false representations concerning accurate responses from AvKARE's counsel to questions regarding the Company's revenue recognition with AvKARE; (k) the Audit Committee conducting two investigations into revenue recognition concerns (ACI and ACII) that were inadequate and lacked independence; and (l) that the Company did not even have the processes in place to determine whether controls within each of the five components of internal control were present and functioning as intended.

553. In particular, the many red flags ignored by Cherry Bekaert, including significant and unusual quarter-end sales to distributors, implicated MiMedx's ineffective controls over revenue recognition. Cherry Bekaert knew that improper revenue recognition was a fraud risk factor and that PCAOB standards required it to "evaluate the design of the company's [MiMedx's] controls that are intended to address fraud risks and other significant risks and determine whether those controls have been implemented."[674]

554. In addition, Cherry Bekaert ignored significant red flags surrounding Petit's and Taylor's statements defending the Company's inappropriate accounting, including statements made directly to Cherry Bekaert. This was contrary to PCAOB standards, which identify "[n]onfinancial management's excessive participation in or preoccupation with the selection of accounting principles or the determination of significant estimates"[675] as a fraud risk factor.

555. Even if MiMedx had any internal controls over revenue recognition, it was evident to Cherry Bekaert that Petit and Taylor were overriding those controls, based on their extensive participation in the Company's accounting decisions and defense of such decisions. PCAOB standards indicate that Cherry Bekaert should

---

[674] AS 12.72.

[675] AU §316.85.A.2.

have performed audit procedures to address the risk of management overriding controls, including, but not limited to: Evaluating whether the business purpose for significant transactions that are outside the normal course of business for the company or that otherwise appear to be unusual due to their timing, size or nature ("significant unusual transactions") indicates that the transactions may have been entered into to engage in fraudulent financial reporting or conceal misappropriation of assets.[676]

556. Cherry Bekaert failed to appropriately test for this risk. This was evidenced by Petit's and Taylor's excessive involvement in accounting matters and defenses against allegations of improper accounting. Despite these red flags, Cherry Bekaert concluded MiMedx's revenue recognition controls were effective throughout the Class Period.

557. The resignation of MiMedx's independent auditor, EY, on December 4, 2018, also demonstrates Cherry Bekaert's failure to follow PCAOB standards in auditing MiMedx's ICFR from FY12 through FY16. While EY was engaged as MiMedx's auditor, it advised the Company that the internal controls necessary for the Company to develop reliable financial statements ***did not exist***.

[676] AU §§316.66-.67A.

558. Finally, MiMedx has now admitted that it had to correct the revenue recognition for ***all of the Company's sales*** as part of the Restatement. Further, Defendants' fraud during the Class Period has been so devastating, that the Company plans to conclude material weaknesses will still exist as of December 31, 2019, when it issues its delayed 2019 Form 10-K. These shocking admissions go to the heart of Cherry Bekaert's audit opinions that MiMedx was maintaining effective ICFR. They demonstrate that Cherry Bekaert's audit process amounted to no audit at all, and that Cherry Bekaert simply approved or recklessly disregarded the internal control failures and GAAP violations of a client that was too valuable to lose. Consequently, Cherry Bekaert failed to conduct its audits in accordance with PCAOB standards.

**D. Cherry Bekaert Is Not Absolved of Liability Because of Misrepresentations by Former MiMedx Management**

559. Investigations by the Audit Committee (ACIII), DOJ, and SEC found that Petit, Taylor, Senken and other members of MiMedx's management made material misstatements and omissions to Cherry Bekaert. As discussed herein, this does not absolve Cherry Bekaert from liability, because it nonetheless failed to follow up on significant red flags associated with the misrepresented sales transactions, and it placed undue reliance on management representations over independent, third-party evidence.

560. Indeed, Cherry Bekaert ignored a litany of red flags indicating that MiMedx's financial statements were fraudulent and its internal controls were non-existent. Basic audit procedures such as calculating AvKARE's DSO numbers, performing appropriate sales cutoff procedures, and sending independent confirmations to MiMedx's main distributors would have alerted Cherry Bekaert to MiMedx's manipulation of revenue recognition policies and issuance of false and misleading financial statements. The presence of these red flags demonstrate that Cherry Bekaert violated PCAOB standards by relying on management representations when simply performing basic auditing procedures would have alerted it to the fraud.

561. Cherry Bekaert relied on ACI and ACII, which blessed MiMedx's fraudulent revenue recognition. These investigations clearly were inadequate and lacked independence. During ACI, Cherry Bekaert ignored that Andersen's allegations were not adequately or independently investigated. Rather, MiMedx's executive team simply rebutted the allegations. In addition, Cherry Bekaert decided not to interview Andersen even though he was the Controller of MiMedx, a CPA, refused to sign the management representation letter, and alleged improper revenue recognition through MiMedx's largest distributors. During ACII, Cherry Bekaert again ignored that the investigation was not independent, as it was performed by

MiMedx's regular corporate counsel (Troutman). Further, during ACII, Cherry Bekaert was made aware of MiMedx's premature revenue recognition with AvKARE through independent audit evidence (admissions from AvKARE's counsel), but instead chose to rely on Petit's representation that the evidence was false, even though Petit was directly implicated in the fraud.

562. Simply put, when Cherry Bekaert was presented with red flag, after red flag, concerning MiMedx's improper revenue recognition, Cherry Bekaert's audit approach was to blindly rely on the management representation letter, ignore evidence that directly contradicted the letter, and not dig into the issue any further. For example, during the 2016 audit Cherry Bekaert added a new representation to the management representation letter as a protection that no side agreement with AvKARE existed. But, as discussed herein, Cherry Bekaert had all the evidence at its disposal, ***including independent confirmation from AvKARE***, that demonstrated a side agreement existed. As a result, Cherry Bekaert violated PCAOB standards addressing management representations including that representations "are not a substitute for the application of those auditing procedures necessary to afford a reasonable basis" for the auditor's opinion.[677]

---

[677] AU §333.02.

