1        IN THE UNITED STATES DISTRICT COURT
        FOR THE NORTHERN DISTRICT OF GEORGIA
2                 ATLANTA DIVISION

3

4

In Re MIMEDX GROUP, INC.      ) Lead Case No. 1:18-CV-00830
5  SECURITIES LITIGATION         )
   _____)
6                                 )
   This Document Relates to:      )
7                                 ) MOTION HEARING
   ALL ACTIONS.                   )
8  _____)

9

10  ---------------------------------------------------------------

11        BEFORE THE HONORABLE WILLIAM M. RAY, II

12            TRANSCRIPT OF PROCEEDINGS

13               FEBRUARY 23, 2021

14
   ---------------------------------------------------------------
15

16

17     *Proceedings recorded by mechanical stenography*
         *and computer-aided transcript produced by*
18

19         WYNETTE C. BLATHERS, RMR, CRR
              Official Court Reporter
20             1714 U.S. Courthouse
              75 Ted Turner Drive, SW
21            Atlanta, Georgia  30303
                 (404) 215-1547
22

23

24

25

```
1   APPEARANCES:

2   On Behalf of Plaintiffs:

3   STEPHEN R. ASTLEY, ESQ.
    Robbins Geller Rudman & Dowd, LLP
4   120 E. Palmetto Park Road
    Suite 500
5   Boca Raton, Florida  33432

6   JOHN C. HERMAN, ESQ.
    Herman Jones LLP
7   3424 Peachtree Road NE, Suite 1650
    Atlanta, Georgia  30326

8


9
    On Behalf of Defendants:
10
    ROBERT R. LONG, IV, and ELIZABETH G. CLARK of Alston & Bird,
11  LLP, and WALTER C. CARLSON of Sidley Austin LLP representing
    MiMedx Group, Inc.
12
    HENRY D. FELLOWS, JR., and MICHAEL C. GRETCHEN of Fellows La
13  Briola, LLP representing:  Michael J. Senken

14  WILLIAM WEINREB and JESSE BERNSTEIN of Quinn Emanuel Urquhart
    & Sullivan, LLP, and DAN F. LANEY III of Rogers & Hardin
15  representing:  William C. Taylor

16  MEREDITH KOTLER of Freshfields Bruckhaus Deringer US LLP, and
    DAN F. LANEY III of Rogers & Hardin representing:  Parker H.
17  Petit

18  CHARLES W. MCINTYRE and KEISHA O. COLEMAN of McGuireWoods, LLP
    representing:  Cherry Bekaert
19

20

21

22

23

24

25
```

```
 1                      Tuesday Morning Session

 2                       February 23, 2021

 3                           9:30 a.m.

 4                            -  -  -

 5                   P R O C E E D I N G S

 6          THE COURT:  Good morning.  We are convened for a

 7  hearing in the MiMedx Group, Inc. Securities Litigation case.

 8  This is the consolidated case which is found under Case Docket

 9  No. 18-CV-830.  I have three motions to dismiss today -- four

10  motions to dismiss actually, MiMedx, Michael Senkens, Cherry

11  Bekaert, and Parker Petit and William Taylor's joint motion to

12  dismiss.

13          So I want all the lawyers, of which there are many,

14  of all those lawyers that have entered appearances, I won't

15  try to figure out who's speaking in advance.  I'll just call

16  on you and let you speak and we'll first -- I'm going to take

17  the motions in the order that they were filed, and I'm going

18  to hear from all of the movants before I hear from the

19  plaintiff's attorneys.  And then I will come back to the

20  movants in the same order that we go this morning for any

21  reply that you might have.  So we'll first hear from whoever

22  is going to speak on behalf of Defendant MiMedx Group, Inc.

23          MR. LONG:  Good morning, your Honor.

24          THE COURT:  All right, Mr. Long.  So, Mr. Long, let

25  me just tell you that I'm not trying to pretermit any of your
```

1  arguments that you want to make, but I do want to tell you and

2  everyone that the issue that I'm most focused on, at least

3  coming into our oral argument today, is the tension that

4  appears between the Eleventh Circuit's case in *Meyer* and the

5  panel's decision in *National Beverage*.

6          MR. LONG:  Okay.  Well, your Honor, we will address

7  the standing issue and the loss causation issue.  That's

8  really the issue that we're going to focus on, so I'm happy to

9  discuss that.

10          THE COURT:  All right.  Go ahead, sir.

11          MR. LONG:  Okay.  I'm here with my colleague,

12  Elizabeth Clark, and we're speaking on behalf of Defendant

13  MiMedx.  Defendant MiMedx is mindful that plaintiff's lengthy

14  pleadings and exhibits and the parties' multiple motions and

15  supplemental submissions present the Court with an

16  extraordinary volume of allegations, arguments, and

17  information.

18          We know that at first blush it may seem like granting

19  a motion to dismiss is not appropriate when superficially at

20  least there's so much information at issue.  But the

21  fundamental reason dismissal is appropriate, notwithstanding

22  all this complexity and papers and arguments, is simple, as

23  the Court seems to be focused on.

24          Under well-established Eleventh Circuit law this

25  plaintiff cannot demonstrate standing or loss causation

1  because this plaintiff sold its stock before there was ever a

2  corrective disclosure.  This Court need only focus on this

3  certain limited and critical area of the case in order to

4  determine whether dismissal is appropriate.  If this kind of

5  focus analysis is applied, then the reason dismissal is

6  appropriate will emerge.

7          So let's take the case back to the basics.  All that

8  is at issue here, despite all plaintiff's attempts to focus on

9  other things, is whether the second amended complaint properly

10  pleads a claim.  And plaintiff does not have Article III

11  standing to pursue its claims against MiMedx because it sold

12  all of its MiMedx stock before the purported fraud was

13  revealed to the market.  This means plaintiff's investment

14  losses were not proximately caused by the misstatements

15  alleged in the second amended complaint.  They can't establish

16  the causal connection to show standing under Article III or

17  loss causation under the federal securities laws.

18          This action cannot proceed if plaintiffs don't plead

19  a causal link between the alleged wrongdoing and a stock drop.

20  Without that link plaintiff doesn't have standing or loss

21  causation, and the case is over.  Courts say again and again

22  plaintiffs cannot look to the securities law to provide

23  investors with broad insurance against their losses.  Instead,

24  the whole point of the exacting scrutiny the law demands at

25  the motion to dismiss phase in securities cases is to act

1    against -- to act as a check against that sort of attempt.

2         Plaintiff has the burden of pleading every single

3    element of a fraud claim, including loss causation, and to do

4    that plaintiff has to plead that the alleged material

5    misrepresentation caused the loss for which plaintiff seeks to

6    recover.  Plaintiff has not done that, so plaintiff's claim

7    should be dismissed.

8         So now I'll walk through in more detail why plaintiff

9    doesn't have standing and can't plead loss causation.  But the

10   key reason is this, and this is identified in *Meyer*.  There

11   were no corrective disclosures during the time plaintiff owned

12   MiMedx stock.  A corrective disclosure is exactly what it

13   sounds like, a disclosure that corrects the alleged

14   misstatements.  And pleading corrective disclosures is

15   essential to pleading securities fraud class actions, and here

16   there were none before plaintiff sold its stock.

17        So, first, to be clear, plaintiff does not dispute

18   that it has to sell its stock after a corrective disclosure.

19   They agree with us on that.  As the Eleventh Circuit explained

20   in *Meyer*, a plaintiff's securities fraud action may not state

21   a claim by simply alleging that a security was purchased at an

22   artificially inflated price.  Instead, a plaintiff must show

23   not only an alleged fraudulent misrepresentation of

24   artificially inflated price of the security, but also that the

25   inflation caused by the alleged fraud was subsequently removed

1　from the stock's price by a corrective disclosure, by

2　information that is released to the market.

3　　　　The example the Eleventh Circuit used in *Meyer* -- and

4　it sounds like the Court is well familiar, but I'll walk

5　through that example.  To illustrate this point is this:

6　Let's say a company sells two products, flat screen TVs and

7　laptops.  Let's say the company makes a false statement about

8　the sales of the laptops, that they sold a million more

9　laptops in a quarter than they actually did.  This causes the

10　stock to be inflated.

11　　　　Let's say a year later the company makes an

12　announcement not about the laptops but about the flat screen

13　TVs and says we're having trouble selling these flat screen

14　TVs.  The market reacts to that.  The stock drops.  There has

15　been no corrective disclosure there.  There's been no

16　statement that contradicts the alleged fraud.  Any drop in the

17　stock has nothing to do with the alleged fraud, and in that

18　situation, as *Meyer* noted, plaintiffs do not have loss

19　causation.

20　　　　So that's a really clear illustration of why

21　corrective disclosures are so important.  So, thus, in a

22　securities fraud class action a corrective disclosure -- this

23　is *Sapssov* -- a corrective disclosure is the requisite piece

24　that reveals the falsity of a previous representation to the

25　market.  In other words, it is the release of information that

1    reveals to the market the pertinent truth that was previously

2    concealed or obscured by the company's fraud.

3            So in that flat screen TV laptop example I mention, a

4    corrective disclosure would have been an announcement to the

5    market before that plaintiff sold its stock -- that's key --

6    that the company really only sold 1 million laptops.  That

7    would remove the inflation caused by the fraud, and that would

8    demonstrate loss causation.

9            But here's the rub:  In this case plaintiff sold its

10   stock on February 26th, 2018.  Now, it sold its stock before

11   there was an announcement of any restatements or potential

12   restatements or any financial statements that would have to be

13   corrected.  But it claims, gins up really, 15 partial

14   disclosures that occurred as corrective disclosures before

15   that date.

16           So we'll talk about the one that's most pertinent to

17   *Meyer*.  But there are a bunch of others, and I'll put them

18   into three categories.  The first are statements that

19   plaintiffs allege were both misleading and corrective.  That

20   makes no sense.  We'll get into that later.  The second are

21   news articles and analyst reports, and the third are the

22   announcements of lawsuits and investigations.  None of those

23   disclosures are corrective as a matter of law.

24           So let's get to the disclosures that they claim are

25   both misleading and corrective.  They agree.  They do not

1  dispute that a disclosure cannot be both misleading and

2  corrective.  They do that because it's common sense.  The *Flag*

3  *Telecom* case tells us that a plaintiff cannot have it both

4  ways by arguing that a misstatement itself constituted a

5  corrective disclosure because a single misstatement cannot

6  artificially inflate a stock price and remove the artificial

7  inflation.  That's not possible.

8         They argue that their disclosures can be corrective

9  because the purported loss causation disclosures were separate

10 from the alleged misstatements.  That's just -- that's not

11 true.  They were the same statements.  They pointed to the

12 same statements as being both corrective and misleading.  And,

13 also, they don't have any case law to support that position.

14 They cite one case, *Big Lots*, from Southern District of Ohio,

15 but that does not actually address whether corrective

16 disclosures can be misleading.

17        So that gets rid of the first 3 of the 15.  So let's

18 go to the next --

19        THE COURT:  Mr. Long, you know, as I was thinking

20 about that point yesterday trying to come up with an example

21 of something being both misleading and corrective, you know, a

22 hypo I thought of was, yeah, let's say that there was a

23 forecast, and the market had absorbed that forecast that a

24 certain product would hit the market by 12 months -- excuse

25 me -- in 12 months by a date certain.  We'll just say

1    January 1, 2022.  And the company knew -- can y'all hear me?

2           MR. LONG:  Yes.

3           THE COURT:  And the company knew that it wasn't going

4    to reach that, that, in fact, that it was going to be a year

5    behind that.

6           And so it came out with a statement that said, look,

7    we recognize we're not going to meet the January 1 by 2022,

8    but we're just going to be a few months past that, when the

9    company knows that it's going to be a full year past that.

10   Wouldn't that be an example of factually something that was

11   corrected?  It corrects the misnomer that the product is going

12   to come out by January 1, 2022, but it's misleading because it

13   still doesn't fully reveal to the market that it's going to be

14   a full year delay, instead insinuates or by innuendo that it's

15   going to be just a few weeks late.

16          MR. LONG:  I do think that that would -- that could

17   be corrective of a prediction that the company made, but I

18   don't think that sort of example would be corrective of a

19   fraudulent statement.  So they had given a forward looking

20   statement that they thought they were going to be able to

21   produce in a year, and that is not necessarily a fraudulent

22   statement in and of itself just because they're predicting

23   something.

24          THE COURT:  Well, it could be.

25          MR. LONG:  It could be.  It could be.

1          THE COURT:  I just had a case that settled where the

2     allegation -- it was against a power company, and the

3     allegation was that the company represented a power plant was

4     going to be online by a certain date.  And that date was

5     important because it had tax consequences associated with it.

6     And the allegation in the lawsuit was that the company knew --

7     at some point it knew.  Maybe it didn't originally mislead the

8     market, but it knew that it wasn't going to meet that

9     projection.

10          And so in that kind of situation if the company had

11     come out and said, look, we're going to be a little bit late

12     but we're not going to be a lot a late, knowing that they're

13     going to be a lot late, it could be correcting the original

14     statement, I suppose.  But, of course, the premise there is

15     that that original statement was fraudulent.  So we'll assume

16     that it was fraudulent but not completely correcting it.

17          So I don't know that I can say that the plaintiff

18     isn't onto something, but I'm not saying that what the

19     plaintiff points to in this case could qualify as that type of

20     example.

21          MR. LONG:  I agree that certainly these statements do

22     not qualify, and I would argue that, you know, certainly you

23     can have different statements within an announcement by a

24     company.  One could be corrective, and one could be

25     misleading.  Your example is one statement, but I just don't

1    think that's what we're dealing with here.

2              THE COURT:  So exactly what does the plaintiff say

3    the statements were that were both corrective and misleading

4    at the same time?

5              MR. LONG:  I'm going to have to pull that up.  I'm

6    sorry.  Your Honor, can I address that on rebuttal?

7              THE COURT:  Yes, sir, you can.

8              MR. LONG:  Okay.  I appreciate that.

9              So now I'd like to move on to the news articles and

10   analyst reports.  The amended complaint cites a number --

11   second amended complaint cites a number of analyst reports and

12   articles and I'm not -- I won't walk through all of them, but

13   the basic problem that plaintiffs have is in all of the

14   analyst reports the authors specifically say that they are

15   relying on public information, not inside information when

16   they write those reports.  And then the Wall Street Journal

17   article says that it was based on public disclosures that were

18   reviewed by the journal.

19             So the articles themselves are based on public

20   information, as we know.  And, as you know, an efficient

21   market is presumed here.  That's where the fraud on the market

22   concept comes from, and anything that's already public is

23   baked into the stock price.  And so those articles cannot be

24   corrective.

25             THE COURT:  So all that makes sense to me, and it

1  makes sense to me when -- I'm trying to remember the -- I

2  can't remember the author in the *Meyer* case, but I've got to

3  admit I'm confused by the per curiam opinion in *National*

4  *Beverage*, which seems to point to an analyst statement with no

5  indication that it includes inside information.  So what do

6  you make of that?

7          MR. LONG:  Well, I think, first of all, the analyst

8  report -- well, that article, actually, it was a Wall Street

9  Journal article, I think.  And the Court was just saying

10  unlike the Wall Street Journal article in our case that says

11  this is based on public information, that article did not say

12  that.  And the Court was just saying, look, we just don't know

13  whether or not that was based on public disclosures.  It's not

14  clear.  We don't want to be presumptuous, and because we don't

15  want to be presumptuous we're going to let that one go

16  through.  I think that's really the distinction.

17          THE COURT:  But it sounds like that's your -- I don't

18  remember reading that rationale.  Maybe I missed it because I

19  had a lot to read, but is that how you interpret what appears

20  to be --

21          MR. LONG:  That's the distinction.

22          THE COURT:  Yeah.  Okay.  Go ahead, sir.

23          MR. LONG:  Okay.  Third, the plaintiff does not

24  dispute that the announcement of lawsuits and investigations

25  cannot act as corrective disclosure, and they can't because

1   that's the controlling law.  *Meyer* held that the commencement

2   of an investigation without more is insufficient to constitute

3   a corrective disclosure and because the announcement of an

4   investigation reveals just that, an investigation and nothing

5   more.  It does not reveal to the market that the company's

6   previous statements were false or fraudulent while stock

7   prices may fall upon the announcement of an investigation.

8   That's because the investigation can be seen to pretend an

9   added risk of future corrective action, not because any prior

10  misstatements were corrected.

11         So the risk is there, and the market reacts to risk,

12  as you might imagine, but that doesn't mean that the market is

13  reacting to information that was actually disclosed about the

14  company.

15         And similarly in *Sapssov v. Health Management*, the

16  Eleventh Circuit held that civil complaints like

17  investigations do not establish the defendant committed or is

18  liable for the conduct alleged.  These are allegations in the

19  end and similarly cannot be considered corrective disclosures

20  as a result.

21         Plaintiff hinges its argument with respect to these

22  disclosures on a single footnote in *Meyer*, and I'm sure we're

23  going to come to this so I'll sort of address it now.  Now, in

24  that footnote *Meyer* hypothesized it could be possible in a

25  different case of an announcement of investigation to qualify

1    as a partial corrective disclosure when the investigation is

2    coupled with a later finding of fraud or wrongdoing.  But the

3    Eleventh Circuit has never applied this footnote, and the law

4    in this circuit per *Meyer* and *Sapssov* is the disclosures of

5    investigations in civil lawsuits are not corrective as a

6    matter of law.

7         THE COURT:  Mr. Long, let me ask you about that

8    footnote, and, obviously, you're going to view this as a

9    friendly question.  But, you know, I'm sitting here on the

10   trial court level trying to figure out what that footnote

11   means.  If it's taken in its literal sense, it could mean that

12   something that is later discovered could relate back to the

13   announcement of the investigation and have given investors the

14   information such that the market could react.  But, of course,

15   the problem appears that the market would not have had that

16   information that is later discovered because it is by

17   definition later discovered.

18        So, I mean, I know you argue, if not you one of your

19   colleagues for the other defendants, argues that the footnote

20   is just dicta, but how would it make sense that something that

21   is later discovered could have given the market information at

22   a previous point in time?

23        MR. LONG:  I don't think -- I think that's the reason

24   *Meyer* went the way it did.  I don't think that makes sense.  I

25   think it makes far more sense, you know, if a plaintiff -- and

1   this is not this plaintiff -- if a plaintiff holds onto the

2   stock, and then information is released that actually is

3   information that is a corrective disclosure.  Then they can

4   claim loss causation at that point.

5          Now, there have been cases -- and it might make sense

6   in a situation like the Ninth Circuit has decided where if

7   there is a later stock drop and -- I'm sorry -- if there is a

8   later corrective disclosure, there's a restatement or they say

9   they're going to have to restate and there's no stock drop

10  then, then maybe a plaintiff who owned stock at both times can

11  look back to that earlier investigation.  That would be the

12  only time that I think that it might be equitable to do.

13         But when it's just an investigation, I just don't

14  think that can be a corrective disclosure.  I think you'd have

15  corrective disclosures every time the SEC announces

16  investigations, and they announce investigations against

17  public companies all the time.

18         THE COURT:  All right.  Go ahead, sir.  Thank you.

19         MR. LONG:  Okay.  Now, in response to our argument

20  about *Meyer*, plaintiff claims that particularly the

21  February 20th disclosure that MiMedx made is corrective

22  because it announced an internal investigation and disclosed

23  that MiMedx was postponing a release of its financial results.

24         Again, that's just not true.  Courts consistently

25  hold that the announcement of a delay in the reporting of

1  financials does not establish loss causation because, again,

2  it doesn't establish that wrongdoing occurred.  All it's

3  indicating is a risk, and we can't -- I mean, companies have

4  to be able to tell their shareholders that they're looking

5  into issues, and we don't want them to be penalized for

6  looking into those things.  So the law is clear.  The fact

7  that MiMedx announced its financial results would be delayed

8  due to potential accounting issues and an internal

9  investigation does not change that analysis.

10       So for all these reasons, none of the events

11 plaintiff describe as occurring before the February 2018 stock

12 sale constitutes a corrective disclosure.

13       Now, we've talked a lot about loss causation, but I

14 want to be clear this is a fundamental standing issue too.

15 The inability to show any corrective disclosure has occurred

16 before plaintiff sold its MiMedx stock means that plaintiff

17 does not have standing to bring this action.

18       The *Lewis* decision shows Article III of the

19 constitution limits the jurisdiction of federal courts to

20 cases and controversies which include the standing doctrine.

21 It's fundamental.  It has to be shown at the beginning, at the

22 complaint, and if a class representative does not have

23 standing, then the case that the class representative is

24 bringing on behalf of the other shareholders cannot go

25 forward.  That's not to say its other class representatives

1   couldn't, but one who sells its stock before there is a

2   corrective disclosure just can't do it.  There has to be that

3   causal link.

