**IN THE UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| In Re MIMEDX GROUP, INC.<br>SECURITIES LITIGATION<br><br>This Document Relates to:<br>ALL ACTIONS | CIVIL ACTION FILE<br>NO. 1:18-cv-00830-WMR<br><br>CLASS ACTION |

**ORDER**

This case comes before the Court on Defendant MiMedx Group, Inc.'s Motion to Dismiss [Doc. 139], Defendant Michael Senken's Motion to Dismiss [Doc. 140], Defendant Cherry Bekaert, LLP's Motion to Dismiss [Doc. 142], and Defendants Parker H. Petit and William C. Taylor's Motion to Dismiss [Doc. 143]. Upon consideration of the parties' arguments, controlling authority, and all appropriate matters of record, the Court rules that the Defendants' respective Motions to Dismiss are **GRANTED** for the reasons set forth below.

## I. BACKGROUND

MiMedx, a Florida corporation with its principal place of business located in Marietta, Georgia, is a biomedical company that designs and markets products used

to treat inflammation, minimize scar tissue, and enhance healing in patients suffering from a variety of injuries. (Doc. 122 at 28 ¶27, and 32-33 ¶38).

The Lead Plaintiff in this action, Carpenter Pension Fund of Illinois (hereinafter "CPFI" or "Lead Plaintiff"), bought and sold MiMedx common stock between August of 2017 and February of 2018. (Doc. 123-20). Specifically, CPFI purchased 41,080 shares of MiMedx common stock in 3 separate transactions between August and October of 2017.[1] (*Id*. at 4). Subsequently, CPFI sold its 41,080 MiMedx shares in two transactions in December of 2017. CPFI then reinvested in MiMedx by purchasing 39,200 shares of common stock on January 16, 2018, and it sold all of those shares on February 26, 2018. (*Id*.)

A few days before CPFI ultimately sold all of its shares of MiMedx stock, Mimedx had announced that it was postponing the release of its financial results for the fiscal year 2017 pending the completion of an Audit Committee investigation into the company's sales and distribution practices. (Doc. 122 at 17 ¶13). In June 2018, several months after CPFI had sold its shares of stock, MiMedx announced that its reported financial results for fiscal years 2012 to 2016 and the first three quarters of 2017 could no longer be relied upon, and that it would be restating those

[1] CPFI purchased 38,420 shares on August 14, 2017; 2,500 shares on October 23, 2017; and 340 shares on October 24, 2017.

financial statements. (*Id.* at ¶14). MiMedx completed this work and issued the restatement of its past financial results in March 2020. (*Id.* at 19-20 ¶19).

On March 30, 2020, CPFI, as the Lead Plaintiff, filed the Second Amended Complaint ("SAC") asserting claims for violations of Section 10(b) of the Exchange Act and SEC Rule 10b-5 thereunder, alleging that Defendants engaged in fraudulent and improper accounting, sales, and distribution practices, including a massive "channel stuffing" scheme, which caused MiMedx's financial results for fiscal years 2012 to 2016 and the first three quarters of 2017 to be materially misstated. Lead Plaintiff further alleges that this fraudulent conduct was intended to artificially inflate the market price of the stock, which in turn induced the CPFI and others to purchase or otherwise acquire the stock at the artificially inflated price. (Doc. 122 at 421-434, Counts I-III). These allegations are bolstered by hundreds of pages of evidentiary support drawn from MiMedx's Audit Committee investigation. (*See generally* Doc. 122).[2]

In the SAC, the Lead Plaintiff further alleges that, when the truth about Defendants' fraudulent conduct was revealed, "the price of MiMedx stock quickly

[2] MiMedx ultimately uncovered a scheme designed to inflate quarterly revenues and was forced to restate several years of financial statements and terminate Petit, Senken, Taylor, and Cranston (the officers and employees found to be responsible for the fraud by MiMedx's investigation). (Doc. 122 at ¶¶14-19).

plummeted as the artificial inflation was removed and Lead Plaintiff and the Class were damaged, suffering true economic loss." (Doc. 122 at 410-411 ¶¶ 576-577). According to the SAC, the truth about Defendants' fraudulent conduct was allegedly revealed through a series of "partial corrective disclosures" which resulted in statistically significant declines in the stock's price over time. (*Id*. at 404-409 ¶ 573). Specifically, the SAC identifies twenty-two "partial disclosures" between December 31, 2014, and December 5, 2018, that allegedly corrected the artificially inflated price of MiMedx's stock. (*Id*.) However, seven of the identified partial disclosures came after the Lead Plaintiff (CPFI) sold all its shares of stock on February 26, 2018. (*See* Doc. 122 at 408-409; Doc. 123-20 at 4).

