# EXHIBIT A

**Subject:**       FW: In re MiMedx Group, Inc. Securities Litigation, No. 1:18-cv-00830-WMR
**Attachments:**   Proposed Order MTD SAC [FINAL].pdf

**From:** Andrew Rees
**Sent:** Monday, February 22, 2021 1:14 PM
**To:** 'sherri_lundy@gand.uscourts.gov' <sherri_lundy@gand.uscourts.gov>
**Cc:** 'Jennifer Lee' <Jennifer_Lee@gand.uscourts.gov>; 'Long, Robert' <Robert.Long@alston.com>; 'Fitzmaurice, Tim' <Tim.Fitzmaurice@alston.com>; 'eric.bruce@freshfields.com' <eric.bruce@freshfields.com>; 'billweinreb@quinnemanuel.com' <billweinreb@quinnemanuel.com>; 'cmcintyre@mcguirewoods.com' <cmcintyre@mcguirewoods.com>; 'Silpa Maruri' <silpamaruri@quinnemanuel.com>; 'LGreenstein@mcguirewoods.com' <LGreenstein@mcguirewoods.com>; 'npittman@mcguirewoods.com' <npittman@mcguirewoods.com>; 'hfellows@fellab.com' <hfellows@fellab.com>; 'Michael Gretchen' <mgretchen@fellab.com>; 'Carlson, Walter C.' <wcarlson@sidley.com>; 'Greaney, Isaac' <igreaney@sidley.com>; 'Jesse Bernstein' <jessebernstein@quinnemanuel.com>; Darren Robbins <DarrenR@rgrdlaw.com>; Stephen Astley <sastley@rgrdlaw.com>; Jack Reise <jreise@rgrdlaw.com>; Elizabeth Shonson <eshonson@rgrdlaw.com>; 'John Herman' <jherman@hermanjones.com>; Art Leahy <ArtL@rgrdlaw.com>; Bailie Heikkinen <bheikkinen@rgrdlaw.com>; Hillary Stakem <HStakem@rgrdlaw.com>; 'ajkaplan@sidley.com' <ajkaplan@sidley.com>
**Subject:** In re MiMedx Group, Inc. Securities Litigation, No. 1:18-cv-00830-WMR

Dear Ms. Lundy,

Pursuant to the Court's Notice of Hearing dated December 21, 2020 [Doc. 171], attached please find Lead Plaintiff's Proposed Order on the Motions to Dismiss pending in the above action.

Best regards,
Andrew

**Andrew T. Rees**

Robbins Geller
Rudman & Dowd LLP

120 East Palmetto Park Road, Suite 500
Boca Raton, FL 33432
(561) 750-3000



UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | | |
|---|---|---|
| In re MIMEDX GROUP, INC. SECURITIES LITIGATION | ) ) ) | Case No. 1:18-cv-00830-WMR |
| | ) | <u>CLASS ACTION</u> |
| | ) | |
| This Document Relates To: | ) ) | |
| ALL ACTIONS. | ) ) | |
| | ) | |

**[PROPOSED] ORDER DENYING DEFENDANTS'
MOTIONS TO DISMISS LEAD PLAINTIFF'S
<u>SECOND AMENDED CONSOLIDATED COMPLAINT</u>**

This is a federal securities fraud class action brought by Lead Plaintiff Carpenters Pension Fund of Illinois ("Plaintiff")[1] against Defendants MiMedx Group, Inc. ("MiMedx" or "Company"); Parker H. Petit ("Petit"), the former Chief Executive Officer ("CEO"), President, and Chairman of the Board of Directors of MiMedx; William C. Taylor ("Taylor"), the former Chief Operating Officer, President, and Director of MiMedx; Michael J. Senken ("Senken"), the former Chief Financial Officer ("CFO") of MiMedx (collectively, "MiMedx Defendants"); and Cherry Bekaert LLP, formerly known as Cherry Bekaert & Holland, L.L.P. ("Cherry"), the former external auditor of MiMedx (together with the MiMedx Defendants, "Defendants").  The operative complaint in this action is Plaintiff's Second Amended Consolidated Complaint for Violations of the Federal Securities Laws filed on March 30, 2020 (Doc. 122) ("SAC"), which alleges violations of Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b-5 promulgated thereunder, and Section 20(a) of the Exchange Act.

Before the Court are Defendants' Motions to Dismiss the SAC.  Docs. 139-140, 142-143.  The Motions to Dismiss have been fully briefed and the Court heard

---

[1]   Plaintiff was appointed to serve as Lead Plaintiff in this action by Order of the Court dated January 16, 2019.  Doc. 42.

1

the parties' oral argument on February 23, 2021.[2]  For the reasons set forth below, the Motions to Dismiss are DENIED.

## I.    BACKGROUND

Defendant MiMedx is a Florida corporation with its principal place of business in Marietta, Georgia, whose common stock publicly traded on the NASDAQ under the ticker symbol "MDXG."  ¶27.[3]  MiMedx is a biomedical company that designs, manufactures, and sells products derived from human placental tissues that are intended to enhance healing and minimize scar tissue formation.  ¶38.

During the Class Period (March 7, 2013 through June 29, 2018), Defendants are alleged to have engaged in improper sales and distribution practices and a fraudulent revenue recognition scheme to artificially inflate the Company's sales, achieve revenue guidance, and maintain the appearance of consistent growth.  ¶¶44-135.  The Company trained its sales force to engage in illicit sales practices to generate revenue, such as guaranteeing reimbursements and manipulating charitable

---

[2]    On February 22, 2021, the Court issued an Order (Doc. 181) denying the MiMedx Defendants' Motion to Strike the SAC (Doc. 138), finding it was without merit.

[3]    The facts summarized herein are taken from the SAC.  Unless noted otherwise, all references to "¶__," "¶¶__," "SAC §," or "SAC Ex." contained herein are to the SAC or exhibits filed therewith.

contributions in violation of federal law.  ¶¶44-63, 73-77.  Defendants also relied on close relationships with government distributor AvKARE, Inc. ("AvKARE") and commercial distributors CPM Medical, Inc. ("CPM"), SLR Medical Consulting, LLC ("SLR"), Stability Biologics ("Stability"), and First Medical to provide much needed revenue injections at the end of quarters.  ¶¶64-135.  MiMedx depended on them to take significant quantities of often-unneeded product at quarter-end to inflate the Company's sales and revenues.  *Id.*  In return, MiMedx provided them with highly favorable, off-book terms, including reduced prices, special financing, and lax return policies.  *Id.*  Defendants disregarded revenue recognition rules and manipulated the timing and recognition of revenue in violation of Generally Accepted Accounting Principles ("GAAP").  *Id.*; ¶¶381-462.

Through Defendants' alleged fraudulent scheme, the Company was able to meet or exceed revenue guidance in all but one quarter during the Class Period.  ¶¶2, 135, 486.  MiMedx grew from a relatively small skin-graft manufacturer with less than $1,000 in revenue to be named the fifth-fastest growing public company in America by *Fortune* magazine.  ¶¶1-2, 39.  MiMedx reported 2016 annual revenue of more than $245 million, an increase of approximately 3,000% over 2011.  ¶2.

As the alleged fraud grew during the Class Period, employees at MiMedx raised concerns with Petit, Taylor, and Senken (collectively, "Individual

Defendants") and other senior executives.  *See, e.g.*, ¶¶136-156.  This included the Company's Controller (Chief Accountant), Mark Andersen ("Andersen"), who challenged the effectiveness of the Company's internal controls, as well as revenue recognition for the Company's largest distributors (AvKARE, SLR, Stability, and First Medical).  ¶141.  Cherry, a certified public accounting firm that had served as MiMedx's external auditor since 2008, was informed of Andersen's complaint by Senken while engaged in MiMedx's 2015 audit.  ¶145.  Petit, Taylor, and Senken provided Cherry with a memo contradicting Andersen's claims.  ¶526.  Cherry did not meet with Andersen or independently look into his concerns, instead accepting management's denials.  ¶¶147, 528.  Once Cherry received a management representation letter (which Andersen had refused to sign), Cherry issued a clean audit report as to MiMedx's fiscal year 2015 ("FY15") financial statements and internal controls over financial reporting.  ¶¶526, 529.

The Individual Defendants removed Andersen and other employees who came forward, some of whom filed whistleblower complaints against them.  *See, e.g.*, ¶¶136-156.  Additionally, third-party news organizations and stock analysts began to reveal the improper sales and revenue recognition practices at MiMedx.  In response, Defendants covered up the fraud by denying wrongdoing and removing and suing whistleblowers.  ¶¶138, 145-146, 153-154, 156.  Facing intensifying

scrutiny, the Company replaced Cherry with Ernst & Young LLP ("EY") on August 4, 2017. ¶¶164-168. Not long after, EY raised serious questions over the Company's revenue recognition with respect to distributor AvKARE, Inc. ("AvKARE") and the adequacy of two Audit Committee investigations ("ACI" and "ACII") into the Company's accounting practices and refused to complete its audit until another internal investigation into such allegations was complete. *Id.*

On February 20, 2018, MiMedx announced that it was postponing the release of its financial results for fiscal year 2017 ("FY17") due to the launch of a third investigation ("ACIII"), which MiMedx described as "an internal investigation into current and prior-period matters relating to allegations regarding certain sales and distribution practices at the Company," including "the accounting treatment of certain distributor contracts." ¶238. ACIII was conducted with assistance from independent counsel (King & Spalding LLP) and an independent auditor (KPMG LLP) and included the review of over 1.5 million documents, significant amounts of other data, 2,750 hours of video, and interviews with over 85 witnesses, many of them multiple times. ¶¶21, 243.

On June 7, 2018, MiMedx revealed ACIII's conclusion that the reported financial results for fiscal years 2012 ("FY12") through 2016 ("FY16"), all interim periods therein, and the first three quarters of FY17 could no longer be relied upon

and should be restated due to improper revenue recognition practices ("Restatement"). ¶¶265-268, 382. On the same day, the Company announced that Senken and Controller John Cranston ("Cranston") had left the Company. ¶267. Thereafter, on July 2, 2018, the Company disclosed that Petit and Taylor had also left MiMedx. ¶269. On September 20, 2018, MiMedx announced that the departures of Petit, Taylor, Senken, and Cranston were terminations "for cause" because they "engaged in . . . conduct detrimental to the business or reputation of the company." ¶279.

MiMedx then disclosed on November 7, 2018 that it must conduct an assessment of revenue recognition for "all of the Company's sales" dating back to 2012, which would prolong the preparation of the Restatement, and that it had received a delisting notification from NASDAQ. ¶283.

On December 5, 2018, MiMedx revealed that EY had resigned as auditor and that the Company had expanded the scope of the Restatement. ¶¶285-291. Two days later, the Company elaborated on EY's noisy withdrawal, explaining that, among other things, "internal controls necessary for the Company to develop reliable financial statements do not exist," EY could not rely on management representations, the Company needed to significantly expand the scope of its audit due to the lack of internal controls, "material allegations of noncompliance with laws and regulations,"

and "the findings to date from the independent investigation conducted by the Audit Committee into these allegations."  ¶292.

On May 23, 2019, MiMedx released a summary of ACIII findings. ¶294. ACIII found "extensive misconduct" and "evidence of material wrongdoing" by the Individual Defendants, including premature and improper revenue recognition through AvKARE and other distributors and "material misstatements and omissions" related to such misconduct. *See, e.g.*, ¶¶275(c), 294.  On July 1, 2019, MiMedx disclosed that ACIII was corroborated by MiMedx's Special Litigation Committee ("SLC") following a year-long investigation.  ¶¶296-297.

Then, on November 26, 2019, the United States Securities and Exchange Commission ("SEC") announced the commencement of a securities fraud action against the MiMedx Defendants (now settled against the Company), alleging that they engaged in a fraudulent scheme, knowingly inflated the Company's revenue, and made false and misleading statements to deceive shareholders as to the Company's true financial performance during the Class Period.  ¶¶302-304.  On the same day, the United States Department of Justice ("DOJ") announced that both Petit and Taylor had been indicted for criminal securities fraud offenses, carrying penalties of up to 20 years in federal prison.  ¶¶305-307.

On March 17, 2020, the Restatement was issued, correcting almost every

financial account on MiMedx's balance sheets and income statements filed during the Class Period.  ¶¶308, 385-391, 440-460, 480.  The Company confirmed that it had prematurely recognized revenue on all sales dating back to 2012, which approximated $870 million.  ¶¶308, 391, 480.  The Restatement also revealed that from fiscal years 2014 ("FY14") through FY16, MiMedx had overstated its net income by 144%, diluted earnings per share by 143%, and accounts receivable by approximately $146 million, and absent the alleged fraud, the Company would have missed its revenue guidance in each of FY14 through FY16.  ¶¶394, 397.

On November 19, 2020, Petit and Taylor were both convicted of criminal securities fraud charges.[4]  Petit was convicted of securities fraud and Taylor was convicted of conspiracy to:  (1) commit securities fraud; (2) make false filings with the SEC; and/or (3) mislead MiMedx's auditors.  *Id.*

## II.  DISCUSSION

### A.  Plaintiff's Request for Judicial Notice

Plaintiff requests that the Court take judicial notice of the criminal convictions of Defendants Petit and Taylor for purposes of its consideration of the pending Motions (Doc. 179-1), and no Defendant has opposed.  A court's analysis is typically

---

[4]  As detailed below, the Court takes judicial notice of these facts.  *See* Request for Judicial Notice and Notice for Supplemental Authority, Doc. 179-1.

confined to the four corners of the pleading when evaluating a motion to dismiss, but a "district court may take judicial notice of certain facts without converting a motion to dismiss into a motion for summary judgment." *Universal Express, Inc. v. SEC*, 177 F. App'x 52, 53-54 (11th Cir. 2006) (finding that complaints filed in another action are judicially noticeable public records). Jury verdicts are certainly public records that may be judicially noticed. *See Jacobson v. Pfizer, Inc.*, 618 F. App'x 509, 511-12 (11th Cir. 2015) (*per curiam*). As such, the Court will take judicial notice of Petit's and Taylor's criminal convictions.

### B.    Defendants' Motions to Dismiss

#### 1.    Standard of Review for Section 10(b) Claims

Plaintiff asserts claims against Defendants for violating Sections 10(b) and Rule 10b-5 promulgated thereunder. To establish such a claim, a plaintiff must plead: "'(1) a material misrepresentation or omission by the defendant ["falsity"]; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation.'" *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37-38 (2011) (citation omitted).

"To survive a motion to dismiss, a claim brought under Rule 10b-5 must satisfy (1) the federal notice pleading requirements; (2) the special fraud pleading

requirements found in Federal Rule of Civil Procedure 9(b); and (3) the additional pleading requirements imposed by the Private Securities Litigation Reform Act of 1995 ('PSLRA')." *FindWhat Inv'r Grp. v. FindWhat.com*, 658 F.3d 1282, 1296 (11th Cir. 2011). Under the federal notice pleading standards, a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Under Rule 9(b), a complaint "must state with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Finally, the PSLRA requires a Rule 10b-5 complaint predicated on allegedly false or misleading statements to: (1) "specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed," 15 U.S.C. §78u-4(b)(1)(B); and (2) "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," 15 U.S.C. §78u-4(b)(2)(A).