563. As a former Director of PCAOB Enforcement and Investigations noted, "[w]hen an auditor is confronted with multiple indicators of problematic revenue recognition . . . he or she must get to the bottom of the relevant issues, including digging into management's representations."[678] Cherry Bekaert failed miserably in this regard, as it blindly relied on management representations when it had audit evidence that contradicted the representations, and when basic audit procedures would have exposed the representations as false. Despite its obligations as a public watchdog, Cherry Bekaert put its own financial interests ahead of professional obligations, placing investors at undue risk of the massive financial harm suffered when MiMedx's fraud ultimately was disclosed.

### E. Cherry Bekaert Was Motivated to Turn a Blind Eye Due to Its Lucrative Audit Fees from MiMedx

564. Cherry Bekaert was also motivated to ignore red flags during its MiMedx audits to keep earning lucrative audit fees from MiMedx, which grew substantially during the Class Period. For example, between 2013 and 2016 Cherry Bekaert's audit fees from MiMedx increased by over 140%. In addition, Cherry Bekaert was paid $625,231 in audit fees for its FY16 audit of MiMedx. This ranked MiMedx as Cherry Bekaert's number one public client in terms of fees earned from

[678] *See supra* n.579.

its 2016 audits.[679] According to the 2015 PCAOB Report, issued on September 29, 2016, Cherry Bekaert only had 36 public clients, so keeping a top client like MiMedx would have been a priority.

565. Further, Cherry Bekaert's number two public client in fees earned during 2016 ($624,436) was Ebix, Inc. ("Ebix"),[680] another company that ultimately replaced Cherry Bekaert as its independent auditor.[681] On December 11, 2018, Viceroy published a 26-page report on Ebix that alleged numerous accounting discrepancies dating from 2013 to 2016, when Cherry Bekaert was Ebix's auditor.[682] Viceroy also noted Ebix's change in auditor from Cherry Bekaert to T.R. Chadha & Co. "just weeks" after Cherry Bekaert was subject to the "scathing" 2017 PCAOB Report discussed above.[683]

**F. Cherry Bekaert's False and Misleading Statements**

566. Cherry Bekaert's clean audit opinions certifying the accuracy of MiMedx's financial statements and effectiveness of the Company's ICFR were false

---

[679] Audit-Market, CHERRY BEKAERT LLP, https://www.audit-market.com/cherry-bekaert (last visited Mar. 23, 2020).

[680] *See* Ebix, Inc., Proxy Statement (Schedule 14A) (Apr. 24, 2017).

[681] *See* Ebix, Inc., Current Report (Form 8-K) (Oct. 5, 2018).

[682] Viceroy Research Group, *supra* n.664.

[683] *Id.*

for fiscal years 2012-2016. As discussed above, MiMedx has admitted that, during these periods, all of the Cherry Bekaert-approved financial statements cannot be relied upon and had to be restated, and that all of the Cherry Bekaert-approved ICFR were ineffective. In accordance with 28 U.S.C. §1658, Cherry Bekaert is liable to Lead Plaintiff and the Class for those opinions issued for fiscal years 2013-2016.

567. As a result, the audit reports issued by Cherry Bekaert and included in MiMedx's Forms 10-K for fiscal years 2013-2015 contained the following virtually identical materially false and misleading statements:

> In our opinion, the financial statements referred to above ***present fairly, in all material respects, the consolidated financial position of MiMedx Group, Inc. and subsidiaries as of December 31 [of the audited fiscal year*** and the previous fiscal year]***, and the consolidated results of their operations and their cash flows for each of the years [in the three-year period] ended December 31 [of the audited fiscal year], in conformity with accounting principles generally accepted in the United States of America***. Also in our opinion, the related consolidated financial statement schedule for each of the three years in the period ended December 31 [of the audited fiscal year], when considered in relation to the basic consolidated financial statements taken as a whole, ***presents fairly, in all material respects***, the information set forth therein.
>
> We also have audited, ***in accordance with the standards of the Public Company Accounting Oversight Board*** (United States), MiMedx Group, Inc.'s internal control over financial reporting as of December 31 [of the audited fiscal year], based on criteria established in *Internal Control—Integrated Framework* (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report [date of the report] ***expressed an unqualified opinion***.

> In our opinion, MiMedx Group, Inc. ***maintained, in all material respects, effective internal control over financial reporting as of December 31 [of the audited fiscal year]***, based on criteria established in Internal Control—Integrated Framework (1992) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).
>
> We have also audited, ***in accordance with the standards of the Public Company Accounting Oversight Board*** (United States of America), the consolidated balance sheets of MiMedx Group, Inc. and subsidiaries as of December 31 [of the audited fiscal year and the previous fiscal year], and the related consolidated statements of operations, stockholders' equity, and cash flows for the [audited fiscal year and the two previous fiscal years], and our report [date of the report] ***expressed an unqualified opinion***.
>
> ***We conducted our audits in accordance with the standards of the Public Company Accounting Oversight Board (United States).***

568. Cherry Bekaert also made the following false statement included in the Company's 2013 Form 10-K as Exhibit 23.1 issued on March 4, 2014:

> We hereby consent to the incorporation by reference in the Registration Statements (Form S-8 Nos. 333-153255, 333-183991, and 333-189784, and Form S-3 No. 333-189785) of our reports dated March 4, 2014, included in this Annual Report on Form 10-K of MiMedx Group, Inc. and Subsidiaries (the Company) relating to the consolidated balance sheets of the Company as of December 31, 2013 and 2012, and the related consolidated statements of operations, stockholders' equity, and cash flows and the related consolidated financial statement schedule for each of the three years in the period ended December 31, 2013, and the ***effectiveness*** of internal control over financial reporting for the Company as of December 31, 2013.

569. Cherry Bekaert also made the following false statements included in the Company's 2016 Form 10-K issued on March 1, 2017:

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the consolidated financial position of MiMedx Group, Inc. and subsidiaries as of December 31, 2016 and 2015, and the consolidated results of its operations and its cash flows for each of the three years in the period ended December 31, 2016, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, the related consolidated financial statement schedule for each of the three years in the period ended December 31, 2016, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly, in all material respects, the information set forth therein.