4            As the Supreme Court explained in *Dura*, when an

5   investor claims its losses for cause by the alleged

6   misrepresentation that it inflated a stock price but the

7   investor sells those shares before the alleged truth which

8   revealed to the market the misrepresentation, quote, will not

9   have led to any loss, closed quote, that can be causally

10  linked to the alleged misrepresentations.  Everybody agrees

11  that plaintiff did not own MiMedx stock after February 26th,

12  2018.  Plaintiff cannot show this injury then is fairly

13  traceable to the challenged actions of MiMedx is resolved.

14           All right.  So we have talked about loss causation.

15  We've talked about standing.  I just want to, you know,

16  re-emphasize loss causation requirement.  That is so that the

17  Courts can police the realm of 10(b) claims guarding against

18  their use as a device to force companies to settle claims

19  simply to avoid the cost and battle of litigation.  Loss

20  causation is the way that Courts can ensure that the

21  securities laws are not just an insurance policy for people

22  who lose money when they invest their shares.

23           And with that I will -- sorry.  Courts in this

24  circuit regularly dismiss complaints for failure to plead loss

25  causation in circumstances like these.  In *Colonial Bancgroup*

1  *Securities Litigation* the Middle District of Alabama dismissed

2  a complaint because the plaintiffs in that case did not own

3  stock when the corrective disclosures were made, which meant

4  they could not establish loss causation.  In *Anchor Glass*

5  *Container Corp*. the Middle District of Florida granted a

6  motion to dismiss for failure to plead loss causation where

7  the plaintiffs did not own stock at the time of the corrective

8  disclosures, and of course we've already talked about *Meyer*.

9         So for all these reasons, we believe that the second

10  amended complaint should be dismissed for failure to plead

11  loss causation.  I'll stop there.  That's the issue you were

12  interested in.  We will rely on our papers for the remaining

13  arguments we make, remaining three arguments, unless you --

14         THE COURT:  All right.  Thank you.  Thank you,

15  Mr. Long.  I don't have any further questions right as we sit.

16  All right.  I'll hear from whoever is going to speak on behalf

17  of Michael Senken in his motion to dismiss.

18         MR. FELLOWS:  Your Honor, Hank Fellows.  Michael

19  Gretchen and I are representing Michael Senken in this matter.

20  At the outset we adopt all of the excellent arguments by

21  Robert Long on behalf of MiMedx as to the plaintiffs' lack of

22  standing and the failure to establish loss causation.  We too

23  believe that the Court is authorized to dismiss the second

24  amended complaint against all the defendants on that basis

25  alone.

1          And it should be noted, your Honor, that of course

2    the plaintiffs are the master of their complaint as amended.

3    They originally filed this action in early 2019, so they've

4    had ample time to select a suitable lead plaintiff.  They had

5    the opportunity to file a second amended complaint, and it's

6    still confronted with the basic objective in the pleadings

7    that authorized dismissal of the second amended complaint.

8          In addition to the lack of loss causation and the

9    lack of standing, your Honor, we wish to point out that as to

10   Mr. Mike Senken, there are ample Eleventh Circuit precedents

11   which justify the dismissal of the second amended complaint

12   against him.  We've cited them in our motion to dismiss, our

13   original memorandum, and our reply memorandum, and I'd simply

14   like to mention the cases.

15         *Mizzaro v. Home Depot*, which is a 2008 decision by

16   the Eleventh Circuit, it really set forth the standard of the

17   triple-layered pleading requirements that are required

18   pursuant to not only Rule 8(b) but Rule 9(b) and the Private

19   Securities Litigation Reform Act of 1995.

20         I think it bears noting, your Honor, that this type

21   of a federal securities case under the Private Securities

22   Litigation Reform Act, it really is unlike general commercial

23   litigation involving general common law fraud cases or

24   fiduciary duty cases.  This is a highly specialized type of

25   federal action requiring special pleading requirements that

1  you don't see in any trust cases, in other sorts of federal

2  statutory cases.

3         So the type of analysis that we're going through,

4  years ago in a garden variety securities fraud case this type

5  of discussion might have occurred at the summary judgment

6  stage.  But because of the way the law was written, the

7  Private Securities Litigation Reform Act in 1995, the Eleventh

8  Circuit through my *Mizzaro v. Home Depot*, through *Carvelli v.*

9  *Ocwen Financial Corporation*, through *Garfield v. NDC Health*,

10 and *Brophy v. Jiangbo Pharmaceuticals*, these are lengthy

11 analyses by the Eleventh Circuit.

12        And in those four cases alone, your Honor, they

13 authorized the dismissal of cases against defendants for

14 failure to satisfy the other corresponding hurdle that the

15 plaintiffs in this case have, which is failure to prove

16 scienter as required by the act.  What that requires under

17 these precedents and under the act, the plaintiffs have to

18 prove either an intent to deceive or severe recklessness, and

19 at least as to Mr. Michael Senken, their pleadings are wrong.

20 They have failed to adequately plead scienter against

21 Mr. Senken.  So --

22        THE COURT:  Mr. Fellows, if I could ask you -- I'm

23 sorry to interrupt.  If I could ask you to maybe put on the

24 hat of the plaintiff in some respects and do this for me:

25 Based on what they've pled, what are the allegations that come

1 | closest to satisfying the scienter requirement?  And then tell
2 | me why that's not enough, if you would.
3 |        MR. FELLOWS:  Okay.  There's only one category which
4 | might approach what is required, but it's still deficient.
5 | And that's the issue of revenue recognition, and as to that,
6 | it relates to a contention that Mr. Mark Anderson that was
7 | brought on by MiMedx in late 2015 and early 2016 sent an email
8 | to Mr. Mike Senken as CFO questioning certain revenue
9 | recognition generated by MiMedx.
10 |        Well, Mr. Senken, the day after he received that
11 | email from Mr. Anderson, he transmitted it to the chair of the
12 | Audit Committee, Mr. Terry Dewberry, and he also forwarded it
13 | to Cherry Bekaert.  So rather than try to conceal that email
14 | or avoid dealing with it, he dealt with it frontally by
15 | forwarding it to the chair of the Audit Committee and to
16 | Cherry Bekaert.  And during the next several weeks Mr. Senken,
17 | Mr. Dewberry, and others discussed Mr. Anderson's concerns.
18 | So Mr. Senken did what he was supposed to do, and that does
19 | not reflect any intent to deceive.
20 |        The other general categories of allegations that the
21 | plaintiffs try to group Mr. Senken into of which he had no
22 | knowledge were the so-called side agreements with certain
23 | distributors and also channel stuffing.  Mr. Senken had no
24 | knowledge of any of the so-called channel stuffing nor did he
25 | have knowledge of any of the side agreements.

1       So those --

2       THE COURT:  Mr. Fellows, if I could ask you about

3  that, is that you saying that he had no knowledge based on

4  what you know in investigation of the case or is that

5  acknowledged by the plaintiff?  Did the plaintiffs' pleadings

6  fail to allege knowledge or even insinuate knowledge on behalf

7  of Mr. Senken of those two allegedly fraudulent activities?

8       MR. FELLOWS:  The plaintiffs' second amended

9  complaint failed to allege that knowledge or intent to deceive

10  or severe recklessness by Mr. Senken as to those categories.

11       THE COURT:  All right.  Thank you, sir.

12       MR. FELLOWS:  And the other points we wish to make,

13  Judge, is we now have ample definitions of what's required to

14  plead intent to deceive or severe recklessness, and we've got

15  those definitions in the *Mizzaro* case.  The *Carvelli* case

16  points out that puffery is not something that's actionable.

17  General statements about the culture of the company are not

18  actionable.

19       In the *Brophy* case, which was a decision by Judge

20  Jill Pryor from the Eleventh Circuit from 2015, in that case

21  Judge Pryor analyzed the claims against a CFO, chief financial

22  officer, as we have here, and, interestingly, she went through

23  an analysis pointing out that there's no allegation that the

24  CFO sold stock during the class period or otherwise profited

25  from the fraud beyond receiving a salary.

1        Well, we have that same situation here, your Honor.

2   The plaintiff has not alleged that Mr. Senken made any sales

3   of stock at any relevant time, and the plaintiff couldn't do

4   so because Mr. Mike Senken retained all of his stock and his

5   stock options during the entire time he worked for the company

6   from 2010 to 2018.  He intended to use the stock and stock

7   options for retirement planning.  When he was dismissed by the

8   company, his stock options were later taken away from him.

9        But his interests, your Honor, as CFO were in

10  complete alignment with the interests of investors.  He had a

11  long-term desire and motivation for the company to do well.

12  He wasn't motivated by any short-term profit objectives or

13  goals, and no allegation is made by the plaintiffs against him

14  to make that sort of contention.  No, he had a long-term view

15  of the company.  Everything he did was consistent with proper

16  reporting requirements as chief financial officer.

17       And even as to the SOX certification he made, your

18  Honor, there's no allegation that he made that certification

19  with an intent to deceive or severe recklessness.  It didn't

20  happen.  So we respectfully submit that Mr. Senken is entitled

21  to have his motion to dismiss granted.  He's grouped in with

22  the other individual defendants, but there are no facts

23  alleged that warrant that either he had an intent to deceive

24  or had severe recklessness.  He didn't have either.

25  Therefore, he's entitled to a dismissal of the case against

 1   him, and I'll reserve my remaining time for rebuttal.

 2         THE COURT:  All right.  Thank you, Mr. Fellows.

 3         All right.  So I'll now hear from whoever is going to

 4   speak on behalf of Cherry Bekaert.  I'm sorry if I

 5   mispronounced that.  Is it Bekaert?  Is that right?

 6         MR. MCINTYRE:  Cherry Bekaert.

 7         THE COURT:  Bekaert.  Okay.  Thank you.

 8         MR. MCINTYRE:  Sure.  Good morning, your Honor.  It's

 9   Chuck McIntyre, and I represent Cherry Bekaert.  I guess I'll

10   start with where a lot of the attention this morning has been

11   spent, which is in the loss causation argument.

12         Ours is, I think, a bit simpler and easier in terms

13   of the fact that there is simply no allegation in the

14   complaint of a corrective disclosure that relates to Cherry

15   Bekaert's audits, and without that plaintiff has not alleged

16   loss causation.  So they must specifically allege with respect

17   to Cherry Bekaert that there was a statement that we made and

18   then a corrective disclosure about it, and that appears

19   nowhere in the complaint.

20         The only allegations with respect to any statement

21   that we made that they allege were fraudulent are the opinions

22   that we issued.  And separately from the loss causation, under

23   *Omnicare* they do not meet the standard of having alleged that

24   we knew at the time that we issued the opinions that those

25   opinions were fraudulent.  It is a --

1        THE COURT:  I raised my hand just because I know

2    there's a delay sometimes in the transition.  So they would

3    need to show as it relate -- assuming they can establish loss

4    causation as to the company, as it relates to your client,

5    they would need to show, I suppose, if she was not an

6    active -- alleged to be some kind of active participant in the

7    fraud as might apply to some of the other defendants, that she

8    was reckless.  Am I right there or am I missing something

9    there?

10        MR. MCINTYRE:  I'm not sure I completely understood

11    the question in terms of --

12        THE COURT:  Well, so if they're not alleging that she

13    was engaged in a conspiracy with other defendants to commit

14    securities violations, then for the plaintiffs to succeed

15    against Ms. Bekaert, they would have to prove what?  That she

16    was recklessness -- she was reckless in how she did her job by

17    issuing the opinions that she did relative to audits and such

18    and that they would have relied upon those financial opinions

19    that she gave such that she would be subject to being sued

20    based on the SEC fraud because of her recklessness?

21        I mean, I guess I'm trying to understand.  I'm not

22    trying to suggest that she's guilty of any of that.  I'm just

23    trying to understand what the plaintiff is actually saying in

24    that regard.

25        MR. MCINTYRE:  Sure, your Honor.  There are three

1  things that the plaintiff would have to establish for Cherry

2  Bekaert to be liable here.  One is loss causation.  One is

3  that we issued false opinions, and we knew they were false

4  when we issued them.  I think what your question is going to

5  is sort of the scienter element or the severe recklessness

6  requirement of the work that we -- of the fact that we were

7  involved in an audit in which now they allege that there were

8  these errors.

9         So it isn't sufficient in and of itself, right, to

10  allege simply your audit opinions were wrong because their was

11  all this fraud that occurred, and the financial statements now

12  have been withdrawn.  For the auditor to be liable, there

13  needs to be a finding that we did that with scienter; right?

14  That either we were involved in the fraud or intended to aid

15  the fraud or that we were severely reckless in the way that we

16  audited the client.

17         THE COURT:  And there's no allegation, as I

18  understand it, that your client was directly involved in the

19  fraud; is that correct?

20         MR. MCINTYRE:  That is correct, your Honor.

21         THE COURT:  So they're saying that, look, if she had

22  been doing her job even negligently, she would have discovered

23  the fraud and would not have issued the opinions that she

24  issued.

25         MR. MCINTYRE:  That's correct, your Honor.  If you

1  look at the -- actually, you can go to the headings in their

2  complaint, and if you look at each of their headings in the

3  sections that relate to Cherry Bekaert, the headings are

4  phrased as a negligent standard, a failure to, you know, apply

5  an appropriate audit standard.  But under the PSLRA and all

6  the law interpreting it in its progeny, and especially

7  *Tellabs*, that is wholly insufficient because there is this

8  scienter requirement.  They must establish that we had done

9  something so recklessly that, in essence, it amounts to having

10  contributed to the fraud.

11        And there's a lot of reference in the complaint to no

12  audit at all, and that, of course, is a loaded statement in

13  the sense that it in and of itself doesn't solve the scienter

14  issue; right?  You could say, well, there was no audit at all,

15  and that would be negligence.  And what the cases have said is

16  when you go to -- if you can't prove that we were involved in

17  the fraud, which they have not alleged and they couldn't

18  allege, then what you have to establish is that we were so

19  reckless, so severely reckless, that that, in essence,

20  contributed to this.  But in order --

21        THE COURT:  Let me parse that, if you don't mind.

22        MR. MCINTYRE:  Sure.

23        THE COURT:  So the part of what you said that I'm not

24  sure I agree with is that if there was no audit at all, that

25  would be negligent.  It would seem that if there was no audit

1    at all but an accountant was representing that there had been

2    an audit, not that they just did it poorly, then that might

3    amount to reckless representations to the market as a whole

4    whose relying on that audit to make decisions; right?

5         MR. MCINTYRE: Yes. And I hadn't finished my -- I

6    apologize. I hadn't finished my thought on that. What I

7    meant when I said that is it's not simply saying there was no

8    audit at all. You have to link it. What the Courts say and

9    what the cases say is you must link that, that no audit at all

10   to an intent to aid the fraud; right? So the reason you did

11   no audit at all was to aid the fraud, and that's not alleged

12   here. We did an audit.

13        Quite frankly, we were lied to multiple times, and

14   there's been a verdict in the criminal trial with respect to

15   that. And one of those indictments was that, you know, you

16   misled the auditors. In fact, if you look at every single

17   investigation that was conducted here, whether it's by the

18   company, the SEC or the DOJ, not one of them, not one of them

19   have any allegation that we were involved in the fraud or had

20   knowledge of the fraud or even that we in any way contributed

21   to what the plaintiffs did -- management did here with respect

22   to the fraud that occurred.

23        So when you look at all of the case law and the way

24   this complaint has been pled, it's really pled as a bad audit.

25   They, in essence, say you did a bad audit, and because you did

1  a bad audit and management engaged in this fraud, you should

2  be liable.  Well, that's not the law.  That's not what's

3  required.  You have to establish that the auditor had the

4  requisite scienter, and I would say if you look at cases since

5  Tellabs in 2008, the number of cases that find the auditor at

6  least gets past the motion to dismiss stage in terms of

7  scienter, are minimal.

8        And if you then segment out those that involve where

9  the auditor was defrauded to the extent that we were defrauded

10  here, then there's none.  I mean, this is a very unique case

11  in the sense that we were lied to multiple times.  And you may

12  say and the plaintiffs do say this.  The plaintiffs say, well,

13  if you had done more, you would have discovered this fraud.

14  But that's not the standard; right?  The standard isn't, well,

15  we were lied to and we were -- that's negligence again; right?

16  If you had done more, you might have found the fraud.  Well,

17  all that does is get you to negligence or even grossly

18  negligent.  We could be grossly negligent here, and that would

19  not be sufficient to meet the scienter requirement.

20        THE COURT:  So let me dive into that just a second as

21  it relates to the negligence claim, although I could see there

22  would be a lot of problems with that kind of lawsuit given

23  that the allegations are that, you know, the most senior

24  officials in MiMedx was involved in the fraud that's been

25  alleged and, I guess, found in the criminal case in New York.

1  I mean, at least theoretically the company might itself

2  possess a malpractice claim against your client if it was just

3  based that she didn't do her job well; right?

4          MR. MCINTYRE:  That's correct, and I will note that

5  we were not sued for malpractice by this client.  But that is

6  correct.  The company would potentially possess a malpractice

7  claim for the negligence.  That is correct.

8          Your Honor, the only other thing I would point out on

9  this topic is that the cases also look for motive; right?

10 What would be our motive?  And the plaintiffs point to only

11 one.  There's only one allegation in the whole complaint with

12 respect to what Cherry Bekaert's motive was here, and that is

13 our fees.  And every case says that that is insufficient to

14 establish a proper motive.  No auditor and certainly not

15 Cherry Bekaert would ever risk their reputation in engaging in

16 or allowing a company to engage in fraud.

17         And let's not forget we were fired.  We were fired

18 before the fraud was revealed, but at the end of the day, it

19 isn't sufficient to simply allege, well, they were getting

20 fees, and that's why they engaged in this.

21         I think I will reserve anything else for rebuttal

22 unless the Court has any additional questions.

23         THE COURT:  All right.  Thank you, sir.  Thank you.

24 Give me just a second.  All right.  So now whoever wants to

25 speak on behalf of Mr. Petit and Mr. Taylor.

1          MR. BERNSTEIN:  Good morning, your Honor.  That would

2    be me, Jesse Bernstein, from Quinn Emanuel.  We represent

3    Mr. Taylor, and we'll also be arguing on behalf of Mr. Petit

4    today.

5          THE COURT:  Can I jump ahead in your case and just

6    ask you this.  I mean, I read your motions, and your motions

7    were originally filed maybe in May.  It was a long time ago,

8    and there's been a lot of water under the bridge since then

9    with regard to these criminal trials.  Isn't really your

10   client's best position and maybe really only realistic

11   position today given what's happened in the criminal cases, to

12   simply argue that there's just not causation here, as Mr. Long

13   has argued and others have adopted?

14         MR. BERNSTEIN:  Respectfully, your Honor, I don't

15   think that's the case, and I think the mixed verdict in the

16   criminal case that your Honor is referencing, which included

17   an acquittal as to Mr. Taylor on the securities fraud charge

18   and an acquittal as to Mr. Petit as to the conspiracy charge,

19   is somewhat irrelevant to the issue before your Honor today.

20   And the reason --

21         THE COURT:  But let me just say this, and I'll do it

22   in the form of a question.  The convictions are res judicata

23   for the allegations that are made, but the acquittals are not

24   because of the different standard of proof that's involved in

25   the civil case; right?

1          MR. BERNSTEIN:  Your Honor, as to the acquittals,

2    there's no res judicata as to the acquittals, but I do not

3    believe there is res judicata at least today and at least as

4    to the allegations in this complaint, even as to the

5    convictions.  And I welcome the opportunity to explain why.

6          THE COURT:  Yes, sir.  Thank you.

7          MR. BERNSTEIN:  First, there's not even a conviction

8    yet.  The appellate process is not even done, let alone been

9    exhausted, and that's in stark contrast to the case that the

10   plaintiff submitted, *SEC v. Rand*, where the SEC did not even

11   move for res judicata until after the criminal conviction had

12   become --

13         THE COURT:  Well, okay.  So if we're talking final

14   res judicata or maybe just the definition itself, I understand

15   your point, the case isn't over, there's appeals that are

16   proceeding.  But it's really hard to argue that there's not at

17   least a civil claim at the motion to dismiss phase when a jury

18   has heard and received similar evidence, as alleged by the

19   plaintiff in their complaint, about the wrongdoings that your

20   clients allegedly engaged in.

21         That's my ultimate point, is that it's really hard to

22   take at face value an allegation that your folks didn't do

23   something wrong here ultimately.  And, in fact, that's the

24   position that the company has taken; right?  I mean, MiMedx

25   has taken that same position relative to both of your clients.

1          MR. BERNSTEIN:  Staying on the criminal trial for a

2     moment, your Honor, I think it's important to note that there

3     are very large differences between the criminal trial and the

4     complaint before your Honor today.  And just to start with

5     what the criminal trial was about, it involved four discrete

6     alleged fraudulent transactions that purportedly occurred

7     years after the beginning of the class period in this case.

8     The jury only -- that one of those transactions was

9     fraudulent.  There was no special verdict form, so we don't

10    know what the jury found, what the jury didn't find.  We don't

11    know why there was a conviction.  We don't know why there was

12    an acquittal.