The Lead Plaintiff alleges that the investment losses that it suffered in December 2017 and February 2018—when CPFI sold its shares of MiMedx stock—were specifically the result of the partial disclosures revealing Defendants' fraudulent conduct and that the losses were not the result of any changes in market conditions, macroeconomic or industry factors, or any other factors unrelated to that conduct. (Doc. 122 at 405 ¶ 573 n. 684, 409 ¶ 574).

## II. <u>LEGAL STANDARD</u>

To survive a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief

that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp v. Twombly, 550 U.S. 544, 570 (2007)). Upon a motion to dismiss, the Court must accept all of the factual allegations in the complaint as true. Twombly, 550 U.S. at 555. However, the Court is not bound to accept as true legal conclusions couched as factual allegations. Id. Legal conclusions may provide the framework of a complaint, but "they must be supported by factual allegations." Iqbal, 556 U.S. at 679. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statement, do not suffice." Id. at 678. While the Plaintiff need not provide detailed factual allegations to survive dismissal, the complaint must contain "either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory." Financial Security Assurance, Inc. v. Stephens, Inc., 500 F.3d 1276, 1282-1283 (11th Cir. 2007) (internal quotations omitted).

To state a claim under Section 10(b), a plaintiff must adequately allege each requisite element: "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." Stoneridge Investment Partners, LLC v. Scientific-Atlanta, Inc., 552 U.S. 148, 157 (2008) (citing Dura Pharms., Inc. v.

Broudo, 544 U.S. 336, 341-42 (2005)). If any single element is not sufficiently pled, a Section 10(b) claim must be dismissed. In addition, securities fraud complaints are subject to the heightened pleading requirements of the Private Securities Litigation Reform Act of 1995 (PSLRA). See Dura, 544 U.S. at 345-346 (explaining that the PSLRA makes clear that it was Congress' intent to permit private securities fraud actions for recovery only where plaintiffs adequately allege and prove the traditional elements of causation and loss). The PSLRA provides that Plaintiff "shall have the burden of proving that the act or omission of the defendant alleged to violate" the Securities Exchange Act of 1934 ("Exchange Act") "caused the loss for which the plaintiff seeks to recover damages." 15 U.S.C. § 78u-4(b)(4).

## III. DISCUSSION

To have standing to bring a claim against Defendants, Lead Plaintiff must plausibly allege "a 'causal connection' between [its] injury and the challenged action of the [Defendants]." Lewis v. Governor of Ala., 944 F.3d 1287, 1296 (11th Cir. 2019) (*en banc*). Likewise, to show loss causation, which is an essential element of a Section 10(b) claim, Lead Plaintiff "must offer proof of a causal connection between the misrepresentation and the investment's subsequent decline in value." Meyer v. Greene, 710 F.3d 1189, 1195 (11th Cir. 2013) (quotations and citation omitted). Lead Plaintiff may not establish loss causation by "simply alleging a

security was purchased at an artificially inflated price." Kinnett v. Strayer Educ., Inc., 501 F. App'x 890, 892 (11th Cir. 2012) (*per curiam*) (citing Dura Pharms., Inc., 544 U.S. at 342-43). Rather, Lead Plaintiff must prove not only that a fraudulent misrepresentation artificially inflated the value of MiMedx's stock, but also that the fraud-induced inflation that was "baked into" the purchase price was subsequently removed from the stock's price upon the revelation of the fraud, often referred to as a "corrective disclosure," thereby causing losses to Plaintiff. Meyer, 710 F.34d at 1195 (quotations and citations omitted).

Here, as will be discussed more fully below, Lead Plaintiff cannot establish loss causation because CPFI sold all of its MiMedx stock before any corrective disclosure "reveal[ed] to the market the falsity of a prior misstatement." Meyer, 710 F.3d at 1200 (quotations and citation omitted). For the same reason, Lead Plaintiff lacks standing because it has failed to state a plausible claim for relief under Section 10(b) as there is no causal connection between its investment losses and the alleged misstatements. Dura, 544 U.S. at 342-343.

### A. There Were No Corrective Disclosures Before the Plaintiffs Sold Their Stock on February 26, 2018

The SAC alleges that there were 15 "partial disclosures" of the alleged fraud conduct before Plaintiff sold all of its MiMedx stock on February 26, 2018. (Doc. 122 at 405-407 ¶573). These "partial disclosures" fall into three categories:

(1) allegedly misleading disclosures; (2) news articles and analyst reports, and (3) lawsuit and investigation announcements. The Court finds that none of these "partial disclosures" were corrective as a matter of law.