In reviewing Defendants' Motions to Dismiss, the Court considers the SAC in its entirety, "accept[s] all factual allegations . . . as true," and construes them in the light most favorable to Plaintiff. *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 309-10, 322-23 (2007); *see also FindWhat*, 658 F.3d at 1296.

2.    **The MiMedx Defendants' Motions to Dismiss**

In their Motions to Dismiss, the MiMedx Defendants raise certain challenges to falsity, scienter, and loss causation but none of the remaining elements of Section 10(b), thus conceding that they were adequately pled.  *See United States v. Levy*, 379 F.3d 1241, 1243 (11th Cir. 2004); *Cross v. Point & Pay, LLC*, 274 F. Supp. 3d 1289, 1297 (M.D. Fla. 2017).  The Court addresses each of the challenged elements in turn.

a.    **Plaintiff Sufficiently Alleges Material Misstatements and Omissions by the MiMedx Defendants**

Section 10(b) and Rule 10b-5(b) make it unlawful for any person, in connection with the purchase or sale of a security, "[t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading."  17 C.F.R. §240.10b-5(b); *see also FindWhat*, 658 F.3d at 1305.  When a corporation "voluntarily reveal[s] one fact about its operations, a duty arises for the corporation to disclose such other facts, if any, as are necessary to ensure that what was revealed is not 'so incomplete as to mislead.'"  *FindWhat*, 658 F.3d at 1305 (citation omitted).

Under the PSLRA and Rule 9(b), a securities complaint alleging that the defendants made a false or misleading statement must also "specify each statement

alleged to have been misleading [and] the reason or reasons why the statement is misleading."  15 U.S.C. §78u-4(b)(1)(B).  This means that a plaintiff must specify the time, place, and content of a defendant's alleged false and misleading statements – "the who, what, when[,] where, and how: the first paragraph of any newspaper story."  *Garfield v. NDC Health Corp.*, 466 F.3d 1255, 1262 (11th Cir. 2006).

The SAC's allegations meet this standard.  The SAC identifies the alleged material misstatements and omissions made by each of the MiMedx Defendants during the Class Period and specifies the reasons why they are false and misleading.[5] These allegations include material misstatements and omissions regarding Defendants' financial statements, internal controls, growth, denials and cover-up of alleged misconduct, compliance and ethics, and relationships with its distributors. *Id*.

Plaintiff alleges that, through its Restatement, the Company has admitted that its financial results reported in every quarterly and annual filing during the Class Period (as well as press releases, investor presentations, and other communications related to those financial disclosures) were inaccurate, failed to comply with GAAP,

---

[5]  ¶¶104, 156, 160, 163, 170-171, 175-176, 179-180, 188-189, 194, 196-201, 203, 206-207, 210, 215-216, 218-220, 223-226, 233, 235, 238, 245-246, 255, 258-260, 272-273, 309-337, 381-462; Doc. 152 at 11-23.

and could not be relied upon. *See, e.g.*, ¶¶385-390. The Company has also stated that its controls over financial reporting were ineffective and, accordingly, its statements regarding internal controls were also false. ¶¶440-460; SAC Ex. 2. The Individual Defendants signed and/or certified these false and misleading financial statements. ¶¶461-462.

None of the MiMedx Defendants challenge that MiMedx's financial reporting or statements regarding GAAP compliance and internal controls were materially false and misleading during the Class Period, and the Court finds such statements are actionable. *See In re Friedman's, Inc. Sec. Litig.*, 385 F. Supp. 2d 1345, 1358-59 (N.D. Ga. 2005) (material falsity alleged where defendants issued false financial results, including improperly recognized revenue, that were ultimately restated). The Court finds that falsity is established on this ground alone.

Plaintiff pleads several additional categories of misstatements and omissions, which it alleges are rendered false by the Company's own statements. These include:

- All misstatements and omissions regarding the Company's sales and revenue growth, based on manipulated, inflated, and ultimately restated numbers. ¶¶311-312. ACIII found that "[f]ormer senior management disregarded revenue recognition rules under GAAP and directed others to take actions that caused the Company . . . to improperly recognize revenue under GAAP, which was a key factor in the Audit Committee concluding it was necessary to restate the Company's financials" and "was involved in conduct that appears to have been designed to manipulate the timing and recognition of revenue – in some

instances where the improper recognition of revenue allowed the Company to meet its published guidance." ¶342; SAC Ex. 2 at 5;

- All misstatements and omissions denying, downplaying, and covering up accusations that the Company's accounting and financial reporting were fraudulent and improper, which were made even as the fraud was ongoing. ¶¶104, 156, 160, 163, 170-171, 175-176, 179-180, 188-189, 194, 196-201, 203, 206-207, 210, 215-216, 218-220, 223-226, 233, 235, 238, 245-246, 255, 258-260, 272-273. The Company found that "evidence" uncovered in ACIII demonstrated that "after questions began to be raised," the Individual Defendants "made material misstatements and omissions" in an attempt to cover up the fraud. ¶272; *see also* SAC Ex. 2 at 4-5;

- All statements relating to the Company's compliance with legal, regulatory, and accounting standards, which were shown to be false through the Restatement and findings of ACIII. ¶¶331-333. The Company acknowledged, for example, that "Petit and Taylor set at an inappropriate 'tone at the top' at MiMedx and emphasized short-term business goals over compliance and ethics, purposely took action to disregard revenue recognition rules under GAAP and manipulate the timing and recognition of revenue[.]" ¶¶359, 450; *see also* SAC Ex. 2 at 5; and

- All statements concealing that independent distributor partners were related parties essentially controlled by MiMedx, denying the use of physician-owned distributors ("PODs"), and minimizing the importance of distributors to MiMedx's sales network. ¶¶313-330, 430-439. The Company disclosed internal control deficiencies for related parties including that "[t]here were not adequate processes in place to ensure that the accounting department (and/or Audit Committee) was aware of significant transactions with related parties so it could determine whether such transactions are appropriately approved, accounted for, and disclosed." ¶¶438, 450.

Plaintiff also asserts that the false and misleading nature of these statements is supported by a myriad of pleaded evidence, including the Restatement, the findings of ACIII, materials produced during the DOJ and SEC investigations, and the withdrawal of the Company's own auditor (EY) due to "material allegations of

14

noncompliance with laws and regulations." *See, e.g.*, ¶¶292-297, 302-308.  And, the Company has stated publicly that each of the Individual Defendants "engaged in longstanding material misconduct, which harmed MiMedx and its shareholders" and disregarded GAAP.  ¶¶342, 579; *In re Sci.-Atlanta, Inc. Sec. Litig.*, 239 F. Supp. 2d 1351, 1359 (N.D. Ga. 2002) (material falsity pled by allegations of "undisclosed channel stuffing" used to "artificially stimulate[] revenue," "hid[ing] this channel stuffing activity by falsely enumerating the reasons for the record growth," and "improperly recognized revenue in violation of the GAAP"), *aff'd*, 374 F.3d 1015 (11th Cir. 2004).  The criminal convictions bolster this conclusion.  *See* Doc. 179-1. The Court agrees that these additional misstatements and omissions are adequately alleged.

The MiMedx Defendants address only a handful of these categories of statements and for the most part, appear to disagree as to which are false.  Docs. 140-1 at 5-10; 143-1 at 8-12.  The Court is not persuaded by these scattered challenges.

For example, Petit and Taylor argue that the alleged growth statements are immaterial puffery (Doc. 143-1 at 9), but the Eleventh Circuit has made clear that these types of statements, tied to specific metrics regarding a company's fiscal health, are "far from" puffery.  *Luczak v. Nat'l Beverage Corp.*, 812 F. App'x 915, 924-25 (11th Cir. 2020); *see also In re Ebix, Inc. Sec. Litig.*, 898 F. Supp. 2d 1325,

15

1343-44 (N.D. Ga. 2012) (complaint adequately alleged materially false statements about the defendant company's growth rate).

Petit, Taylor, and Senken also contend that the alleged compliance statements are puffery because they were merely vague comments about the Company's progress towards achieving regulatory compliance. Docs. 140-1 at 9-10; 143-1 at 9-10. But, the Court's review of these statements demonstrates that they were specific statements of present fact intended to conceal and cover up the alleged fraud using supposed strong and rigorous compliance, ethics, and integrity as a way to deny misconduct and minimize allegations by "short sellers" and other critics. ¶¶331-333. Indeed, they were frequently made in response to pointed questions regarding allegations of improper practices and revenue fraud, which underscores their materiality given the market's concern. ¶¶331-333; *Keippel v. Health Ins. Innovations, Inc.*, No. 8:19-cv-421-02CPT, 2019 WL 5698329, at *7 (M.D. Fla. Nov. 4, 2019) (compliance-related statements not puffery).

Petit and Taylor further contend that their denials of misconduct are not actionable because they were not "adjudicated" and "proven" false prior, and that they were not required to "engage in self-flagellation." Doc. 143-1 at 12-13. This argument fails because Plaintiff alleges that the statements were deceptive and omitted material facts regarding the Company's true business practices and their

impact on the Company's financial results.  The Company acknowledged the Individual Defendants engaged in "purpose[ful]" misconduct, "made material misstatements and omissions" "after questions began to be raised regarding the Company's accounting practices," and "failed to appropriately respond to allegations of improper accounting activities, improper sales practices, and activities consistent with retaliation against employees who raised concerns of such inappropriate accounting and sales activity."  ¶¶272, 359, 361.  And while Defendants were not required to "engage in self-flagellation" (Doc. 143-1 at 12), they also were not permitted to mislead investors when they voluntarily chose to speak about matters related to the alleged misconduct.  *See FindWhat*, 658 F.3d at 1305.[6]

The MiMedx Defendants also dispute whether the Company controlled distributors and sold to PODs in its distribution network (Docs. 139-1 at 23; 140-1 at 8-9; 143-1 at 10-12), but such fact-based arguments are improper at the motion to dismiss stage, when "'all well-pleaded facts are accepted as true, and the reasonable

---

[6]   The MiMedx Defendants assert that there was no duty to disclose created by Item 303 (ECF Nos. 139-1 at 22; 140-1 at 10; 143-1 at 13), but as the SAC states, Defendants' alleged Item 303 violations were "[i]n addition to violating their duty to disclose the full truth to the market" under Section 10(b).  ¶334; Doc. 152 at 23 n.17 (citing *FindWhat*, 658 F.3d at 1305).

inferences therefrom are construed in the light most favorable to the plaintiff.'" *FindWhat*, 658 F.3d at 1296 (quoting *Garfield*, 466 F.3d at 1261).  The SAC pleads specific facts demonstrating that "inherently suspect" PODs were an integral part of the Company's distribution network (¶¶108-110), and that the Individual Defendants exerted influence and control over the distributors to effectuate their fraudulent goals (¶¶430-439).  Accepted as true, that is sufficient at this stage.

Petit, Taylor, and Senken also argue that they had no responsibility for certain alleged false statements.  Doc. 143-1 at 14-15 (citing *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011)); Doc. 140-1 at 7-8.  The Court rejects these arguments as well.  Plaintiff has adequately pled that they were the makers of numerous false and misleading statements because they were "person[s] . . . with ultimate authority over the statement, including its content and whether and how to communicate it," as demonstrated by "attribution within a statement or implicit from surrounding circumstances[.]"  *Janus*, 564 U.S. at 142-43.  Specifically, Plaintiff alleges that they made the following statements:

- Petit, Taylor, and Senken are each responsible for the allegedly false financial statements and other misstatements and omissions contained in the SEC Forms 10-K set forth in the SAC (which were signed by Petit, Taylor, and Senken and certified by Petit and Senken), and Petit and Senken are each responsible for the allegedly false financial statements and other misstatements and omissions contained in the SEC Forms 10-Q set forth in

18

the SAC (which were signed and certified by Petit and Senken).  ¶¶110, 303, 314, 316, 329, 387-389, 420-426, 439, 458-462;

- Several MiMedx press releases and SEC Forms 8-K alleged in the SAC included the same false financial statements contained in the Company's SEC Forms 10-Q, which were signed and certified by Petit and Senken, or in the Company's SEC Forms 10-K, which were signed by Petit, Taylor, and Senken and certified by Petit and Senken.  ¶¶181, 187, 200, 303, 311-312, 387;[7]

- Several MiMedx press releases, SEC filings, conference calls, and shareholder letters alleged in the SAC included false and misleading statements directly attributed to Petit, Taylor, or Senken within the sources themselves, including direct quotes by Petit, Taylor, or Senken.  ¶¶116, 175-176, 180-181, 188-189, 194, 198, 200-201, 214, 216, 218-220; 217, 223, 225-226, 235, 245-246, 259-260, 311, 315, 319-320, 324-325, 329, 332 (identifying the statements attributed to Petit, Taylor, and Senken);

---

[7] Under the group pleading doctrine, press releases and other group-published documents are the collective actions of corporate officers, but the Court need not decide the issue here because the SAC sufficiently attributes such documents to Petit, Taylor, and Senken in the paragraphs cited above. *See Phillips v. Sci.-Atlanta, Inc.*, 374 F.3d 1015, 1018 (11th Cir. 2004) (observing that other Circuits have applied the group pleading doctrine, which "can be broadly characterized as a presumption of group responsibility for statements and omissions in order to satisfy the particularity requirements for pleading fraud under Federal Rule of Civil Procedure 9(b)"); *In re AFC Enters., Inc. Sec. Litig.*, 348 F. Supp. 2d 1363, 1370 (N.D. Ga. 2004) ("In cases such as this of corporate fraud where misrepresentations are conveyed in prospectuses, press releases, or other group-published information, plaintiffs may rely upon the group pleading doctrine.  The group pleading doctrine permits a plaintiff to presume, for the purpose of pleadings, that these statements are the collective actions of the officers or directors of a corporation."); *In re Flowers Foods, Inc. Sec. Litig.*, No. 7:16-CV-222 (WLS), 2018 WL 1558558, at *6 (M.D. Ga. Mar. 23, 2018) ("Under the group pleading doctrine, where Plaintiff has pled the misrepresentations with particularity and the roles of the individual defendants, group-published information, such as SEC filings and press releases, can be considered the collective actions of the officers.") (citing *In re Theragenics Corp. Sec. Litig.*, 105 F. Supp. 2d 1342, 1358 (N.D. Ga. 2000)).

- In the Company press release dated September 29, 2017 and the letter to MiMedx shareholders dated November 30, 2017, Petit specifically endorsed and acknowledged his authority over the alleged false and misleading statements posted on the Company's website. ¶¶223, 235 (referencing the website postings discussed at ¶¶224, 233, 327, 329, 332);

- The allegedly false SEC letters dated January 23, February 8, April 10, and April 18, 2017 were all signed by Senken, establishing that he made the false statements and omissions therein. ¶¶157, 162-163, 317-318, 321-323; and

- The allegedly false SEC letter dated April 18, 2017 was also prepared by Petit and Taylor, along with Senken, establishing that they made the false statements and omissions therein. ¶163.