We also have audited, ***in accordance with the standards of the Public Company Accounting Oversight Board*** (United States), MiMedx Group, Inc.'s internal control over financial reporting as of December 31, 2016, based on criteria established in Internal Control-Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO), and our report dated March 1, 2017 expressed an adverse opinion.

* * *

A material weakness is a control deficiency, or combination of deficiencies, in internal control over financial reporting, such that there is a reasonable possibility that a material misstatement of the Company's annual or interim financial statements will not be prevented or detected on a timely basis. ***The following material weakness has been identified and included in management's assessment***. Management has identified a material weakness in the design of the Company's controls over the tax accounting related to an overstatement of an excess tax benefit which if undetected would have resulted in an understatement of income taxes payable. Specifically, management did not have adequate supervision and review of certain technical tax accounting performed by a third party tax specialist in 2016. ***This material weakness was considered in determining the nature, timing, and extent of audit tests applied in our audit of the 2016 financial statements, and this report does not affect our report dated March 1, 2017, on those financial statements***.

> In our opinion, because of the effect of the material weakness described above on the achievement of the objectives of the control criteria, MiMedx Group, Inc. has not maintained effective internal control over financial reporting as of December 31, 2016, based on criteria established in Internal Control-Integrated Framework issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).
>
> We have also audited, ***in accordance with the standards of the Public Company Accounting Oversight Board*** (United States), the consolidated balance sheets and the related consolidated statements of operations, stockholders' equity, and cash flows of MiMedx Group, Inc., and our report dated March 1, 2017, ***expressed an unqualified opinion***.
>
> * * *
>
> ***We conducted our audit in accordance with the standards of the Public Company Accounting Oversight Board (United States).***

570. These statements, set forth above in ¶¶567-569, were materially false and misleading and omitted material facts for the following reasons, and as further discussed above:

(a) MiMedx's financial statements did not "present fairly, in all material respects, the consolidated financial position of MiMedx . . . and the consolidated results of their operations and their cash flows" and were not prepared in conformity with GAAP due to material misstatements of at least the following financial accounts: sales, cost of sales, gross margin, SG&A expense, R&D expense, operating income, income before taxes, income taxes, net income, EPS,

adjusted EBITDA, cash, accounts receivable and related reserves, returns allowance, inventories and related reserves, prepaid expenses, other current assets, accounts payable, accrued expenses, accumulated deficit, and other financial items in particular periods;

(b) MiMedx did not maintain effective ICFR in all material respects for fiscal years 2013-2016 (in fact, EY found that ICFR did not exist), and MiMedx's material weaknesses in ICFR for FY16 were not limited to the design of the Company's controls over the tax accounting related to an overstatement of an excess tax benefit; and

(c) Cherry Bekaert did not conduct its 2013, 2014, 2015, and 2016 audits of MiMedx's financial statements and ICFR in accordance with the standards of the PCAOB and falsely expressed unqualified audit opinions.

571. These statements also lacked a reasonable factual basis because Cherry Bekaert had knowledge of, or recklessly disregarded, material facts omitted from them concerning MiMedx's true financial condition and effectiveness of ICFR, as detailed herein.

## XII. LOSS CAUSATION

572. As detailed throughout and herein, Defendants' fraudulent scheme and false and misleading statements, individually and collectively, inflated MiMedx's

stock price throughout the Class Period by failing to disclose that, among other things, the Company's sales and revenue growth were substantially the result of fraudulent and improper accounting, sales, and distribution practices, including a massive channel stuffing scheme, that caused the Company's financial results for fiscal years 2012 to 2016 and the first three quarters of 2017 to be materially misstated. These false and misleading statements had the intended effect and caused, or were a substantial contributing cause of, MiMedx's common stock trading at artificially inflated levels during the Class Period, reaching as high as $18.25 per share on January 29, 2018.

573. As stated above in Section VI, the relevant truth about the Company, its improper sales and distribution practices, and fraudulent revenue scheme began to be revealed through a series of partial disclosures, causing the price of MiMedx common stock to decline dramatically. These partial disclosures resulted in statistically significant price declines in MiMedx's common stock as more fully summarized in the chart below:

| Partial Disclosures[684] | Date of Stock Reaction | MDXG % | NASDAQ % | NASDAQ Biotech Industry% |
|---|---|---|---|---|
| On December 31, 2014, MiMedx issued a press release announcing a civil subpoena from the HHS-OIG in connection with its investigation into the Company's sales and marketing activities. | January 2, 2015 | -15.52% | -0.18% | 0.83% |
| On October 13, 2015, MiMedx hosted an analyst day wherein the Company discussed parting ways with its largest U.S. commercial distributor. | Oct. 13, 2015<br>Oct. 14, 2015 | -14.23%<br>-5.81% | -0.87%<br>-0.29% | -3.22%<br>0.89% |
| On April 10, 2016, MiMedx issued a press release announcing that 1Q16 revenue fell short of forecasted guidance by $2 million. | April 11, 2016 | -8.79% | -0.36% | -1.65% |
| On December 15, 2016, Tornquist and Kruchoski filed a lawsuit against MiMedx and Petit for their termination in response to declaring concerns about a channel stuffing scheme to inflate revenue. | December 16, 2016 | -6.43% | -0.36% | 0% |

[684] Each of these events has been determined to be statistically significant based on the use of an event study. An event study is a commonly used methodology which measures how much a stock price rises or falls in response to new, company-specific information. An event study employs a statistical regression analysis that determines how much of a stock price change is explained by market and sector (industry) factors, rather than company-specific information. If a stock's return is statistically significant (as all the returns are in the chart), it indicates that the stock price movement cannot be attributed to market factors, sector factors, or to random volatility, but rather, was caused by new, company-specific information.