13          So this is -- and we think that's particularly

14    important.  The trial did not relate to a whole host of

15    allegations that are in the second amended complaint.  For

16    example, AvKARE, which is, as your Honor I'm sure is aware

17    from the briefing and reviewing the pleadings, is a major part

18    of this action.  AvKARE was not an issue in the criminal

19    trial, not at all.

20          The trial, unlike this action did not involve any of

21    the anti kickback allegations or involve allegations related

22    to the independence of physician-own distributors, which are

23    an entire category of alleged misrepresentations in this

24    action.  The trial didn't relate to alleged misrepresentations

25    regarding the compliance culture of MiMedx.

1    So all of those differences are very important for

2   the issue before your Honor today, which is the motion to

3   dismiss on the second amended complaint.  The criminal trial

4   doesn't speak to any of those.  So, your Honor, we don't view

5   the jury findings to really be that relevant to the issue

6   before us today.

7        THE COURT:  All right.  So I know you join in the

8   causation arguments that Mr. Long and others have made, so you

9   don't really need to talk about that unless you really want

10  to.  Anything else that you want to talk about, though?

11       MR. BERNSTEIN:  Your Honor, I would just make a few

12  points.  You're correct we do join in the causation argument,

13  and I won't point on that one.  We also would -- certain

14  alleged statements are inactionable as a matter of law.  I'll

15  get into those in a second.  Certain alleged statements were

16  not made by either Mr. Petit or Mr. Taylor, as required under

17  the Supreme Court's ruling in *Janus*.  And plaintiffs, we

18  submit, have not met the heightened pleading standard for

19  pleading a strong inference of scienter with respect to each

20  misrepresentation.  And that's also an important distinction

21  between the criminal trial and the action here.

22       Under the PSLRA the plaintiffs cannot just say, well,

23  there was scienter somewhere, and so each misrepresentation is

24  now covered.  They have to show scienter as to each

25  misrepresentation individually.  And I'll get into this in a

1   second, but in particular the pre-2016 alleged

2   misrepresentations suffer from a complete lack of scienter.

3   But starting with the categories of alleged misrepresentations

4   that are simply inactionable as a matter of law -- and

5   Mr. Fellows already covered some of these, so I won't spend

6   too much time on them -- generic statements about growth

7   prospect.  Courts have consistently held that those types of

8   statements are inactionable as a matter of law.  Statements

9   about compliance culture Courts have consistently held

10  inactionable as a matter of law.

11          The statements here about controlling distributors

12  and the use of physician-owned distributors, physician-owned

13  distributors, those are simply conclusory.  As Courts have

14  held, a close even dependent relationship between a

15  distributor and a company does not equate to control.  And

16  that's really all the plaintiffs have alleged on their

17  controlled distributor allegations.

18          And with respect to the physician-owned distributors,

19  MiMedx actually said that it does not directly sell to

20  physician-owned distributors, and all plaintiffs have alleged

21  is that the company's distributors employed physician-owned

22  distributors, so indirectly held physician-owned distributors,

23  which is not inconsistent with any of the representations in

24  this case.

25          And, finally, on the misrepresentations point

1  plaintiffs try to save their inactionable statements by using

2  Item 303, but as the Eleventh Circuit has held, Item 303 is

3  not a catchall disclosure obligation under the Exchange Act

4  for purpose of a securities fraud action.  So Item 303 doesn't

5  save them for these categories of statements that are just

6  inactionable as a matter of law.

7         There are, as I mentioned, numerous statements where

8  neither Mr. Petit nor Mr. Taylor are alleged to have been the

9  maker of the statements, and those are listed in our briefing,

10 and I won't go through each one today.  But those, regardless

11 of the falsity or any other issue, if we're not the maker of

12 those statements, we can't be liable for those statements

13 under 10(b).

14         And now I'd like to spend just a moment on scienter

15 and in particular the scienter allegations related to the

16 pre-2016 representations.  And, again, there's no dispute that

17 on PSLRA plaintiffs need to allege a strong, cogent, and

18 compelling inference of scienter with respect to each alleged

19 misrepresentation.  And with respect to the pre-2016

20 allegations in particular, the complaint is essentially devoid

21 of any real scienter allegations.

22         In fact, the sole allegation that plaintiff appears

23 to rely upon for the pre-2016 period is based on footnote 28

24 of their opposition brief, which is on page 29 of their

25 opposition brief, seems to be the allegation that the Audit

1   Committee found that the improper course of dealing with

2   AvKARE was established as early as 2012.

3          But the problem with this allegation is that policies

4   being in place as of 2012 does not mean that the executives

5   were aware of those alleged policies in 2012.  And even if

6   they were aware of those policies, the knowledge of policies

7   being course of dealing does not equate to knowledge that that

8   course of dealing is inconsistent with generally accepted

9   accounting principles.  And that's why Courts have

10  consistently held that a mere GAAP violation is not by itself

11  sufficient to establish scienter.

12         And, notably, plaintiff's own allegations reveal that

13  the more compelling inference, particularly for the pre-2016

14  period, is that the defendants, Mr. Petit and Mr. Taylor in

15  particular, were unaware that the alleged practices violated

16  GAAP prior to 2016 since plaintiff actually alleges that the

17  Audit Committee found that senior officials were aware by,

18  quote, early 2016 that the course of dealing with AvKARE was

19  inconsistent with the explicit terms of the contract.

20         So plaintiff's own allegations reveal that it wasn't

21  until at least early 2016 that defendants were aware that this

22  course of dealing with AvKARE was inconsistent with the

23  explicit terms of the contract, let alone whether it was a

24  revenue recognition issue under GAAP.  So we respectfully

25  submit that the pre-2016 statements in particular presented a

1  simple case of dismissal for lack of scienter.

2          With respect to the 2016 allegations, we go to the

3  clause with respect to each of those in detail in our papers,

4  and unless your Honor has any questions about those arguments

5  or about any of our other arguments, we'll rest on our papers

6  at this time.

7          THE COURT:  All right.  Thank you, sir.  All right.

8  So we've been going about an hour.  I think what we'll do is

9  we'll take a ten-minute break, we'll come back and hear from

10 the plaintiff, who I think all of the defendants have now had

11 a representative speak.  And depending on how long that goes,

12 we may take another break, but we'll probably go straight on

13 through to the end.  So if you'll just look at your watch, and

14 we'll see you in ten minutes.  Thank you.

15          (Brief recess.)

16          THE COURT:  All right.  I've got less folks on the

17 screen than before, so if you're back with us and you haven't

18 got your camera turned on and if you want it on, then now

19 would be the time to do that.

20          All right.  So who's going to speak on --

21 Mr. Gretchen, are you with the plaintiff, sir?

22          MR. GRETCHEN:  I am not.  I'm with Mr. Fellows

23 representing --

24          THE COURT:  Okay.  Who's speaking for the plaintiff

25 today?

1           MR. ASTLEY:  Stephen Astley, your Honor, with Robbins

2   Geller Rudman & Dowd.

3           THE COURT:  All right.  Mr. Astley, so I know you've

4   got a lot to talk about.  I do want to make sure -- and you

5   don't even have to do it in this order.  I definitely want you

6   to address the basic issue under *Meyer* and *National Beverage*

7   about whether they are consistent, in other words, can I apply

8   both cases and still allow your case to go forward, is there a

9   irreconcilable tension between the two.

10          Obviously, the judges on the *National Beverage* case

11  don't think so because they didn't comment about *Meyer* being

12  inconsistent.  They would not have been authorized to overrule

13  *Meyer*, not in a panel at least, so obviously they didn't think

14  it was inconsistent.  But as a trial judge sitting here

15  reading what they relied on and what Judge Wilson said -- I

16  think it was Wilson in *Meyer* -- said was not allowed, I just

17  find it very difficult to reconcile the two.  So I'm sure

18  you'll address all those points.

19          MR. ASTLEY:  Yes, sir.  If it pleases the Court --

20  can you hear me okay, your Honor?

21          THE COURT:  Yes, sir.

22          MR. ASTLEY:  I promise I will get to loss causation

23  but before we get to that particular argument start with the

24  threshold issue that Mr. Long did, standing.  And before we

25  start that just indulge me for one moment, sir, to set the

1   stage of where we're at.

2          It's been near a year to a day before we appeared

3   last before your Honor, and we can all agree, not the least of

4   which the way we're conducting this hearing, the world has

5   changed substantially.  But in that intervening period the

6   Company has concluded its year and a half long investigation.

7   It included the review of a million and a half pages of

8   documents, interviews of 85 witnesses, review of over 2700

9   hours of video surveillance footage.

10         The Company has issued a near six-year restatement

11  that touches literally every line on the Company's balance

12  sheets and income statements for that secure period.  And just

13  last November, as your Honor mentioned earlier, Mr. Petit

14  and Senken -- excuse me -- Mr. Taylor and Mr. Petit have both

15  been convicted in the Southern District of New York, Mr. Petit

16  being convicted of securities fraud and Mr. Taylor for

17  conspiracy to commit.

18         Now, I think the opening line of the *Tellabs*

19  decision, which has been referenced today, from 2007 is apt.

20  There the Court states that this Court has long recognized

21  that meritorious private actions to enforce federal antifraud

22  securities laws are an essential supplement to criminal

23  prosecutions.  And at its core, your Honor, that's what this

24  case is all about.  It's the law and order and the public

25  securities markets preventing fraud.  It is a total supplement

1  to the criminal and civil enforcement actions for which

2  Mr. Petit will be sentenced later today and Mr. Taylor will be

3  sentenced tomorrow.

4         This is not a case, as Mr. Long indicated in his

5  presentation, of the lead plaintiff treating the laws as a

6  system of investor insurance.  I can tell your Honor

7  faithfully with over a hundred years of dedicated federal

8  securities practice on behalf of those practitioners that are

9  appearing before you today on behalf of the lead plaintiff,

10 given the company's admissions against their own executives

11 and against their own interests, this is the first and will

12 likely be the last case of this kind that you ever have while

13 sitting on the bench.

14        And to this very important point I think it's

15 important to note the Eleventh Circuit's decision in *Mizzaro*,

16 which was referenced earlier today as well -- it's an Eleventh

17 Circuit decision from 2008 concerning primarily scienter, but

18 it talks about a lead plaintiff's reliance on witnesses and

19 how they're appropriate to state a claim.  The Eleventh

20 Circuit instructs that reliance should be with sufficient

21 detail in order for the Court to assess the reliability of

22 what the witness is saying.

23        And, your Honor, to the lead plaintiff the first

24 witness we call to the stand is the Company because that is

25 the witness that provides all the information your Honor needs

1   to know to deny pending motions, advance this case to

2   discovery, and ready it for trial.

3         The Company concluded, based on that exhaustive

4   investigation that I just referenced, that, quote, the

5   unmistakable conclusion is that Mr. Petit, Mr. Taylor, and

6   Mr. Senken engaged in serious wrongdoing.  They each, quote,

7   engaged in extensive misconduct.  These three defendants

8   purposefully took action to disregard revenue recognition

9   under GAAP and to manipulate the timing of revenue to achieve

10  guidance.  Beginning as early as 2012 before the class period

11  these three defendants entered into side deals with

12  distributors to manipulate the timing of revenue.  They drop

13  shipped unordered and unneeded product at quarters end, and

14  they all emphasized short-term business goals over compliance

15  and ethics.

16        When questions emerged about these illegal practices,

17  each of Mr. Petit, Mr. Taylor and Mr. Senken, in the Company's

18  own words found at Exhibit 2 of our complaint, misled key

19  stakeholders such as the Board, the Audit Committee, and the

20  SEC.  These defendants, each of them, engaged in a pattern of

21  retaliation taking action against employees who raised

22  concern.

23        THE COURT:  So, Mr. Astley, if we were at a Rule 11

24  hearing about why you brought the charges, then I think that

25  probably the Company's report would give great comfort to any

1    allegation that the charges shouldn't be brought.  But that's

2    really not why we're here.  We're here to talk about some

3    specific issues.  Mr. Senken and Ms. Bekaert have claimed in

4    their motions that you don't have any specific allegations

5    against them.  Mr. Petit and -- I'm sorry -- Mr. Taylor had

6    likewise argued that your allegations against their clients

7    are, aside from the causation issue, is also unpersuasive.

8            I will tell you that's not persuasive to me as it

9    relates to Taylor and Petit in a global way.  In other words,

10   it's hard for me to accept at the motion to dismiss phase that

11   there's not, you know, good faith allegations made against

12   their clients, that they violated some aspects of the

13   securities law.  I haven't made that conclusion nor ruled out

14   that conclusion as it relates to Bekaert and Senken.  So I

15   need to hear about those things because they've argued those

16   things in their briefs and such.  And then I need to hear

17   about the causation argument, which is really the main

18   argument submitted about -- submitted by Mr. Long and company

19   relative to the two MiMedx.

20           But other than that, let's kind of get down to the

21   point, if we can, to address the specific issues that they

22   raised in their motion to dismiss.

23           MR. ASTLEY:  I will turn to standing and loss

24   causation right now, your Honor.  My point with what I just

25   stated -- and I'm sorry to have belabored the point.

1   Everything I just uttered to your Honor is pleaded in the
2   second amended complaint and does include Mr. Senken.
3   Accepted as true that is a party admission under 8012, and it
4   does support scienter of all the individual defendants.
5          THE COURT:  Well, I mean, we're not going to get into
6   a dichotomy of the rules of evidence, are we?  Because clearly
7   the Company's statements against Mr. Senken are not admissions
8   against Mr. Senken.  They may be against the Company maybe,
9   but they're certainly not against Senken.
10         So we're not at the motion for summary judgment
11   stage.  We're at the motion to dismiss stage.  So you said you
12   were going to get into the specifics, so let's do that.  So
13   why don't you start with the loss causation issue because that
14   is what I'm most interested in.  And think about it from my
15   perspective.  I'm most interested in that because if the
16   defendants are right, the case goes away, and so it doesn't
17   make sense to focus first on the individual claims of any
18   defendant about the allegations against them until we have
19   resolved the issue about loss causation and because that issue
20   permeates everyone's claim or your claim against everyone, I
21   guess I should put it.
22         MR. ASTLEY:  Yes, sir.  And I will turn to that issue
23   right now.  The defendants are masquerading a loss causation
24   challenge as a standing challenge under Article III, and they
25   are just wrong.

1    THE COURT:  Well, the reason that they can do that is
2    that if your named clients did not suffer a loss, then they
3    can't represent a class of people that have, so that's why
4    standing is important.  I mean, that doesn't mean that there
5    couldn't have been other plaintiffs.  Obviously, one would
6    think that there were people that sold after a corrective
7    disclosure was made.  I mean, normally there are.  Mr. Senken,
8    though he could not benefit from it, he may have been one
9    because he held his stock until the end, until it was taken
10   away.  So to me that's why the standing issue is important.
11   I don't think it's an exercise of futility at all if
12   the plaintiffs -- if the defendants are correct that there was
13   not a corrective disclosure.  So let's focus on the corrective
14   disclosure argument.  You have argued in your brief that there
15   are a series of partial disclosures, and so if you could
16   outline for me the best of those that supports your claim that
17   before your client sold their shares that they had suffered a
18   decrease in the price of their stock based upon those
19   disclosures.
20   MR. ASTLEY:  Your Honor, I can absolutely faithfully
21   represent under binding Eleventh Circuit jurisprudence that
22   Mr. Long's understanding of standing vis a vis loss causation
23   is wrong and was rejected by the Eleventh Circuit, and we do
24   not have to show proximate causation or loss causation in
25   order to have standing.  And the Eleventh Circuit said as much

1    in the *Garfield* decision from 2006.

2           And so on this point the Eleventh Circuit said in a

3    securities fraud case standing is established by allegations

4    that plaintiffs bought or sold shares of the stock in question

5    within a reasonable period of time after the alleged

6    fraudulent conduct occurred -- and this is the critical

7    point -- to support an inference of reliance.  Reliance is not

8    loss causation.  It's an entirely different essential element.

9           The Eleventh Circuit has --

10          THE COURT:  Okay.  Wait a minute.  Wait a minute.  So

11   are you arguing that if your client purchased stock after

12   fraud had occurred on behalf of the defendants, that that's

13   all?  What if they sold their stock at a point in time where

14   it increased in price but yet they purchased it at an

15   artificially high price because of the fraud that you complain

16   about?  They wouldn't have a claim for that; right?

17          MR. ASTLEY:  Again, we have to disaggregate a claim

18   under the securities laws with standing under the

19   Constitution.  And absolutely if a lead plaintiff purchased

20   shares during the class period, during the period of

21   artificial inflation, and sold its shares at a loss, it has

22   standing irrespective of whether it can correlate those to a

23   price drop and establish proximate causation.  And at least

24   three Courts have declared this following on *Garfield*'s

25   holding from the Eleventh Circuit.

```
1            Judge Forrester found specifically in the Carter's
2   decision --
3            THE COURT:  Well, don't talk to me about district
4   court cases because they don't even bind the judge who issued
5   the opinion and nor do they grade my homework.  I'm interested
6   in what the Eleventh Circuit says, if you don't mind.
7            MR. ASTLEY:  The Eleventh Circuit says that standing
8   is established if the plaintiffs bought or sold shares during
9   the period of time of fraudulent conduct to support an
10  inference of reliance.  The Eleventh Circuit went further in
11  the FindWhat.com case from 2011, 658 F.3d 1282, reliance
12  focuses on front end causation.  The question of whether a
13  defendant's fraud induced the plaintiff's purchase, loss
14  causation provides the bridge between reliance and actual
15  damages.
16           And even your Honor in your Southern Company case
17  from just 2019 noted this critical distinction.  The reliance
18  element ensures, quote, that there is a proper connection, in
19  other words, traceability between a defendant's
20  misrepresentation and a plaintiff's injury.  Here, your Honor,
21  there is no question that the plaintiff alleges it sold stock
22  at an economic loss, paragraph 577.  If you look at Document
23  9, Exhibit C, plaintiff purchased 80,000 shares of stock
24  August 14th of 2017 and held those shares through
25  February 26th of 2018.  It establishes a total loss of
```

1    $385,000.

2           That is an economic loss that the Eleventh Circuit

3    recognizes in the *Robbins v. Kroger Properties* case as the

4    proper measure of damages in a 10(b) case, and it's the

5    economic harm the *Lewis* court, the Eleventh Circuit *Lewis*

6    court recognized is a well-established injury in fact.

7           There is simply no connection between the front end

8    causation required reliance, as the *Garfield* Court indicates,

9    to establish standing and the later merits determination,

10   which I'll turn to now, of whether the lead plaintiff is able

11   to actually state a claim by establishing one of the essential

12   elements, loss causation, otherwise known as proximate

13   causation.  And what the defendant --

14           THE COURT:  So what happens to your case if you can

15   establish standing but you can't establish that the loss that

16   your clients suffered -- and when I say your clients, I mean

17   your named plaintiffs -- was the result of a corrective

18   disclosure?

19           MR. ASTLEY:  Yes.  This strictly happens, sir, a lead

20   plaintiff will have constitutional standing, but your Honor

21   will dismiss, dismiss the case for failure to state a claim

22   under 12(b)(6) for failure to plead an essential element, that

23   being loss causation.  They are two different issues.  The

24   Eleventh Circuit instructs specifically in the *Lewis v.*

25   *Governor of Alabama* case your Honor must determine the

1  standing issue as a threshold matter without regard to the

2  merits.

3          So in order to evaluate standing, you clearly can't

4  adjudicate the merits question of loss causation first.

5  That's the apple cart toppled right over itself.  That is not

6  the law, but that is what the defendants are asking you to do.

7  There is absolutely no question under Eleventh Circuit law the

8  lead plaintiff has standing.

9          Now, what your Honor is concerned about and I'm going

10 to speak to right now is whether there's loss causation, and

11 that is another element, essential element, of the claim that

12 must be stated under 12(b)(6) in order to advance the case.

13 On this point let me just jump to your Honor's concern about

14 the difference between the apparent tension between *Meyer* and

15 *Luczak*.

16         Your Honor, there is no tension.  The opinions are

17 entirely consistent.  Judge Wilson's decision in *Meyer*, one of

18 my former cases, is in no way limiting or inconsistent with

19 Judge Pryor's decision in *Luczak*.  *Luczak* isn't an

20 announcement of an investigation situation.  *Luczak*, the first

21 disclosure at issue was a letter issued on March 23rd of 2018.

22 It's a letter to the company from the SEC which disclosed for

23 the first time the disparity between the company's prior

24 statements about key metrics that the company used or perhaps

25 didn't use when talking about the success of its operations,

1  the VPO versus VPC metric.

2       And that disclosure, the Eleventh Circuit held, in

3  *Luczak* informed the market of those prior inconsistent

4  statements by the defendants and that the defendants were not

5  cooperating with the SEC.  But it was not --

6       THE COURT:  Let's back up a little bit before we get

7  to the cooperation part of what you said.  Why would the

8  market need the SEC to inform it, being the market, that there

9  was inconsistent statements made in presumably publicly

10  available documents?