**1. Allegedly Misleading Corrective Disclosures**.

Lead Plaintiff argues that three of the "partial disclosures" (occurring on October 13, 2015, April 10, 2016 and November 20, 2017, respectively) were corrective disclosures because they essentially "revealed the truth of the fraud" even though they "were accompanied by misstatements and omissions that obfuscated the true revelations or otherwise misled investors about the true extent of the fraud." (Doc._152 at 52; *see also* Doc. 122 at 125 ¶¶ 182-183, at 126-27 ¶ 187, at 151 ¶¶ 233-234). Despite Lead Plaintiff's argument to the contrary, the Court finds that Lead Plaintiff is essentially relying on the disclosures to be both misstatements *and* corrective. (Doc. 152 at 52). Lead Plaintiff "cannot have it both ways" and "simultaneously argue that [a] misstatement itself constituted a corrective disclosure." In re Flag Telecom Holdings, Ltd. Sec. Litig., 574 F.3d 29, 41 (2d Cir. 2009); see also Dura, 504 U.S. at 343-345 (discussing how disclosures either inflate the stock's price or remove the inflation). If these disclosures were intended to mislead the investors by explaining away the decline in the stock price in order to conceal the fraud and maintain investor confidence, as Lead Plaintiff contends, the

Court cannot understand how the same alleged misrepresentations can constitute corrective disclosures of the underlying fraud. A corrective disclosure "reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud." FindWhat Investor Grp. v. FindWhat.com, 658 F.3d 1282, 1311 (11th Cir. 2011). Here, these disclosures did not reveal the pertinent truth regarding Defendants alleged fraudulent conduct. Thus, the Court finds that these three "partial disclosures" cannot be corrective, as a matter of law. See In re Flag Telecom, 574 F.3d at 41; Meyer, 710 F.3d at 1200 ("a corrective disclosure must reveal to the market the falsity of a prior misstatement").

**2. News Articles and Analyst Reports**

The SAC also identifies seven analyst reports or articles as partial disclosures. (Doc. 122 at 406-407 ¶573). These reports and articles, however, only repeated information that was already in the public domain.

- The Viceroy Research Group's reports provide a disclaimer which states that "This report and any statements made in connection with it are the authors' opinions, which have been based upon publicly available facts[.] … You can access any information or evidence cited in this report of that we relied on to write this report from information in the public domain. … [A]ll information contained herein ... has been obtained from public sources ... who are not insiders or connected persons of the stock covered herein." (Doc. 123-21 at 3; Doc. 123-42 at 3).

- The Aurelius Value reports provide a disclaimer which states that "This report is based on information reasonably available to the author[.]" (Doc. 123-29 at 2; Doc. 123-30 at 2). Further, the Marcus Aurelius Value website provides a disclaimer in its "terms of service" which states that "all information contained in his reports ... has been obtained from public sources" and "he has not obtained information from persons who are insiders or connected persons of the stock covered[.]"[3]

- Citron's report was based on information obtained from opinion articles available on public websites, including Aurelius Value. (Doc. 123-39; Doc. 123-40).

- The First Analysis (Munda) reports were based on MiMedx's public filings and statements, market analyses, and information obtained through other publicly available sources. (Doc. 123-37; Doc. 123-38).

The fact that the information contained in the analyst reports were obtained from publicly available sources is fatal to Lead Plaintiff's claim of loss causation because a corrective disclosure "must disclose *new* information." Meyer, 710 F.3d at 1198 (emphasis in original). Although the opinions of the authors of the reports and their investigative results may be new, the "mere repackaging of already-public information by an analyst … is simply insufficient to constitute a corrective disclosure." Id. at 1199. Thus, the Court finds that the above reports cannot be

---

[3] *Terms of Service*, MARCUS AURELIUS VALUE (last visited March 24, 2021), http://www.mavalue.org/terms-of-service/.

considered as corrective disclosures because they are based on information that was already available to the public.

**3. Lawsuits and Investigations**

The remaining partial disclosures consist of announcements of (i) a lawsuit by former employees, (ii) government investigations, and (iii) MiMedx's own internal investigation. (Doc. 122 at 407-409 ¶ 573). However, the Eleventh Circuit has made clear that such announcements, without more, are not corrective disclosures because they do not "reveal to the market that a company's previous statements were false or fraudulent." Meyer, 710 F.3d at 1201. "The announcement of an investigation reveals just that—an investigation—and nothing more." Id. (citations omitted). Although stock prices may fall as a result of such announcements, they do not reveal to the market that a company's previous statements were false or fraudulent. Rather, the resulting decline in stock prices "is because the investigation [or lawsuit] can be seen to portend an added *risk* of future corrective action." Id. (emphasis in original).