Finally, MiMedx is liable for all of the alleged false statements and omissions made by Petit, Taylor, and Senken (discussed above) as well as alleged group-published statements that were not specifically attributed to the Individual Defendants within the sources themselves (¶¶156, 160, 198-199, 203, 206-207, 210, 215, 220, 224, 233, 238, 255, 311, 326-327, 329, 332). *See, e.g.*, *Plymouth Cnty. Ret. Sys. v. Carter's Inc.*, No. 1:08-cv-02940-JOF, 2011 WL 13124501, at *12 (N.D. Ga. Mar. 17, 2011) ("'[T]he corporation itself may be treated as making press releases and public statements issued by authorized officers on its behalf, and statements made by its authorized officers to further the interests of the corporation.'") (citation omitted); *Skypoint Advisors, LLC v. 3 Amigos Prods. LLC*, No. 2:18-cv-356-FtM-29MRM, 2019 WL 4600409, at *11 n.3 (M.D. Fla. Sept. 23, 2019) (allegations that company made statements by and through other defendants sufficient under *Janus*).

20

The Court concludes that Plaintiff has adequately alleged that the MiMedx Defendants made material misstatements and omissions.

### b.    Plaintiff Sufficiently Alleges the Scienter of Each MiMedx Defendant

To satisfy the pleading requirements for scienter under Rule 9(b) and the PSLRA, a complaint must plead "'with particularity facts giving rise to a strong inference' that the defendants either intended to defraud investors or were severely reckless when they made the allegedly materially false or incomplete statements." *Mizzaro v. Home Depot, Inc.*, 544 F.3d 1230, 1238 (11th Cir. 2008) (citation omitted); 15 U.S.C. §78u-4(b)(2).   This standard is satisfied when, accepting allegations as true and considering them collectively, a reasonable person would deem the inference of scienter as least as strong as an opposing inference. *Tellabs*, 551 U.S. at 324.   "[T]he court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 326; *Mizzaro*, 544 F.3d at 1238. The inference of scienter "need not be irrefutable, *i.e.*, of the 'smoking gun' genre, or even the 'most plausible of competing inferences.'"  *Tellabs*, 551 U.S. at 324 (citation omitted); *see also Monroe Cnty. Emps.' Ret. Sys. v. Southern Co.*, No. 1:17-CV-241-MHC, 2018 WL 1558577, at *32 (N.D. Ga. Mar. 29, 2018) ("As the Eleventh Circuit has stated, 'the question . . . boils down to whether a reasonable person would infer that there was at least a fifty-fifty chance that the individual

21

defendants knew about the alleged fraud (or were severely reckless in not knowing about it).'") (quoting *Mizzaro*, 544 F.3d at 1249).

The SAC alleges that the Individual Defendants knew or recklessly disregarded the true facts surrounding MiMedx's inflated financial results and illicit sales and distribution practices, including side arrangements with distributors, channel stuffing, and improper revenue recognition. *See, e.g.*, ¶¶338-364; Doc. 152-1. As Plaintiff alleges, ACIII confirmed the Individual Defendants' direct roles in the Company's fraudulent conduct that ultimately resulted in the Restatement. ¶¶338, 342-343. Specifically, ACIII reached an "unmistakable conclusion" that the Individual Defendants engaged in "serious wrongdoing" and "extensive misconduct," including making material misstatements, disregarding revenue recognition rules, taking actions to silence whistleblowers, and setting an inappropriate tone at the top. ¶¶294, 342; SAC Ex. 2. Moreover, ACIII found that the Individual Defendants' "disregard[ing] [of] revenue recognition rules under GAAP and direct[ing] others to take actions that . . . caused the Company to improperly recognize revenue under GAAP . . . was a key factor in the Audit Committee concluding it was necessary to restate the Company's financials[.]" ¶342. Because of the ACIII findings, the Individual Defendants were retroactively terminated "for cause" by the Board of Directors for engaging in conduct detrimental

to the Company, and their incentive compensation was clawed back by the Company, thus supporting Plaintiff's allegations that the Individual Defendants were motivated to fraudulently inflate the Company's revenue in order to obtain additional compensation. ¶¶279, 289, 372. Subsequently, the Individual Defendants were charged with securities fraud by the SEC and Petit and Taylor were prosecuted by the DOJ and criminally convicted. ¶¶302-307; Doc. 179-1.

### (1)    Petit and Taylor

The Court notes that in the Eleventh Circuit, such convictions bear on Petit's and Taylor's ability to re-litigate issues determined in their criminal proceedings. *See SEC v. Rand*, 805 F. App'x 871, 875 (11th Cir. 2020) (*per curiam*) (holding that securities fraud defendants in a civil action, who were previously convicted in a DOJ criminal trial, were barred from contesting the issues decided in the criminal trial). Petit's securities fraud conviction required proof that he "willfully" made a material misrepresentation or omission, *United States v. Vilar*, 729 F.3d 62, 88, 92 (2d Cir. 2013), and Taylor's conspiracy conviction required proof that he "knowingly engaged in the conspiracy with the specific intent to commit" securities fraud, making false filings with the SEC, and/or misleading MiMedx's auditors, *United States v. Mahaffy*, 693 F.3d 113, 123 (2d Cir. 2012). The *mens rea* for the crimes for which Petit and Taylor were convicted necessarily eclipse the requisite burden

23

for alleging scienter under Section 10(b) and thus support a strong inference of their scienter here.

The Court notes that Plaintiff alleges numerous other indicia of Petit's and Taylor's scienter and that they do not challenge the vast majority. *See, e.g.*, ¶¶340-347, 350-354, 359-363, 369, 372, 374-380; Doc. 152-1.  Petit and Taylor raise a handful of arguments in an attempt to dispute the allegations (Doc. 143-1 at 16-25), such as that they did not "have any accounting training or expertise" – a fact that not only have MiMedx, Petit, and Taylor previously admitted, but that Senken affirmed in a representation to the DOJ (SAC Ex. 11 at 20).  Petit and Taylor also argue that Plaintiff's allegations do not demonstrate that they created an "inappropriate tone at the top," but merely that there was a high-pressure environment.  Doc. 143-1 at 20-24.  But Petit's and Taylor's assertion is directly contrary to ACIII's finding that they did just that.  ¶359.

Petit and Taylor also suggest that it is equally plausible that their prior denials of misconduct support their innocence and that their termination of multiple MiMedx employees during the Class Period was not retaliatory, but done for legitimate business reasons.  Doc. 143-1 at 24-25.[8]  However, the Court does not

---

[8]   And, in acknowledging that many of the counter-inferences they advance are at best "equally" or "just as" plausible as Plaintiff's inference (Doc. 143-1 at 21, 24), Petit and Taylor effectively concede the element under *Tellabs*.  *See Southern*, 2018

24

find these exculpatory inferences credible in view of the SAC's well-pled factual allegations, let alone more compelling than the strong inference of culpability offered by Plaintiff.

### (2)   Senken

Likewise, as stated above, ACIII found that Senken was a culpable participant in the alleged fraud.  *See, e.g.*, ¶¶340-342, 348; Doc. 152-1 at 3.  Plaintiff has also alleged numerous particular indicia of Senken's scienter, the majority of which he also fails to challenge.  *Id*.  The Court finds that the few arguments Senken does raise merely contradict the allegations of the SAC and are unpersuasive.  Doc. 140-1 at 10-24.  For example, Senken suggests that Plaintiff fails to plead "any glaring accounting irregularities" supporting his awareness of the fraud or that he was involved in the concealment of the fraud or harassment of whistleblowers.  *Id*. at 13-18.  But, Plaintiff alleges exactly such facts.  Plaintiff pleads that Senken had responsibility for the accounting irregularities in the Company's financial statements and also the actions that he took to cover up the fraud.  Doc. 152 at 33-38.  These actions included, *e.g.*, retaliating against Andersen for raising concerns about the Company's revenue recognition practices and making false statements to the SEC

WL 1558577, at *32; *see also* Doc. 143-1 at 2, 7 (acknowledging the relevant pleading standard).

in response to comment letters questioning the Company's revenue recognition policies. *See, e.g.*, ¶¶140-145, 317-318, 321-322.

In sum, the Court finds that Plaintiff has also adequately alleged a strong inference of Senken's scienter.

By pleading a strong inference of scienter as to each of the Individual Defendants, the SAC adequately pleads scienter as to MiMedx. *See SEC v. Watkins Pencor, LLC*, 810 F. App'x 823, 830 n.8 (11th Cir. 2020) ("'Corporations, of course, have no state of mind of their own.  Instead, the scienter of their agents must be imputed to them.'") (quoting *Mizzaro*, 544 F.3d at 1254); *see also In re Faro Techs. Sec. Litig.*, 534 F. Supp. 2d 1248, 1263 (M.D. Fla. 2007) (adopting report and recommendation) (an inference of a company's scienter exists where "the wrongdoing alleged was not a single act of a low-level employee, but rather, an ongoing method of doing business").  MiMedx's only challenge to scienter, that it has no corporate scienter through non-Defendant MiMedx employees (Doc. 139-1 at 22-23), is therefore moot.

### c. Plaintiff Sufficiently Alleges Standing and Loss Causation

MiMedx's primary argument is that Plaintiff cannot establish standing or plead loss causation because it sold all of its MiMedx shares before any corrective disclosure occurred and, as a result, there is no causal connection between Plaintiff's

investment losses and the alleged misstatements.  Doc. 139-1 at 7-21.  Senken adopts this argument in his Motion (Doc. 140-1 at 5) but Cherry,[9] Petit, and Taylor do not raise it.[10]  Plaintiff argues that the MiMedx Defendants conflate standing and loss causation, and that it has adequately pled both.  Doc. 152 at 39-50.

The Court finds the MiMedx Defendants' arguments unpersuasive and that standing and loss causation are adequately pled.  However, as standing is a threshold inquiry distinct from the element of loss causation, the Court will address each separately and in turn.

### (1)   Standing

Standing is a threshold determination as to whether a case or controversy exists under Article III such that a federal court has jurisdiction.  *Lewis v. Governor of Ala.*, 944 F.3d 1287, 1296 (11th Cir. 2019).  "In essence the question of standing

---

[9]   Cherry challenges loss causation on narrower grounds, which are discussed in Section II.B.3.c, *infra*.

[10]   Petit and Taylor suggest on Reply that they joined this and other arguments in MiMedx's Motion through a one sentence conclusion: "For the foregoing reasons, and those set forth in the accompanying motions to dismiss filed by the other named Defendants, the SAC should be dismissed."  Doc. 155 at 3 n.1 (citing Doc. 143-1 at 25).  They also stated that they "expressly join in MiMedx's arguments in the reply as well."  Doc. 159 at 3 n.1.  The Court notes that such loose statements are insufficient to constitute joinder.  *See Colite Int'l Inc. v. Robert L. Lipton, Inc.*, NO. 05-60046-CIV-DIMITROULEAS, 2006 U.S. Dist. LEXIS 109530, at *15 n.13 (S.D. Fla. Jan. 20, 2006).  Nevertheless, even assuming such joinder, these arguments are unavailing as discussed herein.

is whether the litigant is entitled to have the court decide the merits of the dispute or of particular issues." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). The MiMedx Defendants acknowledge that the Eleventh Circuit has held that "'a court must satisfy itself that the plaintiff has standing before proceeding to consider the merits of her claim[.]" Doc. 139-1 at 16 (quoting *Lewis*, 944 F.3d at 1296).

Yet, the MiMedx Defendants invite the Court to put the proverbial "cart before the horse" and undertake a merits determination on the issue of loss causation before reaching the issue of standing. The Court declines this invitation.

The Court must accept the Complaint's allegations as true and draw any inferences in Plaintiff's favor. *Lewis*, 944 F.3d at 1309. Moreover, at the pleading stage, "general factual allegations of injury resulting from the defendant's conduct may suffice" to demonstrate standing. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992); *Moody v. Holman*, 887 F.3d 1281, 1286 (11th Cir. 2018).

The MiMedx Defendants argue that Plaintiff lacks standing because it sold its stock before any actionable corrective disclosure and, accordingly, is unable to trace its economic harm to Defendants' alleged wrongful conduct. But, as Plaintiff correctly argues, this argument conflates loss causation with standing.

The Eleventh Circuit has made clear that in securities fraud cases, "'[s]tanding is established by allegations that plaintiffs bought or sold shares of the stock in

question within a reasonable period of time after the allegedly fraudulent conduct occurred to support an inference of reliance.'" *Garfield*, 466 F.3d at 1267 (citation omitted). Reliance or "transaction causation" is distinct from proximate cause (*i.e.*, loss causation). *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 341-42 (2005); *see also FindWhat*, 658 F.3d at 1311 ("While reliance focuses on the front-end causation question of whether the defendant's fraud induced or influenced the plaintiff's stock purchase, loss causation provides the 'bridge between reliance and actual damages.'") (citation omitted). As this Court stated, "'[t]he reliance element' 'ensures that there is a proper connection between a defendant's misrepresentation and a plaintiff's injury.'" *Monroe Cnty. Emps.' Ret. Sys. v. Southern Co.*, 332 F.R.D. 370, 381 (N.D. Ga. 2019) (quoting *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014)).

The distinction is fatal to the MiMedx Defendants' argument. As another court in this District explained, "'no authority even remotely suggests that proximate causation applies to the doctrine of standing. Instead, even harms that flow indirectly from the action in question can be said to be fairly traceable to that action for standing purposes.'" *Carter's*, 2011 WL 13124501, at *10 (quoting *Focus on the Family v. Pinellas Suncoast Transit Auth.*, 344 F.3d 1263, 1273 (11th Cir. 2003)). "In fact, 'in evaluating Article III's causation (or "traceability") requirement,

29

[courts] are concerned with something less than the concept of proximate cause.'" *Id.* (quoting *Focus*, 344 F.3d at 1273). "As such, proximate causation need not be sufficiently alleged for a plaintiff to successfully assert standing." *Id.* at *13

When properly evaluated, Plaintiff's standing is easily satisfied. Plaintiff alleges that it suffered economic losses as a result of Defendants' fraud. ¶¶26, 577; SAC Ex. 20. Economic harm is an "actual, concrete, and particularized," injury in fact, "'well-established . . . under federal standing jurisprudence.'" *Lewis*, 944 F.3d at 1296 (quoting *Adinolfe v. United Techs. Corp.*, 768 F.3d 1161, 1172 (11th Cir. 2014)); *see also Robbins v. Koger Props., Inc.*, 116 F.3d 1441, 1447 n.5 (11th Cir. 1997) (finding the proper measure of damages in Section 10(b) case is "the out-of-pocket rule"). Plaintiff purchased 80,280 MiMedx shares between August 14, 2017 and January 16, 2018 and did not sell its last share until February 26, 2018 for a total loss of approximately $385,000. *See* SAC Ex. 20; Doc. 9, Ex. C. Under Eleventh Circuit precedent as applied by numerous courts, that satisfies Plaintiff's standing. *See Garfield*, 466 F.3d at 1267; *see also, e.g.*, *Luczak v. Nat'l Beverage Corp.*, 400 F. Supp. 3d 1318, 1325-26 (S.D. Fla. 2019), *rev'd on other grounds*, 812 F. App'x 915 (11th Cir. 2020) (standing exhibited from the decrease in the value of his shares caused by defendants' misleading statements as evident from plaintiff's purchases and sales of company stock and associated losses); *Thorpe v. Walter Inv. Mgmt.,*

*Corp.*, No. 1:14-cv-20880-UU, 2016 WL 4006661, at *7 n.5 (S.D. Fla. Mar. 16, 2016) (plaintiffs "clearly satisfy constitutional standing as they allege a decrease in value of their . . . shares caused by Defendants' misleading statements which can be redressed by a favorable ruling in this action"); *Carter's*, 2011 WL 13124501, at *11.