| **Partial Disclosures[684]** | **Date of Stock Reaction** | **MDXG %** | **NASDAQ %** | **NASDAQ Biotech Industry%** |
|---|---|---|---|---|
| On May 23, 2017, Munda issued a report concerning the Company's relationship with AvKARE. | May 23, 2017 | -4.95% | 0.09% | -0.16% |
| On September 7, 2017, *The Capital Forum* issued an article reporting on an investigation into MiMedx's channel stuffing by the VA-OIG. | Sept. 7, 2017<br>Sept. 8, 2017 | -5.60%<br>-8.19% | 0.08%<br>-0.59% | 0.27%<br>-0.37% |
| On September 20, 2017, Aurelius issued a report questioning MiMedx's improper channel stuffing in violation of GAAP and the Company's reliance on distributors. Viceroy also issued a 35-page report discussing improper kickback and bribery schemes. | September 20, 2017 | -6.23% | -0.08% | 0.84% |
| On September, 27, 2017, Aurelius issued a report claiming ACII was not independent. | September 27, 2017 | -3.25% | 1.15% | 0.65% |
| On October 23, 2017, Munda issued a report concerning MiMedx excluding its analysts from asking questions on calls and noting unanswered questions about its dealings with the VA. The next day, on October 24, 2017, Citron posted a video on YouTube concerning use of third parties to inflate financials. | Oct. 23, 2017<br>Oct. 24, 2017 | -11.37%<br>-8.28% | -0.64%<br>0.18% | -1.17%<br>-0.82% |
| On November 16, 2017, Viceroy issued a report revealing, among other things, that MiMedx fraudulently exploited the | November 16, 2017 | -4.86% | 1.32% | 1.55% |

| **Partial Disclosures[684]** | **Date of Stock Reaction** | **MDXG %** | **NASDAQ %** | **NASDAQ Biotech Industry%** |
|---|---|---|---|---|
| insurance reimbursement system by manipulating the insurance codes used for medical procedures involving MiMedx products. | | | | |
| On November 20, 2017, MiMedx issued a press release on its website responding to recent short seller reports raising investor concerns about the impact on the Company. | November 20, 2017 | -6.43% | 0.12% | -0.95% |
| On February 15, 2018, Aurelius issued an "Open Letter to the MiMedx Auditors" regarding improper accounting practices amounting to a "serious and pervasive fraud." | February 16, 2018 | -6.22% | -0.23% | -0.37% |
| On February 20, 2018, MiMedx announced ACIII and the postponement of its 2017 Form 10-K. | February 20, 2018 | -39.53% | -0.07% | -1.05% |
| On February 23, 2018, *The Wall Street Journal* reported improper payments to more than 20 doctors for the use of MiMedx products. The Company also hosted a conference call wherein the Company downplayed the delay in the filing of its 2017 Form 10-K but expressed uncertainty in the timeframe for ACIII. | February 23, 2018 | -11.82% | 1.77% | 2.11% |
| On February 26, 2018, a *Bloomberg* article disclosed the DOJ investigation into MiMedx for overcharging the government for its products. | February 26, 2018 | -6.13% | 1.15% | 0.73% |

| **Partial Disclosures**[684] | **Date of Stock Reaction** | **MDXG %** | **NASDAQ %** | **NASDAQ Biotech Industry%** |
|---|---|---|---|---|
| On May 8, 2018, the DOJ released a statement that a federal grand jury returned the *Becker* Indictment for conspiracy to commit health care fraud involving benefits received from MiMedx employees. | May 9, 2018 | -7.49% | 1.01% | 1.42% |
| On June 7, 2018, MiMedx disclosed that nearly six years of financials were materially incorrect, requiring the Restatement. The Company also announced that Senken and Cranston had departed the Company. | June 7, 2018 | -23.39% | -0.69% | -0.81% |
| On July 2, 2018, MiMedx disclosed that Petit and Taylor resigned from their positions. | July 2, 2018 | -38.50% | 0.77% | 0.90% |
| On, July 26, 2018, MiMedx disclosed that it notified NASDAQ that it would be unable to bring its filings up to date by August 28, 2018, and in response received a potential delisting notice. | July 27, 2018 | -13.54% | -1.46% | -2.08% |
| On October 5, 2018, *The Wall Street Journal* issued an article reporting on MiMedx keeping cheaper products out of its VA hospitals and disclosing that MiMedx was under investigation by the DOD Criminal Investigative Service in connection with its financial agreements with a surgeon at the Augusta VA. | October 5, 2018 | -12.4% | -1.15% | -0.96% |
| On November 7, 2018, MiMedx announced it received a delisting notice | Nov. 7, 2018<br>Nov. 8, 2018 | -41.16%<br>-19.4% | 2.64%<br>-0.48% | 2.44%<br>-0.98% |

| Partial Disclosures[684] | Date of Stock Reaction | MDXG % | NASDAQ % | NASDAQ Biotech Industry% |
|---|---|---|---|---|
| from NASDAQ effective November 8, 2018, and provided an update on ACIII, stating it would now review all of the Company's sales dating back to 2012. | | | | |
| On December 5, 2018, MiMedx announced a massive reorganization, Cashman's termination, revenue softening, and additional information on ACIII, which revealed improper business practices. EY also resigned effective immediately stating a lack of internal controls. | December 6, 2018 | -59.32% | 0.44% | 0.39% |

574. The timing and magnitude of the above declines in the price of MiMedx common stock in response to the partial disclosures detailed above (and more fully in Section VI) negate any inference that the losses suffered by Lead Plaintiff were caused by changed market conditions, macroeconomic or industry factors, or Company-specific facts unrelated to Defendants' fraudulent conduct. This is further evidenced by the chart above, which demonstrates clear divergence of the Company's common stock price from the NASDAQ Composite Index and the

NASDAQ Biotechnology Index[685] stock price as the revelation of the truth became known to the market.

575. As further detailed above in Section VI, these stock drops would have been even more significant had the full truth regarding MiMedx's improper sales and distribution practices and fraudulent revenue scheme been known. However, in the face of market concerns regarding these practices, Defendants continued to make false and misleading statements downplaying, denying, and concealing the fraud in order to maintain an appearance of the Company's legitimacy and to artificially prop up its stock price. These false and misleading statements and omissions, among others, had the intended effect of preventing the market from learning the full truth and keeping MiMedx's stock price artificially inflated throughout the Class Period.