11       MR. ASTLEY:  According to the opinion, the defendants

12  did not rely on VPO or VPC as metrics but in submissions to

13  the SEC indicated that they did, and so the SEC in a public

14  response asked the company to explain the apparent

15  contradiction between the company's reliance on these metrics

16  versus not.

17       THE COURT:  Okay.  Excuse me.  My question, though,

18  is this:  The information that the SEC was summarizing in its

19  letter, wasn't all that information included in documents that

20  were previously filed that anyone in the public would have had

21  access to?

22       MR. ASTLEY:  That doesn't appear on the face of the

23  opinion, sir, and I don't have the answer to that question.

24  What I do know is --

25       THE COURT:  Well, let's assume that it did, and then

1  we'll assume that it didn't and try and analyze both of those.

2  If it was public information that the SEC noticed was

3  inconsistent, then the letter would not be communicating to

4  the market the inconsistency; right?  Because the information

5  was already public.  I mean, that's sort of defined in the

6  hypo; right?

7          MR. ASTLEY:  What I can tell your Honor is clearly --

8          THE COURT:  Yes or no?  I mean, I think that's a

9  question you can answer yes or no; right?  Because if it was

10 in public documents, then it wouldn't be communicating

11 anything new other than that maybe the SEC had noticed it;

12 right?

13         MR. ASTLEY:  And that's precisely what the Court

14 identified and that the company was not cooperating with the

15 SEC about --

16         THE COURT:  That's a different thing.  But as it

17 relates to the information itself, that's public.  Okay.  If

18 the information was not public information, let's say it was

19 information that had gone back and forth between the company

20 and the SEC that was not publicly available, then that would

21 be information that the letter is for the first time

22 communicating to the public; right?

23         MR. ASTLEY:  Yes.  We all agree, your Honor, there

24 wouldn't be any ambiguity.  If it's a late passaging of

25 previously public information under both *Meyer* and the *Sapssov*

1  case, there is no corrective disclosure of --

2          THE COURT:  Okay.

3          MR. ASTLEY:  -- republication of previously public

4  information.

5          THE COURT:  Okay.  So then the other item of the

6  letter that the defendants MiMedx would have received that

7  would have been made available, I guess, for the public that

8  would have been a part of this corrective disclosure was that

9  the SEC had determined that MiMedx was not cooperating with it

10 and it was communicating, it being SEC, was communicating that

11 fact publicly when it sent and released the letter; right?

12         MR. ASTLEY:  We're talking about *Luczak* and *National*

13 *Beverage*?  Are we talking about the MiMedx case -- I'm sorry.

14 I just --

15         THE COURT:  I'm sorry.  I may be confusing the two.

16 I apologize.  In the *National Beverage* case when the letter

17 was sent to the National Beverage, it was communicating that

18 there was a lack of cooperation between the SEC and National

19 Beverage.  And that would have been the first disclosure by

20 anyone of that fact; right?  Assuming that to be a fact.

21         MR. ASTLEY:  That is correct, and that's what the

22 Eleventh Circuit said.

23         THE COURT:  Okay.

24         MR. ASTLEY:  And that's why it was a corrective

25 disclosure but not a *Meyer* disclosure because under *Meyer* it's

1  a very simple proposition.  An announcement of an

2  investigation with nothing more, without something more, quote

3  unquote, does not reveal the pertinent truth of any prior

4  false statement.

5         THE COURT:  And so trying to give meat to that -- I

6  guess it was the footnote in *Meyer* -- the more part would be

7  the SEC's communication to the market and to National Beverage

8  that the SEC viewed National Beverage as being uncooperative

9  with its regulatory and policing efforts; correct?

10        MR. ASTLEY:  That is incorrect.

11        THE COURT:  Okay.  So then what's incorrect about it?

12        MR. ASTLEY:  In the firsthand, the first disclosure

13  at issue in National Beverage, the March 23rd, 2018,

14  announcement which for the first time imparted the new

15  information that the company was not complying with the SEC's

16  request, was in and of itself a corrective disclosure.  It did

17  not --

18        THE COURT:  I'm sorry.  A corrective disclosure by

19  whom?

20        MR. ASTLEY:  By the announcement from the SEC as

21  it --

22        THE COURT:  By whom?  By the SEC?  The SEC is allowed

23  to make corrective disclosures?  In other words, your argument

24  is that a third party is able to make a corrective disclosure;

25  right?

1          MR. ASTLEY:  That is absolutely clear under many

2     Eleventh Circuit cases, including *FindWhat* and the actual

3     *National Beverage* opinion itself.

4          THE COURT:  I'm not sure why you're disagreeing with

5     the point that I make because you just made the same point,

6     the point being that the letter was -- that the Court in

7     *National Beverage* relied on was a letter where the SEC was

8     disclosing that it viewed National Beverage as being

9     uncooperative; right?

10          MR. ASTLEY:  Yes.  I agree with that, and I apologize

11     if I misapprehended what your Honor was asking.  But that is

12     correct.

13          THE COURT:  Okay.  And then the second bit of

14     information that came from the letter from the SEC to National

15     Beverage was what now?  Refresh my memory.

16          MR. ASTLEY:  According to the opinion, it was the

17     apparent discrepancy with what was publicly reported about the

18     company not relying on two key metrics, VPO and VPC, but

19     apparently for some reason the SEC understood that they were.

20     And the SEC asked them to comment on that apparent --

21          THE COURT:  Okay.  So hold on a second.  So what

22     would have been new was that the SEC had recognized that there

23     was a discrepancy, not that there was a discrepancy.  Am I

24     right there?

25          MR. ASTLEY:  It appears both of those things are

1  true, sir.  It appears as though there may have been an

2  unknown discrepancy from an investor standpoint that the

3  company was actually using these metrics, and it's also the

4  additional revelation that the SEC thought that there was a

5  discrepancy.

6         THE COURT:  How in the world would the SEC know what

7  the market opinion was, what investors -- in other words, if

8  investors didn't realize that the publicly available

9  information showed a discrepancy, how would the SEC know that?

10        MR. ASTLEY:  How the SEC had the information is not

11  clear from the opinion, but what is absolutely clear --

12        THE COURT:  But wait a minute.  Wait a minute.  Wait

13  a minute.  They couldn't know.  The SEC couldn't know what the

14  market knew; right?  I mean, all the SEC could know was we've

15  got reports.  You have -- National Beverage, you have

16  inconsistencies.  And we see that, and we're telling you about

17  it, and we want to know what the deal is; right?  There's no

18  way that the SEC would know what the market as a whole knew or

19  didn't know other than that the market as a whole had access

20  to information or didn't have access to information because it

21  was private.

22        MR. ASTLEY:  Of course that's true, sir, and I

23  apologize.  That was not my point.  It's really, quite

24  frankly, irrelevant to the loss causation analysis whether --

25        THE COURT:  It's not irrelevant to understanding the

```
 1  reason for the Court's treatment of this information in
 2  National Beverage versus its treatment of certain information
 3  in Meyer.  So let me summarize, and you tell me what I'm
 4  missing, if anything.
 5           The letter that went -- forget about what some
 6  analyst or Wall Street Journal or whatever said because we'll
 7  talk about that too I'm sure.  But the letter from the SEC to
 8  National Beverage recognizes an inconsistency in the publicly
 9  filed documents by National Beverage, and it's alerting
10  National Beverage to the fact that it sees this inconsistency.
11  And it's also alerting National Beverage and anyone else who
12  might read the letter -- because presumably everyone had
13  access to the letter -- that the SEC believes National
14  Beverage was being uncooperative; right?  Anything more than
15  that?
16           MR. ASTLEY:  I think the predicate that your Honor is
17  offering is not correct to what the Court said, but the rest
18  of it I agree with.
19           THE COURT:  Well, what did the Court say about the
20  letter?
21           MR. ASTLEY:  The Court said that these two -- the
22  company had indicated previously that these two metrics that
23  this National Beverage company was discussing were not part of
24  the company's consideration of their operating performance.
25  The SEC asked on January 2018 National Beverage to discuss why
```

1   it's not believed these metrics were necessary to discuss to

2   the public, and National Beverage responded to that publicly

3   by refusing to disclose the basis for these metrics which it

4   claimed were, quote, proprietary metrics.

5          And so the point that I think that I'm making, that

6   factual context is fundamentally different from what we're

7   dealing with in this case.  Luczak is not consistent with

8   *Meyer* because what was at issue in *Luczak National Beverage*

9   wasn't a *Meyer* disclosure.  It wasn't a previously announced

10  investigation, and it wasn't a repackaging of previously

11  public information.

12         So when your Honor re-reads the opinion and evaluates

13  the difference in that way, I think you can see that they're

14  entirely harmonized.  We all agree *Meyer* clearly holds an

15  investigation without more is not corrective.  In addition, we

16  all agree that pre republication of previously public

17  information is not corrective.  All I'm saying is --

18         THE COURT:  Well, do you disagree that an analyst's

19  opinion about publicly available information also cannot

20  qualify as a partial or any type of corrective action?

21         MR. ASTLEY:  That is what *Meyer* held with respect to

22  the Einhorn presentation.

23         THE COURT:  Right.  So it's got to be something new

24  that is not based on publicly available information; right?

25         MR. ASTLEY:  We all agree with that, yes, sir.

1          THE COURT:  Okay.  So in your case then, you know,

2    just apply then *Meyer* to your facts, and tell me how your

3    facts are different from *Meyer*.

4          MR. ASTLEY:  Yes, sir.  So what *Meyer* held on page

5    1201 of the opinion, quote, the commencement of an SEC

6    investigation without more is insufficient to constitute a

7    corrective disclosure.  The without more, as your Honor noted,

8    is in the body of the opinion.  Then you go down to the

9    footnote, note 13, and the Court fills in the blank of what

10   the something more might be.  The *Meyer* Court specifically

11   notes, that's not to say that investigation could never form

12   the basis.  We merely hold that standing alone without a

13   subsequent disclosure of wrongdoing it doesn't qualify.

14         But then the Court goes on, your Honor, to make two

15   key points.  It may be possible for an investigation to

16   qualify as a disclosure when the investigation is coupled with

17   a later finding of wrongdoing and --

18         THE COURT:  Hold on.  Hold on.  But that's not law;

19   right?  I mean, that sentence you just read is not law.

20         MR. ASTLEY:  That is the indisputable holding of

21   *Meyer*, absolutely.

22         THE COURT:  That it may be possible?  It also may not

23   be possible.  I mean, I'm not sure -- what I'm saying is the

24   Court didn't hold that the situation it was throwing out in

25   that footnote would constitute the more part of the opinion.

1   It threw it out as a possibility, but it didn't hold such.

2   It's not anything that's binding on me or binding on the

3   Eleventh Circuit; right?

4         MR. ASTLEY:  What's binding on the Eleventh Circuit

5   is the conclusion that the something more may include a plea

6   of guilty or a subsequent restatement, and that is the holding

7   of the Court.  It provided two contexts in which a previously

8   announced investigation would be --

9         THE COURT:  I'm sorry.  Did it use the language it

10  may be?  Go back and read that sentence.  So you're

11  interpreting may be as is?  I mean, we're engaged in a

12  linguistic debate here.  But does may be make it absolutely so

13  or is the Court musing about the kinds of things that might?

14  In other words, is may be the equivalent of might or is it the

15  equivalent of is?  In other words, I don't think it's a

16  holding at all.  I think it's kind of throwing out some things

17  that might be enough, but it doesn't hold that they are

18  enough, does it?

19        MR. ASTLEY:  Totally agree, sir.  It is not

20  establishing a rule of law in all cases that those following

21  events will be corrective.  It may be possible, and I think

22  lead plaintiff's argument here is the something more that

23  occurred in this case does meet the *Meyer* threshold as these

24  defendants were convicted for securities fraud.  The company

25  did find they engaged in actual wrongdoing, and they restated

1   six years of financial results.  There is --

2          THE COURT:  Okay.  I'm going to -- okay.  I don't

3   have the opinion in front of me.  I think you're still talking

4   about what's in the footnote that still has the may be, and

5   I'm just telling you I don't read the may be these types of

6   things to necessarily mean what more means.  To me it's a

7   footnote that a judge added when another judge requested.

8   Have you got it?  Let me see it.  Hold on a second.

9          (Brief Pause.)

10         THE COURT:  The Court said in footnote 13 of *Meyer*,

11  midway through, it may be possible in a different case for the

12  disclosure of an SEC investigation to qualify as a partial

13  corrective disclosure for purposes of opening the class action

14  when the investigation is coupled with a later finding of

15  fraud or wrongdoing.

16         And the way you're interpreting that language is that

17  is an establishing law that those things absolutely can be the

18  more that the Court referred to in the body of the opinion.

19  And I'm saying you might be right, but the Eleventh Circuit

20  has never said that those things will.  It says may, and may

21  means what it means in may.  So I'm not sure that the Eleventh

22  Circuit has adopted anything there other than engaging in some

23  intellectual musings of what might happen in the future, which

24  also mean that it might not happen in the future.

25         And, look, I'm sitting here as a trial judge.  You're

1   trying to argue to me what the more means for sure, but the

2   fact of the matter is other than the *National Beverage* case --

3   and I say that because that name is easier than the

4   plaintiff's name to pronounce -- other than that, do you have

5   any other case that might define what the more might be?

6          MR. ASTLEY:  Yes, the *Lloyd* case from the Ninth

7   Circuit that the defendants cite, 811 F.3d 1200 at page 1210

8   to 1211.

9          THE COURT:  Lloyd?

10          MR. ASTLEY:  Lloyd --

11          THE COURT:  I'm sorry.  Lloyd is an Eleventh Circuit

12   case?

13          MR. ASTLEY:  No, it's a Ninth Circuit case the

14   defendants rely on.  But it's a favorable loss causation

15   ruling.  The Ninth Circuit, your Honor, to give you context,

16   was following *Meyer* based on an earlier opinion, the *Loos*,

17   L-o-o-s, opinion where it too left open what the something

18   more is.  The Ninth Circuit in *Lloyd* adjudicated what the

19   something more meant for the Ninth Circuit and it --

20          THE COURT:  Right.  So the answer to my question is

21   there are no other cases.  You know, if we're talking about

22   binding authority, about what the Eleventh Circuit means,

23   there are none, and so you're relying on other cases that have

24   applied the more.  So what I've got as far as binding

25   authority -- and really only have the *Meyer* decision because

1    the *National Beverage* case isn't binding.  But I'm not sure

2    that trial judges generally look at not unreported or

3    nonpublished or per curiam opinions and ignore them.  I mean,

4    it is a statement of at least that panel.  So the best two

5    cases I've had, though, are then the *Meyer* and *National*

6    *Beverage*; right?

7            MR. ASTLEY:  At the Eleventh Circuit level both those

8    opinions are binding, and those are the best cases that you

9    have.

10           THE COURT:  Okay.  And so let's get back into the

11   facts of your case.

12           MR. ASTLEY:  Yes, sir.

13           THE COURT:  So trying to define what more is, we've

14   got what happened later, which was the investigation and the

15   findings of the second, I believe, Audit Committee of MiMedx.

16   We've got the criminal prosecution and convictions of Petit

17   and Taylor.  Again, we're defining more.  What else do you

18   have that could qualify in the more area?

19           MR. ASTLEY:  The company's restatement of six years

20   of their financial statements.

21           THE COURT:  So the fact that the company looked back

22   and said, look, we did it wrong, it was clearly wrong, so

23   we're reissuing our financial statements.  Anything else that

24   would fall into the more area?

25           MR. ASTLEY:  Yes.  There are a number of disclosures,

1  23 of them, that are plead --

2          THE COURT:  We're talking about the more.  We're not

3  talking about partial disclosures, other things that predated.

4  We're just talking about the more part.  Anything else?  So

5  you think the things that happened -- the other partial

6  disclosures that you claim would constitute the more?

7          MR. ASTLEY:  No.  What I'm saying, sir, is the

8  announcement that we're discussing about is a February 20th,

9  2018, disclosure, the delayed 10-K for fiscal '17 as well as

10 the announcement of a third company's investigation.  There

11 are seven subsequent events that arguably could be the

12 something more under *Meyer*.  They include a wall -- I'm sorry.

13         THE COURT:  All right.  So let's do this.  I raised

14 this question, I think, with Mr. Long.  Your client sold their

15 stock.  How can something that happens later have been a

16 disclosure that would have affected the price of your client's

17 stock when they sold it?  That's what I'm confused about in

18 the language of *Meyer*, about something that comes later that

19 has some kind of retroactive effect.

20         MR. ASTLEY:  Yes, sir.  That's the issue.  It's the

21 retroactive effect.  Clearly a lead plaintiff has to establish

22 loss causation, which includes selling shares following a

23 disclosure.  But whether or not that disclosure which results

24 in a stock price decline is causation under the law thereby

25 actionable to afford the plaintiff damages can be determined

1   by subsequent events.  That's the *Meyer* ruling.

2          THE COURT:  Right.  Hold on a second.  It happens

3   because we're then able to look at the subsequent events and

4   say that the price decrease that affected your sale price --

5   well, I'm not sure how I was saying that.  Let me jump into it

6   this way.  So Mr. Long argues that if when those disclosures

7   are made later, after your sale, after your plaintiff sell

8   their stock and the price continues to go down then once the

9   disclosures are made, that that's proof that -- and conclusive

10  upon the fact that any decrease in the stock that occurred

11  when that February 20th disclosure was made, was that they're

12  unrelated.  In other words, because the price goes down later,

13  then the price decrease earlier when your client sold its

14  assets and stock, could not be related.

15         I know I didn't say that very well.  I apologize for

16  that.  I'm thinking it well.  I'm just not saying it well.

17         MR. ASTLEY:  I understand precisely what your Honor

18  is asking, and it circles back to this *Lloyd* decision that

19  they're relying on from the Ninth Circuit, obviously

20  nonbinding, which they misstate, quite frankly.  *Lloyd*

21  following *Meyer* from an earlier Ninth Circuit case, *Loos*,

22  L-o-o-s, still into something more to say a later write off of

23  loans could qualify even though the stock price didn't drop.

24  So in and of itself there wouldn't be damages associated with

25  that later event, but it could resurrect the earlier

1  disclosure that otherwise wouldn't be actionable under *Meyer*.

2          There is no rule of law that says a subsequent

3  disclosure can't have a stock price, and it doesn't make any

4  sense, your Honor.  The Eleventh Circuit repeatedly recognizes

5  a partial disclosure theory.  Partial disclosures necessarily

6  provide part of the truth but not the whole truth.  So

7  subsequent disclosures add to the mosaic of truth, and they

8  too, assuming they have new material information, can cause

9  their own stock price declines.  And that's what's happened

10  here.

11          As there was subsequent drips of new material

12  information, the market is learning more about the scope and

13  the scale and the wrongfulness of the fraud and the true

14  operating conditions of the company, and the stock price is

15  dropping.  All of those are clearly cognizable as a general

16  matter under a partial disclosure theory.  *FindWhat* recognizes

17  that.  *National Beverage* recognizes a leakage partial

18  disclosure theory, and that's what's at issue in this case.

19          What the defendants are trying to do is say, well,

20  Judge, we bucketed the later events, so they can't be the sort

21  of something more that resurrects the February 20th

22  disclosure.  But they're just wrong.

23          For example, we've already talked about the

24  investigation and the something more being a restatement, the

25  company's investigation findings, and the convictions.  The

1    second category is these so-called misleading corrective

2    disclosures relying on, again, Judge, not an Eleventh Circuit

3    case.  The defendants are relying on a Second Circuit case

4    that literally has never been cited in the Eleventh Circuit.

5    And they say that this *Flag Telecom* case supports that you

6    can't have a misleading corrective disclosure, which is

7    clearly at odds with the *Luczak* decision and the *Meyer*

8    decision, which recognizes partial disclosure loss causation.

9           On the third category of events that they try to say

10   are inactionable as a matter of law, so-called news and

11   analyst reports.  And they cite, of course, *Sapssov*, again one

12   of my firm's cases.  *Sapssov*, like *Meyer*, stands for the

13   position that repackaging of previously disclosed information

14   is not actionable because of the fraud-on-the-market theory

15   reliance.  Here, however, what the defendants don't address is

16   that the subsequent disclosures in these news articles and the

17   analyst reports, Wall Street Journal, Citron, Aurelius, they

18   literally are pleaded to include MiMedx internal documents

19   never before published, internal emails between employees --

20          THE COURT:  I'm sorry.  Back up.  How would they have

21   access to them if they're not publicly available?

22          MR. ASTLEY:  Because whistleblowers were going to

23   these news outlets and analysts with internal company

24   documents and emails and blowing the lid on the individual

25   defendants' fraud.  The Wall Street Journal is reporting it.

1  These analysts are analyzing these documents and having phone

2  conversations with these former employees.  They're quoted in

3  all these articles, and I would cite to your Honor Exhibits 4,

4  21, 29, 30, 36, 37, 38 and 42 of the complaint, all of which

5  are incorporated by reference.  And you can literally see

6  phone logs, internal emails, screenshots, internal company

7  documents, all explaining how the company is engaged in this

8  outlandish and outrageous fraud.