Plaintiff argues that these announcements were corrective because they were "followed by related disclosures that further informed investors of Defendants' actual wrongdoing."[4] (Doc. 152 at 47). Plaintiff's cites a footnote in Meyer, which

[4] Plaintiffs argument rests chiefly on an unpublished per curiam opinion issued by the Eleventh Circuit, Luczak v. National Beverage Corp., 810 F. App'x 915 (11th Cir. 2020) (per curiam). In Luczak, the SEC issued a public letter concluding that National Beverage

hypothesized in *dicta* that "[i]t may be possible, in a different case, for the disclosure of an SEC investigation to qualify as a partial corrective disclosure . . . when the investigation is coupled with a later finding of fraud or wrongdoing." Meyer, 710 F.3d at 1201 n.13. However, the Eleventh Circuit has yet to hold that a lawsuit or investigation announcement can be considered, retroactively, as a corrective disclosure upon a later finding of fraud or wrongdoing. This Court declines to do so in this case. Therefore, the Court rules that the announcements regarding (i) the lawsuit by former employees, (ii) the government investigations, and (iii) the Company's own internal investigation cannot be considered corrective disclosures

made inconsistent statements regarding particular performance metrics. Id. at 918. Subsequently, the *Wall Street Journal Article* reported that National Beverage declined to provide the figures regarding the metrics to the SEC. Id. The Eleventh Circuit held that the SEC letter and the *Wall Street Journal* article both qualified as corrective disclosures. Id. at 922-923. While these circumstances make for a compelling argument, it appears that the holding in Luczak is somewhat inconsistent with the holding in Meyer. Furthermore, Luczak is not binding on this Court, but this Court is bound by the Eleventh Circuit's decision in Meyer.

because they only reveal the risk of a future corrective disclosure and are not corrective themselves.[5] [6]

Lastly, Lead Plaintiff also argues that loss causation is sufficiently alleged under the theory that Defendants' partial disclosures concealed a foreseeable risk that ultimately materialized in the revelation of the fraudulent conduct. (Doc. 152 at 48, n.40). This basis for establishing the loss causation element has been referred to by courts in other circuits as the "materialization of the concealed risk" theory of loss causation. Lentell v. Merrill Lynch & Co., 396 F.3d 161, 173 (2d Cir.2005); see also Ray v. Citigroup Global Mkts., Inc., 482 F.3d 991, 995 (7th Cir.2007). However, the Eleventh Circuit "has never decided whether the materialization-of-

[5] Lead Plaintiff also argues that the December 15, 2016, lawsuit announcement "was not limited to an investigation announcement." (Doc. 152 at 55, n.46.) Plaintiff, however, sold its MiMedx stock prior to December 15, 2016, and then repurchased MiMedx stock following the announcement of the lawsuit. (Doc. 123-20 at 4). By that time the market had already reacted to the announcement, so the Plaintiffs cannot establish standing or plead loss causation based on this announcement because the alleged artificial inflation was removed while the Plaintiffs were not stockholders. FindWhat, 658 F.3d at 1310.

[6] The Court also rejects Lead Plaintiff's alternative argument that the February 20, 2018, "partial disclosure" is corrective because it disclosed that MiMedx was postponing the release of its financial results in addition to announcing the investigation. (Doc. 152 at 53-54). Just like the announcement of an investigation, the withholding and audit of a company's financial results reveals only that the records are being reviewed—nothing more. Although the stock's price may decline because there is a *risk* that the records may need to be restated, the announcement of the withholding of the financial results for auditing purposes is not a corrective disclosure itself.

concealed-risk theory may be used to prove loss causation in a fraud-on-the-market case." Hubbard v. BankAtlantic Bancorp, Inc., 688 F.3d 713, 726 n.25 (11th Cir. 2012). This Court declines to do so here.

As Lead Plaintiff has failed to sufficiently allege that a corrective disclosure of the fraud resulted in the decline of the stock price before it sold the stock, Lead Plaintiff cannot establish the loss causation element of its Section 10(b) claim. Therefore, Lead Plaintiff has failed to state a claim upon which relief may be granted.

**B. Plaintiffs Cannot Establish Standing to Bring This Action**

To establish standing to sue, a plaintiff must satisfy three criteria: (i) the plaintiff must have suffered an injury in fact in relation to a legally protected interest; (ii) the plaintiff must show a causal connection between the injury and the challenged action of defendant; and (iii) the plaintiff must show it is likely, not merely speculative, that a favorable judgment will redress the injury. Lujan v. Defs. Of Wildlife, 504 U.S. 555, 560-61 (1992).