### (2)   Loss Causation

To plead loss causation, a plaintiff must "provide a defendant with some indication of the loss and the causal connection that the plaintiff has in mind." *Dura*, 544 U.S. at 347.  A plaintiff must demonstrate a corrective disclosure – "a release of information that reveals to the market the pertinent truth that was previously concealed or obscured by the company's fraud," a stock price drop soon after the corrective disclosure, and information allowing "the factfinder [to] infer that it is more probable than not that it was the corrective disclosure – as opposed to other possible depressive factors – that caused at least a 'substantial' amount of the price drop." *Luczak*, 812 F. App'x at 920 (quoting *FindWhat*, 658 F. 3d at 1311-12).

"In order to qualify as corrective, the disclosure must share the same subject matter as the prior misstatement" but need not "precisely mirror" the misstatement, or provide a fact-for-fact disclosure of the relevant truth.  *FindWhat*, 658 F.3d at 1311 n.28.  In other words, "Plaintiff need not allege 'an express admission of fraud

. . . "the relevant truth concealed by the defendant's misrepresentations may be disclosed directly or indirectly.""" *Flowers*, 2018 WL 1558558, at *20 (quoting *In re Sci.-Atlanta, Inc. Sec. Litig.*, 754 F. Supp. 2d 1339, 1369 (N.D. Ga. 2010)). Moreover, the relevant truth can leak out "gradually" through a "'series of partial disclosures,'" rather than a single, complete, corrective disclosure. *Id.* at *18 (quoting *Meyer*, 710 F.3d at 1197); *see also Dura*, 544 U.S. at 342-43; *Luczak*, 812 F. App'x at 921.

In *Dura*, the Supreme Court characterized the loss causation inquiry as a "simple test" and suggested that it is subject to "ordinary pleading rules" which do "not . . . impose a great burden upon a plaintiff." 544 U.S. at 347. The parties disagree on the pleading standard to be applied. Docs. 152 at 39-40; 155 at 5 n.2. The Eleventh Circuit has not taken a position on whether the heightened pleading standards of Rule 9(b) and the PSLRA apply to allegations of loss causation. *Luczak*, 812 F. App'x at 920. However, following *Dura*, several Judges of this Court have recognized that loss causation is only subject to Rule 8's notice pleading standard. *See In re Equifax Inc. Sec. Litig.*, 357 F. Supp. 3d 1189, 1249 (N.D. Ga. 2019) (loss causation is only subject to Rule 8's notice pleading standard); *Ebix*, 898 F. Supp. 2d at 1347 (same); *In re Immucor Inc. Sec. Litig.*, No. 1:05-CV-2276-WSD, 2006 WL 3000133, at *19-20 (N.D. Ga. Oct. 4, 2006) (same). The Court need not make

this determination as it concludes that Plaintiff's loss causation allegations satisfy even the heightened pleading standards of Rule 9(b) and the PSLRA.

Plaintiff alleges that Defendants' misrepresentations and omissions caused MiMedx's stock to trade at artificially inflated prices during the Class Period, and that the truth of Defendants' fraud was revealed through a series of partial disclosures, cumulatively informing investors of Defendants' prior misstatements and omissions of material fact. ¶¶572-580. Plaintiff also alleges that each of the alleged loss causation disclosures is supported by an event study[11] conducted by a financial expert (¶573 n.684), demonstrating that it is probable that "it was the corrective disclosure – as opposed to other possible depressive factors – that caused at least a 'substantial' amount of the price drop." *Luczak*, 812 F. App'x at 920 (quoting *FindWhat*, 658 F. 3d at 1311-12). The SAC connects the alleged partial disclosures to Defendants' prior misstatements and omissions, and pleads how the disclosures individually and collectively operated to inform the market of MiMedx's true financial condition. *See Dura*, 544 U.S. at 347; *Luczak*, 812 F. App'x at 921. Accepting such allegations as true, as the Court must, the Court finds that they amply provide Defendants with an "indication of the loss and the causal connection that the

---

[11] *See FindWhat*, 658 F.3d. at 1313 (an event study is a common methodology to establish loss causation).

33

plaintiff has in mind." *Dura*, 544 U.S. at 347; *see also Luczak*, 812 F. App'x at 920; *FindWhat*, 658 F.3d at 1309.

Moreover, the Court finds persuasive that MiMedx's own statements (and chart) in its shareholder presentations support loss causation. ¶¶21, 578-579. For example, Petit acknowledged in a letter to shareholders dated November 30, 2017 that the Company's stock price decline was due to short seller reports of financial manipulations and channel stuffing. ¶578. Thereafter, on June 3, 2019, the Company stated that the misconduct of Petit and certain members of his management team "***harmed MiMedx and its shareholders*** . . . . ***The stock price has fallen substantially***, ***and the Company's market value is down more than $1 billion since February 2018.***" ¶579. On June 5, 2019, the Company clarified that such conduct caused its stock to drop "to a low of $1.15/share in December 2018 from more than $17/share ***before the accounting issues were revealed in early 2018***." *Id.* The SAC also attaches the Company's June 5, 2019 shareholder presentation entitled, "Brief History of MiMedx's Accounting Issues," which labels several of the alleged disclosures that caused MiMedx's stock price to decline in 2018 beginning with the February 20, 2018 disclosure. SAC Ex. 17 at 10; ¶¶238-239, 573, 579. Plaintiff alleges that through these statements to investors, MiMedx itself connected the February 20, 2018 stock price decline and resulting shareholder losses to the

disclosure of accounting issues on that date.   ¶579.   The MiMedx Defendants state that the Company has not admitted or conceded that the alleged fraud was revealed as early as February 2018.   Doc. 155 at 3-4.   While the Court need not reach a determination as to whether these statements constitute party admissions under Fed. R. Evid. 801(d)(2), the MiMedx Defendants' refusal to recognize the Company's own statements to shareholders and assertion of contrary legal positions are not well-taken.

That the MiMedx Defendants challenge only those corrective disclosures on or before February 26, 2018 – the day Plaintiff sold its shares – is fatal to their loss causation challenge.   Doc. 139-1 at 7-21.   As Plaintiff notes, and the MiMedx Defendants do not dispute, there are several other corrective disclosures they do not take issue with (including, for example, those on May 8, June 7, and July 2, 2018), thus conceding such disclosures are legally cognizable and sufficiently pled.   The MiMedx Defendants also previously acknowledged that the June 7, 2018 disclosure of the Restatement was a corrective disclosure of the fraud.   Doc. 100-1 at 9 ("The first disclosure that can be considered corrective of this alleged fraud occurred on June 7, 2018 . . ."), 15, 17.   As such, there is at least one, if not several, valid disclosures that revealed the fraud here, and therefore the Court finds loss causation is adequately pled.   *See Dura*, 550 U.S. at 347; *Luczak*, 812 F. App'x at 920.

35

Considering the MiMedx Defendants' challenges to the alleged disclosures on or before February 26, 2018 does not change the Court's conclusion. Defendants detail three categories, and advance that each category is not corrective as "a matter of law" under *Meyer*: (1) lawsuits and investigations; (2) allegedly misleading corrective disclosure; and (3) news and analyst reports. Doc. 139-1 at 10 (citing *Meyer*, 710 F.3d at 1200). *Meyer* made no such determination, and the MiMedx Defendants do not cite any other authority that establishes the bright-line rule they ask the Court to interpose. *See id.* The Eleventh Circuit has made clear that corrective disclosures "'can come from any source, and can take any form from which the market can absorb the information and react, so long as [they] reveal[] to the market the falsity of the prior misstatements.'" *Luczak*, 812 F. App'x at 921 (quoting *FindWhat*, 658 F. 3d at 1311-12).

The MiMedx Defendants advance that the alleged disclosures involving lawsuits and investigations are not considered corrective disclosures under *Meyer*. Docs. 139-1 at 13-14; 155 at 9-14. These include: (1) the Company's delayed financial results for FY17 and associated announcement of ACIII pertaining to distributor relationships and accounting practices (on February 20, 2018); (2) announcements of investigations (on December 31, 2014, September 7, 2017, and

February 26, 2018); and (3) the *Kruchoski/Tornquist* whistleblower litigation (on December 15, 2016). *Id.*

Plaintiff takes issue with the characterizations of these announcements and argues that the MiMedx Defendants misinterpret *Meyer*. Doc. 152 at 49. To begin, Plaintiff argues that the February 20, 2018 disclosure did not just involve the announcement of an investigation but rather disclosed that the Company was postponing the release of its financial results and had engaged independent legal and accounting advisors to conduct another investigation (ACIII) into its sales and distribution practices and related accounting treatment. ¶238. The Court agrees with Plaintiff that such events can be cognizable loss causation disclosures. *See*, *e.g.*, *Carter's*, 2011 WL 13124501, at *10 (finding announcement that company would delay quarterly earnings release to complete a review of accounting to be a partial loss causation disclosure); *In re NetBank, Inc. Sec. Litig.*, No. 1:07-CV-2298-BBM, 2009 WL 2432359, at *14 (N.D. Ga. Jan. 29, 2009) (loss causation adequately alleged by "delays in reporting financial data and filing requisite reports with the SEC"); *In re New Century*, 588 F. Supp. 2d 1206, 1213, 1237 (C.D. Cal. 2008) (finding loss causation sufficiently plead by issuance of a notification of late filing of an annual report with the SEC due to an investigation of issues relating to the need restate financials).

Moreover, Plaintiff contends the significance of this announcement is evident from the resulting 40% stock price decline, analyst reactions thereto (¶¶240, 248), and MiMedx's own statements to shareholders associating the Company's February 20, 2018 disclosure with a revelation of misconduct and accounting issues and stock price losses (¶579; SAC Ex. 17). The Eleventh Circuit has found that stock price declines following the release of news are indicative of loss causation, and this Court agrees. *See FindWhat*, 658 F.3d at 1311 ("Plaintiffs frequently demonstrate loss causation in fraud-on-the-market cases circumstantially, by . . . showing the stock price dropped soon after the corrective disclosure."); *Luczak*, 812 F. App'x at 922-23.

The MiMedx Defendants contend, however, that the February 20, 2018 disclosure cannot constitute a corrective disclosure because it is a "'commencement of an . . . investigation'" under *Meyer*. Doc. 139-1 at 13 (quoting *Meyer*, 710 F.3d at 1201). Even if that was an appropriate characterization, the Court agrees with Plaintiff that *Meyer* explicitly held that an investigation announcement may be a corrective disclosure when "coupled with" later disclosures of actual wrongdoing. 710 F.3d at 1201 n.13. The Court is not persuaded by the MiMedx Defendants' interpretation that this was *dicta*. *Meyer* clearly held that "the commencement of an SEC investigation, ***without more***, is insufficient to constitute a corrective disclosure

38

for purposes of §10(b)."  *Id.* at 1201 (emphasis added).  The Eleventh Circuit went

on to clarify:

> That is not to say that an SEC investigation could never form the basis
> for a corrective disclosure. We merely hold that the disclosure of an
> SEC investigation, standing alone and without any subsequent
> disclosure of actual wrongdoing, does not "reveal[] to the market the
> pertinent truth" of anything, and therefore does not qualify as a
> corrective disclosure.

*Id.* at 1201 n.13 (quoting *FindWhat*, 658 F.3d at 1311).  *Meyer* even provided

examples of sufficient, subsequent wrongdoing, including a corporate officer's

guilty plea or a restatement of the company's earnings and revenues.  *Id.*

There is no doubt that there was a subsequent disclosure of actual wrongdoing

here – the something "more" *Meyer* indicated.  *Id.* at 1201.[12]  The Company admitted

as much.  As Plaintiff further alleges, the announcements of investigations by

regulators and the DOJ (December 31, 2014, September 7, 2017, and February 26,

2018), the *Kruchoski/Tornquist* whistleblower lawsuit (December 15, 2016), and

ACIII and delayed financials (February 20, 2018), revealed new facts about

---

[12]  Other Circuits are in accord, reaching the same conclusion that an announcement
of an investigation considered collectively with other partial disclosures are
sufficient to plead loss causation.  *See, e.g.*, *Lloyd v. CVB Fin. Corp.*, 811 F.3d 1200,
1210-11 (9th Cir. 2016) (disclosure of an SEC subpoena together with other partial
disclosures were sufficient to plead loss causation); *Pub. Emps.' Ret. Sys. of Miss. v.
Amedisys, Inc.*, 769 F.3d 313, 323-26 (5th Cir. 2014) (disclosures of SEC and DOJ
investigations when "viewed together with the totality of the other alleged partial
disclosures" were sufficient to plead loss causation).

Defendants' fraud, causing the Company's stock price to decline significantly (¶¶173-175, 193, 208-210, 238-239, 255, 572-580), and each was followed by related disclosures that further informed investors of Defendants' actual wrongdoing.   These included, among many other things: (1) MiMedx's false financial reporting and need to restate almost every financial account over a nearly six-year period during the Class Period; (2) the results of ACIII detailing the MiMedx Defendants' fraudulent conduct; (3) MiMedx's own repeated admissions of misconduct, improprieties, and the lack of controls related to, among other things, "product pricing, payments to medical professionals, and related activities"; and (4) the criminal convictions of Petit and Taylor.   ¶¶276-308, SAC Ex. 1; Doc. 179-1.

The MiMedx Defendants counter that the causative impact of the February 20, 2018 disclosure is undermined by the subsequent drops of June 7, 2018 and December 5, 2018 (Doc. 155 at 10-11), but this too is unpersuasive.[13]   The stock price's subsequent declines in response to additional revelations of the MiMedx

---

[13] The MiMedx Defendants assert that an investigation disclosure cannot be corrective unless the stock price "lost value on news of the investigation but then did not respond to a later disclosure by the defendant." Doc. 139-1 at 14. The MiMedx Defendants' reliance on *Lloyd*, is misplaced. The Ninth Circuit held, consistent with *Meyer*, that a subsequent corrective disclosure, even absent a meaningful stock price decline, could render an earlier announced SEC subpoena corrective, but not that the absence of a meaningful stock price decline was required. 811 F.3d at 2010-11.