576. In sum, as detailed above, the rapid declines served to remove artificial inflation from the price of MiMedx common stock, and were direct and foreseeable consequences of the revelation of the falsity of Defendants' Class Period misrepresentations and omissions to the market and a materialization of the risks concealed by Defendants' fraud. Thus, the revelations of truth, as well as the

[685] These indices were cited as benchmarks for MiMedx's stock performance in MiMedx's 2016 Form 10-K, filed with the SEC on March 1, 2017 (the Company's most recent annual filing).

resulting clear market reactions, support a reasonable inference that the market understood that Defendants' prior statements were false and misleading and omitted material information. In short, as the truth was revealed, the price of MiMedx common stock quickly plummeted as the artificial inflation was removed and Lead Plaintiff and the Class were damaged, suffering true economic loss.

577. Accordingly, the economic losses, *i.e.*, damages, suffered by Lead Plaintiff and members of the Class were a direct and proximate result of Defendants' fraudulent scheme and misrepresentations and omissions that artificially inflated the price of MiMedx common stock and the subsequent significant declines in the value of MiMedx common stock as the truth concerning Defendants' prior misrepresentations and fraudulent conduct entered the marketplace.

578. In fact, Defendants have made several statements admitting to loss causation based on the allegations herein. On November 30, 2017, for example, as the fraud was unraveling, Petit sent a letter to MiMedx shareholders admitting to the Company's "dramatic" stock price decline due to "publicity" from short sellers, including "allegations of financial manipulations" and "channel stuffing."

579. Moreover, during a series of proxy filings leading up to the Company's annual shareholder meeting in June 2019, MiMedx admitted that shareholders suffered substantial losses from revelations, dating at least back to "February 2018,"

of the Company's "accounting issues" and the "misconduct" and "serious wrongdoing" of Petit and his management team. In particular:

- **June 3, 2019**: "The unmistakable conclusion from the independent investigation [ACIII] was that Mr. Petit and certain members of his management team engaged in serious wrongdoing. ***This misconduct has harmed MiMedx and its shareholders*** . . . . ***The stock price has fallen substantially***, and the Company's market value is down more than $1 billion ***since February 2018.***"[686]

- **June 5, 2019**: "Mr. Petit's conduct has harmed MiMedx and shareholders . . . . ***MiMedx stock has declined in value***[.] [The] [s]tock dropped to a low of $1.15/share in December 2018 from more than $17/share before ***the accounting issues were revealed in early 2018***."[687]

- **June 10, 2019**: "[T]he Audit Committee of the Board found that the evidence demonstrated that Mr. Petit and certain members of his management team engaged in longstanding material misconduct, ***which harmed MiMedx and its shareholders***."[688]

580. Additionally, in a sworn affidavit filed during the course of its criminal securities fraud investigation, the USPIS acknowledged the MiMedx stock price drop caused by the Company's February 20, 2018 revelations discussed above. The

---

686 *See* Ex. 15, at 2.

687 *See* Ex. 17, at 10, 18 (MiMedx's illustration of the decline in shareholder value upon revelation of the fraud).

688 *See* Ex. 18, at 2.

USPIS stated that Petit and an unnamed MiMedx shareholder engaged in an insider trading scheme to avoid anticipated losses from such drop:

> I further submit that there is probable cause to believe that in or about January and February of 2018, [redacted] engaged in the Insider Trading Scheme by converting material non-public information ("MNPI") that PETE PETIT had obtained by virtue of his employment at MiMedx to their own use for personal gain. Through that trading, among other things, [redacted name of shareholder] avoided at least approximately $2 million in losses by selling MiMedx stock from in and around late January to late February 2018, shortly before the MiMedx [sic] announced a delay in the release of its 10-K filing, ***which caused an approximately 36 percent decrease in the stock price***.[689]

## XIII. PRESUMPTION OF RELIANCE

581. A class-wide presumption of reliance is appropriate with respect to the claims in this action under the United States Supreme Court's holding in *Affiliated Ute Citizens v. United States*, 406 U.S. 128 (1972), because such claims are grounded on Defendants' material omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects, as well as a massive fraudulent scheme – information that Defendants were obligated to disclose – positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have

[689] *See* Ex. 9, at ¶14.

considered them important in making investment decisions. Given the importance of Defendants' material Class Period omissions set forth above, that requirement is satisfied here.

582. A class-wide presumption of reliance is also appropriate with respect to the claims in this action under the fraud-on-the-market doctrine. As a result of Defendants' materially false and misleading statements, the Company's publicly traded common stock traded at artificially inflated prices during the Class Period on a market that was open, well-developed, and efficient at all times. Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's publicly traded common stock relying upon the integrity of the market price of such common stock and the market information relating to MiMedx, and have been damaged thereby.

583. At all relevant times, the market for the Company's common stock was an efficient market for the following reasons, among others:

(a) as a regulated issuer, MiMedx regularly made public filings with the SEC and related press releases, and was eligible to file Forms S-3 with the SEC during the Class Period;

(b) MiMedx regularly communicated with public investors via established market communication mechanisms, including through regular

disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press, and other similar reporting services;

(c) MiMedx was followed by several securities analysts employed by major brokerage firms, such as Canaccord Genuity, Brean Capital, LLC, UBS Securities LLC, and PiperJaffray, among others, who wrote research reports concerning MiMedx that were distributed to the brokerage firms' sales forces, entered the public marketplace, and were publicly available; and

(d) the Company's common stock met the requirements for listing, and were listed and actively traded, on the NASDAQ during the Class Period, a highly efficient and automated market.

584. As a result of the foregoing, the market for the Company's common stock promptly digested current information regarding MiMedx from all publicly available sources and reflected such information in the price of the Company's common stock.

585. Under these circumstances, all purchasers or acquirers of the Company's common stock during the Class Period suffered similar injury through their purchases or acquisitions of the Company's common stock at artificially inflated prices.

586. At the times they purchased or otherwise acquired the Company's common stock, Lead Plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not reasonably have discovered those facts.

587. As a result of the above circumstances, the presumption of reliance applies.

588. In sum, Lead Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations during the Class Period;

(b) the misrepresentations were material;

(c) the Company's common stock traded in an efficient market;

(d) the misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's common stock; and

(e) Lead Plaintiff and other members of the Class purchased or otherwise acquired the Company's common stock between the time Defendants misrepresented material facts and the time the true facts were disclosed, without knowledge that the facts were misrepresented.