9        THE COURT:  Well, what they engaged in is irrelevant

10  for purposes of trying to determine whether it was publicly

11  available or not.  Your argument is that the -- that when the

12  articles were written, that they were based on documents that

13  had only been released to them and not released generally?

14        MR. ASTLEY:  Yes, sir.  That's literally pleaded in

15  the complaint, and we have the source materials for your Honor

16  to show that.

17        THE COURT:  Okay.  Well, the source material is the

18  documents for which form the basis of the article.  I guess my

19  point of inquiry is how do you know that that wasn't publicly

20  available yet, in other words, that when the article was

21  written, that no one else in the market knew about it?

22        MR. ASTLEY:  The only way to know that in fact --

23  because obviously I don't have a magic ball -- is to look at

24  the market's reaction to the news of the day and how it's

25  being characterized and the fact that the market reacted the

1    way that it did is a suggestion of loss causation and fact --

2            THE COURT:  The reason I ask is you state things as

3    being factual when, in fact, you're interpreting things to

4    reach those points.  It's not that it -- it may be true.  I'm

5    not saying you're not right about it, but you don't know for a

6    fact other than by further analyzing what happened in the

7    market that day; right?

8            MR. ASTLEY:  What I'm suggesting to your Honor is

9    your accepting the allegations as true.  And these are pleaded

10   in the complaint, so that's why I'm arguing as true for

11   purposes of Rule 12.

12           THE COURT:  Yeah, but just because you plead it you

13   also have to have a factual basis to plead it; right?

14           MR. ASTLEY:  Absolutely.

15           THE COURT:  Under federal law at least you do, so

16   that's why I'm asking about it.  Your allegation is, is that

17   the articles written were based on information that was not

18   yet based on the -- yet assimilated into the market, and your

19   conclusion in that regard is the fact that once the article

20   was written, the price of the stock reacted; right?

21           MR. ASTLEY:  Exactly, your Honor.  Inferentially that

22   would suggest that this new material information, which is

23   consistent with this fraud-on-the-market theory discussed in

24   *Meyer* as well as *Sapssov*, that new material information is

25   digested in a relative short period of time, and the market

1    reacts.  And the Eleventh Circuit specifically says a stock

2    price decline is circumstantial evidence to show a corrective

3    disclosure.  That's the Eleventh Circuit's holding.  That's

4    not me arguing it.

5         THE COURT:  And so what the defendants might then try

6    to do, if the facts support that at some point, is to

7    introduce evidence of expert testimony that would show some

8    overall market decrease, and they would then argue that the

9    decrease that you're pointing to was not because of this

10   information, that it was because of the market for medical

11   supplies and equipment like they make; correct?

12        MR. ASTLEY:  That is absolutely correct, and we

13   address that in the pleading at paragraph 573, your Honor.  We

14   use an event study that's predicated on an expert analysis

15   recognized in the Eleventh Circuit specifically as being the

16   way to ferret out market related news and even industry news

17   down to company specific news that move the stock price.  All

18   of the disclosures in 572 are pursuant to a statistical

19   analysis known as an event study to do precisely what your

20   Honor is suggesting.

21        THE COURT:  Right.  So I don't know whether I should

22   be impressed or concerned that you can tell me the paragraph

23   number without looking at a piece of paper or the computer

24   screen.  Maybe you are.  That's both an impressive and

25   horrifying event that you would be so familiar that you would

1   know that.  But go ahead, sir.

2          MR. ASTLEY:  Yes, sir.  I appreciate that.  Listen,

3   this is a very important topic.  There's lots of arguments in

4   the securities jurisprudence over the very issue that your

5   Honor is putting your thumb on, so I understand why it's

6   important to your Honor.  What I would hope to do as an

7   advocate is try to, from the plaintiff's perspective, provide

8   you what we think the relevant authorities are for your Honor

9   to come out with the correct ruling.

10          One other point that I think is very important to

11   bear mention here -- because sometimes facts, not just the

12   law, matter -- you have to apply the law under the facts as

13   they are, not as we want them to be.  Keep in mind, Judge, the

14   Company and Mr. Petit specifically have disclosed publicly

15   that the stock price fell in response to revelation over the

16   accounting fraud on November 30th of 2017, so well before

17   February 20th of '18.  This is reflected at 578 of the

18   complaint.

19          Mr. Petit sends shareholders a letter saying that the

20   dramatic stock price decline that had occurred as of

21   November 30th, 2017, was due to publicity from allegations of

22   financial manipulations and channel stuffing.  Then the

23   company itself in SEC filings in June of '19 -- and if you

24   don't mind, sir, I will elucidate this because I think

25   pictures are worth a thousand words.  Hopefully, you can see

1    this, your Honor.

2            This is literally a chart, sir, that the defendants,

3    MiMedx, published in an SEC filing in June of 2019 as part of

4    a proxy filing, a 14A.  And there are seven disclosures -- I'm

5    sorry -- five disclosures to note, sir, that I'd like to walk

6    through.  Each one of these disclosures is pleaded in

7    paragraph 572 as a loss causation event.  The chart --

8            THE COURT:  Do we have a copy of this in the

9    pleadings as well?

10           MR. ASTLEY:  Yes, you do, sir.  It's at Exhibit 17,

11   page 10; 17, page 10.  The very first disclosure is this

12   infamous February 20, '18, disclosure that Mr. Long is saying

13   is not a revelation as a matter of law.  The company literally

14   is outlining a brief history of MiMedx accounting issues, and

15   the very first disclosure with a huge stock price decline on

16   the left side of the page is MiMedx announces it can't release

17   its financials, February 20th.  Plaintiff was holding stock at

18   this point.

19           Then if you go further, based on this announcements,

20   market analysts connected this very drop to the delay.  This

21   is reflected at paragraphs 240 and 241 where the stock price

22   fell, according to analysts, because of the delay in the

23   statutorily mandated fiscal year '17 financial results.

24           The second box to your right, sir, is when the Audit

25   Committee announces that its financials cannot be relied upon,

1    and they would need to engage in a restatement.  The stock

2    fell 24 percent on this disclosure, and the company is itself

3    linking it to the accounting issues.

4           The next box to the right, sir, is when Mr. Petit and

5    the COO separated from the company.  The stock fell almost

6    40 percent.  The Atlanta Journal Constitution specifically

7    noted on paragraph 271 that this was the product of the

8    ongoing investigation.

9           Then in the next box to the right, the November 7th,

10   2018, disclosure is when MiMedx announces that the fallout

11   from the fraud is that they've been delisted from the NASDAQ.

12   There was a two-day drop, sir, of over 60 percent because that

13   information was so huge the company was no longer publicly

14   traded.

15          And then the final disclosure of note is when the

16   replacement auditor, Ernst & Young, resigned and noted that it

17   could not rely on management.  There were zero internal

18   controls for it to even assess whether the financial

19   statements were fairly presented.  Stock fell another 60

20   percent.  The drops are getting correspondently smaller, sir,

21   as you can see, as the graph goes down because the prices

22   fall.

23          And so a big percentage drop is a smaller drop in

24   dollars, but the broader point that I'm making here, again

25   Exhibit 17 at page 10 -- this is pleaded in the complaint as

1    well -- is the company itself is asking your Honor to dismiss

2    on loss causation grounds the very events they admit to

3    shareholders caused the stock price reactions due to the

4    revelation of the accounting issues, and that's just not well

5    taken.  They can't have it both ways, and those admissions

6    should be fatal to their application to your Honor.

7          Now, with that I know we've spent a lot of time on

8    loss causation and standing, I'd like to transition over to

9    some of the other elements if it pleases the Court.

10         THE COURT:  Yes, sir.

11         MR. ASTLEY:  Okay.  On the issue of falsity, no one

12   is challenging and I'm not going to belabor the six years of

13   financial restatement.  23 accounts, every line item of the

14   balance sheet, every line item of the income statement was

15   wrong.  The company literally admitted every single sale from

16   2012, 2017, every single dollar was done not pursuant to the

17   accounting rules for how you recognize revenue, ASC605.

18         Based on the fact that these are indisputably false,

19   SEC regulations mandate financial statements be filed in

20   conformity with GAAP.  The defendants' statements that they do

21   challenge are clearly actionable.  The first category that you

22   heard spoken about today was so-called growth statements.

23   These are statements specified in paragraph 311 of the

24   complaint, and there are dozens of them.  And, your Honor, in

25   a single sentence -- it's a one-sentence argument -- the

1    defendants say they're inactionable as a matter of law.

2           Your Honor references Eleventh Circuit authority as

3    being the most persuasive.  Literally the *National Beverage*

4    case states that growth opinions, growth statements are

5    actionable.  That's literally a false statement that was

6    issue -- at issue in *Luczak*.  So defendants' argument is just

7    wrong as a matter of law.

8           And if you look at paragraph 311, these defendants

9    quarter-in and quarter-out were touting the revenue growth

10   that the company admits was false and that all of that growth

11   was predicated on these illegal and improper sales practices.

12   The timing and recognition of revenue was designed to

13   manipulate and meet revenue guidance.  So those statements are

14   actionable, and I would highlight *Luczak*, the *National*

15   *Beverage* case.

16          The second category that was referenced are really --

17   there's two of them.  It's all of the defendants' statements

18   denying and downplaying and covering up the allegations.

19   There is almost a three-year window pleaded in the complaint

20   where questions are coming out about the accounting, and these

21   three defendants are vociferously engaged in a campaign of

22   denial.

23          The company specifically admits that when questions

24   began to emerge, these individual defendants, all three of

25   them, made, quote, material misrepresentations and omissions

1  in an attempt to cover up the fraud.  And that's the standard

2  for falsity in the Eleventh Circuit, was there a material

3  misstatement of fact or omission of material fact.  The

4  company is literally saying there was.

5         Now, the defendants argue, hey, we're not required to

6  engage in self-flagellation.  Fair enough, Judge, but what the

7  Eleventh Circuit also says is you can't choose to speak and

8  then lie about what you're saying, and that's what *FindWhat*

9  says.  When you voluntarily choose to speak, you can't omit a

10 necessary fact to make the statements that you're uttering

11 under circumstances in which you're uttering them not

12 misleading.  And so the defendants created their own duty.

13        They could have said no comment.  They could have

14 said we're looking into it further.  They could have said

15 we'll get back to you after we consult with our lawyers.  But

16 what they can't do, which happened dozens and dozens of times,

17 is demean short-sellers, demean whistleblowers, say everyone

18 is wrong, no one knows what they're talking about, everything

19 they're doing is correct, they have no worries.  And that's

20 what's happening over and over again.

21        They went so far as to articulate the stringent

22 compliance standards that they had and their great ethics and

23 integrity.  But literally -- this is paragraph 332 -- the

24 company disclosed that these defendants made statements

25 designed to conceal a cover-up-the-fraud using compliance and

1    ethics as a shield.  And so they are clearly actionable, and

2    there is law that we cite to support that.

3           The final category -- and then I'll be done with

4    falsity, your Honor.

5           THE COURT:  Give me just a second.  I'm sorry.  I'm

6    just moving my microphone a little further away from me

7    because my court reporter has requested me to.  Wynette,

8    that's as far as I can move it.

9           All right.  Go ahead, sir.

10          MR. ASTLEY:  The last comment on falsity, sir,

11   concerns Mr. Bernstein's comment for Mr. Petit and Taylor on

12   these so-called PODs, physician-owned distributorships.

13   They're reflected at paragraphs 329 through 330.  These are an

14   entity that Health and Human Services has specifically

15   declared as being inherently suspect insofar as healthcare

16   laws are concerned.  The defendants specifically stated,

17   contrary to what you were earlier told today, paragraph 329,

18   the company does not sell to or through, quote unquote, PODs.

19   But clearly the complaint pleads that they do.  Accepted as

20   true I reference paragraph 109, 115, Exhibits 35 and 45.

21          With that, sir, I will go to the *Janus* comments.  I

22   don't know if that's something that resonated for your Honor,

23   but one of the arguments that the defendants are making is,

24   hey, we didn't make those statements, we can't be responsible

25   for statements that we didn't make.  And that is true under a

1  Supreme Court case from 2011 called *Janus Capital Group*.

2  However, as is well pleaded, this is reflected in the proposed

3  order that we submitted to your staff yesterday.  If you go

4  through every category of statement, and we do exhaustively,

5  every one of these statements can be attributed to one or more

6  of the defendants and the company is responsible for them as

7  well.  So I don't think there should be any question there,

8  and I'll refer your Honor to the proposed order.

9          With that, let me turn to the final element as it

10  pertains to the individuals, and that's scienter.  Everybody

11  agrees under *Tellabs* and *Mizzaro* that the complaint must plead

12  with particularity a strong inference that either the

13  defendants intend to defraud or were severely reckless when

14  they made their statements.

15          Your Honor in the *Southern Company* case might recall

16  quoting the Eleventh Circuit for the proposition that in the

17  Eleventh Circuit the scienter question boils down to whether a

18  reasonable person would infer there was at least a 50-50

19  chance that the individual defendant knew about the alleged

20  fraud or was severely reckless in not knowing about it.  And

21  that's a quote from your *Southern Company* case quoting

22  *Mizzaro*, an Eleventh Circuit holding.

23          So again without belaboring the point, insofar as the

24  three individual defendants are concerned, accepted as true

25  there is a myriad of indicia on their scienter, not the least

1    of which is the company saying they engaged in extensive

2    misconduct, made material misrepresentations of material fact,

3    they were intimately involved in orchestrating the fraud, they

4    entered side deals with distributors contrary to terms of the

5    contracts, they dropped shipments that weren't ordered or not

6    needed.

7         All of this is specified in the complaint, but I'll

8    refer your Honor to Exhibit 2.  It's literally the company's

9    internal investigation findings.  It's a five-page document

10   which provides all the indicia your Honor needs to know that

11   every one of these defendants has scienter.

12        Then to go a step further, Judge, Docket 152-1 --

13        THE COURT:  Wait a minute.  Wait a minute.  I don't

14   want to move on quite so fast.  Let's talk about Ms. Bekaert.

15   So I'm going to ask you some of the questions that I asked

16   counsel, I believe, for her and for the COO.  What is your

17   best evidence as it relates to the allegation that Ms. Bekaert

18   either engaged in fraud intentionally or was recklessly --

19   reckless in doing her job such that it amounts to a substitute

20   for scienter?

21        MR. ASTLEY:  Yes, sir.  Now, Cherry Bekaert, just to

22   be -- to clarify, your Honor, is a company.  She's not a

23   person, so it's an auditing firm.  It was --

24        THE COURT:  Okay.  I'm sorry.  I was thinking it was

25   a person.  Okay.  So the firm itself then.

1          MR. ASTLEY:  The firm itself.  I just wanted to

2     clarify for your Honor that point.

3          Let's start with the Eleventh Circuit standard

4     because that sets the stage for the question that your Honor

5     just asked.  The Eleventh Circuit has declared a four-part

6     disjunctive standard to show scienter on the part of an

7     auditor.  This is the *Brophy* case, 781 F.3d 1296 from 2015.

8     The standard is the accounting practices were so deficient

9     that the audit amounted to nothing at all or an egregious

10    refusal to see the obvious or to investigate the doubtful, or

11    that the accounting judgments that were made were such that no

12    reasonable auditor would make those decisions.  That's four

13    separate standards to show scienter.

14         In the complaint, your Honor, there are six -- well,

15    there are six primary indications of scienter for Cherry

16    Bekaert that I'd like to highlight for your Honor today.  In

17    the Eleventh Circuit the *Garfield* decision, an Eleventh

18    Circuit case from 2006, holds that a drastic overstatement of

19    accounts is a factor that the Eleventh Circuit has found

20    significant for scienter.  And that's been applied by many

21    district court cases.

22         The magnitude of the fraud is itself an indication of

23    scienter because it speaks to failure to see the obvious or

24    investigate the doubtful, two of the four parts of the *Brophy*

25    test.  And this applied regularly in the Northern District of

1   Georgia and throughout the Eleventh Circuit.

2           Cherry Bekaert does not dispute that the financial

3   statements were false.  It does not dispute that every single

4   sale from 2012 forward didn't comply with GAAP.  The company

5   admits and Cherry Bekaert doesn't dispute that the company

6   admits that not a single revenue recognition criteria was met

7   for that six-year period.  Literally nothing about the

8   revenues was correct by the company's own admission, which is

9   reflected in Exhibit 1 as well as the complaint.

10          Based on that fraud for that period of time to that

11  degree, literally every financial line item from the balance

12  sheet to the income statement was wrong, every single one of

13  them.  Based on the fraud over that period of time, the

14  company has now gone from having millions of dollars of net

15  income to having zero.  For the years that they've received

16  guidance, they wouldn't have achieved any of that absent these

17  manipulations.

18          So the Eleventh Circuit recognizes that sort of

19  fraud, the size and scale of it, as bearing on Cherry

20  Bekaert's recklessness because no auditor doing their job

21  would fail to see something so obvious.  But the Eleventh

22  Circuit goes on to say that with the addition of so-called red

23  flags, it makes the inference of recklessness even stronger.

24          *Garfield*, the Eleventh Circuit case from 2006,

25  instructs that red flags, quote unquote, are those facts that

1  come to the attention of the auditor which would place a

2  reasonable auditor on notice that the audited company was

3  engaged in wrongdoing.

4         And I think this is an important point also to

5  mention, your Honor.  The Eleventh Circuit in the *Brophy*

6  decision provides that the auditing standards, that they

7  codify the standards, and there is, quote, sufficient

8  uniformity that a fact finder may assess compliance using a

9  reasonable person standard.  This is *Brophy* at 781 F.3d 1307.

10 The point being contrary to the arguments you were hearing

11 earlier, this is not a situation where an auditor can have a

12 subjective opinion.  It's got to apply the Eleventh Circuit

13 recognized objective standards reasonably, and compliance with

14 those standards is one of reasonableness, not subjectivity.

15        There are a myriad of red flags, your Honor, pleaded

16 to support scienter.  I would highlight paragraphs 482 through

17 539, 552 through 556, and 562 and 563.  But to boil those down

18 for your Honor, there are five key distributor relationships

19 at issue in the case.  The first is the company's government

20 distributor called AvKARE.  This was the largest customer of

21 the company from 2012 to 2015.  It represented 50 percent of

22 all the company's revenues.  The company has admitted not a

23 single dollar from AvKARE was proper.

24        Cherry Bekaert knew the contract terms.  They were

25 publicly disclosed.  This is paragraph 489.  AvKARE was

1  required to pay its purchases within 45 days.  AvKARE did not

2  pay within 45 days for the entire class per.  In fact, the

3  so-called DSOs, the days sales outstanding, were well over a

4  hundred days throughout, which is a critical point because you

5  can't book revenue unless you're collecting cash.  Checking

6  collectability is one of the basic criteria that Cherry

7  Bekaert was required to do but failed to do because it did not

8  identify the apparent contradiction between the sales contract

9  and the payment schedule as the company later admitted.

10         But more than that, Judge, because that may seem like

11  a technicality, Cherry Bekaert was literally approached by an

12  insider.  This is not a situation where Mr. Astley is just

13  spinning a web of advocacy and trying to convince your Honor

14  of something that didn't occur.  Mr. Anderson was the lead

15  accountant for the company.  He was the controller, and he

16  approached Mr. Senken who then approached Cherry Bekaert to

17  instruct Cherry that the revenue for AvKARE and four other key

18  distributors was entirely inappropriate.

19         Cherry did absolutely no investigation.  It didn't

20  interview him.  It didn't follow up with confirmation

21  procedures to the distributors that Mr. Anderson was

22  identifying.  What Cherry Bekaert did was talk to management

23  and obtain what's known as a management representation letter.

24  Basically the very people that were being accused of fraud,

25  Judge, Cherry Bekaert had sign off on a piece of paper that

1    they weren't committing fraud.  That is clearly not the law.

2    That's not the accounting regulations.  That's not even common

3    sense, but yet Cherry Bekaert took the representations of the

4    very people being accused of fraud as their evidence to sign

5    off on the financial statements.  And that's, as I said,

6    failure to investigate those sorts of tips is indicative of

7    scienter.

8            Now, what Cherry says in response -- and I'm sure

9    we'll hear this in reply -- oh, we were told that Mr. Anderson

10   wasn't available, but that's not what's pleaded in the

11   complaint, Judge.  Exhibit 11, page 7 specifically identifies

12   that Cherry believed he wasn't available and he had a lawyer,

13   but no efforts were identified to contact him or counsel.

14   They simply relied on a representation from Mr. Senken that

15   Mr. Anderson had no further concerns.

16           The critical point here in terms of the pleading,

17   your Honor, is to the extent Cherry was unable to access

18   Mr. Anderson, who was a whistleblower identifying the fraud

19   that was then afoot or was otherwise prevented from contacting

20   the very distributors that Mr. Anderson was identifying as

21   being involved in that ploy, the audit rules say and the

22   Supreme Court says Cherry could not issue its audit opinion.

23   That's AU Accounting Rule 317-19, and the Supreme Court *U.S.*

24   *v. Young* case, 465 U.S. at 819.