In class actions, named plaintiffs must establish individual standing to survive a motion to dismiss. "[A] plaintiff cannot include class action allegations in a complaint and expect to be relieved of personally meeting the requirements of constitutional standing, even if the persons described in the class definition would

have standing themselves to sue." A&M Gerber Chiropractic LLC v. Geico Gen. Ins. Co., 925 F.3d 1205, 1211 (11th Cir. 2019) (citing Griffin v. Dugger, 823 F.2d 1476, 1482-83 (11th Cir. 1987)). Furthermore, "[a] named plaintiff in a class action who cannot establish the requisite case or controversy between himself and the defendants simply cannot seek relief for anyone—not for himself, and not for any other member of the class." Id.

Here, the key issue is the causation element of standing. To establish loss causation in a Section 10(b) claim – i.e., to fairly trace Lead Plaintiff's injury to the Defendants' alleged fraudulent conduct – Lead Plaintiff must sufficiently allege, *inter alia*, that the fraud-induced inflation that was baked into the purchase price of the MiMedx stock was subsequently removed from the stock's price by a corrective disclosure, thereby causing the loss. Meyer, 710 F.3d at 1195. If a shareholder claims that its investment losses were caused by alleged misrepresentations that inflated a company's stock price, but the investor sells the shares before the pertinent truth regarding the misrepresentations is revealed through a corrective disclosure, then the losses are not attributable to the misrepresentations. Id.; see also Dura, 544 U.S. 336, 342 ("[I]f … the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss"). It is not until "the wool is eventually pulled from the market's eyes and the truth becomes

known about the company's misrepresentation" and there is "a decline in stock price in reaction to the revelation" that the investor suffers a compensable injury "caused by the fraud." Meyer, 710 F.3d at 1196.

This conclusion flows naturally from the efficient market theory that Lead Plaintiff relies upon to plead its case. (Doc. 122 at 413-416 ¶¶ 581-588). By invoking the efficient market theory, Plaintiff asks this Court to presume that the market rapidly and efficiently translates public information into the security's price. FindWhat, 658 F.3d at 1310 (11th Cir. 2011). This allows the Court to presume that the market price of MiMedx's stock reflected the alleged misrepresentations of the Defendants, causing the stock price being artificially inflated. Id. However, "[t]he efficient market theory ... is a Delphic sword: it cuts both ways." Meyer, 710 F.3d at 1198. The market will only cease to attribute the artificial inflation to the stock's price when the truth is finally revealed. FindWhat, 658 F.3d at 1315. Thus, unless there is a corrective disclosure that "reveal[s] to the market the falsity of [a] previous misstatement[]," the alleged "fraud-induced inflation is still priced into the shares," and any "drop in price is wholly unrelated to the [alleged] misrepresentations." Meyer, 710 F.3d at 1196-1197.

Here, the Court finds that there were no corrective disclosures prior to the date Plaintiff sold all of its MiMedx common stock. Therefore, Plaintiff's

investment losses are not fairly traceable to the alleged misrepresentations because the artificial inflation caused by the misrepresentations was still "baked into" the stock's price when the Plaintiff sold its stock and, thus, the loss suffered by the Plaintiff is "wholly unrelated to the [alleged] misrepresentation[s]." Meyer, 710 F.3d at 1196. As there is no causal connection between Lead Plaintiff's loss and the challenged conduct of Defendants, the Court finds that Lead Plaintiff lacks standing to pursue this action against MiMedx and the individual Defendants.

## IV. CONCLUSION

For the foregoing reasons, IT IS HEREBY ORDERED as follows:

- Defendant MiMedx Group Inc.'s Motion to Dismiss the Second Amended Complaint for Failure to State a Claim [Doc. 139] is **GRANTED**;

- Defendant Michael Senken's Motion to Dismiss the Second Amended Complaint for Failure to State a Claim [Doc. 140] is **GRANTED**;

- Defendant Cherry Bekaert, LLP's Motion to Dismiss the Second Amended Complaint for Failure to State a Claim. [Doc. 142] is **GRANTED**; and

- Defendants Parker H. Petit and William C. Taylor's joint Motion to Dismiss the Second Amended Complaint for Failure to State a Claim [Doc. 143] is **GRANTED**.

IT IS SO ORDERED, this 25th day of March, 2021.

William M. Ray II

WILLIAM M. RAY, II
UNITED STATES DISTRICT JUDGE