Defendants' fraud does not undermine the February 20, 2018 disclosure's corrective nature.

The later disclosures on June 7 and December 5, 2018 revealed additional material facts that caused further declines. *See* ¶¶265-266 (June 7, 2018 disclosure of Restatement of nearly *six* years of financial statements tied to its revenue recognition practices and findings of its third audit committee investigation, along with the departures of Senken and Cranston); ¶¶286-290 (December 5, 2018 disclosures of EY's resignation after only a year and a half and that ACIII was still ongoing, the Restatement was expanded in scope, the Company had made changes to its business practices that reduced revenue, and the Individual Defendants had impeded the Restatement process).[14] That the stock continued to fall in response to

---

[14]  The MiMedx Defendants' assertion that a civil complaint or whistleblower action cannot be a corrective disclosure is contrary to Eleventh Circuit law. *Luczak*, 812 F. App'x at 921 (corrective disclosures "can come from any source, and can take any form from which the market can absorb the information and react, so long as [they] reveal[] to the market the falsity of the prior misstatements"). *Sapssov v. Health Management Associates, Inc.*, did not hold otherwise. 608 F. App'x 855, 864 (11th Cir. 2015). There, the Eleventh Circuit held that a short seller report that "merely repackaged" information from an earlier publicly available lawsuit could not "form the basis for a corrective disclosure." *Id.* at 863-64. In such a way, *Sapssov* merely confirmed its holding in *Meyer*. *Id.* at 863. Unlike here, there were no "subsequent disclosure[s] of actual wrongdoing." *Meyer*, 710 F.3d at 1201 n.13.

the revelation of these additional facts about Defendants' fraud is hardly surprising and does not undercut the February 20, 2018 disclosure.

The MiMedx Defendants also suggest that certain disclosures are not cognizable because they are also alleged to be misstatements, including: (1) the October 13, 2015 statements in which MiMedx discussed parting ways with its largest distributor (CPM) (¶¶181-185); (2) the April 10, 2016 announcement that MiMedx fell short of revenue guidance (¶¶187-192); and (3) the November 20, 2017 press release responding to recent reports by Viceroy and pointing investors to its unorthodox website dedicated to rebutting and sparring with "short sellers" (¶¶233-234).  Docs. 139-1 at 10-11; 155 at 5-7.

Plaintiff argues that these are valid causal events that partially, but not fully, revealed the true operational condition at MiMedx and financial impact of Defendants' fraud that were accompanied by *separate* misstatements and omissions that obfuscated the true revelations or otherwise misled investors about the true extent of the fraud.[15]  Doc. 152 at 44-45.  The Court agrees with Plaintiff that these

---

[15] Plaintiff cites the following comparison of loss causation disclosures, misstatements, and omissions made on the three disclosure dates subject to the MiMedx Defendants' argument.  *See, e.g.*, October 13 2015 (*compare* ¶182 (loss causation disclosure), *with* ¶183 (omissions)); April 10, 2016 (*compare* ¶187 (loss causation disclosure), *with* ¶188 (misstatements)); November 20, 2017 (*compare* ¶233 (loss causation disclosure), *with* ¶272 (misstatements)).

constitute partial corrective disclosures, the cognizability of which the Eleventh Circuit has endorsed.  *See Meyer*, 710 F.3d at 1197; *Luczak*, 812 F. App'x at 921. Necessary to a partial disclosure is the release of part of the truth, not the whole truth, and Defendants' simultaneous misstatements in the form of denials and omissions regarding the broader array of fraud at hand had the intended effect of keeping MiMedx's stock price artificially inflated throughout the Class Period. ¶¶572-580.

Finally, the MiMedx Defendants argue that disclosures based on news articles and analyst reports released during and before February 2018 are not corrective disclosures because they are merely "repeated" information that "was already in the public domain."  Doc. 139-1 at 11-12 (citing *Meyer*, 710 F.3d at 1198).  Plaintiff contends that this argument runs afoul of *Luczak*'s holding that disclosures "'can come from any source, and can take any form[.]'"  812 F. App'x at 921-23 (quoting *FindWhat*, 658 F. 3d at 1311-12) (finding "defendants' fraudulent behavior leaked out through a series of partial disclosures," including through a *Wall Street Journal* article).  Moreover, Plaintiff contends that the MiMedx Defendants ignore the SAC's particular allegations that such news articles and analyst reports were corrective because they revealed new information that informed investors of Defendants' fraud. This new information came from non-public sources including internal MiMedx

documents, e-mails from MiMedx executives, and the reporters' and analysts' discussions with former MiMedx employees and customers.  ¶¶204, 211-212, 221, 227, 229, 231, 236, 242, 313-315, 318, 421-422; SAC Exs. 4, 21, 29-30, 36-38, 42; Doc. 152 at 49 n.49.  At this juncture, the Court accepts as true the SAC's well-pleaded allegations, and finds the alleged partial disclosures adequately conveyed new, non-public information and are sufficiently pled for purposes of loss causation under *Luczak*, 812 F. App'x at 921-23.

> ### d.  Plaintiff Sufficiently Alleges the Individual Defendants' Liability Under Section 20(a) of the Exchange Act

Plaintiff brings additional claims against the Individual Defendants for violating Section 20(a) of the Exchange Act.  Section 20(a) imposes liability on individuals who act as control persons over those who violate Section 10(b) and Rule 10b-5.  15 U.S.C. §78t(a).  Plaintiff has stated a claim under Section 20(a) by alleging:  (1) each MiMedx Defendant's primary violation of Section 10(b), as discussed above; (2) that the Individual Defendants had the power to control the general business affairs of MiMedx (¶¶34-36, 340-347); and (3) that the Individual Defendants had the requisite power to directly or indirectly control or influence the specific corporate policies at MiMedx that resulted in primary liability (*id.*).  *See*

*Mizzaro*, 544 F.3d at 1237.  The Court rejects the Individual Defendants' arguments to the contrary.  Docs. 140-1 at 24-25; 143-1 at 25 n.12.

The MiMedx Defendants' Motions to Dismiss are therefore DENIED.

### 3.    Cherry's Motion to Dismiss

Plaintiff alleges that Cherry is also liable under Section 10(b) for recklessly issuing "clean" audit reports for MiMedx's fiscal year 2013 ("FY13") through FY16 financial statements and internal controls over financial reporting ("ICFR"),[16] which misleadingly confirmed the accuracy of MiMedx's financial statements, the effectiveness of the Company's ICFR,[17] and misrepresented that the audits were in accordance with PCAOB standards.  Cherry challenges three elements of Plaintiff's claim: scienter, falsity, and loss causation.  Doc. 142-1.  The Court addresses each in turn.

---

[16]  ICFR are those processes "designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles." Cherry Report of Independent Registered Public Accounting Firm, MiMedx 2016 Form 10-K, issued on March 1, 2017.

[17]  Cherry issued an adverse audit report in FY16 over MiMedx's ICFR, but only due to a single material weakness in income tax accounting that had been identified by MiMedx management.  It did not disclose any additional material weaknesses in MiMedx's accounting for revenue, ineffective control environment or absence of internal controls to develop reliable financial statements.  ¶466 n.556.

### a.    Scienter

Plaintiff alleges that Cherry was reckless in issuing its audit reports.  Doc. 153 at 12-33.[18]  The parties agree that an auditor's recklessness is governed by *Brophy v. Jiangbo Pharms., Inc.*, 781 F.3d 1296, 1307 (11th Cir. 2015) (citation omitted):

> "[Plaintiffs] must prove that the accounting practices were so deficient that the audit amounted to no audit at all, ***or*** an egregious refusal to see the obvious, ***or*** to investigate the doubtful, ***or*** that the accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts."

(emphasis added).  Docs. 142-1 at 18; 153 at 12.  The Court notes that *Brophy* sets forth this standard in the disjunctive, identifying several distinct ways an auditor's recklessness may be established.  *Id*.

With this in mind, the Court evaluates Plaintiff's allegations of Cherry's scienter.

### (1)    Magnitude and Duration of the Accounting Fraud and Associated Restatement

Plaintiff argues that the duration and magnitude of the MiMedx fraud and GAAP violations that took place under Cherry's watch support a strong inference of scienter.  Doc. 153 at 31-33.  Cherry does not dispute that as a result of the fraud,

---

[18]  As the standard for pleading scienter is set forth above in Section II.B.2.b, the Court will not reiterate it here.

the Company had to restate nearly every financial account on its balance sheet and income statement for nearly six years. *Id.* Nor does Cherry challenge that during FY14 through FY16, MiMedx's net income was overstated by 144%, diluted EPS by 143%, and accounts receivable by approximately $146 million. ¶394. Plaintiff alleges that the massive scale of the fraud is also evident from the Company's acknowledgement that revenue on all distributor and customer sales dating back to 2012 ($870 million) should have been delayed until payment was actually received (instead of on shipment). ¶¶308, 382, 386; Doc. 153 at 32.

Cherry challenges the magnitude of the Restatement, arguing that it only resulted in a downward sales revision of $86 million. Doc. 161 at 19. It also argues that the Court should not consider the magnitude of the fraud because such allegations are "fraud by hindsight" and even a "massive" restatement does not raise a strong inference of scienter where the fraud was concealed from Cherry. *Id.*

The Court is not persuaded by Cherry's arguments. A "[d]rastic overstatement of accounts" is a factor that the Eleventh Circuit has found significant in the cumulative scienter analysis. *Garfield*, 466 F.3d at 1267-68. The Company's misstatement of virtually every financial account for almost six years, to the degree pleaded, alleges a significant accounting fraud – particularly where such overstatement enabled the Company to falsely meet its published financial guidance.

47

¶¶17, 135, 342, 394.  This supports a strong inference that Cherry "should have known or was severely reckless not to know that its unqualified audits were misleading."  *In re Carter's, Inc. Sec. Litig.*, No. 1:08-CV-02940-AT, 2012 WL 3715241, at *2 (N.D. Ga. Aug. 28, 2012); *accord In re SunBeam Sec. Litig.,* 89 F. Supp. 2d 1326, 1345 (S.D. Fla. 1999); *see also In re Eagle Building Techs., Inc. Sec. Litig.*, 319 F. Supp. 2d 1318, 1328 (S.D. Fla. 2004) (substantial overstatement of financials combined with other red flags sufficient to establish the requisite level of scienter).

### (2)   Allegations that Cherry Ignored Red Flags

Plaintiff also contends that scienter is supported by Cherry's disregard of a proliferation of "red flags" present during Cherry's audits of MiMedx.  ¶¶482-539, 552-556, 562-563.  Red flags are "'those facts which come to the attention of an auditor which would place a reasonable auditor on notice that the audited company was engaged in wrongdoing to the detriment of its investors.'"  *Garfield*, 466 F.3d at 1268 (citation omitted).  "[R]ed flags must be viewed in the aggregate; defendants 'cannot secure dismissal by cherry-picking only those allegations susceptible to rebuttal and disregarding the remainder.'"  *In re Refco Inc. Sec. Litig.*, 503 F. Supp. 2d 611, 658 (S.D.N.Y. 2007) (citation omitted); *accord Eagle*, 319 F. Supp. 2d at 1331 ("When the GAAS and GAAP violations are combined with the magnitude of

48

the fraud or red flags . . . it is apparent that the 'factual picture painted by the complaint reveals allegations providing a sufficient inference of scienter.'") (citation omitted); *Flowers*, 2018 WL 1558558, at *13 ("an inference of scienter may be raised when defendants ignore 'red flags' warning them that their actions may be fraudulent") (quoting *Ziemba v. Cascade Int'l, Inc.*, 256 F.3d 1194, 1209-10 (11th Cir. 2001)). "[T]he more facts alleged that should cause a reasonable auditor to investigate further before making a representation, the more cogent and compelling a scienter inference becomes." *Carter's*, 2012 WL 3715241, at *6 n.17.

The Court notes that Cherry has raised several factual disputes as to the alleged red flags. Doc. 142-1 at 24-29. However, at this stage of the proceedings, the Court's job is not to resolve such disputes but to determine whether Plaintiff's allegations, accepted as true, present a cogent inference of scienter that is at least equal to Cherry's. *Eagle*, 319 F. Supp. 2d at 1329 ("This Court cannot accept the movant's mere allegations as true, especially in light of the fact-specific red flags pled by the Plaintiffs."). Nor will the Court choose between divergent views over the proper application of a myriad of PCAOB and other accounting standards, which is clearly the province of experts following discovery. The Eleventh Circuit instructs that even at the summary judgment stage, following fact discovery, the Court is not to resolve a "battle of experts" but is left with no choice but send a case to trial where

49

opposing experts faithfully present competing views of proper conduct.  *See Arthur v. Thomas*, 974 F. Supp. 2d 1340, 1352-53 (M.D. Ala. 2013) (citing *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013)).  The Court will wait until it is presented with a more developed factual record to determine if a genuine issue of triable fact remain, and if trial is necessary.

Bearing this in mind, the red flags alleged are summarized as follows.

### (i)      Charges of Improper Revenue Recognition at MiMedx by Whistleblowers

Plaintiff pleads that Cherry was presented with multiple credible charges of improper revenue recognition and sales practices at MiMedx by current and former MiMedx employees, which Cherry failed to adequately investigate.  Doc. 153 at 18-27.  Plaintiff alleges that these charges suggested an increased fraud risk at MiMedx,[19] identified "potential illegal acts" as defined by PCAOB standards, and implicated the accuracy of MiMedx's financial statements and the effectiveness of ICFR.  ¶521.  As such, Plaintiff alleges that Cherry was required under PCAOB

---

[19]  *See* AU §316.85 (delineating fraud risk factors including, *e.g.*, management pressure to achieve guidance or market expectations, transactions with related parties, significant end-of-period transactions, deficient ICFR, non-financial management's excessive participation in the selection of accounting principles, and known history of securities laws violations by management).

standards to undertake additional evidence-gathering to support its audit reports and increase its professional skepticism of management representations. ¶¶521-537, 552 (citing standards of the American Institute of Certified Public Accountants ("AU") §§316, 317). According to Plaintiff, Cherry was reckless in failing to do so. *Id.*

*Andersen*. Plaintiff alleges that Cherry's failure to investigate concerns raised by the Company's Controller, Andersen (MiMedx's top accountant and a former auditor), is strong evidence of Cherry's recklessness. Doc. 153 at 18-20.

Plaintiff alleges that Andersen joined MiMedx as its Controller in August 2015 and had only served in this role for approximately five months when he identified serious accounting and internal control concerns. ¶¶140, 145. Cherry does not dispute that it was made aware of Andersen's concerns during the course of its FY15 audit of MiMedx, in January 2016. ¶¶140, 145; Doc. 142-1, at 7. In particular, Andersen voiced strong concerns that revenue from certain 2015 transactions involving MiMedx distributors AvKARE, SLR, Stability, and First Medical, and pre-2015 revenue from AvKARE, was being prematurely recognized in violation of GAAP. ¶¶522-525. Specifically, Andersen stated his belief that the revenue that the Company was attributing to AvKARE sales in 2015 was inflated because AvKARE "ha[d] a right of return and doesn't meet all of the [GAAP] criteria, and implicitly doesn't pay MiMedx until the tissue has been implanted." ¶522.