## XIV. NO SAFE HARBOR

589. The federal statutory safe harbor providing for forward-looking statements under certain circumstances does not apply to any of the allegedly false and misleading statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements accompanying them. To be meaningful, cautionary statements must identify important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Such cautions were loudly absent from MiMedx's Class Period filings.

590. The Company's supposed risk warnings, both individually and collectively, failed to warn the market of the true risks detailed herein. These warnings were not meaningfully different from year-to-year, but, instead, were merely boilerplate language that failed to develop with time as the very risks they sought to warn of began to materialize. Therefore, these "cautions" were untethered to the known problems at hand, rendering them meaningless. Given the scope and magnitude of Defendants' fraud, as detailed herein, the risk warnings were themselves false and misleading and did not shield Defendants from liability. The risk warnings were false and misleading because they did not disclose that

Defendants were actually embroiled in the very circumstances about which they purportedly warned, and Defendants had actual knowledge of material adverse facts undermining such disclosures.

591. Moreover, to the extent that any statements pleaded herein are forward-looking, Defendants are liable for them because, at the time each of them was made, the particular speaker knew it was false or misleading, for the reasons detailed herein, and/or the forward-looking statement was authorized and/or approved by an executive officer of MiMedx who knew it was false or misleading when made.

## XV. LEAD PLAINTIFF'S CLASS ACTION ALLEGATIONS

592. Lead Plaintiff brings this action as a class action pursuant to Rule 23(a) and (b)(3) of the Federal Rules of Civil Procedure on behalf of a Class consisting of all persons or entities that purchased or otherwise acquired the publicly traded common stock of MiMedx between March 7, 2013 and June 29, 2018, inclusive, and who were damaged thereby. Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

593. Because MiMedx has millions of shares of stock outstanding and because the Company's shares were actively traded on the NASDAQ during the

Class Period, members of the Class are so numerous that joinder of all members is impracticable. According to the Company, 111,034,873 shares of MiMedx common stock were outstanding as of October 13, 2017. While the exact number of Class members can only be determined by appropriate discovery, Lead Plaintiff believes that Class members number at least in the hundreds, if not the thousands, and that they are geographically dispersed.

594. Lead Plaintiff's claims are typical of the claims of the members of the Class because Lead Plaintiff and all of the Class members sustained damages arising out of Defendants' wrongful conduct complained of herein.

595. Lead Plaintiff will fairly and adequately protect the interests of the Class members and has retained counsel experienced and competent in class actions and securities litigation. Lead Plaintiff has no interests that are contrary to, or in conflict with, the members of the Class that Lead Plaintiff seeks to represent.

596. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual members of the Class may be relatively small, the expense and burden of individual litigation make it impossible for the members of the Class to individually redress the wrongs done

to them. There will be no difficulty in the management of this action as a class action.

597. Questions of law and fact common to the members of the Class predominate over any questions that may affect only individual members in that Defendants have acted on grounds generally applicable to the entire Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants violated the federal securities laws as alleged herein;

(b) whether Defendants' publicly disseminated press releases and statements during the Class Period omitted and/or misrepresented material facts;

(c) whether Defendants failed to convey material facts or to correct material facts previously disseminated;

(d) whether Defendants participated in and pursued the fraudulent scheme or course of business complained of herein;

(e) whether and to what extent MiMedx's financial statements during the Class Period failed to comply with GAAP;

(f) whether Cherry Bekaert's audits of MiMedx's financial statements during the Class Period were conducted in accordance with PCAOB standards;

(g) whether Defendants acted willfully, with knowledge or recklessness, in omitting and/or misrepresenting material facts;

(h) whether Cherry Bekaert abandoned its duty of independence as MiMedx's auditor;

(i) whether the market prices of the Company's common stock during the Class Period were artificially inflated due to the material nondisclosures and/or misrepresentations complained of herein; and

(j) whether the members of the Class have sustained damages as a result of the decline in value of the Company's common stock when the truth was revealed and the artificial inflation came out of the stock price, and, if so, what is the appropriate measure of damages.

## COUNT I

## FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST THE MIMEDX DEFENDANTS

598. Lead Plaintiff repeats and re-alleges the allegations set forth above in Sections I-X and XII-XV as though fully set forth herein. This claim is asserted against the MiMedx Defendants.

599. During the Class Period, the MiMedx Defendants, and each of them, carried out a plan, scheme, and course of conduct that was intended to and,

throughout the Class Period, did: (a) deceive the investing public, Lead Plaintiff, and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of the Company's publicly traded common stock; and (c) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire the Company's publicly traded common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, the MiMedx Defendants, and each of them, took the actions set forth herein.

600. The MiMedx Defendants: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers or acquirers of the Company's common stock in an effort to artificially inflate, and maintain the artificial inflation of, the market price of the Company's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5. The MiMedx Defendants are sued as primary participants in the wrongful and illegal conduct charged herein. The Individual Defendants are also sued as controlling persons of MiMedx, as alleged below.

601. In addition to the duties of full disclosure imposed on the MiMedx Defendants as a result of their making affirmative statements and reports, or

participating in the making of affirmative statements and reports to the investing public, they each had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. §210.01, *et seq*.) and S-K (17 C.F.R. §229.10, *et seq*.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, sales, financial condition, and operational performance, so that the market prices of the Company's publicly traded common stock would be based on truthful, complete, and accurate information.

602. The MiMedx Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the Company's financial and operational results and prospects as specified herein.

603. The MiMedx Defendants each employed devices, schemes, and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of the Company's financial and operational strength, which included the making of, or the participation in the making of, untrue statements of

material facts about the Company's financial and operational results and prospects and omitting to state material facts necessary to make the statements made about the Company's financial and operational results and prospects not misleading in light of the circumstances under which they were made, as set forth more particularly herein, and engaged in transactions, practices, and a course of business which operated as a fraud and deceit upon the purchasers or acquirers of the Company's common stock during the Class Period.