25           Now, Cherry's recklessness is not just supported by

1   the magnitude.  It's not just supported by Mr. Anderson.  It's

2   also supported by the fact that two additional whistleblowers

3   less than a year later came forward, Mr. Kruchoski and

4   Mr. Tornquist.  These folks, Judge, actually filed an SEC

5   whistleblower complaint under the penalty of perjury, and they

6   corroborated everything Mr. Anderson had said almost a year

7   prior.  But instead of investigating those corroborative

8   allegations, Cherry again relied on another representation

9   from Mr. Petit, Senken, and Taylor that there was nothing

10  going on, and the allegations were false.

11        But to make matters worse, Judge, Cherry also had

12  independent confirmation from AvKARE.  This government

13  distributor told Cherry point blank that it was not paying

14  according to the contract.  So Cherry had independent evidence

15  from Mr. Anderson, Mr. Kruchoski, Mr. Tornquist, as well as

16  one of the distributors itself that there was fraud afoot.

17  Four different sources were telling Cherry that there was

18  fraud afoot, and they did not investigate.

19        What they say they did was rely on the second

20  internal investigation which found that there was no

21  substantiation to the allegations.  But, of course, the

22  problem with that reliance is it's very circular.  If you read

23  the SLC report, which highlights that investigation -- it's

24  Exhibit 13 -- the SLC says that the Audit Committee conducting

25  that second investigation that Cherry says it was relying on

1  to exonerate its recklessness was, in fact, relying on Cherry

2  to do an evaluation of the company's internal controls to know

3  whether the financial statements were fairly presented.

4          So it's an entire who's on first situation, Cherry

5  saying we relied on the Audit Committee, the Audit Committee

6  saying, hey, we relied on Cherry.  So that just doesn't hold

7  water.  All of this is pleaded in the complaint, your Honor.

8          But then going a step further, Cherry says, well, in

9  addition to relying on the Audit Committee, we relied on a

10  so-called expert that the company hired to tell us whether the

11  accounting was appropriate, the sort of accounting that we're

12  supposed to do as the independent auditor.  But that is a

13  total red herring, your Honor, and this is addressed at 535 of

14  the complaint.

15          The expert who was retained by the company was only

16  retained on a very discrete matter, on an amended contract

17  with the government distributor AvKARE.  And he specifically

18  and explicitly was only relying on the representations of

19  Mr. Petit, Taylor and Senken, again reflected at paragraph 535

20  and 536 of the complaint.

21          So this is opinion upon opinion upon opinion.

22  Ultimately all roads converge on Cherry Bekaert relying on

23  management representations by the very people, Petit, Taylor

24  and Senken, who were being accused of the wrongdoing.  So, of

25  course, they were denying that they did anything wrong.  We

1  heard counsel today say they did nothing wrong.  There's three

2  years of public declaration they did nothing wrong, but these

3  were the people being accused of wrongdoing.

4       And Cherry with its independent responsibility was

5  not allowed to rely on those self-serving declarations.  It's

6  against Supreme Court jurisprudence.  It's against accounting

7  rules.  It absolutely satisfies the Eleventh Circuit *Brophy*

8  standard for recklessness.

9       THE COURT:  All right.  Tell you what, so you sound

10  like you're at a point of transition maybe to talk about

11  Mr. Senken and then the others, but we're going to take a

12  break for lunch.  I haven't put any limitations on anyone's

13  argument, and I'm not going to do that to you.  So we will

14  break until 1:15.  We'll come back and hear the rest of your

15  response to the motions, and then we'll turn to any replies

16  that anyone wants to make.

17       Okay.  So I think my clock in the courtroom is a

18  minute or two slow, so just look at your watch and your clock

19  and just be back in an hour.  Okay.  Thank you.  We'll see

20  y'all then.

21       (Whereupon, a recess was taken from 12:10 p.m. until

22  1:15 p.m.)

23       THE COURT:  All right, Mr. Astley.  We're ready for

24  you to proceed.

25       MR. ASTLEY:  I'm so sorry, your Honor.

1          THE COURT:  That's okay.

2          MR. ASTLEY:  Would you like me to proceed?

3          THE COURT:  Yes, sir.  Thank you.

4          MR. ASTLEY:  Yes, your Honor.  I shouldn't take up

5   too much more of your time, ten minutes, if that's okay with

6   the Court.  I would like to just start where we started this

7   morning.  I neglected to mention an important Eleventh Circuit

8   case to you.  Your Honor was interested particularly on the

9   issue of loss causation and standing to have Eleventh Circuit

10  law.

11          The family focus case*, Family v. Pinellas Suncoast*

12  *Transit Authority*, 344 F.3d 1263 at 1273, is an Eleventh

13  Circuit case on standing.  There the Eleventh Circuit stated,

14  and I quote, no authority even remotely suggests that

15  proximate causation applies to the doctrine of standing.  Even

16  evaluating Article III's causation or traceability

17  requirement, Courts are concerned with something less than

18  proximate cause.  As such, proximate causation need not be

19  sufficiently alleged for a plaintiff to successfully assert

20  standing.  Again, that's the *Focus on the Family v. Pinellas*

21  decision from 2003.

22          Just to bring home the point consistent with the

23  *Garfield* decision in the securities fraud context of 2006,

24  reliance is the necessary linkage to support traceability, not

25  proximate causation.

1          With that, I'd like to pick back up with the scienter

2   that we were discussing for Cherry Bekaert and wrap that up by

3   noting for your Honor that Cherry Bekaert had been informed by

4   at least three different sources of information.  There were

5   three insiders, whistleblowers who reported the fraud to

6   Cherry Bekaert, the outside distributor, AvKARE, which was the

7   largest government entity --

8          THE COURT:  I'm sorry.  When you started talking

9   about AvKARE, when you started talking about AvKARE -- I know

10  I didn't say that correctly -- but you froze, at least for me,

11  and I couldn't hear what you were saying.

12         MR. ASTLEY:  I'm sorry, sir.  I was just trying to

13  wrap up the Cherry Bekaert scienter by saying in the complaint

14  it's pleaded that there are at least four different sources of

15  independent information that were provided to Cherry Bekaert

16  that informed them that fraud was afoot.  And instead of

17  relying on those four independent sources, as is required by

18  the law in the *U.S. v. Young* case, Supreme Court case, and the

19  accounting rules, they chose to rely on the very people that

20  were being accused of fraud, Mr. Petit, Mr. Taylor, and

21  Mr. Senken.

22         So when your Honor asked me before we broke what's

23  the best indication of Cherry Bekaert's recklessness, it's

24  that.  They were relying on the accused's protestations of

25  innocence rather than the direct evidence that had been

1   provided to them that there was fraud going on.  And that is

2   why, your Honor -- and this is reflected at paragraphs 540 to

3   546 of the complaint -- the PCAOB, the organization formed by

4   Sarbanes-Oxley and tasked with evaluating compliance of public

5   accounting firms, declared Cherry Bekaert's 2016 audit of

6   MiMedx to be so deficient it failed its essential purpose and

7   that no audit opinion should have been issued at all, which is

8   precisely what the *Brophy* standard says is recklessness,

9   accounting practices so deficient that the audit amounted to

10  no audit at all.

11          With that, I will turn to Cherry's primary argument,

12  and we heard it by Mr. McIntyre in their opening submission.

13  Hey, we were lied to.  The complaint acknowledges we were lied

14  to.  The SEC and DOJ admit that we were lied to, and therefore

15  we're entitled to a get-out-of-jail-free card now.

16          The question, your Honor, isn't whether Cherry was

17  deceived.  The question is whether that deception was so

18  unknowable that they are entitled for your Honor to dismiss

19  them, was it so plain, was it so clear.  And this is why the

20  Third Circuit, for example, which addressed this very issue

21  noted in the *Suprema Specialties* case that it had not

22  overlooked the auditor's protestations that it was a victim of

23  the fraud, and it was quite possible that those claims would

24  not survive summary judgment motion.

25          But at the pleading stage the Third Circuit held,

1  plaintiffs are entitled to benefit from all reasonable

2  inferences.  And on the face of the numerous and not

3  insignificant accounting violations, the Third Circuit could

4  not rule out as a matter of law a strong and reasonable

5  inference of the auditor.  And that's why Judge Totenberg

6  concluded it was premature in the *Carter's* case, and that's

7  why the Southern District in the *Refco Securities Litigation*

8  case, Judge Lynch, found the same conclusion.

9          The point that I'm making in short, Judge, is Cherry

10  has a potential defense, but much too much -- much too little

11  is of note about the scope, the scale, and the manner of the

12  alleged deception.  And the lead plaintiff specifically speaks

13  that Cherry Bekaert knew or should have known it was being

14  deceived, and this is based on all of the red flags that it

15  was presented with, that it failed to investigate all of the

16  credible charges of wrongdoing by whistleblowers, and that it

17  failed to follow up on known contradictions with the

18  representations it was receiving from management.

19          We know for a fact that they relied on management

20  contrary to those external sources, but at the same time

21  Cherry's defense falls flat because they knew management's

22  representations were not reliable.  For example, management

23  represented one of the key distributors had a signed

24  distribution agreement, and, therefore, the sales were proper

25  under accounting rules.  But there wasn't a signed agreement,

1  and Cherry knew that.  And this is all reflected at paragraphs

2  506 through 512.

3       For another one of the key distributors that was at

4  issue in both the indictment and in this case as well, First

5  Medical, Cherry knew that the orders were not pursuant to the

6  parties' contract but pursuant to an email deal and weren't

7  secured by a line of credit, again the point being that what

8  Cherry knew contradicted the representations from management

9  that it was relying on.  And this is paragraphs 513 and 514.

10      COURT REPORTER:  Can you repeat the last sentence,

11  please.  I didn't understand the last sentence.

12      MR. ASTLEY:  I said -- I'm sorry.  I was trying to

13  find who was talking to me.  What I was saying is that Cherry

14  Bekaert had in its possession knowledge that the

15  representations it was relying on from management were not

16  reliable and that those representations were contradicted by

17  known evidence.  For example, Judge, as well Cherry Bekaert

18  knew one of the key distributors, this company called SLR, was

19  being paid an extravagant so-called consulting arrangement for

20  $200,000, and they didn't follow up on that.

21      And then, finally, your Honor -- I'm sorry.  I hear a

22  lot of feedback, so hopefully you can hear me okay.  Turning

23  to Cherry's falsity argument, they are arguing that dismissal

24  is mandated because their opinions are inoculated by a Supreme

25  Court case, the *Omnicare* case, from 2015.  And the crux of the

1    argument is that their audit reports are inactionable opinion

2    because the lead plaintiff does not plead that they did not

3    subjectively believe what they were saying.  And in short

4    that's not the law.

5            First, under *Omnicare* subjective disbelief is only

6    one of the ways a speaker can be held liable for opinions

7    rendered.  But more important to the facts of this case, the

8    Supreme Court went on to note that opinions themselves include

9    statements of fact, and a fact is a thing done or existing or

10   an actual happening.  And this is at page 182 of that opinion.

11   For example, the statement "the coffee is hot" expresses

12   certainty about a thing even though reasonable people can

13   disagree on what constitutes hot.  But the statement "I think

14   the coffee is hot" does not express that same certainty.

15           COURT REPORTER:  Judge, can you hit the mute button?

16   I think that might help.

17           MR. ASTLEY:  Judge, can you hear me?  Just give me a

18   thumbs up.

19           THE COURT:  I guess I pushed the wrong button because

20   I muted, and when you started talking, I couldn't hear you.

21           COURT REPORTER:  Turn up the volume and then mute it.

22   That should help.

23           THE COURT:  Turn up the volume?

24           COURT REPORTER:  Yes, and then mute it.

25           THE COURT:  I'm sorry.  I'm doing the camera and not

1   the volume.

2           COURT REPORTER:  Okay.

3           COURTROOM DEPUTY:  Yeah.  Now we can hear the

4   courtroom, so that's fine.

5           MR. ASTLEY:  Okay, Judge, can you hear me?  If you'd

6   just give me a thumbs up.  Great.  I apologize.  There was a

7   ton of feedback.  It was very hard to know whether you were

8   able to hear me or not.

9           I was just addressing Cherry Bekaert's falsity

10  argument where they are asserting dismissal is warranted

11  because opinions are supposedly inactionable under the Supreme

12  Court's *Omnicare* decision, which is found at 575 U.S. 175.

13  It's decision from 2015.  *Omnicare* provides three avenues for

14  liability even for opinion statements, the first of which is

15  subjective disbelief.  Cherry makes the point that because we

16  don't plead, that they subjectively disbelieved their audit

17  opinions.  Therefore, there can be no liability.  But that

18  ignores the other two prongs of *Omnicare* liability, the second

19  of which includes statements of fact embedded in statements of

20  opinion, which the Supreme Court notes frequently occurs.

21          The example the Supreme Court provided was the simple

22  statement "the coffee is hot."  That is a statement that is of

23  sufficient certainty to constitute a statement of fact whereas

24  the statement "I think the coffee is hot" is not, the point

25  being as it pertains to this case, even though reasonable

1  people can dispute what constitutes hot, statements like the

2  ones Cherry Bekaert made expressing certainty as to compliance

3  with objective and uniform standards, such as the PCAOB

4  standard at issue here, are factual statements just as the

5  simple statement "the coffee is hot" is.

6        The *Brophy* case from the Eleventh Circuit stated

7  specifically that the PCAOB codifies a set of standards and

8  that there is sufficient uniformity that a fact finder may

9  assess compliance using a reasonable person standard.  Cherry

10  Bekaert stated explicitly, we conducted our audits in

11  accordance with the standards of the PCOB.  Just like saying

12  the coffee is hot they were expressing a factual assertion

13  with certainty that they followed the standards as they

14  understood them, in the same way I may say the coffee is hot

15  as I understand the term "hot" to mean.

16        The third avenue of liability under *Omnicare*, which

17  Cherry Bekaert doesn't address, is the omissions theory which

18  is clearly pleaded in the complaint.  And the Supreme Court

19  provided that if an opinion statement conveys facts about how

20  the speaker has formed the opinion but if the real facts are

21  otherwise but not provided, an opinion statement will mislead

22  its audience by omission.  And that omission liability can

23  attach due to both facts about the inquiry the speaker did or

24  did not conduct or the knowledge the speaker did or did not

25  have.  And that's at page 194.

1   And the point being here there are so many omitted

2   facts about Cherry Bekaert's failure to comply with applicable

3   standards and all the red flags at issue that we've been

4   discussing and all of the whistleblower tips and all of the

5   contradictions between the very management representations

6   they were relying on and the evidence that Cherry had in its

7   possession at that time are the sort of reasonable omissions

8   that would otherwise mislead investors.  And investors

9   understandably relied on Cherry's independence and

10  professionalism with the opinions that it rendered.

11      In closing, insofar as Cherry Bekaert is concerned,

12  the Supreme Court provided in *U.S. v. Young* that an

13  independent certified public accounting -- accountant like

14  Cherry Bekaert performs a special role.  By certifying public

15  reports that depict a corporation's financial status, the

16  independent auditor assumes a public responsibility

17  transcending the employment relationship with the client.  The

18  independent public accountant performing that special function

19  ultimately owes allegiance to creditors and stockholders as

20  well as, quote, the investing public.  The public watchdog,

21  quote unquote, function demands that the accountant maintain

22  total independence from the client at all times and requires

23  complete fidelity to the public trust.

24      Here there were an array of indicia that are pleaded

25  in Sections 10 and 11 of the complaint as they pertain to

1  Cherry Bekaert that reflect that organization's abject failure
2  to abide by the very essential purpose of the audit, and it's
3  precisely why those indicia, the red flags and the magnitude
4  and the whistleblower allegations and all of the prior PCAOB
5  notifications of deficiency, all collectively evaluated under
6  the holistic *Tellabs* analysis for scienter reflect an extreme
7  departure from that organization's standard of care so as to
8  present a misleading picture to the investing public.  And
9  that is why they should be held liable for their conduct.

10         Contrary to Mr. McIntyre's summary, there is no
11  requirement that the auditor be actively engaged in the fraud.
12  The scienter element does not speak to whether it did or did
13  not know of the defendants' fraud.  It speaks to whether the
14  statements that Cherry Bekaert made were knowingly false or
15  recklessly so.  So the scienter is focusing on Cherry's intent
16  vis-a-vis their own public statements and their exclamation
17  that they conducted their audits in accord with PCOB standards
18  as well as the financial statements being fairly presented in
19  accordance with applicable standards were entirely false and
20  given all of the indicia were done so with severe
21  recklessness.

22         With that, before we broke your Honor wanted me to
23  discuss scienter with respect to Mr. Senken, and I will turn
24  to that now.  To the extent that Mr. Senken is presenting
25  himself before your Honor as some sort of lesser as compared

1    to Mr. Petit and Mr. Taylor, that's entirely inaccurate.  But,

2    more importantly, it ignores what's pleaded and accepted as

3    true in the complaint.  The company itself has specifically

4    determined, just like it did for Mr. Petit and Mr. Taylor,

5    that Mr. Senken was a culpable participant in the alleged

6    fraud.  And this is pleaded at paragraphs 340 to 342 and

7    reflected in the findings of that investigation, which is

8    Exhibit 2.

9            Senior management is defined by the company as

10   including each of Mr. Petit, Mr. Taylor, and Mr. Senken.  And

11   each of these former members of senior management were aware

12   of the illegal course of dealing.

13           THE COURT:  So let's concentrate, if you can hear me,

14   let's concentrate on the facts as opposed to the company's

15   finding.  I mean, the company's finding is the company's

16   finding.  It may or may not be admissible, you know, directly.

17   It may be just more admissible indirectly by having people

18   testify about what's in there.  So tell me about the specific

19   facts that you know related to Mr. Senken.

20           MR. ASTLEY:  Yes.  One point or comment on that

21   point, frequently these cases, your Honor, are relying on

22   cooperating witnesses to provide information to establish the

23   scienter of the executives, and so whether or not the

24   company's commentary is admissible evidence or not is not the

25   standard.  The company has provided, based on an exhaustive

1    investigation that's pleaded in the complaint, that Mr. Senken

2    was a culpable participant.  That --

3        THE COURT:  Yeah, but that's opinion, and opinion is

4    not admissible.  It may be admissible in this case as it

5    relates to admissions in interest -- it relates for the

6    corporation, but their conclusions don't matter.  What matters

7    is the facts that the conclusions were based on.

8        MR. ASTLEY:  Yes, and I'm not saying -- it's standard

9    for --

10       THE COURT:  Okay.  So we're not going to argue --

11   here's the thing.  We're not going to argue about it.  Okay.

12   What I'm asking you to do is to tell me the facts.  All right.

13   That's what I want to know, is the facts.  I don't care what

14   the company's conclusion is at least at this point.

15       MR. ASTLEY:  Yes.  Well, Mr. Senken was one of the

16   three members who orchestrated the fraud, and this is

17   reflected at Docket 152-1, which is a summary of all the

18   numerous indicia of the defendants' active participation.

19   Mr. Senken knowingly concealed the fraud.  He lied to the SEC

20   in numerous letters in January and February and April of 2018.

21   That's reflected in Exhibit 2 at page 4.  He actively

22   monitored the off-book arrangement with the government

23   distributor since at least 2012, which is again reflected in

24   the complaint and supported by Exhibit 2.

25       His whole compensation was incentivized by the very

Case 1:18-cv-00830-WMR   Document 184   Filed 03/11/21   Page 100 of 135

100

```
 1  fraud that was afoot, and, in fact, the company determined to
 2  claw back all of that compensation due to --
 3          THE COURT:  Give me just a minute.
 4          MR. ASTLEY:  Yes, sir.
 5          (Brief Pause.)
 6          THE COURT:  All right.  I don't have the ability to
 7  easily go between documents right now.  So you're giving me a
 8  lot of conclusions.  I'm asking you a very specific question,
 9  and the question is tell me what it is that Mr. Senken did.
10  To say that, well, he lied, okay, how did he lie?  I want the
11  specifics, and I want to know how you know it.  And I don't
12  want you telling me that it's because that's what the company
13  said.  Okay.  So that's what I need from you.
14          MR. ASTLEY:  Yes, Judge.  Mr. Senken lied to the SEC,
15  and we know that, which is reflected in the letters that are
16  quoted in the complaint where Mr. Senken indicates that the
17  company is complying with appropriate accounting conventions
18  and that there are no off-book arrangements, that the company
19  is adhering to auditing standards for revenue recognition,
20  when, in fact, we know that he was participating in off-book
21  arrangements by sending emails and changing and altering terms
22  of contracts, providing return allowances and other violations
23  of the accounting rules.
24          THE COURT:  And how do you know that he was doing
25  those things?
```

1          MR. ASTLEY:  Well, we know that from the company's

2    conclusions which specify the specific transactions that he

3    was involved with, and they're pleaded in the complaint and

4    accepted as true.