51

Moreover, Andersen refused to sign a management representation letter[20] to Cherry attesting to the accuracy of MiMedx's financial statements as part of the FY15 audit, and was shortly thereafter removed from the Controller position by MiMedx management.  ¶¶145, 526-527, 561.

The SAC pleads that these serious allegations, brought by Andersen, the Company's lead accountant, as well as his refusal to sign the management representation letter and his suspicious departure from MiMedx, were significant "red flags" putting Cherry on notice of the need to engage in additional analysis. ¶¶523-527.  Specifically, Cherry was required to act with heightened professional skepticism to determine the reliability of the representations it received and to confirm significant information from AvKARE, SLR, Stability, and First Medical in order to evaluate their effect on MiMedx's financial statements.  ¶¶523-525. However, Plaintiff alleges that Cherry never interviewed Andersen, nor did it sufficiently evaluate the Company's transactions with the identified distributors. ¶528.  Instead, Cherry exclusively relied on MiMedx management's representations

---

[20]   A management representation letter is a letter that external auditors obtain as part of their audit, which contains written representations regarding, among other things, the reliability of a company's financial statements and ICFR assessment.  The letter is typically signed by a company's CEO, CFO and its lead accountant.  AU §§333.01, 333.06; AS 5.75.

that they had spoken with Andersen and he had no "further concerns," and a memorandum prepared by Senken, Petit, and Taylor that refuted Andersen's allegations.   Plaintiff pleads this violated a host of PCAOB standards and was severely reckless.  Doc. 142-1; ¶¶526-529.

Cherry counters that it did not ignore Andersen's allegations; that it attempted to interview Andersen but was told he had obtained an attorney and was unavailable. Doc. 142-1 at 26.[21]   Plaintiff alleges that, nevertheless, to the extent Cherry was denied access to needed evidence, it was required to disclaim any opinion over MiMedx's financials, not affirm a clean bill of health.  *See* ¶528 (citing AU §317.19) ("if the auditor is precluded from obtaining sufficient appropriate evidential matter to evaluate whether an illegal act . . . is likely to have, occurred, the auditor generally should disclaim an opinion . . ."); *see also United States v. Arthur Young & Co.*, 465 U.S. 805, 818 (1984) ("If the auditor were convinced that the scope of the examination had been limited by management's reluctance to disclose matters . . . , the auditor would be unable to issue an unqualified opinion as to the accuracy of the corporation's financial statements.  Instead, the auditor would be required to issue a

---

[21]  This, however, is contradicted by the SAC, which reflects that Cherry wanted to meet with Andersen, "but believes [Senken] said that [Andersen] wasn't available" and does not reflect any communication with counsel occurred.  SAC Ex. 11 at 7.

qualified opinion, an adverse opinion, or a disclaimer of opinion, thereby notifying the investing public of possible potential problems inherent in the corporation's financial reports.").  Cherry also defends its audit by stating that it questioned sales to Stability (one of the distributors implicated by Andersen's allegations) and demanded a written representation from management addressing the substance of Andersen's allegations (but was lied to by management in their representation).[22] Doc. 142 at 26-27.  Again, however, the SAC avers that Cherry failed to perform any confirmation procedures in regard to Stability.  ¶¶511-512.  The Court, however, is not positioned to resolve this factual dispute, nor is it tasked with doing so at this stage, where it instead accepts the allegations as true and draws all reasonable inferences in Plaintiff's favor.  *Tellabs*, 551 U.S. at 324.

Plaintiff alleges that Cherry's reliance on the MiMedx Defendants' representations was particularly reckless under the circumstances because: (1) Andersen had also raised concerns as to the effectiveness of the internal control environment at MiMedx, which necessarily cast doubt on management's representations (¶¶522-529); (2) the investigation into Andersen's allegations was

---

[22]  The new representation stated that "all sales recorded by the Company to new distributors in 2015 [SLR, Stability and First Medical] have met the four revenue recognition criteria of ASC 605." *Id*.

woefully inadequate, as Andersen's direct supervisor Senken immediately prepared a memorandum rebutting the allegations rather than conducting an appropriate investigation into their substance (¶526); (3) Petit's and Taylor's involvement in defending MiMedx's accounting treatment of the transactions Andersen flagged was itself suspicious, as they were non-accounting employees, and their involvement in GAAP-compliance decisions indicated possible management override of any ICFR in place (¶527 (citing AU §316.85.A.2)); (4) Petit's prior companies had been charged with engaging in improper revenue recognition practices by the SEC and improper sales practices by the DOJ (¶¶374-376); (5) in 2014, the Company had previously faced allegations and a HHS-OIG investigation relating to the Company's unlawful sale, marketing, and promotion of its EpiFix product (¶¶172-174, 552); and (6) as discussed below in Section II.B.3.a(2)(ii), there were numerous red flags calling into question the veracity of management's representations and indicating MiMedx's off-book agreements concerning the very distributors and transactions flagged by Andersen (*i.e.*, related-party ties, failure to tender timely payment, unusual end-of-quarter transactions), which Cherry did not appropriately investigate or willfully ignored despite its obligations under AU §§316 and 317. As such, Plaintiff argues that Cherry's response to Andersen's allegations and blind reliance on management's representations is strongly suggestive of an "egregious refusal to

see the obvious," and failure "to investigate the doubtful[.]" *Brophy*, 781 F. 3d at 1307; Doc. 153 at 1.

The Court agrees. Given Andersen's position and understanding of the Company's financial statements and the seriousness of the concerns he raised, Cherry's reliance on management's representations, despite the numerous red flags to the contrary, supports a strong inference of Cherry's scienter. ¶525. *See Sunbeam*, 89 F. Supp. 2d at 1344-45 (scienter pled where red flags included failure to investigate employee tips). "[T]he independent certified public accountant cannot be content with the corporation's representations" but "is ethically and professionally obligated to ascertain for himself as far as possible whether the corporation's [financial statements] have been accurately stated." *Young*, 465 U.S. at 818. Cherry was required to look beyond and question the reliability of management representations given the red flags that existed. *See* ¶494 (citing AU §333.04 ("[I]f a representation made by management is contradicted by other evidence, the auditor should investigate . . . and consider the reliability of the representations made[.]")).

***Kruchoski and Tornquist***. The SAC also pleads that Cherry failed to adequately evaluate or exercise appropriate professional skepticism regarding allegations of improper accounting raised by two additional whistleblowers,

Kruchoski and Tornquist, in advance of Cherry's FY16 audit of MiMedx.  Kruchoski and Tornquist are alleged to have been terminated for raising issues of healthcare fraud, channel stuffing, the misrepresentation and premature recognition of revenue, delayed reporting of product returns so as to manipulate the Company's profit figures, and the Company's issuance of false and misleading statements to the SEC and investors.  ¶¶151-153.  Following their terminations, Kruchoski and Tornquist were immediately sued by the Company and days later, they filed a formal whistleblower complaint with the SEC under penalty of perjury, and civil claims against MiMedx.   ¶¶153-154.   The Company acknowledges that MiMedx management retaliated against them for raising concerns – much as Petit is alleged to have done to employee whistleblowers at one of his previous companies, Healthdyne.  ¶¶342, 375.

Plaintiff alleges that Kruchoski's and Tornquist's allegations of fraudulent revenue recognition practices, corroborative of Andersen's a year prior, further indicated an increased risk of fraud at the Company and, again, required Cherry to perform auditing procedures to evaluate a "potential illegal act" and appropriately determine that MiMedx's financial statements were not materially misstated.  ¶¶530-539, 552 (citing AU §317).  Plaintiff alleges that Cherry, again, and in violation of PCAOB standards, did not do so.  ¶¶530-539.

Cherry argues that it was entitled to rely on Troutman Sanders LLP's ("Troutman") investigation for the Audit Committee (ACII), which found no evidence supporting the allegations. ¶¶155-156, 160. Cherry contends that, as the SLC found that it was reasonable for the Audit Committee to rely on Troutman, this refutes any allegation it was unreasonable for Cherry to do the same. Plaintiff alleges that Cherry's reliance on ACII as exoneration for its own conduct is particularly dubious as it refused to participate in the SLC investigation into, among other things, the sufficiency of ACII. *See* SAC Ex. 13. The SLC also found that the Audit Committee reasonably relied on the internal controls testing conducted by Cherry, which Plaintiff alleges were non-existent. *Id.* Indeed, the PCAOB found that Cherry's FY16 audit, including over ICFR, was deficient in many respects. The Court agrees with Plaintiff that Cherry was required to follow PCAOB standards in conducting its audit, and could not just abdicate its professional responsibilities to another party not required to follow the same professional standards. Cherry did not act reasonably in relying on the opinions of others in lieu of ascertaining for itself whether MiMedx's financial statements were accurately stated. *Young*, 465 U.S. at 817-18. The Court finds that Plaintiff adequately alleges that Cherry's reliance on ACII was insufficient to fulfill its independent, professional responsibilities in the face of myriad, credible red flags that should have led it to question the veracity of

58

management representations that formed the basis for the Audit Committee's conclusion.  ¶¶494-497, 534-536; SAC Ex. 2.

Plaintiff also alleges that the obvious insufficiency of ACII (and ACI) is evident from the fact that Cherry's successor, EY, almost immediately questioned the adequacy of these investigations.  And, EY found that key questions surrounding the allegations remained unresolved, and refused to complete its annual audit until another internal investigation into the Company's sales, distribution, and accounting practices was conducted.  Doc. 153 at 23-25; ¶¶165-166, 531-533.

Moreover, Plaintiff alleges that, through ACII, Cherry received independent, third-party evidence from AvKARE's counsel admitting to the parties' side arrangement.  ¶¶494-496, 534.  Again, however, Cherry placed greater reliance on representations from Petit and an accounting white paper prepared by Senken (with the assistance of Petit and Taylor) asserting that there were no side agreements with AvKARE.  *Id.*  Cherry's reliance on these representations is alleged to have been particularly unreasonable as Kruchoski and Tornquist had specifically implicated Petit and Taylor in the alleged fraud.[23]  ¶497 (citing AU §230.09 ("the auditor should

---

[23]  The Court also notes that another MiMedx employee, Jon Vitale, filed a *qui tam* suit against MiMedx on January 19, 2017, also during Cherry's FY16 audit.  ¶21 n.11.  Vitale, like Kruchoski and Tornquist, charged MiMedx with improper sales practices and specifically, with violation of the False Claims Act and federal Anti-Kickback Statute.  *Id.*; *see also* ¶¶46-47.  This should also have served as a red flag

not be satisfied with less than persuasive evidence" that a company's financial statements are free of material misstatement "because of a belief that management is honest")).

Cherry contends that it took "concrete steps in response to" the Kruchoski/Tornquist allegations, including requiring MiMedx to retain an independent revenue recognition expert to look at AvKARE.  Doc. 161 at 13-14. Plaintiff alleges, however, that the expert was engaged to opine on a discrete issue – AvKARE's revenue recognition under its recently amended PDA, which had altered AvKARE's official right of return – not the broad array of concerns Andersen, Kruchoski, or Tornquist voiced.  ¶535.  Moreover, Cherry understood that the revenue expert retained by the Company was explicitly relying on management representations, not unlike itself.  *See* SAC Ex. 12 at 57.  That is hardly exonerating at this stage.  *Special Situations Fund III QP LP v. Marrone Bio Innov., Inc.*, 243 F. Supp. 3d 1109, 1122 (E.D. Cal. 2017) ("[A]n auditor cannot inoculate itself from liability by stating its opinion was based on another opinion. . . . Like philosophy's apocryphal turtles, EY's view of auditing is that 'it's opinions all the way down.'"). Further, the expert, with his limited engagement, did not have the benefit of being

to Cherry and caused it to exercise heightened professional skepticism regarding MiMedx management's representations.

aware of a multitude of existing red flags that Plaintiff alleges Cherry was aware of. ¶¶535-536.  Plaintiff alleges that the reasonableness of Cherry's reliance on the revenue recognition expert is further undercut by the fact that, as discussed below, despite the revenue expert's retention, the PCAOB still found Cherry's FY16 audit severely deficient.  ¶¶540-546.

Cherry's reliance on ACII and the revenue recognition expert, if proven, may ultimately lend support to a good faith defense.  However, at this stage of the proceedings, without the benefit of discovery, the Court cannot state that they are sufficient as a matter of law to negate an otherwise strong inference of scienter.[24] An auditor is not discharged from its obligation to independently reach its own conclusions and evaluate contradicting evidence with skepticism by relying on the opinions of others.  *See Young*, 465 U.S. at 818.  Nor can an auditor base its report on materials "which on their face or under the circumstances suggest that they cannot be relied on without further inquiry[.]"  *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 279 (3d Cir. 2006); *see also Omanoff v. Patrizio & Zhao LLC*, No. 14-723, 2015 WL 1472566, at *4 (D.N.J. Mar. 31, 2015).  Accordingly, the Court

---

[24]  The Court notes that numerous questions remain as to what the expert reviewed, what formed the basis of his opinion, and the contents of the opinion itself.  Such fact questions are best left for discovery.

finds that Cherry's alleged failure to independently and sufficiently investigate Kruchoski's and Tornquist's allegations further supports an inference that Cherry acted with severe recklessness under *Brophy*, 781 F.3d at 1307.

            **(ii)**        **Signs that MiMedx had Off-the-Books Arrangements With Its Distributors**

Plaintiff alleges that Cherry failed to investigate MiMedx's arrangements and suspicious end-of-quarter transactions with the same large distributors that were flagged by the employee whistleblowers.  ¶¶481-520.  Plaintiff asserts that in so doing, Cherry not only violated PCAOB standards, it failed to recognize several apparent red flags that would have alerted a reasonable auditor to additional fraud risk factors and MiMedx's off-the-books arrangements with key distributors.[25]  *See* ¶485 (citing AU §316.85.A2); ¶498 (citing AS 15 (requiring additional audit evidence to support an audit report as the level of fraud risk increases)).