604. The Individual Defendants' primary liability and controlling person liability arise from the following facts, among others: (a) the Individual Defendants were high-level executives at the Company during the Class Period; (b) the Individual Defendants, by virtue of their responsibilities and activities as senior executive officers were privy to, and participated in, the creation, development, and reporting of the Company's financial condition; (c) the Individual Defendants enjoyed significant personal contact and familiarity with, were advised of, and had access to other members of the Company's management team, internal reports, and other data and information about the Company's financial and operational results and prospects at all relevant times; and (d) the Individual Defendants were aware of the Company's dissemination of information to the investing public that they knew

or recklessly disregarded was materially false and misleading and omitted material facts.

605. Each of the MiMedx Defendants had actual knowledge of the material misrepresentations and omissions of material fact set forth herein, or acted with reckless disregard for the truth, in that each failed to ascertain and disclose such facts, even though such facts were available to each of them. The MiMedx Defendants' material misrepresentations and omissions of material fact were done knowingly or with recklessness and for the purpose and effect of concealing information regarding the Company's true financial and operational results and prospects from the investing public and supporting the artificially inflated price of its common stock. If the MiMedx Defendants did not have actual knowledge of the material misrepresentations and omissions of material fact alleged, they were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether their statements were materially false or misleading or omitted material facts.

606. As a result of the MiMedx Defendants' dissemination of materially false and misleading information and failure to disclose material facts, as set forth above, the market price of the Company's common stock was artificially inflated during the Class Period. In ignorance of the fact that market price of the Company's

publicly traded common stock was artificially inflated, and relying directly or indirectly on the materially false and misleading statements made by the MiMedx Defendants, or upon the integrity of the market in which the stock traded, and/or on the absence of material adverse information that was known to, or disregarded with recklessness by, the MiMedx Defendants, but not disclosed in public statements by the MiMedx Defendants during the Class Period, Lead Plaintiff and other members of the Class acquired the Company's publicly traded common stock during the Class Period at artificially high prices and were damaged thereby, as evidenced by, among others, the stock price declines set forth above.

607. At the time of such material misrepresentations, Lead Plaintiff and other members of the Class were ignorant of their falsity and believed them to be true. Had Lead Plaintiff and other members of the Class and the marketplace known of the Company's fraudulent practices, the true nature and prospects of the Company's financial and operating results and prospects, or the Company's true intrinsic value, which were not disclosed by the MiMedx Defendants, Lead Plaintiff and other members of the Class would not have purchased or otherwise acquired their MiMedx publicly traded common stock during the Class Period; or, if they had purchased or otherwise acquired such stock during the Class Period, they would not

have done so at the artificially inflated prices at which the shares were purchased or otherwise acquired.

608. By virtue of the foregoing, the MiMedx Defendants, and each of them, have each violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

609. As a direct and proximate result of the MiMedx Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their respective purchases or acquisitions and sales of the Company's publicly traded common stock during the Class Period, as evidenced by the stock price declines set forth above, when the artificial inflation was removed from the price of the Company's stock.

## COUNT II

## FOR VIOLATIONS OF SECTION 10(b) OF THE EXCHANGE ACT AND RULE 10b-5 PROMULGATED THEREUNDER AGAINST CHERRY BEKAERT

610. Lead Plaintiff repeats and re-alleges the allegations set forth above in Sections I-VII and XI-XV as though fully set forth herein. This claim is asserted against Cherry Bekaert.

611. During the Class Period, Cherry Bekaert alone, or in concert with others, carried out a plan, scheme, and course of conduct that was intended to and,

throughout the Class Period, did: (a) deceive the investing public, Lead Plaintiff, and other Class members, as alleged herein; (b) artificially inflate and maintain the market price of the Company's publicly traded common stock; and (c) cause Lead Plaintiff and other members of the Class to purchase or otherwise acquire the Company's publicly traded common stock at artificially inflated prices. In furtherance of this unlawful scheme, plan, and course of conduct, Cherry Bekaert took the actions set forth herein.

612. Cherry Bekaert: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of conduct that operated as a fraud and deceit upon the purchasers or acquirers of the Company's publicly traded common stock in an effort to artificially inflate, and maintain the artificial inflation of, the market price of the Company's publicly traded common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder. Cherry Bekaert is being sued as a primary participant in the wrongful and illegal conduct charged herein.

613. In addition to the duties of full disclosure imposed on Cherry Bekaert as a result of making affirmative statements and reports, or participating in the making of affirmative statements and reports to the investing public, it had a duty to

promptly disseminate truthful information that would be material to investors in accordance with the standards of the PCAOB so that the market prices of the Company's publicly traded common stock would be based on truthful, complete, and accurate information.

614. Cherry Bekaert, individually and/or in concert with others, directly and/or indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a course of conduct to conceal adverse material information that resulted in misstatements and omissions of material facts about the Company's financial statements, reporting, and ICFR for fiscal years 2013 through 2016, as specified herein. Cherry Bekaert employed devices, schemes, and artifices to defraud while in possession of material, adverse non-public information and engaged in acts, practices, and a course of conduct that included the making of, or participation in the making of, untrue and misleading statements of material facts and the omission of material facts necessary in order to make the statements made about the Company not misleading.

615. Cherry Bekaert knew, or was reckless in not knowing, that MiMedx's reported annual financial statements and results for fiscal years 2013 through 2016, which were disseminated to the investing public, were materially misstated and included omissions of material fact that were not presented in accordance with

GAAP, and that Cherry Bekaert's audits and/or reviews were not performed in accordance with PCAOB standards. Therefore, each of Cherry Bekaert's unqualified or "clean" audit reports concerning MiMedx's misstated financial reports for fiscal years 2013 through 2016 was materially false and misleading.

616. As a result of Cherry Bekaert's clean audit opinions of MiMedx's misstated financial reports for fiscal years 2013 through 2016 and Cherry Bekaert's own false and misleading statements and omissions in its clean audit reports, the market price of the Company's publicly traded common stock was artificially inflated during the Class Period. Had Cherry Bekaert not violated principles and standards of the PCAOB, it would have detected the material weakness in MiMedx's ICFR and the fraudulent revenue recognition and material misstatements in MiMedx's financial statements and reporting for fiscal years 2013 through 2016.