5          THE COURT:  What independent evidence do you have

6    that he did those things other than the -- I don't know if you

7    watch TV.  Maybe you don't.  If you know what paragraph 527 is

8    of the complaint without looking, you probably don't watch a

9    lot of TV.  That was really kind of supposed to be a joke, but

10   maybe not.  Maybe it doesn't come across that way.

11         There's an episode right now on Apple TV called "The

12   Morning Show."  It's a loose-based series with Jennifer

13   Aniston and Steve Carell and Reese Witherspoon, you know,

14   seemingly based on the NBC situation with Matt Lauer.  And in

15   that TV show the very last episode reveals that the network,

16   which I don't remember the name, UAB or some fictional

17   company, had orchestrated an investigation to throw a producer

18   under the bus.  And the reason they did that was because the

19   president of the company was trying to protect himself.

20         So my point in bringing that up is to say I don't

21   know whether or not there's anything to what the company has

22   said or hasn't said.  It may all be a hundred percent right or

23   it may not be.  There certainly could be motivations for

24   others in the company to blame one person or the other,

25   particularly Mr. Senken given that they'd already fired him at

1    the point this report came out, I believe.  So I'm asking

2    about the specifics.  If you don't have any other than the

3    company, that's fine, but that's what I'm looking for.  I'm

4    looking for what do you know other than what the company has

5    said.

6         MR. ASTLEY:  Yes.  I guess a couple of points, your

7    Honor, and I certainly understand what you're putting your

8    thumb on.  We're not at summary judgment.  I don't have all

9    the evidence.  It's not --

10        THE COURT:  You don't have to be defensive about it.

11   You just answer my question.  Either, well, Judge, we don't

12   have anything other than the report, we're relying on the

13   report or, yeah, this is what we have.  I don't know what's in

14   your brain.  Okay.  That's why I'm asking you.  And if all

15   you're doing is relying on what the company has said, then

16   fine, just tell me that.  But if there's something else, then

17   tell me that because when I sit down and evaluate it all, I

18   want to know what the source of your information is.  It might

19   not make a difference, but it could.  So just tell me what you

20   know.

21        MR. ASTLEY:  Exhibits 4 through 6 are Ernst & Young's

22   notes so the auditor's notes.  As part of the company's

23   investigation we have the contemporaneous notes of King &

24   Spalding and the auditor which summarize documents and

25   evidence that was evaluated as part of that, so it's reflected

1   in those exhibits.

2          We have the affidavits from the U.S. Postal

3   Inspection Service law enforcement officer who made four

4   different applications for search and seizure warrants under

5   oath, and we have all the evidence specified in those

6   affidavits.  We have the notes of interviews from the Justice

7   Department that Mr. Petit and Taylor filed in the Southern

8   District which explains the interviews the Justice Department

9   did precipitating the indictment.  So that's all an evidence

10  source of information.

11         We have the SEC complaint itself where it details the

12  many numerous emails and internal documents that were

13  evaluated and Mr. Senken's participation in the overall

14  scheme.  All of this is to say it is entirely corroborative of

15  the company's conclusions reflected in the investigative

16  report.

17         And then, of course, we have our own investigation.

18  As an officer of the court, we interviewed former employees.

19  We dealt with experts.  You know, we tried to ensure that the

20  sources were reliable and credible and they corroborated

21  one -- and they corroborated one another.  And that's why the

22  *Mizzaro* case, the Eleventh Circuit case, says that you can

23  rely on this sort of information to give rise to a viable

24  claim.  And, in fact, the Court goes so far as to say with

25  these Enron style accounting frauds, it is, quote, undeniable

1  that senior management was participating in it.

2        And so between affidavits, accountants and lawyer

3  notes, DOJ interview summaries, descriptions of internal

4  documents contained in all of the news reports, quotes from

5  former employees, emails, screenshots, those sort of

6  evidentiary materials, all are supporting the company's

7  conclusions reflected in Exhibit 2.  All of which is pleaded

8  in the complaint pertains to Mr. Senken and given that we're

9  at a Rule 12 stage is well beyond what any Eleventh Circuit or

10  any other court in the country has found is needed to

11  establish from a pleading perspective scienter to proceed to

12  discovery.

13        So I think hopefully that gives a finer point.  If we

14  want to open up the notes and go through specific

15  transactions, we have it here.  It's voluminous information.

16  I don't have it all committed to memory, but I will work as

17  long as I need to in order to give your Honor comfort that

18  what's pleaded in this complaint is well-sourced and

19  corroborative of other stuff that's also pleaded in the

20  complaint.

21        THE COURT:  Yeah, no need to stop.  Go ahead and

22  continue with your argument.

23        MR. ASTLEY:  Yes, sir.  With that, sir, I believe

24  I've covered all of the challenges for both the MiMedx

25  defendants and Cherry Bekaert as well as the very points that

1  were raised in the opening submissions.  So absent any

2  questions I do want to be helpful to your Honor.  I don't have

3  any further remarks.

4          THE COURT:  All right.  Thank you, sir.  All right.

5  We'll go through the same order that we did earlier.

6  Mr. Long.

7          MR. LONG:  Thank you, your Honor.  I'm going to --

8  we've heard a lot of different arguments on a lot of different

9  issues, and I'm going to take us back to the basics for our

10 argument on loss causation.  As a reminder, plaintiffs sold

11 their shares on February 26th.  They put up that chart that

12 had a bunch of events that happened that they argue were

13 corrective disclosures.  Except for the event on 2-20, they

14 didn't own their shares during any of those.

15         Under *Meyer*, which is the controlling law, they

16 clearly do not -- cannot show loss causation.  The only way

17 that they could show loss causation would be if this Court

18 extended *Meyer* via that footnote that they ask for.  We don't

19 think that is appropriate at all, and we think their case can

20 be dismissed solely on that.

21         I do, however, want to point out a few other

22 important parts about their argument.  You'll notice

23 plaintiffs really didn't even argue about the statements that

24 were both corrective and misleading.  They didn't address

25 those.  They didn't argue that the other filed lawsuits that

1  they allege are corrective disclosures are corrective
2  disclosures.  They didn't even address that.
3        On the analyst reports, they're just wrong about
4  that.  The analyst reports clearly say in the disclaimers that
5  they were not relying on any nonpublic information.  Those
6  disclaimers, you know, they say things such as -- excuse me
7  one second, I'm pulling these up -- all information contained
8  in the reports have been obtained from public sources.  That's
9  Aurelius, Viceroy.  All information contained herein has been
10  obtained from public sources.
11        That's no different than *Meyer* where *Meyer* held that
12  the Einhorn presentation contained a disclaimer on the second
13  slide of the presentation stating that all of the information
14  in the presentation was, quote, obtained from publicly
15  available sources.  That's the way those analyst reports are
16  written.  They're not disclosing nonpublic information in
17  their analyst reports.  That would be a big deal if they were
18  doing that, if they obtained nonpublic information and
19  disclosed it.
20        I don't know where they were getting that information
21  that's in those analyst reports, but they say themselves that
22  it was public information.  The Wall Street Journal article
23  that they cite to specifically says that it got its
24  information from public sources.  That's different from
25  *National Beverage* where the Wall Street Journal article did

1  not say that.

2          And to address your earlier question, your Honor, or

3  your earlier point, on *National Beverage* they do actually

4  specifically call that out.  They make that distinction, I

5  think, because they're trying to distinguish their set of

6  facts from *Meyer*.  They say, quote, the June 26th article, the

7  Wall Street Journal article, does not specify that this

8  information was gleaned only from the SEC letter, so the

9  district court should not have drawn that conclusion.

10          So, in other words, what they're saying is that Wall

11  Street article did not have that specific disclaimer, and

12  therefore the district court erred in assuming that it had

13  such a disclaimer, assuming that they weren't getting their

14  information from nonpublic sources.  So that's the distinction

15  that *National Beverage* makes there.

16          And, in fact, *National Beverage* rules on another

17  article that it was not a corrective disclosure because they

18  specifically find that that article was based on public

19  information.  So that's how you reconcile the two cases.  And,

20  in any event*, Meyer* is the controlling matter here.  I

21  understand *National Beverage* is persuasive and important, but

22  it is the controlling matter.

23          And I really didn't hear plaintiff saying that he

24  disagreed with our characterization of *National Beverage* or

25  *Meyer*.  The reality is if it's public information, it cannot

1   be -- republishing it cannot be corrective.

2           You had asked about the statements that were

3   corrective and misleading.  Do you still want me to identify

4   those just for your record?  We also have these in our

5   briefing, but I can run through those real quickly.

6           THE COURT:  That was so long ago when we brought that

7   up I can't remember exactly, so you might need to refresh my

8   memory on it.

9           MR. LONG:  Sure, sure.  We were talking -- that was

10  like four hours ago we were talking about statements that

11  plaintiffs allege were both corrective and misleading.  There

12  were three statements that we pointed to, and so with your

13  permission, your Honor, I'll go ahead and read those and

14  explain.

15          Okay.  The first is in the second amended complaint,

16  paragraph 573.  They allege that a partial disclosure was that

17  the company had parted ways with its largest U.S. commercial

18  distributor.  That's CPM they were referring to.  So they say

19  that's a corrective disclosure.  But then later they allege

20  that that same statement revealed that it had parted ways with

21  the distributor later determined to be CPM which negatively

22  impacted the company's 3Q15 results and that this announcement

23  was misleading because MiMedx did not reveal the true scope of

24  fraud and its dependence on CPM and its networks of sub

25  distributors, including PODs, to facilitate its improper sales

1  and distribution practices, including channel stuffing.

2        So they're saying it's corrective but it's not --

3  it's misleading.  That's just contradictory.

4        The next one is at paragraph 573 where plaintiffs

5  allege as a partial corrective disclosure that MiMedx's

6  April 10th, 2016, announcement that its first quarter 2016

7  revenue fell short of forecasted guidance by $2 million.  So

8  the company says that but the company -- but then plaintiffs

9  allege that that's misleading.

10       In the second amended complaint, paragraphs 187 to

11  -88, they allege that MiMedx issued a press release announcing

12  its financial results for first quarter of '16 and its first

13  revenue miss in more than four years.  And this announcement

14  was allegedly misleading because as defendants knew but failed

15  to disclose the shortfall was a result of defendants' systemic

16  channel stuffing practices and fraudulent revenue scheme

17  catching up to them --

18       THE COURT:  Hold on a second.

19       MR. LONG:  Sure.

20       THE COURT:  So let me understand both of the points

21  with regard to the company that it's no longer associated with

22  and with regard to the earnings not meeting the forecast.  In

23  both cases they were misleading disclosures, according to the

24  plaintiff.  You argue because it didn't tell why.  It didn't

25  tell why they didn't meet the forecast, I guess.  I don't even

1    know that's the why.  They just didn't give you the background

2    information about what their relationship was all about in

3    both cases.

4              MR. LONG:  Right.

5              THE COURT:  Well, I mean, just -- again, I asked

6    Mr. Fellows this earlier.  Maybe I did to you too.  Putting

7    the plaintiff's hat on for a moment, why would you?  I mean,

8    even given that there is a fraud and conspiracy that they've

9    alleged, but why would it even be germane, those additional

10   disclosures that they say should have been made when that

11   information was conveyed to the market?

12             MR. LONG:  So the way I think about it is plaintiffs

13   can either say that it was misleading or it was not.  I mean,

14   I don't understand how it can be corrective if, in fact, the

15   supposed fraud was not disclosed.  That's the problem.  It was

16   bad news.  There's no question that it's bad news that they

17   lost -- and they didn't meet their earnings.  But the idea

18   that it's corrective is the key idea, and they are simply

19   saying --

20             THE COURT:  So wouldn't it be corrective if they said

21   the things that they claim was fraudulent by not saying?  I

22   mean, isn't that what would have made it corrective?

23             MR. LONG:  Yes, and they didn't do that.  All they

24   pointed to was bad news, and they say, well -- and it would be

25   even worse if they disclosed the fraud, but that's not a

1  corrective disclosure.

2         THE COURT:  All right.  Go ahead, sir.  You've gone

3  over two of them, and then there was a third one.

4         MR. LONG:  Yeah.  And I just hit a button on my

5  thing, and it scrolled me down.  So bear with me one second.

6  Okay.  All right.  And then the last one is November 27th of

7  2017.  The SEC alleges in paragraph 573 that we alleged --

8  they're alleging as a partial corrective disclosure the

9  November 20th, 2017, announcement that responds to recent

10 short-seller reports.  And they allege in the second amended

11 complaint, 233 and 272, that MiMedx issued a press release

12 disputing a short-seller report and that these statements were

13 materially false and misleading and omitted material facts.

14        THE COURT:  So, Mr. Long, in the short-selling report

15 I'm assuming that is where either someone reported that there

16 was some short selling going on or they were recommending that

17 short selling occur, one of those two.  It might have been

18 something else.  What was the reason for either of those

19 actions or some other action as reported in that report?

20        MR. LONG:  Well, I think the reasoning was that the

21 short-sellers did believe that the company was not -- was

22 overvalued and was not living up to the promises.  They were

23 pointing out that they were whistleblowers and that kind of

24 thing, as short-sellers do.  That's their job.  They're trying

25 to convince everybody that the shares are not worth as much as

1    they are trading at.

2           And MiMedx is just responding to that and saying

3    that's not true.  Look, I mean, no company likes to have

4    short-seller reports out there.  It's bad news for a company,

5    and so it's not surprising.  That's just something a company

6    has to deal with.  But, again, that doesn't make it a

7    corrective disclosure.  You know, there actually has to be

8    some sort of information that's nonpublic that's being

9    disclosed that would reveal the alleged fraud.

10          THE COURT:  So what the company did when they

11   responded, is they tried to -- the company tried to dispel the

12   rumors or analysis of the short-sellers.

13          MR. LONG:  Right.

14          THE COURT:  In other words, say, hey, everything is

15   good here, nothing to see.

16          MR. LONG:  Right.

17          THE COURT:  And the plaintiff alleges that that was

18   fraudulent, and that certainly fits their theory about what

19   the company was doing that was wrong but that the statement --

20   is the argument that the plaintiff is making is that the

21   company's statement was a disclosure or that the short-sale

22   report itself was some kind of corrective disclosure?

23          MR. LONG:  It's not clear.  What is clear is that

24   neither is a corrective disclosure.  I mean, if the company is

25   still just engaging in the alleged fraud by trying to cover up

1  the short-seller reports, that can't be corrective.  And then

2  the short-seller reports themselves have disclaimers that say

3  that they're relying on public information, so that can't be

4  corrective.  There's nothing they can point to that could be

5  considered a corrective disclosure there.  All they can point

6  to is bad news and the stocks were down, and that's what

7  they're trying to do.

8         THE COURT:  All right.  Yes, sir.  So other points

9  you wanted to make?

10        MR. LONG:  Okay.  I want to address the standing

11  arguments that plaintiffs made.  I mean, they're just wrong, I

12  mean, *Garfield*, first of all.  So the Court understands, that

13  was not addressed in plaintiff's briefing on standing.

14  They've cited for other things.  But in *Garfield*, the Eleventh

15  Circuit case, they denied standing.  They rejected standing of

16  the plaintiffs in that case, and anyway the standing that was

17  at issue had nothing to do with corrective disclosures.  It

18  had to do with plaintiffs that had brought after so-called

19  corrective disclosures.

20        The case that plaintiffs cited to was actually a

21  Sixth Circuit case, and it's cited in the *Garfield* case in a

22  quote from there.  But that's Sixth Circuit law, not Eleventh

23  Circuit law.  And just the idea is that you don't have to have

24  loss causation in order to have standing is just incorrect,

25  and there's no basis for that.

1          The *Focus on the Family* case that they cite, first of
2    all, it's not a securities case, and there still has to be an
3    action by defendants that is traceable to plaintiff's loss.
4    And if you don't have that, then you just don't have standing,
5    and here the whole problem that they have is they can't point
6    to any information.  They can point to risk but no information
7    that happened before they sold their stock.

8          I'll also point out that both *Focus on the Family* and
9    *Garfield* were decided before *Meyer*.  *Meyer* ultimately is the
10   reason that plaintiffs can't go forward here.  We're not
11   saying that a case couldn't be made.  They cite millions of
12   examples of all the bad things they think that people have
13   done in this case, but plaintiffs sold before any of those
14   things.

15         THE COURT:  You're pausing for me.  I don't have a
16   question for you.

17         MR. LONG:  I think that does it for MiMedx.  Unless
18   the Court doesn't have any other questions, we will close.

19         THE COURT:  All right.  Thank you, sir.  Mr. Fellows.

20         MR. FELLOWS:  Yes.  We'd like to direct your
21   attention to our reply brief in support of our motion to
22   dismiss, which is Document 157.  We filed it on August 27th of
23   2020.  And beginning on page 7 we address the specifics that
24   your Honor is looking for.  We explain that the second amended
25   complaint does not adequately allege that Mr. Senken knowingly

1  directed or knew about any alleged fraud.

2          And if you look at the bullet points we discuss,

3  starting on page 7, we point out the second amended complaint

4  does not -- it does not dispute, that it does not allege that

5  Mr. Senken was involved in any side agreements with MiMedx

6  distributors.  That's number one.

7          Number two, the second amended complaint does not

8  identify any instances in which Mr. Senken evidenced knowledge

9  of a channel stuffing scheme or was present for specific

10 meetings or communications in which a scheme was discussed.

11         Number three, the second amended complaint does not

12 allege that Mr. Senken personally took any actions against any

13 internal whistleblowers.

14         The fourth point, there were no red flags in the

15 MiMedx accounting statements that would have alerted

16 Mr. Senken to any issues when he made the SOX certifications.

17         So the absence of Mr. Senken from these allegations

18 dilutes any inference of scienter as to Mr. Senken.  These are

19 specifics we're giving you, your Honor.  We go on to explain

20 in our reply brief that the general assertions that the

21 plaintiff has grouped Mr. Senken into with others, it fails to

22 create a strong inference of scienter as to Mr. Senken.

23         And let us not forget this hearing started at 9:30.

24 We're past 2:00 o'clock.  We all need to go back to the

25 basics, your Honor.  In the Private Securities Litigation

1   Act -- it's 15 U.S.C. Section 78u-4 -- there are two different

2   separate requirements that the Eleventh Circuit now for the

3   past 25 years has had an opportunity to address.  One is the

4   required state of mind, and the statutory section is

5   78u-4(b)(2) Required State of Mind.  And it requires that a

6   plaintiff state with particularity facts giving rise to a

7   strong inference that the defendant acted with the required

8   state of mind.

9         So that requirement is explicitly stated in the

10   statute.  That's not something that the Courts have fashioned

11   over the years.  That's in the statute.  And as Mr. Long has

12   ably explained to the Court, the other key requirement of loss

13   causation, the plaintiff has the burden of proving that the

14   act or omission of each defendant to violate this section

15   caused the loss for which the plaintiff seeks to recover

16   damages.  Here again this statutory provision as to loss

17   causation speaks for itself, and the Courts that have rendered

18   the decisions over the years to the Eleventh Circuit have used

19   both of these as gatekeepers.

20         Your Honor, this is analogous.  It's not directly

21   analogous, but it's almost analogous to the *Daubert* analysis

22   that federal district judges are to be used as gatekeepers to

23   assess expert witness testimony and separate out junk science

24   from true science.  Here in this Private Securities Litigation

25   Act Congress specifically empowered triers of fact, federal

1 district judges such as yourself, to make these

2 determinations.

3        And the absence of sufficient allegations, your

4 Honor, authorize your Honor to dismiss this case, first

5 dismiss the case totally against all defendants based on the

6 lack of standing that this lead plaintiff has, based on lack

7 of the loss causation, and as to our client -- and I'm

8 speaking as to our client -- as to the failure of the

9 plaintiff to establish a strong inference of scienter, which

10 means intent to deceive or severe recklessness.

11        And as I mentioned before, the four Eleventh Circuit

12 decisions which govern the disposition in this case for

13 Mr. Senken are the *Mizzaro* case, *Carvelli*, *Garfield*, and

14 *Brophy*.  And as we point out, your Honor -- and I'll end with

15 this point -- on page 12 of our proposed order, negligence or

16 even gross negligence is not enough to plead scienter under

17 Section 10(b).  That's the teaching of the *Brophy* decision

18 issued in 2015, authored by Judge Jill Pryor.

19        Severe recklessness is limited to those highly

20 unreasonable omissions or misrepresentations that involve not

21 merely simple or even inexcusable negligence but an extreme

22 departure from the standards of ordinary care and that present

23 a danger of misleading buyers or sellers, which is either

24 known to the defendant or is so obvious that the defendant

25 must have been aware.  That's the teaching of *Garfield*.

1        And then just finishing up, in the *Carvelli* case --

2   that's the 2019 decision authored by Judge Newsom -- just as

3   Judge Pryor did with the 2015 decision in *Brophy*, Judge Newsom

4   went through a very detailed analysis of explaining why the

5   standards hadn't been met.  And so both Judge Newsom and Judge

6   Pryor in separate cases -- but these are recent decisions --

7   both affirmed dismissals of the complaints.