*Large End-of-Quarter Transactions*.  Plaintiff alleges that many of the same transactions that Andersen specifically raised should have been red flags to Cherry

---

[25] The SAC identifies additional standard audit procedures that would have permitted a reasonable auditor to identify and address the improper revenue recognition at MiMedx, including analytical procedures relating to revenue using disaggregated data, customer confirmations, inquiries of the audit client's sales and marketing personnel or in-house counsel regarding terms of transactions, and physical inventory checks. ¶¶482-487.

due to their size, timing and unusual nature, and would have been easily identifiable had Cherry been performing basic audit procedures.  ¶¶484-487, 501-502, 504-506. For example:

- **SLR**, a brand new distributor and start-up company, placed MiMedx's second largest sale in history (9.5% of 3Q15 revenue) as its first ever order from MiMedx.  ¶505.  At the time, SLR had generated less than $500,000 in annual revenue, and so its $4.6 million order should have been thoroughly audited and SLR's ability to pay for the order investigated.  ¶¶506-507; 502 (citing AU §316.66A);

- **First Medical** placed two large orders in a single month (June 2015), the second of which was placed in the last few days of 2Q15 and was not secured by a line of credit, as per the parties' contract (¶513).  The purchase order for this sale explicitly stated that the payment terms were not pursuant to the parties' distribution agreement but "As per Email Dated: 25/06/2015."  ¶513; and

- **Stability** did not even have a signed official distribution agreement at the time of its unusually large 3Q15 and 4Q15 orders (despite MiMedx management's representations that it did), and it did not pay for the product pursuant to the contract.  ¶¶510-512.

Plaintiff argues that even a surface-level review of these repeated, large, end-of-quarter transactions should have raised Cherry's suspicions.  Doc. 153-1 at 27-30.  That it did not is alleged to be particularly egregious when considered with MiMedx management's repeated public statements highlighting the Company's ability to consistently achieve its quarterly revenue guidance, and the fact that the Company frequently exceeded its revenue targets by less than $500,000.  ¶396.

*Distributors Failed to Timely Pay*.  In addition to the above, Plaintiff alleges that the Company's distributors, and, in particular, those flagged by Andersen, failed to timely pay.  The lack of timely payments evidenced that the Company was not abiding by its contractual payment terms for each distributor and raised doubt over "collectability," one of the four revenue recognition criteria. ¶405.

For example, Plaintiff alleges that under the Company's contractual agreement with AvKARE (which was publicly filed and known to Cherry), AvKARE was required to pay orders within 45 days.  ¶491.  However, Plaintiff alleges that had Cherry conducted a basic audit procedure to calculate AvKARE's Days' Sales Outstanding ("DSO"), it would have seen that, as early as 2012 (the start of the parties' relationship), AvKARE was not paying for MiMedx goods in accordance with the parties' stated 45-day contractual term.  ¶¶491-492, 495. Instead of 45 days, it would have seen that AvKARE's DSOs were 137, 97, 80, and 125 for 2012, 2013, 2014, and 2015, respectively, suggesting there was a side arrangement.  ¶491.  Had Cherry acted as a reasonable auditor and in compliance with PCAOB standards, it would have conducted such calculations at the time of its audits, particularly as AvKARE was MiMedx's largest customer from 2012 through 2015.  ¶¶488-489.

Likewise, Plaintiff alleges that PCAOB standards also require auditors to evaluate the financial capability of parties with respect to significant uncollected balances, especially when the balances originate from significant and unusual transactions.  ¶502 (citing AU §316.66A).  Plaintiff alleges that Cherry ignored numerous facts demonstrating that the Company's other distributors failed to pay on time, had significant uncollected balances, or lacked the ability to pay.  ¶¶505, 508, 510, 513.  Specifically, Plaintiff alleges that:

- SLR had only paid for $1.4 million of the $5.6 million owed for its 3Q15 and 4Q15 orders by the time Cherry issued its FY15 audit report (*i.e.*, 75% of its balance was overdue) (¶508);

- First Medical failed to make any payments for its 2Q15 and 4Q15 sales (approximately $2.4 million) until 2017 (¶513); and

- Stability had paid for only 10% of its $2.2 million 3Q15 order by the end of 4Q15, and had not sold any material amount to end customers (¶510).

The Company has since admitted that it recognized revenue from these distributors prematurely, "when collection was not reasonably assured."  ¶298.  Plaintiff argues that these facts indicated the presence of side agreements and an increased risk of improper revenue recognition and, accordingly, Cherry's disregard of or failure to discover them was severely reckless. ¶¶505, 508, 510, 513.

*Related-Party Ties*.  Plaintiff also alleges that Cherry ignored numerous facts that indicated that SLR and CPM were "related parties" under MiMedx's control,

which presented an additional fraud risk requiring Cherry's particular scrutiny and testing for independent economic substance.  ¶¶517-520, SAC Ex. 11 at 7.  For example, the owners of both CPM and SLR had lucrative "consulting" agreements with MiMedx, of which Cherry was or should have been aware.  ¶¶503-505; SAC Ex. 11 at 9.  Plaintiff alleges that despite the fact that Andersen raised concern as to a $4.6 million sale to SLR (¶142), the second largest sale in Company history, to a brand-new distributor without a prior sales history, owned and operated by a former MiMedx sales employee (¶505), Cherry failed to carefully scrutinize this transaction.  Indeed, Cherry Audit Partner Paul Chancey told criminal authorities that Cherry did not conduct any audit confirmation procedures to test whether SLR had economic substance separate and apart from MiMedx.  *See* ¶507; SAC Ex. 11 at 7.  Plaintiff alleges that Cherry never investigated or even inquired about these related-party ties in violation of PCAOB standards.  ¶¶118, 500-509, 520.

The Court finds that, viewed collectively, the many red flags alleged in the SAC contribute to a strong inference that Cherry was severely reckless in its audits of MiMedx's revenues.  Contrary to Cherry's contentions, the red flags pled in the SAC go beyond "a plaintiff's typical laundry list of PCAOB violations" (Doc. 142-1 at 21).  Rather, the SAC pleads specific facts that Cherry recklessly ignored, failed to acknowledge, or failed to evaluate in accordance with PCAOB standards.  At this

stage of the litigation, where the Court must take the facts pled as true, such allegations are sufficient. *See Cosby v. KPMG, LLP*, No. 3:16-CV-121-TAV-DCP, 2018 WL 3723712, at *5 (E.D. Tenn. Aug. 2, 2018) ("Plaintiffs in this case have satisfied the scienter requirement by pleading that the defendant deliberately ignored 'highly suspicious facts.'") (citation omitted); *Sun v. Han*, No. 15-703 (JLL), 2015 WL 9304542, at *17 (D.N.J. Dec. 21, 2015) (allegedly suspect DSOs and accounts receivables contributed to inference of scienter); *In re Am. Bus. Fin. Servs., Inc. Noteholders Litig. v. BDO Seidman LP*, No. 05-0232, 2008 WL 3405580, at *9 (E.D. Pa. Aug. 11, 2008) (auditor's scienter pled where plaintiff alleged "numerous, significant and specific auditing decisions and repeated decisions not to investigate multiple red flags"); *Gould v. Winstar Commc'ns, Inc.*, 692 F.3d 148, 160 (2d Cir. 2012) (auditor's scienter shown by "repeated[] fail[ure] to scrutinize serious signs of fraud by an important client, including . . . significant end-of-quarter transactions"); *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, 381 F. Supp. 2d 192, 240 (S.D.N.Y. 2004) (that auditor "ignored the fact that material amounts of advertising revenue came in at the end of each quarter just in time to . . . hit its . . . revenue targets" demonstrated scienter).

### (3)   EY's Immediate Recognition of Problems
### at MiMedx and Resignation

Plaintiff alleges that the inference that Cherry did not act as a reasonable auditor in its audits of MiMedx is underscored by a comparison to the conduct of EY, its replacement as MiMedx's auditor. ¶¶164-165, 537-539, 557.

EY succeeded Cherry on August 4, 2017.  ¶206.  Plaintiff alleges that EY was only engaged as MiMedx's auditor for five months before raising serious questions about MiMedx's revenue recognition with respect to AvKARE and the adequacy of the prior Audit Committee investigations, which Cherry had readily relied upon. ¶¶164-165, 532, 539.  In response to EY's concerns, MiMedx management provided a memorandum substantially similar to the memorandum provided to Cherry about the Company's revenue recognition policies related to AvKARE.  ¶537.  However, while Cherry accepted the representations in the memorandum, even in the face of contrary independent evidence, EY refused to do so.  Instead, EY demanded that an independent investigation be conducted into the same allegations of improper revenue recognition raised by Andersen, Kruchoski, and Tornquist during Cherry's audits before it would complete its own audit of the Company.  ¶¶469, 537.  Without an audit report from EY, the Company was forced to delay the issuance of its financial results, as announced on February 20, 2018.  ¶168.

Moreover, Plaintiff alleges that EY's noisy resignation before ACIII was completed supports a strong inference that Cherry failed to act reasonably in conducting its audit.  ¶¶469, 499, 557.  In conjunction with EY's resignation, EY advised MiMedx that: (1) it could not rely on representations from MiMedx's management; (2) it had uncovered information it believed impacted the reliability of previously issued financial statements; (3) it needed to significantly expand the scope of the audit due to the existence of unresolved material allegations of inappropriate financial reporting and noncompliance with laws and regulations; and (4) it had found that "the internal controls necessary for the Company to develop reliable financial statements do not exist." ¶292.  Plaintiff alleges that EY's findings were soon corroborated by three other accounting firms (KPMG LLP, AlixPartners, LLP, and BDO USA, LLP) hired by MiMedx's Board of Directors and SLC.  ¶¶168, 296, 358.

Plaintiff argues that the ability of EY to discover the ongoing revenue fraud within months of its first audit of MiMedx, while Cherry did not identify or investigate concerns about MiMedx's revenue recognition in over five years of supposedly detailed audits with a long-term client, supports an inference of severe

69

recklessness.  Doc. 153 at 25-27.  ¶¶164-168, 537, 539.[26]  *See Brophy*, 781 F.3d at 1307 (finding that recklessness is established where "accounting judgments which were made were such that no reasonable accountant would have made the same decisions if confronted with the same facts"); *Katz v. Image Innovations Holdings, Inc.*, 542 F. Supp. 2d 269, 275 (S.D.N.Y. 2008) (findings of new auditor based on information available at time of original audit supported recklessness); *In re Longwei Petroleum Inv. Holding, Ltd. Sec. Litig.*, No. 13 CV 214(HB), 2014 WL 285103, at *6 (S.D.N.Y. Jan. 27, 2014) ("[W]here 'the "red flags" would be clearly evident to any auditor performing its duties' it is reasonable to infer that the auditor 'must have noticed the "red flags," but deliberately chose to disregard them.'") (citation omitted); *Sunbeam*, 89 F. Supp. 2d at 1346 (auditor's alleged knowledge of its client's internal workings and history with the company supported claim that failures to observe GAAS amounted to recklessness for purposes of Section 10(b)).

---

[26] The Court is not persuaded by Cherry's assertions that EY had access to information that Cherry did not have at the time it performed its audits such that EY would naturally have reached a different outcome.  To the contrary, Cherry is alleged to have had access to employee whistleblower allegations of improper sales practices and revenue recognition (including the Controller's), evidence of various side agreements and ineffective ICFR, and myriad other red flags.  Moreover, Cherry's proposed alternative explanation for EY's findings is undercut by the brief window of time between Cherry's replacement as auditor and EY identifying the problems at MiMedx. Doc. 161 at 16.

### (4)     Allegations that Cherry was Severely Reckless in Stating that MiMedx's Internal Controls Were Effective

As part of its responsibilities as MiMedx's external auditor, Cherry was required to audit MiMedx's assessment of its ICFR and reach its own, independent conclusion as to their effectiveness.  ¶548.  Plaintiff alleges Cherry was severely reckless in issuing clean audit reports of MiMedx's ICFR during FY13 through FY15, and failing to disclose material weaknesses in ICFR in its FY16 report.

First, Plaintiff points to corroborative findings that the Company's ICFR were non-existent during the Class Period.  In resigning its engagement as MiMedx's auditor, EY advised that "the internal controls for the Company to develop reliable financial statements do not exist" (¶292) and the Company acknowledged in its Restatement that "[m]anagement did not have processes in place to assess whether controls within each of the five components of internal control were present and functioning as intended."[27]  ¶¶450, 456.  Further, as detailed below, in its 2017 inspection of Cherry, the PCAOB determined Cherry's FY16 audit of MiMedx's

---

[27]  Plaintiff also alleges that it was only after the Restatement that the Company developed an internal audit function for the company and actually documented key policies and internal control procedures for significant accounting areas (with a focus on revenue recognition issues).  ¶447.

ICFR to be severely deficient in multiple respects,[28] such that its audit report failed its essential purpose and should not have been issued.  ¶544.

Second, a Company's "tone at the top" is alleged to be critically important to a company's control environment under AS 5, such that Cherry was required to assess whether "management's philosophy and operating style promote effective internal control over financial reporting" and "whether sound integrity and ethical values, particularly of top management, are developed and understood."  ¶548. Plaintiff alleges that Cherry could not have performed any reasonable assessment of the control environment at MiMedx, or it would have observed what ACIII found – the "recurrent trend in which former senior management emphasized short-term business goals over compliance and ethics," that former senior management "was not receptive to employee concerns," and "failed to respond appropriately to compliance issues."  ¶550.  Moreover, the Kruchoski/Tornquist lawsuit, brought during Cherry's FY16 audit, contained detailed allegations about the overly aggressive and unethical sales culture fostered by MiMedx management, including Taylor and Petit, and was highly corroborative of Andersen and other known fraud

---

[28]  For example, the PCAOB identified Cherry's "failure, in an audit of ICFR to perform sufficient procedures to test the design and operating effectiveness of controls over" sales and sales-related estimates and the existence and valuation of accounts receivable as significant audit deficiencies.  ¶544.

risk factors from Petit's prior companies, and the HHS-OIG investigation of similar improper sales practices.  ¶¶3-4, 148-154, 448, 530, 552.

Plaintiff alleges that these facts were known or obvious to Cherry at the time of its audits.  ¶¶548-557.  Cherry's continuous declaration of the effectiveness of the Company's ICFR (when in fact its ICFR did not exist) was therefore severely reckless because Cherry either completely failed to assess the ICFR or it failed "to see the obvious, or to investigate the doubtful[.]" *Brophy*, 781 F.3d at 1307.  Plaintiff further asserts that the fact that Cherry's audits of ICFR amounted to none at all also casts doubt on the sufficiency of Cherry's entire audit process.  ¶546 (describing Viceroy's questioning of how Cherry was able to audit MiMedx's financials when its replacement, EY, later "quit on the apparent basis that internal controls to verify MiMedx's financials 'do not exist'"); *Brophy*, 781 F.3d at 1307; *In re Hamilton Bancorp., Inc. Sec. Litig.*, 194 F. Supp. 2d 1353, 1359 (S.D. Fla. 2002) (lack of internal controls in problem areas contributed to finding that audit "amounted to no audit at all or an egregious refusal to see the obvious or investigate the doubtful").

Cherry argues that its identification of a material weakness in MiMedx's ICFR in FY16 means that it could not have conducted "no audit at all."  Doc. 142-1 at 29. The Court is unpersuaded.  An audit in name only, without adherence to objective PCAOB standards, is no audit at all.  That Cherry was apprised by MiMedx of an

73

unrelated weakness in ICFR does not undercut its recklessness but rather demonstrates that Cherry was placed on notice that additional review was needed (but was allegedly not performed).  Moreover, the PCAOB found that Cherry's audit of ICFR that same year – FY16 – was severely deficient and its audit report unsupported.  Accordingly, the Court finds that Cherry's adverse FY16 audit report of ICFR does not undercut an inference of Cherry's scienter.