617. Instead, Cherry Bekaert acted with knowledge or reckless disregard as to (a) the false and misleading nature of the certifications it provided; (b) the false and misleading nature of MiMedx's financial statements and reports and ineffective internal controls; (c) its failure to conduct proper audit tests and examinations of the books, records, and financial statements of MiMedx; and (d) the false representations that its financial statements had been properly audited in accordance with PCAOB standards.

618. In violation of PCAOB standards, Cherry Bekaert failed to expand the scope of its audits notwithstanding its knowledge or reckless ignorance of innumerable red flags that put it on notice of the Company's illicit sales and distribution practices, improper revenue recognition, and other accounting practices, and of the misstatements and material omissions by the MiMedx Defendants. Cherry Bekaert had "a responsibility to plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether caused by error or fraud."[690] If there is a material misstatement, whether by fraud or mistake, the auditor's procedures need to be designed and performed to detect it.

619. Cherry Bekaert's fraudulent devices, schemes, artifices, and deceptive acts, practices, and course of conduct included: (a) failing to test appropriately MiMedx's revenue recognition policies and procedures and associated internal controls, which did not even exist; (b) failing to modify and/or increase the nature, timing, and extent of its testing to obtain reasonable assurances that MiMedx's financial statements were not materially misstated and were prepared in accordance with GAAP; and (c) failing to apply the requisite professional skepticism and due

[690] AU §110.02.

professional care to MiMedx management's representations regarding MiMedx's revenue recognition policies with respect to MiMedx's distributors.

620. Cherry Bekaert's conduct represents an extreme departure from the professional standards that should have been applied. Cherry Bekaert knew that its audit reports would be relied upon by investors in MiMedx publicly traded common stock. Had Cherry Bekaert exercised due professional care and professional skepticism, it would have determined that MiMedx's internal controls over revenue recognition did not exist, its accounting treatment of certain sales and distribution practices was improper, and its books and records were consistently falsified to conceal the Company's true financial condition.

621. During the Class Period, Lead Plaintiff and the Class were unaware of Cherry Bekaert's conduct and unaware of the fact that the market price of MiMedx's common stock was artificially inflated during the Class Period. Had Lead Plaintiff and the Class known of the unlawful scheme and unlawful course of conduct, they would not have purchased MiMedx publicly traded common stock, or if they had, they would not have done so at the artificially inflated prices paid for such stock.

622. By virtue of the foregoing, Cherry Bekaert violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder, and is liable to Lead Plaintiff

and the Class for damages suffered in connection with their purchases of MiMedx publicly traded common stock during the Class Period.

## COUNT III

## FOR VIOLATIONS OF SECTION 20(a) OF THE EXCHANGE ACT AGAINST THE INDIVIDUAL DEFENDANTS

623. Lead Plaintiff repeats and re-alleges the allegations set forth above in Sections I-X and XII-XV as though fully set forth herein. This claim is asserted against the Individual Defendants.

624. The Individual Defendants acted as controlling persons of MiMedx within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions with the Company, participation in, and/or awareness of, the Company's operations, and/or intimate knowledge of the Company's fraudulent practices and the Company's actual results and future prospects, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that Lead Plaintiff contends are materially false and misleading and omitted material facts. The Individual Defendants were provided with, or had unlimited access to, copies of the Company's reports, press releases, public filings, and other statements alleged by Lead Plaintiff to be misleading prior to and/or shortly after these statements were issued and had

the ability to prevent the issuance of the statements or cause the statements to be corrected.

625. In addition, the Individual Defendants had direct involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein and exercised the same.

626. As set forth above, the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their controlling positions, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of the Individual Defendants' wrongful conduct, Lead Plaintiff and other members of the Class suffered damages in connection with their purchases or acquisitions of the Company's common stock during the Class Period, as evidenced by, among others, the common stock price declines set forth above, when the artificial inflation was released from the Company's common stock price.

## PRAYER FOR RELIEF

WHEREFORE, Lead Plaintiff, on its own behalf and on behalf of the Class, prays for relief and judgment, as follows:

A. Declaring that this action is a proper class action and certifying Lead Plaintiff as Class representative pursuant to Rule 23 of the Federal Rules of Civil Procedure and Lead Plaintiff's counsel as Class Counsel for the proposed Class;

B. Awarding compensatory damages in favor of Lead Plaintiff and other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C. Awarding Lead Plaintiff and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

D. Such other and further relief as the Court deems appropriate.

**JURY TRIAL DEMANDED**

Lead Plaintiff hereby demands a trial by jury.

DATED: March 30, 2020

ROBBINS GELLER RUDMAN
& DOWD LLP

*/s/ Stephen R. Astley*

JACK REISE
STEPHEN R. ASTLEY
ELIZABETH A. SHONSON
BAILIE L. HEIKKINEN
ANDREW T. REES
120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
Telephone: 561/750-3000
561/750-3364 (fax)
jreise@rgrdlaw.com
sastley@rgrdlaw.com
eshonson@rgrdlaw.com
bheikkinen@rgrdlaw.com
arees@rgrdlaw.com

ROBBINS GELLER RUDMAN
& DOWD LLP
ARTHUR C. LEAHY
HILLARY B. STAKEM
655 West Broadway, Suite 1900
San Diego, CA 92101
Telephone: 619/231-1058
619/231-7423 (fax)
artl@rgrdlaw.com
hstakem@rgrdlaw.com

*Lead Counsel for Lead Plaintiff*

HERMAN JONES LLP
JOHN C. HERMAN
(Georgia Bar No. 348370)
PETER M. JONES
(Georgia Bar No. 402620)
CARLTON R. JONES
(Georgia Bar No. 940540)
Monarch Tower, Suite 1650
3424 Peachtree Road, N.E.
Atlanta, GA 30326
Telephone: 404/504-6555
404/504-6501 (fax)
jherman@hermanjones.com
pjones@hermanjones.com
cjones@hermanjones.com

*Local Counsel for Lead Plaintiff*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 30th day of March 2020, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system, and a copy of the foregoing pleading has been electronically mailed to all attorneys of record.

*/s/ Stephen R. Astley*
STEPHEN R. ASTLEY