8        That's what we've got here, your Honor.  And on

9   behalf of Mr. Senken we request that your Honor dismiss the

10  second amended complaint against him.  Thank you.

11       THE COURT:  Mr. Fellows, before you're done I want to

12  ask you this question:  Didn't the Eleventh Circuit recently

13  opine in a class action case that the standing analysis

14  required actual damages to be suffered by the plaintiff?  And

15  I'm thinking -- you know, I'm just looking now.  I'm thinking

16  that maybe the case was Spokeo (phonetic) or something like

17  that.  What can you recall about that?  Well, Spokeo was a

18  U.S. Supreme Court case but there was a -- I'm just looking.

19  One case that just pops up is *Muransky v. Godiva Chocolatier*.

20  Does that ring a bell to you?

21       MR. FELLOWS:  Yes.  That's exactly -- (Inaudible due

22  to Zoom audio interference)

23       COURT REPORTER:  I'm sorry.  Can you repeat that?  I

24  couldn't understand.

25       THE COURT:  Just state that over again.  You faded in

1  and out a little bit.

2        MR. FELLOWS:  There's got to be an injury in fact to

3  satisfy the standing requirement under Article III.  I believe

4  that Judge Tjoflat also recently issued a decision on that

5  point as well in a -- Judge Tjoflat over the years has

6  authored a number of decisions reaffirming that the federal

7  courts are courts of limited jurisdiction and that Article III

8  has to be satisfied before a plaintiff can proceed.

9        And that's what we've got here.  There's a lack of

10  standing by this plaintiff.  And then we've got, from our

11  standpoint on the defense side, the twin towers of absence of

12  loss causation and failure to plead a strong inference of

13  scienter, at least as it relates to Mr. Senken.

14        THE COURT:  All right.  Thank you, sir.  If y'all

15  will give me just a moment before we go on.

16        (Brief Pause.)

17        THE COURT:  All right.  Thank you for waiting on me.

18  All right.  On behalf of the accounting firm.

19        MR. MCINTYRE:  Thank you, your Honor.  I could not

20  have said better Mr. Fellows' framework, casting of the

21  framework for the Eleventh Circuit and *Tellabs* and the PSLRA,

22  so I'm going adopt it and not repeat it.  But I do want to add

23  a couple of things to it.

24        One is that as difficult as scienter is to prove, it

25  is even more difficult to prove it against or to allege it

1  against the outside auditor.  And there are numerous cases --
2  and we've cited them -- that stand for that proposition.  Here
3  it would be an ironic result, I think, given that we testified
4  in the criminal trial on behalf of the government against the
5  management that had misled us with respect to the information
6  that we were given or failed to be given during the course of
7  the audit.
8          There's also -- Mr. Astley made some allegations just
9  now that, quite frankly, are not in the complaint, and I want
10  to make sure that we address those.  He said that the PCAOB
11  had, in essence, determined that we had not -- that we had
12  done no audit at all, and it had instructed us to withdraw our
13  opinion.  First of all, that's nowhere in his complaint.  I've
14  pulled the pages of his complaint.  It's not in there, and
15  it's not true.  The PCOB never issued such an instruction.
16  And, in fact, the PCOB has never sanctioned us for any of the
17  work that we did on MiMedx, and they have the authority and
18  the ability to do that.
19          I also want to turn to his characterization of
20  *Omnicare*.  Well, *Omnicare*, his interpretation of the coffee is
21  hot versus what's an opinion and what's not an opinion would
22  eliminate *Omnicare*; right?  It would reverse the Supreme
23  Court's ruling.  The Supreme Court was saying that when you
24  say the coffee is hot, that you are expressing a fact, not an
25  opinion.  If you pull any of Cherry Bekaert's opinions, which

1  are attached to the complaint, they are labeled opinions.

2  And, in fact, they contain a sentence that says we believe

3  that our audits provide a reasonable basis for our opinion.

4  It's a reasonable belief.  It's not the coffee is hot.  It's I

5  believe the coffee is hot.  And that was the distinction and

6  the example that the *Omnicare* case and Court was using when it

7  was trying to distinguish between statements of fact and

8  statements of opinion.

9        There is no question that the only three allegations

10  that reflect or are intended to allege a false statement by us

11  are our opinions.  That's all they allege.  And with respect

12  to the loss causation related to those statements, I just want

13  to point out that our loss causation, in addition to the

14  standing argument that you've heard so much about and which we

15  certainly agree with, we have a separate loss causation

16  argument.

17        And when Mr. Astley put up that chart showing the

18  different inflection points, I would just point out what I did

19  in the opening argument.  Not one of those pointed to Cherry

20  Bekaert.  There's no reference to Cherry Bekaert, no reference

21  to our opinions, et cetera.  So separate and apart from the

22  standing, they have to plead loss causation with respect to

23  us.  They need a corrective disclosure.  They don't have it.

24  They didn't plead it.  It doesn't exist, and, therefore, for

25  that reason alone we're entitled to be dismissed from this

1   case.

2          Finally, Mr. Astley had gone through what he called

3   red flags, and he makes the argument -- and I probably

4   shouldn't have said finally, it's a bad thing for a litigator

5   to ever say -- that there were certain red flags that we

6   either were aware of and that we didn't respond to and didn't

7   do anything in response -- and I think he even cited our

8   briefing and said, you know, they don't even have support for

9   some of the statements that they say in their brief about what

10  they did.

11         Well, yes, we do because, again, it's in his

12  complaint; right?  So if we take the AvKARE argument, there

13  was a two-and-a-half-month investigation by a nationally

14  recognized law firm.  He doesn't like to admit that, and he

15  likes to downplay it.

16         But the point is Cherry Bekaert was aware of the fact

17  that this investigation was going on, that the company had

18  hired an outside law firm to look at these issues.  And it

19  determined that there was not an issue there that reflected on

20  the accusations that had been made with respect to the revenue

21  recognition, which, by the way, I'd just point out it's about

22  10 percent of the overall sales during the entire period were

23  not actual sales.  The rest of them had to be recast into

24  different periods, but it wasn't as if there weren't real

25  sales, which is one of the reasons why the company is still in

1  business today.

2          We, as part of that investigation by a nationally

3  recognized law firm, had the company go out and retain a

4  revenue expert and create a white paper.  Now, Mr. Astley

5  says, well, you know, we allege that that white paper was

6  limited to a very narrow issue.  Well, but that's not really

7  the point at this juncture.  The point at this juncture is can

8  you draw inferences from all of these steps that we were

9  taking, that we either knew of the fraud or we were reckless

10 in not taking enough steps to ferret out a fraud.

11         It's not as if we did no audit at all.  We did, and

12 we took audit steps.  Maybe there was negligence, but that's

13 not sufficient; gross negligence, not sufficient.  You have to

14 substitute in some sort of intent or motive, something to aid

15 the company with its fraud, either by turning a blind eye or

16 otherwise, but we have no motive here.  Our fees?  Every Court

17 that looks at fees says that's insufficient, that can't be the

18 motive, there has to be something more.

19         So I don't think it's fair to say that we took no

20 action with respect to the allegations that were the subject

21 of the second review by the company, second internal review.

22         As to the Anderson --

23         THE COURT:  Let me ask you about this whole

24 discussion about motive.  You made it earlier this morning,

25 and you're making it now.  And I understand your points on it,

1 but is that really relevant for purposes of a motion to

2 dismiss about whether you were reckless or not?

3         MR. MCINTYRE:  It is, your Honor, under *Tellabs*.  If

4 you look at all the cases, when you're weighing the inferences

5 and trying to come up with what is more cogent, under *Tellabs*,

6 what's more cogent and compelling, you're absolutely able to

7 look at the inference that, well, plaintiff alleges, you know,

8 these things that you did or didn't do.  And in weighing those

9 inferences, how do I weigh them?  You know, is it just

10 negligence?  Is it gross negligence?  Because that's

11 insufficient.  Or is there something more?

12         And so what the Courts say is look for what that

13 something more might be.  Has the plaintiff alleged a motive?

14 And in some of these cases the plaintiff alleges a motive;

15 right?  It says you were getting a kickback.

16         THE COURT:  The absence of a motive, I guess, is my

17 point.  The absence of a motive isn't fatal to the allegation

18 that your client was reckless, is it?

19         MR. MCINTYRE:  No, not necessarily.  That's right.

20 That's correct.  I would argue here, however, in light of the

21 misrepresentations by management propounded on us and all of

22 the other evidence that we have with respect to what we

23 weren't told, that in order for the plaintiff to overcome the

24 hurdle and to say we were -- and it's not just reckless, your

25 Honor.  It's severely reckless.  But to overcome that hurdle,

1  right, you have to establish that how do I distinguish between

2  the gross negligence and the severely reckless.  It's got to

3  be something, and there isn't motive here.  But you're right

4  it wouldn't just be motive because --

5        THE COURT:  Is there a legal definition of the

6  difference between reckless and severe reckless?

7        MR. MCINTYRE:  Your Honor, not that I'm aware of

8  except in the Eleventh Circuit I believe the holding is that

9  it has to be -- so, yeah, in the Eleventh Circuit the holding

10 is severely reckless which is more than inexcusable,

11 inexcusable negligence, and must be an extreme departure from

12 the standards of ordinary care.  And that's *Mizzaro*.

13        THE COURT:  So it sounds like we're kind of back to

14 the *Meyer* decision and something more.  So reckless and

15 something more; right?

16        MR. MCINTYRE:  I think that's right, your Honor.

17        THE COURT:  Yeah, okay.  All right.  Thank you.

18 Anything else?

19        MR. MCINTYRE:  Yes, your Honor.  I would just like to

20 point out that with respect to the Anderson allegations that

21 Mr. Astley referred to, again, his characterization of his own

22 complaint leaves out a lot of the allegations in that

23 complaint about what we did with respect to investigating that

24 particular complaint.

25        And, you know, we went to management.  We were told

1    that management -- that Mr. Anderson would not speak to us.

2    We did not ignore it.  We raised further questions of

3    management about it and we -- but, most importantly, the Audit

4    Committee had interviewed Mr. Anderson, and so it wasn't

5    management.  It was the Audit Committee, which is an

6    independent entity and the one that we interact with separate

7    and apart from management.  And we went to the Audit Committee

8    and said, what is this issue with Mr. Anderson?  They said,

9    we've looked at it.  It's not a problem.  Now, to the Audit

10   Committee's defense, management lied to them as well.

11         So again we come back to the point that it isn't as

12   if we sat on our hands and didn't audit the company.  We did.

13   We audited the company.  A massive fraud was committed

14   directed towards us; right?  This isn't just a fraud at the

15   company that we didn't discover.  It was a fraud of the

16   company in which it was directed towards us, which is why the

17   two individuals were indicted and convicted.  It was part of

18   the fraud, was to lie to us and to mislead us.

19         Other than some more nuanced points, I will just say

20   that we believe for all of these reasons the complaint as to

21   us is inadequately pled and should be dismissed.

22         THE COURT:  All right.  Thank you, sir.  So on behalf

23   of either or both of the other two defendants, although I'm

24   guessing you don't -- do you represent both of them?  I'm a

25   little bit confused.  Is there a default judgment against one

1    of the defendants?

2         MR. BERNSTEIN:  I only represent Defendant Taylor.

3    And Meredith Kotler, who's on as well from Freshfields, she

4    represents Parker Petit.

5         MS. KOTLER:  Good afternoon, your Honor.  I'll just

6    add that the two defendants made a joint motion to dismiss.

7    In the interest of time and efficiency, Mr. Bernstein made the

8    argument for both Mr. Petit and Mr. Taylor.  There's no

9    default judgment for either of them or anything like that.

10        THE COURT:  I just wanted to make sure I didn't miss

11   you earlier.  All right.  Mr. Bernstein, did you have anything

12   you wanted to say in reply?

13        MR. BERNSTEIN:  Yes, very briefly, your Honor, and I

14   want to start somewhere where I believe we have agreement with

15   Mr. Astley, which is on the *Janus* issue, the maker issue.

16   Mr. Astley does not -- he conceded earlier that for statements

17   for which they are not attributed to either Mr. Taylor or

18   Mr. Petit, those two cannot be held liable under the

19   securities laws.  He mentioned that perhaps MiMedx could be or

20   another defendant could be, which may be true, but as to at

21   least Mr. Petit and Mr. Taylor, they cannot be held liable.

22        I want to move very quickly to scienter once again.

23   I did not hear Mr. Astley talk about any of the pre-2016

24   allegations that would evidence scienter for any of the

25   alleged misrepresentations from the very early part of the

1   class period in 2013 all the way through 2016, any allegations

2   about what Mr. Petit or Taylor knew in 2013, 2014, 2015.

3          Again, I know from their briefing that the only thing

4   we've seen them reference is the Audit Committee's apparent

5   finding or alleged finding that the supposed improper dealing

6   with AvKARE was established as early as 2012.  But it doesn't

7   answer the question and there are no facts around that that

8   say that Mr. Petit or Mr. Taylor were aware that the

9   arrangement was improper or had any impact on how the

10  financials should be reported.

11         And then briefly with respect to the categories of

12  misrepresentations where they are simply inactionable as a

13  matter of law, starting with the generic growth statements,

14  plaintiff cites to *Luczak* for the proposition that generic

15  growth statements are actionable.  The Court didn't hold that,

16  your Honor.  The case has been discussed numerous times today.

17  The Court there simply said that the company's specific

18  statements that it was using a proprietary method to calculate

19  the company's growth was actionable because the company was

20  not, in fact, using those methods.

21         That's entirely distinguishable from the scenario

22  here where plaintiff is relying on generic statements such as

23  the one on page 185 of the complaint, paragraph 311, that,

24  quote, revenue growth was extremely solid.  That is a classic

25  generic statement that's mere puffery, and, therefore,

1  inactionable as a matter of law.

2         Moving on to the compliance statements, your Honor,

3  we respectfully submit that the law is that generic statements

4  touting adequate compliance are simply immaterial as a matter

5  of law regardless of their literal truth.  And --

6         THE COURT:  Before you -- let's stay right there then

7  for a second because you're actually still on it.  So if a

8  company had no growth and a person says that, a responsible

9  person, a CEO, whatever, says the growth that the company has

10  experienced is solid, would your argument be that that's not

11  actionable?  Because it's not a question of degree.  It's not

12  like how hot is the coffee.  It is, you know, white versus

13  black, you know.

14         MR. BERNSTEIN:  Your Honor, the statement about

15  growth being solid, I think, would still be inactionable as a

16  matter of law.  That doesn't mean that the plaintiffs wouldn't

17  have a claim.  They would have a claim that the numbers were

18  literally false, and they could base their claim on that.

19  It's just that the statement about growth being extremely

20  solid or great, that statement is just immaterial as a matter

21  of law because investors don't rely on those types of puffery

22  type statements.

23         THE COURT:  Well, has a Court said -- I mean, I

24  understand the distinction between puffery and facts, but is

25  there a case that says that investors don't rely on that?  I

1  mean, how would we know that unless -- is there some expert

2  testimony that says investors don't rely on general statements

3  of optimism?

4  　　　　MR. BERNSTEIN:  That's how the case law has

5  developed.  Courts have said over and over again that

6  statements of puffery, the reason they are inactionable is

7  because they are not the sorts of statements that an investor

8  would rely upon.

9  　　　　THE COURT:  Wouldn't that sort of be a fact -- I

10  mean, in my hypo wouldn't that be sort of an exception to

11  that?  I mean, if we have no growth, in fact, we have negative

12  growth and you're saying, well, the rate of our increase in

13  ourselves, in the growth of ourselves has been solid, I mean,

14  yeah, puffery if we're talking about hundred units increase

15  over the year before.  But if we're talking about losses

16  versus positive numbers, that seems a little bit different

17  than puffery because it's just an untrue characterization no

18  matter how you interpret it, it seems.

19  　　　　　I mean, I don't want to get bogged down on it.  We've

20  had a long day.  But I don't know that that's an

21  as-a-matter-of-law kind of statement that you're making

22  because I'm going to guess in every case it's a degree of how

23  good was it or how bad was it, not where we've got totally

24  opposite things, growth versus no growth.  You know what I'm

25  saying?

1          MR. BERNSTEIN:  I understand your point, your Honor.

2    I don't think it's an unfair point.  I think the law has

3    developed in a way that certain statements, regardless of

4    literal truth or not, are just inactionable as a matter of

5    law.  And you're certainly right, your Honor, that certain

6    statements are, I think, subject to more context type

7    evaluation, but certain statements are simply puffery as a

8    matter of law.  And statements talking about growth being

9    strong or great, those are the type of statements that Courts

10   have said are inactionable as a matter of law.

11         Moving finally to the physician-owned distributor

12   allegations, Mr. Astley seemed to claim that defendants

13   represented that physician-owned distributors or PODs were

14   nowhere in the distribution chain, but the very statements

15   that plaintiffs quote -- and this is in paragraph 329 of their

16   complaint -- are that, quote, we do not directly sell to or

17   distribute any of our products through PODs, closed quote, and

18   also that, quote, we sell to distributors and may have PODs

19   roped in, closed quote.

20         So the allegation or the statement, rather, by

21   defendants was not that there's no PODs involved anywhere in

22   the chain, in fact, quite to the contrary.  Defendants

23   disclosed that the relationship with PODs is not direct, which

24   I think implies there may be an indirect.  And, in fact, they

25   later say we sell to distributors and may have PODs roped in.

1  So those statements, your Honor, I believe also need to be

2  dismissed.

3         And so regardless of whether the Court adopts the

4  loss causation argument, which we believe is compelling and

5  requires dismissal of the entire action, for the reasons I

6  just discussed, certain allegations at least as to Mr. Petit

7  and Mr. Taylor, need to be dismissed regardless of the outcome

8  of the loss causation argument.

9         And with that, your Honor, unless your Honor has any

10  questions, we'll rest.

11         THE COURT:  All right.  Thank you, sir.  All right.

12  So that's going to end our hearing.  We're not going to do

13  another round of it.

14         But as it relates to timing, my understanding would

15  be that I need to rule on the pending motions by the end of

16  March given that all of these motions are subject to a

17  six-month report.  So that's a short way or a long way maybe

18  of telling you that I am going rule by the end of March -- so

19  I can't tell you exactly when -- and maybe the very end of

20  March.  But at some point in the next 45 days or less, I

21  guess, than that -- today is what, the 23rd?  So in the next

22  five weeks I'm going to rule on the motion.

23         I will also tell you that, you know, what I'm going

24  to do today is I'm going to spend a little bit more time going

25  back and reading *Meyer* and *National Beverage* and that when I

1  go to rule, I will only rule on what I have to rule on.  So if

2  the case is decided based on proximate cause related to the

3  damages that are claimed, if I, in other words, rule against

4  the plaintiff on that, that will end the inquiry.  I will not

5  rule on the other things.

6      Part of that is a question of timing, that I have a

7  limited amount of time to delve into the specific allegations

8  that are included in the complaint.  I recognize that that's

9  somewhat of a shortfall and in case if I do rule that way and

10  I were to be reversed, then I'll have to go back and revisit

11  that.  But from a time limitation standpoint, that's what I'm

12  going to do, and, also, it's just my general philosophy.  I

13  follow Justice Roberts' admonition to judges that we should

14  rule on what we have to rule on and nothing more.  And so

15  that's where we may find ourselves depending on how I come

16  down on the issue of causation.

17      If I don't rule the defendants' way on the issue of

18  causation, then I will obviously jump into the substantive

19  allegations against each defendant.

20      In any event, if there are no other questions, is

21  there anything else out there pending for me to rule on that

22  would be subject to the requirement, the six-month

23  requirement?  I'm not aware of anything as I sit here today,

24  but I'm seeing some shaking of the heads.  Okay.  All right.

25      Well, I'm sure y'all didn't plan on being with us as

1  long as we've been together.  I didn't necessarily plan on it

2  either, but, in any event, I hope you have a good rest of your

3  day and good evening.  Thank you.

4          (Whereupon, the proceedings were adjourned at 2:40

5  p.m.)

6                          -  -  -

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
1                    REPORTERS CERTIFICATE

2

3

4          I, Wynette C. Blathers, Official Court Reporter for

5   the United States District Court for the Northern District of

6   Georgia, with offices at Atlanta, do hereby certify:

7          That I reported on the Stenograph machine the

8   proceedings held in open court on February 23, 2021, in the

9   matter of In Re:  MIMEDX GROUP, INC. SECURITIES LITIGATION,

10  Case No. 1:18-CV-00830-WMR; that said proceedings in

11  connection with the hearing were reduced to typewritten form

12  by me; and that the foregoing transcript (Pages 1 through 134)

13  is a true and accurate record of the proceedings.

14         This the 11th day of March, 2021.

15

16

17

18                          _____
                        /s/ Wynette C. Blathers, RMR, CRR
19                          Official Court Reporter

20

21

22

23

24

25
```