### (5)    PCAOB Reports Finding Cherry's Audits Deficient

Plaintiff alleges that in consecutive reviews of Cherry's audits, the PCAOB repeatedly found that Cherry failed to adhere to appropriate auditing standards, and that those reports are supportive of Cherry's scienter.[29]  ¶¶540-546.  Of particular importance, the PCAOB's review of Cherry's FY16 MiMedx audit determined that Cherry had failed to perform sufficient procedures in auditing MiMedx's revenues, among other things.  ¶¶543-546.[30]  The PCAOB concluded that Cherry's audit was

---

[29]  The PCAOB inspects registered public accounting firms to assess compliance with the Sarbanes-Oxley Act, PCAOB standards, SEC rules, and professional standards in connection with the firm's performance of audits, issuance of audit reports and related matters, and provides each firm with a report summarizing any deficiencies identified through the inspection.  ¶540 n.649.

[30]  The PCAOB found that Cherry did not "take into account all relevant audit evidence, regardless of whether it appear[ed] to corroborate or contradict the assertions in the financial statements."  ¶496.

so deficient that "the auditor issued an opinion without satisfying its fundamental obligation to obtain reasonable assurance about whether the financial statements were free of material misstatement and the issuer maintained effective ICFR," and that "the audit opinion should not have been issued." Doc. 153 at 15. Accordingly, and as supported by prior PCAOB reports that provided notice to Cherry of deficiencies in its audit procedures (¶¶540-543),[31] Plaintiff argues that the PCAOB's findings are strong support for an inference that Cherry's audit was so deficient as to have amounted to no audit at all. *Brophy*, 781 F.3d at 1307.

The Court does not find persuasive Cherry's arguments that the PCAOB reports were made "with the benefit of hindsight," and so cannot support an inference of scienter. *See* Doc. 161 at 7. While it is true that the 2017 PCAOB inspection was completed after Cherry issued its FY16 audit report, it was based on a contemporaneous review of the work Cherry performed, Cherry's work papers,

---

[31] The PCAOB's 2012 and 2015 reviews of Cherry's audits also found a number of the same severe deficiencies in Cherry's procedures to audit revenues and revenue-related estimates. ¶¶541-542. The Court further observes that Judge Story also found noteworthy the PCAOB's findings in 2007 and 2010 that Cherry had failed to "obtain sufficient competent evidential matter to support its opinions and procedures," in a case involving Ebix. *Ebix*, 898 F. Supp. 2d at 1345; ¶565. These prior PCAOB-identified audit deficiencies, as well as those identified by the PCAOB in its 2007 and 2010 reviews, puts Cherry on reasonable notice, and Plaintiff correctly argues that these prior acts may have evidential value with regard to Cherry's motive, intent, or absence of mistake. See Fed. R. Evid. 404(b).

interviews with the auditors involved, and the information available to Cherry at the time of its audit.[32]  And, although the PCAOB reports contain disclaimers – *i.e.*, that "the Reports' findings are not determinations that an auditor has committed any conduct for which it could be sanctioned and do not constitute conclusive findings for purposes of imposing legal liability" (Doc. 161 at 8) – such language does not bear on whether the PCAOB's findings can, when viewed collectively with other factual allegations, support an inference of scienter at the pleading stage.  The issue of whether the PCAOB, operating as an independent agency and within its own rules, could or should have sanctioned Cherry for its deficient FY16 audit is not before the Court and is irrelevant to the Court's analysis of the reports for Cherry's scienter under Section 10(b).

The Court acknowledges that certain courts have rejected PCAOB warnings as indicative of scienter, but concludes that the PCAOB reports alleged here, particularly the PCAOB's 2017 report, contribute to the mosaic of scienter allegations that the Court should collectively consider.  *See Longwei*, 2014 WL 285103, at *5 (scienter established where auditor "had been rebuked for audit deficiencies in the past by the [PCAOB]").  The PCAOB reports further demonstrate

---

[32]  *See* PCAOB Release No. 104-2018-114 (July 26, 2018), at n.5.

Cherry's deviation from PCAOB standards, and, in the "broader context" of the SAC's allegations, "paint a portrait of an audit so reckless that a jury could infer intent to defraud." *Carter's*, 2012 WL 3715241, at *6 & n.17 ("[I]n examining allegations of scienter, courts have looked at . . . the breadth and scope of the auditor's deviation from GAAP or GAAS"); *Suprema*, 438 F.3d at 281 ("'[I]n many cases the most plausible means to prevail on a section 10(b) claim against an auditor . . . will be to show how specific and not insignificant accounting violations collectively raise an inference of scienter.'").

### (6)    Motive

Motive is not required to support scienter. *Tellabs*, 551 U.S. at 325. Nevertheless, Plaintiff argues that an inference of scienter is also supported by allegations in the SAC concerning Cherry's financial motives to turn a blind eye toward MiMedx management's improper revenue recognition scheme. ¶¶564-565. An auditor's financial relationship with its client does not by itself establish scienter, but it can contribute to an inference of scienter. *See In re Acclaim Ent., Inc. Sec. Litig.*, No. 03-CV-1270(JS)(ETB), 2006 WL 8434998, at *3 (E.D.N.Y. Mar. 23, 2006). Specifically, Plaintiff alleges that as Cherry was a regional auditor, with only 35 clients as of the time the 2017 PCAOB report was published, MiMedx was a significant client and source of revenue. ¶546. MiMedx was a growing company

with growing audit fees for Cherry (increasing over 140% between 2013 and 2016).

¶564.  It was Cherry's top public client in terms of fees by FY16.  *Id.*  The Court

finds that while not independently determinative, these allegations further support a

strong inference that Cherry turned a blind-eye to the many red flags alleged in the

SAC.  *Tellabs*, 551 U.S. at 325.

### (7)    Cherry's Opposing Inference That It Acted in Good Faith

Cherry argues that an inference of scienter in this case is "impossible" because

Cherry was "deliberately deceived regarding the true" facts by the MiMedx

Defendants.  Doc. 161 at 4-5.  Cherry argues that "[t]he much 'more compelling

inference generated by the pleadings is that [Cherry] failed to discover or disclose

the fraud . . . because great lengths were taken to conceal the fraud from prying eyes,'

and 'that [Cherry] was one of the principle ***targets*** of the fraud, rather than its

perpetrator.'"  Doc. 142-1 at 20 (citation omitted).

Cherry will have the opportunity after full discovery to argue that it acted in

good faith, but the Court agrees with Judge Totenberg that such a defense is

premature at this juncture.  *Carter's*, 2012 WL 3715241, at *7; *accord Refco*, 503

F. Supp. 2d at 658 n.40.  At the pleading stage, any such deception does not undercut

the strong inference of Cherry's scienter that arises from Plaintiff's allegations that

Cherry disregarded a multitude of red flags, failed to appropriately investigate

multiple corroborative and credible charges of fraud raised by MiMedx employees, failed to act in accordance with PCAOB standards, and blindly relied on management representations despite evidence that they could not be credited.  Too much is unknown about the scale, scope, and manner of deception at this stage, and Cherry's defense will be undermined if, as Plaintiff pleads, management's deception was in fact known or knowable by Cherry.  Therefore, at the pleading stage, the Court cannot conclude as a matter of law that management's deception negates the strong inference of Cherry's scienter that arises from Plaintiff's allegations.

The Court concludes that the totality of these allegations, and others in the SAC, present a compelling inference of Cherry's recklessness that is stronger than Cherry's opposing inference.  *Tellabs*, 551 U.S. at 323.

## b.   Actionable Misstatements or Omissions

Plaintiff alleges that Cherry made materially false and misleading representations and omitted material facts[33] when it issued three categories of statements in its audit reports.  These include statements that: (1) the Company's financial statements fairly represented MiMedx's financial position and results of operation in conformity with GAAP; (2) MiMedx's ICFR were effective; and (3)

---

[33]  The standard for pleading material false statements and omissions is fully set forth above in Section II.B.2.a, so the Court need not repeat it here.

79

Cherry's audit was conducted in accordance with the standards of the PCAOB.  Doc. 153 at 33-34; ¶¶566-570.

Cherry argues that its audit reports are statements of opinion and thus are inactionable under the Supreme Court's decision in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184-95 (2015).  Doc. 142-1 at 31-34.[34]  The Court disagrees.  Considering audit reports to be *per se* inactionable opinions under *Omnicare* as Cherry suggests would eliminate auditor liability, which is clearly not what the Supreme Court intended, nor what any court has determined.  The Eleventh Circuit has not addressed the issue of whether statements in audit reports are statements of opinion or fact,[35] and the Court finds that it need not resolve that issue here as Cherry's statements are actionable in either light.

First, Plaintiff alleges that Cherry's statements were materially false and misleading and omitted material fact.  *FindWhat*, 658 F.3d at 1305.  MiMedx has

---

[34]  While *Omnicare* addressed Section 11 liability, the Eleventh Circuit has adopted its analysis in the Section 10(b) context.  *Carvelli v. Ocwen Fin. Corp.*, 934 F.3d 1307, 1322 n.7 (11th Cir. 2019).

[35]  In *Omnicare*, the Supreme Court recognized that "some sentences that begin with opinion words like 'I believe' contain embedded statements of fact[.]"  575 U.S. at 185.  Moreover, it stated that the "magic words" of "'we believe' or 'we think'" "can preface nearly any conclusion, and the resulting statements, as we have shown, remain perfectly capable of misleading investors," so liability is not nullified merely by their presence.  *Id.* at 192-93.

stated, and no Defendant challenges, that all of the Cherry-approved financial statements during these periods were materially inaccurate, failed to comply with GAAP and needed to be restated because they could not be relied upon.  ¶¶382-386.  Likewise, Plaintiff has alleged that the Company's internal controls were non-existent, and the Company agrees with that as well.  ¶¶440-457, 460.  Finally, as detailed above, Plaintiff alleges that Cherry did not in fact conduct its audits in compliance with PCAOB standards.  The SAC specifies which PCAOB standards Cherry allegedly violated, pleads numerous facts explaining how and when the violations occurred, and, with respect to Cherry's FY16 audit report, alleges that the PCAOB found Cherry's audit to be deficient and failed to comply with PCAOB standards.  ¶¶463-570.  These well-pled allegations, accepted as true, demonstrate falsity under Rule 9(b).  *Garfield*, 466 F.3d at 1262.

Even if the Court were to consider the statements as opinions, *Omnicare* does not foreclose liability.  *See* 575 U.S. at 184-195.  Rather, the Supreme Court held that opinions are actionable where: (1) the speaker did not honestly hold or believe the stated opinion; (2) the opinion contained "embedded statements of fact" that are misleading; or (3) there are "facts going to the basis for the issuer's opinion . . . whose omission makes the opinion statement at issue misleading to a reasonable person reading the statement fairly and in context."  *Id.*

81

The statements at issue easily fall within *Omnicare*.  It is not determinative, given the other facts alleged, whether Cherry believed that its audit reports were false at the time they were made.  Doc. 161-1 at 2-3.  That is only one of the avenues for liability under *Omnicare*.  Here, the Court finds that Cherry's statements contained embedded facts – "'a thing done or existing' or 'an actual happening.'" *Omnicare*, 575 U.S. at 182.  Statements expressing certainty as to compliance with objective and uniform standards such as PCAOB standards or GAAP are factual, just as *Omnicare* illustrated "the coffee is hot" is.  *Id*.  An auditor can state with certainty that it followed such standards as it understood them, including that it exercised the independent judgment that is required by those standards.  *See Special Situation Funds*, 243 F. Supp. 3d at 1120 (auditor's stated compliance with PCAOB standards was a representation of embedded fact).

Second, as Plaintiff argues, the statements in Cherry's audit reports omitted many material "facts going to the basis for the issuer's opinion . . . whose omission makes [them] misleading to a reasonable person reading the statement fairly and in context."  *Omnicare*, 575 U.S. at 194; Doc. 153 at 34; ¶¶463-563, 566-571.[36]

_____

[36]  While a statement of opinion is not misleading just because external facts show the opinion to be incorrect, a reasonable investor may understand an opinion "to convey facts about how the speaker has formed the opinion – or, otherwise put, about the speaker's basis for holding that view.  And if the real facts are otherwise, but not provided, the opinion statement will mislead its audience."  *Omnicare*, 575 U.S. at

Plaintiff has identified numerous red flags that Cherry was aware of during the course of its audits but failed to appropriately investigate, and it did not disclose those facts in its audit reports.  Doc. 161 at 33; ¶¶463-563.  The Court agrees that these undisclosed facts, which may impact a reasonable investor's assessment of the reasonableness of and reliance on Cherry's reports, were material facts, the absence of which "will mislead its audience."  *Id.* at 189.

The Court finds Cherry's statements actionable under *FindWhat*, 658 F.3d at 1305, and *Omnicare*, 575 U.S. at 194, 196.

### c.   Loss Causation

Cherry also moves to dismiss the SAC on loss causation grounds,[37] arguing that Plaintiff fails to adequately allege a causal connection between the misrepresentations alleged and the economic loss suffered by investors.  Doc. 142-1 at 34.  Plaintiff alleges that such causal connection is firmly established because, without the audit reports and certifications from Cherry, MiMedx would not have been permitted to file its false and misleading financial reports with the SEC.

---

189.  Omission liability can attach due to both "facts about the inquiry the issuer did or did not conduct or the knowledge it did or did not have," if the omission of those facts makes the statement misleading.  *Id.* at 194.

[37] The standard for pleading loss causation is fully set forth above in Section II.B.2.c, so the Court need not repeat it here.

Moreover, the SAC provides the necessary linkage between the many pleaded revelatory events, all of which "touch upon" Defendants' fraud, which was in turn reflected in the Company's fraudulently issued – but certified – financial statements. *See* ¶¶572-580; *FindWhat*, 658 F.3d at 1309.  Thus, given the applicable standards detailed above, this is sufficient to establish loss causation at the pleading stage.  *See Refco*, 503 F. Supp. 2d at 657 (announcement that audited company's prior financial statements could not be relied upon could serve as corrective disclosure of auditor's false statements); *Longwei*, 2014 WL 285103, at *6 (same); *Cosby*, 2018 WL 3723712, at *7 (loss causation against auditor alleged where "Plaintiffs have provided detailed allegations of loss, and they have clearly asserted that this loss was a direct result of disclosures regarding [the audited company's] operating loss and questionable cost figures").

Cherry's Motion to Dismiss is therefore DENIED.

## III.   CONCLUSION

For the foregoing reasons, it is **ORDERED AND ADJUDGED** that Defendants' Motions to Dismiss are **DENIED**.

**SO ORDERED**, this _____ day of _____ 2021.

_____

84

_____
William M. Ray, II
United States District Judge
Northern District of Georgia

85